# Attachment C

**31 Hofstra L. Rev. 913**

Hofstra Law Review
Summer 2003

Article

Copyright (c) 2003 American Bar Association

# AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES

**Revised Edition**

**February 2003**

**\*914** Copyright (c) 2003 American Bar Association. All rights reserved. The materials herein may be reproduced, in whole or in part, provided that such use is for informational, non-commercial purposes only and any copy of the materials or portion thereof acknowledges original publication by the American Bar Association and includes the title of the publication, the name of the author, and the legend 'Copyright 2003 American Bar Association. Reprinted by permission.' Requests to reproduce materials in any other manner should be addressed to: Copyrights & Contracts Department, American Bar Association, 750 N. Lake Shore Drive, Chicago, IL 60611; Phone: 312-988-6102; FAX: 312-988-6030; E-mail: copyright@abanet.org.

Only the text of the black-letter guidelines has been formally approved by the American Bar Association House of Delegates as official policy. Although it does not express the formal position of the American Bar Association, the commentary serves as useful explanation of the black-letter Guidelines. The text of the commentary published herein is the final version, which was officially released by the ABA on October 24, 2003. It supersedes all prior drafts which had been distributed for informational purposes.

## Acknowledgments

The American Bar Association gratefully acknowledges the assistance of the members of the Advisory Committee and others who contributed valuable insight and expertise to this endeavor: Barry Alberts, private practitioner, Schiff Hardin & Waite, Chicago, Illinois (Representative from ABA Section of Litigation); Sylvia Bacon, Judge (Retired), Superior Court of the District of Columbia, Washington, D.C. (Representative from ABA Criminal Justice Section); Stephen B. Bright, Director, Southern Center for Human Rights, Atlanta, Georgia (Representative from National Association of Criminal Defense Lawyers); David I. Bruck, private practitioner, Columbia, South Carolina (Representative from Federal Death Penalty Resource Counsel); Mardi Crawford, Staff Attorney, New York State Defenders Association, Albany, New York; Lawrence J. Fox, private practitioner, Drinker Biddle & Reath LLP, Philadelphia, Pennsylvania (Chair, ABA Special Committee on Death Penalty Representation); Stephen K. Harper, Co-coordinator, Capital Litigation Unit, Miami-Dade County Public Defender's Office, Miami, Florida (Representative from National Legal Aid and Defender Association); Randy Hertz, Professor of Law, New York University School of Law, New York, New York; Henderson Hill, private practitioner, Ferguson, Stein, Chambers, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, North Carolina (Representative from ABA Special Committee on Death Penalty Representation); Denise LeBoeuf, Director, Capital Post-conviction Project of Louisiana, New Orleans, Louisiana; Norman Lefstein, Professor of Law and Dean Emeritus, Indiana University School of Law, Indianapolis, Indiana; Margaret Love, of counsel, Asbill Moffitt & Boss, Chartered, Washington, D.C.; Jill Miller, Forensic Social **\*915** Worker, Madison,

Wisconsin; L. Jonathan Ross, private practitioner, Wiggin & Nourie, P.A., Manchester, New Hampshire (Chair, ABA Standing Committee on Legal Aid and Indigent Defendants); Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; Randolph Stone, Professor of Law, University of Chicago School of Law, Chicago, Illinois (Representative from ABA Standing Committee on Legal Aid and Indigent Defendants); Ronald J. Tabak, private practitioner, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York (Representative from ABA Section of Individual Rights and Responsibilities); Scott Wallace, Director, Defender Legal Services, National Legal Aid and Defender Association, Washington, D.C.; and Denise Young, private practitioner, Tucson, Arizona (Representative from Habeas Assistance and Training Project).

The following ABA staff and ABA entities participated in this project: Terry Brooks; Rebecca Coffee; Shubhangi Deoras; Judith Gallant; Robin Maher; Melanie Mays; Elisabeth Semel; the Association of the Bar of the City of New York; Criminal Justice Section; the Special Committee on Death Penalty Representation; the Section of Individual Rights and Responsibilities; the Standing Committee on Legal Aid and Indigent Defendants; the Section of Litigation; and the Senior Lawyers Division.

Finally, the ABA thanks Raoul Schoenemann, Chris Spaulding, and Janice Bergmann, who served as consultants to this project, and expresses its special appreciation to the Reporter, Eric M. Freedman, Professor of Law, Hofstra University School of Law, Hempstead, New York.

### *916 Introduction

This revised edition of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases is the product of a two-year long drafting effort. In April 2001, the ABA Standing Committee on Legal Aid and Indigent Defendants and the ABA Special Committee on Death Penalty Representation jointly sponsored the ABA Death Penalty Guidelines Revision Project to update the Guidelines, which were originally adopted by the ABA House of Delegates in 1989. An Advisory Committee of experts was recruited to review and identify necessary revisions, including representatives from the following ABA and outside entities: ABA Criminal Justice Section; ABA Section of Litigation; ABA Section on Individual Rights and Responsibilities; ABA Standing Committee on Legal Aid and Indigent Defendants; ABA Special Committee on Death Penalty Representation; National Association of Criminal Defense Lawyers; National Legal Aid and Defender Association; Federal Death Penalty Resource Counsel; Habeas Assistance and Training Counsel; and State Capital Defenders Association.

Expert capital litigators were retained as consultants to the ABA Death Penalty Guidelines Revision Project to incorporate the decisions of the Advisory Committee into preliminary drafts of revisions. Drafts were considered by Advisory Committee members during several day-long meetings in Washington, D.C. as well as follow-up discussions. The final working draft of the revisions was approved by the ABA Standing Committee on Legal Aid and Indigent Defendants and the ABA Special Committee on Death Penalty Representation. The ABA House of Delegates approved the revised edition of the Guidelines on February 10, 2003.

### *917 Table Of Contents

GUIDELINE 1. 1--OBJECTIVE AND SCOPE OF GUIDELINES ................................................ 919
GUIDELINE 2. 1--ADOPTION AND IMPLEMENTATION OF A PLAN TO PROVIDE HIGH ........ 939
QUALITY LEGAL REPRESENTATION IN DEATH PENALTY CASES
GUIDELINE 3. 1--DESIGNATION OF A RESPONSIBLE AGENCY ........................................ 944
GUIDELINE 4. 1--THE DEFENSE TEAM AND SUPPORTING SERVICES .............................. 952
GUIDELINE 5. 1--QUALIFICATIONS OF DEFENSE COUNSEL ......................................... 961
GUIDELINE 6. 1--WORKLOAD ....................................................................... 965
GUIDELINE 7. 1--MONITORING; REMOVAL ........................................................ 970
GUIDELINE 8. 1--TRAINING .......................................................................... 976
GUIDELINE 9. 1--FUNDING AND COMPENSATION ................................................. 981
GUIDELINE 10. 1--ESTABLISHMENT OF PERFORMANCE STANDARDS .......................... 989

GUIDELINE 10. 2--APPLICABILITY OF PERFORMANCE STANDARDS — 993
GUIDELINE 10. 3--OBLIGATIONS OF COUNSEL RESPECTING WORKLOAD — 996
GUIDELINE 10. 4--THE DEFENSE TEAM — 999
GUIDELINE 10. 5--RELATIONSHIP WITH THE CLIENT — 1005
GUIDELINE 10. 6--ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL — 1012
GUIDELINE 10. 7--INVESTIGATION — 1015
GUIDELINE 10. 8--THE DUTY TO ASSERT LEGAL CLAIMS — 1028
GUIDELINE 10. 9.1--THE DUTY TO SEEK AN AGREED-UPON DISPOSITION — 1035
GUIDELINE 10. 9.2--ENTRY OF A PLEA OF GUILTY — 1044
GUIDELINE 10. 10.1--TRIAL PREPARATION OVERALL — 1047
GUIDELINE 10. 10.2--VOIR DIRE AND JURY SELECTION — 1049
GUIDELINE 10. 11--THE DEFENSE CASE CONCERNING PENALTY — 1055
GUIDELINE 10. 12--THE OFFICIAL PRESENTENCE REPORT — 1071
GUIDELINE 10. 13--THE DUTY TO FACILITATE THE WORK OF SUCCESSOR COUNSEL — 1074
GUIDELINE 10. 14--DUTIES OF TRIAL COUNSEL AFTER CONVICTION — 1076
GUIDELINE 10. 15.1--DUTIES OF POST-CONVICTION COUNSEL — 1079
GUIDELINE 10. 15.2--DUTIES OF CLEMENCY COUNSEL — 1088

**\*919  GUIDELINE 1.1--OBJECTIVE AND SCOPE OF GUIDELINES**

A. The objective of these Guidelines is to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction.

B. These Guidelines apply from the moment the client is taken into custody and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, post-conviction review, clemency proceedings and any connected litigation.


**Definitional Notes**

**Throughout these Guidelines:**

1. As in the first edition, "should" is used as a mandatory term.

2. By "jurisdiction" is meant the government under whose legal authority the death sentence is to be imposed. Most commonly, this will be a state (as opposed to, e.g., a county) or the federal government as a whole. The term also includes the military and any other relevant unit of government (e.g., Commonwealth, Territory). Where a federal judicial district or circuit is meant, the commentary will so state.

3. The terms "counsel," "attorney," and "lawyer" apply to all attorneys, whether appointed, retained, acting pro bono, or employed by any defender organization (e.g., federal or state public defenders offices, resource centers), who act on behalf of the defendant in a capital case. When modified by "private," these terms apply to both pro bono and retained attorneys.

4. The term "custody" is used in the inclusive sense of Hensley v. Municipal Court, 411 U.S. 345, 350-51 (1973).

  **\*920**  5. The term "post-conviction" is a general one, including (a) all stages of direct appeal within the jurisdiction and certiorari, (b) all stages of state collateral review proceedings (however denominated under state law) and certiorari, (c) all stages of federal collateral review proceedings, however denominated (ordinarily petitions for writs of habeas corpus or motions pursuant to 28 U.S.C. § 2255, but including all applications of similar purport, e.g., for writ of error coram nobis), and including all applications for action by the Courts of Appeals or the United States Supreme Court (commonly certiorari, but also, e.g., applications for original writs of habeas corpus, applications for certificates of probable cause), all applications for interlocutory relief (e.g., stay of execution, appointment of counsel) in connection with any of the foregoing, and (d) all requests, in any

form, for pardons, reprieves, commutations, or similar relief made to executive officials, and all applications to administrative or judicial bodies in connection with such requests. If a particular subcategory of post-conviction proceeding is meant, the language of the relevant Guideline or commentary will so state.

6. The terms "defendant," "petitioner," "inmate," "accused," and "client" are used interchangeably.

7. The terms "capital case" and "death penalty case," are used interchangeably.

8. The terms "defender organization," "Independent Authority" and "Responsible Agency" are defined in Guideline 3.1 and accompanying commentary.

9. The term "Legal Representation Plan" is defined in Guideline 2.1.


**History of Guideline**

The commentary to the original edition of this Guideline stated that it was designed to express existing "practice norms and constitutional requirements." This thought has been moved to the black letter in order to emphasize that these Guidelines are not aspirational. Instead, they embody the current consensus about what is required to provide effective defense representation in capital cases.

 **\*921**   The first edition of this Guideline stated that the objective in providing counsel in death penalty cases should be to ensure the provision of "quality legal representation." The language has been amended to call for "high quality legal representation" to emphasize that, because of the extraordinary complexity and demands of capital cases, a significantly greater degree of skill and experience on the part of defense counsel is required than in a noncapital case.

The Guidelines formerly covered only "defendants eligible for appointment of counsel." Their scope has been revised for this edition to cover "all persons facing the possible imposition or execution of a death sentence." The purpose of the change is to make clear that the obligations of these Guidelines are applicable in all capital cases, including those in which counsel is retained or representation is provided on a pro bono basis. The definition of "counsel" reflects this change.

The use of the term "jurisdiction" as now defined has the effect of broadening the range of proceedings covered. In accordance with current ABA policy, the Guidelines now apply to military proceedings, whether by way of court martial, military commission or tribunal, or otherwise.

In accordance with the same policy, the words "from the moment the client is taken into custody" have been added to make explicit that these Guidelines also apply to circumstances in which an uncharged prisoner who might face the death penalty is denied access to counsel seeking to act on his or her behalf (e.g., by the federal government invoking national security, or by state authorities exceeding constitutional limitations). This language replaces phraseology in the former Guidelines which made them applicable to "cases in which the death penalty is sought." The period between an arrest or detention and the prosecutor's declaration of intent to seek the death penalty is often critically important. In addition to enabling counsel to counsel his or her client and to obtain information regarding guilt that may later become unavailable, effective advocacy by defense counsel during this period may persuade the prosecution not to seek the death penalty. Thus, it is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible--well before the prosecution has actually determined that the death penalty will be sought.

These Guidelines, therefore, apply in any circumstance in which a detainee of the government may face a possible death sentence, regardless of whether formal legal proceedings have been commenced or the prosecution has affirmatively indicated that the death penalty will be sought. The case remains subject to these Guidelines until the imposition  **\*922**  of the death

penalty is no longer a legal possibility. In addition, as more fully described in the commentary, these Guidelines also recognize that capital defense counsel may be required to pursue related litigation on the client's behalf.

### Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-1.2(c) & cmt. ("The Function of Defense Counsel in Capital Cases"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.1 (3d ed. 1992) ("Objective").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.2 cmt. (3d ed. 1992) ("Systems for Legal Representation").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-6.1 (3d ed. 1992) ("Initial Provision of Counsel").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-6.2 (3d ed. 1992) ("Duration of Representation").

ABA House of Delegates Resolution 8C (adopted Feb. 5, 2002).

### Commentary

### Introduction

In 1932, Mr. Justice Sutherland, writing for the United States Supreme Court in Powell v. Alabama, [1] a death penalty case, acknowledged that a person facing criminal charges "requires the guiding hand of counsel at every step in the proceedings against him." [2]

**\*923**  More than seventy years later, death penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases. [3]

The quality of counsel's "guiding hand" in modern capital cases is crucial to ensuring a reliable determination of guilt and the imposition of an appropriate sentence. Today, it is universally accepted that the responsibilities of defense counsel in a death penalty case are uniquely demanding, both in the knowledge that counsel must possess and in the skills he or she must master. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles, scientific developments, and psychological concerns. Counsel must be able to develop and implement advocacy strategies applying existing rules in the pressure-filled environment of high-stakes, complex litigation, as well as anticipate changes in the law that might eventually result in the appellate reversal of an unfavorable judgment.

As one writer has explained:

> Every task ordinarily performed in the representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution. The responsibilities thrust upon defense counsel in a capital case carry with them psychological and emotional pressures unknown elsewhere in the law. In addition, defending a capital case is an intellectually rigorous enterprise, requiring command of the rules unique to capital litigation and constant vigilance in keeping abreast of new developments in a volatile and highly nuanced area of the law. [4]

Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make "extraordinary efforts on behalf of the accused." [5] As discussed infra in the text accompanying notes 230-31, these efforts may need to include litigation or administrative advocacy outside the confines of the capital case itself **924** (e.g., pursuit of information through a state open records law, [6] administrative proceedings to obtain or correct a military record, a collateral attack to invalidate a predicate conviction, [7] litigation of a systemic challenge to the jury selection procedures of a jurisdiction or district, [8] or to a jurisdiction's clemency process). [9]

Structure of the Guidelines This commentary provides a general overview of the areas in which counsel must be prepared to perform effectively and be given appropriate governmental support in doing so. These areas are addressed more specifically in subsequent Guidelines and commentaries. While there is some inevitable overlap, Guidelines 1.1-10.1 contain primarily principles and policies that should guide jurisdictions in creating a system for the delivery of defense services in capital cases, and Guidelines 10.2-10.15.2 contain primarily performance standards defining the duties of counsel handling those cases.

Representation at Trial Trial attorneys in death penalty cases must be able to apply sophisticated jury selection techniques, including rehabilitation of venire members who initially state opposition to the death penalty and demonstration of bias on the part of prospective jurors who will automatically vote to impose the death penalty if the defendant is convicted on the capital charge. [10] Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination. [11]

**925** An attorney representing the accused in a death penalty case must fully investigate the relevant facts. Because counsel faces what are effectively two different trials--one regarding whether the defendant is guilty of a capital crime, and the other concerning whether the defendant should be sentenced to death [12]--providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation. Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty. [13] Counsel must promptly obtain the investigative resources necessary to prepare for both phases, including at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case. [14] Comprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lesser sentence, [15] to persuade the prosecution to forego seeking a death sentence at trial, or to uncover facts that will make the client legally ineligible for the death penalty. [16] At the same time, counsel must **926** consciously work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress. [17]

With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime and all evidence-- whether testimonial, forensic, or otherwise--purporting to inculpate the client. To assume the accuracy of whatever information the client may initially offer or the prosecutor may choose or be compelled to disclose is to render ineffective assistance of counsel. As more fully described infra in the text accompanying notes 195-204, the defense lawyer's obligation includes not only finding, interviewing, and scrutinizing the backgrounds of potential prosecution witnesses, but also searching for any other potential witnesses who might challenge the prosecution's version of events, and subjecting all forensic evidence to rigorous independent scrutiny. Further, notwithstanding the prosecution's burden of proof on the capital charge, defense counsel may need to investigate possible affirmative defenses--ranging from absolute defenses to liability (e.g., self-defense or insanity) to partial defenses that might bar a death sentence (e.g., guilt of a lesser-included offense). In addition to investigating the alleged offense, counsel must also thoroughly investigate all events surrounding the arrest, particularly if the prosecution intends to introduce evidence obtained pursuant to alleged waivers by the defendant (e.g., inculpatory statements or items recovered in searches of the accused's home).

Moreover, trial counsel must coordinate and integrate the presentation during the guilt phase of the trial with the projected strategy for seeking a non-death sentence at the penalty phase. [18]

At that phase, defense counsel must both rebut the prosecution's case in favor of the death penalty and affirmatively present the best possible case in favor of a sentence other than death. [19]

If the defendant has any prior criminal history, the prosecution can be expected to attempt to offer it in support of a death sentence. Defense counsel accordingly must comprehensively investigate--together with the defense investigator, a mitigation specialist, and other members of the defense team-- the defendant's behavior and the circumstances of the *927 conviction. [20] Only then can counsel protect the accused's Fourteenth Amendment right to deny or rebut factual allegations made by the prosecution in support of a death sentence, [21] and the client's Eighth Amendment right not to be sentenced to death based on prior convictions obtained in violation of his constitutional rights. [22]

If uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly must thoroughly investigate it as an integral part of preparing for the penalty phase. [23]

Along with preparing to counter the prosecution's case for the death penalty, defense counsel must develop an affirmative case for sparing the defendant's life. [24] A capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death. [25] This Eighth Amendment right to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'" [26] Nor will the presentation be persuasive unless it (a) is consistent with that made by the defense at the guilt phase and (b) links the evidence offered in mitigation to the specific circumstances of the client. [27]

Finally, trial counsel, like counsel throughout the process, must raise every legal claim that may ultimately prove meritorious, lest default doctrines later bar its assertion.

> [T]he courts have shown a remarkable lack of solicitude for prisoners-- including ones executed as a result-- whose attorneys *928 through no fault of the prisoners were not sufficiently versed in the law to . . . consider the possibility that a claim long rejected by local, state, and federal courts nonetheless might succeed in the future or in a higher court. [28]

The commentary to the first edition of this Guideline noted that "many indigent capital defendants are not receiving the assistance of a lawyer sufficiently skilled in practice to render quality assistance" and supported the statement with numerous examples. The situation is no better today. [29] Indeed, problems with the quality of defense representation in death penalty cases have been so profound and pervasive that several Supreme Court Justices have openly expressed concern. Justice Ginsburg told a public audience that she had "yet to see a death case among the dozens coming to the Supreme Court on eve-of-execution stay applications in which the defendant was well represented *929 at trial" and that "people who are well represented at trial do not get the death penalty." [30] Similarly, Justice O'Connor expressed concern that the system "may well be allowing some innocent defendants to be executed" and suggested that "[p]erhaps it's time to look at minimum standards for appointed counsel in death cases and adequate compensation for appointed counsel when they are used." [31] As Justice Breyer has said, "the inadequacy of representation in capital cases" is "a fact that aggravates the other failings" of the death penalty system as a whole. [32]

In the past, post-conviction review has often been relied upon to identify and correct untrustworthy verdicts.[33] However, legal changes in the habeas corpus regime,[34] combined with Congress' defunding of post-conviction defender organizations ("PCDOs") in 1995,[35] make it less *930 likely that such traditional "fail safes" will continue to operate properly in the future. Under the standards set out by the Supreme Court for reviewing claims of ineffective assistance of counsel,[36] even seriously deficient performance all too rarely leads to reversal.[37] Hence, jurisdictions that continue to impose the death penalty must commit the substantial resources necessary to ensure effective representation at the trial stage.[38] In mandating the provision of high quality legal representation at the trial level of a capital case, this Guideline recognizes the simple truth that any other course has weighty costs--to be paid in money and delay if cases are reversed at later stages or in injustice if they are not.

Post-conviction Review Ensuring high quality legal representation in capital trials, however, does not diminish the need for equally effective representation on appeal, in state and federal post-conviction proceedings, and in applications for executive clemency. Because each of those proceedings has a unique role to play in the capital process, because both legal and social norms commonly evolve over the course of a case, and because of *931 "the general tendency of evidence of innocence to emerge only at a relatively late stage in capital proceedings,"[39] jurisdictions that retain capital punishment must provide representation in accordance with the standards of these Guidelines, as outlined in Subsection B, "at all stages of the case." Post-judgment proceedings demand a high degree of technical proficiency, and the skills essential to effective representation differ in significant ways from those necessary to succeed at trial. In addition, death penalty cases at the post-conviction stage may be subject to rules that provide less time for preparation than is available in noncapital cases.[40] Substantive pleadings may have to be prepared simultaneously with, or even be delayed for, pleadings to stay the client's execution.[41] For post-judgment review to succeed as a safeguard against injustice, courts must appoint appropriately trained and experienced lawyers.

### A. Representation on Direct Appeal

The Constitution guarantees effective assistance of counsel on an appeal as of right.[42] The "guiding hand of counsel" must lead the condemned client through direct review. Appellate counsel must be intimately familiar with technical rules of issue preservation and presentation, as well as the substantive state, federal, and international law governing death penalty cases, including issues which are "percolating" in the lower courts but have not yet been authoritatively resolved by the Supreme Court.[43] Counsel must also be capable of *932 making complex strategic decisions that maximize the client's chances of ultimate success in the event that the direct appeal is resolved unfavorably.[44]

### B. Collateral Review Proceedings

Habeas corpus and other procedures for seeking collateral relief are especially important in capital cases.[45] Quality representation in both state and federal court is essential if legally flawed convictions and sentences are to be corrected.[46]

1. State Collateral Review Proceedings

Counsel's obligations in state collateral review proceedings are demanding.[47] Counsel must be prepared to thoroughly reinvestigate the *933 entire case to ensure that the client was neither actually innocent nor convicted or sentenced to death in violation of either state or federal law. This means that counsel must obtain and read the entire record of the trial, including all transcripts and motions, as well as proceedings (such as bench conferences) that may have been recorded but not transcribed. In many cases, the record is voluminous, often amounting to many thousands of pages. Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, again scrutinizing them for what is missing as well as what is present.

Like trial counsel, counsel handling state collateral proceedings must undertake a thorough investigation into the facts surrounding all phases of the case. It is counsel's obligation to make an independent examination of all of the available evidence-- both that which the jury heard and that which it did not--to determine whether the decisionmaker at trial made a fully informed resolution of the issues of both guilt and punishment.

Since the reinstatement of the death penalty in 1976, [48] there have been more than 110 known wrongful convictions in capital cases in the United States. [49] As further described infra in the text accompanying **934** notes 198-204, these resulted from a variety of causes, including the testimony of unreliable jailhouse informants, [50] the use of dubious or fraudulent forensic scientific methods, [51] prosecutorial misconduct, and **935** incompetence of defense counsel at trial. Because state collateral proceedings may present the last opportunity to present new evidence to challenge the conviction, it is imperative that counsel conduct a searching inquiry to assess whether any mistake may have been made.

Reinvestigation of the case will require counsel to interview most, if not all, of the critical witnesses for the prosecution and investigate their backgrounds. Counsel must determine if the witness's testimony bears scrutiny or whether motives for fabrication or bias were left uncovered at the time of trial. Counsel must also assess all of the non-testimonial evidence and consider such issues as whether forensic testing must now be performed, either because some technology, such as DNA, was unavailable at the time of trial or because trial counsel failed to ensure that necessary testing took place. [52]

Counsel must conduct a similarly comprehensive reevaluation of the punishment phase to verify or undermine the accuracy of all evidence presented by the prosecution, and to determine whether the decisionmaker was properly informed of all relevant evidence, [53] able to give appropriate weight to that evidence, [54] and provided with a clear and legally accurate set of instructions for communicating its conclusion. [55]

**936** 2. Federal Habeas Corpus

In addition to requiring counsel to undertake all the tasks just described in Subsection B(1), federal collateral proceedings present another set of obstacles--ones that highlight the importance of quality representation. From 1973 to 1995, capital habeas corpus petitioners obtained relief at many times the rate of noncapital ones [56] and they should continue to do so in the future. But federal habeas corpus actions are governed by a complex set of procedural rules. [57] Counsel must master these thoroughly. [58] Moreover, restrictions on the availability of federal habeas relief for state prisoners imposed by the AEDPA will continue to raise numerous novel legal issues.

C. Executive Clemency

Executive clemency plays a particularly important role in death penalty cases, as it "provides the [government] with a final, deliberative opportunity to reassess this irrevocable punishment." [59] Because post-judgment proceedings have traditionally provided very limited opportunity for review of questions of guilt or innocence, clemency is **937** "the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." [60] As the Supreme Court has recognized, "history is replete with examples of wrongfully convicted persons who have been pardoned in the wake of after-discovered evidence establishing their innocence." [61] Recent advances in the use of DNA technologies, combined with restrictions on the availability of post-conviction review, have elevated the important role that clemency has played as the "fail-safe" of the criminal justice system, [62] and increased the demands on counsel. [63] Moreover, wholly apart from questions of guilt or innocence, executive clemency has been granted in death penalty cases for a broad range of humanitarian reasons. [64] Recognizing these considerations, the Supreme Court has begun to apply due process protection to clemency proceedings. [65] Thus, in addition

to assembling the most persuasive possible record for the decisionmaker, counsel must carefully examine the possibility of pressing legal claims asserting the right to a fuller and fairer process. [66]

The Imperative of a Systemic Approach General statements of expectations about what lawyers should do will not themselves ensure high quality legal representation. Indeed, Guidelines confined to such statements would be ones "that palter with us in a double sense; that keep the word of promise to our ear, and break it to our hope." [67] Attorney error is often the result of systemic problems, *938 not individual deficiency. [68] The provision of counsel for indigent capital defendants is too frequently made through ad hoc appointment, a system inimical to effective representation. [69] Although defender offices generally have the experience and dedication to provide high quality legal representation in capital cases, they are commonly overworked and inadequately funded. And private counsel often discover too late that they have taken on a task for which they are unqualified [70] or lack sufficient resources. The Guidelines that follow, therefore, not only detail the elements of quality representation, but mandate the systematic provision of resources to ensure that such representation is achieved in fact, whether counsel is individually assigned, employed by a defender office, or privately retained with or without compensation. [71]

### Conclusion

Unless legal representation at each stage of a capital case reflects current standards of practice, there is an unacceptable "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." [72] Accordingly, any jurisdiction wishing to impose a death sentence must at minimum provide representation that comports with these Guidelines. [73]

### *939  GUIDELINE 2.1--ADOPTION AND IMPLEMENTATION OF A PLAN TO PROVIDE HIGH QUALITY LEGAL REPRESENTATION IN DEATH PENALTY CASES

A. Each jurisdiction should adopt and implement a plan formalizing the means by which high quality legal representation in death penalty cases is to be provided in accordance with these Guidelines (the "Legal Representation Plan").

B. The Legal Representation Plan should set forth how the jurisdiction will conform to each of these Guidelines.

C. All elements of the Legal Representation Plan should be structured to ensure that counsel defending death penalty cases are able to do so free from political influence and under conditions that enable them to provide zealous advocacy in accordance with professional standards.

### History of Guideline

The obligation to create a formal "Legal Representation Plan" for provision of representation in death penalty cases was contained in Guideline 3.1 of the original edition. Subsection B is new and is designed to make it easier for jurisdictions to determine the necessary contents of a Plan. Subsection C is drawn from several sections of the original edition.

### Related Standards

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.2 (3d ed. 1992) ("Systems for legal representation").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.3 (3d ed. 1992) ("Professional Independence").

*940 ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.4 (3d ed. 1992) ("Supporting Services").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.5 (3d ed. 1992) ("Training and Professional Development").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.6 (3d ed. 1992) ("Funding").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-4.1 (3d ed. 1992) ("Chief Defender and Staff").

ABA The Ten Principles of a Public Defense Delivery System, Principle 1 (2002) ("The Public Defense Function, Including the Selection, Funding, and Payment of Defense Counsel, Is Independent.").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States § 2.18 (1976) ("Administration of Defense System Funds").

Nat'l Legal Aid & Defender Ass'n, Standards for The Administration of Assigned Counsel Systems Standard 2.2 (1989) ("Independence from Judiciary and Funding Source").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services Guideline II-1 (1984) ( "Purposes").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services Standard II-2 (1984) ("Members").

Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act, Section 10 (1970) ("Office of Defender General").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.8 (1973) ("Selection of Public Defenders").

#### *941 Commentary

Each jurisdiction should take effective measures to formalize the process by which high quality legal representation will be provided in capital cases. This may be done by statute, court order, regulation or otherwise. The critical element is that the plan be judicially enforceable in full against the jurisdiction. [74]

The Legal Representation Plan should provide standards and procedures that apply to capital cases on a jurisdiction-wide basis. National professional groups concerned with criminal justice issues have for decades advocated that defender services be organized on a state-wide basis. [75] Specifically, the ABA Standards for Criminal Justice endorse state-wide organization "as the best means for service provision." [76] Jurisdiction-wide organization and funding can best ameliorate local disparities in resources and quality of representation, *942 and insulate the administration of defense services from local political pressures. [77]

This last item is, of course, of critical concern.

> [I]t is essential that both full-time defenders and assigned counsel be fully independent, free to act on behalf of their clients as dictated by their best professional judgment. A system that does not guarantee the integrity of the professional relation is fundamentally deficient in that it fails to provide counsel who have the same freedom of action as the lawyer whom the person with sufficient means can afford to retain. [78]

Therefore, as Guideline 2.1(C) mandates, any acceptable Legal Representation Plan must assure that individual lawyers are not subject to formal or informal sanctions (e.g., through the denial of future appointments, reductions in fee awards, or withholding of promotions in institutional offices) for engaging in effective representation. The same principle applies to the overall architecture of the system. Thus, for example, the head of a public defender office must be subject to judicial supervision only in the same manner and to the same extent as a lawyer in private practice--and not be subject to institutional arrangements that *943 might enable his or her re-appointment to be blocked by judges irked at the zealous advocacy conducted by his or her office. [79]

Moreover, the system must be structured so as to assure that each client receives defense services "in accordance with professional standards," as noted in Subsection C. For example, it is predictable that there will be conflicts of interest among various actors in the criminal justice system (e.g., co-defendants, co-operating witnesses), who may play different roles in different cases, and the plan must provide a mechanism to assure conflict-free representation. [80]

### *944  GUIDELINE 3.1--DESIGNATION OF A RESPONSIBLE AGENCY

A. The Legal Representation Plan should designate one or more agencies to be responsible, in accordance with the standards provided in these Guidelines, for:

1. ensuring that each capital defendant in the jurisdiction receives high quality legal representation, and

2. performing all the duties listed in Subsection E (the "Responsible Agency").

B. The Responsible Agency should be independent of the judiciary and it, and not the judiciary or elected officials, should select lawyers for specific cases.

C. The Responsible Agency for each stage of the proceeding in a particular case should be one of the following:

Defender Organization

1. A "defender organization," that is, either:

a. a jurisdiction-wide capital trial office, relying on staff attorneys, members of the private bar, or both to provide representation in death penalty cases; or

b. a jurisdiction-wide capital appellate and/or post-conviction defender office, relying on staff attorneys, members of the private bar, or both to provide representation in death penalty cases; or

*945  Independent Authority

2. An "Independent Authority," that is, an entity run by defense attorneys with demonstrated knowledge and expertise in capital representation.

D. Conflict of Interest:

1. In any circumstance in which the performance by a defender organization of a duty listed in Subsection E would result in a conflict of interest, the relevant duty should be performed by the Independent Authority. The jurisdiction should implement an effectual system to identify and resolve such conflicts.

2. When the Independent Authority is the Responsible Agency, attorneys who hold formal roles in the Independent Authority should be ineligible to represent defendants in capital cases within the jurisdiction during their term of service.

E. The Responsible Agency should, in accordance with the provisions of these Guidelines, perform the following duties:

1. recruit and certify attorneys as qualified to be appointed to represent defendants in death penalty cases;

2. draft and periodically publish rosters of certified attorneys;

3. draft and periodically publish certification standards and procedures by which attorneys are certified and assigned to particular cases;

4. assign the attorneys who will represent the defendant at each stage of every case, except to **\*946** the extent that the defendant has private attorneys;

5. monitor the performance of all attorneys providing representation in capital proceedings;

6. periodically review the roster of qualified attorneys and withdraw certification from any attorney who fails to provide high quality legal representation consistent with these Guidelines;

7. conduct, sponsor, or approve specialized training programs for attorneys representing defendants in death penalty cases; and

8. investigate and maintain records concerning complaints about the performance of attorneys providing representation in death penalty cases and take appropriate corrective action without delay.


**History of Guideline**

The obligation of the Legal Representation Plan to designate a "Responsible Agency" for the appointment of counsel in death penalty cases was contained in Guideline 3.1 of the first edition. Subsection B makes it clear that the Responsible Agency should be an independent entity, and that lawyer selection should not be performed by the judiciary or elected officials. Subsection C is new and describes the acceptable kinds of Responsible Agencies. Subsection D is new and specifies the obligations of the Responsible Agency in the event of a conflict of interest. Lastly, part of Subsection E is new and details the other duties of the Responsible Agency, including the duty to ensure that qualified attorneys are available to represent defendants in death penalty cases, the duty to promptly investigate complaints about the performance of attorneys, and the duty to take corrective action without delay.


**\*947 Related Standards**

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.2 (3d ed. 1992) ("Systems for Legal Representation").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.3 (3d ed. 1992) ("Professional Independence").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-4.1 (3d ed. 1992) ("Chief Defender and Staff").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.8 (1973) ("Selection of Public Defenders").

Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act Section 10 (1970) ("Office of Defender General").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, § 2.10 (1976) ("The Defender Commission").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, § 2.11 (1976) ("Functions of the Defender Commission").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, § 2.12 (1976) ("Qualifications of the Defender Director and Conditions of Employment").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, § 2.13 (1976) ("The Governing Body for Assigned Counsel Programs").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, § 2.18 (1976) ("Administration of Defense System Funds").

**\*948** Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 2.2 (1989) ("Independence from Judiciary and Funding Source").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 3.1 (1989) ("Establishment of Legal Representation Plan").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 3.2.1 (1989) ("Creation of Board").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 3.2.2 (1989) ("Functions of Board").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline II-1 (1984) ("Purposes").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline II-2 (1984) ( "Members").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline II-3 (1984) ( "Duties").

### Commentary

As indicated in Guideline 2.1(C) and the accompanying commentary, the Legal Representation Plan must ensure that the capital defense function remains free from political influence. One important mechanism for accomplishing this goal is granting the authority for training, assigning, and monitoring capital defense lawyers to one or more entities independent of the judiciary and wholly devoted to fostering high quality legal defense representation.

This Guideline, based on accumulated experience, contemplates two structures that jurisdictions might employ.

1.In the first structure, the jurisdiction has created (a) a jurisdiction-wide capital trial organization, relying on staff attorneys, *949 and, optionally, members of the private bar, and/or (b) a jurisdiction-wide capital appellate and/or post-conviction defender organization, relying on staff attorneys, and, optionally, members of the private bar (collectively, "defender organizations"). [81]

In this structure, the defender organizations may both provide representation and perform all the functions listed in Subsection E as appropriate to their portion of the system, with one key exception. No defender organization may perform any function that would involve it in a conflict of interest, e.g., monitoring its own performance under Guideline 7.1(A), investigating or disposing of a complaint pursuant to Guideline 7.1(B) against one of its staff lawyers, or making the appointment of counsel in a situation in which there exists a professional conflict. Thus, for example, if two defendants with antagonistic defenses were charged with a capital crime, the agency could assign itself to defend one of them but could play no role in the assignment of counsel to the other. Similarly, as noted in Subsection E(5), a defender organization could not monitor the quality of its own performance (Subsection E(5)).

Accordingly, this structure also contemplates the existence of an "Independent Authority," which will at minimum deal with conflicts such as these.

2. In the second structure, an "Independent Authority," an entity run by defense attorneys with demonstrated knowledge and expertise in the representation of persons facing the possible imposition or execution of a death sentence, performs all the functions listed in Subsection E but does not itself provide representation.

While serving the organization in a formal role, whether paid or unpaid (e.g., officers, directors, staff members), attorneys should not be eligible for appointment to death penalty cases. The idea is that attorneys should not be appointed by an entity in whose operations they are playing a material role. Thus, this provision does not extend to persons who are simply providing occasional advice to the entity.

*950 The agency performing the function in the particular case, whether a defender organization or the Independent Authority, is referred to as "the Responsible Agency."

The Responsible Agency must assess the qualifications of attorneys who wish to represent capital defendants, conducting a meaningful review of each request for inclusion on the roster of qualified counsel in light of the criteria listed in Guideline 5.1. In order to make informed decisions on eligibility, the Responsible Agency should have sufficient flexibility to gather as much relevant information as possible to secure a fair picture of the applicant's ability and experience. The Responsible Agency should utilize whatever sources of information it deems appropriate, including in-court observations, writing samples, and information-gathering from the applicant, from judges before whom the applicant has appeared, and from attorneys, supervisors, and former clients who are familiar with the applicant's professional abilities. The performance standards established pursuant to Guidelines 10.1 et seq. should also be used to evaluate the prior performance in capital cases of attorneys seeking to establish eligibility for renewal placement on the roster of qualified counsel.

In assigning attorneys to capital cases, the overriding consideration must always be to provide high quality legal representation to the person facing a possible death sentence. Adherence to a "strict rotation" system for assigning counsel in the interest of fairness to attorneys should never take precedence over the interests of the capital defendant in receiving the best possible representation. Rather, in making assignments of counsel to a particular capital case, the Responsible Agency should give careful consideration to counsel's qualifications, skills, and experience; any aspects of the case that make assignment of a lawyer with specific qualifications or skills necessary or particularly appropriate (e.g., counsel's ability to speak the client's native language); and the relative onerousness of prospective lawyers' existing caseloads. It is also appropriate to give consideration to maintaining continuity of counsel where the defendant has previously been represented by a qualified lawyer at an earlier stage of the proceedings, provided that (a) counsel is also deemed qualified to represent the client at the subsequent stage of the proceedings

and (b) counsel's representation of the client at successive stages of the proceedings does not present a conflict of interest.[82] Given the extraordinary demands and pressures placed on **\*951** counsel in a capital case,[83] the Responsible Agency should, in accordance with Guideline 4.1(A)(1), ensure that at every stage of the proceedings the defendant is represented by counsel who are in a position to provide high quality legal representation. This may require the agency to furnish resources, in the form of additional counsel or otherwise,[84] to private counsel.[85]

The remaining elements of this Guideline reflect the longstanding view of the ABA that "[j]urisdictions that have the death penalty should establish and fund organizations to recruit, select, train, monitor, support, and assist attorneys involved at all stages of capital litigation and, if necessary, to participate in the trial of such cases."[86] Several of these functions are described in greater detail in subsequent Guidelines.[87] The common theme, however, is that the provision of consistently high quality legal representation requires that the duties given to the Responsible Agency by this Guideline be performed by an entity with the authority and resources to discharge them vigorously.

## **\*952  GUIDELINE 4.1--THE DEFENSE TEAM AND SUPPORTING SERVICES**

A. The Legal Representation Plan should provide for assembly of a defense team that will provide high quality legal representation.

1. The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.

2. The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.

B. The Legal Representation Plan should provide for counsel to receive the assistance of all expert, investigative, and other ancillary professional services reasonably necessary or appropriate to provide high quality legal representation at every stage of the proceedings. The Plan should specifically ensure provision of such services to private attorneys whose clients are financially unable to afford them.

1. Counsel should have the right to have such services provided by persons independent of the government.

2. Counsel should have the right to protect the confidentiality of communications with the persons providing such services to the same extent as would counsel paying such persons from private funds.

## **\*953  History of Guideline**

This Guideline is based on Guideline 8.1 of the original edition. In keeping with the team approach described in the commentary, Subsection A has been added to provide for the assembly of a "defense team." The first sentence of Subsection B is based on the original version of the Guideline and has been revised to emphasize that the purpose of providing adequate support services is to further the overall goal of providing "high quality legal representation," not merely "an effective defense." The second sentence is taken from Standard 5-1.4 of the ABA Standards for Criminal Justice: Providing Defense Services. Subsections B(1) and B(2) are new and reflect the decision to include private attorneys in these Guidelines.

## **Related Standards**

ABA Criminal Justice Mental Health Standards Standard 7-1.1 (1986) ("Roles of Mental Health and Mental Retardation Professionals in the Criminal Process").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.4 (3d ed. 1992) ("Supporting Services").

ABA Standards for Criminal Justice: Prosecution Function Standard 3-2.4 ("Special Assistants, Investigative Resources, Experts"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Defense Function Standard 4-4.1 ("Duty to Investigate"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.14 (1973) ("Supporting Personnel and Facilities").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.15 (1973) ("Providing Assigned Counsel").

 **\*954**  Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act, Section 2 (1970) ("Right to Representation, Services, and Facilities").

Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act, Section 12 (1970) ("Personnel and Facilities").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Defense Services, Guideline III-8 (1984) ("Support Staff and Forensic Experts").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Defense Services, Guideline III-9 (1984) ( "Investigators").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Defense Services, Guideline III-10 (1984) ( "Compensation").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States § 3.1 (1976) ("Assigned Counsel Fees and Supporting Services").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States § 3.4 (1976) ("Nonpersonnel Needs in Defender Offices").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.6 (1989) ("Support Services").

## Commentary

### Introduction

In a capital case reaffirming that fundamental fairness entitles indigent defendants to the "basic tools of an adequate defense," the United States Supreme Court stated:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and  **\*955**  that a criminal trial is fundamentally unfair if the [prosecution] proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. [88]

It is critically important, therefore, that each jurisdiction authorize sufficient funds to enable counsel in capital cases to conduct a thorough investigation for trial, sentencing, appeal, post-conviction and clemency, and to procure and effectively present the necessary expert witnesses and documentary evidence. [89]

The Team Approach to Capital Defense National standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel have access to adequate "supporting services [including] secretaries[,] investigators[, and] . . . expert witnesses, as well as personnel skilled in social work and related disciplines to provide assistance at pretrial release hearings and at sentencings." [90]

This need is particularly acute in death penalty cases. The prosecution commits vast resources to its effort to prove the defendant guilty of capital murder. The defense must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own. [91] Yet investigating a homicide is uniquely complex and often involves evidence of many different types. Analyzing and interpreting such evidence is impossible without consulting experts--whether pathologists, serologists, microanalysts, DNA analysts, ballistics specialists, translators, or others. [92]

 **\*956** In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row. [93] Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings, including competency to stand trial, sanity at the time of the offense, capacity to intend or premeditate death, ability to comprehend Miranda warnings, and competency to waive constitutional rights. The Constitution forbids the execution of persons with mental retardation, [94] making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. [95] Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. [96] Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary. [97]

Counsel's own observations of the client's mental status, while necessary, [98] can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation)  **\*957** that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

Although mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, it bears emphasis that every situation will also have its own unique needs. The demands of each case--and each stage of the same case--will differ. Jurisdictions must therefore construe this Guideline broadly, keeping in mind the superior opportunity of defense counsel to determine what assistance is needed to provide high quality legal representation under the particular circumstances at hand and counsel's need to explore the potential of a variety of possible theories. For example, it might well be appropriate for counsel to retain an expert from an out-of-state university familiar with the cultural context by which the defendant was shaped or a professional who is skilled at retrieving elusive paper or electronic records. While resources are not unlimited, of course, jurisdictions should also be mindful that sufficient funding early in a case may well result in significant savings to the system as a whole. [99]

Effective Assistance of Experts Subsections B(1) and B(2) are aimed at insuring that the fact of public funding does not diminish the quality of the assistance that counsel is able to obtain from experts. Thus, unless counsel agrees otherwise, the defendant is entitled to experts independent of the government; the jurisdiction may not meet its obligations by relegating **\*958** him to the state mental hospital or the state crime laboratory. [100]  Similarly, doctrines of privilege, work product, and the like should protect the communications between counsel and the experts just as they would if the experts were being paid with private funds. Any procedures for the auditing of public funds should be structured so as to preserve this confidentiality.

The Core Defense Team In addition to employing the particular nonlegal resources that high quality legal representation requires in each individual case, the standard of practice demands that counsel have certain specific forms of assistance in every case. This Guideline accordingly requires that those resources be provided. [101]

### A. The Investigator

The assistance of an investigator who has received specialized training is indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings. Although some investigative tasks, such as assessing the credibility of key trial witnesses, appropriately lie within the domain of counsel, the prevailing national standard of practice forbids counsel from shouldering primary responsibility for the investigation. Counsel lacks the special expertise required to accomplish the high quality investigation to which a capital defendant is entitled and simply has too many other duties to discharge in preparing the case. Moreover, the defense may need to call the person who conducted the interview as a trial witness. [102]  As a result, an investigator should be part of the defense team at every stage of a capital proceeding.

### \*959 B. The Mitigation Specialist

A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. [103]  They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. [104]  The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation. [105]

**\*960** The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case is pending. The rapport developed in this process can be the key to persuading a client to accept a plea to a sentence less than death. [106]

For all of these reasons the use of mitigation specialists has become "part of the existing 'standard of care'" in capital cases, ensuring "high quality investigation and preparation of the penalty phase." [107]

Counsel Not Compensated by Public Funds Finally, in the relatively rare case in which a capital defendant retains counsel, jurisdictions must ensure that the defendant has access to necessary investigative and expert services if the defendant cannot afford them.

> Inability to afford counsel necessarily means that a defendant is unable to afford essential supporting services, such as investigative assistance and expert witnesses. The converse does not follow, however. Just because a defendant is able to afford retained counsel does not mean that sufficient finances are available for essential services. . . . [S]upporting services [should] be made available to the clients of retained counsel who are unable to afford the required assistance. [108]

Of course, the same observations apply where counsel is serving pro bono or, although originally retained, has simply run out of money.

**\*961  GUIDELINE 5.1--QUALIFICATIONS OF DEFENSE COUNSEL**

A. The Responsible Agency should develop and publish qualification standards for defense counsel in capital cases. These standards should be construed and applied in such a way as to further the overriding goal of providing each client with high quality legal representation.

B. In formulating qualification standards, the Responsible Agency should insure:

1. That every attorney representing a capital defendant has:

a. obtained a license or permission to practice in the jurisdiction;

b. demonstrated a commitment to providing zealous advocacy and high quality legal representation in the defense of capital cases; and

c. satisfied the training requirements set forth in Guideline 8.1.

2. That the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation. Accordingly, the qualification standards should insure that the pool includes sufficient numbers of attorneys who have demonstrated:

a. substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

 \*962  b. skill in the management and conduct of complex negotiations and litigation;

c. skill in legal research, analysis, and the drafting of litigation documents;

d. skill in oral advocacy;

e. skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence;

f. skill in the investigation, preparation, and presentation of evidence bearing upon mental status;

g. skill in the investigation, preparation, and presentation of mitigating evidence; and

h. skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

### History of Guideline

This Guideline has been substantially reorganized for this edition. In the original edition, it emphasized quantitative measures of attorney experience-- such as years of litigation experience and number of jury trials--as the basis for qualifying counsel to undertake representation in death penalty cases. In this revised edition, the inquiry focuses on counsel's ability to provide high quality legal representation.

### Related Standards

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-2.2 (3d ed. 1992) ("Eligibility to Serve").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.15 (1973) ("Providing Assigned Counsel").

 **963**  Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 1.2 (1995) ("Education, Training, and Experience of Defense Counsel").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline II-3 (1984) ("Duties").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 2.9 (1989) ("Standards for Performance of Counsel").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.1(b) (1989) ("Establishment and General Operation of Assigned Counsel Roster").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.1.1 (1989) ("Qualifications of Attorneys").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 2.15 (1976) ("Establishing the Assigned Counsel Panel").

### Commentary

Under Guideline 3.1, it is the duty of the Responsible Agency to provide capital defendants with attorneys who will give them high quality legal representation. This Guideline amplifies that duty. It is designed to be outcome-focused and to leave the Responsible Agency maximum flexibility. The Guideline sets forth the necessary qualifications for all attorneys (Subsection B(1)), and also requires that "the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation." (Subsection B(2)). The qualification standards set by the Responsible Agency must be such as to bring about this result. This functional approach is new to this edition.

As described in the commentary to Guideline 1.1, the abilities that death penalty defense counsel must possess in order to provide high **\*964** quality legal representation differ from those required in any other area of law. Accordingly, quantitative measures of experience are not a sufficient basis to determine an attorney's qualifications for the task. An attorney with substantial prior experience in the representation of death penalty cases, but whose past performance does not represent the level of proficiency or commitment necessary for the adequate representation of a client in a capital case, should not be placed on the appointment roster. [109]

There are also attorneys who do not possess substantial prior experience yet who will provide high quality legal representation in death penalty cases. [110] Such attorneys may have specialized training and experience in the field (e.g., as law professors), may previously have been prosecutors, or may have had substantial experience in civil practice. [111] These attorneys should receive appointments if the Responsible Agency is satisfied that the client will be provided with high quality legal representation by the defense team as a whole.

In order to make maximum use of the available resources in the legal community overall, the Responsible Agency needs to devise qualification standards that build upon the contribution that each lawyer can make to the defense team, while ensuring that the team is of such a size and aggregate level of experience as to be able to function effectively.

### \*965  GUIDELINE 6.1--WORKLOAD

The Responsible Agency should implement effectual mechanisms to ensure that the workload of attorneys representing defendants in death penalty cases is maintained at a level that enables counsel to provide each client with high quality legal representation in accordance with these Guidelines.

### History of Guideline

The original edition of this Guideline stated that "attorneys accepting appointments pursuant to these Guidelines . . . should not accept appointment" if their workload would interfere with the provision of "quality representation or lead to the breach of professional obligations."

Although that admonition has been retained in Guideline 10.3, this Guideline, which in accordance with Guideline 1.1 applies to all defense counsel (not just appointed members of the private bar), has been added to make clear that it is the responsibility of the jurisdiction creating the system to establish mechanisms for controlling attorney workloads.

### Related Standards

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-5.3 (3d ed. 1992) ("Workload").

ABA Standards for Criminal Justice: Defense Functions Standard 4-1.3 ("Delays; Punctuality; Workload") in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.1 (1976) ("Establishing Maximum Pending Workload Levels for Individual Attorneys").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.2 (1976) ("Statistics and Record-keeping").

**\*966**  Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.3 (1976) ("Elimination of Excessive Caseloads").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline III-12 (1984) ( "Case and Work-Overload").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.1(c) (1989) ("Establishment and General Operation of Assigned Counsel Roster").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.1.2 (1989) ("Workload of Attorneys").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.12 (1973) ("Workload of Public Defenders").

ABA, The Ten Principles of a Public Defense Delivery System, Principle 5 (2002) ("Defense Counsel's Workload Is Controlled to Permit the Rendering of Quality Representation").

### Commentary

In order to achieve the goal of providing capital defendants with high quality legal representation, the caseloads of their attorneys must be such as to permit the investment of the extraordinary time and effort necessary to ensure effective and zealous representation in a capital case. As the commentary to the ABA Defense Services Standards notes:

> One of the most significant impediments to the furnishing of quality defense services for the poor is the presence of excessive workloads. . . .

> All too often in defender organizations[,] . . . attorneys are asked to provide representation in too many cases. . . . Unfortunately, not even the most able and industrious lawyers can provide quality representation when their workloads are unmanageable. Excessive **\*967** workloads, moreover, lead to attorney frustration, disillusionment by clients, and weakening of the adversary system. [112]

A numerical set of caseload standards, standing alone, would not ensure high quality legal representation. While national caseload standards should in no event be exceeded, the concept of "workload" (i.e., caseload adjusted by factors such as case complexity, support services, and an attorney's non-representational duties) is a more accurate measurement of counsel's ability to provide quality representation. In assessing counsel's workload, the Responsible Agency must also consider whether counsel has adequate access to essential support staff such as investigators, mitigation specialists, paralegals, and legal secretaries. Counsel's workload, including legal cases and other work, should never be so large as to interfere with the rendering of quality representation or lead to the breach of ethical obligations, and counsel is obligated to decline to undertake additional cases above such levels. [113]

In accordance with these principles, the Responsible Agency should assess the workload of eligible attorneys prior to appointment to ensure that counsel will be able to provide high quality legal representation. To assist in assessing workloads, some defender offices have established workload guidelines that are useful in determining whether the workload of a particular attorney is excessive. These guidelines may be consulted as one measure of appropriate workloads. [114]

Studies have consistently found that defending capital cases requires vastly more time and effort by counsel than noncapital matters. For example, one study found that over the entire course of a case, **\*968** defense attorneys in federal capital cases bill for over twelve times as many hours as in noncapital homicide cases. [115] In terms of actual numbers of hours invested in the defense of capital cases, recent studies indicate that several thousand hours are typically required to provide appropriate representation. For example, an in-depth examination of federal capital trials from 1990 to 1997 conducted on behalf of the Judicial Conference of the United States found that the total attorney hours per representation in capital cases that actually proceeded to trial averaged 1,889. [116]

Workloads for lawyers handling direct appeals should also be maintained at levels that are consistent with providing high quality legal representation. Like the responsibilities of counsel at trial, appellate work in a capital case is time-consuming and difficult. A capital trial record, which appellate counsel must review in full and with care, typically runs to thousands or even tens of thousands of pages--even before, pursuant to Guideline 10.7(B)(2), counsel investigates the possibility that the record may be incomplete. Once appellate counsel has reviewed the record, he or she must conduct especially wide-ranging legal research, canvassing both state and federal judicial opinions, before drafting the opening brief. Given the gravity of the punishment, the unsettled state of the law, and the insistence of the courts on rigorous default rules, it is incumbent upon appellate counsel to raise every potential ground of error that might result in a reversal of the defendant's conviction or punishment. [117] Further, counsel must aggressively examine the government's brief and research its legal assertions in order to prepare an adequate reply. Preparing for and presenting oral argument requires counsel to invest still more hours. In California, where the Office of the State Public Defender handled capital appeals in the California Supreme Court, a 1989 study concluded that attorneys' responsibilities should be limited to two to three such proceedings per year. [118]

**\*969** Similarly, the workloads of counsel handling collateral proceedings must be carefully limited to allow for high quality legal representation. A 1998 survey of the time and expenses required in Florida capital post-conviction cases concluded that:

> [T]he most experienced and qualified lawyers at Florida's post-conviction defender office, the Office of Capital Collateral Representation[,] have estimated that, on average, over 3,300 lawyer hours are required to take a post-conviction death penalty case from the denial of certiorari by the United States Supreme Court following direct appeal to the denial of certiorari [from state post-conviction proceedings.] [119]

It is the duty of the Responsible Agency to distribute assignments in light of each attorney's duty under the Rules of Professional Conduct to "provide competent representation to a client," [120] which requires the legal knowledge, skill, thoroughness and preparation necessary for a complex and specialized area of the law. [121] Thus, the Responsible Agency must monitor private counsel in accordance with Guideline 7.1, and provide them with additional assistance as necessary. And the Independent Authority must monitor the defender organizations of the jurisdiction and stand ready to supplement their resources with those of the private bar.

Regardless of the context, no system that involves burdening attorneys with more cases than they can reasonably handle can provide high quality legal representation. In the capital context, no such system is acceptable.

**\*970  GUIDELINE 7.1--MONITORING; REMOVAL**

A. The Responsible Agency should monitor the performance of all defense counsel to ensure that the client is receiving high quality legal representation. Where there is evidence that an attorney is not providing high quality legal representation, the Responsible Agency should take appropriate action to protect the interests of the attorney's current and potential clients.

B. The Responsible Agency should establish and publicize a regular procedure for investigating and resolving any complaints made by judges, clients, attorneys, or others that defense counsel failed to provide high quality legal representation.

C. The Responsible Agency should periodically review the rosters of attorneys who have been certified to accept appointments in capital cases to ensure that those attorneys remain capable of providing high quality legal representation. Where there is evidence that an attorney has failed to provide high quality legal representation, the attorney should not receive additional appointments and should be removed from the roster. Where there is evidence that a systemic defect in a defender office has caused the office to fail to provide high quality legal representation, the office should not receive additional appointments.

D. Before taking final action making an attorney or a defender office ineligible to receive additional appointments, the Responsible Agency should provide written notice that such action is being contemplated, and give the attorney or defender office opportunity to respond in writing.

**\*971** E. An attorney or defender office sanctioned pursuant to this Guideline should be restored to the roster only in exceptional circumstances.

F. The Responsible Agency should ensure that this Guideline is implemented consistently with Guideline 2.1(C), so that an attorney's zealous representation of a client cannot be cause for the imposition or threatened imposition of sanctions pursuant to this Guideline.

## History of Guideline

In the original edition, this Guideline provided that an attorney should receive no additional capital appointments if counsel had "inexcusably ignored basic responsibilities of an effective lawyer, resulting in prejudice to the client's case." In this edition, the standard has been changed to prohibit future appointment where counsel "has failed to provide high quality legal representation." The change was made because the former language was considered insufficiently stringent. Subsection B is based on commentary to the original edition of the Guideline. Subsections C-E are taken from Subsections A and C of the original edition of the Guideline. Subsection F is new and is intended to emphasize the importance of the principle enunciated in Guideline 2.1(C).

## Related Standards

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-2.3 (3d ed. 1992) ("Rotation of Assignments and Revision of Roster").

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-6.3 (3d ed. 1992) ("Removal").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.4 (1989) ("Supervision of Attorneys").

**\*972** Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.4.2 (1989) ("Monitoring").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.5 (1989) ("Disciplinary Policies and Procedures").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.5.1 (1989) ("Penalties Less than Removal").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.5.2 (1989) ("Removal from Program Roster(s)").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.5.3 (1989) ("Reinstatement After Removal").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.4 (1976) ("Supervision and Evaluation of Defender System Personnel").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.5 (1976) ("Monitoring and Evaluation of Assigned Counsel Program Personnel").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline III-16 (1984) ("Supervision and Evaluation").

ABA, The Ten Principles of a Public Defense Delivery System, Principle 10 (2002) ("Defense Counsel Is Supervised and Systematically Reviewed for Quality and Efficiency According to Nationally and Locally Adopted Standards").

### *973 Commentary

Consistent with its duty to ensure that high quality legal assistance is afforded to indigent capital defendants, the Responsible Agency should monitor the performance of all capital defense counsel, including defender offices. "Admittedly, this is not an easy task and there obviously are difficulties present in having third parties scrutinize the judgments of private counsel. On the other hand, the difficulty of the task should not be an excuse for doing nothing." [122]

While the Responsible Agency should investigate and maintain records regarding any complaints made against assigned counsel by judges, clients and other attorneys, [123] an effective attorney-monitoring program in death penalty matters should go considerably beyond these activities. The performance of each assigned lawyer should be subject to systematic review based upon publicized standards and procedures. [124] Counsel should be removed from the roster when counsel has failed to represent a client consistently with these Guidelines. [125]

In fulfilling its monitoring function, the Responsible Agency should not attempt to micro-manage counsel's work; [126] most lawyering tasks may reasonably be performed in a variety of ways. In order to preserve the nature of the attorney-client relationship, counsel for the accused must have the freedom to represent their client as they deem professionally appropriate. Clients, moreover, should have the right to continue satisfactory relationships with lawyers in whom they have reposed their confidence and trust. Rather, the responsibility of the Responsible Agency is to ensure that, overall, the attorney is providing high quality legal representation. Where counsel fails to do so, whether *974 because of a mental or physical impairment, [127] or for any other reason, the Responsible Agency should intervene. This may occur on the Responsible Agency's own motion or as a result of a request by the defendant or the court. [128]

In keeping with the paramount objective of protecting the rights and interests of the defendant, Subsection B provides that the Responsible Agency should have a regularized procedure for investigating and resolving complaints of inadequate representation. The procedure should recognize that many people (e.g., family members of the client, witnesses whom the attorney has interviewed or not interviewed) may be in a position to provide important information. The procedure should be publicized accordingly.

The Responsible Agency must monitor cases, and take appropriate action in the event of any substandard performance. If the jurisdiction has defender organizations, the entity monitoring them must review such problems with an eye towards rectifying both deficiencies on the part of individual staff lawyers and any structural flaws that those deficiencies may reveal. If inadequate training, office workload, or some other systemic problem has resulted in representation of lower quality than required by these Guidelines and the situation is not corrected, the office should be removed from the roster.

Because of the unique and irrevocable nature of the death penalty, counsel or offices that have been removed from the roster should be readmitted only upon exceptional assurances that no further dereliction of duty will occur. The Responsible Agency should not readmit counsel or the office to the roster unless it determines that the original removal was in error, or finds by clear and convincing evidence that the problem which led to the removal of counsel or the office has been identified and **\*975** corrected. It may condition readmission on specific actions (e.g., proof of reduction in workload, proof of additional training and/or experience, substance abuse counseling, or correction of systemic defects in an office).

### \*976  GUIDELINE 8.1--TRAINING

A. The Legal Representation Plan should provide funds for the effective training, professional development, and continuing education of all members of the defense team.

B. Attorneys seeking to qualify to receive appointments should be required to satisfactorily complete a comprehensive training program, approved by the Responsible Agency, in the defense of capital cases. Such a program should include, but not be limited to, presentations and training in the following areas:

1. relevant state, federal, and international law;

2. pleading and motion practice;

3. pretrial investigation, preparation, and theory development regarding guilt/innocence and penalty;

4. jury selection;

5. trial preparation and presentation, including the use of experts;

6. ethical considerations particular to capital defense representation;

7. preservation of the record and of issues for post-conviction review;

8. counsel's relationship with the client and his family;

9. post-conviction litigation in state and federal courts;

10. the presentation and rebuttal of scientific  **\*977**  evidence, and developments in mental health fields and other relevant areas of forensic and biological science;

11. the unique issues relating to the defense of those charged with committing capital offenses when under the age of 18.

C. Attorneys seeking to remain on the roster or appointment roster should be required to attend and successfully complete, at least once every two years, a specialized training program approved by the Responsible Agency that focuses on the defense of death penalty cases.

D. The Legal Representation Plan should insure that all non-attorneys wishing to be eligible to participate on defense teams receive continuing professional education appropriate to their areas of expertise.

**History of Guideline**

The importance of training was addressed in Guideline 9.1 of the original version of the Guidelines for lawyers seeking to receive appointments in capital cases. Subsections A and D have been added to this revised edition to emphasize that the Legal Representation Plan must provide for specialized training of all members of the defense team involved in the representation of capital defendants. Subsections B and C are based on the original edition of the Guideline. This revised edition of the Guideline has been amended to emphasize that qualified training programs must be "comprehensive" in scope. Thus the eleven areas of training set forth in Subsection B are new and are intended to indicate the broad range of topics that must be covered in order for an initial training program to meet minimum requirements. The requirement of participation in a continuing legal education program every two years is also a minimum; many capital defense counsel have discovered that they must attend training programs more frequently in order to provide effective legal representation.

**\*978  Related Standards**

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.5 (3d ed. 1992) ("Training and Professional Development").

ABA Standards for Criminal Justice: Prosecution Function Standard 3-2.6 (3d ed. 1993) ("Training Programs"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.15 (1973) ("Providing Assigned Counsel").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.16 (1973) ("Training and Education of Defenders").

Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act, Section 10 (1970) ("Office of Defender General").

Nat'l Legal Aid and Defender Ass'n, Defender Training and Development Standards (1997).

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Defense Services Guideline III-17 (1984) ( "Professional Development").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.7 (1976) ("Training Staff Attorneys in a Defender System").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.8 (1976) ("Training Assigned Counsel").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.2 (1989) ("Orientation").

\*979  Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.3.1 (1989) ("Entry-Level Training").

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.3.2 (1989) ("In-Service Training").

ABA, The Ten Principles of a Public Defense Delivery System, Principle 9 (2002) ("Defense Counsel Is Provided with and Required to Attend Continuing Legal Education").

### Commentary

As indicated in the commentary to Guideline 1.1, providing high quality legal representation in capital cases requires unique skills. Accordingly, the standard of practice requires that counsel have received comprehensive specialized training before being considered qualified to undertake representation in a death penalty case. [129] Such training is not to be confined to instruction in the substantive law and procedure applicable to legal representation of capital defendants, but must extend to related substantive areas of mitigation and forensic science. In addition, comprehensive training programs must include practical instruction in advocacy skills, as well as presentations by experienced practitioners.

Once an attorney has been deemed qualified to accept appointments in capital cases, the standard of practice requires counsel to regularly receive formal training in order to keep abreast of the field. [130] Continuing legal education, which is required by many state bars as a matter of course for all attorneys, is critically important to capital **\*980** defense attorneys. As the commentary to Guideline 1.1 indicates, they must not only have mastery of current developments in law, forensics, and related areas, but also be able to anticipate future ones. [131]

In recognition of the central role that ongoing training plays in the provision of effective capital defense representation, a number of professional organizations, including the National Association of Criminal Defense Lawyers, the National Legal Aid and Defender Association, the Habeas Assistance Project, the NAACP Legal Defense and Education Fund, Inc., the office of the Kentucky Public Advocate, and the Association of the Bar of the City of New York, have regularly devoted significant efforts to providing educational programs of the quality contemplated by this Guideline.

Many such organizations also provide resources, such as newsletters, that counsel should utilize to learn of new developments and to benefit from the collective wisdom and experience of the capital defense bar.

### \*981  GUIDELINE 9.1--FUNDING AND COMPENSATION

A. The Legal Representation Plan must ensure funding for the full cost of high quality legal representation, as defined by these Guidelines, by the defense team and outside experts selected by counsel.

B. Counsel in death penalty cases should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the extraordinary responsibilities inherent in death penalty representation.

1. Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases.

2. Attorneys employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale of the prosecutor's office in the jurisdiction.

3. Appointed counsel should be fully compensated for actual time and service performed at an hourly rate commensurate with the prevailing rates for similar services performed by retained counsel in the jurisdiction, with no distinction between rates for services performed in or out of court. Periodic billing and payment should be available.

C. Non-attorney members of the defense team should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the specialized skills needed by those who assist counsel with the litigation of death penalty cases.

1. Investigators employed by defender organizations should be compensated according   **\*982**  to a salary scale that is commensurate with the salary scale of the prosecutor's office in the jurisdiction.

2. Mitigation specialists and experts employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale for comparable expert services in the private sector.

3. Members of the defense team assisting private counsel should be fully compensated for actual time and service performed at an hourly rate commensurate with prevailing rates paid by retained counsel in the jurisdiction for similar services, with no distinction between rates for services performed in or out of court. Periodic billing and payment should be available.

D. Additional compensation should be provided in unusually protracted or extraordinary cases.

E. Counsel and members of the defense team should be fully reimbursed for reasonable incidental expenses.


**History of Guideline**

This Guideline was Guideline 10.1 in the original edition. The express disapproval of flat or fixed fee compensation provisions and statutory fee maximums is new to this edition. The provision is in keeping with Guideline 10.1(A) of the original edition, which mandates that counsel be fully compensated at a reasonable hourly rate of compensation, and follows the commentary to Standard 5-2.4 of the ABA Standards for Criminal Justice: Providing Defense Services, which observes that "[t]he possible effect of such rates is to discourage lawyers from doing more than what is minimally necessary to qualify for the flat payment." Subsection B(2) is new to the Guideline and has been added to provide for compensation of attorneys employed by defender organizations. Subsection B(3) is based on the original edition of the Guideline, but a provision has been added indicating that there should be no distinction between the hourly rates of compensation for services  **\*983**  performed in or out of court. Subsection C is new to this edition and provides for compensation of the other members of the defense team. Subsection D is new to this edition. Subsection E is based on the original edition.


**Related Standards**

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-2.4 (3d ed. 1992) ("Compensation and Expenses").

ABA Standards for Criminal Justice: Criminal Appeals Standard 21-2.4 (2d ed. 1980) ("Procedural Devices Intended to Eliminate Frivolous Appeals Before Determination of Their Merits").

ABA Standards for Criminal Justice: Postconviction REMEDIES Standard 22-4.3 (2d ed. 1980) ("Appointment of Counsel").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.7.1 ("Assigned Counsel Fees").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.7.2 ("Method of Compensation").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.7.3 ("Payment of Expenses").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.7.4 ("Only Authorized Compensation") (1989).

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 3.1 (1976) ("Assigned Counsel Fees and Supporting Services").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 3.2 (1976) ("Defender System Salaries").

*984  Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act, Section 11 (1970) ("Local Offices").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.7 (1973) ("Defender to Be Full-time and Adequately Compensated").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.11 (1973) ("Salaries for Defender Attorneys").

Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act, Section 13 (1970) ("Court Assigned Attorneys").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline III-10 (1984) ( "Compensation").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline III-11 (1984) ( "Special Case Compensation").

## Commentary

In order to fulfill its constitutional obligation to provide effective legal representation for poor people charged with crimes, [132] "[g]overnment has the responsibility to fund the full cost of quality legal representation." [133] This means that it must "firmly and unhesitatingly resolve any conflicts between the treasury and the fundamental constitutional rights in favor of the latter." [134]

As Subsection A of this Guideline emphasizes, each jurisdiction is responsible for paying not just the direct compensation of members of  *985  the defense team, but also the costs involved in meeting the requirements of these Guidelines for high quality legal representation (e.g., Guideline 4.1, Guideline 8.1).

As a rough benchmark, jurisdictions should provide funding for defender services that maintains parity between the defense and the prosecution with respect to workload, salaries, and resources necessary to provide quality legal representation (including benefits, technology, facilities, legal research, support staff, paralegals, investigators, mitigation specialists, and access to forensic services and experts). In doing so, jurisdictions must be mindful that the prosecution has access at no cost to many services for which the defense must pay. A prosecution office will not only benefit from the formal resources of its jurisdiction (e.g., a state crime laboratory) and co-operating jurisdictions (e.g., the FBI), but from many informal resources as well. For example, a prosecutor seeking to locate a witness in a distant city can frequently enlist the assistance of a local police department; defense counsel will have to pay to send out an investigator. Yet funding for defense services usually lags far behind prosecution funding. [135]

In particular, compensation of attorneys for death penalty representation remains notoriously inadequate. [136] As Justice Blackmun *986  observed in 1994:

[C]ompensation for attorneys representing indigent capital defendants often is perversely low. Although a properly conducted capital trial can involve hundreds of hours of investigation, preparation, and lengthy trial proceedings, many States severely limit the compensation paid for capital defense. . . .

As a result, attorneys appointed to represent capital defendants at the trial level frequently are unable to recoup even their overhead costs and out-of-pocket expenses, and effectively may be required to work at minimum wage or below while funding from their own pockets their client's defense. [137]

Low fees make it economically unattractive for competent attorneys to seek assignments and to expend the time and effort a case may require. A 1993 study of capital representation in Texas, for example, showed that "more and more experienced private criminal attorneys are refusing to accept court appointments in capital cases because of the time involved, the substantial infringement on their private practices, the lack of compensation for counsel fees and experts/expenses and the enormous pressure that they feel in handling these cases." [138] Similarly, a survey of Mississippi attorneys appointed to represent indigent defendants in capital cases found that eighty-two percent would either refuse or be very reluctant to accept another appointment because of financial considerations. [139] A 1998 study of federal death penalty cases reported that "[a]lthough the hourly rates of compensation in federal capital cases are higher than those paid in non-capital federal criminal cases, they are quite low in comparison to hourly rates for lawyers generally, and to the imputed hourly cost of office overhead." [140]

While compensation is generally inadequate for representation at trial, it is even worse--and indeed, in a number of jurisdictions, nonexistent--for representation in state collateral proceedings. [141] *987 Thousands of attorney hours are required to represent a death-sentenced prisoner effectively in such cases. [142] Not surprisingly, few attorneys are willing to take on this responsibility for negligible compensation. As a result, a substantial and growing number of condemned inmates who have completed direct review are without legal representation. [143]

It is such inmates--and the justice system--rather than lawyers (who can always move to more lucrative fields) that are victimized when jurisdictions fail to fulfill their financial responsibilities. What is "most important [is that] the quality of the representation often suffers when adequate compensation for counsel is not available." [144] This is not a merely theoretical concern. It is demonstrably the case that, by discouraging more experienced criminal defense lawyers from accepting appointments in capital cases, inadequate compensation has often left capital defense representation to inexperienced or outright incompetent counsel. A series of studies in several death penalty states have found that appointed counsel in death penalty cases have been subject to professional disciplinary action at significantly higher rates than other lawyers. [145]

These realities underlie the mandate of this guideline that members of the death penalty defense team be fully compensated at a rate commensurate with the provision of high quality legal representation. The Guideline's strong disapproval of flat fees, statutory caps, and other arbitrary limitations on attorney compensation is based upon the adverse effect such schemes have upon effective representation. [146] Rather, compensation should be based on the number of hours expended plus the effort, efficiency, and skill of counsel. [147] When assigned counsel is paid *988 a predetermined fee for the case regardless of the number of hours of work actually demanded by the representation, there is an unacceptable risk that counsel will limit the amount of time invested in the representation in order to maximize the return on the fixed fee. [148]

Moreover, any compensation system that fails to reflect the extraordinary responsibilities and commitment required of all members of the defense team in death penalty cases, [149] that does not provide for extra payments when unusually burdensome

representation is provided, or that does not provide for the periodic payment of fees to all members of the defense team will not succeed in obtaining the high quality legal representation required by these Guidelines.

For better or worse, a system for the provision of defense services in capital cases will get what it pays for.[150]

### *989 GUIDELINE 10.1--ESTABLISHMENT OF PERFORMANCE STANDARDS

A. The Responsible Agency should establish standards of performance for all counsel in death penalty cases.

B. The standards of performance should be formulated so as to insure that all counsel provide high quality legal representation in capital cases in accordance with these Guidelines. The Responsible Agency should refer to the standards when assessing the qualifications or performance of counsel.

C. The standards of performance should include, but not be limited to, the specific standards set out in these Guidelines.

### History of Guideline

This Guideline is former Guideline 11.1 with only stylistic revisions.

### Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-1.1 ("The Function of the Standards"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation (1995).

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.1 (3d ed. 1992) ("Objective").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 2.1 (1989) ("Provision of Quality Representation").

 *990 Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 2.9 (1989) ("Standards for Performance of Counsel").

### Commentary

### The Structure of Guideline 10

Guideline 10 mandates the establishment of performance standards designed to insure the provision of high quality legal representation. Compliance with Guideline 10 may therefore be relevant to a determination as to whether a jurisdiction meets the requirements of Chapter 154 of the AEDPA, which provides governments with procedural advantages if they choose to establish effectual mechanisms "for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent [capital] prisoners[, and] . . . provide standards of competency for the appointment of such counsel."[151]

Guideline 10.1 directs the Responsible Agency to promulgate performance standards. Guidelines 10.2-10.15.1 contain specific standards that should be included in any set of performance standards. They do not constitute a complete set of performance standards, however. They address only those aspects of defense representation in which death penalty cases differ from other

types of criminal cases [152] and omit those that are applicable to the defense of criminal cases generally. Such standards should, however, also be included in the set established by the Responsible Agency, with the understanding that in capital cases the acceptable level of adherence to those standards must be higher than in non-capital ones. "[D]eath is . . . different" [153] and, as discussed in the commentary to Guideline 1.1, death penalty cases have become so specialized that defense counsel in such cases have duties and functions definably different from those of counsel in ordinary criminal cases. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles and rules, become **\*991** educated regarding a wide range of mental health issues and scientific technologies, and be able to develop strategies for applying them in the pressure-filled environment of high-stakes, complex litigation. The level of attorney competence that may be tolerable in non-capital cases [154] can be fatally inadequate in capital ones. [155] The standards of performance established under this Guideline should accordingly insure that all aspects of the representation conform to the special standard of practice applicable to capital cases. [156]

**\*992** Consistent with the overall purpose of these Guidelines [157] the specific standards of Guidelines 10.2-15.2 are intended to describe appropriate professional conduct. Compliance with those standards may therefore be relevant in the judicial evaluation of the performance of defense counsel to determine the validity of a capital conviction or death sentence. [158] They should in any event be utilized by the Responsible Agency in determining the eligibility of counsel for appointment or reappointment to capital cases and when monitoring the performance of counsel. [159]

### **\*993** GUIDELINE 10.2--APPLICABILITY OF PERFORMANCE STANDARDS

Counsel should provide high quality legal representation in accordance with these Guidelines for so long as the jurisdiction is legally entitled to seek the death penalty.

### History of Guideline

This Guideline is based on Guideline 11.3 of the original edition and has been revised for consistency with Guideline 1.1.

### Related Standards

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.1 (1973) ("Availability of Publicly Financed Representation in Criminal Cases").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 2.5 (1989) ("Early Representation").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 2.6 (1989) ("Duration and Continuity of Representation").

ABA, The Ten Principles of a Public Defense Delivery System, Principle 3 (2002) ("Clients Are Screened for Eligibility, and Defense Counsel Is Assigned and Notified of Appointment, as Soon as Feasible After Clients' Arrest, Detention, or Request for Counsel") (footnote omitted).

### Commentary

The Supreme Court has stated that the "existence [of a death penalty statute] on the statute books provide[s] fair warning as to the **\*994** degree of culpability which the State ascribe[s] to the act of murder." [160] In accordance with Guideline 1.1 (B),

once a client is detained under circumstances in which the death penalty is legally possible, counsel should proceed as if it will be sought. [161]

As described supra in the text accompanying footnotes 13-17, early investigation to determine weaknesses in the State's case and uncover mitigating evidence is a necessity, and should not be put off in the hope that the death penalty will not be requested, or that the request will be dropped at a later point.

Moreover, early investigation may uncover mitigating circumstances or other information that will convince the prosecutor to forego pursuit of a death sentence. [162]

Jurisdictions vary in whether the defense must be formally notified as to whether the prosecution will seek the death penalty. [163] If required **995** notice has not been given, counsel is under no duty to invite a death penalty prosecution. While preparing for a capital case when notice has not been given, counsel should also prepare to challenge any prosecution efforts that should be barred for failure to give notice. [164]

Counsel must continue to treat the case as capital "until the imposition of the death penalty is no longer a legal possibility." [165]

### *996  GUIDELINE 10.3--OBLIGATIONS OF COUNSEL RESPECTING WORKLOAD

Counsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines.

### History of Guideline

This Guideline is based on Guideline 6.1 of the original edition.

### Related Standards

ABA Standards for Criminal Justice: Providing Defense Services Standard 5-5.3 (3d ed. 1992) ("Workload").

ABA Standards for Criminal Justice: Defense Function Standard 4-1.3 ("Delays; Punctuality; Workload") in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.1 (1976) ("Establishing Maximum Pending Workload Levels for Individual Attorneys").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.2 (1976) ("Statistics and Record-keeping").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 5.3 (1976) ("Elimination of Excessive Caseloads").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline III-12 (1984) ( "Case and Work Overload").

**997** Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 1.3 (1995) ("General Duties of Defense Counsel").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.1(c) (1989) ("Establishment and General Operation of Assigned Counsel Roster").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.1.2 (1989) ("Workloads of Attorneys").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.12 (1973) ("Workload of Public Defenders").

## Commentary

It is each attorney's duty under the Model Rules of Professional Conduct neither to accept employment when it would jeopardize the lawyer's ability to render competent representation [166] nor to handle cases without "adequate preparation." [167] Applying these professional norms to the special context of defense representation in death penalty cases, this Guideline mandates that attorneys maintain a workload consistent with the provision of high quality legal representation, bearing in mind the considerations discussed in the commentary to Guideline 6.1

Once having agreed to represent a capital client, counsel should control their overall workload so as to be able to do so effectively. Counsel who determine, in the exercise of best professional judgment, that accepting new cases or continuing with old ones will lead to providing capital defense representation of less than high quality should take such steps as may be appropriate to reduce pending or projected caseloads, such as seeking assistance from the Responsible Agency, refusing further cases and moving to withdraw from existing cases.

*998 In short, an attorney whose workload threatens to cause a breach of his or her obligations under these Guidelines has a duty to take corrective action. Counsel in that situation may not simply attempt to muddle through.

## *999 GUIDELINE 10.4--THE DEFENSE TEAM

A. When it is responsible for designating counsel to defend a capital case, the Responsible Agency should designate a lead counsel and one or more associate counsel. The Responsible Agency should ordinarily solicit the views of lead counsel before designating associate counsel.

B. Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards.

1. Subject to the foregoing, lead counsel may delegate to other members of the defense team duties imposed by these Guidelines, unless:

a. The Guideline specifically imposes the duty on "lead counsel," or

b. The Guideline specifically imposes the duty on "all counsel" or "all members of the defense team."

C. As soon as possible after designation, lead counsel should assemble a defense team by:

1. Consulting with the Responsible Agency regarding the number and identity of the associate counsel;

2. Subject to standards of the Responsible Agency that are in accord with these Guidelines and in consultation with associate counsel to the extent practicable, selecting and making any appropriate contractual agreements with non-attorney team members in such a way that the team includes:

**\*1000**  a. at least one mitigation specialist and one fact investigator;

b. at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments; and

c. any other members needed to provide high quality legal representation.

D. Counsel at all stages should demand on behalf of the client all resources necessary to provide high quality legal representation. If such resources are denied, counsel should make an adequate record to preserve the issue for further review.

### History of Guideline

This Guideline is new. It supplements Guideline 4.1.

### Related Standards

ABA Criminal Justice Mental Health Standards Standard 7-1.1 (1986) ("Roles of Mental Health and Mental Retardation Professionals in the Criminal Process").

ABA Criminal Justice Mental Health Standards Standard 7-5.7 (1986) ( "Evaluation and Adjudication of Competence to Be Executed; Stay of Execution; Restoration of Competence").

ABA Standards for Criminal Justice: Prosecution Function Standard 3-2.4 ("Special Assistants, Investigative Resources, Experts") in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Defense Function Standard 4-4.1 ("Duty to Investigate") in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

**\*1001**  Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 4.1 (1995) ("Investigation").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts, Standard 13.14 (1973) ("Supporting Personnel and Facilities").

Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.15 (1973) ("Providing Assigned Counsel").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating and Awarding Governmental Contracts for Criminal Defense Services, Guideline III-8 (1984) ( "Support Staff and Forensic Experts").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating & Awarding Governmental Contracts for Criminal Defense Services, Guideline III-9 (1984) ( "Investigators").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Negotiating & Awarding Governmental Contracts for Criminal Defense Services, Guideline III-10 (1984) ( "Compensation").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 3.1 (1976) ("Assigned Counsel Fees and Supporting Services").

Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guideline 3.4 (1976) ("Nonpersonnel Needs in Defender Offices").

Nat'l Legal Aid & Defender Ass'n, Standards for the Administration of Assigned Counsel Systems Standard 4.6 (1989) ("Support Services").

 **\*1002** Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act, Section 2 (1970) ("Right to Representation, Services, and Facilities").

Nat'l Conf. of Comm'rs on Unif. State Laws, Model Public Defender Act, Section 12 (1970) ("Personnel and Facilities").

## Commentary

As reflected in Guideline 4.1 and the accompanying commentary, the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines. [168] The team approach enhances the quality of representation by expanding the knowledge base available to prepare and present the case, increases efficiency by allowing attorneys to delegate many time-consuming tasks to skilled assistants and focus on the legal issues in the case, [169] improves the relationship with the client and his family by providing more avenues of communication, and provides more support to individual team members. [170]

This Guideline contemplates that the Responsible Agency will ordinarily [171] begin by designating lead counsel for a particular case and then, in consultation with that counsel, designate one or more associate counsel. [172] As described in Subsection B, the role of lead counsel is to direct the work of the defense team in such a way that, overall, it provides high quality legal representation in accordance with these Guidelines and professional standards. Accordingly, lead counsel is free **\*1003** to allocate the duties imposed by these Guidelines to appropriate members of the defense team, with two exceptions: (1) duties (such as the one contained in Subsection (C)) that are specifically imposed on "lead counsel," and (2) duties (such as the one contained in Guideline 10.13) that are specifically imposed on "all counsel" or "all members of the defense team."

After designation, lead counsel should assemble the rest of the defense team. The Responsible Agency should give lead counsel maximum flexibility in this regard. For example, counsel should structure the team in such a way as to distinguish between experts who will play a "consulting" role, serving as part of the defense team covered by the attorney-client privilege and work product doctrine, and experts who will be called to testify, thereby waiving such protections. [173] This may well require, in the words of the Guideline, "appropriate contractual arrangements" (Subsection C(2)).

However, Subsection C(2) provides that the Responsible Agency may impose standards on the composition of the defense team that are in accord with these Guidelines. Examples would include a requirement that a staff attorney of a defender organization utilize in-house resources in the first instance, that compensation levels be limited to levels consistent with Guideline 9.1(C), or that non-attorneys meet appropriate professional qualifications.

The defense team should include at least two attorneys, a fact investigator, and a mitigation specialist. The roles of these individuals are more fully described in the commentaries to Guideline 1.1 and Guideline 4.1. In addition, as also described in the commentary to Guideline 4.1, the team must have a member (who may be one of the foregoing or an additional person) with the necessary qualifications to screen individuals (the client in the first instance, but possibly family members as the mitigation

investigation progresses) for mental or psychological disorders or defects and to recommend such further investigation of the subject as may seem appropriate.

The team described in the foregoing paragraph is the minimum. In most cases, at least as trial approaches, the provision of high quality *1004 representation will require at least some contributions by additional lawyers--for example, a specialist to assist with motions practice and record preservation, or an attorney who is particularly knowledgeable about an area of scientific evidence. [174] As discussed in the commentary to Guideline 4.1, because mental health issues pervade capital cases, a psychologist or other mental health expert may well be a needed member of the defense team. As the commentary to Guideline 4.1 also discusses, additional expert assistance specific to the case will almost always be necessary for an effective defense.

At every stage of the case, lead counsel is responsible, in the exercise of sound professional judgment, for determining what resources are needed and for demanding that the jurisdiction provide them. Because the defense should not be required to disclose privileged communications or strategy to the prosecution in order to secure these resources, [175] it is counsel's obligation to insist upon making such requests ex parte and in camera. [176]

If requests for the resources needed to provide high quality legal representation at any stage of the proceedings are denied, counsel should make a full record to preserve the issue for further review. [177]

### *1005 GUIDELINE 10.5--RELATIONSHIP WITH THE CLIENT

A. Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.

B. 1. Barring exceptional circumstances, an interview of the client should be conducted within 24 hours of initial counsel's entry into the case.

2. Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards.

3. Counsel at all stages of the case should re-advise the client and the government regarding these matters as appropriate.

C. Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as:

1. the progress of and prospects for the factual investigation, and what assistance the client might provide to it;

2. current or potential legal issues;

3. the development of a defense theory;

4. presentation of the defense case;

*1006 5. potential agreed-upon dispositions of the case;

6. litigation deadlines and the projected schedule of case-related events; and

7. relevant aspects of the client's relationship with correctional, parole or other governmental agents (e.g., prison medical providers or state psychiatrists).

## History of Guideline

This Guideline collects, and slightly expands upon, material that was found in Guidelines 11.4.2, 11.6.1, and 11.8.3 of the original edition. The major revisions make this standard apply to all stages of a capital case and note expressly counsel's obligation to discuss potential dispositions of the case with the client.

## Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-3.1 ("Establishment of Relationship"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Defense Function Standard 4-3.2 ("Interviewing the Client"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Defense Function Standard 4-3.8 ("Duty to Keep Client Informed"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Defense Function Standard 4-5.2 ("Control and Direction of the Case"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

 *1007 Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 1.3(c) (1995) ("General Duties of Defense Counsel").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 2.2 (1995) ("Initial Interview").

ABA, The Ten Principles of a Public Defense Delivery System, Principle 3 (2000) ("Clients Are Screened for Eligibility, and Defense Counsel Is Assigned and Notified of Appointment, as Soon as Feasible After Clients' Arrest, Detention, or Request For Counsel") (footnote omitted).

## Commentary

### The Problem

Immediate contact with the client is necessary not only to gain information needed to secure evidence and crucial witnesses, but also to try to prevent uncounseled confessions or admissions and to begin to establish a relationship of trust with the client.

Anyone who has just been arrested and charged with capital murder is likely to be in a state of extreme anxiety. Many capital defendants are, in addition, severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; they may be depressed and even suicidal; or they may be in complete denial in the face of overwhelming evidence. In fact, the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that "[i]t must be assumed that the client is emotionally and intellectually impaired."[178] There will also often be significant cultural  *1008 and/or language barriers

between the client and his lawyers. In many cases, a mitigation specialist, social worker or other mental health expert can help identify and overcome these barriers, and assist counsel in establishing a rapport with the client.

Counsel's Duty Although, as described supra in the text accompanying notes 103-07, ongoing communication by non-attorney members of the defense team is important, it does not discharge the obligation of counsel at every stage of the case to keep the client informed of developments and progress in the case, and to consult with the client on strategic and tactical matters. Some decisions require the client's knowledge and agreement; [179] others, which may be made by counsel, should nonetheless be fully discussed with the client beforehand.

Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea. [180] Client contact must be ongoing, and include sufficient time spent at the prison to develop a rapport between attorney and client. An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial, appeal, post-conviction review, or clemency. Even if counsel manages to ask the right questions, a client will not--with good reason--trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls. It is also essential to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.

  *1009  Often, so-called "difficult" clients are the consequence of bad lawyering--either in the past or present. [181] Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation. [182]

Overcoming barriers to communication and establishing a rapport with the client are critical to effective representation. Even apart from the need to obtain vital information, [183] the lawyer must understand the client and his life history. [184] To communicate effectively on the client's behalf in negotiating a plea, addressing a jury, arguing to a post-conviction court, or urging clemency, counsel must be able to humanize the defendant. That cannot be done unless the lawyer knows the inmate well enough to be able to convey a sense of truly caring what happens to him. [185]

Counsel's Duties Respecting Uncooperative Clients Some clients will initially insist that they want to be executed--as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to  *1010  simply acquiesce to such wishes, which usually reflect the distorting effects of overwhelming feelings of guilt and despair rather than a rational decision in favor of a state-assisted suicide. [186] Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison. A client who insists on his innocence should be reminded that a waiver of mitigation will not persuade an appellate court of his innocence, and securing a life sentence may bar the state from seeking death in the event of a new trial. [187]

Counsel in any event should be familiar enough with the client's mental condition to make a reasoned decision--fully documented, for the benefit of actors at later stages of the case--whether to assert the position that the client is not competent to waive further proceedings. [188]

The Temporal Scope of Counsel's Duties The obligations imposed on counsel by this Guideline apply to all stages of the case. Thus, post-conviction counsel, from direct appeal through clemency, must not only consult with the client but also monitor the client's personal condition for potential legal consequences. [189] For example, actions by prison authorities (e.g., solitary confinement, administration of psychotropic medications) may impede the ability to present the client as a witness at a hearing or have legal implications, [190] **\*1011** and changes in the client's mental state (e.g., as a result of the breakup of a close relationship or a worsening physical condition) may bear upon his capacity to assist counsel and, ultimately, to be executed. [191] In any event, as already discussed, maintaining an ongoing relationship with the client minimizes the possibility that he will engage in counter-productive behavior (e.g., attempt to drop appeals, act out before a judge, confess to the media). Thus, the failure to maintain such a relationship is professionally irresponsible. [192]

### **\*1012  GUIDELINE 10.6--ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL**

A. Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B. Unless predecessor counsel has already done so, counsel representing a foreign national should:

1. immediately advise the client of his or her right to communicate with the relevant consular office; and

2. obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.

a. Counsel who is unable to obtain consent should exercise his or her best professional judgment under the circumstances.

### **History of Guideline**

This Guideline is new and reflects developments in law and practice since the original edition.

### **Related Standards**

Vienna Convention on Consular Relations and Optional Protocol on Disputes, April 24, 1963, art. 36, 21 U.S.T. 77, T.I.A.S. 6820.

### **Commentary**

The right to consular assistance is contained in Article 36 of the Vienna Convention on Consular Relations, a multilateral treaty ratified **\*1013** unconditionally by the United States in 1969. Under its provisions, an obligation rests on local authorities to promptly inform detained or arrested foreign nationals of their right to communicate with their consulate. At the request of the foreign national, local authorities must contact the consulate and permit consular communication and access.

There is considerable evidence that American local authorities routinely fail to comply with their obligations under the Vienna Convention. [193]

Any such failure is likely to have both practical and legal implications. As a practical matter, consuls are empowered to arrange for their nationals' legal representation and to provide a wide range of other services. These include, to name a few, enlisting the diplomatic assistance of their country to communicate with the State Department and international and domestic tribunals (e.g.,

through amicus briefs), assisting in investigations abroad, providing culturally appropriate resources to explain the American legal system, and arranging for contact with families and other supportive individuals. As a legal matter, a breach of the obligations of the Vienna Convention or a bilateral consular convention may well give rise to a claim on behalf of the client.

Enlisting the consulate's support after obtaining the client's consent to do so should therefore be viewed by counsel as an important element in defending a foreign national at any stage of a death penalty case, [194] **1014** and counsel should also give careful consideration to the assertion of any legal rights that the client may have as a result of any failure of the government to meet its treaty obligations.

Subsection B(2)(a) recognizes, however, that cases do vary. A range of considerations may make clients reluctant to have their consular office informed of their detentions. In many circumstances, such as those in which clients simply fear embarrassment if word of their plight reaches home, the attorney should counsel the client to overcome the reluctance. But if the client is a political dissident and the likely effect of informing the consulate would be to cause adverse consequences to his relatives without obtaining any assistance with the case, the attorney might reasonably abide by the client's direction to withhold notification. The matter should, however, be kept under continuing review, since conditions may well change over time.

Subsection A is included in the Guideline to emphasize that the determination of nationality may require some effort by counsel. A foreign government might recognize an American citizen as one of its nationals on the basis of an affiliation (e.g., one grandparent of that nationality) that would not be apparent at first glance.

## *1015  GUIDELINE 10.7--INVESTIGATION

A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

1. The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

2. The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

B. 1. Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

2. Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.

### History of Guideline

This Guideline is based on portions of Guideline 11.4.1 of the original edition. Changes in this Guideline clarify that counsel should conduct thorough and independent investigations relating to both guilt and penalty issues regardless of overwhelming evidence of guilt, client statements concerning the facts of the alleged crime, or client statements **1016** that counsel should refrain from collecting or presenting evidence bearing upon guilt or penalty.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

Subsection B(1) is new and describes the obligation of counsel at every stage to examine the defense provided to the client at all prior phases of the case. Subsection B(2) is also new and describes counsel's ongoing obligation to ensure that the official record of proceedings is complete.

**Related Standards**

ABA Standards for Criminal Justice: Defense Function Standard 4-4.1 ("Duty to Investigate"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 4.1 (1995) ("Investigation").

**Commentary**

At every stage of the proceedings, counsel has a duty to investigate the case thoroughly.[195] This duty is intensified (as are many duties) by the unique nature of the death penalty, has been emphasized by recent statutory changes,[196] and is broadened by the bifurcation of capital trials.[197] This Guideline outlines the scope of the investigation required by a capital case, but is not intended to be exhaustive.

  **\*1017** Guilt/Innocence As noted supra in the text accompanying notes 48-51, between 1976 and 2003 some 110 people were freed from death row in the United States on the grounds of innocence.[198] Unfortunately, inadequate investigation by defense attorneys--as well as faulty eyewitness identification, coerced confessions, prosecutorial misconduct, false jailhouse informant testimony,[199] flawed or false forensic evidence,[200] and the special vulnerability of juvenile suspects--have contributed to wrongful convictions in both capital and non-capital cases.[201] In capital cases, the mental vulnerabilities of a large portion of the client **\*1018** population compound the possibilities for error.[202] This underscores the importance of defense counsel's duty to take seriously the possibility of the client's innocence,[203] to scrutinize carefully the quality of the state's case, and to investigate and re-investigate all possible defenses.[204]

In this regard, the elements of an appropriate investigation include the following:

  1. Charging Documents:

Copies of all charging documents in the case should be obtained and examined in the context of the applicable law to identify:

a. the elements of the charged offense(s), including the element(s) alleged to make the death penalty applicable;

b. the defenses, ordinary and affirmative, that may be available to the substantive charge and to the applicability of the death penalty;

  **\*1019** c. any issues, constitutional or otherwise, (such as statutes of limitations or double jeopardy) that can be raised to attack the charging documents; and

d. defense counsel's right to obtain information in the possession of the government, and the applicability, extent, and validity of any obligation that might arise to provide reciprocal discovery.

2. Potential Witnesses:

a. Barring exceptional circumstances, counsel should seek out and interview potential witnesses, including, but not limited to:

(1) eyewitnesses or other witnesses having purported knowledge of events surrounding the alleged offense itself;

(2) potential alibi witnesses;

(3) witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), and the degree of culpability for the offense, including:

(a) members of the client's immediate and extended family

(b) neighbors, friends and acquaintances who knew the client or his family

(c) former teachers, clergy, employers, co-workers, social service providers, and doctors

(d) correctional, probation, or parole officers;

 *1020 (4) members of the victim's family.

b. Counsel should conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews. Counsel should investigate all sources of possible impeachment of defense and prosecution witnesses.

3. The Police and Prosecution:

Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports, autopsy reports, photos, video or audio tape recordings, and crime scene and crime lab reports together with the underlying data therefor. Where necessary, counsel should pursue such efforts through formal and informal discovery.

4. Physical Evidence:

Counsel should make a prompt request to the relevant government agencies for any physical evidence or expert reports relevant to the offense or sentencing, as well as the underlying materials. With the assistance of appropriate experts, counsel should then aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence.

5. The Scene:

Counsel should view the scene of the alleged offense as soon as possible. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g., weather, time of day, and lighting conditions).  *1021 Penalty Counsel's duty to investigate and present mitigating evidence is now well established. [205] The duty to investigate exists regardless of the expressed desires of a client. [206] Nor may counsel "sit idly by, thinking that investigation would be futile." [207] Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case. [208]

**\*1022** Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant,"[209] "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."[210] At least in the case of the client, this begins with the moment of conception.[211] Counsel needs to explore:

> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e. g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

**\*1023** (3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e. g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.[212]

Accordingly, immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client to:

> 1. discuss the alleged offense or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

2. explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors; and

**\*1024** 3. obtain necessary releases for securing confidential records relating to any of the relevant histories.

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview. Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer. As noted supra in the text accompanying note 103, a mitigation specialist who is trained to recognize and overcome these barriers, and who has

the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others.[213] Records--from courts, government agencies, the military, employers, etc.--can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness,[214] and corroborating witnesses' recollections. Records should be requested **\*1025** concerning not only the client, but also his parents, grandparents, siblings, cousins, and children.[215] A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.[216] The collection of corroborating information from multiple sources--a time-consuming task--is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.[217]

Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members, including but not limited to:

a. school records

b. social service and welfare records

c. juvenile dependency or family court records

d. medical records

e. military records

f. employment records

g. criminal and correctional records

h. family birth, marriage, and death records

i. alcohol and drug abuse assessment or treatment records

j. INS records

If the client was incarcerated, institutionalized or placed outside of the home, as either a juvenile or an adult, the defense team should investigate the possible effect of the facility's conditions on the client's **\*1026** contemporaneous and later conduct.[218] The investigation should also explore the adequacy of institutional responses to childhood trauma, mental illness, or disability to determine whether the client's problems were ever accurately identified or properly addressed.[219] Even if the institution that responded to the client was not grossly abusive or neglectful, it may have been incompetent in a number of ways. For example, IQ testing or other psychological evaluations may have been performed by untrained personnel or using inappropriate instruments--flaws that might not appear on the face of the institutional records.

The circumstances of a particular case will often require specialized research and expert consultation. For example, if a client grew up in a migrant farm worker community, counsel should investigate what pesticides the client may have been exposed

to and their possible effect on a child's developing brain.[220] If a client is a relatively recent immigrant, counsel must learn about the client's culture, about the circumstances of his upbringing in his country of origin, and about the difficulties the client's immigrant community faces in this country.[221] Counsel should also be particularly sensitive in these circumstances to language or translation difficulties that may unwittingly have led to misunderstandings between the client and others, including government officials and members of the community at large, with whom he may have come into contact.

**\*1027** Miscellaneous Concerns Counsel should maintain copies of media reports about the case for various purposes, including to support a motion for change of venue, if appropriate, to assist in the voir dire of the jury regarding the effects of pretrial publicity, to monitor the public statements of potential witnesses, and to facilitate the work of counsel who might be involved in later stages of the case.

Counsel must also investigate prior convictions, adjudications, or unadjudicated offenses that could be used as aggravating circumstances or otherwise come into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside.[222] Counsel may also find extenuating circumstances that can be offered to lessen the weight of a conviction, adjudication, or unadjudicated offense.[223]

Additional investigation may be required to provide evidentiary support for other legal issues in the case, such as challenging racial discrimination in the imposition of the death penalty or in the composition of juries.[224] Whether within the criminal case or outside it, counsel has a duty to pursue appropriate remedies if the investigation reveals that such conditions exist.[225]

As discussed infra in the text accompanying notes 249-52, counsel should consider making overtures to members of the victim's family--possibly through an intermediary, such as a clergy member, defense-victim liaison, or representative of an organization such as Murder Victim's Families for Reconciliation--to ascertain their feelings about the death penalty and/or the possibility of a plea.[226]

**\*1028 GUIDELINE 10.8--THE DUTY TO ASSERT LEGAL CLAIMS**

A. Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:

1. consider all legal claims potentially available; and

2. thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted; and

3. evaluate each potential claim in light of:

a. the unique characteristics of death penalty law and practice; and

b. the near certainty that all available avenues of post-conviction relief will be pursued in the event of conviction and imposition of a death sentence; and

c. the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; and

d. any other professionally appropriate costs and benefits to the assertion of the claim.

B. Counsel who decide to assert a particular legal claim should:

1. present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction; and

**\*1029** 2. ensure that a full record is made of all legal proceedings in connection with the claim.

C. Counsel at all stages of the case should keep under consideration the possible advantages to the client of:

1. asserting legal claims whose basis has only recently become known or available to counsel; and

2. supplementing claims previously made with additional factual or legal information.

### History of Guideline

This Guideline is based on Guideline 11.5.1 ("The Decision to File Pretrial Motions") and Guideline 11.7.3 ("Objection to Error and Preservation of Issues for Post Judgment Review") of the original edition. New language makes clear that the obligations imposed by this Guideline exist at every stage of the proceeding and extend to procedural vehicles other than the submission of motions to the trial court.

In Subsection A(3)(b), the phrase "near certainty" is new and replaces the word "likelihood" from the original edition. The change reflects recent scholarship indicating that appellate and post-conviction remedies are pursued by almost 100% of capital defendants who are convicted and sentenced to death.

Subsections B and C are new to this edition.

### Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-3.6 ("Prompt Action to Protect the Accused"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Defense Function Standard 4-4.5 ("Compliance with Discovery Procedure"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

**\*1030** Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 5.1 (1995) ("The Decision to File Pretrial Motions").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 5.3 (1995) ("Subsequent Filing of Pretrial Motions").

### Commentary

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial." [227] For this reason, trial counsel in a death penalty case must be especially aware not only of strategies for winning at trial, [228] but also of the heightened need to fully preserve all potential issues for later review.

As the text of the first sentence of Subsection A makes clear, this obligation is not limited to trial counsel or to motions made to the trial court. For example, if a state post-conviction court rules on the merits of a claim for relief, the claim will be available for federal review even if the state's rules required the issue to be raised at trial. [229] So, too, it may be appropriate for counsel

to proceed on some claims (e.g., double jeopardy) by seeking an interlocutory supervisory writ from an appellate **\*1031** court [230] or by otherwise seeking relief outside the confines of the capital litigation itself. [231]

As discussed supra in the text accompanying note 28, most jurisdictions have strict waiver rules that will forestall post-judgment relief if an issue was not litigated at the first opportunity. An issue may be waived not only by the failure to timely file a pretrial motion, but also because of the lack of a contemporaneous objection at trial, or the failure to request a jury instruction, or counsel's failure to comply with some other procedural requirement established by statute, court rule, or case law. Counsel must therefore know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection, or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings.

Whether raising an issue specific to a capital case (such as requesting individual, sequestered voir dire on death-qualification of the jury) or a more common motion shaped by the capital aspect of the case (such as requesting a change of venue because of publicity), counsel should be sure to litigate all of the possible legal [232] and factual [233] bases **\*1032** for the request. This will increase the likelihood that the request will be granted and will also fully preserve the issue for post-conviction review in the event the claim is denied.

Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case. [234] As described in the commentary to Guideline 1.1, counsel also has a duty, pursuant to Subsection (A)(3)(a)-(c) of this Guideline, to preserve issues calling for a change in existing precedent; the client's life may well depend on how zealously counsel discharges this duty. [235] Counsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices. [236]

**\*1033** Because "[p]reserving all [possible] grounds can be very difficult in the heat of battle during trial," [237] counsel should file written motions in limine prior to trial raising any issues that counsel anticipate will arise at trial. All of the grounds should be set out in the motion. [238] Similarly, requests for rulings during the course of post-conviction proceedings (e.g., for investigative resources pursuant to Guideline 10.4(D)) should be made fully and formally.

In accordance with Subsection B(2), counsel at every stage must ensure that there is a complete record respecting all claims that are made, including objections, motions, statements of grounds, questioning of witnesses or venire members, oral and written arguments of both sides, discussions among counsel and the court, evidence proffered and received, rulings of the court, reasons given by the court for its rulings, and any agreements reached between the parties. If a court refuses to allow a proceeding to be recorded, counsel should state the objection to the court's refusal, to the substance of the court's ruling, and then at the first available opportunity make a record of what transpired in the unrecorded proceeding. [239] Counsel should also ensure that the record is clear with regard to the critical facts to support the claim. For example, if counsel objects to the peremptory strike of a juror as race-based, counsel should ensure that it is clear from the record not only that the prosecutor struck a particular juror, but the race of the juror, of every other member of the venire, and the extent to which the unchallenged venire members shared the characteristics claimed to be justifying the challenge. [240]

Further, as reflected in Guideline 10.7(B)(2), counsel at all stages of the case must determine independently whether the existing official record may incompletely reflect the proceedings, e.g., because the court reporter took notes but did not transcribe them or an interpreter's translation was inaccurate, or because the court clerk did not include legal memoranda in the record transmitted to subsequent courts, or there was official negligence or misconduct.

As the nonexclusive list of considerations in Subsection A(3) suggests, there are many instances in which counsel should assert legal claims even though their prospects of immediate success on the merits **\*1034** are at best modest. Examples of such

circumstances (in addition to those in which counsel need to forestall later procedural defenses (Subsection A(3)(c)), include instances where:

> • the claim should be preserved in light of foreseeable future events (e.g., the completion of an investigation, a ruling in a relevant case); or

• asserting the claim may increase the government's incentive to reach an agreed-upon disposition; or

• the presentation made in support of the claim may favorably influence other relevant actors (e.g., the Governor). [241]

**\*1035  GUIDELINE 10.9.1--THE DUTY TO SEEK AN AGREED-UPON DISPOSITION**

A. Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition.

B. Counsel at every stage of the case should explore with the client the possibility and desirability of reaching an agreed-upon disposition. In so doing, counsel should fully explain the rights that would be waived, the possible collateral consequences, and the legal, factual, and contextual considerations that bear upon the decision. Specifically, counsel should know and fully explain to the client:

1. the maximum penalty that may be imposed for the charged offense(s) and any possible lesser included or alternative offenses;

2. any collateral consequences of potential penalties less than death, such as forfeiture of assets, deportation, civil liabilities, and the use of the disposition adversely to the client in penalty phase proceedings of other prosecutions of him as well as any direct consequences of potential penalties less than death, such as the possibility and likelihood of parole, place of confinement and good-time credits;

3. the general range of sentences for similar offenses committed by defendants with similar backgrounds, and the impact of any applicable sentencing guidelines or mandatory sentencing requirements;

 **\*1036**  4. the governing legal regime, including but not limited to whatever choices the client may have as to the fact finder and/or sentencer;

5. the types of pleas that may be agreed to, such as a plea of guilty, a conditional plea of guilty, or a plea of nolo contendere or other plea which does not require the client to personally acknowledge guilt, along with the advantages and disadvantages of each;

6. whether any agreement negotiated can be made binding on the court, on penal/parole authorities, and any others who may be involved;

7. the practices, policies and concerns of the particular jurisdiction, the judge and prosecuting authority, the family of the victim and any other persons or entities which may affect the content and likely results of plea negotiations;

8. concessions that the client might offer, such as:

a. an agreement to waive trial and to plead guilty to particular charges;

b. an agreement to permit a judge to perform functions relative to guilt or sentence that would otherwise be performed by a jury or vice versa;

c. an agreement regarding future custodial status, such as one to be confined in a more onerous category of institution than would otherwise be the case;

d. an agreement to forego in whole or part legal remedies such as appeals, motions for post-conviction relief, and/or parole or clemency applications;

*1037 e. an agreement to provide the prosecution with assistance in investigating or prosecuting the present case or other alleged criminal activity;

f. an agreement to engage in or refrain from any particular conduct, as appropriate to the case;

g. an agreement with the victim's family, which may include matters such as: a meeting between the victim's family and the client, a promise not to publicize or profit from the offense, the issuance or delivery of a public statement of remorse by the client, or restitution;

h. agreements such as those described in Subsections 8(a)-(g) respecting actual or potential charges in another jurisdiction;

9. benefits the client might obtain from a negotiated settlement, including:

a. a guarantee that the death penalty will not be imposed;

b. an agreement that the defendant will receive a specified sentence;

c. an agreement that the prosecutor will not advocate a certain sentence, will not present certain information to the court, or will engage in or refrain from engaging in other actions with regard to sentencing;

d. an agreement that one or more of multiple charges will be reduced or dismissed;

e. an agreement that the client will not be subject to further investigation or prosecution for uncharged alleged or suspected criminal conduct;

*1038 f. an agreement that the client may enter a conditional plea to preserve the right to further contest certain legal issues;

g. an agreement that the court or prosecutor will make specific recommendations to correctional or parole authorities regarding the terms of the client's confinement;

h. agreements such as those described in Subsections 9(a)-(g) respecting actual or potential charges in another jurisdiction.

C. Counsel should keep the client fully informed of any negotiations for a disposition, convey to the client any offers made by the prosecution, and discuss with the client possible negotiation strategies.

D. Counsel should inform the client of any tentative negotiated agreement reached with the prosecution, and explain to the client the full content of the agreement along with the advantages, disadvantages and potential consequences of the agreement.

E. If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate. Similarly, a client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.

F. Counsel should not accept any agreed-upon disposition without the client's express authorization.

G. The existence of ongoing negotiations with the prosecution does not in any way diminish the obligations of defense counsel respecting litigation.

**\*1039  History of Guideline**

Guideline 10.9.1 is based on aspects of Guidelines 11.6.1, 11.6.2, and 11.6.3 of the original edition. New language has been added to clarify the importance of pursuing an agreed-upon disposition at every phase of the case, not just as a substitute for proceeding to trial initially. The current version of the Guideline also requires that counsel enter into a continuing dialogue with the client about the content of any such agreement, including advantages, disadvantages, and potential consequences.

This Guideline omits the requirement, which appeared in Guideline 11.6.1 of the original edition, of client consent to initiate plea discussions, in recognition of the possible unintended consequence of premature rejection of plea options by a suicidal or depressed client. However, Guideline 10.9.2(A) does require counsel to obtain the client's consent before accepting any agreed-upon disposition.

**Related Standards**

ABA Standards for Criminal Justice: Defense Function Standard 4-6.1 ("Duty to Explore Disposition Without Trial"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Defense Function Standard 4-6.2 ("Plea Discussions"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Pleas of Guilty Standard 14-3.2 (3d ed. 1999) ("Responsibilities of Defense Counsel").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 6.1 (1995) ("The Plea Negotiation Process and the Duties of Counsel").

**Commentary**

Guidelines 10.9.1-2 both deal with the subject of agreed-upon dispositions. They and their associated commentaries should be read together.

**\*1040**  "Death is different because avoiding execution is, in many capital cases, the best and only realistic result possible"; as a result, plea bargains in capital cases are not usually "offered" but instead must be "pursued and won." [242] Agreements are often only possible after many years of effort. Accordingly, this Guideline emphasizes that the obligation of counsel to seek an agreed-upon disposition continues throughout all phases of the case. As in other sorts of protracted litigation, circumstances change over time (e.g., through replacement of a prosecutor, death of a prosecution witness, alteration in viewpoint of a key family member of the client or the victim, favorable developments in the law or the litigation, reconsideration by the client) and as they do new possibilities arise. [243] Whenever they do, counsel must pursue them.

In many jurisdictions, the prosecution will consider waiving the death penalty after the defense makes a proffer of the mitigating evidence that would be presented at the penalty phase and explains why death would be legally and/or factually inappropriate. In some states and the federal government, this process is formalized and occurs before a decision is made whether to seek the death penalty. [244] In other **1041** jurisdictions, the process is not formalized and may occur after the prosecution has announced its intention to seek the death penalty. In either event, the mitigation investigation is crucial to persuading the prosecution not to seek death. [245]

Although, for the reasons explained in the History to this Guideline, counsel does not need to have obtained client consent before entering into plea discussions, counsel does need to have thoroughly examined the quality of the prosecution's case and investigated possible first-phase defenses and mitigation, as discussed in the commentary to Guideline 10.7. Counsel must also consider the collateral consequences of entering a plea. For example, when the resulting adjudication of guilt could be used as an aggravating circumstance in another pending case, counsel should endeavor to structure an agreement that would resolve both cases without imposition of the death penalty.

In some cases, where there is a viable first-phase defense, it may be possible to negotiate a plea to a lesser charge. And if it is trial counsel's perception that the death penalty is being sought primarily to allow selection of a death-qualified (and therefore conviction-prone) jury, counsel should seek to remedy the situation through litigation in accordance with Guideline 10.8 as well as through negotiation. In many capital cases, however, the prosecution's evidence of guilt is strong, and there is little or no chance of charge bargaining. In these cases, a guilty plea in exchange for life imprisonment is the best available outcome.

These considerations mean that in the area of plea negotiations, as in so many others, death penalty cases are sui generis. Many bases for bargaining in non-capital cases are irrelevant or have little practical significance in a capital case, [246] and some uniquely restrictive legal principles apply. [247] Emotional and political pressures, including ones from the victim's family or the media, are especially likely to limit the government's willingness to bargain. On the other hand, the complexity, **1042** expense, legal risks, and length of the capital trial and appellate process may make an agreement particularly desirable for the prosecution. [248]

A very difficult but important part of capital plea negotiation is often contact with the family of the victim. [249] In some states, the prosecution is required to notify and confer with the victim's family prior to entering a plea agreement. [250] Any approaches to the victim's family should be undertaken carefully and with sensitivity. Counsel should be creative in proposing resolutions that may satisfy the needs of the victim's family, including providing more immediate closure by expressly foregoing appeals or arranging an apology or meeting between the victim's family and the client if the client is willing and able to do so. As described supra in the text accompanying note 226, the defense team should consider seeking the assistance of clergy, a defense-victim liaison, or an organization of murder victims' families in the outreach effort and in crafting possible resolutions. In any event, because the victim's family can be critical to achieving a settlement, [251] defense counsel should make the decision regarding contact on a fully informed and professional basis, rather than because of nervousness over entering a situation that might be emotionally stressful or in reliance on an unsupported guess as to what the response to an approach might be.

Except in unusual circumstances, all agreements that are made should be formally documented between the parties concerned (e.g., in a writing between the client and representatives of the victim). In any event, counsel has an obligation under Guideline 10.13 to maintain in his or her own files a complete written description of any agreement.

Agreements for action or nonaction by government actors in exchange for a plea of guilty are governed by Guideline 10.9.2(B) (2) and, for the client's future benefit, should be set forth as clearly as possible on the record. [252]

In addition to persuading the prosecution to negotiate a resolution to the case, counsel must often persuade the client as well. As discussed **1043** in the commentary to Guidelines 10.5 and 10.9.2, a relationship of trust with the client is essential to

accomplishing this. The entire defense team must work from the outset of the case with the client and others close to him to lay the groundwork for acceptance of a reasonable resolution.

If the possibility of a negotiated disposition is rejected by either the prosecution or the client when a settlement appears to counsel to be in the client's best interest, counsel should continue efforts at persuasion while also continuing to litigate the case vigorously (Subsection G).

### *1044  GUIDELINE 10.9.2--ENTRY OF A PLEA OF GUILTY

A. The informed decision whether to enter a plea of guilty lies with the client.

B. In the event the client determines to enter a plea of guilty:

1. Prior to the entry of the plea, counsel should:

a. make certain that the client understands the rights to be waived by entering the plea and that the client's decision to waive those rights is knowing, voluntary and intelligent;

b. ensure that the client understands the conditions and limits of the plea agreement and the maximum punishment, sanctions, and other consequences to which he or she will be exposed by entering the plea;

c. explain to the client the nature of the plea hearing and prepare the client for the role he or she will play in the hearing, including answering questions in court and providing a statement concerning the offense.

2. During entry of the plea, counsel should make sure that the full content and conditions of any agreements with the government are placed on the record.

### History of Guideline

This Guideline amends Guideline 11.6.4 of the original edition to clarify that the decision regarding whether to enter a plea of guilty must be informed and counseled, yet ultimately lies with the client.

### *1045  Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-6.1 ("Duty to Explore Disposition Without Trial") in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Defense Function Standard 4-6.2 ("Plea Discussions") in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Pleas of Guilty Standard 14-1.4 (3d ed. 1999) ("Defendant to Be Advised").

ABA Standards for Criminal Justice: Pleas of Guilty Standard 14-1.7 (3d ed. 1999) ("Record of Proceedings").

ABA Standards for Criminal Justice: Pleas of Guilty Standard 14-3.2 (3d ed. 1999) ("Responsibilities of Defense Counsel").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 6.3 (1995) ("The Decision to Enter a Plea of Guilty").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 6.4 (1995) ("Entry of the Plea Before the Court").

**Commentary**

If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights.

The relationship that the defense team has established with the client and his or her family will often determine whether the client will accept counsel's advice regarding the advisability of a plea. The case must therefore be diligently investigated so that the client will have as realistic a view of the situation as possible. As the commentary to Guideline 10.5 describes, a client will, quite reasonably, not accept **\*1046** counsel's advice about the case if the attorney has failed to conduct a meaningful investigation.[253]

A competent client is ultimately entitled to make his own choice. Counsel's role is to ensure that the choice is as well considered as possible. This may require counsel to work diligently over time to overcome the client's natural resistance to the idea of standing in open court, admitting to guilt, and perhaps agreeing to permanent imprisonment. Or it may require counsel to do everything possible to prevent a depressed or suicidal client from pleading guilty where such a plea could result in an avoidable death sentence.[254]

Because of the factors described supra in the text accompanying notes 178-92, it will often require the combined and sustained efforts of the entire defense team to dissuade the client from making a self-destructive decision. As noted there, the defense team may also need to call on family, friends, clergy, and others to provide information that assists the client in reaching an appropriate conclusion.

**\*1047 GUIDELINE 10.10.1--TRIAL PREPARATION OVERALL**

As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.

**History of Guideline**

The revisions to this Guideline, which was formerly Guideline 11.7.1, are stylistic.

**Related Standards**

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 4.3 (1995) ("Theory of the Case").

**Commentary**

Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case. In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated. The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt.[255] At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a

non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory[256] that will be reinforced by its presentation at both the guilt and *1048 mitigation stages.[257] Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument.[258]

### *1049  GUIDELINE 10.10.2--VOIR DIRE AND JURY SELECTION

A. Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge. Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.

B. Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's beliefs about the death penalty. Counsel should be familiar with techniques: (1) for exposing those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the defendant is death-eligible, regardless of the individual circumstances of the case; (2) for uncovering those prospective jurors who are unable to give meaningful consideration to mitigating evidence; and (3) for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

C. Counsel should consider seeking expert assistance in the jury selection process.

### History of Guideline

This Guideline is based on Guideline 11.7.2 of the original edition. Subsection A of the Guideline has been amended to make clear that potential jury composition challenges should not be limited to the petit jury, but should also include the selection of the grand jury and grand *1050 jury forepersons. Subsection B has been amended to reflect recent scholarship demonstrating that the starkest failures of capital voir dire are the failure to uncover jurors who will automatically impose the death penalty following a conviction or finding of the circumstances which make the defendant eligible for the death penalty, and the failure to uncover jurors who are unable to consider particular mitigating circumstances. Subsection C is new. Its language is derived from Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation Guideline 7.2(a)(7) (1995) ("Voir Dire and Jury Selection"), and the accompanying commentary.

### Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-7.2 ("Selection of Jurors"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.1 ("Selection of Prospective Jurors"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.2 ("Juror Questionnaires"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.3 ("Challenge to the Array"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.4 ("Conduct of Voir Dire Examination"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.5 ("Challenges for Cause"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

**\*1051**  ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.6 ("Peremptory Challenges"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.7 ("Procedure for Exercise of Challenges; Swearing the Jury"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.8 ("Impermissible Peremptory Challenges"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

ABA Standards for Criminal Justice: Trial by Jury Standard 15-2.9 ("Alternate Jurors"), in ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996).

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 7.2 (1995) ("Voir Dire and Jury Selection").

## Commentary

Jury selection is important and complex in any criminal case.[259]  In capital cases, it is all the more critical. Counsel should devote substantial time to determining the makeup of the venire, preparing a case-specific set of voir dire questions, planning a strategy for voir dire, and choosing a jury most favorable to the theories of mitigation that will be presented. Given the intricacy of the process and the sheer amount of data to be managed, counsel should consider obtaining the assistance of an expert jury consultant.[260]

**\*1052**  Counsel's jury selection strategy should minimize the problem of "death qualified" juries that result from exclusion of potential jurors whose opposition to capital punishment effectively skews the jury pool not only as to imposition of the death penalty but as to conviction.[261]  Case law stemming from Supreme Court decisions that address capital jury selection procedures[262] has resulted in a highly specialized and technical procedure. As a practical matter, the burden rests with defense counsel to "life qualify" a jury. Counsel should conduct a voir dire that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law, whether because they will automatically vote for death in certain circumstances or because  **\*1053**  they are unwilling to consider mitigating evidence.[263]  Counsel should also develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty. Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations,[264] counsel should determine whether discrimination is involved in the jury selection process. Counsel should investigate whether minorities or women are underrepresented on the jury lists from which grand and petit juries are drawn, or if race or gender played a role in the selection of grand jury forepersons.[265]  The defense in a capital case is entitled to voir dire to discover those potential jurors poisoned by racial bias, and should do so when appropriate.[266]  Death qualification often results in the removal of more prospective jurors who are members of minority groups than those who are white, because minority jurors are more likely to express reservations about the death penalty.[267]  Neither race nor gender may form a basis for peremptory challenges,[268] but a recent empirical analysis of capital murder cases supports the conclusion that "discrimination in the use of peremptory challenges on the basis of race and gender . . . is widespread."[269]  Counsel should listen closely to the prosecutor's voir  **\*1054**  dire, challenges for cause and reasons for exercising peremptory challenges, make appropriate objections, and ensure that all information critical to a discrimination claim is preserved on the record.[270]

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

**\*1055  GUIDELINE 10.11--THE DEFENSE CASE CONCERNING PENALTY**

A. As set out in Guideline 10.7(A), counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.

B. Trial counsel should discuss with the client early in the case the sentencing alternatives available, and the relationship between the strategy for the sentencing phase and for the guilt/innocence phase.

C. Prior to the sentencing phase, trial counsel should discuss with the client the specific sentencing phase procedures of the jurisdiction and advise the client of steps being taken in preparation for sentencing.

D. Counsel at every stage of the case should discuss with the client the content and purpose of the information concerning penalty that they intend to present to the sentencing or reviewing body or individual, means by which the mitigation presentation might be strengthened, and the strategy for meeting the prosecution's case in aggravation.

E. Counsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing or reviewing body or individual.

F. In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:

1. Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be  \*1056  explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;

2. Expert and lay witnesses along with supporting documentation (e.g., school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor;

3. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

4. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

5. Demonstrative evidence, such as photos, videos, and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts, and letters of praise or reference.

G. In determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense case will open the door to the prosecution's presentation of otherwise  \*1057  inadmissible aggravating evidence. Counsel should pursue all appropriate means (e.g., motions in limine) to ensure that the defense case concerning penalty is constricted as little as possible by this consideration, and should make a full record in order to support any subsequent challenges.

H. Trial counsel should determine at the earliest possible time what aggravating factors the prosecution will rely upon in seeking the death penalty and what evidence will be offered in support thereof. If the jurisdiction has rules regarding notification of

these factors, counsel at all stages of the case should object to any non-compliance, and if such rules are inadequate, counsel at all stages of the case should challenge the adequacy of the rules.

I. Counsel at all stages of the case should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible.

J. If the prosecution is granted leave at any stage of the case to have the client interviewed by witnesses associated with the government, defense counsel should:

1. carefully consider

a. what legal challenges may appropriately be made to the interview or the conditions surrounding it, and

b. the legal and strategic issues implicated by the client's co-operation or non-cooperation;

2. insure that the client understands the significance of any statements made during such an interview; and

\*1058  3. attend the interview.

K. Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions. Post-conviction counsel should pursue these issues through factual investigation and legal argument.

L. Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.

### History of Guideline

The substance of this Guideline is drawn from Guideline 11.8.3 of the original edition. The principal changes are the expansion of coverage to counsel at all stages of the proceedings, and language changes to underscore the range and importance of expert testimony in capital cases, the breadth of mitigating evidence, and counsel's duty to present arguments in mitigation.

### Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-8.1 ("Sentencing"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 8.1 (1995) ("Obligations of Counsel in Sentencing").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 8.2 (1995) ("Sentencing Options, Consequences and Procedures").

### \*1059  Commentary

Capital sentencing is unique in a variety of ways, but only one ultimately matters: the stakes are life and death.

This commentary is written primarily from the perspective of trial counsel. But corresponding obligations rest on successor counsel. This Guideline has been broadened to include them because of the realities that in capital cases (a) more evidence tends to become available to the defense as time passes, [271] and (b) updated presentations of the defense case on penalty in accordance with Guideline 10.15.1(E)(3) may influence decisionmakers both on the bench (e.g., an appellate court considering a claim of ineffective assistance of counsel) and off it (e.g., the prosecutor, the Governor).

The Importance of an Integrated Defense During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, "the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation." [272] Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime. [273] First phase defenses that seek to reduce the client's culpability for the crime (e.g., by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma. [274] But whether or not the guilt phase defense will be that the defendant did not **\*1060** commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase. [275]

The Defense Presentation at the Penalty Phase As discussed in the commentary to Guideline 10.7, areas of mitigation are extremely broad and encompass any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death. [276] Often, a mitigation presentation is offered not to justify or excuse the crime "but to help explain it." [277] If counsel cannot establish a direct cause and effect relationship between any one mitigating factor and the commission of a capital offense, **\*1061** counsel may wish to show the combination of factors that led the client to commit the crime. [278] But mitigation evidence need not be so limited. Depending on the case, counsel may choose instead to emphasize the impact of an execution on the client's family, the client's prior positive contributions to the community, or other factors unconnected to the crime which militate against his execution (Subsection F). In any event, it is critically important to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors. [279]

Since an understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present. Expert witnesses may be useful for this purpose and may assist the jury in understanding the significance of the observations. [280] For example, expert testimony may explain the permanent neurological damage caused by fetal alcohol syndrome or childhood abuse, or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control. [281] Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an "all-purpose" expert who may have insufficient knowledge or experience to testify persuasively. [282] In order to prepare effectively for trial, and to choose the best experts, counsel should take advantage of training materials and seminars and remain current on developments in fields such as neurology and psychology, which often have important implications for understanding clients' behavior. [283] Counsel should also **\*1062** seek advice and assistance from colleagues and experts in the field of capital litigation.

Counsel should ordinarily use lay witnesses as much as possible to provide the factual foundation for the expert's conclusions. [284] Community members such as co-workers, prison guards, teachers, military personnel, or clergy who interacted with the defendant or his family, or have other relevant personal knowledge or experience often speak to the jury with particular credibility. [285]

Family members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives of many capital defendants. These witnesses can also humanize the client by allowing the jury to see him in the context of his family,

showing that they care about him, and providing examples of his capacity to behave in a caring, positive way, such as attempting to protect other family members from domestic violence or trying to be a good parent and provider. [286] Similarly, acquaintances who can testify to the client's performance of good works in the community may help the decisionmaker to have a more complete view of him. None of this evidence should be offered as counterweight to the gravity of the crime, but rather to show that the person who committed the crime is a flawed but real individual rather than a generic evildoer, someone for whom one could reasonably see a constricted but worthwhile future.

In addition to humanizing the client, counsel should endeavor to show that the alternatives to the death penalty would be adequate punishment. Studies show that "future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials," whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration. [287] Accordingly, counsel should give serious consideration to making an explicit presentation of information on this subject. Evidence that the client has adapted well to prison and has had few disciplinary problems can allay jurors' fears and reinforce other positive mitigating evidence. [288] Counsel should therefore always  *1063  encourage the client not only to avoid any disciplinary infractions but also to participate in treatment programs and/or educational, religious or other constructive activities.

Counsel is entitled to impress upon the sentencer through evidence, argument, and/or instruction that the client will either never be eligible for parole, will be required to serve a lengthy minimum mandatory sentence before being considered for parole, or will be serving so many lengthy, consecutive sentences that he has no realistic hope of release. [289] In at least some jurisdictions, counsel may be allowed to present evidence concerning the conditions under which such a sentence would be served. [290]

Counsel should also consider, in consultation with the client, the possibility of the client expressing remorse for the crime in testimony, in allocution, or in a post-trial statement. If counsel decides that a trial presentation by the client is desirable, and the proposed testimony or allocution is forestalled by evidentiary rulings of the court either  *1064  disallowing it or conditioning it on unacceptable cross-examination, counsel should take care to make a full record of the circumstances, including the content of the proposed statement. In light of the strong common law underpinnings of allocution and the broad constitutional right to present mitigation that has already been described, any such issue is likely to merit the careful examination of successor counsel.

Finally, in preparing a defense presentation on mitigation, counsel must try to anticipate the evidence that may be admitted in response and to tailor the presentation to avoid opening the door to damaging rebuttal evidence that would otherwise be inadmissible. [291]

The Defense Response to the Prosecution's Penalty Phase Presentation Counsel should prepare for the prosecutor's case at the sentencing phase in much the same way as for the prosecutor's case at the guilt/innocence phase. [292] Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted, or undercut. As discussed in the commentary to Guideline 10.2, jurisdictions vary in whether the defense must be formally notified as to whether the prosecution will seek the death penalty. If required notice has not been given, counsel should also prepare to challenge at the sentencing phase any prosecution efforts that should be barred for failure to give notice. [293]

Counsel should carefully research applicable state and federal law governing the admissibility of evidence in aggravation. Where possible, counsel should move to exclude aggravating evidence as inadmissible, and, if that fails, rebut the evidence or offer mitigating evidence that will blunt its impact. [294]

 *1065  If (but only if) [295] the defense presents an expert who has examined the client, a prosecution expert may be entitled to examine the client to prepare for rebuttal. [296] Counsel should become familiar with the governing law regarding limitations on the scope of expert evaluations conducted by prosecution experts, and file appropriate motions to ensure that the scope

of the examination is no broader than legally permissible.[297] If the examination is not limited as counsel deem appropriate, Subsection J(1) requires them to give careful consideration to their response (e.g., refuse to participate on possible pain of preclusion, participate at the cost of an irretrievable surrender of information, seek relief from a higher court). Counsel must discuss with the client in advance any evaluation that is to take place and attend the examination in order to protect the client's rights (Subsections J(2)-(3)). Counsel may also seek to have the evaluation observed by a defense expert.

Counsel should integrate the defense response to the prosecution's evidence in aggravation with the overall theory of the case. In some cases, counsel's response to aggravating evidence at the penalty stage converges with the defense presentation at the guilt/ innocence phase. The prosecutor will offer no additional evidence at the penalty phase but will simply rely on aggravating factors established by the *1066 evidence at the guilt/innocence phase, such as that the murder was committed during the course of a felony.[298] In such cases, counsel's rebuttal presentation should focus on the circumstances of the crime, and defendant's conduct as it relates to the elements of the applicable aggravating circumstances.

In other cases, the prosecution will introduce additional aggravating evidence at the penalty stage. If the prosecutor seeks to introduce evidence of unadjudicated prior criminal conduct as aggravating evidence, counsel should fully investigate the circumstances of the prior conduct and determine whether it is properly admissible at the penalty stage.[299]

If the prosecution relies upon a prior conviction (as opposed to conduct), counsel should also determine whether it could be attacked as the product of an invalid guilty plea,[300] as obtained when the client was unrepresented by counsel,[301] as a violation of double jeopardy,[302] or on some other basis. Counsel should determine whether a constitutional challenge to a prior conviction must be litigated in the jurisdiction where the conviction occurred.[303]

*1067 In jurisdictions where victim impact evidence is permitted, counsel, mindful that such evidence is often very persuasive to the sentencer, should ascertain what, if any, victim impact evidence the prosecution intends to introduce at penalty phase, and evaluate all available strategies for contesting the admissibility of such evidence[304] and minimizing its effect on the sentencer.[305]

In particular, in light of the instability of the case law,[306] counsel should consider the federal constitutionality of admitting such evidence to be an open field for legal advocacy.[307]

Counsel should also evaluate how to blunt certain intangible factors that can be damaging to a capital defendant at sentencing, including the heinous nature of the crime or the sentencer's possible racial antagonism for the client.[308] In jurisdictions where the alternative to a death sentence is life without the possibility of parole, counsel should consider informing the jury of the defendant's parole ineligibility in order to blunt the concern that the defendant may one day be released from custody.[309] If they have not done so previously in building their affirmative case for *1068 a penalty less than death,[310] counsel should also consider putting on evidence describing the conditions under which the client would serve a life sentence to rebut aggravating evidence of future dangerousness.[311]

Jury Considerations Personal argument by counsel in support of a sentence less than death is important. Counsel who seeks to persuade a decisionmaker to empathize with the client must convey his or her own empathy.[312] While counsel may choose to discuss the gravity of the sentencer's life and death decision, the fact that the jury will have been death-qualified[313] means that trumpeting absolutist arguments against the death penalty is less likely to move the audience than sounding pro-life, pro-mercy notes that derive their resonance from the specific facts at hand.

It is essential that counsel object to evidentiary rulings, instructions, or verdict forms that improperly circumscribe the scope of the mitigating evidence that can be presented or the ability of the jury to consider and give effect to such evidence. [314] Counsel should also object to and be **\*1069** prepared to rebut arguments that improperly minimize the significance of mitigating evidence [315] or equate the standards for mitigation with those for a first-phase defense. [316] At the same time, counsel should request instructions that will ensure that the jury understands, considers, and gives effect to all relevant mitigating evidence. [317] It is vital that the instructions clearly convey the differing unanimity requirements applicable to aggravating and mitigating factors. [318]

If the jury instructions are insufficient to achieve the purposes described in the previous paragraph or are otherwise confusing or misleading, counsel must object, even if the instructions are the standard ones given in the jurisdiction. If the court does not instruct the jury on individual mitigating circumstances, counsel should spell them out in closing argument.

**\*1070** Record Preservation In some jurisdictions, counsel is required or allowed to either proffer to the court or present to the sentencer mitigating evidence, regardless of the client's wishes. [319] Even if such a presentation is not mandatory, counsel should endeavor to put all available mitigating evidence into the record because of its possible impact on subsequent decisionmakers in the case.

### \*1071 GUIDELINE 10.12--THE OFFICIAL PRESENTENCE REPORT

A. If an official presentence report or similar document may or will be presented to the court at any time, counsel should become familiar with the procedures governing preparation, submission, and verification of the report. In addition, counsel should:

1. where preparation of the report is optional, consider the strategic implications of requesting that a report be prepared;

2. provide to the report preparer information favorable to the client. In this regard, counsel should consider whether the client should speak with the person preparing the report; if the determination is made to do so, counsel should discuss the interview in advance with the client and attend it;

3. review the completed report;

4. take appropriate steps to ensure that improper, incorrect or misleading information that may harm the client is deleted from the report;

5. take steps to preserve and protect the client's interests where the defense considers information in the presentence report to be improper, inaccurate or misleading.

#### History of Guideline

This Guideline is based on Guideline 11.8.4 of the original edition. New requirements in the Guideline include: (1) counsel's obligation to become familiar with the procedures governing preparation, submission, and verification of official presentence reports, where there is a chance that such a report may be presented to the court at any time; (2) counsel's obligation to provide information that is favorable to the client **\*1072** to the person who is preparing the report; (3) counsel's obligation to prepare the client for and attend an interview with the person preparing the report, provided counsel has first determined such an interview to be appropriate.

#### Related Standards

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 8.3 (1995) ("Preparation for Sentencing").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 8.4 (1995) ("The Official Presentence Report").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 8.5 (1995) ("The Prosecution's Sentencing Position").

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 8.6 (1995) ("The Defense Sentencing Memorandum").

ABA Standards for Criminal Justice: Defense Function Standard 4-8.1 ("Sentencing") in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

### Commentary

In many jurisdictions, an official presentence report may be prepared prior to the imposition of sentence in a capital case.[320] How such reports may be used in the sentencing process differs from jurisdiction to jurisdiction, and counsel should become familiar with the statutes, court rules, case law, and local practice governing their use.[321]  **\*1073**  There are also constitutional limits on the use of presentence reports in capital sentencing.[322]

In some jurisdictions, a presentence report is not prepared unless requested by the defense. Counsel should carefully consider the implications of such a request.[323] In jurisdictions where a presentence report is prepared regardless of the wishes of the defense, counsel should submit information favorable to the client, including the client's social history and expert evaluations. If the report preparer does not include the defense materials, counsel should consider how they might otherwise be made part of the client's official records. This information may not only affect the sentencing decision, but also the client's classification, programming and treatment in the prison system following imposition of sentence. In any event, counsel should make a clear record of any inaccuracies they discern in the report.

### \*1074  GUIDELINE 10.13--THE DUTY TO FACILITATE THE WORK OF SUCCESSOR COUNSEL

In accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client and should cooperate fully with successor counsel. This duty includes, but is not limited to:

A. maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation;

B. providing the client's files, as well as information regarding all aspects of the representation, to successor counsel;

C. sharing potential further areas of legal and factual research with successor counsel; and

D. cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

### History of Guideline

This Guideline is new.

**Related Standards**

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 9.2(c) (1995) ("Right to Appeal").

**Commentary**

All members of the defense team must anticipate and facilitate the duty of successor counsel, embodied in Guideline 7.1(B) (1), to investigate the defense presentation at all prior stages of the case. As set forth in Subsection A, this duty includes an affirmative obligation to **\*1075** maintain contemporaneous records that will enable successor counsel to have a factual predicate for the assertion of whatever legal claims may arise. For example, there may be issues as to whether the government produced certain evidence or whether counsel knew of the existence of a particular witness or legal theory. Each counsel's files should be maintained in a manner sufficient to enable successor counsel to answer questions of this sort through appropriate documentation (e.g., notes of client interviews, telephone message slips, etc.).

Even after team members have been formally replaced, they must continue to safeguard the interests of the client. Specifically, they must cooperate with the professionally appropriate strategies of successor counsel (Subsection D). And this is true even when (as is commonly the case) successor counsel are investigating or asserting a claim that prior counsel was ineffective. [324] As the California Bar has ruled in a formal opinion,

> [T]he Rules of Professional Conduct impose a duty upon trial counsel to fully and candidly discuss matters relating to the representation of the client with appellate counsel and to respond to the questions of appellate counsel, even if to do so would be to disclose that trial counsel failed to provide effective assistance of counsel. This decision is in accord with the general rule that the attorney owes a duty of complete fidelity to the client and to the interests of the client. [325]

The duties contained in this Guideline are of enormous practical significance to the vindication of the client's legal rights. "[T]he strategic thinking of the lawyer, and learning this strategic thinking[,] is absolutely critical to the thorough presentation of a post-conviction claim. It should be routinely and openly presented to the post-conviction counsel." [326] To do otherwise is professionally unethical. [327]

**\*1076  GUIDELINE 10.14--DUTIES OF TRIAL COUNSEL AFTER CONVICTION**

A. Trial counsel should be familiar with all state and federal post-conviction options available to the client. Trial counsel should discuss with the client the post-conviction procedures that will or may follow imposition of the death sentence.

B. Trial counsel should take whatever action(s), such as filing a notice of appeal, and/or motion for a new trial, will maximize the client's ability to obtain post-conviction relief.

C. Trial counsel should not cease acting on the client's behalf until successor counsel has entered the case or trial counsel's representation has been formally terminated. Until that time, Guideline 10.15.1 applies in its entirety.

D. Trial counsel should take all appropriate action to ensure that the client obtains successor counsel as soon as possible.

### History of Guideline

This Guideline is based on Guideline 11.9.1 of the original edition. Subsection B has been revised to require that trial counsel take whatever action(s) will maximize the client's ability to obtain post-conviction relief. Additionally, Subsection D has been revised to require that **\*1077** counsel take all appropriate action to ensure that the client obtains successor counsel as soon as possible.

### Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-8.2 ("Appeal"), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 9.2 (1995) ("Right to Appeal").

### Commentary

Post-conviction procedures, and therefore the duties of counsel, vary among jurisdictions.[328] Whatever the procedures, the client should be advised of what will happen following sentencing. For example, if the client will be given any psychological examination or will otherwise be interviewed by prison personnel or others following the court's imposition of sentence, the client should be counseled regarding that interview and advised of the potential legal impact of any statements the client might make there.[329]

The client should also be advised of all available avenues of judicial review[330] and what the client must do to secure review (e.g., sign a notice of appeal or affidavit of indigency). Trial counsel should file the necessary documents and take whatever other steps are needed to preserve the client's right to review, such as ordering transcripts of the trial proceedings and objecting to any governmentally imposed barriers (e.g., failure to provide counsel) to obtaining such review. If there are **\*1078** any further actions available that might expand the scope of review (e.g., filing a motion for a new trial), trial counsel should take them.[331]

In short, trial counsel is responsible for making sure that the client's legal position does not suffer any harm during the period of transition to successor counsel. To avoid prejudice to the client, trial counsel should, in accordance with Subsection D, make every effort to ensure that this period is as short as possible. But, in any event, trial counsel may not cease acting on the client's behalf until successor counsel has entered the case. As Subsection C provides, until that time trial counsel must discharge the duties common to all post-conviction counsel as set forth in Guideline 10.15.1 (including obtaining a stay of execution if needed).

Trial counsel must also monitor the client's personal condition as set out in Guideline 10.15.1(E)(2). If the client's mental status deteriorates under the impact of the conviction and death sentence, the client may inappropriately decide to cease efforts to secure review, thereby creating a series of problems for the defense team that might well have been avoided.

Once successor counsel are in place, trial counsel continue to be under the obligation, imposed by Guideline 10.13, to recognize a continuing duty to safeguard the interests of the client and to cooperate fully with successor counsel.

### \*1079  GUIDELINE 10.15.1--DUTIES OF POST-CONVICTION COUNSEL

A. Counsel representing a capital client at any point after conviction should be familiar with the jurisdiction's procedures for setting execution dates and providing notice of them. Post-conviction counsel should also be thoroughly familiar with all available procedures for seeking a stay of execution.

B. If an execution date is set, post-conviction counsel should immediately take all appropriate steps to secure a stay of execution and pursue those efforts through all available fora.

C. Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

D. The duties of the counsel representing the client on direct appeal should include filing a petition for certiorari in the Supreme Court of the United States. If appellate counsel does not intend to file such a petition, he or she should immediately notify successor counsel if known and the Responsible Agency.

E. Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to:

1. maintain close contact with the client regarding litigation developments; and

*1080  2. continually monitor the client's mental, physical and emotional condition for effects on the client's legal position;

3. keep under continuing review the desirability of modifying prior counsel's theory of the case in light of subsequent developments; and

4. continue an aggressive investigation of all aspects of the case.


### History of Guideline

This Guideline is based on Guideline 11.9.3 of the original edition. Subsections A, B, and D are entirely new. Subsection C includes new language regarding the manner in which post-conviction counsel must present all arguably meritorious issues. Subsection E includes new language emphasizing the ongoing obligations imposed by these Guidelines upon post-conviction counsel.


### Related Standards

ABA Standards for Criminal Justice: Defense Function Standard 4-8.5 ("Post-conviction Remedies") in Aba Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).


### Commentary

Almost all of the duties imposed by Guidelines 10.3 et seq. are applicable in the post-conviction context. Subsection E notes this by way of reminder. Post-conviction counsel should consult those Guidelines and accompanying commentaries.

*1081  The Paramount Duty to Obtain a Stay No matter how compelling the client's post-conviction case may be, he faces the risk that his execution will moot it.[332] This is a phenomenon unique to capital litigation and one that must be uppermost in the mind of post-conviction counsel.

When states fail to provide post-conviction counsel entirely or in a timely manner,[333] or request the setting of an execution date to advance the litigation,[334] or impose short periods of time for filing substantive post-judgment pleadings, the result is

emergency requests for stays of execution so that substantive pleadings will be considered.[335] Although **1082** the ABA and other professional voices have repeatedly condemned this system,[336] defense counsel must make the best of it--by seeking stays or reprieves from any available source and challenging the unfairness of any overly restrictive constraints on the filing of substantive pleadings and/or stays.

And to the extent that counsel can responsibly reduce the stresses imposed upon the client by this often nightmarish system, counsel should of course do so (e.g., by reassuring the client of the unlikelihood of the execution actually occurring on its nominal date, notwithstanding the alarming preparations being made by the prison).[337]

Keeping the Client Whole Even if their executions have been safely stayed, however, the mental condition of many capital clients will deteriorate the longer they remain on death row. This may result in suicidal tendencies and/or impairments in realistic perception and rational decisionmaking.[338] Counsel should seek to minimize this risk by staying in close contact with the client.[339]

**1083** Counsel's ongoing monitoring of the client's status, required by Subsection E(2), also has a strictly legal purpose. As described supra in the text accompanying notes 188-92, a worsening in the client's mental condition may directly affect the legal posture of the case and the lawyer needs to be aware of developments. For example, the case establishing the proposition that insane persons cannot be executed[340] was heavily based on notes on the client's mental status that counsel had kept over a period of months.

The Labyrinth of Post-conviction Litigation

## A. The Direct Appeal

Practice varies among jurisdictions as to the limits of the appellate process and the relationship between direct appeals and collateral post-conviction challenges to a conviction or sentence.[341] Issues that are only partially or minimally reflected by the record, or that are outside the record, should be explored by appellate counsel as a predicate for informed decisionmaking about legal strategy.

As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. "Winnowing" issues in a capital appeal can have fatal consequences. Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later.[342] When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.[343]

**1084** Appellate counsel must be familiar with the deadlines for filing petitions for state and federal post-conviction relief and how they are affected by the direct appeal. If the conviction and sentence are affirmed, appellate counsel should ordinarily file on the client's behalf a petition for certiorari review in the United States Supreme Court. Under the AEDPA, a client's one-year statute of limitations for filing a petition for federal habeas corpus relief generally begins to run upon the denial of certiorari or when the 90 days for filing a petition has elapsed.[344] Appellate counsel should therefore immediately inform successor counsel if he or she does not intend to file a petition for certiorari or when a petition for is denied; if successor counsel is not yet appointed, counsel should promptly advise the Responsible Agency of the need to designate successor counsel (Subsection D).

Appellate counsel should also advise the client directly of all applicable deadlines for seeking post-conviction relief and explain the tolling provisions of the AEDPA,[345] emphasizing that a state post-conviction motion should be filed sufficiently in advance of the one-year deadline to allow adequate time to prepare a federal habeas corpus petition. In states in which the direct appeal

and state post-conviction review are conducted in tandem, [346] post-conviction proceedings may be concluded at the same time as, or even before, the direct appeal, effectively rendering the tolling provisions inapplicable.

In light of this mutual dependency among all the post-conviction legal procedures, it is of the utmost importance that, in accordance with Guideline 10.13, appellate counsel cooperate fully with successor counsel and turn over all relevant files promptly.

### *1085 B. Collateral Relief--State and Federal

As described in the commentary to Guideline 1.1, providing high quality legal representation in collateral review proceedings in capital cases requires enormous amounts of time, energy, and knowledge. The field is increasingly complex and ever-changing. As state and federal collateral proceedings become ever-more intertwined, counsel representing a capital client in state collateral proceedings must become intimately familiar with federal habeas corpus procedures. As indicated above, for example, although the AEDPA deals strictly with cases being litigated in federal court, its statute of limitations provision creates a de facto statute of limitations for filing a collateral review petition in state court. Some state collateral counsel have failed to understand the AEDPA's implications, and unwittingly forfeited their client's right to federal habeas corpus review. [347]

Collateral counsel has the same obligation as trial and appellate counsel to establish a relationship of trust with the client. But by the time a case reaches this stage, the client will have put his life into the hands of at least one other lawyer and found himself on death row. Counsel should not be surprised if the client initially exhibits some hostility and lack of trust, and must endeavor to overcome these barriers.

Ultimately, winning collateral relief in capital cases will require changing the picture that has previously been presented. The old facts and legal arguments--those which resulted in a conviction and imposition of the ultimate punishment, both affirmed on appeal--are unlikely to motivate a collateral court to make the effort required to stop the momentum the case has already gained in rolling through the legal system. [348] Because an appreciable portion of the task of post-conviction counsel is to change the overall picture of the case, Subsection E(3) requires that they keep under continuing review the desirability of amending the defense theory of the case, whether one has been formulated by prior counsel in accordance with Guideline 10.10.1 or not.

For similar reasons, collateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation *1086 in accordance with Guideline 10.7. (Subsection E(4)). As demonstrated by the high percentage of reversals and disturbingly large number of innocent persons sentenced to death, the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case. [349] That may be because of information concealed by the state, because of witnesses who did not appear at trial or who testified falsely, because the trial attorney did not conduct an adequate investigation in the first instance, because new developments show the inadequacies of prior forensic evidence, because of juror misconduct, or for a variety of other reasons.

Two parallel tracks of post-conviction investigation are required. One involves reinvestigating the capital case; the other focuses on the client. Reinvestigating the case means examining the facts underlying the conviction and sentence, as well as such items as trial counsel's performance, judicial bias or prosecutorial misconduct. Reinvestigating the client means assembling a more-thorough biography of the client than was known at the time of trial, not only to discover mitigation that was not presented previously, but also to identify mental-health claims which potentially reach beyond sentencing issues to fundamental questions of competency and mental-state defenses.

As with every other stage of capital proceedings, collateral counsel has a duty in accordance with Guideline 10.8 to raise and preserve all arguably meritorious issues. [350] These include not only challenges to the conviction and sentence, but also issues which may arise subsequently. [351] Collateral counsel should assume that any meritorious issue not contained in the initial

application will be waived or procedurally defaulted in subsequent litigation, or barred by strict rules governing subsequent applications. [352] Counsel should also be aware that *1087 any change in the availability of post-conviction relief may itself provide an issue for further litigation. [353] This is especially true if the change occurred after the case was begun and could be argued to have affected strategic decisions along the way.

### *1088  GUIDELINE 10.15.2--DUTIES OF CLEMENCY COUNSEL

A. Clemency counsel should be familiar with the procedures for and permissible substantive content of a request for clemency.

B. Clemency counsel should conduct an investigation in accordance with Guideline 10.7.

C. Clemency counsel should ensure that clemency is sought in as timely and persuasive a manner as possible, tailoring the presentation to the characteristics of the particular client, case and jurisdiction.

D. Clemency counsel should ensure that the process governing consideration of the client's application is substantively and procedurally just, and, if it is not, should seek appropriate redress.

### History of Guideline

This Guideline is based on Guideline 11.9.4 of the original edition. Subsection D of the Guideline was added to reflect the effect of the decision in Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998), on the duties of clemency counsel.

### Related Standards

None.

### Commentary

As discussed supra in the text accompanying notes 59-66, a series of developments in law, public opinion, and forensic science suggests that clemency petitions in capital cases will in the future enjoy a greater success rate than they do now, which will place additional demands on clemency counsel.

*1089 As Subsection B emphasizes, further investigation is critical at this phase. Beyond that, the manner in which clemency is dispensed in the jurisdiction controls what clemency counsel needs to do. [354]

Counsel should be familiar with the clemency-dispenser, and with the factors the clemency-dispenser has historically found persuasive. As possible innocence is the most frequently cited reason for clemency, [355] if there is a possibility that the client is innocent, counsel should mobilize an especially detailed investigation to determine whether confidence in the client's guilt can be undermined. If doubts about the fairness of the judicial proceedings that produced the death sentence have led to clemency in other cases, counsel should consider whether particular instances of procedural unfairness can be set out as to the client's case. [356] If personal characteristics of the condemned, such as youth, mental illness, [357] spousal abuse, or cultural barriers, have proven helpful *1090 in past clemency proceedings, then counsel should discover and demonstrate examples of the client's similar characteristics to the extent possible.

In any event, the presentation should be as complete and persuasive as possible, utilizing all appropriate resources in support (e.g., relevant outside organizations, the trial judge, prominent citizens), and discussing explicitly why the clemency-dispenser should act favorably notwithstanding the repeated reaffirmation of the client's conviction and sentence by the judicial system.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

For example, counsel may be in a position to argue that the underlying claims were powerful ones but procedural technicalities barred the courts from addressing their merits.

As discussed in the text supra accompanying notes 65-66, due process protections apply to clemency proceedings, and counsel should be alert to the possibility of developing the nascent existing law in this area.

Footnotes

1   287 U.S. 45 (1932).

2   Id. at 69.

3   See McFarland v. Scott, 512 U.S. 849, 855 (1994) (noting the uniqueness and complexity of death penalty jurisprudence); Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299, 303-04 (1983); see generally Andrea D. Lyon, Defending the Death Penalty Case: What Makes Death Different?, 42 Mercer L. Rev. 695 (1990); Welsh S. White, Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care, 1993 U. Ill. L. Rev. 323 (1993).

4   Douglas W. Vick, Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences, 43 Buff. L. Rev. 329, 357-58 (1995) (footnote omitted).

5   See ABA Standards for Criminal Justice: Defense Function, Standard 4-1.2(c), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993).

6   See, e.g., McCleskey v. Zant, 499 U.S. 467, 526 (1991) (Marshall, J., dissenting) (involving successor federal habeas corpus petition based on documents released as a result of new interpretation of Georgia Open Records Act by Georgia Supreme Court).

7   For example, the defendant prevailed in Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (disallowing use of prior conviction used in aggravation) only after the same pro bono counsel successfully litigated People v. Johnson, 506 N.E. 1177, 1178 (N.Y. 1987) (vacating that conviction). See infra text accompanying note 22.

8   Cf. Amadeo v. Zant, 486 U.S. 214, 219 (1988) (involving federal habeas corpus petitioner who succeeded on jury discrimination claim whose factual predicate was discovered in independent litigation against the county).

9   See infra text accompanying notes 65-66.

10   See infra Guideline 10.10.2.

11   See infra Guideline 5.1.

12   See Bullington v. Missouri, 451 U.S. 430, 438-46 (1981); Comm. on Civ. Rts., Ass'n of the Bar of the City of N.Y., Legislative Modification of Federal Habeas Corpus in Capital Cases, 44 Rec. Ass'n of the Bar of City of N.Y. 848, 854 (1989) [hereinafter Legislative Modification].
[For a lawyer], taking on such a case means making a commitment to the full legal and factual evaluation of two very different proceedings (guilt and sentencing) in circumstances where the client is likely to be the subject of intense public hostility, where the state has devoted maximum resources to the prosecution, and where one must endure the draining emotional effects of one's personal responsibility for the outcome.
Id.

13   See infra text accompanying notes 160-65; see also Wiggins v. Smith, 123 S. Ct. 2572 (2003) (holding counsel ineffective on basis of inadequate mitigation investigation; although counsel did arrange psychological testing for client and obtain some government records they thereby "acquired only rudimentary knowledge of his history from a narrow set of sources"); Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (notwithstanding fact that trial counsel "competently handled the guilt phase of the trial," counsel's failure to begin to prepare for sentencing phase until a week before trial fell below professional standards, and counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); id. at 415 (O'Connor, J., concurring) ("counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances" amounted to ineffective

assistance of counsel); ABA Standards for Criminal Justice: Standard 4-4.1(a), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.... The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.")

[14]   See infra Guideline 10.4(C)(2) and accompanying commentary.

[15]   See infra Guidelines 10.9.1, 10.9.2.

[16]   See, e.g., Atkins v. Virginia, 536 U.S. 304 (2002) (mental retardation).

[17]   See infra Guideline 10.5 and accompanying commentary.

[18]   See infra Guideline 10.10.1 and accompanying commentary; see also Stephen B. Bright, Developing Themes in Closing Argument and Elsewhere: Lessons from Capital Cases, Litig., Fall 2000, at 40; Lyon, supra note 3, at 708-11; Mary Ann Tally, Integrating Theories for Capital Trials: Developing the Theory of Life, The Champion, Nov. 1998, at 34.

[19]   See infra Guideline 10.11 and accompanying commentary.

[20]   See infra text accompanying notes 222, 301-02.

[21]   See, e.g., Simmons v. South Carolina, 512 U.S. 154, 160-61 (1994); Gardner v. Florida, 430 U.S. 349, 362 (1977).

[22]   See Johnson v. Mississippi, 486 U.S. 578, 587-88 (1988). Counsel's obligation to prevent the prosecution from using unconstitutionally obtained prior convictions in support of a death sentence, noted infra in the text accompanying note 222, may well require counsel to litigate collateral challenges to such prior convictions in the jurisdictions or districts where those convictions were obtained. See, e.g., Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 402-04 (2001).

[23]   See infra text accompanying notes 223, 300.

[24]   See infra text accompanying notes 277-92.

[25]   See Eddings v. Oklahoma, 455 U.S. 104, 113-15 (1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion); infra text accompanying note 277.

[26]   Louis D. Bilionis & Richard A. Rosen, Lawyers, Arbitrariness, and the Eighth Amendment, 75 Tex. L. Rev. 1301, 1316 (1997) (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell, & Stevens, JJ.)).

[27]   See infra Guideline 10.11 and accompanying commentary.

[28]   Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure §11.2(a), at 482 (4th ed. 2001). Thus, for example, within a single week in the spring of 2002, the Supreme Court rendered two major rulings favorable to capital defendants. See Atkins v. Virginia, 536 U.S. 304, 321 (2002) (holding that the Constitution bars execution of mentally retarded individuals); Ring v. Arizona, 536 U.S. 584, 608 (2002) (applying Apprendi v. New Jersey, 530 U.S. 466 (2000), to capital cases). In both cases, the Court squarely overruled governing precedent. See Penry v. Lynaugh, 492 U.S. 302, 340 (1989) (holding that the Constitution does not bar the execution of mentally retarded individuals); Walton v. Arizona, 497 U.S. 639, 649-51 (1990) (upholding same statute later invalidated in Ring against same challenge); Apprendi v. New Jersey, 530 U.S. 466, 496 (2000) (stating that Walton remained good law). It would have been appropriate (and indeed, some Justices might believe, required on pain of forfeiture) for capital counsel to assert these claims at every stage in the proceedings, even though they were then plainly at odds with the governing law. See infra Guideline 10.8 and accompanying commentary. One current example is the potential categorical unconstitutionality of the execution of juveniles. In light of a growing body of scientific evidence regarding the diminished culpability of juveniles, Eighth Amendment considerations, and international laws and treaties forbidding the execution for crimes committed while under the age of eighteen, four current Justices have suggested that the Court should absolutely bar the execution of such offenders. See In re Stanford, 123 S. Ct. 472, 475 (2002) (Stevens, Souter, Breyer, Ginsburg, JJ., dissenting). Counsel would be remiss not to assert the claim, notwithstanding that the Court has previously rejected it. See Stanford v. Kentucky, 492 U.S. 361, 380 (1989); Simmons v. Roper, 2003 Mo. LEXIS 123, at *2-4 (Mo., Aug. 26, 2003) (vacating death sentence of defendant who was seventeen at the time of crime on the basis that "the

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

Supreme Court would today hold such executions are prohibited by the Eighth and Fourteenth Amendments"). Similar examples are discussed infra at notes 231, 271, 276, 307, 352).

29    See James S. Liebman, The Overproduction of Death, 100 Colum. L. Rev. 2030, 2102-10 (2000); Spec. Comm. on Capital Representation & Comm. on Civ. Rts., Ass'n of the Bar of the City of N.Y., The Crisis in Capital Representation, 51 Rec. of Ass'n of the Bar of City of N.Y. 169, 185-87 (1996) [hereinafter Crisis in Capital Representation]; Jeffrey L. Kirchmeier, Drink, Drugs, and Drowsiness: The Constitutional Right to Effective Assistance of Counsel and the Strickland Prejudice Requirement, 75 Neb. L. Rev. 425, 428-34 (1996); see also infra note 155; see generally Stephen B. Bright, Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer, 103 Yale L.J. 1835 (1994); Notes, The Eighth Amendment and Ineffective Assistance of Counsel in Capital Trials, 107 Harv. L. Rev. 1923 (1994).

30    Anne Gearan, Supreme Court Justice Supports Death Penalty Moratorium, Associated Press, Apr. 10, 2001.

31    Crystal Nix Hines, Lack of Lawyers Hinders Appeals in Capital Cases, N.Y. Times, July 5, 2001, at A1 (quoting Justice Sandra Day O'Connor).

32    See Ring, 536 U.S. at 618 (Breyer, J., concurring). The "failings" to which Justice Breyer refers are many of the same ones that led the ABA to call for a moratorium on the imposition of the death penalty. See ABA, Report Accompanying Recommendation 107, 3 (1997), available at www.abanet.org/moratorium/resolution.html ("Today, administration of the death penalty, far from being fair and consistent, is instead a haphazard maze of unfair practices with no internal consistency.").

33    See Eric M. Freedman, Habeas Corpus: Rethinking the Great Writ of Liberty 147-48 (2001) (listing numerous modern examples of injustices in capital cases redressed on federal habeas corpus); Hertz & Liebman, supra note 28, §11.2(c) (same).

34    In 1996, Congress enacted the Anti-Terrorism and Effective Death Penalty Act ("the AEDPA"), which imposed substantial restrictions on the availability of federal habeas corpus for state prisoners. The AEDPA established strict deadlines for the filing of a federal habeas petition, limits on the scope of review of state court decisions, restrictions on the availability of evidentiary hearings to develop facts in support of constitutional claims, and placed stringent constraints on federal courts' consideration of additional applications for review by the petitioner. See generally 28 U.S.C. §§2244-2255, 2261-2264 (2000). There is significant cause for concern that these provisions may "greatly diminish the reliability of the capital system's review process and of the capital verdicts that the system produces." James S. Liebman, An "Effective Death Penalty" ? AEDPA and Error Detection in Capital Cases, 67 Brook. L. Rev. 411, 427 (2001); see also ABA Panel Discussion, Dead Man Walking Without Due Process? A Discussion of the Anti-Terrorism and Effective Death Penalty Act of 1996, 23 N.Y.U. Rev. L. & Soc. Change 163, 168-86 (1997); Marshall J. Hartman & Jeanette Nyden, Habeas Corpus and the New Federalism After the Anti-Terrorism and Effective Death Penalty Act of 1996, 30 J. Marshall L. Rev. 337, 387 (1997); Larry W. Yackle, A Primer on the New Habeas Corpus Statute, 44 Buff. L. Rev. 381, 386-93 (1996). One reason for this concern is that portions of the legislation seemed to reduce the level of scrutiny that the federal courts could give to state capital convictions. See §2254 (d)-(e) (providing that writ may not be granted unless state proceedings resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts").

35    See Crisis in Capital Representation, supra note 29, at 200-05 (presenting state-by-state analysis of impact of defunding of PCDOs); Roscoe C. Howard, Jr., The Defunding of the Post Conviction Defense Organizations as a Denial of the Right to Counsel, 98 W. Va. L. Rev. 863, 865 (1996) (emphasizing the important role that the former PCDOs played in assuring fairness in habeas corpus review of capital convictions); see also Ronald J. Tabak, Capital Punishment: Is There Any Habeas Left in This Corpus?, 27 Loy. U. Chi. L.J. 523, 540-43 (1996).

36    See Strickland v. Washington, 466 U.S. 668, 687 (1984).

37    See McFarland v. Scott, 512 U.S. 1256, 1259 (1994) (Blackmun, J., dissenting) ("Ten years after the articulation of [the Strickland] standard, practical experience establishes that the Strickland test, in application, has failed to protect a defendant's right to be represented by something more than 'a person who happens to be a lawyer.'") (quoting Strickland v. Washington, 466 U.S. 668, 685 (1984)); Kim Taylor-Thompson, Tuning Up Gideon's Trumpet, 71 Fordham L. Rev. 1461, 1465 (2003) ("[T]he ruling has proved disabling to the right to effective assistance of counsel in practice."); Adele Bernhard, Take Courage: What the Courts Can Do to Improve the Delivery of Criminal Defense Services, 63 U. Pitt. L. Rev. 293, 346 (2002) ("[A]ll who have seriously considered the question agree that Strickland has not worked either to prevent miscarriages of justice or to improve attorney performance."); William S. Geimer, A Decade of Strickland's Tin Horn: Doctrinal and Practical Undermining of the Right to Counsel, 4 Wm. & Mary Bill Rts.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

J. 91, 94 (1995) ("Strickland has been roundly and properly criticized for fostering tolerance of abysmal lawyering."); Legislative Modification, supra note 12 at 862 n.28 (criticizing "the strong presumptions of attorney effectiveness mandated by Strickland" as applied to capital cases, and urging that "[w]hatever benefits counter-factual presumptions may have in other areas of the law, they are certainly out of place when a human life hangs in the balance"); infra note 155.

38    See, e.g., Report of the Governor's Commission on Capital Punishment 177, 179 (Apr. 15, 2002), available at http://www.idoc.state.il.us/ccp/ccp/reports/commission-report/index.html (recommending that the Illinois legislature "significantly improve the resources available to the criminal justice system in order to permit the meaningful implementation of reforms in capital cases," including the full funding of the defense, which "should significantly improve the quality of defense representation of capital defendants").

39    Eric M. Freedman, Innocence, Federalism, and the Capital Jury: Two Legislative Proposals for Evaluating Post-Trial Evidence of Innocence in Death Penalty Cases, 18 N.Y.U. Rev. L. & Soc. Change 315, 316 (1991).

40    Under the AEDPA, "special habeas corpus procedures" may apply to federal habeas corpus petitions in capital cases if a state's post-conviction procedures satisfy certain prerequisites. See 28 U.S.C. §§ 2261, 2263 (2000). Thus, the deadline for filing of a federal habeas corpus petition by capital prisoners in qualifying "opt-in" states is 180 days, id., in contrast to the one-year limitations period that would otherwise apply. 28 U.S.C. §2244(d)(1) (2000). In addition, the AEDPA's "opt-in" procedures accelerate the time for review of the case by the district court and the court of appeals, 28 U.S.C. §2266(b)(1)(A), (c)(1)(A) (2000), and restrict a capital habeas corpus petitioner's ability to amend a petition after the state files its response. 28 U.S.C. §2266(b)(3)(B) (2000). See also Michael Mello & Donna Duffy, Suspending Justice: The Unconstitutionality of the Proposed Six-Month Time Limit on the Filing of Habeas Corpus Petitions by State Death Row Inmates, 18 N.Y.U. Rev. L. & Soc. Change 451, 487-92 (1991) (discussing why a six-month limit does not provide an attorney with adequate time to prepare a habeas petition properly); infra note 335.

41    See infra text accompanying notes 333-38.

42    See Evitts v. Lucey, 469 U.S. 387, 396 (1985).

43    See Smith v. Murray, 477 U.S. 527, 536-37 (1986) (holding that appellate counsel in a Virginia capital case had waived a legal issue by not raising it at an earlier stage of appeal; the novelty of the issue in Virginia was no excuse because it had been raised, though unsuccessfully, in an intermediate appellate court of another state).

44    See infra text accompanying notes 342-47.

45    See McFarland v. Scott, 512 U.S. 849, 855 (1994) ("[Q]uality legal representation is necessary in capital habeas corpus proceedings in light of 'the seriousness of the possible penalty and ... the unique and complex nature of the litigation.'") (citation omitted); see generally Hertz & Liebman, supra note 28, §2.6.

46    A recent comprehensive study finds that of every one hundred death sentences imposed, forty-seven are reversed at the state level, on direct appeal or collateral review. An additional twenty-one are overturned on federal habeas corpus. See James S. Liebman et al., A Broken System: Error Rates in Capital Cases, 1973-1995, pt. I, app. A, at 5-6 (2000). These statistics indicate the importance of providing qualified counsel for both state and federal proceedings.

47    Some states provide attorneys at public expense to death-sentenced prisoners seeking state post-conviction relief, but others do not. See Andrew Hammel, Diabolical Federalism: A Functional Critique and Proposed Reconstruction of Death Penalty Federal Habeas, 39 Am. Crim. L. Rev. 1, 83-99 (2002) (providing state-by-state list); Jennifer N. Ide, The Case of Exzavious Lee Gibson: A Georgia Court's (Constitutional?) Denial of a Federal Right, 47 Emory L.J. 1079, 1099-1110 (1998); Clive A. Stafford Smith & Rémy Voisin Starns, Folly By Fiat: Pretending that Death Row Inmates Can Represent Themselves in State Capital Post-Conviction Proceedings, 45 Loy. L. Rev. 55, 56 (1999). Moreover, even in those states that nominally do provide counsel for collateral review, the intertwined realities of chronic underfunding, lack of standards, and a dearth of qualified lawyers willing to accept appointment, see The Spangenberg Group, ABA Postconviction Death Penalty Representation Project, An Updated Analysis of the Right to Counsel and the Right to Compensation and Expenses in State Postconviction Death Penalty Cases (1996) [hereinafter Right to Compensation and Expenses], have resulted in a disturbingly large number of instances in which attorneys have failed to provide their clients meaningful assistance. See, e.g., Tex. Defender Serv., A State of Denial: Texas Justice and the Death Penalty, ch. 7 (2002), available at http://www.texasdefender.org/publications.htm (reporting that a review of 103 post-conviction petitions filed by court-appointed counsel in Texas death penalty cases between 1995 and 2000 indicated that 17.5 percent of the petitions were fifteen pages long or

less, and that counsel offered no evidence outside the trial record in 42.7 percent of the cases reviewed). Counsel should accordingly be alert to the development of both state and federal law respecting the right to the effective assistance of counsel on state post-conviction review. See infra notes 74, 204 (citing cases recognizing right); see also Celestine Richards McConville, The Right to the Effective Assistance of Capital Postconviction Counsel: Constitutional Implications of Statutory Grants of Capital Counsel, 2003 Wisc. L. Rev. 31, 84-98 (arguing that once a jurisdiction creates a statutory right to post-conviction counsel, the Constitution requires it to provide effective counsel); Leonard Post, A Fight Over Limits on Pay, Hours: Florida Faces a Suit From a Death Penalty Lawyer, Nat'l L.J., Mar. 31, 2003, at A1 (describing litigation challenging Florida statutory cap on number of hours for which post-conviction lawyers may be compensated).

In particular, counsel should continue to test the boundaries of Murray v. Giarratano, 492 U.S. 1 (1989). Although a plurality of Justices there rejected the constitutional claim of a capital defendant to the appointment of counsel in state post-conviction proceedings, the controlling opinion of Justice Kennedy emphasized that it was based "[o]n the facts and records of this case," in which "no prisoner on death row in Virginia has been unable to obtain counsel to represent him in post-conviction proceedings, and Virginia's prison system is staffed with institutional lawyers to assist in preparing petitions for postconviction relief." Id. at 14-15 (Kennedy, J., concurring); cf. infra note 334 (citing cases in which states have failed to provide capital prisoners this level of resources).

[48]     See Gregg v. Georgia, 428 U.S. 153 (1976).

[49]     See Death Penalty Information Center: Innocence and the Death Penalty, at http://www.deathpenaltyinfo.org/article.php? did=412&scid=6 (stating that, "[s]ince 1973, 111 people in 25 states have been released from death row with evidence of their innocence") (latest release July 28, 2003); see also C. Ronald Huff et al., Convicted But Innocent 62-82 (1996); see generally Barry Scheck et al., Actual Innocence: When Justice Goes Wrong and How to Make it Right (updated ed. 2001); Edward Connors et al., Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial (1996); Ken Armstrong & Steve Mills, "Until I Can be Sure": How the Threat of Executing the Innocent has Transformed the Death Penalty Debate, in Beyond Repair? America's Death Penalty (Stephen P. Garvey ed. 2003); Michael L. Radelet & Hugo Adam Bedau, The Execution of the Innocent, in America's Experiment with Capital Punishment: Reflections on the Past, Present and Future of the Ultimate Penal Sanction 223 (James Acker et al. eds. 1998).

[50]     See generally Dodd v. State, 993 P.2d 778, 783-84 (Okla. Crim. App. 2000) (citing "insidious reliability problems" as basis for imposing major procedural restrictions on use of jailhouse informants); Province of Manitoba, Manitoba Justice, The Inquiry Regarding Thomas Sophonow, Manitoba Guidelines Respecting the Use of Jailhouse Informants (Nov. 5, 2001), available at http:// www.gov.mb.ca/justice/sophonow/appendix/appendixf.pdf (following inquiry into wrongful conviction of Thomas Sophonow, which found jailhouse informants to be "the most deceitful and deceptive group of witnesses known to frequent the courts" (Province of Manitoba Manitoba Justice, The Inquiry Regarding Thomas Sophonow, Jailhouse Informant, Their Unreliability and the Importance of Complete Crown Disclosure Pertaining to Them, available at http:// www.gov/mb.ca/justice/sophonow/jailhouse), Province bars their use except in limited circumstances and subject to tight safeguards); Constitution Project, Mandatory Justice: Eighteen Reforms to the Death Penalty 52 (2001) (noting that a "category of evidence that has a particularly high chance of being an outright lie, exaggerated, or otherwise erroneous is the testimony of jailhouse informants. Their confinement provides evidence of their questionable character, motivates them to lie in order to improve the conditions of their confinement or even secure their release, and often affords access to information that can be used to manufacture credible testimony."); Robert M. Bloom, Jailhouse Informants, Crim. Just., Spring 2003, at 20 (discussing issues regarding the unreliability of jailhouse informants and the use of their testimony in capital cases); Ted Rohrlich, Jail House Informant Owns Up to Perjury in a Dozen Cases, L.A. Times, Jan. 4, 1990, at A1 (detailing perjuries committed by Leslie White, an inmate at the Los Angeles County jail who demonstrated to authorities and reporters how he concocted false confessions, and noting confession of another informant, Stephen Jesse Cisneros, to perjury in five murder cases).

[51]     See generally Brief of Amici Curiae Five Innocent Former Death Row Inmates & Centurion Ministries, Schlup v. Delo, 513 U.S. 298 (1995) (No. 93-7901) (reviewing generally unscrupulous practices by investigators and prosecutors that can lead to false convictions); Paul Duggan, Oklahoma Reviews 3,000 Convictions, Wash. Post, May 9, 2001, at A2 (discussing Oklahoma review of three thousand convictions based on work of Joyce Gilchrist, an Oklahoma City police chemist, who went far beyond what was scientifically knowable in conducting forensic investigations of local crime); Davidson Goldin, 5th Trooper Pleads Guilty in Scandal, N.Y. Times, Apr. 8, 1995, at A29 (describing scandal in which New York state troopers transferred fingerprints of potential suspects to crime

scenes to enhance their cases); Mark Hansen, Out of the Blue, 82 A.B.A. J., Feb. 1996 (describing dentist, widely discredited by his peers, who claimed to be able to match bite marks to the teeth that made them); Adam Liptak, 2 States to Review Lab Work of Expert Who Erred on ID, N.Y. Times, Dec. 19, 2002, at A24 (Montana and Washington reviewing approximately one hundred cases based on questionable forensic testimony of Arnold Melnikoff); Armando Villafranca, Bradford Cites HPD Lab Flap, Urges Hold for 7 on Death Row, Hous. Chron., Mar. 7, 2003 (reporting legislative testimony of Houston Police Chief urging that no execution dates be set for seven death row inmates whose cases may have been affected by shoddy work of Houston police crime laboratory, which was found in a state audit to have had numerous shortcomings in preservation and testing of DNA evidence); Edna Buchanan, Did FBI Wrongly Aid Death Row Conviction?, Miami Herald, May 31, 2003, at 1A (although internal review of FBI crime laboratory has identified about three thousand cases of shoddy forensic work, agency has only notified about 150 defendants of problems; suspect cases include those involving hair and fiber analyst Michael Malone, on the basis of whose testimony James Duckett faces execution in Florida); Timothy W. Maier, Inside the DNA Labs, Insight Magazine, June 10-23, 2003, at 18 (summarizing numerous cases); Police Review Chemist's Work, N.Y. Times, Mar. 13, 2003, at A22 (reporting that Baltimore County police are reviewing all 480 blood-typing cases handled by former department chemist Concepcion Bacasnot after she falsely testified to a match that resulted in an innocent defendant serving twenty years for rape); infra note 200.

52    See, e.g., Eric M. Freedman, Earl Washington's Ordeal, 29 Hofstra L. Rev. 1089, 1098-99 (2001) (describing how pro bono counsel in state post-conviction proceeding discovered exculpatory semen stain evidence, which "having been appropriately turned over by the government, lay unappreciated in the files of former defense counsel"); Gwen Filosa, N.O. Man Cleared in '84 Murder, New Orleans Times-Picayune, May 9, 2003, at 1 (describing case of John Thompson, who was deterred from taking the stand at his original murder trial by a prior conviction for armed robbery, which, as a defense investigator discovered weeks before the execution date, had been tainted by government suppression of an exculpatory blood test; when retried on the murder charge, Thompson, who had always maintained his innocence, was acquitted).

53    See, e.g., Wiggins v. Smith, 123 S. Ct. 2527 (2003) (granting habeas corpus relief to petitioner whose trial counsel failed to find and present mitigating evidence); Williams v. Taylor, 529 U.S. 362, 370-71, 374 (2000) (same).

54    See infra Guideline 10.10.2(B) and accompanying commentary.

55    For examples of death sentences overturned for failure to comply with this requirement, see Penry v. Johnson, 532 U.S. 782, 796-804 (2001), McKoy v. North Carolina, 494 U.S. 433, 444 (1990), Mills v. Maryland, 486 U.S. 367, 375-80 (1988), and Davis v. Mitchell, 318 F.3d 682, 691 (6th Cir. 2003); see also Lenz v. Warden, 579 S.E.2d 194 (Va. 2003) (holding trial counsel ineffective for failure to object to defective penalty phase verdict form); infra note 315.

56    See James S. Liebman et al., Capital Attrition: Error Rates in Capital Cases, 1973-1995, 78 Tex. L. Rev. 1839, 1844, 1849 (2000) (federal habeas relief was granted in forty percent of 599 cases between 1973 and 1995 in which the judgment remained intact after direct appeal and state post-conviction review); cf. Eric M. Freedman, Federal Habeas Corpus in Capital Cases, in America's Experiment with Capital Punishment: Reflections on the Past, Present and Future of the Ultimate Penal Sanction 427 (James Acker et al. eds. 1998) ("By the most generous estimates, the rate in non-capital cases does not exceed seven percent, and, if the appropriate statistical methodology is applied, the actual number is less than one percent.").

57    See, e.g., Edwards v. Carpenter, 529 U.S. 446 (2000) (limits on asserting ineffective assistance of counsel as "cause" for procedural default); Schlup v. Delo, 513 U.S. 298 (1995) ("fundamental miscarriage of justice" exception to procedural default rule); Teague v. Lane, 489 U.S. 288 (1989) (non-retroactivity of "new rules" of constitutional procedure); Wainwright v. Sykes, 433 U.S. 72 (1977) (limiting review of constitutional claims due to procedural default). Indeed, on the website of the New York Times, its Supreme Court reporter, Linda Greenhouse, has described the Court's habeas jurisprudence as "so complex as to be almost theological" (posted July 6, 2001).

58    See Legislative Modification, supra note 12, at 854 ("The post-conviction handling of capital cases is a legal specialty requiring mastery of an intricate body of fast-changing substantive and procedural law."). The failure of counsel to fulfill these obligations may entitle the client to relief under federal constitutional or statutory law. See Cooey v. Bradshaw, 216 F.R.D. 408 (N.D. Ohio 2003) (granting stay of execution on claim of ineffective assistance by prior counsel appointed under 21 U.S.C. §848), motion to vacate stay denied, No. 03-4001 (6th Cir. July 24, 2003), motion to vacate stay denied, No. 03-5472 (U.S. July 24, 2003).

59    Daniel T. Kobil, Due Process in Death Penalty Commutations: Life, Liberty, and the Pursuit of Clemency, 27 U. Rich. L. Rev. 201, 214 (1992); see infra Guideline 10.15.2 and accompanying commentary.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

60    Herrera v. Collins, 506 U.S. 390, 411-12 (1993).

61    Id. at 415.

62    See Kathleen M. Ridolfi, Not Just an Act of Mercy: The Demise of Post-Conviction Relief and a Rightful Claim to Clemency, 24 N.Y.U. Rev. L. & Soc. Change 43, 68-77 (1998); infra text accompanying note 356.

63    See, e.g., Freedman, supra note 52, at 1100-03 (describing detailed oral and written presentations made to two Governors of Virginia by a six-lawyer team to secure DNA testing for death row inmate Earl Washington that resulted in his exoneration); see also infra Guideline 10.15.2 and accompanying commentary.

64    See Michael L. Radelet & Barbara A. Zsembik, Executive Clemency in Post-Furman Cases, 27 U. Rich. L. Rev. 289, 297-99 (1993) (identifying twenty-nine cases between 1972 and 1993 in which death-sentenced inmates had their death sentences commuted to terms of life imprisonment through executive clemency procedures for humanitarian reasons); infra text accompanying notes 357-58.

65    See Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 275-76 (1998); see also Ford v. Wainwright, 477 U.S. 399, 405-10, 418 (1986) (invalidating Florida procedure for determining whether inmate was mentally competent to be executed).

66    See, e.g., Wilson v. United States Dist. Ct., 161 F.3d 1185, 1186-87 (9th Cir. 1998) (affirming district court order staying a prisoner's execution on the grounds that his clemency hearing violated due process).

67    William Shakespeare, Macbeth act 5, sc. 8.

68    See Liebman, supra note 29, at 2108; Goodpaster, supra note 3, at 356-59.

69    See infra Guideline 2.1(C) and accompanying commentary.

70    See, e.g., Washington v. Murray, 952 F.2d 1472, 1475, 1476 (4th Cir. 1991) (vacating district court's summary dismissal of ineffective assistance of counsel claim based on failure of retained counsel to appreciate exculpatory significance of scientific evidence produced by prosecution).

71    See infra Guidelines 4.1, 8.1, & 9.1 and accompanying commentary; see generally Cuyler v. Sullivan, 446 U.S. 335, 344-45 (1980) (noting that guarantee of Sixth Amendment applies equally whether counsel is retained or appointed).

72    Lockett v. Ohio, 438 U.S. 586, 605 (1978).

73    Cf. Legislative Modification, supra note 12, at 848 ("[F]or so long as the death penalty continues to exist in this country, capital inmates are entitled to procedures--including ones for the provision of competent counsel-- that result in the full and fair review of their convictions and sentences. Correlatively, any state which chooses to impose death sentences must accept the obligation of providing mechanisms for assuring that those sentences are legally and factually correct at the time of their execution.") (citation omitted).

74    See, e.g., Iovieno v. Comm'r, 699 A.2d 1003 (Conn. 1997) (recognizing claim that statutorily-mandated state post-conviction counsel was ineffective since "'it would be absurd to have the right to appointed counsel who is not required to be competent'") (quoting Lozada v. Warden, 613 A.2d 818, 821 (Conn. 1992)); Spalding v. Dugger, 526 So. 2d 71, 72 (Fla. 1988) (holding that under statute creating office for post-conviction capital representation, "each defendant ... is entitled, as a statutory right, to effective legal representation" and may enforce that right in post-conviction proceedings); People v. Johnson, 609 N.E.2d 304, 311 (Ill. 1993) (granting relief where, contrary to court rule, appointed post-conviction counsel "made no effort to investigate the claims raised in the defendant's post-conviction petition or to obtain affidavits from any of the witnesses specifically identified in the defendant's pro se petition"); see also supra note 47 (noting possible federal constitutional implications of state's decision to grant post-conviction counsel); see generally infra note 204.

75    See, e.g., Nat'l Legal Aid & Defender Ass'n, Nat'l Study Commission on Defense Servs., Guidelines for Legal Defense Systems in the United States Final Report (1976) (calling for a state-wide organization with a centralized administration to "ensure uniformity and equality of legal representation and supporting services and to guarantee professional independence for individual defenders"); Nat'l Conf. of Comm'rs on Unif. State Laws, Prefatory Note to Uniform Law Comm'rs Model Public Defender Act, in Handbook of the Nat'l Conference of Comm'rs on Uniform State Laws 267-268 (1970) (approving recommendation of National Defenders Conference that every state establish a state-wide public defender system "to assure better coordination and consistency of approach throughout

the state, [provide] better consultation with the several branches of state government,... reduce the administrative burden on court personnel and provide more efficient and more experienced defense counsel services to needy persons accused of crime"); Task Force on the Admin. of Justice, President's Comm'n on Law Enforcement & Admin. of Justice, Task Force Report: The Courts 52-53 (1967) (recommending that "each State should finance assigned counsel and defender systems on a regular and statewide basis").

76   ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.2(c) and cmt. (3d ed. 1992, black letter approved 1990, commentary completed 1992).

77   Mississippi, for example, has recently moved from a county-based to a state-based system for the provision of capital defense services. See Julie Goodman, Inmates on Death Row Given Last Hope, Clarion-Ledger (Jackson, Miss.), May 13, 2002, at B1 (discussing post-conviction defense office); Emily Wagster, Capital Defense Job Filled; State Office to Provide Lawyers for Indigent, Sun Herald (Biloxi, Miss.), July 7, 2001, at A2 (discussing trial defense office). Similarly, California has adopted state-wide qualifications for appointed trial counsel in capital cases effective January 1, 2003. See Cal. R. Ct. 4.117; see generally Ashley Rapp, Note, Death Penalty Prosecutorial Changing Decisions and County Budgeting Restrictions: Is the Death Penalty Arbitrarily Applied Based on County Funding?, 71 Fordham L. Rev. 2735 (2003) (arguing that inter-county funding disparities may render state capital systems vulnerable to challenges under Furman v. Georgia, 408 U.S. 238 (1972)).

78   ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.3 cmt. (3d ed. 1992); see also Taylor-Thompson, supra note 37, at 1508; ABA, The Ten Principles of a Public Defense Delivery System, Principle 1 and cmt. (2002).
The public defense function, including the selection, funding, and payment of defense counsel, is independent. The public defense function should be independent from political influence and subject to judicial supervision only in the same manner and to the same extent as retained counsel. To safeguard independence and to promote efficiency and quality of services, a nonpartisan board should oversee defender, assigned counsel, or contract systems. Removing oversight from the judiciary ensures judicial independence from undue political pressures and is an important means of furthering the independence of public defense. The selection of the chief defender and staff should be made on the basis of merit, and recruitment of attorneys should involve special efforts aimed at achieving diversity in attorney staff.

79   In North Carolina, for example, the Indigent Defense Services Commission, which consists of ten members appointed by, but independent of, the state Bar, the Governor, the Chief Justice, and the legislature, plus three members chosen collectively by those ten, and appoints a Capital Defender who is responsible only to it. See Commission on Indigent Services, Minutes of the Meeting of Apr. 19, 2002, available at http://www.ncids.org. The Capital Defender supervises a staff of attorneys and also oversees the representation provided by a roster of private lawyers and public defenders who have been certified to provide representation in capital cases. See Commission on Indigent Services, Minutes of the Meeting of June 15, 2001, available at http://www.ncids.org.Cf. Retarding Due Process, St. Petersburg Times, Apr. 22, 2002, at A10 (editorial criticizing Florida legislation permanently barring any appointed capital defense attorney seeking compensation in excess of fee schedule from another appointment).

80   For instance, although it may not violate the Sixth Amendment for defense counsel to have previously represented the victim, see Mickens v. Taylor, 535 U.S. 162, 164, 173-74 (2002), such a situation most certainly violates ethical norms, see Brief of Legal Ethicists and the Stein Center for Law and Ethics as Amici Curiae in Support of Petitioner, Mickens v. Taylor, 535 U.S. 162 (2002), and would not be permitted by any acceptable plan for capital representation. Cf. Ex parte McCormick, 645 S.W.2d 801, 806 (Tex. Crim. App. 1983) (en banc) (reversing two capital convictions because same counsel represented both co-defendants); Wm. C. Turner Herbert, Recent Development, Off the Beaten Path: An Analysis of the Supreme Court's Surprising Decision in Mickens v. Taylor, 81 N.C. L. Rev. 1268 (2003) (criticizing Mickens).

81   For example, in 1995, New York enacted a comprehensive legislative plan for a "capital defender office" ("CDO") to provide representation and legal assistance in capital cases. N.Y. Jud. Law § 35-b(3) (McKinney 2001). The CDO is authorized to represent capital defendants and also to advise and assist other appointed counsel in such cases. See id. The office assists in determining qualification standards and presents training programs for attorneys seeking to become certified to accept appointments. See id. As described supra note 79, North Carolina has also adopted this model. Other states have similar programs for providing representation in post-conviction proceedings. See, e.g., Cal. Gov't Code §68661 (West Supp. 2003) (creating California Habeas Corpus Resource Center, which is authorized to provide representation and serve as a resource in state and federal post-conviction proceedings).

82   Of course, any applicable statutory provisions, e.g., 28 U.S.C. §2261(d), must also be observed.

83   See supra Guideline 1.1 and accompanying commentary.

84    See infra Guideline 4.1 and accompanying commentary.

85    Specifically, the Responsible Agency should in every capital case determine whether retained or pro bono counsel meets the qualification standards set forth in Guideline 5.1 infra and, if not, provide as many additional qualified attorneys as are appropriate under the circumstances of the case. In accordance with Guideline 4.1(B), the Responsible Agency must also assure that counsel have the necessary support services.

86    ABA Criminal Justice Section, Report to the House of Delegates (1990), reprinted in Toward a More Just and Effective System of Review in State Death Penalty Cases, 40 Am. U. L. Rev. 1, 9 (1990).

87    See, e.g., infra Guideline 7.1 (removal of attorneys from roster); Guideline 8.1 (training programs).

88    Ake v. Oklahoma, 470 U.S. 68, 77 (1985).

89    See ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.4 cmt. (3d ed. 1992).

90    Id.

91    See Subcomm. on Federal Death Penalty Cases, Comm. on Defender Services, Judicial Conference of the United States, Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation (1998) [hereinafter Federal Death Penalty Cases] (discussing federal death penalty cases), available at http:// www.uscourts.gov/dpenalty/1COVER.htm (reporting that "both the prosecution and the defense rely more extensively on experts in death penalty cases than in other [] criminal cases").

92    See, e.g., Alec Wilkinson, A Night at the Beast House, The New Yorker, Feb. 13, 1995, at 68 (discussing how counsel used an expert to show that victim was not killed in the prosecuting jurisdiction but dragged to the crime scene after her death; client eventually exonerated and released).

93    See, e.g., Craig Haney, The Social Context of Capital Murder: Social Histories and the Logic of Mitigation, 35 Santa Clara L. Rev. 547, 559-83 (1995) (examining "the structure of the lives of those who commit [capital violence]"); Dorothy Otnow Lewis et al., Psychiatric, Neurological, and Psychoeducational Characteristics of 15 Death Row Inmates in the United States, 143 Am. J. Psychiatry 838, 839-44 (1986) (reviewing inmates' "psychiatric evaluations [and] detailed medical, family, social, and educational histories").

94    See Atkins v. Virginia, 53 U.S. 304, 350 (2002).

95    See Goodpaster, supra note 3, at 323-24.

96    See John H. Blume, Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination, The Advocate, Aug. 1995, available at http://www.dpa.state.ky.us/rwheeler/blume/blume.html.

97    See Douglas S. Liebert, Ph.D. & David V. Foster, M.D., The Mental Health Evaluation in Capital Cases: Standards of Practice, 15:4 Am. J. Forensic Psychiatry 43-64 (1994).

98    See infra Guidelines 10.5 and 10.15.1(E)(2) and accompanying commentary. Effective representation requires ongoing interactive contact with the client--in person, by mail, on the telephone, and in other ways--both by counsel and, as discussed in the remainder of this commentary, by the other members of the defense team. To the extent that jurisdictions impede such contact--whether by charging excessive fees for telephone calls, limiting mailings, failing to provide convenient and confidential arrangements for visits, restricting the access of non-attorney defense team members to clients, or otherwise--they jeopardize the provision of high quality legal representation in accordance with these Guidelines.

99    For example, in light of the constitutional prohibition on the execution of the mentally retarded, significant resources spent at the pretrial phase in investigating and presenting the defendant's retardation status will be amply repaid in future cost savings since the most likely outcomes are (a) the case is taken off the capital track entirely, very possibly by agreement with the prosecution or (b) the issue is decided against the defendant, thus minimizing the likelihood of it being raised later. See, e.g., Dan Barry, Ashcroft Says Retarded Man No Longer Faces Death Penalty, N.Y. Times, Mar. 20, 2003, at B1. Similarly, it is not only expensive, but also extremely unjust for exculpatory evidence about which trial counsel should have learned from an expert to lie undiscovered until post-conviction proceedings many years later-- years during which an innocent person is incarcerated. See Freedman, supra note 52, at 1094-95, 1098-99.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

100    Of course, non-lawyer professionals on the staff of defender organizations are, even if on the public payroll, "independent of the government" for this purpose.

101    This Guideline contemplates that defense counsel will be primarily responsible for selection of the remaining members of the defense team. Guideline 10.4 discusses in greater detail the division of this responsibility among the attorneys on the team. The Responsible Agency should, however, be prepared to provide assistance in finding qualified individuals to fill these roles.

102    See infra Guideline 10.7 and accompanying commentary.

103    See Dwight H. Sullivan et al., Raising the Bar: Mitigation Specialists in Military Capital Litigation, 12 Geo. Mason U. Civ. Rts. L.J. 199, 206-11 (2002).

104    See Vivian Berger, The Chiropractor as Brain Surgeon: Defense Lawyering in Capital Cases, 18 N.Y.U. Rev. L. & Soc. Change 245, 250 (1991) (noting that many attorneys make no preparations whatsoever for the sentencing phase; because they believe that a lawyer should try to win rather than plan to lose, they "are devastated when the client is convicted and afterward just throw in the towel"); infra Guideline 10.10.1 and accompanying commentary; text accompanying notes 273-76; see also Head v. Thomason, 578 S.E.2d 426, 430 (Ga. 2003) (finding in state post-conviction proceeding that trial counsel were ineffective at penalty phase; due to their unwarrantedly optimistic belief that the sentencer would not impose death, they were less diligent than they should have been in obtaining mitigation evidence, and failed "to make use of the mitigating evidence and the experts they had").

105    See   generally   Russell   Stetler,   Why   Capital   Cases   Require   Mitigation   Specialists, at   http://www.nlada.org/DMS/Documents/998934720.005/Why%20Capital%CCC20Cases%CCC20Require%CCC20Mitigation %CCCPECIALISTS.DOC (LAST VISITED JULY 26, 2003) (DISCUSSING THE ROLE AND REQUIRED SKILLS OF THE MITIGATION SPECIALIST); TEXAS DEFENDER SERVICE CAPITAL TRIAL PROJECT, DEATH PENALTY MITIGATION MANUAL FOR TRIAL ATTORNEYS CH. 2 (2001) ("THE MITIGATION SPECIALIST AND THE TEAM APPROACH") [HEREINAFTER TEXAS DEATH PENALTY MITIGATION MANUAL].

106    See infra text accompanying note 178.

107    See Federal Death Penalty Cases, supra note 91. Numerous death penalty jurisdictions, by state statute, court rule, or case law, routinely authorize the payment of funds for mitigation experts pursuant to defense motion. See, e.g., Ga. Code Ann. §17-12-90 to 97 (1997); 725 Ill. Comp. Stat. 124/10(c) (West 2002); Ky. Rev. Stat. Ann. §31.110(1)(b) (Michie 2002); S.C. Code Ann. §16-3-26(C) (1) (Law Co-op. 2001); Tenn. Code. Ann. §40-14-207(b) (1997); Tenn. S. Ct. R. 13 §5; State v. Bailey, 424 S.E.2d 503, 507 (S.C. 1992) (interpreting §16-3-26(C)(1) as applied to capital cases, stating that "in today's capital trial, the defendant is entitled to produce evidence concerning his childhood and family background in mitigation of his criminal conduct, so that the jury may impose life imprisonment as an alternative to the death sentence. In preparing this evidence, the attorney must employ investigators in the course of thoroughly researching the defendant's entire life"). In federal capital trials, mitigation experts are routinely appointed and compensated under 21 U.S.C. §848(q) (2000).

108    ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.4 cmt. (3d ed. 1992); see also Edward C. Monahan & James J. Clark, Funds for Resources for Indigent Defendants Represented by Retained Counsel, The Champion, Dec. 1996, at 16.

109    See Bright, supra note 29, at 1871 n.209 ("Standards for the appointment of counsel, which are defined in terms of number of years in practice and number of trials, do very little to improve the quality of representation since many of the worst lawyers are those who have long taken criminal appointments and would meet the qualifications.").

110    Because, as the second sentence of Subsection A emphasizes, the overriding goal is to provide high quality legal representation to the client in the individual case, it may also be appropriate for the appointing authority to certify an attorney for a limited purpose, such as to represent a particular client with whom he or she has a special relationship.

111    Superior post-conviction death penalty defense representation has often been provided by members of the private bar who did not have prior experience in the field but who did have a commitment to excellence. See, e.g., Kelly Choi, Against All Odds, Am. Law., Dec. 2000, at 98; Death-Row Rescue, Star Trib., Jan. 5, 2001, at 18A.

112    ABA Standards For Criminal Justice: Providing Defense Services Standard 5-5.3 cmt. (3d ed. 1992); see also Model Code of Prof'l Responsibility EC 2-30 (1997); Model Rules of Prof'l Conduct Rule 1.3 cmt. 2 (2002) ("A lawyer's work load must be controlled

so that each matter can be handled competently."); Taylor-Thompson, supra note 37, at 1509 ("If a defense delivery system does not at once identify and impose limits on the number of cases for which an individual lawyer will be responsible, case pressures will inevitably overwhelm the lawyer and compromise the representation.").

113     See infra Guideline 10.3 and accompanying commentary.

114     See Nat'l Legal Aid & Defender Ass'n, Guidelines for Legal Defense Systems in the United States, Guidelines 4.1, 5.1-5.3 (1976); Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Report of the Task Force on the Courts Standard 13.12 (1973). These standards all acknowledge the need to determine acceptable workloads, and all acknowledge within the standards themselves or in commentary the myriad factors that must be considered in weighing workload. Only the National Advisory Commission sets forth suggested numerical maximums for caseloads; those numbers are provided with the caveat "that particular local conditions--such as travel time--may mean that lower limits are essential." Id. The National Advisory Commission standard does not address death penalty workloads.

115     See Federal Death Penalty Cases, supra note 91.

116     See id. This figure was only for the number of hours expended through the end of trial court proceedings, and did not include any post-conviction representation.

117     See supra text accompanying notes 42-44. Moreover, counsel must continue to investigate the facts. See infra Guideline 10.7 (A); see also Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989) (holding appellate counsel ineffective because "[h]e did not review fully the trial court file or talk with petitioner or trial counsel," and hence was unaware of a trial court ruling that should have been appealed).

118     See Nat'l Ctr. for State Courts & The Spangenberg Group, Workload and Productivity Standards: A Report to the Office of the State Public Defender 86-89 (1989).

119     The Spangenberg Group, Amended Time & Expense Analysis of Post-Conviction Capital Cases in Florida 16 (1998).

120     Model Rules of Prof'l Conduct R. 1.1 (2002).

121     See id. cmt. 1; see also ABA Standards for Criminal Justice: Defense Function Standard 4-1.2(d), in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993); Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation 1.3(a) (1995).

122     ABA Standards for Criminal Justice: Providing Defense Services Standard 5-2.3 cmt. (3d ed. 1992).

123     See id.

124     See infra Guidelines 10.1-10.15.2.

125     The standard for denying additional appointments to death penalty lawyers should be more strictly applied than the standard for denying additional appointments in non-capital cases. In non-capital criminal cases, the standard provides that "[w]here there is compelling evidence that an attorney consistently has ignored basic responsibilities[,]... the attorney's name should be removed from the roster after notice and hearing, with the possibility of reinstatement after removal if adequate demonstration of remedial measures is shown." ABA Standards for Criminal Justice: Providing Defense Services Standard 5-2.3 cmt. (3d ed. 1992) (emphasis added). As these Guidelines make clear, low quality representation of a capital defendant may have irrevocable consequences. Accordingly, the Responsible Agency should not wait for an attorney to "consistently... ignore[] basic responsibilities." Id.

126     See ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.3 cmt. (3d ed. 1992).

127     It cannot always be safely assumed that counsel who has been determined to be qualified based on past performance will represent current or future clients satisfactorily. Circumstances can change. For example, the attorney may begin suffering from illness, chemical dependency or some other handicap unknown to the appointing authority, the court or the client. See Kirchmeier, supra note 29, at 455-60 (discussing cases in which defendants were represented by lawyers who were intoxicated, abusing drugs, or mentally ill).

128     See ABA Standards For Criminal Justice: Special Functions of the Trial Judge Standard 6-1.1(a) (3d ed. 1999) ("The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal

justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial.").

129   See, e.g., New York Capital Defender Office, Minimum Standards for Lead Counsel and Associate Counsel in Capital Cases, available at http:// www.nycdo.org/35b/35b-std.html (requiring that applicants submit "a description of specialized criminal defense training programs regularly attended, such as the NITA, the National Criminal Defense College, or bar association criminal practice programs" and specifying that "[a]n attorney shall not be eligible to be appointed as lead counsel or associate counsel in a capital case unless the Capital Defender Office shall certify that the attorney satisfactorily has completed a basic capital training program prescribed by the Capital Defender Office" or qualifies for an Interim Certification because she is otherwise qualified and is "in active pursuit of such training").

130   As one authority has noted, capital defense counsel must exhibit "constant vigilance in keeping abreast of new developments in a volatile and highly nuanced area of the law." Vick, supra note 4, at 358; see also Taylor-Thompson, supra note 37, at 1510.

131   See supra text accompanying note 28.

132   See generally Gideon v. Wainwright, 372 U.S. 335 (1963); Powell v. Alabama, 287 U.S. 45 (1932).

133   ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.6 (3d ed. 1992).

134   Pruett v. State, 574 So. 2d 1342, 1354 n.17 (Miss. 1990) (quoting Makemson v. Martin County, 491 So. 2d 1109, 1113 (Fla. 1986)).

135   Studies indicate that funding for prosecution is, on the average, three times greater than funding that is provided for defense services at both the state and federal levels. See ABA Standards for Criminal Justice: Providing Defense Services Standard 5-1.6 cmt. (3d ed. 1992) (footnote omitted). The ABA has recently reaffirmed its commitment to the principle of equal funding, calling for a public defense system in which:
There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system. There should be parity of workload, salaries and other resources (such as benefits, technology, facilities, legal research, support staff, paralegals, investigators, and access to forensic services and experts) between prosecution and public defense. Assigned counsel should be paid a reasonable fee in addition to actual overhead and expenses. Contracts with private attorneys for public defense services should never be let primarily on the basis of cost; they should specify performance requirements and the anticipated workload, provide an overflow or funding mechanism for excess, unusual or complex cases, and separately fund expert, investigative and other litigation support services. No part of the justice system should be expanded or the workload increased without consideration of the impact that expansion will have on the balance and on the other components of the justice system. Public defense should participate as an equal partner in improving the justice system. This principle assumes that the prosecutor is adequately funded and supported in all respects, so that securing parity will mean that defense counsel is able to provide quality legal representation.
ABA, The Ten Principles of a Public Defense Delivery Sys., Principle 8 (2002) (footnotes omitted), available at http:// www.abanet.org/legalservices/downloads/sclaid/resolution107.pdf.

136   See generally Ruth E. Friedman & Bryan A. Stevenson, Solving Alabama's Capital Defense Problems: It's a Dollars and Sense Thing, 44 Ala. L. Rev. 1 (1992); Anthony Paduano & Clive A. Stafford Smith, The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases, 43 Rutgers L. Rev. 281 (1991); Vick, supra note 4; Albert L. Vreeland, II, Note, The Breath of the Unfee'd Lawyer: Statutory Fee Limitations and Ineffective Assistance of Counsel in Capital Litigation, 90 Mich. L. Rev. 626 (1991).

137   McFarland v. Scott, 512 U.S. 1256, 1257-58 (1994) (Blackmun, J., dissenting from denial of certiorari).

138   The Spangenberg Group, A Study of Representation in Capital Cases in Texas 152 (1993).

139   See Friedman & Stevenson, supra note 136, at 31 n.148.

140   Federal Death Penalty Cases, supra note 91, at 28 (footnotes omitted).

141   For a survey of state practices regarding appointment and compensation of post-conviction counsel, see generally Hammel, supra note 47, and The Spangenberg Group, ABA Postconviction Death Penalty Representation Project, An Updated Analysis of the Right to Counsel and the Right to Compensation and Expenses in State Postconviction Death Penalty Cases (1996).

142   As discussed supra in the text accompanying note 119, a 1998 study of time and expenses required in Florida capital post-conviction cases concluded that on average, over 3,300 lawyer hours are required to represent a death-sentenced prisoner in Florida's post-conviction proceedings. The Spangenberg Group, supra note 119, at 16.

143   See Celestine Richards McConville, The Right to Effective Assistance of Capital Postconviction Counsel: Constitutional Implications of Statutory Grants of Capital Counsel, 2003 Wisc. L. Rev. 31, 35 n.22; Smith & Starns, supra note 47, at 106-19 (discussing state provisions for appointment of counsel and states that fail to appoint or compensate counsel); infra note 334.

144   ABA Standards for Criminal Justice: Providing Defense Services Standard 5-2.4 cmt. (3d ed. 1992).

145   See Vick, supra note 4, at 398 (summarizing studies); see also Kirchmeier, supra note 29, at 455-60 (listing cases of appointed capital defense counsel who were intoxicated, abusing drugs, or mentally ill).

146   See Vick, supra note 4, at 399-400.

147   See ABA Standards for Criminal Justice: Providing Defense Services Standard 5-2.4 cmt. (3d ed. 1992).

148   See, e.g., Bailey v. State, 424 S.E.2d 503, 506 (S.C. 1992). The court stated:
[I]t would be foolish to ignore the very real possibility that a lawyer may not be capable of properly balancing the obligation to expend the proper amount of time in an appointed criminal matter where the fees involved are nominal, with his personal concerns to earn a decent living by devoting his time to matters wherein he will be reasonably compensated. The indigent client, of course, will be the one to suffer the consequences if the balancing job is not tilted in his favor.
Id. (quoting Okeekchobee County v. Jennings, 473 So. 2d 1314, 1318 (Fla. Dist. Ct. App. 1985), quashed sub nom. Dennis v. Okeechobee County, 491 So. 2d 1115 (Fla. 1986)) (emphasis omitted).

149   See supra text accompanying notes 1-8.

150   Cf. Martinez-Macias v. Collins, 979 F.2d 1067, 1067 (5th Cir. 1992) (granting habeas corpus relief because "Macias was denied his constitutional right to adequate counsel in a capital case in which actual innocence was a close question. The state paid defense counsel $11.84 per hour. Unfortunately, the justice system got only what it paid for").

151   28 U.S.C. §2261(b) (2000). The standards of other Guidelines, such as Guideline 2.1 ("Adoption and Implementation of a Plan to Provide High Quality Legal Representation in Death Penalty Cases"), Guideline 5.1 ("Qualifications of Defense Counsel"), Guideline 7.1 ("Monitoring; Removal"), and Guideline 9.1 ("Funding and Compensation"), should also guide the determination as to whether a jurisdiction has "opted in" to Chapter 154.

152   For a general description of these, see supra commentary to Guideline 1.1. Guideline 10 should be read against the background provided by that commentary.

153   Gardner v. Florida, 430 U.S. 349, 357 (1977) (plurality opinion).

154   For general standards regarding the performance of criminal defense counsel, see ABA Standards for Criminal Justice: Defense Function Standard 4, in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993); Institute of Judicial Admin./ABA Juvenile Justice Standards Annotated, Standards Relating to Counsel for Private Parties (1980); and Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation (1997).

155   For example, as discussed in the commentary to Guideline 1.1, the current Supreme Court standard for effective assistance of counsel, articulated in Strickland v. Washington, 466 U.S. 668, 687 (1984), requires the defendant to show that counsel's performance was deficient and that the deficient performance undermined the reliability of the conviction or sentence. The application of this standard to capital cases had long been in an entirely unsatisfactory state, as many commentators observed. "Myriad cases in which defendants have been executed confirm that Strickland's minimal standard for attorney competence in capital cases is a woeful failure. Demonstrable errors by counsel, though falling short of ineffective assistance, repeatedly have been shown to have had fatal consequences." Randall Coyne & Lyn Entzeroth, Report Regarding Implementation of the American Bar Association's Recommendations and Resolutions Concerning the Death Penalty and Calling for a Moratorium on Executions, 4 Geo. J. On Fighting Poverty 3, 18 (1996). In case after case, attorneys who failed to present any evidence in mitigation of the death penalty, or who presented a bare minimum of such evidence, were found to satisfy Strickland, see, e.g., Chandler v. United States, 218 F.3d 1305,

1319, 1327 (11th Cir. 2000) (en banc), cert. denied, 531 U.S. 1204 (2001), even though "the failure to present mitigating evidence is a virtual invitation to impose the death penalty." White, supra note 3, at 341.

There is reason to believe that the Supreme Court has heard these concerns. In no case, capital or non-capital, had the Court ever held counsel to have performed ineffectively under Strickland until it determined in Williams v. Taylor, 529 U.S. 362, 395-96 (2000), that the lawyers in a capital case had been deficient in failing to conduct a thorough investigation of their client's background for sentencing purposes. The Court followed up with Wiggins v. Smith, 123 S. Ct. 2527, 2536-37 (2003), which, relying upon the first edition of these Guidelines as a guide to reasonable professional performance, also held counsel in a capital case to have provided ineffective assistance by failing to conduct a complete mitigation investigation. The effect may be that, at least in capital cases, the lower courts will have to re-interpret Strickland as imposing considerably more stringent standards than had hitherto been assumed. See Marcia Coyle, New Standards in Death Cases: High Court Rules on Effective Counsel, Nat'l L. J., July 14, 2003, at 1 ("The promise of Williams--to put teeth into the Strickland standards--has not been fulfilled, according to some scholars and litigators. But Wiggins, they added, will not be so easily ignored by lower courts."). This view finds support in the fact that Justice O'Connor wrote both Strickland and Wiggins, reinforcing the point that the former will have to be read in light of the latter.

156     The standards established by the Responsible Agency should clearly state that performance in the capital context should be measured with reference to the special expertise required in capital cases. See, e.g., State v. Davis, 561 A.2d 1082, 1089 (N.J. 1989) (stating that meeting the Strickland standard in capital cases requires "capital competence"); see generally Nebraska Comm'n on Pub. Advocacy, Standards for Indigent Defense Services in Capital and Non-Capital Cases. Review by the Responsible Agency should likewise be intensified, compared to the scrutiny that might be given under a system to appoint counsel in non-capital cases. See, e.g., supra note 125.

157     See supra Guideline 1.1(A).

158     See, e.g., Wiggins, 123 S. Ct. 2527 (2003) (relying on first edition of these Guidelines to hold that counsel's mitigation investigation failed to meet reasonable professional standards); Williams v. Taylor, 529 U.S. 362, 396 (2000) (citing ABA Standards for Criminal Justice 4-4.1 cmt. at 4-55 (2d ed. 1980) for proposition that "trial counsel [in a capital case have an] obligation to conduct a thorough investigation of the defendant's background," and concluding that defense counsel performed deficiently in failing to conduct a diligent investigation into his client's background).

159     See supra Guidelines 5.1 and 7.1, and accompanying commentary.

160     Dobbert v. Florida, 432 U.S. 282, 297 (1977).

161     In a number of cases, courts have found no bar to the prosecution pursuing a death sentence, despite belated notice to the defense. See, e.g., State v. Lee, 917 P.2d 692, 698-99 (Ariz. 1996) (affirming death sentence where state filed its written notice eighty-seven days late under state law, because defendant had actual notice that State intended to pursue death penalty); People v. Dist. Court, Gilpin County, 825 P.2d 1000, 1002-03 (Colo. 1992) (concluding defendant received adequate notice of intent to seek death penalty where prosecution never stated death penalty would not be sought and notice was filed forty-one days before trial, even though discovery had been completed and date for filing pretrial motions had passed).

162     See, e.g., State v. Pirtle, 904 P.2d 245, 254 (Wash. 1995) (noting that under state law, "[b]efore the death penalty can be sought, there must be 'reason to believe that there are not sufficient mitigating circumstances to merit leniency'") (quoting State v. Campbell, 691 P.2d 929, 942 (Wash. 1984)); U.S. Dep't of Justice, United States Attorneys' Manual §9-10.030 (2001) [hereinafter United States Attorneys' Manual] ("In any case in which a United States Attorney's Office is considering whether to request approval to seek the death penalty, the United States Attorney shall give counsel for the defendant a reasonable opportunity to present any facts, including any mitigating factors, to the United States Attorney for consideration."). "Input from the defendant as to mitigating factors is normally desirable, because the subjective factors are better known to the defendant." State v. Pirtle, 904 P.2d at 254 (citation omitted); see also infra text accompanying notes 244-45.

163     Some jurisdictions require the defense be provided formal notice of the government's intent to seek the death penalty well before the guilt/innocence phase. See, e.g., Ariz. R. Crim. P. 15.1(g)(1) (requiring a prosecutor to provide the defendant notice of intent

to seek the death penalty "no later than 60 days after the arraignment in superior court"); Md. Code Ann., Crim. Law §2-202(a) (2002) (providing that:

A defendant found guilty of murder in the first degree may be sentenced to death only if: (1) At least 30 days before trial, the State gave written notice to the defendant of: (i) The State's intention to seek a sentence of death; and (ii) Each aggravating circumstance on which the State intends to rely);

Nev. Sup. Ct. R. 250(4)(c) ("No later than 30 days after the filing of an information or indictment, the state must file in the district court a notice of intent to seek the death penalty. The notice must allege all aggravating circumstances which the state intends to prove and allege with specificity the facts on which the state will rely to prove each aggravating circumstance."); N.Y. Crim. Proc. Law §250.40(1)-(2) (McKinney 2002) (stating that:

A sentence of death may not be imposed upon a defendant convicted of murder in the first degree unless ... the people file with the court and serve upon the defendant a notice of intent to seek the death penalty ... within one hundred twenty days of the defendant's arraignment upon an indictment charging the defendant with murder.);

Wash. Rev. Code Ann. §10.95.040(2)-(3) (West 2002) (stating the state is precluded from seeking the death penalty unless written notice is served on the defendant or counsel "within thirty days after the defendant's arraignment upon the charge of aggravated first degree murder unless the court, for good cause shown, extends or reopens the period for filing and service of the notice"); United States Attorneys' Manual, supra note 162, §9-10.030 ("If the United States Attorney decides to request approval to seek the death penalty, the United States Attorney's Office should inform counsel for the defendant.").

Other jurisdictions do not require notice. See, e.g., Dist. Court, Gilpin County, 825 P.2d at 1002 ("There is no Colorado statute requiring the prosecutor to give notice of intent to seek the death penalty."); Sireci v. State, 399 So. 2d. 964, 970 (Fla. 1981) ("When one is charged with murder in the first degree, he is well aware of the fact that it is a capital felony punishable by a maximum sentence of death."); Williams v. State, 445 So. 2d 798, 804 (Miss. 1984) ("Anytime an individual is charged with murder, he is put on notice that the death penalty may result."). In jurisdictions where the prosecutor is not statutorily required to give notice of the intent to seek the death penalty, due process nonetheless requires that the defendant have adequate notice. See Lankford v. Idaho, 500 U.S. 110, 119-22 (1991) (holding due process was violated where the trial court imposed a death sentence after the prosecution stated it would not recommend a death sentence and the trial judge was silent following the state's decision).

164  See, e.g., Holmberg v. De Leon, 938 P.2d 1110, 1111 (Ariz. 1997) (granting defense motion to strike State's notice of intent to seek death penalty on ground that it violated state court rule requiring notice within 30 days of arraignment); State v. Second Judicial Dist. Court, 11 P.3d 1209, 1211, 1215 (Nev. 2000) (concluding trial court acted within its discretion in denying prosecution motion for leave to file untimely notice of intent to seek death penalty; defense opposed motion). Counsel should be mindful of the possibility that it may be appropriate to pursue the challenge through some collateral proceeding (e.g, application for a writ of prohibition). See infra text accompanying note 230.

165  History of Guideline 1.1, supra.

166  See Model Rules of Prof'l Conduct R. 1.1 (2002).

167  Id. at R. 1.1 cmt. 5; cf. David J. Williams, Letter to the Editor, La. B.J., Aug./Sep. 2002, at 86 (Letter from counsel to Leslie Dale Martin, who was executed on May 10, 2002, stating that "the caseload of the lead counsel was such that he only had time to read through the file once before trial.... This case cost me most of the respect that I formerly had for the criminal justice system").

168  See Texas Death Penalty Mitigation Manual, supra note 105.

169  See Mahoney v. Pataki, 772 N.E.2d 1118, 1123 (N.Y. 2002).

170  See Texas Death Penalty Mitigation Manual, supra note 105.

171  This term is meant to accommodate the variety of exigent circumstances under which the provision of high quality legal representation might require a different procedure. For example, the client may be so situated that the professionally responsible course is to have a relatively junior attorney deal with the immediate situation, designating lead counsel subsequently. Alternatively, the client might insist on having a particular retained or pro bono attorney involved in the representation.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

172    Cf. N.Y. Jud. Law §35-b(2) (McKinney 2002) ("With respect to counsel at trial and at a separate sentencing proceeding, the court shall appoint two attorneys, one to be designated 'lead' counsel and the other to be designated 'associate' counsel."); Cal. R. Ct. R. 4.117(c)(1) (effective Jan. 1, 2003) ("If the court appoints more than one attorney, one must be designated lead counsel ... and at least one other must be designated associate counsel...."). Because the Responsible Agency has a continuing duty to monitor the performance of the defense team to insure that it is providing high quality legal representation at every stage of the case, see supra Guideline 7.1, the Responsible Agency may appropriately change these designations to reflect developments in the case (e.g, it moves to a new post-conviction stage, or lead counsel becomes ill).

173    See James J. Clark et al., The Fiend Unmasked: Developing the Mental Health Dimensions of the Defense, in Ky. Dep't of Pub. Advoc., Mental Health & Experts Manual ch. 8 (6th ed. 2002), available at http:// dpa.state.ky.us/library/manuals/mental/ch08.html; ABA Criminal Justice Mental Health Standards Standard 7-1.1 & cmt. (1989) (mental health and mental retardation experts serving as consultants are agents of the attorney, subject to the attorney-client privilege and the work-product doctrine); accord id. Standard 7-3.3 & cmt; see also supra Guideline 4.1(B)(2).

174    Cf. Freedman, supra note 52, at 1089 n.* (noting that each of six primary attorneys and eleven other named professionals were "critical to saving Mr. Washington's life.").

175    See Guideline 4.1(B)(2); see generally Bittaker v. Woodford, 311 F.3d 715 (9th Cir. 2003).

176    Many jurisdictions provide, by statute or case law, that requests for expert assistance may be made ex parte so that indigent defendants are not required to divulge confidential work product or strategy to the prosecution. See, e.g., 18 U.S.C. §3006A(e)(1) (2000) (providing for ex parte hearings for requests for investigative, expert, or other services for indigent defendants); Cal. Penal Code §987.9(a) (West Supp. 2002); Kan. Stat. Ann. §22-4508 (1995); Minn. Stat. Ann. §611.21 (West Supp. 2002); Nev. Rev. Stat. Ann. §7.135 (Michie 1998); N.Y. County Law §722-c (McKinney Supp. 2002); S.C. Code Ann. §16-3-26(C)(1) (Law. Co-op. 2001); Tenn. Code Ann. §40-14-207(b) (1997); Ex parte Moody, 684 So. 2d 114, 120 (Ala. 1996); Brooks v. State, 385 S.E.2d 81, 84 (Ga. 1989) (holding that while state could be heard on the issue of indigency, showing of need for expert should be made ex parte); McGregor v. State, 733 P.2d 416, 416 (Okla. Crim. App. 1987) (stating that "to allow participation, or even presence, by the State would thwart the Supreme Court's attempt to place indigent defendants, as nearly as possible, on a level of equality with nonindigent defendants"); Ex parte Lexington County, 442 S.E.2d 589, 594 (S.C. 1994) (equal protection concerns require hearing to be both ex parte and in camera); State v. Barnett, 909 S.W.2d 423, 429 (Tenn. 1995); Williams v. State, 958 S.W.2d 186, 192-94 (Tex. Crim. App. 1997).

177    Under the AEDPA, such a record may be critical to the ability of the client to succeed on federal habeas corpus. See Williams v. Taylor, 529 U.S. 420, 437 (2000); see generally Stephen B. Bright, Obtaining Funds for Experts and Investigative Assistance, The Champion, June 1997, at 31, 33; Edward C. Monahan & James J. Clark, Funds for Defense Experts: What a National Benchmark Requires, The Champion, June 1997, at 12.

178    Rick Kammen & Lee Norton, Plea Agreements: Working with Capital Defendants, The Advocate, Mar. 2000, at 31, available at http:// www.dpa.state.ky.us/library/advocate/mar00/plea.html; see also Lewis, supra note 93, at 840 (finding forty percent of death row inmates to be chronically psychotic); Dorothy Otnow Lewis et al., Neuropsychiatric, Psychoeducational, and Family Characteristics of 14 Juveniles Condemned to Death in the United States, 145 Am. J. Psychiatry 584, 586-87 (1988) (finding fifty percent of death sentenced juveniles in survey suffered from psychosis and almost all were severely abused as children).

179    See, e.g., Nixon v. Singletary, 758 So. 2d 618, 624-25 (Fla. 2000) (ineffective assistance for counsel to fail to obtain client's explicit prior consent to strategy of conceding guilt to jury in opening statement in effort to preserve credibility for sentencing); People v. Hattery, 488 N.E.2d 513, 519 (Ill. 1985) (same).

180    See ABA Standards for Criminal Justice: Defense Function Standard 4-5.2 & cmt., in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993); see also Kevin M. Doyle, Heart of the Deal: Ten Suggestions for Plea Bargaining, The Champion, Nov. 1999, at 68 (counsel should not expect client to accept plea bargain unless opinion is founded on experience and leg work investigating the case); White, supra note 3, at 371, 374 (thorough investigation and relationship of trust key to persuading client to accept appropriate plea offer).

181    See White, supra note 3, at 338 ("Often, capital defendants have had bad prior experiences with appointed attorneys, leading them to view such attorneys as 'part of the system' rather than advocates who will represent their interests. Appointed capital defense attorneys sometimes exacerbate this perception by harshly criticizing their clients's [sic] conduct or making it clear that they are reluctant to

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

represent them. A capital defendant who experiences, or previously has experienced, these kinds of judgments understandably will be reluctant to trust his attorney.") (footnotes omitted); infra note 313.

182    A lawyer can also frequently earn a client's trust by assisting him with problems he encounters in prison, or otherwise demonstrating concern for his well being and a willingness to advocate for him. See id.; Lee Norton, Mitigation Investigation, in Florida Public Defender Ass'n, Defending a Capital Case in Florida 25 (2001). Accordingly, such advocacy is an appropriate part of the role of defense counsel in a capital case. Indeed, a lawyer who displays a greater concern with habeas corpus doctrine than with recovering the radio that prison authorities have confiscated from the client is unlikely to develop the sort of relationship that will lead to a satisfactory legal outcome.

183    One important example is the fact that the client is mentally retarded--a fact that the client may conceal with great skill, see, e.g., James W. Ellis & Ruth A. Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 430-31 (1985), but one which counsel absolutely must know. See Atkins v. Virginia, 536 U.S. 304, 321 (2002) (holding that mentally retarded defendants may not constitutionally be executed). The issue of mental illness presents a very similar set of challenges.

184    See Goodpaster, supra note 3, at 321.

185    See Norton, supra note 182, at 5; White, supra note 3, at 375 (jury will be less likely to empathize with defendant if it does "not perceive a bond between the defendant and his attorney").

186    See infra Guideline 10.7(A) and accompanying commentary; Kammen & Norton, supra note 178.

187    See Bullington v. Missouri, 451 U.S. 430, 445-46 (1981); see also Sattazahn v. Pennsylvania, 537 U.S. 101 (2003). Moreover, if a mitigation investigator is productive, it may persuade the prosecutor to forgo the death penalty. In that event, the jury will not be "death-qualified" and the client's chances of an acquittal will be enhanced.

188    See generally Godinez v. Moran, 509 U.S. 389, 396-402 (1993) (setting forth minimum competency standard that the Constitution requires).

189    See infra text accompanying notes 341.

190    Cf. Sell v. United States, 123 S. Ct. 2174, 2184 (2003) (holding that "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests"); Riggins v. Nevada, 504 U.S. 127, 137-38 (1992) (defendant was constitutionally entitled to have administration of anti-psychotic drugs cease before trial). The Supreme Court has not addressed the application of these principles to phases of the criminal process other than the trial itself, but those cases should alert capital defense counsel to do so. See, e.g., Rohan v. Woodford, 334 F.3d 803, 818-19 (9th Cir. 2003) (Kozinski, J.) (holding as a matter of statutory construction that mentally incompetent federal habeas petitioner is entitled to a stay of execution and of proceedings until he recovers).

191    See infra text accompanying note 341.

192    See ABA Model Rules of Prof'l Conduct R. 1.4(a) (2002) ("A lawyer shall ... keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.").

193    See Breard v. Greene, 523 U.S. 371, 380-81 (1998) (Breyer, J., dissenting) (finding Paraguayan national's argument for stay of execution not wholly without merit where the United States government had submitted an amicus brief acknowledging that the Vienna Convention had been violated); Sandra Babcock, The Role of International Law in United States Death Penalty Cases, 15 Leiden J. Int. L. 367, 368 (2002) (describing violations as "widespread and uncontested"); see also Case Concerning Avena and Other Mexican Nationals (Mexico v. U.S.A.), 2003 I.C.J. 128, at http:// news.findlaw.com/hdocs/docs/deathpen/mxus20503pord.pdf (Order of Feb. 5, 2003 on Request for the Indication of Provisional Remedies) (ordering United States to "take all measures necessary to ensure" that three Mexican nationals under state death sentences are not executed pending resolution of Mexico's claim "that, in the cases of 49... detained Mexican nationals ... the United States made no attempt at any time to comply with Article 36 of the Vienna Convention").

Furthermore, counsel should be alert to the fact that the United States has bilateral consular treaties with over fifty countries which may impose obligations additional to those under the Vienna Convention. See generally U.S. Dep't of State, The Bureau of Consular Affairs, Consular Notification and Access, Part 5: Legal Material, at www.travel.state.gov/ notification5.html#provisions (listing treaties). One example is Article 16 of the Consular Convention Between the United States and the United Kingdom, 3 U.S.T. 3426 (1952), which currently covers thirty-two independent countries around the world that were formerly entities within the British Empire.

194   See Valdez v. State, 46 P.3d 703, 710 (Okla. Crim. App. 2002) (granting post-conviction relief because it was ineffective assistance for trial counsel not to "inform Petitioner he could have obtained financial, legal and investigative assistance from his consulate"); see also Breard v. Greene, 523 U.S. at 380; Madej v. Schomig, No. 98 C 1866, 2002 WL 31386480, at *2 (N.D. Ill., Oct. 22, 2002) (finding that had Polish Consulate in Chicago been notified as required by Vienna Convention, it "almost certainly" would have "provided Petitioner with an attorney who would have assisted in obtaining constitutionally effective assistance at the [capital] sentencing hearing," rather than one who utterly failed to investigate or prepare. "With that assistance, there is a probability that the outcome of the sentencing hearing would have been different."); Anne-Marie Slaughter, Editorial: On a Foreign Death Row, Wash. Post, Apr. 14, 1998, at A15 (noting that under the Vienna Convention on Consular Relations, "[a] citizen is entitled to the protection and advice of his or her government when caught in a foreign legal system and a foreign language [and access to] a translator, local counsel and diplomatic pressure if needed"). Foreign governments often have formal assistance programs in place for nationals facing the death penalty in the United States. See, e.g., Ana Mendieta, Mexico to Aid Nationals in U.S. Fund Will Help 45 Death Row Inmates, Chicago Sun-Times, Oct. 6, 2000, at 18 (describing creation of legal assistance program to defend the rights of Mexican nationals sentenced to death in the United States and bolster recognition of rights under the Vienna Convention); Court Blocks Execution of Canadian in Texas, Wash. Post, Dec. 10, 1998, at A47 ("Canada ... regularly seeks clemency for Canadians sentenced to death abroad.").

195   See Powell v. Alabama, 287 U.S. 45, 57 (1932) (describing "thorough-going investigation" as "vitally important"); ABA Standards for Criminal Justice: Defense Function Standard 4-4.1, 4-6.1, in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993); Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 4.1 (1997) ("Investigation"); see also Hertz & Leibman, supra note 28 at 489 n.41 (discussing duty described in Subsection (B) to conduct full investigation of prior proceedings); infra text and accompanying note 240 (same); infra note 351 (discussing duty of post-conviction counsel to investigate all potential claims, whether or not previously asserted).

196   See 28 U.S.C. §2254(e)(2) (2000), which, as amended by the AEDPA, precludes certain claims from federal habeas corpus review if the petitioner "has failed to develop the factual basis" of them "in State court proceedings." See Williams v. Taylor, 529 U.S. 420, 424 (2000) (construing this section).

197   See generally Lyon, supra note 3; Vick, supra note 4. Numerous courts have found counsel to be ineffective when they have failed to conduct an adequate investigation for sentencing. See, e.g., Wiggins v. Smith, 123 S. Ct. 2543-44 (2003) (counsel ineffective because, although they obtained some mitigation evidence, they failed to investigate client's social history or explore the numerous areas of mitigation listed in first edition of these guidelines); Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison); Douglas v. Woodford, 316 F.3d 1079, 1087-89 (9th Cir. 2003) (although counsel did uncover and present some mitigating evidence, his investigation "was constitutionally inadequate" for failing to dig deeply enough into client's social, medical, and psychological background; nor did counsel adequately prepare the penalty phase witnesses in order to present the material that he did have "to the jury in a sufficiently detailed and sympathetic manner"); Brownlee v. Haley, 306 F.3d 1043, 1070 (11th Cir. 2002) (counsel ineffective for failing to "investigate, obtain, or present any mitigating evidence to the jury, let alone the powerful mitigating evidence of Brownlee's borderline mental retardation, psychiatric disorders, and history of drug and alcohol abuse"); infra note 205.

As discussed infra note 261, another consequence of bifurcation is that counsel must investigate the possibility that the defendant was judged at either the guilt or penalty phases by one or more jurors who were not impartial.

198   See Death Penalty Information Center, Innocence and the Death Penalty (2003), at http://www.deathpenaltyinfo.org/article.php? did=412&scid=6 (stating that, "[s]ince 1973, 111 people in 25 states have been released from death row with evidence of their innocence") (latest release July 28, 2003); see generally infra note 231 (suggesting legal implications of these developments).

199   See, e.g., Dodd v. State, 993 P.2d 778, 783-84 (Okla. Crim. App. 2000) (canvassing special unreliability of such testimony and restricting its use); supra note 50.

200   Recent years have seen a series of scandals involving the prosecution's use, knowingly or unknowingly, of scientifically unsupportable or simply fabricated forensic evidence by governmental agents. See generally U.S. Dep't Justice, Off. Insp. Gen., The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases (1996) (detailing results of eighteen-month investigation into charges by whistleblower Frederic Whitehurst that FBI Laboratory mishandled "some of the most significant prosecutions in the recent history of the Department of Justice" and finding "significant instances of testimonial errors, substandard analytical work, and deficient practices"); Paul C. Giannelli, The Abuse of Scientific Evidence in Criminal Cases: The Need for Independent Crime Laboratories, 4 Va. J. Soc. Pol'y & L. 439, 442-69 (1997) (summarizing numerous cases); supra note 51.

201   See generally Barry Scheck et al., Actual Innocence: When Justice Goes Wrong and How to Make it Right (2001).

202   See Atkins v. Virginia, 536 U.S. 304, 320-21 (2002) ("Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes."); see also Jurek v. Estelle, 623 F.2d 929, 938, 941 (5th Cir. 1980) (reviewing "with that suspicion mandated by the Supreme Court" the voluntariness of a confession made by a defendant of "limited intelligence"); Freedman, supra note 52, at 1104-06 (noting characteristics of mentally retarded persons making them more likely to confess falsely).

203   As this Guideline emphasizes, that is so even where circumstances appear overwhelmingly indicative of guilt. A recent study that includes both capital and non-capital DNA exonerations has found that in twenty-two percent of the cases the client had confessed notwithstanding his innocence. See Scheck et al., supra note 201, at 120. See Dan Morain, Blind Justice John Cherry's Killing Left Many Victims; Was the Accused One of Them?, L.A. Times, July 16, 1989, View, at 6 (noting that Jerry Bigelow confessed many times, including to the media, and was eventually found to be innocent).

204   See Henderson v. Sargent, 926 F.2d 706, 711-12 (8th Cir. 1991) (granting writ where trial counsel's performance at guilt phase was ineffective in lacking "an adequate investigation of the facts of the case, consideration of viable theories, and development of evidence to support those theories," and state post-conviction counsel was ineffective for failing to perform full analysis of "trial testimony and the police record [and failing to conduct] interviews with the persons who testified at trial or had firsthand knowledge of the events surrounding the murder"); People v. Johnson, 609 N.E.2d 304, 310-12 (Ill. 1993) (holding state post-conviction counsel ineffective for failing to interview witnesses that client claimed trial attorneys should have called); Steven M. Pincus, "It's Good to be Free" An Essay About the Exoneration of Albert Burrell, 28 Wm. Mitchell L. Rev. 27, 33-34 (2001).

205   See, e.g., Wiggins v. Smith, 123 S. Ct. 2526 (2003) (counsel failed to uncover evidence that client never had a stable home and was repeatedly subjected to gross physical, sexual, and psychological abuse); Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison); Caro v. Woodford, 280 F.3d 1247, 1255 (9th Cir. 2002) (counsel ineffective for failing to investigate and present evidence of client's brain damage due to prolonged pesticide exposure and repeated head injuries, and failing to present expert testimony explaining "the effects of the severe physical, emotional, and psychological abuse to which Caro was subjected as a child"), cert. denied, 536 U.S. 951 (2002); Coleman v. Mitchell, 268 F.3d 417, 449-51 (6th Cir. 2001) (though counsel's duty to investigate mitigating evidence is well established, counsel failed to investigate and present evidence that defendant had been abandoned as an infant in a garbage can by his mentally ill mother, was raised in a brothel run by his grandmother where he was exposed to group sex, bestiality and pedophilia, and suffered from probable brain damage and borderline personality disorder), cert. denied, 535 U.S. 1031 (2002); Jermyn v. Horn, 266 F.3d 257, 307-08 (3d Cir. 2001) (counsel ineffective for failing to investigate and present evidence of defendant's abusive childhood and "psychiatric testimony explaining how Jermyn's development was thwarted by the torture and psychological abuse he suffered as a child"); supra note 197.

206   See Hardwick v. Crosby, 320 F.3d 1127, 1190 n.215 (11th Cir. 2003) ("Even if Hardwick did ask [counsel] not to present witnesses at the sentencing proceeding, ... [counsel] had a duty to Hardwick at the sentencing phase to present available mitigating witnesses as Hardwick's defense against the death penalty."); Blanco v. Singletary, 943 F.2d 1477, 1501-03 (11th Cir. 1991) (counsel ineffective for "latch[ing] onto" client's assertions he did not want to call penalty phase witnesses and failing to conduct an investigation sufficient to allow their client to make an informed decision to waive mitigation); see also Karis v. Calderon, 283 F.3d 1117, 1136-41 (9th Cir. 2002), cert. denied, 126 S. Ct. 2637 (2003).

207   Voyles v. Watkins, 489 F. Supp. 901, 910 (N.D. Miss. 1980); accord Austin v. Bell, 126 F.3d 843, 849 (6th Cir. 1997) (counsel's failure to investigate and present mitigating evidence at the penalty phase of the trial "because he did not think that it would do any good" constituted ineffective assistance).

208   See, e.g., Wiggins, 123 S. Ct. at 2526 (2003) (counsel's ineffectiveness lay not in failure to present evidence of client's family background, but rather in failure to conduct an investigation sufficient to support a professionally reasonable decision whether to do so); Douglas v. Woodford, 316 F.3d 1079, 1089 (9th Cir. 2003) ("It is, of course, difficult for an attorney to advise a client of the prospects of success or the potential consequences of failing to present mitigating evidence when the attorney does not know that such evidence exists."); Silva v. Woodford, 279 F.3d 825, 838-39 (9th Cir. 2002), cert. denied, 123 S. Ct. 342 (2002); Coleman, 268 F.3d at 447; Battenfield v. Gibson, 236 F.3d 1215, 1229 (10th Cir. 2001) ("In addition to hampering [defense counsel's] ability to make strategic decisions, [defense counsel's] failure to investigate [defendant's background] clearly affected his ability to competently advise [defendant] regarding the meaning of mitigation evidence and the availability of possible mitigation strategies."); United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."); Knighton v. Maggio, 740 F.2d 1344, 1350 (5th Cir. 1984) (petitioner entitled to relief if record shows that counsel "could not make a valid strategic choice because he had made no investigation").

209   Brown v. State, 526 So. 2d 903, 908 (Fla. 1988) (citing Hitchcock v. Dugger, 481 U.S. 393, 394 (1987)); see also Eddings v. Oklahoma, 455 U.S. 104, 113-15 (1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978); infra text accompanying note 277.

210   Russell Stetler, Mitigation Evidence in Death Penalty Cases, The Champion, Jan./Feb. 1999, at 35; see also ABA Criminal Justice Section, supra note 86, at 63.

211   See Norton, supra note 182, at 2 (mitigation investigation must encompass client's "whole life"); Equal Justice Initiative of Ala., Alabama Capital Defense Trial Manual ch. 12 (3d ed. 1997) [hereinafter Alabama Capital Defense Trial Manual]; Lyon, supra note 3, at 703 (observing that "mitigation begins with the onset of the [defendant's] life" because "[m]any [defendants'] problems start with things like fetal alcohol syndrome, head trauma at birth, or their mother's drug addiction during pregnancy"); Vick, supra note 4, at 363.

212   See supra text accompanying notes 13-27.

213   See Goodpaster, supra note 3, at 321; Lyon, supra note 3, at 704-06; Vick, supra note 4, at 366-67.

214   See Wiggins v. Smith, 123 S. Ct. 2527 (2003) (inadequacy of trial counsel's mitigation investigation demonstrated by post-conviction presentation of expert's report that demonstrated "the severe physical and sexual abuse petitioner suffered at the hands of his mother and while in the care of a series of foster parents" through "state social services, medical, and school records, as well as interviews with petitioner and numerous family members"); Williams v. Taylor, 529 U.S. 362, 395 (2000) (counsel ineffective where they: failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records. Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.) (footnote omitted); Jermyn v. Horn, 266 F.3d 257, 307 (3d Cir. 2001) (counsel ineffective for failing to obtain school records that disclosed childhood abuse); see also Alabama Capital Defense Trial Manual, supra note 211; Texas Death Penalty Mitigation Manual, supra note 105, ch. 3; Norton, supra note 182, at 32-38.

215   In order to verify or corroborate witness testimony about circumstances and events in the defendant's life, defense counsel must "assemble the documentary record of the defendant's life, collecting school, work, and prison records" which might serve as sources of relevant facts. Vick, supra note 4, at 367; see also Lyon, supra note 3, at 705-06. Contemporaneous records are more credible than witnesses sharing previously undisclosed memories or experts offering opinions that were formed only after the client faced capital charges. Records may also document events that neither the client nor family members remember. See, e.g., Williams, 362 U.S. at 395 n.19 (relying on a social worker's graphic description of the Williams home that could not have been provided by client, who was too young, or the adult family members, who were too intoxicated, to recall the scene).

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

216    See Norton, supra note 182, at 3 (counsel should "investigate at least three generations" of the client's family).

217    See id. (advocating "triangulation" of data).

218    See Terry A. Kupers, M.D., Prison Madness The Mental Health Crisis Behind Bars and What We Must Do About It, 33-34 (1999);
       David M. Halbfinger, Care of Juvenile Offenders in Mississippi is Faulted, N.Y. Times, Sept. 1, 2003 at A13 (describing allegations
       of severely abusive conditions in Mississippi juvenile detention facilities and noting that "what is happening in Mississippi is by
       no means rare. Arizona, Arkansas, California, Georgia, Louisiana, Maryland, and South Dakota, among other states, have all had
       scandals in recent years," although the conditions in Mississippi were supposed to have been corrected pursuant to a court order
       issued in 1977).

219    See Craig Haney, Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death, 49
       Stan. L. Rev. 1447, 1467 (1997) (noting damaging effects of "social conditions and experiences" often inflicted on institutionalized
       juvenile offenders).

220    See Caro v. Woodford, 280 F.3d 1247, 1255 (9th Cir. 2002), cert. denied, 536 U.S. 951 (2002).

221    See Mak v. Blodgett, 970 F.2d 614, 616-18 & n.5 (9th Cir. 1992) (positive testimony from defendant's family, combined with expert
       testimony about difficulty of adolescent immigrants from Hong Kong assimilating to North America, would have humanized client
       and could have resulted in a life sentence for defendant convicted of thirteen murders). See also Guideline 10.6 and accompanying
       commentary (noting that foreign government might recognize an American citizen as one of its nationals and provide counsel with
       extremely valuable assistance).

222    See Johnson v. Mississippi, 486 U.S. 578, 586-87 (1988); supra notes 7, 22.

223    See supra text accompanying notes 20-28.

224    See, e.g., Miller-el v. Cockrell, 537 U.S. 322, 329-33 (2003) (ruling for habeas petitioner in reliance on evidence regarding prosecutors'
       racial discrimination during voir dire presented at a pre-trial hearing and in state post-conviction proceedings); Sara Rimer, In Dallas,
       Dismissal of Black Jurors Leads to Appeal by Death Row Inmate, N.Y. Times, Feb. 13, 2002, at A24 (discussing memoranda
       and training manuals from prosecutor's office documenting policy of racial discrimination in jury selection); Stephen B. Bright,
       Challenging Racial Discrimination in Capital Cases, The Champion, Jan./Feb. 1997, at 22.

225    See infra Guideline 10.10.2; supra text accompanying note 7; infra text accompanying notes 264-70.

226    See Russell Stetler, Working with the Victim's Survivors in Death Penalty Cases, The Champion, June 1999, at 42; see also Michael
       Janofsky, Parents of Gay Obtain Mercy for His Killer, N.Y. Times, Nov. 5, 1999, at A1 (describing widely publicized case in which
       the prosecutor decided to drop his request for the death penalty because the parents of the victim so requested).

227    Stephen B. Bright, Preserving Error at Capital Trials, The Champion, Apr. 1997, at 42-43. For example, John Eldon Smith was
       executed by the State of Georgia even though he was sentenced to death by a jury selected from a jury pool from which women
       were unconstitutionally excluded. The federal courts refused to consider the issue because Mr. Smith's lawyers failed to preserve it.
       Mr. Smith's co-defendant was also sentenced to death from a jury selected from the same pool. The issue was preserved in the co-
       defendant's case, and the co-defendant's conviction and death sentence were vacated. At retrial, the co-defendant was sentenced to
       life imprisonment. See Smith v. Kemp, 715 F.2d 1459, 1476 (11th Cir. 1983) (Hatchett, J., concurring in part and dissenting in part).

228    See Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation Guideline 5.1 (1995) (listing
       potential motions).

229    See Ake v. Oklahoma, 470 U.S. 68, 75 (1985); see also Stewart v. Smith, 536 U.S. 856, 859-60 (2002) (per curiam).

230    See, e.g., Schumer v. Holtzman, 454 N.E.2d 522, 526 (N.Y. 1983) (granting writ of prohibition sought by non-capital suspect to
       preclude investigation by improperly designated prosecutor); cf. Hynes v. Tomei, 706 N.E.2d 1201, 1207 (N.Y. 1998) (invalidating
       portion of New York death penalty statute in proceeding for writ of prohibition brought by prosecutor).

231    See Bradley v. Pryor, 305 F.3d 1287, 1289-90 (11th Cir. 2002) (holding that action seeking DNA samples for testing to establish the
       innocence of a capital prisoner is properly brought under Section 1983 rather than as habeas corpus petition), cert. denied, 123 S.

Ct. 1909 (2003); supra text accompanying notes 5-9. As this example suggests, developments in DNA technology and increasing knowledge of the extent and causes of wrongful convictions in capital cases, see supra text and accompanying notes 48-51, 198-204, should lead defense attorneys to be aggressive in pursuing the implication of the Court's assumption in Herrerra v. Collins, 506 U.S. 390, 417 (1993), 'that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there was no state avenue open to process such a claim:" See House v. Bell, 311 F.3d 767 (6th Cir. 2002) (en banc), cert. denied, 123 S. Ct. 2575 (2003) (relying upon this passage and opinion of Justice O'Connor in Schlup v. Delo, 513 U.S. 298 (1995), in certifying to state courts issue of whether procedural vehicle existed to present to them evidence of innocence first uncovered during federal habeas proceedings).

232    Counsel should always cite to any arguably applicable provision of the United States Constitution, the state constitution, and state law as bases for granting a claim. A reviewing court may refuse to consider a legal theory different from that put forward originally. See Anderson v. Harless, 459 U.S. 4, 6 (1982) (refusing to consider violation of Due Process Clause of federal Constitution because defense counsel in state courts relied solely upon due process clause of state constitution). For example, courts have refused to consider an assertion that a statement was taken in violation of the Sixth Amendment right to counsel because it was argued in earlier proceedings only that the statement was obtained in violation of the Fifth Amendment protection against self-incrimination. See McCleskey v. Zant, 499 U.S. 467, 502 (1991). Counsel should also present all of the relevant facts as early as feasible. See generally Bright, supra note 227, at 43, 44.

233    In this regard, as Subsection C indicates, counsel should bear in mind that in capital litigation the courts tend to be much more responsive to supplemental presentations than they might be in other contexts. See, e.g., Brooks v. Estelle, 702 F.2d 84, 84-85 (5th Cir. 1983) (noting petitioner's multiple applications to the court and addressing them on the merits); Spaziano v. State, 660 So. 2d 1363, 1364, 65-66 (Fla. 1995) (granting motions filed by defendant facing fifth death warrant that "[sought] to open by rehearing an appeal that was finalized more than thirteen years ago and a post-conviction proceeding that was terminated with a denial of rehearing more than nine years ago" and ordering a remand that eventually resulted in an in-court recantation by a key witness and a life sentence); see also DNA Tests to be Done in '74 Case, Orlando Sentinel, Dec. 13, 2002, at B3.

234    See Bright, supra note 227, at 43 ("Failure to make an objection for fear of alienating the judge or jury may be a valid consideration in a case in which there is a good chance of acquittal or the length of sentence will be so short that appellate review will be irrelevant to the client. But in a capital case, it may deprive the client of a life-saving reversal on direct appeal or in habeas corpus proceedings.").

235    See supra text accompanying note 28. If a claim, whether meritorious or not, is being litigated anywhere in the country, counsel is likely to be charged with knowledge that the "tools to construct their constitutional claim" exist and be expected to raise it. Engle v. Isaac, 456 U.S. 107, 133 (1982). In Smith v. Murray, 477 U.S. 527 (1986), counsel failed to raise a particular issue on behalf of Mr. Smith in one state court because the state supreme court had recently rejected it. See id. at 531. Mr. Smith raised the issue in subsequent state and federal collateral proceedings, see id., and, well after these were concluded, the United States Supreme Court ruled favorably on the question. See id. at 536. However, because of counsel's previous decision to forego the presentation of a claim that was then meritless, the Court "conclude[d] that ... [Mr. Smith] must therefore be executed," Id. at 540 (Stevens, J., dissenting), and he was. See Legislative Modification, supra note 12, at 852; see also infra note 343.

236    For example, execution by electrocution has become de facto unconstitutional because state governments have concluded that challenges to the practice have merit, even though the contrary precedent remains in place. See In re Kemmler, 136 U.S. 436, 449 (1890); cf. Alabama: Optional Execution by Injection, N.Y. Times, Apr. 26, 2002, at A20 (discussing how Alabama enacted a law making lethal injection the state's primary method of execution when it looked as if the Supreme Court might rule that the electric chair was cruel and unusual punishment); Sara Rimer, Florida Lawmakers Reject Electric Chair, N.Y. Times, Jan. 7, 2000, at A13 (same in Florida).

237    Bright, supra note 227, at 45.

238    See Alabama Capital Defense Trial Manual, supra note 211, at 53.

239    See Dobbs v. Zant, 506 U.S. 357, 358 (1993); Robinson v. Robinson, 487 S.W.2d 713, 714-15 (Tex. 1972); 4M Linen & Unif. Supply Co. v. W.P. Ballard & Co., 793 S.W.2d 320, 323 (Tex. Ct. App. 1990).

240    See Bright, supra note 227, at 46.

241    See 3 Cal. Att'ys for Crim. Justice, 3 California Death Penalty Defense Manual 4 (1993).

242    Kevin McNally, Death Is Different: Your Approach to a Capital Case Must be Different, Too, The Champion, Mar. 1984, at 8, 15; see also Doyle, supra note 180.

243    Examples of agreed-upon dispositions after extended litigation include the cases of Calvin Burdine, see Henry Weinstein, Inmate in Texas Sleeping-Lawyer Case Pleads Guilty, L.A. Times, June 20, 2003, at 14 (client agrees to three life sentences), Michael Wayne Williams, see Jamie C. Ruff, Williams Pleads Guilty to Murders, Richmond Times-Dispatch, Mar. 25, 2003, at B1 (client waives parole eligibility and agrees to life term), Lloyd Schlup, see Tim O'Neil, Killer Who Escaped Execution Over New "Evidence" Pleads Guilty, St. Louis Post-Dispatch, Mar. 25, 1999, at A15 (client pleads guilty to second-degree murder after new evidence appeared), and Paris Carriger, see Samuel R. Gross, Lost Lives: Miscarriages of Justice in Capital Cases, 61 Law & Contemp. Probs. 125, 139-40 (1998) (following affirmance of federal habeas corpus relief by Carriger v. Stewart, 132 F.3d 463 (9th Cir. 1997) (en banc), client pleaded guilty to lesser offense and was released). Numerous other instances are reported in Liebman et al., supra note 46, Apps. C, D.; see also James Kimberly, Inmate Swaps Death Sentence for 20 Years, Hous. Chron., Aug. 12, 2003, at 1 (Paul Colella pleads to twenty-year term "just days before a federal judge was to hear evidence on... allegations of prosecutorial misconduct and ineffective assistance"); Lynn Thompson, Life Without Parole in Massacre: Mak Sentenced Again for 13 Wah Mee Deaths in 1983, Seattle Times, May 21, 2002, at B1 (client sentenced to 13 life terms after prosecution decides not to appeal judge's order that death penalty is unavailable).

244    See United States Attorneys' Manual, supra note 162, §9-10.030. New York law gives the District Attorney a 120-day "deliberative period" to decide whether to file a notice of intent to seek the death penalty. See N.Y. Crim. Proc. Law §250.40(2) (McKinney 2002); Francois v. Dolan, 731 N.E.2d 614, 616 (N.Y. 2000). During that time, with the assistance of the Capital Defender's Office, counsel is appointed and may attempt to persuade the prosecutor not to file a notice. See N.Y. Jud. Law §35-b (McKinney 2002). The notice may also be withdrawn at any time. See N.Y. Crim. Proc. Law §250.40(4) (McKinney 2002). Between 1995 and mid-2003, District Attorneys in New York formally investigated seeking the death penalty against 780 defendants, but only filed notice that they were seeking the death penalty against forty-eight of these. See New York Capital Defender Office home page, at http://www.nycdo.org/caseload/answers.html (last visited June 14, 2003).

245    See supra text accompanying note 162; Doyle, supra note 180; White, supra note 3, at 328-29.

246    A number of concessions that the parties might exchange in the capital context appear in Subsection B.

247    See United States v. Jackson, 390 U.S. 570, 583 (1968) (invalidating provision of federal statute carrying capital punishment on basis that it coerced waivers of jury trial rights); Hynes v. Tomei, 706 N.E.2d 1201, 1207 (N.Y. 1998) (applying Jackson to invalidate portion of New York death penalty statute); Comm. On Capital Punishment, Ass'n of the Bar of the City of N.Y., The Pataki Administration's Proposals to Expand the Death Penalty, 55 Rec. Ass'n of the Bar of City of N.Y. 129, 141-44 (2000) (describing mechanisms by which pleas in capital cases were being reached in light of Hynes).

248    Plea offers are extended prior to trial in a significant proportion of cases and also commonly occur after protracted litigation, see supra note 243.

249    See Stetler, supra note 226, at 42; see also Gail Gibson & Laura Willis, Tears and Remorse Precede Life Term in Dawson Deaths, Baltimore Sun, Aug. 28, 2003, at 1 (as part of arrangement for life sentence, Darrell L. Brooks makes emotional apology in open court to families of seven victims of his arson).

250    See, e.g., Ala. Code §15-23-71 (1995).

251    See supra text accompanying note 226.

252    See Ricketts v. Adamson, 483 U.S. 1, 7, 10-12 (1987) (where defendant was deemed to have breached terms of plea agreement by refusing to testify against co-defendant at a retrial, double jeopardy did not preclude state from vacating defendant's plea of guilty to second degree murder, trying him for capital murder and sentencing him to death).

253    See supra text accompanying note 180.

254    See supra commentary to Guideline 10.5.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

255   See Nixon v. Singletary, 758 So. 2d 618, 624-25 (Fla. 2000) (ineffective assistance where counsel failed to obtain client's explicit prior consent to strategy of conceding guilt to jury in opening statement in effort to preserve credibility for sentencing); People v. Hattery, 488 N.E.2d 513, 518-19 (Ill. 1985) (same).

256   See infra text accompanying notes 273-75; McNally, supra note 242, at 8-11; White, supra note 3, at 356-58.

257   As the text accompanying notes 104-07, supra, suggests, for counsel to gamble that there never will be a mitigation phase because the client will not be convicted of the capital charge is to render ineffective assistance.

258   See Bright, supra note 227, at 40.

259   See John H. Blume et al., Probing "Life Qualification" Through Expanded Voir Dire, 29 Hofstra L. Rev. 1209, 1209 & n.1 (2001) ("The conventional wisdom is that most trials are won or lost in jury selection."); Nat'l Legal Aid & Defender Ass'n, Performance Guidelines For Criminal Defense Representation, Guideline 7.2 & cmt. (1995) ("Voir Dire and Jury Selection").

260   See Nat'l Legal Aid & Defender Ass'n, Performance Guidelines For Criminal Defense Representation, Guideline 7.2 & cmt. (1995) ("Voir Dire and Jury Selection") (noting that the need for jury selection experts is "most obvious in extraordinary cases such as death penalty cases"). In addition, counsel investigating a capital case should be particularly alert to the possibility that, notwithstanding surface appearances, one or more jurors were unqualified to sit at either phase of the trial and make every effort to develop the relevant facts, whether by interviewing jurors or otherwise. Such inquiries can be "critical in discovering constitutional errors." Hertz & Liebman, supra note 28, at 489 n.40; see, e.g., Williams v. Taylor, 529 U.S. 420, 440-43 (2000) (explaining that because state post-conviction counsel made a reasonable effort to investigate possibility that a juror concealed on voir dire a relationship that would have disqualified her from sitting at the guilt phase, petitioner was entitled to pursue claim on federal habeas corpus); Fullwood v. Lee, 290 F.3d 663, 681-84 (4th Cir. 2002) (relying on affidavit from juror obtained during state post-conviction proceedings to order evidentiary hearing on federal habeas corpus claim that extraneous influences prejudiced jury at penalty phase), cert. denied, 123 S. Ct. 890 (2003). If applicable law places undue limits on such investigations, it should be challenged.

261   See Blume et al., supra note 259, at 1232.
      [E]xposure to the death qualification process makes a juror more likely to assume the defendant will be convicted and sentenced to death; more likely to assume that the law disapproves of persons who oppose the death penalty; more likely to assume that the judge, prosecutor, and defense attorney all believe the defendant is guilty and will be sentenced to die; and more likely to believe that the defendant deserves the death penalty;
      Id.; see also Liebman, supra note 29, at 2097 & n.164 (discussing studies demonstrating that death qualification process produces juries more likely to convict than non-death-qualified juries, and that repeated discussion of death penalty during voir dire in capital cases makes jurors substantially more likely to vote for death). Nonetheless, the current state of Supreme Court case law is that a jurisdiction does not violate the federal Constitution by using the death qualification process. See Lockhart v. McCree, 476 U.S. 162, 173 (1986).

262   See, e.g., Morgan v. Illinois, 504 U.S. 719, 729 (1992) (holding "juror[s] who will automatically vote for the death penalty in every case" or are unwilling or unable to give meaningful consideration to mitigating evidence must be disqualified from service); Wainwright v. Witt, 469 U.S. 412, 424-26 (1985) (holding that trial judges may exclude from a capital jury persons whose "views on [capital punishment] would 'prevent or substantially impair the performance of [their] duties....'"); Adams v. Texas, 448 U.S. 38, 42, 49 (1980) (invalidating statute disqualifying any juror who would not swear "that the mandatory penalty of death or imprisonment for life would not affect his deliberations on any issue of fact"); Witherspoon v. Illinois, 391 U.S. 510, 519-23 (1968) (holding that persons who have qualms about the death penalty in general and who might be inclined to oppose it as a matter of public policy, but who can put aside those reservations in a particular case, and in compliance with their oaths as jurors, consider imposing the death penalty according to the relevant state law, may not be precluded from serving as jurors in a death penalty case).

263   See Blume et al., supra note 259, at 1247-53; Marshall Dayan, Using Mitigating Evidence in Jury Selection in Capital Trials, The Champion, July 1993.

264   See Stephen B. Bright, Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty, 35 Santa Clara L. Rev. 433, 439-42 (1995) (examining the historic relationship between racial violence and the death penalty, and describing how racial prejudice continues to influence capital sentencing decisions); William S. Lofquist, Putting Them There,

Keeping Them There, and Killing Them: An Analysis of State-Level Variations in Death Penalty Intensity, 87 Iowa L. Rev. 1505, 1535 (2002) (presenting social science data correlating death penalty intensity with race-specific factors).

265    See Campbell v. Louisiana, 523 U.S. 392, 395 (1998); Rose v. Mitchell, 443 U.S. 545, 548 (1979); cf. Amadeo v. Zant, 486 U.S. 214, 216-18 (1988) (describing habeas petitioner's challenge to composition of grand jury based on district attorney's policy to under-represent women and racial minorities on master jury lists).

266    See generally Turner v. Murray, 476 U.S. 28, 36-37 (1986) (Brennan, J., concurring in part and dissenting in part).

267    See Bright, supra note 225, at 20.

268    See, e.g., Batson v. Kentucky, 476 U.S. 79, 84, 90 (1986); J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 128-29 (1994); see also Miller-El v. Cockrell, 537 U.S. 322, 329-32 (2003).

269    David C. Baldus et al., The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis, 3 U. Pa. J. Const. L. 3, 10 (2001); see generally Jeffrey S. Brand, The Supreme Court, Equal Protection and Jury Selection: Denying That Race Still Matters, 1994 Wis. L. Rev. 511 (finding persistent widespread discrimination in the use of peremptory challenges and attributing it to unwillingness or inability of the courts to scrutinize manifestly pretextual nonracial justifications). These findings emphasize the duty of counsel to pursue this area energetically, both factually and legally. See, e.g., Douglas L. Colbert, Challenging the Challenge: Thirteenth Amendment as a Prohibition Against the Racial Use of Peremptory Challenges, 76 Cornell L. Rev. 1, 124-25 (1990) (proposing Thirteenth Amendment theory entitling a minority defendant to specific number of minority jurors). In particular, in light of the considerations discussed in this paragraph of text and the history described supra note 28, counsel would be unwise to assume the permanence of the 5-4 ruling in McCleskey v. Kemp, 481 U.S. 279 (1987).

270    See supra Guideline 10.8(B)(2) and text accompanying note 238.

271    See supra text accompanying note 39.

272    Lyon, supra note 3, at 711.

273    See id. at 708; Scott E. Sundby, The Capital Jury and Absolution, 38 Cornell L. Rev. 1557, 1596-97 (1998).

274    In fact, most statutory mitigating circumstances, which were typically adapted from the Model Penal Code, are "imperfect" versions of first phase defenses such as insanity, diminished capacity, duress, and self-defense. See Carol S. Steiker & Jordan M. Steiker, Let God Sort Them Out? Refining the Individualization Requirement in Capital Sentencing, 102 Yale L.J. 835, 856-57 (1992) (reviewing Beverly Lowry, Crossed Over: A Murder, A Memoir (1992)). Of course, the defendant's penalty phase presentation may not constitutionally be limited to statutory mitigating circumstances and the jury must be allowed to give full consideration to any non-statutory ones he advances. See Hitchcock v. Dugger, 481 U.S. 393, 394 (1987); Lockett v. Ohio, 438 U.S. 586, 604 (1978).

275    For an example of an argument making an effective transition, see Edith Georgi Houlihan, Defending the Accused Child Killer, The Champion, Apr. 1998, at 23. Jurisdictions vary as to whether the defendant has a right to present lingering doubt as a mitigating circumstance. Compare People v. Sanchez, 906 P.2d 1129, 1178 (Cal. 1995) (stating that under California law, "the jury's consideration of residual doubt is proper"), with Way v. State, 760 So. 2d 903, 916-17 (Fla. 2000) (rejecting claim under Florida constitution that a defendant must be permitted to present mitigating "evidence relevant only to establish a lingering doubt"). Existing case law in the United States Supreme Court suggests that a capital defendant has no federal constitutional right to have lingering doubt considered as a mitigating circumstance at the penalty phase. See Franklin v. Lynaugh, 487 U.S. 164, 174 (1988). Given the significant number of death row exonerations, see supra text accompanying notes 48-51 & 198-204, and the degree to which these have plainly troubled many Justices, see Atkins v. Virginia, 536 U.S. 304, 320 n.25 (2002) ("Despite the heavy burden that the prosecution must shoulder in capital cases ... in recent years a disturbing number of inmates on death row have been exonerated."), supra text accompanying note 31, there is ample reason to doubt the force of this precedent. See Constitution Project, supra note 50, at 40-41 (advocating allowing lingering doubt to be considered as a mitigating circumstance); see generally Christina S. Pignatelli, Residual Doubt: It's a Life Saver, 13 Cap. Def. J. 307 (2001).

276    See Penry v. Lynaugh, 492 U.S. 302, 327-28 (1989) (stating that "it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense"); McCleskey v. Kemp, 481 U.S. 279, 306 (1987) (reaffirming that "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty.

In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant"); Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986) (holding evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence even though it does "not relate specifically to petitioner's culpability for the crime he committed"). Similarly, counsel could appropriately argue to the jury that the death sentence should not be imposed on a client because doing so would tend to incite the client's political followers to avenge him by committing further crimes. See, e.g., Benjamin Weiser, Jury Rejects Death Penalty for Terrorist, N.Y. Times, July 11, 2001, at B1 (reporting successful use of this argument at trial of defendant convicted of bombing American embassy).

277    Haney, supra note 93, at 560. See Simmons v. Luebbers, 299 F.3d 929, 938-39 (8th Cir. 2002) ("Mitigating evidence was essential to provide some sort of explanation for Simmons's abhorrent behavior. Despite the availability of such evidence, however, none was presented. Simmons's attorneys' representation was ineffective."), cert. denied 123 S. Ct. 1582 (2003).

278    See Haney, supra note 93, at 600.

279    For an example of the process working as it should, see Alex Kotlowitz, In the Face of Death, N.Y. Times Mag., July 6, 2003, at 32. See generally Scott E. Sundby, The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony, 83 Va. L. Rev. 1109, 1140-41 (1997) (noting that jurors find expert testimony unpersuasive if it is not tied into other evidence presented in the case).

280    See White, supra note 3, at 342-43.

281    See, e.g., Ainsworth v. Woodford, 268 F.3d 868, 876 (9th Cir. 2001) (stating that "the introduction of expert testimony would also have been important" to explain the effects that "'serious physical and psychological abuse and neglect as a child'" had on the defendant).

282    See Caro v. Calderon, 165 F.3d 1223, 1226-27 (9th Cir. 1999) (although counsel consulted four experts, including a medical doctor, a psychologist, and a psychiatrist, counsel failed to consult neurologist or toxicologist who could have explained neurological effects of defendant's extensive exposure to pesticides).

283    High quality continuing legal education programs on the death penalty, such as those noted supra in the commentary to Guideline 8.1, regularly present such information.

284    See Sundby, supra note 279, at 1163-84.

285    See id. at 1118, 1151.

286    See id. at 1152-62; see also Wayne A. Logan, When Balance and Fairness Collide: An Argument for Execution Impact Evidence in Capital Trials, 33 U. Mich. J.L. Reform 1, 12-14 (1999).

287    John H. Blume et al., Future Dangerousness in Capital Cases: Always "At Issue," 86 Cornell L. Rev. 397, 398-99 (2001).

288    See Skipper v. South Carolina, 476 U.S. 1, 8 (1986) (stating that jury would "quite naturally" give great weight to "[t]he testimony of ... disinterested witnesses" such as "jailers who would have had no particular reason to be favorably predisposed toward one of their charges"); Sundby, supra note 279, at 1147 (noting tendency of juries to respond favorably to testimony of prison employees).

289    The Supreme Court has held that:
       where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.'
       Shafer v. South Carolina, 532 U.S. 36, 39 (2001) (quoting Ramdass v. Angelone, 530 U.S. 156, 165 (2000) (plurality opinion)). The precise contours of this rule remain in dispute, see Brown v. Texas, 522 U.S. 940, 940-41 (1997), and counsel may appropriately seek to extend them (e.g., by applying the rule to other alternative sentences than life imprisonment without parole or by requiring that the jury receive the information through instructions).

Some state courts have held that the trial court must resolve, before the capital sentencing hearing, issues such as the length of other sentences the defendant would serve and whether he would be eligible for parole. See Clark v. Tansy, 882 P.2d 527, 534 (N.M. 1994) (holding that trial court must, upon defendant's request, impose sentence for non-capital convictions prior to jury deliberations on death penalty); Turner v. State, 573 So. 2d 657, 674-75 (Miss. 1990) (stating that trial court should determine

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

defendant's habitual offender status before capital sentencing hearing so jury could be accurately informed of defendant's parole ineligibility). In other jurisdictions, the defense can at least argue that the defendant is likely to receive lengthy, consecutive sentences. See Jones v. State, 569 So. 2d 1234, 1239-40 (Fla. 1990) (finding length of time a defendant would be "removed from society" if sentenced to life imprisonment is relevant mitigating evidence that the jury must be permitted to consider); Turner v. State, 645 So. 2d 444, 448 (Fla. 1994) (holding that jury could properly consider in mitigation that alternative to death sentences would have been two life sentences with combined minimum mandatory of fifty years).

290  In the federal capital sentencing of a defendant convicted of bombing American embassies overseas, the defense presented evidence about conditions at the federal "Super Max" prison in Florence, Colorado, where the defendant would be incarcerated if sentenced to life without parole. See Benjamin Weiser, Lawyers for Embassy Bomber Push for Prison Over Execution, N.Y. Times, June 27, 2001, at B4; see also infra note 311. The defendant was subsequently sentenced to life without parole. See Weiser, supra note 276.

291  However, as Subsection G suggests, if there is uncertainty as to the scope of how wide this opening would be or if counsel believes that excessive rebuttal is to be admitted, they should object and make a full record on the issue.

292  See White, supra note 3, at 358.

293  See supra text accompanying notes 163-64.

294  See Smith v. Stewart, 189 F.3d 1004, 1010-11 (9th Cir. 1999) (concluding counsel was ineffective in part for failing to challenge the state's use of prior rape convictions in aggravation as prior violent offenses where both of the convictions occurred when Arizona law did not include violence as an element of rape); Parker v. Bowersox, 188 F.3d 923, 929-31 (8th Cir. 1999) (concluding trial counsel was ineffective for failing to present evidence to rebut the only aggravating circumstances); Summit v. Blackburn, 795 F.2d 1237, 1244-45 (5th Cir. 1986) (concluding trial counsel was ineffective for failing to argue the lack of corroborating evidence of the sole aggravating factor when under state law a defendant cannot be convicted based solely on an uncorroborated confession and the only evidence supporting the aggravating factor was defendant's confession).

295  See, e.g., Estelle v. Smith, 451 U.S. 454, 468 (1981) (per curiam) (stating "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding").

296  As described infra in note 297, several states explicitly limit this right in various ways.

297  See, e.g., Fed. R. Crim. P. 12.2(c)(4) (2003) ("No statement made by a defendant in the course of any [court-ordered psychiatric] examination ... may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant... has introduced evidence"); Abernathy v. State, 462 S.E.2d 615, 616 (Ga. 1995) (holding that where defendant intends "to introduce evidence of mental illness in any phase of trial," he may be required "to submit to an independent psychiatric evaluation or be barred from presenting such evidence, even in mitigation"); State v. Reid, 981 S.W.2d 166, 168 (Tenn. 1998) (stating that once defendant files notice of intent to present expert testimony regarding mitigating evidence, state expert may examine defendant; however, state expert report will be provided only to the defense until after conviction and after defendant confirms intent to rely on expert testimony as part of case in mitigation); see also Fla. R. Crim. P. 3.202(d) (2002) ("After the filing of [notice]... to seek the death penalty, the court shall order that, within 48 hours after the defendant is convicted of capital murder, the defendant be examined by a mental health expert chosen by the state....The examination shall be limited to those mitigating circumstances the defendant expects to establish through expert testimony."); Dillbeck v. State, 643 So. 2d 1027, 1030-31 (Fla. 1994) ("[W]here the defendant plans to use only in the penalty phase the testimony of an expert who has interviewed him or her, the State is entitled to examine the defendant only after conviction and after the State has certified that it will seek the death penalty."); State v. Johnson, 576 S.E.2d 831, 835-37 (Ga. 2003).

298  See, e.g., Lowenfield v. Phelps, 484 U.S. 231, 246 (1988); see also Fla. Stat. Ann. §921.141(5) (West 2001) (listing as an aggravating circumstance the fact that the crime was committed while the defendant was engaged in, or an accomplice to, the commission or attempted commission or flight after committing or attempting to commit any one of twelve enumerated felonies). In some states, the prosecution is essentially limited at the penalty phase to the evidence admitted at the guilt phase. See, e.g., N.Y. Crim. Proc. Law §400.27(3), (6) (McKinney 2002).

299    See supra text accompanying notes 23, 222-23. In some jurisdictions, only criminal conduct for which the client has been convicted is admissible at the penalty stage. See, e.g., Fla. Stat. Ann. §921.141(5) (listing as aggravating circumstance the fact that the defendant was previously convicted of capital felony or a felony involving violence). In others, no conviction is necessary, but the admissibility of a prior bad act may depend on other factors. See, e.g., Cal. Penal Code §190.3 (West 1999) (allowing admission of evidence of other criminal activity at penalty phase even though the defendant was not convicted for it, unless the defendant was prosecuted and acquitted or it did not involve the use or threat of violence); Pace v. State, 524 S.E.2d 490, 505 (Ga. 1999) (prior crime without conviction may be used in aggravation unless there is a previous acquittal). As a matter of constitutional law, the attack on the admission of unadjudicated prior misconduct in capital sentencing, which has long been a powerful one in light of the Court's established recognition of the need for special reliability in that context, see Monge v. California, 524 U.S. 721, 731-33 (1998) (collecting authority), has received additional support both from Ring v. Arizona, 536 U.S. 584 (2002) and from the Court's elaboration of due process limitations in related contexts. See State Farm Mut. Auto. Ins. Co. v. Campbell, 123 S. Ct. 1513, 1523 (2003) (in assessing punitive damages a recidivist may be punished more severely than a first offender, but only where the repeated misconduct is of the same sort as that involved in current case).

300    See Boykin v. Alabama, 395 U.S. 238, 242-44 (1969).

301    See Gideon v. Wainwright, 372 U.S. 335, 339 (1963).

302    See Menna v. New York, 423 U.S. 61, 62 (1975).

303    See Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 402-04 (2001); see also supra note 22.

304    Limitations on the admission of such evidence exist in a number of jurisdictions as a matter of state law. See, e.g., People v. Edwards, 819 P.2d 436, 464-67 (Cal. 1991); Bivins v. State, 642 N.E.2d 928, 956-57 (Ind. 1994).

305    See generally Jeremy A. Blumenthal, The Admissibility of Victim Impact Statements at Capital Sentencing: Traditional and Nontraditional Perspectives, 50 Drake L. Rev. 67 (2001); Randall Coyne, Inflicting Payne on Oklahoma: The Use of Victim Impact Evidence During the Sentencing Phase of Capital Cases, 45 Okla. L. Rev. 589, 612-15 (1992); Ellen Kreitzberg, How Much Payne Will the Courts Allow?, The Champion, Jan./Feb. 1998, at 31; Michael Ogul, Capital Cases: Dealing with Victim Impact Evidence (pts. 1 & 2), The Champion, June 2000, at 43, Aug./Sept. 2000, at 42.

306    Compare Booth v. Maryland, 482 U.S. 496, 501-03 (1987) (victim impact evidence unconstitutional), and South Carolina v. Gathers, 490 U.S. 805, 810-12 (1989) (prosecutorial argument for death based upon laudable characteristics of victim unconstitutional), with Payne v. Tennessee, 501 U.S. 808, 825, 828-30 (1991) (overruling Booth and Gathers while noting that Due Process Clause is violated if such evidence is unduly prejudicial).

307    Of course, counsel should also pursue all available state law theories that might exclude such evidence, as indicated supra in note 232; see, e.g., Olsen v. State, 2003 Wyo. LEXIS 57, 176-93 (April 14, 2003) (reviewing Wyoming statutory scheme and concluding it does not authorize admission of victim impact evidence in capital case); People v. Logan, 224 Ill. App.3d 735 (1st Dist. 1991) (notwithstanding that no death penalty had been imposed, it was ineffective assistance of appellate counsel to fail to challenge victim impact testimony as inadmissible under state law or limit its impact). For example, on the assumption that victim impact evidence in support of the death penalty would be admissible, there is conflicting case law in various states on whether the defense can call members of the victim's family to testify in opposition to the client's execution. Cf. supra text accompanying note 277 (noting that Constitution requires defendants to be able to offer any evidence that might cause sentencer to decline to impose a death sentence in the case at hand).

308    See White, supra note 3, at 359-60.

309    See supra text accompanying notes 289-90.

310    See supra text accompanying note 290.

311    See United States v. Johnson, 223 F.3d 665, 671 (7th Cir. 2000) (describing how, to rebut government's assertion of future dangerousness, federal capital defendant put on evidence at penalty phase regarding conditions at "Supermax" prison where defendant would be housed if sentenced to life imprisonment), cert. denied, 534 U.S. 829 (2001); supra note 290.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

312    See supra text accompanying note 185; White, supra note 3, at 374-75. An attorney whose contempt for his client is palpable cannot provide effective representation. See, e.g., Rickman v. Bell, 131 F.3d 1150, 1157 (6th Cir. 1997) (describing counsel's "repeated expressions of contempt for his client" as providing the defendant "not with a defense counsel, but with a second prosecutor[;] creating a loathsome image ... that would make a juror feel compelled to rid the world of him"); Clark v. State, 690 So. 2d 1280, 1283 (Fla. 1997) ("Counsel completely abdicated his responsibility to Clark when he told the jury that Clark's case presented his most difficult challenge ever in arguing against imposition of the death penalty.").

313    See supra commentary to Guideline 10.10.2.

314    See, e.g., Penry v. Johnson, 532 U.S. 782, 799-800 (2001) (instructions and verdict form prevented jury from giving effect to mitigating evidence of defendant's mental retardation); McKoy v. North Carolina, 494 U.S. 433, 439-41 (1990) (verdict form and instructions suggesting mitigating circumstances must be found unanimously improperly restricted jurors' ability to give effect to mitigating evidence); Mills v. Maryland, 486 U.S. 367, 384 (1988) (same); Belmontes v. Woodford, 355 F.3d 1024, 1032 (9th Cir. 2003) (granting habeas relief on penalty because "the jury was not instructed that it must consider Belmontes' principal mitigation evidence, which tended to show that he would adapt well to prison and likely become a constructive member of society if incarcerated for life without possibility of parole"); Davis v. Mitchell, 318 F.3d 682, 691 (6th Cir. 2003); Banks v. Horn, 316 F.3d 228, 233 (3d Cir. 2003) ("'Under the United States Supreme Court's cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one the Court dares not risk.'") (quoting Mills, 486 U.S. at 384); Lenz v. Warden, 579 S.E.2d 194, 196 (Va. 2003) (holding trial counsel ineffective for failure to object to defective penalty phase verdict form).

315    Prosecutors will frequently try to argue, for example, that "not everybody" who is abused as a child grows up to commit capital murder or that mental illness did not "cause" the defendant to commit the crime. See Haney, supra note 93, at 589-602. Both of these arguments are objectionable on Eighth Amendment grounds because they nullify the effect of virtually all mitigation. See id.; supra text accompanying notes 277-80. In any event, counsel can seek to counter such arguments by emphasizing the unique combination of factors at play in the client's life and demonstrating that there are causal connections between, for example, childhood abuse, neurological damage, and violent behavior. See, e.g., Phyllis L. Crocker, Childhood Abuse and Adult Murder: Implications for the Death Penalty, 77 N.C. L. Rev. 1143, 1157-66 (1999) (reviewing psychological and medical "research on the correlation between childhood abuse and adult violence").

316    Arguments confusing the standards for a first phase defense and mitigation also violate the Eighth Amendment. See generally Eddings v. Oklahoma, 455 U.S. 104, 113-15 (1982) (finding unconstitutional trial judge's failure to consider defendant's violent upbringing as a mitigating factor at sentencing); see generally Phyllis L. Crocker, Concepts of Culpability and Deathworthiness: Differentiating Between Guilt and Punishment in Death Penalty Cases, 66 Fordham L. Rev. 21 (1997).

317    See Blume et al., supra note 287, at 398-99. See also Theodore Eisenberg & Martin T. Wells, Deadly Confusion: Juror Instructions in Capital Cases, 79 Cornell L. Rev. 1, 11-12 (1993) (describing results of study showing jury confusion as to meaning of instructions, particularly about the mitigating circumstance burden of proof); James Luginbuhl & Julie Howe, Discretion in Capital Sentencing Instructions: Guided or Misguided?, 70 Ind. L.J. 1161, 1167 (1995) (describing results of study showing that a substantial percentage of jurors do not understand instructions concerning aggravating and mitigating evidence, burdens of proof and unanimity).

318    See McKoy v. North Carolina, 494 U.S. 433, 444 (1990) (instructions allowing jury to consider only mitigating circumstances found unanimously violated Eighth Amendment); Mills v. Maryland, 486 U.S. 367, 375-80 (1988) (same result where jury could misinterpret instructions to require unanimity); supra note 315.

319    See, e.g., Hardwick v. Crosby, 320 F.3d 1127, 1190 n.215 (11th Cir. 2003) ("Even if Hardwick did ask [counsel] not to present witnesses at the sentencing proceeding,... [counsel] had a duty to Hardwick at the sentencing phase to present available mitigating witnesses as Hardwick's defense against the death penalty."); Koon v. Dugger, 619 So. 2d 246, 250 (Fla. 1993) (finding that: when a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be.); State v. Koedatich, 548 A.2d 939, 993-95 (N.J. 1988) (mitigating factors must be introduced regardless of the defendant's position).

320    See, e.g., Muhammad v. State, 782 So. 2d 343, 363 n.10 (Fla. 2001), cert. denied, 534 U.S. 944 (2001); State v. Dunster, 631 N.W.2d 879, 906-08 (Neb. 2001), cert. denied, 535 U.S. 908 (2002); Ex parte George, 717 So. 2d 858, 859 (Ala. 1998).

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

321    For example, in Florida, a presentence investigation report is required in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigating evidence. See Muhammad, 782 So. 2d at 363. In California, although a probation report is prepared prior to the trial court's ruling on a capital defendant's post-trial motion to modify the death verdict, it is error for the judge, in ruling on that motion, to consider information contained in the probation report that was not presented to the jury. See, e.g., People v. Kipp, 956 P.2d 1169, 1189-90 (Cal. 1998).

322    See Gardner v. Florida, 430 U.S. 349, 358-62 (1977) (holding that if, in imposing a death sentence, the trial judge relies in part on confidential information in a presentence investigation report, the report must be disclosed to defense counsel or due process is violated).

323    For example, in Ohio, a presentence report is prepared only at the request of the defense and, if the defense requests the preparation of a report, the prosecution is allowed to present victim impact evidence, other crimes evidence, and other information that may not otherwise be admissible at the penalty phase to the jury. See Ohio Rev. Code Ann. §2929.03(D)(1) (Anderson 1999); State v. White, 709 N.E.2d 140, 153-55 (Ohio 1999). Because Ohio provides capital defendants the right to reasonably necessary investigation, experts, or other assistance for trial and penalty phases, see Ohio Rev. Code Ann. §2929.024 (Anderson 1999), capital counsel who request a presentence report instead may be ineffective for doing so. See Glenn v. Tate, 71 F.3d 1204, 1209-10 (6th Cir. 1995) (finding counsel ineffective in part because they requested a psychological report under the presentence report statute, rather than as necessary investigation, which mandated the results be shared with the jury).

324    See David M. Siegel, My Reputation or Your Liberty (or Your Life): The Ethical Obligations of Criminal Defense Counsel in Postconviction Proceedings, 23 J. Legal Prof. 85, 90-91 (1999) ("While any criminal defense lawyer whose client is convicted is subject to the possibility of a claim for ineffective assistance, lawyers in capital cases are virtually guaranteed such claims.").

325    State Bar of Cal. Standing Comm. on Prof'l Responsibility & Conduct, Formal Op. 1992-127 (1992), at http:// www.calbar.ca.gov/ calbar/html_unclassified/ca92-127.html. See 1 Hertz & Liebman, supra note 28, at 485 n.20 (discussing the duties described in this Guideline and noting that "if former counsel was ineffective, it is his responsibility to the client and the profession to cooperate in redressing the violation") (emphasis omitted).

326    Siegel, supra note 324, at 114.

327    See id. ("[G]iven the peculiar aspects of the role of counsel whose former client brings a post-conviction action, [it] violates counsel's ethical obligations" to fail to cooperate with successor counsel in "the disclosure to the post-conviction counsel of files and notes from the representation, the volunteering of absences in the record and the volunteering of counsel's strategic thinking in the case."); Meegan B. Nelson, Note, When Clients Become "Ex-Clients": The Duties Owed After Discharge, 26 J. Legal Prof. 233, 241 (2002) ("Essentially, a failure to cooperate with the client's new attorney can constitute the same violations as a failure to cooperate with the actual client under Model Rule 1.16."); see generally State Bar of Ariz Comm. on the Rules of Prof'l Conduct, Formal Op. 98-07 (1998) (discussing ethical obligations surrounding file retention and surrender to clients and successor counsel); Returning Client Files After Termination, Hawaii Bar J., Sept. 1998, at 16 (finding an ethical obligation to release to the client "all file materials which, if not released ... would prejudice the rights of the client").

328    For example, trial counsel in California is given, by statute, certain post-conviction duties and must remain on the case until the record is certified. See Cal. Penal Code §§1239(b), 1240.1(e)(1) (West Supp. 2003).

329    See Cal. Att'ys for Crim. Justice & Cal. Defenders Ass'n, California Death Penalty Defense Manual 1-38 to 1-40 (1986).

330    Some death penalty states provide for automatic appellate review. See, e.g., Cal. Penal Code §1239(b); Md. Code Ann., Crim. Law §2-401(a) (2002); Md. Reg. 8-306(c) (2002); N.C. Gen. Stat. §15A-2000(d)(1) (2001).

331    This comports with the requirements for counsel in all criminal cases. See Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation Guideline 9.2(a) (1995); cf. Mayo v. Cockrell, 287 F.3d 336, 338, 341 (5th Cir. 2002) (denying federal habeas corpus relief where trial counsel was unaware that he remained on case until replaced, appellate counsel was unaware of his appointment until after expiration of time for filing of new trial motion, and a meritorious new trial motion went unfiled), cert. denied, 123 S. Ct. 443 (2002).

332   See Brooks v. Estelle, 702 F.2d 84, 84-85 (5th Cir. 1983) (dismissing appeal, which had received certificate of probable cause from district court, as moot since petitioner had been executed following the denial of a stay by Brooks v. Estelle, 697 F.2d 586 (5th Cir. 1982)).

333   There has been no right to state post-conviction counsel in Georgia. See Gibson v. Turpin, 513 S.E.2d 186, 188 (Ga. 1999). In August 1996, Georgia Supreme Court Justice Robert Benham noted that several persons under sentence of death in Georgia were in "immediate need of legal representation," and asked area law firms to volunteer. Bill Rankin, When Death Row Inmates Go To Court Without Lawyers: In the Late Stages of Their Fight to Stay Alive, Some Must Represent Themselves, Atlanta J. & Const., Dec. 29, 1996, at D5 (internal quotation marks omitted). One Atlanta civil firm that volunteered was assigned the case of Marcus Wellons. See id. Three days after the firm received a copy of the trial transcript, the trial court set an execution date for two weeks later. See id. The firm rushed to the Georgia Supreme Court and asked for more time to submit a formal post-conviction petition. See id. Hours before Mr. Wellons's scheduled execution, the Court denied the request by a 4-3 vote. See id. As guards were about to shave Mr. Wellons's head for that evening's electrocution, the federal district court granted a stay of execution. See id. State counsel and the federal defender were given ten months to prepare the federal petition. See id.

A similar instance of legal Russian roulette took place in Alabama in 2001 in the case of Thomas D. Arthur. See Arthur v. Haley, 248 F.3d 1302 (11th Cir. 2001) (affirming grant of stay on day before scheduled execution to inmate who had been unrepresented for more than two years following direct appeal); Agency Claims Death Row Inmates Without Lawyers a Growing Problem, Chattanooga Times Free Press, March 26, 2001, at B8 (describing Arthur case and absence of any state funding for post-conviction representation in Alabama). As suggested supra note 47, counsel should be aggressive in challenging such irresponsible behavior by the states as a federal constitutional violation.

334   For example, in Kentucky capital cases the Attorney General invariably requests an execution date at the end of direct appeal, and the Governor invariably signs the death warrant. No stay of execution may be granted until the state post-conviction petition is filed. As a result, in order to obtain a stay, counsel must often file a state post-conviction petition well before the time allowed under state law because there is an outstanding execution date. The practice is the same in federal habeas proceedings. See, e.g., Execution of Killer Delayed, Cincinnati Enquirer, June 9, 2000, at D1B.

335   When a capital case enters a phase of being "under warrant"--i.e., when a death warrant has been signed--time commitments for counsel increase, "due in large part to the necessary duplication of effort in the preparation of several petitions which might have to be filed simultaneously in different courts." ABA Post-Conviction Death Penalty Representation Project et al., Time and Expense Analysis in Postconviction Death Penalty Cases 10 (1987).

336   See ABA Criminal Justice Section, supra note 86, at 10-11 (calling for automatic federal stays throughout post-conviction period); Legislative Modification, supra note 12, at 855 ("We agree with the Powell Committee [appointed by Chief Justice Rehnquist to study reform of capital habeas corpus] that the current mechanisms for obtaining stays of execution are irrational and indefensible. At best, they lead to an enormous waste of legal effort by all participants in the system, and at worst they result in inconsistencies that have fatal consequences."); Ira P. Robbins, Justice by the Numbers: The Supreme Court and the Rule of Four - Or is it Five?, 36 Suff. U. L. Rev. 1 (2002); Eric M. Freedman, Can Justice Be Served by Appeals of the Dead?, Nat'l L.J., Oct. 19, 1992, at 13 (current situation respecting stays is "no way to run a judicial system").

337   See, e.g., McDonald v. Missouri, 464 U.S. 1306, 1307 (1984) (Blackmun, J., in chambers).
(I thought I had advised the Supreme Court of Missouri once before, in Williams, that ... I ... shall stay the execution of any Missouri applicant whose direct review of his conviction and death sentence is being sought and has not been completed. I repeat the admonition to the Supreme Court of Missouri, and to any official within the State's chain of responsibility, that I shall continue that practice. The stay, of course, ought to be granted by the state tribunal in the first instance, but, if it fails to fulfill its responsibility, I shall fulfill mine.) Williams v. Missouri, 463 U.S. 1301, 1301-02 (1983) (Blackmun, J., in chambers) (executions scheduled for prior to the expiration of the time for seeking certiorari on direct appeal must be stayed "as a matter of course").

338   See C. Lee Harrington, A Community Divided: Defense Attorneys and the Ethics of Death Row Volunteering, 25 Law & Soc. Inquiry 849, 850 (2000) (noting that "[b]etween 1977 and March 1998, 59 [condemned] inmates had volunteered for execution compared to 382 executed unwillingly"); see also infra note 351.

339    See supra text accompanying notes 189-92.

340    See Ford v. Wainwright, 477 U.S. 399, 402 (1986).

341    In some states, there is a unitary appeal system in which direct appeal and collateral challenges such as ineffective assistance of counsel claims are raised simultaneously. See, e.g., Idaho Code §19-2719 (Michie Supp. 2002). In other jurisdictions, ineffective assistance of counsel claims generally may not be raised on direct appeal but are reserved for separate post-conviction proceedings. See, e.g., Lawrence v. State, 691 So. 2d 1068, 1074 (Fla. 1997) (explaining that claims of ineffective assistance of counsel are not cognizable on direct appeal). The federal system follows the latter rule. See Massaro v. United States, 123 S. Ct. 1690 (2003) (unanimous).

342    For example, as described supra in note 235 in Smith v. Murray, 477 U.S. 527 (1986), the Supreme Court declined to address the merits of a petitioner's claim that his Fifth Amendment rights were violated by the testimony of a psychiatrist who had examined the defendant without warning him that the interview could be used against him. See id. at 529. Appellate counsel failed to assert this claim on direct appeal because the Virginia Supreme Court had rejected such claims at that time. See id. at 531. The Supreme Court subsequently found such testimony unconstitutional in Estelle v. Smith, 451 U.S. 454 (1981). In a "Catch-22" for the defendant, the Court concluded appellate counsel was not ineffective, because the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Murray, 477 U.S. at 536 (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). At the same time, the claim was not deemed sufficiently novel to constitute cause for the procedural default because "forms of the claim he [advanced] had been percolating in the lower courts for years at the time of his original appeal." Murray, 477 U.S. at 536-37. Mr. Smith was therefore barred from raising the issue in federal habeas proceedings, id. at 539, and was executed.

343    It is for this reason that Subsection C refers to "issues... that are arguably meritorious under the standards applicable to high quality capital defense representation." See supra Guideline 10.8, text accompanying notes 234-36; see also supra text accompanying note 28. For examples of such issues, see supra notes 231, 271, 276, 307, and infra note 352.

344    28 U.S.C. §2244(d)(1)(A) (2000); see Liebman & Hertz, supra note 28, §5.1b.

345    See Clay v. United States, 123 S. Ct. 1042 (2003).

346    See, e.g., California Supreme Court, California Supreme Court Policies Regarding Cases Arising From Judgments of Death 3 (2002) (petitions for writ of habeas corpus to be filed within 180 days of final due date for filing reply brief on direct appeal); Okla. Stat. Ann. tit. 22, §1089(D)(1) (West Supp. 2003) (motion for post-conviction relief must be filed within 90 days from filing of reply brief on direct appeal).

347    See generally, Goodman v. Johnson, No. 99-20452 (5th Cir. Sept. 19, 1999) (unpublished); Cantu-Tzin v. Johnson, 162 F.3d 295 (5th Cir. 1998). Spencer Goodman was executed by Texas in January 2000 and Andrew Cantu-Tzin was executed by Texas in January 1999.

348    See generally, Russell Stetler, Post-Conviction Investigation in Death Penalty Cases, The Champion, Aug. 1999, available at http://www.criminaljustice.org/public.nsf/championarticles/99aug06/.

349    See supra text accompanying notes 47-58.

350    See supra Guideline 10.8 and accompanying commentary. As Subsection C emphasizes, the duty to investigate and present such claims applies to "all issues, whether or not previously presented." Until previously unpresented issues are fully explored, there is no way to determine whether or not any arguably applicable forfeiture doctrines may be overcome. See House v. Bell, 311 F.3d 767 (6th Cir. 2002) (en banc), cert denied, 123 S. Ct. 2575 (2003) (certifying to state courts issue of whether procedural vehicle existed to present evidence of innocence first uncovered during federal habeas proceedings).

351    For example, although the Justices disagree on the point, as shown most recently by their varying opinions respecting the certiorari petition in Foster v. Florida, 123 S. Ct. 470 (2002), it may well be that after a certain length of time continued confinement on death row ripens into an Eighth Amendment violation.

AMERICAN BAR ASSOCIATION GUIDELINES FOR THE..., 31 Hofstra L. Rev. 913

352   See Mason v. Meyers, 208 F.3d 414, 417 (3d Cir. 2000) (stating that as a result of the strict rules governing successive habeas corpus petitions enacted by the AEDPA and codified at 28 U.S.C. §2244(b), "it is essential that habeas petitioners include in their first petition all potential claims for which they might desire to seek review and relief").

353   See, e.g., Lindh v. Murphy, 521 U.S. 320, 322-23 (1997) (discussing the retroactive application of various procedural provisions in the AEDPA to pending cases).

354   The states utilize fifty different clemency processes, which can be categorized in the following manner: the Governor has sole authority over the clemency process; the Governor cannot grant clemency without a recommendation from a board or advisory group to do so; the Governor decides clemency after receiving a nonbinding recommendation from a board or advisory group; a board or advisory group makes the clemency determination; or, the Governor sits as a member of the board which makes the clemency determination. The Death Penalty Information Group details the process by state. See Death Penalty Information Center, Clemency, at http://www.deathpenaltyinfo.org/article.php? did=126&scid=13 (last visited Aug. 18, 2003) [hereinafter Clemency]. For federal death row inmates, the President alone has pardon power. See U.S. Const. art. II, §2, cl. 1.

355   The Death Penalty Information Center reports that since 1976, of the thirty-five death row inmates who have been granted clemency for reasons other than the personal convictions of the governor in opposition to the death penalty, the possible innocence of the condemned inmate was provided as the reason for granting clemency in sixteen cases (forty-six percent). See Clemency, supra note 354.

356   For example, in 1999 the Governor of Arkansas commuted the death sentence of Bobby Ray Fretwell after receiving a letter from a juror at Fretwell's trial stating that he had been "the lone holdout against the death penalty but relented for fear he would be an outcast in the small community where the killing occurred." See Arkansas Governor Spares Killer's Life After Juror's Plea, L.A. Times, Feb. 6, 1999, at A19. In the case of Charlie Brooks, who was executed in Texas in 1982, counsel enlisted the trial prosecutor to argue before the Board of Pardons and Paroles that it would be unfair to execute the client when his co-defendant was serving a term of years and the state did not know who the triggerman had been. See Robert Reinhold, Groups Race to Prevent Texas Execution, N.Y. Times, Dec. 6, 1982, at A16.

357   As indicated supra text accompanying note 64, a broad range of humanitarian concerns unrelated to issues of guilt has traditionally supported executive clemency. For example, in June 2003 Governor Paul E. Patton of Kentucky commuted the death sentence of Kevin Stanford because he had been seventeen at the time of the commission of his crimes. See Henry Weinstein, Death Sentence Commuted for Ky. Man Who Killed at 17, L.A. Times, June 22, 2003, at 36. In 2002, the Georgia Board of Pardons commuted the death sentence of Alexander Williams to life in prison without parole in large part due to Williams's profound mental illness. See Rhonda Cook, Death Penalty Reduced to Life, Atlanta J. & Const., Feb. 26, 2002, at A1.

31 HOFLR 913

---

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.