```
 1     DISTRICT COURT, EL PASO COUNTY,
       STATE OF COLORADO
 2     270 South Tejon Street
 3     Colorado Springs, CO  80903

 4     _____

 5     THE PEOPLE OF THE STATE OF COLORADO,

 6     Plaintiff,

 7          vs.

 8     ROBERT LEWIS DEAR,

 9     Defendant.                          COURT USE ONLY

10

11     For the Plaintiff:               Case No. 15CR5795

12     Daniel H. May, #11379
       Jeffrey D. Lindsey, #24664
13     Donna Billek, #30721                 Division 10
       Doyle Baker, #22277
14     Office of the District Attorney
       105 East Vermijo Avenue, Suite 500
15     Colorado Springs, CO  80903

16     For the Defendant:

17     Daniel King, #26129
       Rosalie Roy, #26861
18     Kristen Nelson, #44247
       Office of the State Public Defender
19     19 North Tejon Street, Suite 105
       Colorado Springs, CO  80903
20

21                      REPORTER'S TRANSCRIPT

22

23          The above-entitled matter came on for competency

24     hearing on Thursday, April 28, 2016, before the HONORABLE

25     GILBERT A. MARTINEZ, District Court Judge.
```

Ex. C

```
 1                          I N D E X

 2

 3    DEFENDANT'S WITNESSES:

 4    Jerry Schiffelbein
              Direct Examination by Ms. Roy            4
 5    Cross-examination by Ms. Billek                 55
              Redirect Examination by Ms. Roy         89
 6    Recross-examination by Ms. Billek              104

 7    Dr. Jackie Grimmett
              Direct Examination by Ms. Nelson       107
 8    Voir Dire Examination by Mr. May               112
              Direct Examination by Ms. Nelson       114
 9    Voir Dire Examination by Mr. May               159
              Direct Examination by Ms. Nelson       162
10    Cross-examination by Mr. May                   163
              Redirect Examination by Ms. Nelson     201
11    Recross-examination by Mr. May                 210

12

13    PEOPLE'S WITNESS:

14    Dr. Thomas Gray
              Direct Examination by Ms. Billek       215
15

16    DEFENDANT'S EXHIBITS:                        RECEIVED:
              CH-A - CD (Jail Calls)                 34
17            CH-B - CD (Jail Calls)                 34
              CH-C - Grimmett CV                    109
18            CH-D - Grimmett Report                161

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (Thursday, April 28, 2016 - 8:59 a.m.)

 3                          *****

 4         THE COURT:  The Court will call 15CR5795.

 5         If counsel will identify themselves for the record,

 6   please.

 7         MS. BILLEK:  Good morning, Your Honor.  Donna Billek, Dan

 8   May, and Jeff Lindsey appearing on behalf of the People.

 9         MS. ROY:  Good morning, Your Honor.  Rose Roy, Kristen

10   Nelson, and Dan King on behalf of Mr. Dear.

11         THE COURT:  All right.  And are the parties ready to

12   proceed?

13         MS. ROY:  Yes, sir.

14         THE COURT:  All right.

15         MS. BILLEK:  Yes.

16         THE COURT:  Who's calling witnesses first?

17         MS. BILLEK:  Your Honor, that would be the defense.  It's

18   their burden under the statute.

19         THE COURT:  They have the burden.

20         Any objections to that?

21         MS. ROY:  No, Your Honor.

22         THE COURT:  All right.  You may proceed.

23         MS. ROY:  We would call Dr. Jackie Grimmett.

24         Okay.  I apologize.  Apparently we're going to do

25   Detective Schiffelbein first.
```

4

1          THE COURT:  Okay.  Would you raise your right hand,

2    please.

3                         JERRY SCHIFFELBEIN,

4    the witness herein, called at 9 a.m., was sworn by the Court,

5    testified as follows:

6          THE COURT:  Please be seated.

7          THE WITNESS:  Thank you.

8                         DIRECT EXAMINATION

9    BY MS. ROY:

10         Q.   Good morning, Detective.

11         A.   Good morning.

12         Q.   You -- it's my understanding you are at least one of the

13   lead detectives in this case; is that right?

14         A.   Yes.  I'm the primary lead detective.

15         Q.   Okay.  And at what point were you assigned sort of that

16   role?

17         A.   Either late November 27th or the early morning hours of

18   November 28th.

19         THE COURT:  And before we get there, can you tell us your

20   name for the record, please.

21         THE WITNESS:  Oh.  It's Detective Jerry Schiffelbein,

22   S --

23         THE COURT:  Okay.  And spell your last name.

24         THE WITNESS:  S-c-h-i-f-f-e-l-b, as in boy, e-i-n.

25         THE COURT:  Thank you.

1  BY MS. ROY:

2      Q.   And so you said either late on the 27th, early 28th of

3  November?

4      A.   Yes.  There was a conversation at some point in time.  I

5  was still at the sheriff's office when that conversation took

6  place.  I don't -- I don't remember exactly the time that that

7  happened.

8      Q.   Do you -- can you tell us sort of what your first

9  involvement in the case was.

10     A.   Initially -- when I received a telephone call from my

11  supervisor, the situation was still ongoing.  I was initially

12  tasked with responding to Memorial Hospital to contact any victims

13  that arrived there.  I had contacted a couple individuals there.

14  And then I received a telephone call from another supervisor, and I

15  was asked to respond back to the command post at Centennial and

16  Fillmore.

17     Q.   Okay.  And how long was it that you were at the command

18  post before you actually had contact with Mr. Dear?

19     A.   Less than an hour, I believe, maybe right around that

20  time.  I met with my supervisor, talked about the game plan going

21  forward, about what my role would be, and then I contacted Robert

22  Dear for the first time at 4:57 p.m. on November 27th.

23     Q.   And how did that work out?

24     A.   He was brought to an area near the command post by

25  tactical officers and the sheriff's office armored vehicle, the

1    BEAR.  When he exited the BEAR, I contacted him immediately there

2    as he exited.

3         Q.   And as he was being brought to you in the BEAR or

4    BearCat, were you aware that he had surrendered himself?

5         A.   Yes.  I had overheard that over the radio.  When I was

6    waiting for the next step, I had my radio on, was listening to

7    everything, and was aware that he had been taken into custody.

8         Q.   And were you advised of the circumstances around how that

9    happened?

10        A.   I had known from the radio traffic that he had said that

11   he was basically surrendering, and then that he was taken into

12   custody from there.

13        Q.   All right.  And when -- as he was being brought out of

14   the Planned Parenthood building, are you aware of statements that

15   he had made at that time?

16        A.   Not coming out of the building, no.

17        Q.   Okay.  So your first contact is when he's coming out of

18   the police BearCat?

19        A.   It was the sheriff's office BEAR.

20        Q.   Okay.

21        A.   It's the bigger one of the two armored vehicles --

22        Q.   Okay.

23        A.   -- but, yes, that's the first -- the first contact I had

24   with him and the first statements I heard.

25        Q.   Okay.  And can you tell us what the first statements that

1   you heard were.

2       A.   He made a comment about "no more baby parts," something

3   about "saving the babies."

4       Q.   Okay.  And so he -- was he directing that at you or

5   anyone in particular or did you know?

6       A.   I don't -- I don't believe it was anybody in particular.

7   It was just he made the statement very loud.  There was a large

8   group of people around, around him when the statements were made.

9       Q.   Okay.  And you say a large group.  Who -- what kind of

10  people were in that group?  Was it all law enforcement or...

11      A.   In the immediate group was law enforcement.  We were on

12  the north side of Fillmore on Centennial, literally right in the

13  middle of the road.  The media staging area was on the south side

14  of Fillmore, still on Centennial, basically, so they were across

15  the street.  I don't know if they could hear any of it or if that's

16  who it was directed to, but they were within a few hundred yards of

17  where we were.

18      Q.   Okay.  So the people in the immediate vicinity of the

19  BEAR were primarily law enforcement?

20      A.   Yes.

21      Q.   And were they identified as law enforcement, wearing

22  uniforms, things of that nature?

23      A.   A vast majority, yes.  There were several plain clothes

24  as well, but a majority of them were identified tactical officers

25  in, you know, tactical vests and uniformed officers and some of us

1    in plain clothes.

2         Q.   Okay.  From a number of different law enforcement

3    agencies?

4         A.   Yes.

5         Q.   Okay.  So one -- one might expect that someone walking

6    into that situation would recognize that that was a large group of

7    law enforcement personnel?

8              MS. BILLEK:  Objection, Your Honor; speculation.

9              MS. ROY:  I don't believe it's speculation based on the

10   questions that he's already answered.

11             THE COURT:  Objection's overruled.

12             THE WITNESS:  It was all law enforcement.  I'd be

13   surprised if somebody didn't know that's who it was.

14   BY MS. ROY:

15        Q.   Okay.  So you would be surprised if someone came into

16   that situation and accidently said something, not realizing they

17   were saying it to a group of police officers --

18        A.   Correct.

19        Q.   -- or law enforcement officers?

20        A.   Correct.

21        Q.   You then, I believe, had some direct contact with Mr.

22   Dear; is that right?

23        A.   Yes.

24        Q.   Tell us about that.

25        A.   I contacted him right when he got out of the BEAR.  I

1   introduced myself to him.  I think I first asked for his first

2   name, had a brief conversation with him at the BEAR that -- about

3   talking to him.  He was then -- an unmarked patrol car pulled up,

4   and he was placed in the backseat of that patrol vehicle.  And I

5   got in the backseat of the car with him and rode with him to the

6   sheriff's office.

7       Q.   And you identified yourself as a detective with Colorado

8   Springs Police Department?

9       A.   I don't know if I said detective.  I know I said I worked

10  for the police department, and I gave him my first name.

11      Q.   Okay.  And were you in plain clothes that day?

12      A.   I was.

13      Q.   Okay.  And you typically -- are you in plain clothes?

14      A.   Yes.

15      Q.   You got into a marked patrol vehicle?

16      A.   It was an unmarked vehicle, but it had all the same

17  equipment.  It just doesn't have the big police on the side.  It

18  was a black car, has a cage in it.

19      Q.   Okay.

20      A.   I rode in the back portion of that vehicle with Robert.

21      Q.   Okay.  So you rode where someone would normally be held

22  if they were in custody?

23      A.   Yes.

24      Q.   And Mr. Dear was also back where someone in custody would

25  ride?

1     A.   Yes.

2     Q.   Other people in the car?

3     A.   Yes.

4     Q.   How many?

5     A.   There was two patrol officers, one driving, one in the

6  front passenger seat.

7     Q.   Do you recall if they were -- how they were dressed?

8     A.   They were in full uniform.

9     Q.   So -- and the car, you say, it was a police car, lights,

10  sirens, cage, all of those things?

11     A.   Yes, just no -- I don't remember if that -- our unmarkeds

12  are a little bit different.  Some still have the light bar on top.

13  Some they're mounted, like, above the rearview mirror.  I don't

14  remember how that car was set up --

15     Q.   Okay.

16     A.   -- but it has all the same equipment as a regular patrol

17  car.

18     Q.   Okay.  So, again, you would expect someone who would be

19  put in that car would recognize that it was a police car?

20     A.   Absolutely.

21     Q.   When you were in the police car, did you have

22  conversation with Mr. Dear?

23     A.   Yes.

24     Q.   Tell us about that.

25     A.   I had -- when I first contacted him, I had made the

1   comment to him that it was obvious he had some things he wanted

2   heard.  I was the one to make sure those -- that what he wanted --

3   what his message was got heard.

4          We got in the car.  As we started driving, he began

5   talking.  I stopped him and went over his *Miranda* warning with him.

6   And then after that, he agreed to continue to talk.  And we

7   continued to talk from there all the way to the sheriff's office

8   and throughout the night.

9      Q.   Okay.  So fair to say he was eager to talk to you?

10     A.   Yes.

11     Q.   And your assignment, prior to even making contact with

12  him, would have been, as lead detective, that if he were going to

13  give a statement, you'd be the person taking that statement?

14     A.   Yes.

15     Q.   Okay.  And so when he started talking so quickly, you

16  said you actually stopped him so that you could advise him of his

17  rights?

18     A.   Yes.

19     Q.   Okay.  And when you did that, how -- what was his

20  reaction?  What was his response?

21     A.   When I first stopped him and told him I had to go over

22  some stuff with him, he told me what I was gonna go over with him.

23  He told me I was gonna go over his *Miranda* rights.  I told him that

24  was correct.  He told me that -- he made a comment about he would

25  waive whatever he needed to waive, and then I went over it.  I read

1    it to him, and then we continued to talk.

2         Q.   So he -- he sort of was in a hurry to get through those

3    *Miranda* rights so he could get his story out to you?

4         A.   I don't know about being in a hurry.  He had said that he

5    knew what I was gonna read to him.  And he was agreeing to waive it

6    before I even read it to him, but I told him I still had to go over

7    that with him.

8         Q.   Okay.  Do you sometimes have people that you read their

9    rights to and you wait and let them mull it over and then get a

10   response from them?

11        A.   It does happen, yes.

12        Q.   And that's not how Mr. Dear was?

13        A.   No.

14        Q.   When he started to talk to you, you're still in the back

15   of the patrol car, do you recall what he told you at that time?

16        A.   He started talking about a lot of different things.  He

17   had -- I believe at that point in time was the first time he had

18   quoted Luke 10:18 for me of -- the Biblical verse, referred to

19   President Obama as potentially being the Antichrist, and some

20   conversation like that took place in the back of the car.  He had

21   talked about being followed by FBI agents.  That's basically the

22   gist of that initial conversation.

23        Q.   Okay.  And you told us about Luke 10:18.  At that point

24   in time were you aware of what that was, what that verse was?

25        A.   No.

1      Q.   Okay.  Since that time you've heard it repeated numerous

2   times?

3      A.   I've heard it a lot and I've seen -- I've seen a lot of

4   stuff on it since then, yes.

5      Q.   At -- he then talked to you, you said, about the FBI?

6      A.   Yes.

7      Q.   What did he tell you about -- at the beginning of his --

8   what he believed his interaction with the FBI was?

9      A.   It happened shortly after the Branch Davidian incident in

10   Waco, Texas, that he had made a call to a radio show and referred

11   to the FBI as the Federal Bureau of Incineration.  He had made a

12   comment that he thought that he had freedom of speech, but

13   apparently he didn't, and that's the point in time they began

14   following him, harassing him and that type of stuff.

15      Q.   Okay.  And so that's back in 1993; is that correct?

16      A.   I believe that's when Waco occurred, yes.  Early '90s.

17      Q.   Okay.  And so he, in his statement to you, was telling

18   you that the FBI has been following him since that incident?

19      A.   Yes.

20      Q.   And it's based on him calling the radio show?

21      A.   Correct.

22      Q.   Okay.  And do you recall him talking to you about what

23   prompted him to say Federal Bureau of Incineration?

24      A.   He made a comment -- I don't remember the exact content

25   without -- or the exact quote without looking at the report, but it

1    was something about being God's will that he said it or God had had

2    him say it.  He hadn't planned to say it, but it was something

3    about God's will or something like that.

4         Q.   Could it be that the Holy Spirit prompted him to say it?

5         A.   I believe that's correct, yes.

6         Q.   Okay.  So inferring to you that when he made the call,

7    that wasn't his plan, but that the Holy Spirit spoke through him

8    and that's why those words came out of his mouth?

9         A.   Yes.

10        Q.   Okay.  And he then gave you some examples, did he not,

11   about other things that had happened in his life to substantiate

12   that the FBI or feds had been following him?

13        A.   Yes.

14        Q.   Okay.  And, again, this is still in the patrol car; you

15   haven't even gotten to the police station yet?

16        A.   That's correct.

17        Q.   Okay.  And do you recall him talking to you about also

18   following some person by the name of Alex Jones?

19        A.   Yes.

20        Q.   What did he tell you about that?

21        A.   I remember him talking about Alex Jones.  We had several

22   conversations about Alex Jones.  And separating which conversation

23   took place at which point in time, it's gonna be hard to do without

24   going over reports.

25             But he talked about Alex Jones, that he thought was what

1   he termed a double agent, was somebody that would get a lot of

2   people excited about a bunch of different things but actually

3   worked for the federal government.

4          He specifically referred to Alex Jones in Y2K, that there

5   was some stuff with Y2K about what Alex Jones said was gonna happen

6   didn't happen, and it was designed to get -- basically to help

7   identify these people for the federal government to watch.

8       Q.   Okay.  And that was part of how he was a double agent,

9   then?

10      A.   Yes.

11      Q.   And do you recall him talking about the Holy Spirit again

12  with regard to him and Alex Jones?

13      A.   Yes, that he -- he had called the radio show and had told

14  Alex Jones -- accused him of being a double agent.

15      Q.   And the reason he did that was because the Holy Spirit

16  was speaking through him?

17      A.   Yes.

18      Q.   When -- I believe that it's not too long after that that

19  you actually got to the sheriff's office; is that right?

20      A.   It seemed like a long time, but it was -- the

21  conversation in the car, in the whole scheme of things, wasn't that

22  long.  I think the drive was probably 20 minutes --

23      Q.   Okay.

24      A.   -- for us to get there due to the road conditions.  And

25  then when we got to the sheriff's office, there's some conversation

1    that continued in the car until we got access into the building.

2        Q.   Okay.  And so during part of that time, do you recall him

3    talking to you specifically about some things that had happened

4    that day --

5        A.   Yes.

6        Q.   -- with regard to being at the hospital?

7        A.   Yes.

8        Q.   Tell us about that.

9        A.   That he had -- his girlfriend was in the hospital.  I

10   don't remember -- then I clarified which hospital, but it was the

11   hospital in Woodland Park and that the feds had been harassing her

12   and him there.  They had -- were going to try to take him out,

13   which is what -- which is the point in time he decided to come to

14   Colorado Springs to Planned Parenthood.

15       Q.   And do you know what he meant by "taken out"?

16       A.   He talked about -- at one point in time about a janitor

17   shoving a mop handle into his eye.  He had talked about people

18   coming up behind him that were going to choke him, get him in,

19   like, a neck restraint type of thing, talked about different

20   scenarios like that.

21       Q.   Okay.  And that was what he said had happened that very

22   morning?

23       A.   Yes.

24       Q.   Okay.  So that very morning of the incident, do you

25   recall him referring to a fake janitor?

 1      A.   Yes.

 2      Q.   So his explanation was that this person was not a janitor

 3  at the hospital but a fed --

 4      A.   Correct.

 5      Q.   -- some -- some type of agent?

 6      A.   Yes.

 7      Q.   And that they were going to kill him that day?

 8      A.   Yes.

 9      Q.   He also described to you about things that were evidence

10  that the feds had been messing with him and following him; do you

11  recall that?

12      A.   Yes.

13      Q.   And he talked just briefly about that in the car, but do

14  you recall sort of the things that he described to you that they

15  would do, for instance, to clothing?

16      A.   He talked about a lot of different things.  He talked

17  about them coming into his house, cutting holes in his clothes,

18  talked about -- I think he referred to as thumpers, where they

19  would send, like, a thumping noise where they would come into his

20  house and would leave -- I'm trying to think of what it was now --

21  leave something in the house.  A feather to let -- to let him know

22  that they had been in his house.  A lot of different things like

23  that he talked about.

24      Q.   Okay.  So he talked about that this had been going on, of

25  course, since the incident in Waco, Texas --

1      A.    Yes.

2      Q.    -- up to the day of this incident where you're talking to

3   him?

4      A.    Correct.

5      Q.    And he gave you, fair to say, many examples of things

6   that he knew that the feds had been doing to him?

7      A.    Yes.

8      Q.    And that's why he knew they were going to get him that

9   day?

10      A.    Yes.

11      Q.    Did he discuss with you why he turned himself in?

12      A.    Yes.

13      Q.    Tell us about that.

14      A.    That he had basically gone in that day.  He had planned

15   on dying in the building.  After the -- lots of shots fired, he

16   described hundreds of rounds coming by him, that he was trying to

17   decide what he wanted to do with the whole situation.  He had a

18   card that -- he said he had decided one side of the card said he

19   gives up; the other side says that it ends in a shootout, and he

20   flipped the card.  It said that he should give up.  And that was

21   God speaking to him, so that's when he gave up.

22      Q.    Do you recall him also talking to you about calling into

23   another radio show called Mandy in the Morning?

24      A.    Yes.

25      Q.    Okay.  Do you recall when he said that happened?

1    A.   He had told me -- he gave me the date of July 28th.   That

2  was actually an incorrect date.   It was July 29th that that phone

3  call was made.

4    Q.   Okay.   And as part of your investigation in this case,

5  were you able to investigate that and find out whether it happened?

6    A.   Yes.

7    Q.   And did it happen?

8    A.   It did, on July 29th.

9    Q.   Okay.   And when he called the Mandy in the Morning show,

10 do you recall what he said?

11   A.   That show that day was primarily about Planned Parenthood

12 and some of the videos that had come out.   They were talking about

13 that type of stuff.   Mr. Dear called.   I recognized his voice

14 immediately.   He tells Mandy -- it's Mandy Connell is her name --

15 "Thank you for bringing this up," mentions President Obama being

16 the biggest -- the most pro-abortion president we ever had, then

17 quotes Luke 10:18, and then refers to President Obama as the

18 Antichrist, and then the call is ended.

19   Q.   So he quoted to her on the air Luke 10:18?

20   A.   Yes.

21   Q.   Do you recall him talking to you about what happened the

22 day after he made that phone call to that radio station?

23   A.   I don't remember off the top of my head.

24   Q.   Do you recall him talking to you about the fact that he

25 tried to get on the internet and that -- that then he was blocked

1    from doing that?

2        A.   Yes.  He had tried to get ahold of the podcast, and he

3    was unable to.

4        Q.   And what did he believe was the cause of that?

5        A.   That the feds had blocked his internet.

6        Q.   Based on the fact that he called the radio station?

7        A.   Yes.

8        Q.   And told them about Luke 10:18?

9        A.   Yes.

10       Q.   When -- and at some point -- I think it's quickly

11   thereafter that you actually arrive and went inside the sheriff's

12   office, sometime in there?

13       A.   Yes.

14       Q.   Okay.  Once you went into the sheriff's office, what did

15   you do?

16       A.   We went -- proceeded to -- I don't even know what floor

17   it is within the sheriff's office.  We got on the elevator.  I rode

18   with him to whatever floor it was.  We then went into one of their

19   interview rooms where he was placed in an interview room.  I

20   briefly left, came back, continued the conversation with him.  That

21   took place for about seven and a half hours.  There was significant

22   breaks in there, restroom breaks, that type of thing.  We didn't

23   talk the entire seven and a half hours, but I continued my

24   conversation with him there.

25       Q.   Okay.  And let me back up and ask you:  The ride in the

1   patrol car from the scene to the sheriff's office, you recorded

2   that conversation; is that correct?

3        A.   Audio-recorded, yes.

4        Q.   Okay.  And was that on your -- your telephone --

5        A.   It was on my iPhone.

6        Q.   -- is how you did it?  Okay.

7             And you -- then when you got to the sheriff's office,

8   tell us about that.  Did you set that up to be recorded?

9        A.   Yes.  It was already -- when we got there, I inquired, as

10  we were walking up, to ensure the room that we were going to was

11  already recorded.  I was told it was, and we went into the room.

12  And that was audio and video.

13       Q.   Okay.  And so the first part in the car is just the audio

14  from your iPhone, and then the second part is audio and video?

15       A.   Yes.

16       Q.   Okay.  You said the second part was about seven and a

17  half hours from beginning to end?

18       A.   Correct.

19       Q.   Okay.  When you --

20            MS. ROY:  I'm gonna ask the Court, should we mark

21  exhibits as CH --

22            THE COURT:  Yes.

23            MS. ROY:  -- dash A?

24            THE COURT:  Yes, please.

25            MS. ROY:  Thank you.

 1      Q.   When you got into the room, did you have a chance to sort

 2  of observe Mr. Dear?

 3      A.   A little bit better.  The light -- it was kind of dark

 4  out on the scene.  I observed him a little bit better at that point

 5  in time, yes.

 6      Q.   Okay.  You talked to him a little bit about some of his

 7  injuries?

 8      A.   Yes.

 9      Q.   And do you recall him talking to you about an injury that

10  he had on his hand?

11      A.   Yes.

12      Q.   What did he tell you about that?

13      A.   He had a pretty significant laceration to his right hand.

14  He had said -- I inquired how he got that.  He had told me that

15  during the incident he wanted to make it -- he wanted the police

16  officers to think that he had committed suicide.  And he had tried

17  to fire a round and during that the slide mechanism of the rifle

18  had cut his hand.

19      Q.   Did you ask him about whether he had considered

20  committing suicide?

21      A.   I don't know if I asked it directly like that.  I know we

22  talked about it, 'cause he had kind of mentioned it being against

23  his religious beliefs, talked about the people in the Bible that

24  had committed suicide.  I know we had some conversation about that.

25  I don't recall me actually asking the question.  I know we talked

1    about it.

2         Q.    Do you recall he had an injury somewhere to his torso?

3         A.    He had another injury to his lower -- I think it's lower

4    right side of his abdomen that he had.

5         Q.    What was your conversation about that?

6         A.    I'd asked him about that.  He said he had been shot and

7    that the ballistic -- his homemade ballistic vest had stopped the

8    bullet.  We talked a little bit about when that exchange -- when he

9    thought that he had been shot during the exchange of gunfire was.

10   He provided some details of when that actually occurred within the

11   event and -- but he talked about his homemade vest had stopped the

12   bullet.

13        Q.    Tell us about the homemade vest.  What -- what's it made

14   from?

15        A.    Silver -- he described silver coins and duct tape.

16        Q.    So this was something that he made himself?

17        A.    Yes.

18        Q.    Did you ask him when he made it?

19        A.    I did.  I believe he said it had been about a month ago

20   that he had sold it -- or had built it, made it, and that he had

21   been wearing it since.

22        Q.    Okay.  So he made it sometime prior and had been wearing

23   it every day?

24        A.    Yes.

25        Q.    Did he explain to you why he had been wearing that every

 1   day?

 2        A.   Because the feds were out to get him.

 3        Q.   So he knew it was close to the end?

 4        A.   I didn't specifically --

 5             MS. BILLEK:  Objection, Your Honor; speculation.

 6             THE COURT:  That objection will be sustained.

 7   BY MS. ROY:

 8        Q.   Did he seem to indicate that -- well, did he tell you why

 9   he started wearing it when he did?

10        A.   He talked about the feds were -- were after him, and

11   that's why he started wearing it.  I don't -- I don't recall

12   getting any deeper into that than that, not that I recall.

13        Q.   Okay.  With regard to some of the things he told you

14   about the feds following him, do you recall him giving you examples

15   of things that they had done to try to get him?

16        A.   A lot, yes.

17        Q.   He had many, many stories; correct?

18        A.   Yes.

19        Q.   Examples of things that were specifically done to him by

20   the federal government?

21        A.   Him and his family, yes.

22        Q.   Okay.  He indicated that they had had fake charges filed

23   against him?

24        A.   He discussed a sexual assault charge that he had been

25   arrested for in South Carolina in the '90s and said that was a fake

1   charge.  That was shortly after the phone call talking about the

2   Waco, Texas, incident that that rape charge, as he referred to it,

3   came up, but yes.

4       Q.   So the first thing -- the first thing that the feds did

5   to him, according to him, after the call to Waco was that fake

6   charge?

7       A.   Yes.

8       Q.   Okay.  And fair to say that he sort of jumped around

9   quite a bit in the interview?

10      A.   Early on, yes.

11      Q.   Okay.  You try to redirect him?

12      A.   Yes.

13      Q.   And you try to get him back to, "You know, let's talk

14  about what happened today"?

15      A.   Correct.

16      Q.   Fair to say that he would start to talk to you about what

17  happened that day and then get off on a tangent?

18      A.   Yes.  We'd start talking about the Planned Parenthood

19  specific incident, and he'd tell me that he had another story to

20  tell me, and then would make a right turn and talk about that and

21  then would try to come back and talk about that day's events.

22      Q.   Okay.  So you would try to steer him back into -- into

23  the topic that you wanted to discuss?

24      A.   Yes.  Early on it was much more difficult to talk just

25  about that day.  As the interview went on, we were -- I was able to

1   keep him more on track with what happened that day.

2        Q.   Okay.  Ultimately, how many times did he talk to you

3   about the federal government being after him?

4        A.   I don't know the number of times.  It was pretty

5   prevalent throughout the entire interview, almost the entire time.

6        Q.   Okay.  Every time he talked about what happened that day,

7   what reason did he give for the going to Planned Parenthood?

8        A.   He was basically making his last stand.  He knew that it

9   was the end; the feds were going to take him out that day.  He had

10   to decide where to make his last stand.  So he made his -- I think

11   he referred to the most evilest place on earth, and he decided to

12   go to Planned Parenthood.

13        Q.   Do you recall him talking about -- well, he started with

14   the conversation about the hospital --

15        A.   Yes.

16        Q.   -- correct?  And at the hospital he knew that it was fake

17   hospital; it was fake people at the hospital?

18        A.   He had talked about -- I don't think he said a fake

19   hospital, but some of the employees there were actually federal

20   employees that were posing as hospital staff.

21        Q.   And did he talk to you about them following him?

22        A.   Yes.

23        Q.   Okay.  And he described that they actually followed him

24   that day?

25        A.   Yes.

1       Q.    When he left the hospital?

2       A.    Yes.

3       Q.    And he said -- did he tell you that normally he was

4   followed?

5       A.    Yes.

6       Q.    By how many people?

7       A.    He said usually there were a couple.  And then I know at

8   some point in time he said it got to be where there were, like,

9   10 -- 10 following him all the time.

10      Q.    And then that day, is that the day they were -- that

11  there were also 10 following him?

12      A.    I believe that's the day he said that there were at least

13  10 following him.

14      Q.    Okay.  Fair to say that when he talked to you, he brought

15  up Luke 10:18 many times?

16      A.    He brought it up several times.  It wasn't a predominant

17  portion of our interview.  He brought it up a couple times.  I

18  don't recall how many, but he did bring it up more than once.

19      Q.    Okay.  And he brought up many times how the feds would

20  follow him and do things to him?

21      A.    Yes.

22      Q.    That he was being persecuted by the feds, essentially?

23      A.    Yes.

24      Q.    And he gave you examples of cutting the holes in

25  clothing?

```
 1        A.   Correct.

 2        Q.   Did he describe to you why he came to Colorado?

 3        A.   To be left alone.  He had -- basically to be left alone

 4   was the biggest reason.

 5        Q.   Okay.  Left alone by the feds?

 6        A.   Yes.

 7        Q.   Okay.  He wasn't -- he didn't indicate he was coming here

 8   to get away from family or anything like that?

 9        A.   No.

10        Q.   Okay.  Did he describe to you whether that worked?

11        A.   He said it didn't.

12        Q.   Okay.  So he came here to Colorado and he was living in

13   Hartsel?

14        A.   Correct.

15        Q.   Have you gone to Hartsel?

16        A.   I have not, no.

17        Q.   You were aware that he was living sort of in a -- in a --

18   off-the-beaten path in a camper?

19        A.   I've seen -- he described for me the camper he was living

20   in.  I've seen -- we had served a search warrant November 28th out

21   there.  I've seen the photographs and the Google Earth overviews

22   and that type of stuff of the area.  So I'm aware of where he was

23   living, but I've never been there.

24        Q.   Okay.  When he described to you the things that were

25   happening to him, do you recall him describing the things that were
```

1   happening to him while he lived there in Hartsel?

2        A.   Yes.

3        Q.   What kind of things were the feds doing?

4        A.   He had at that point in time referred to the -- I'm

5   trying to think of the term.  I think he referred to as the

6   IntraGard, where the feds had neighbors spying on him, that they

7   would drive down the road.  He lived right off of Highway 24.  That

8   they would drive down the road several times a day and -- and spy

9   on him.  And they were -- you know, everywhere he went within the

10  town they were -- somebody was there following him.

11       Q.   Okay.  So they were all over Hartsel?

12       A.   Yes.

13       Q.   Did he describe to you also that the feds would fly over

14  where he lived, fly airplanes and helicopters?

15       A.   I don't recall that.  I'm not saying he didn't.  I just

16  don't recall without looking back at the report.

17       Q.   Okay.  Do you recall him talking about how they would

18  get -- get into his radio?

19       A.   He talked about fake radio shows that they would pipe

20  into his radio.  I don't recall getting into specifics about how

21  that was accomplished, but I know he said that they would basically

22  send fake radio shows with information they wanted him to hear to

23  try to get to him; but they would do that through his radio, yes.

24       Q.   Okay.  So the radio in his pickup truck?

25       A.   Yes.

1      Q.    Somehow they would specially broadcast certain things

2    that just went to him and came through his radio?

3      A.    Yes.

4      Q.    Did he tell you -- do you remember him telling you how

5    they were able to get access to his pickup truck?

6      A.    I know that he had talked about them coming on his

7    property and going inside and doing things.  I don't -- I don't

8    recall anything more specific about the pickup other than that same

9    conversation about they would come onto his property and do stuff

10   then.

11     Q.    Do you remember him talking about having the oil changed?

12     A.    That's right.  He did talk about he had to take -- go get

13   the oil changed, which is when he thinks that they had done

14   something to his radio.

15     Q.    Okay.  And so after that point then he could -- was

16   getting these special broadcasts that were directed only at him?

17     A.    Special broadcasts so they could hear what was going on.

18   They could always hear everything in the truck.

19     Q.    So it was a listening device for the federal

20   government --

21     A.    Yes.

22     Q.    -- as well?  So they could spy on him and hear what he

23   was doing?

24     A.    Yes.

25     Q.    At any point in time in the interview did his sort of

1   demeanor change?

2        A.    I guess -- can you be more specific?

3        Q.    Well, he was eager to talk to you?

4        A.    Yes.

5        Q.    And you said this lasted for seven and a half hours?

6        A.    Yes.  You know, he was excited initially, which he -- you

7   know, after some time had passed, he calmed down a little bit as

8   far as the excitedness of the conversation.  During the time we

9   talked about a lot of different things.

10            At one point in time we talked about Paul Hill.  And as

11   he was describing Paul Hill to me and him being his hero, he

12   visibly started crying.  His voice got shaky.  His eyes teared up.

13   We talked about Paul Hill for a bit and what he had done.

14            You know, towards the end of the interview he was very --

15   he was tired.  You know, we'd take a break.  And we were -- there

16   was one point in time I probably was out of the room for an hour

17   and a half, I'm guessing, and he had sat down on the floor and was

18   real reluctant to stand back up 'cause he was kind -- he basically

19   said he was comfortable on the floor.

20            So it kind of went from excitedness to there's some

21   emotional parts in there to he was just tired.

22            At the very end I had asked him another question about

23   Eric Rudolph.  And he had told me that that was an interesting case

24   with him, but he was just too tired to talk anymore.

25        Q.    When you finished the interview, then he was taken to the

1  hospital; is that right?

2      A.  Yes.  We arranged for -- the same two patrol officers

3  that we had rode with to the sheriff's office were still there.  We

4  had arranged for them to take him to the hospital to get medically

5  cleared because of the laceration to his hand as well as his

6  indication that the injury to his abdomen was a gunshot.  Even --

7  even though it didn't penetrate, there was obvious trauma there.

8  We wanted him to get checked out to ensure that there wasn't

9  anything significant going on before he was taken to CJC.

10     Q.  And did you go with him there?

11     A.  I did not, no.

12     Q.  And then CJC is the jail?

13     A.  Yes.

14     Q.  Okay.  And were you with him when he was taken to the

15  jail?

16     A.  No.  After they left the sheriff's office, I had no other

17  contact with him that day into November 28th.

18     Q.  Were you aware that Mr. Dear expressed concern for you

19  after he had talked to you?

20     A.  No.

21     Q.  That he expressed concern that --

22         MS. BILLEK:  Objection, Your Honor.  The detective has

23  indicated no, so there should be no further question regarding it.

24         THE COURT:  Your response?

25         MS. ROY:  Well, I can ask him if he knows, Judge.

33

1          THE COURT:  All right.  If you'll rephrase the question.

2    BY MS. ROY:

3      Q.   Were you -- did anyone notify you that Mr. Dear made some

4    statements as he was going to the jail and being taken into the

5    jail about concern for you?

6      A.   Not that I remember, no.

7      Q.   Okay.

8          MS. ROY:  So at this point, Judge, I'm going to show

9    Detective Schiffelbein what we've previously marked as CH-A and

10   CH-B.

11         THE COURT:  Okay.

12         MS. ROY:  CH-A is the -- and CH-B.

13     Q.   Have you had a chance to look at these discs today,

14   Detective?

15     A.   Yes.  I did check them this morning before court to

16   ensure what was on them.

17         CH-A is the audio of the initial transport from the --

18   from the minute I contacted him through arrival at the sheriff's

19   office.  And CH-B is the entire video-recording of the interview

20   once we arrived at the sheriff's office.

21     Q.   Okay.  And you have had a chance to listen to both of

22   those; and those appear to be accurate copies of the recordings

23   that you made?

24     A.   Yes.  Just to clarify, I didn't listen to the whole

25   thing.  Because of the length, I spot-checked it just to make sure

1    it is what the discs say they are, and it is.

2              MS. ROY:  We'd move to admit CH-A and CH-B.

3              MS. BILLEK:  No objection, Your Honor.

4              THE COURT:  All right.  CH-A and CH-B will be admitted.

5              (Whereupon Defendant's Exhibits CH-A and CH-B were

6    received in evidence.)

7    BY MS. ROY:

8         Q.   So in addition to interviewing Mr. Dear, you also have

9    done follow-up work on the case; is that fair to say?

10        A.   Yes.

11        Q.   And some of the things that you've done are review some

12   of the records from the jail?

13        A.   I don't -- I've got the records from the jail.  I haven't

14   spent a lot of time reviewing those.  So as far as, like, the

15   records from CJC, I've done very, very little with them other than

16   obtained them and then discover them.  So not a lot with that.

17        Q.   Okay.  So you had them print them out or picked them up

18   and then you put them into evidence?

19        A.   Just -- I just put them into the case book and discovered

20   them, yes.

21        Q.   Okay.  You also listened to a number of phone calls that

22   Mr. Dear has made from the jail?

23        A.   I have listened to every telephone call he's made from

24   the day he got -- he arrived at CJC through April 13th of this

25   year.

1     Q.   And you have been in court each time that Mr. Dear has

2   been in court?

3     A.   Not each time.  I missed a couple in the middle.  I was

4   there for the first one on -- I believe it was December 10th.  The

5   December 23rd hearing I was out of town.

6     Q.   Okay.

7     A.   And then there was another hearing after that that I

8   was -- I don't remember where I was.  I know I've missed two of the

9   ones in between the last one.

10    Q.   Okay.  So I'm gonna ask you some questions about some of

11  the phone calls that Mr. Dear has made.

12    A.   Okay.

13    Q.   So it sounds to me like you periodically got copies of

14  the phone calls; is that -- is that fair to say?

15    A.   Usually after the initial -- depends on the time frame.

16  Usually after the initial info dump, I guess, getting information

17  from CJC as far as phone calls, I try to get them month by month.

18  So on May 1st I would make a phone call to CJC to get all of his

19  phone calls for April.

20    Q.   Okay.

21    A.   It kind of depends on the circumstances, what's going on,

22  depends on if I will get them sporadically in between, which I have

23  done on this -- in this case; but, for the most part, it's month by

24  month.  It's easier to track and to know where I'm at with them and

25  stuff.  So it's just usually once a month.

1      Q.   Okay.  And when you get the phone calls, what do you do

2   with them?

3      A.   Take them back to the office.  The original -- they're

4   given to me on a disc.  I submit that original disc into evidence.

5   I make copies to be discovered for attorneys, and I keep a working

6   copy for myself, and then I listen to them.

7      Q.   Okay.  And when you listen to them, you write a report

8   about the general information that is discussed in those phone

9   calls?

10     A.   Yes.

11     Q.   And so you're aware that -- you also received Mr. Dear's

12  visitation logs from the jail; is that right?

13     A.   Yes.

14     Q.   Okay.  So you sort of have a general picture of people

15  who have visited Mr. Dear?

16     A.   The only real attention I've paid to the visitation log

17  is I had noticed -- I had checked, based on conversations with his

18  girlfriend, about going to see him.  I had checked to see if she

19  had, and I did see her name on there.  As far as the other names,

20  I -- they really don't mean anything to me, but I -- that's really

21  the only time I've checked them.

22     Q.   Okay.  With -- well, let me ask you this:  You're aware

23  that he has accepted visits also from some members of the media?

24     A.   Yes.

25     Q.   And with regard to phone calls, you're aware that he's

1    made phone calls to the members of the media as well?

2         A.    Yes.

3         Q.    He's also called other people; is that right?

4         A.    Correct.  Yes.

5         Q.    Including his family members a couple of times?

6         A.    Yeah.  He's talked to his mother on the phone.  I believe

7    it's an aunt, maybe, that he had talked to, one of his early phone

8    calls, and then there's media members as well as a writer out of

9    New York.

10         Q.    Okay.  Let's talk about the phone calls to the family

11   member.

12         A.    Okay.

13         Q.    Do you recall, just generally, what Mr. Dear talked about

14   in that phone call?

15         A.    I know he had talked about his defense attorneys were

16   working against him.  The family member -- like I said, I think it

17   was an aunt had told him that she had met with them and they seemed

18   like nice people.  And he had said that they may be good for

19   everybody else, but not when you go against the president.

20         Q.    Did he also suggest that maybe they were, when he says

21   against him, part of feds?

22         A.    I don't know if he specifically said "part of the feds."

23   I know he had -- and, again, there's a bunch of different

24   conversations, and I'm trying to keep them separated.  But he had

25   talked about -- I know he thought that his defense attorneys were

 1   working with Planned Parenthood, basically to silence him.

 2        Q.   Okay.  So not trying to help him?

 3        A.   Correct.

 4        Q.   Okay.  And did he also talk in that phone call about

 5   things that were happening -- happening to him at the jail; do you

 6   recall?

 7        A.   I can't remember if that's the phone call he talked about

 8   he thought that they were doing something to his water.  I don't

 9   recall.

10        Q.   Okay.  And if I ask you some questions -- I don't know

11   that it's necessarily important which phone call --

12        A.   Okay.

13        Q.   -- but I just want to ask you some general questions

14   about things that he is saying in these phone calls.

15        A.   Okay.

16        Q.   Does that sound fair?

17        A.   Works for me.

18        Q.   In regards --

19             MS. BILLEK:  Your Honor, I would ask that they be

20   narrowed down so that I know which phone call we're talking about

21   rather than a just kind of general question.  There's a number of

22   calls.

23             THE COURT:  Objection overruled.

24   BY MS. ROY:

25        Q.   In some of the phone calls, did Mr. Dear talk about his

```
 1   food being poisoned at the jail?

 2       A.   I know at some point in time he did.  I don't remember if

 3   that was a phone call or in a court hearing --

 4       Q.   Okay.

 5       A.   -- but at some point in time, yes.

 6       Q.   Did he talk in his phone call to the family member about

 7   his girlfriend, Stephanie?  Do you remember that?

 8       A.   Yes.

 9       Q.   What did he say about Stephanie?

10       A.   That she -- I don't recall his exact term, but basically

11   she had been working for the feds and that she was against him and

12   she was part of the feds against him.

13       Q.   So he's describing that now he knows that she was working

14   for the feds?

15       A.   Yes.

16       Q.   That's not something that he talked to you about during

17   your interview; is that right?

18       A.   Correct.

19       Q.   So in your interview, when he was talking to you about

20   the feds, the feds were people at the hospital but not his

21   girlfriend, Stephanie?

22       A.   Correct.

23       Q.   But once -- now that he's incarcerated, his girlfriend,

24   Stephanie, has become part of this conspiracy?

25       A.   Yes.
```

```
 1        Q.    So that's something sort of new --

 2              THE DEFENDANT:  I figured it out.

 3        Q.    -- new from the time that you interviewed him on the

 4   28th --

 5        A.    Yes.

 6        Q.    -- of November?  Do you recall --

 7              THE DEFENDANT:  I forgive her.

 8        Q.    Do you recall him also talking with some of the media

 9   about some of those things?

10        A.    Yes.

11        Q.    That he's now figured out that Stephanie was part of the

12   whole plan to get him on November 28th?

13        A.    November 27th, yes.

14        Q.    Or November 27th.

15              Do you recall him in his conversations, telephone

16   conversations talking about the Court?

17        A.    Yes.

18        Q.    Okay.  And what did he say about the Court?

19        A.    He said a lot of different things about the Court.

20              He's talked about that Judge Martinez is also against

21   him, was working to silence him, points to the fact -- I mean,

22   points to a lot of different things, that all the case file's been

23   sealed, the warrants have been sealed, the gag order being in

24   place.

25              He talks about Judge Martinez having taken the case
```

1   basically out of turn, not according to the roster, as he refers to

2   it, as indicative of him being biased against him.  Talks about a

3   comment he had read in the paper that he believed that Your Honor

4   had given to the media as basically saying he was incompetent

5   before there was any competency eval done as further indication

6   that the judge was out to get him -- out against him.

7       Q.   So after the hearing he read something in the paper that

8   confirmed that opinion?

9       A.   He talked about reading something in the -- I'm pretty

10  sure it was the paper, but he had saw a news account that there was

11  a statement attributed to Judge Martinez that led him to believe

12  that he was gonna try to keep the truth silenced.

13      Q.   In the phone calls did he also discuss the state

14  hospital?

15      A.   Yes.

16      Q.   And the doctors at the state hospital?

17      A.   Yes.

18      Q.   And what did he say about the state hospital and the

19  doctors?

20      A.   I don't remember a lot.  I remember -- I remember a lot

21  of his comments after the state hospital, just about that he

22  referred to Dr. Gray by name; that he had briefly talked to them,

23  but he had told them that he believed what Tom Cruise said, that

24  psychiatry is quackery is what he used, and that they wanted him to

25  meet with a second doctor because Dr. Gray didn't want to go out on

1  a limb on his own and say that he was incompetent without somebody

2  else to back him up.

3      Q.   Do you -- do you recall in some of the phone

4  conversations him discussing his lawyers?

5      A.   Yes.

6      Q.   And tell us about that.

7      A.   He's gone back and forth.  He -- a lot of it he is upset

8  because his attorneys want to do a mental health defense.  And if

9  it's a -- if he pleads not guilty by insanity, by reason of

10  insanity, it diminishes his message.  It diminishes his cause that

11  he was set out.  He does not want to mount a mental health defense

12  because of that.  He's had conversations about wanting -- basically

13  a defense of others is what he wants to argue before a jury, much

14  like Paul Hill did.

15          He goes -- there's conversation where he talks about his

16  attorneys are dirty, have tricked him, aren't truthful with him to

17  conversations where he talks about he's made up with his attorneys

18  and now they get along.

19          There's then conversations -- one of the more recent ones

20  he talks about how his attorneys are mad at him for talking to the

21  media; and he was doing it basically just to spite them and make

22  them mad.

23      Q.   In these conversations did he indicate he thinks his

24  attorneys are sort of in on it as well?

25      A.   There are times.  Early on he talks about his attorneys

1    working with Planned Parenthood to keep him silenced.  That has not

2    been part of his conversations in the past couple months.

3         Q.   He talked on the phone calls about whether or not he was

4    accepting visits?

5         A.   He talks about -- accepting visits.  If you're talking

6    about visits from attorneys and doctors, he does talk about he's

7    accepted some.  He talks about refusing to visit some of them and

8    refusing some visits while he's accepted others.  He does talk

9    about that.

10        Q.   Do you recall him specifically having a phone

11   conversation with someone named -- by the name of Amanda Robb?

12        A.   He's had several calls with her, yes.

13        Q.   Okay.  Tell us about the calls to Amanda Robb.

14        A.   He -- Amanda Robb is one of his first phone calls that he

15   makes to anybody outside of family.  He has a conversation with her

16   early on, just some basic information about his beliefs.  The

17   conversations transition over time to more of a -- I mean, almost

18   like a friendly friendship conversation.  They talk about a lot of

19   different things, life and that type of stuff.

20             So he's talked about what led him to Planned Parenthood.

21   He's talked to her about Luke 10:18.  He's asked her to look stuff

22   up for him on the internet, including a video -- a YouTube video

23   that he says turned him on to the Luke 10:18 stuff is how he first

24   became aware of that.

25             So they've had a lot of different conversations about a

1   lot of different things, including the event, including some

2   Biblical stuff over the last several months.

3       Q.   Okay.  And Biblical -- in addition to the Luke 10:18,

4   some other quotes and things like that?

5       A.   Some other quotes.  I mean, on Easter -- he knows that

6   Amanda Robb is Jewish.  On Easter he calls and tries to convince

7   her to become a follower of Jesus Christ and tells her that if she

8   doesn't, she's gonna go to hell.  So there's some of that type of

9   Biblical conversation as well.

10      Q.   Do you recall him also having a conversation with her

11  about Stephanie and that Stephanie is a fed?

12      A.   I know that he's talked to her about that, yes, about he

13  had figured it out that she was working against him as well.

14      Q.   And any -- described that he had figured out -- that out

15  while he's been in custody?

16      A.   Yes.

17      Q.   Okay.  So did he tell you how long he had been in a

18  relationship with her?

19      A.   I believe it's seven years.

20      Q.   And so during that seven years he didn't figure it out;

21  correct?

22      A.   Correct.

23      Q.   And that's --

24           THE DEFENDANT:  I had my suspicions.

25      Q.   Do you recall, as part of the jail records, him being

1    concerned that when he was at the jail -- or at the hospital that

2    something was done to him?  Are you aware of that?

3         A.   Not that I can recall, no.

4         Q.   When he was having hand...

5         A.   Not that I can recall.

6         Q.   Okay.  You're not aware of any kind of information about

7    him believing that a microchip had been implanted in him?

8         A.   I don't recall ever seeing anything like that, no.

9         Q.   Okay.  And, I guess, since this interview that you did

10   with him, have you had any direct contact with Mr. Dear?

11        A.   No.  Just telephone calls and in court seeing him.

12        Q.   Okay.  Were you in court the time when he was discussing

13   he made some statements about we can have his hair tested?

14        A.   I was not, no.

15        Q.   Okay.  Were you made aware that that happened, that he

16   suggested that would prove that, in fact, he is being poisoned at

17   the jail?

18        A.   I was aware of that, yes.

19        Q.   And, in fact, that was reported in the -- in the media?

20        A.   Yes.

21        Q.   When he talked to you during the interview, do you recall

22   him using the term "honeypot"?

23        A.   Several times, yes.

24        Q.   What's a honeypot?

25        A.   Basically a female sent -- he talked about women being

1    his weakness.  That a honeypot is a female sent to basically

2    infiltrate him, get information on him, sent by the feds.

3         Q.   Okay.  And so they're spies, not necessarily federal

4    agents but getting information for the feds?

5         A.   Yes.

6         Q.   And he gave you a number of examples of times throughout

7    his last 22 years that the feds had sent honeypots --

8         A.   Yes.

9         Q.   -- to get him?

10        A.   Yes.

11        Q.   Did he also -- do you recall him telling you about an

12   accident that he had had, a motorcycle accident?

13        A.   Yes.

14        Q.   Okay.  And I guess I'm backtracking.  I can't recall if

15   he discussed that on the phone call or not.

16        A.   I believe that was in my interview with him.  He does

17   talk about a motorcycle accident.  I believe it was in South

18   Carolina where he -- let me back up.

19             The motorcycle accident I'm remembering is one involving

20   his son in Charleston, South Carolina.  He talked to me about

21   another motorcycle incident where an ambulance had tried to have

22   followed him down a road back behind a -- like an old church or

23   something.  That's the motor -- the accident I'm thinking of is the

24   one involving his oldest son.

25        Q.   Okay.  With the incident with the ambulance following

 1   him, that was also an incident where he was describing to you proof

 2   that the feds were after him?

 3       A.   Yes.

 4       Q.   And so the ambulance was really a cover?

 5       A.   Yes.

 6       Q.   And it was really federal agents that were chasing him?

 7       A.   Yes.

 8       Q.   And that was sometime in the last 22 years?

 9       A.   Yes.  It was when he lived in South Carolina.

10       Q.   Okay.

11            THE DEFENDANT:  Two weeks after I started spreading Luke

12   10:18.

13       Q.   When you listened to the phone calls, do you also -- do

14   you recall him making a call to -- you said several media people?

15       A.   Yes.

16       Q.   Is that fair to say?

17       A.   Yes.

18       Q.   And that during those phone calls, he was essentially

19   saying the same thing, that the feds had been after him all this

20   time?

21       A.   Yes.

22       Q.   Okay.  And that now he knew that Stephanie was in on it?

23       A.   Correct.

24       Q.   And that he knew that they were gonna get him that day?

25       A.   Yes.

1      Q.   And that they were specifically following him on November

2      27th?

3      A.   Yes.

4      Q.   And that they were there at the Planned Parenthood?

5      A.   I don't recall him saying that they were at the Planned

6      Parenthood.  I recall him saying that they had warned Planned

7      Parenthood that he was coming.

8      Q.   Okay.  Do you recall him saying -- using the term "the

9      feds were there slithered away like snakes"?

10     A.   I remember the "slithered away like snakes."  I never got

11     the impression that he was saying they were there.  It was my --

12     again, my understanding of it was that they had called ahead to let

13     Planned Parenthood know that they were coming, slithery like

14     snakes.  They'll let the local cops handle him as opposed to them

15     handling him.

16     Q.   When you're investigating this case, I would assume

17     you've been in contact with many law enforcement agencies?

18     A.   Yes.

19     Q.   Did you find any evidence that, in fact, the federal

20     government has been following Mr. Dear for the last 22 years?

21     A.   No.

22     Q.   It sounds like you did get to listen to the copy of the

23     phone call to Mandy in the Morning?

24     A.   Yes.

25     Q.   Okay.  So you know that that phone call happened?

 1      A.   Correct.

 2      Q.   And that was discussing Luke 10:18?

 3      A.   Yes.  And abortion.

 4      Q.   Okay.  Do you recall Mr. Dear making a call to Mr.

 5  Salinger from the press?

 6      A.   Yes.

 7      Q.   Tell us about that phone call.

 8      A.   That was -- from my recollection, that was the very first

 9  media phone call he had made to the media.  He had called and

10  basically talked about the same stuff we've been talking about that

11  he had told me in the interview, that he said in several of these

12  other phone calls, basically the same information that was provided

13  in that one as the other ones.

14      Q.   Okay.  At some point did you hear some information that

15  Mr. Dear was concerned for Mr. Salinger now that he has given Mr.

16  Salinger all this information?

17      A.   Yes, 'cause he does talk to Mr. Salinger about Luke 10:18

18  and he does make comment about being concerned -- he needed to be

19  concerned about his safety now that he has this information as

20  well.

21      Q.   Okay.  So Mr. Dear seems to indicate that if he shares

22  the information that he has about Obama and the feds with someone,

23  that that's potentially putting that person in danger?

24      A.   Yes.

25      Q.   Okay.

1         THE DEFENDANT:  That's why it's all sealed.

2    Q.   And do you recall him talking on the telephone about --

3    you said, you know, a little bit about the judge and the sealing of

4    the file.  Do you recall us having that conversation?

5    A.   Yes.

6    Q.   Okay.  And tell us about that.

7    A.   He -- he talked about -- it's kind of awkward testifying

8    about the judge when the judge is here.  He talks about --

9    Q.   I understand.

10   A.   He talks about Your Honor trying to silence -- keep his

11   message -- silence the truth, that that is why the affidavits were

12   sealed, why the record has been sealed, why there's the gag order

13   in place.

14        Again, he talks about the -- Your Honor taking the case,

15   as he refers to it, out of turn on the roster; it wasn't his turn

16   on the roster, as further indication that there's something -- some

17   attempts to just send him away and be done with him to where his

18   message is never heard.

19   Q.   So it appears that there's sort of a pattern that is

20   some -- that once Mr. Dear has some contact with someone and shares

21   the information, they then -- he's concerned that they're in danger

22   and/or in on a conspiracy?

23   A.   I don't know if I agree with -- I don't know if I agree

24   with that.  He -- he's specifically told Rick Salinger, "You need

25   to be careful."  He started down with the Luke 10:18 stuff.

1     Q.   Um-hmm.

2     A.   He's the only one that I remember expressing concern for

3 their safety about Luke 10:18.  The information about people

4 involved in the conspiracy, that's -- you know, early on some of

5 the conversations would -- would indicate that a lot of people,

6 including his attorneys, were involved in the conspiracy --

7 conspiracy with the -- but it's mainly been the conspiracy to keep

8 him quiet and are working with Planned Parenthood to silence him

9 and not get his message out about protecting the unborn.  That's --

10 that's a different -- I guess, the way I interpret it, it's

11 different than the conspiracy with the feds.  It's a conspiracy to

12 basically help Planned Parenthood.

13     Q.   Okay.  Rather than the Luke 10:18, trying to keep that

14 word from getting out?

15     A.   I mean, that's intertwined, yes.  That's intertwined in

16 all of his conversations that he has.  But as far as the conspiracy

17 part of it, people being involved, when -- it's my impression

18 listening to the phone calls and all of his conversations, that's a

19 conspiracy -- the co-conspirator, I guess, for about a lack of a

20 better term, are to silence him to where his message does not get

21 out.

22     Q.   Do you recall him talking about why this is so important

23 for this year in terms of President Obama?

24     A.   Because it's an election year.  He's insistent that the

25 presidential election won't happen, that President Obama will

1   declare martial law and rebuild himself as the Antichrist.

2        Q.   So that would happen this year, 2016?

3        A.   It has to take place before the next president, yeah.

4        Q.   Before the next swearing in?

5        A.   Yes.

6        Q.   Do you recall listening to the phone calls and hearing

7   Mr. Dear talk about the fact that he believes he's competent?

8        A.   Yes.

9        Q.   And that he does not want to cooperate with his

10  attorneys?

11       A.   Correct.

12       Q.   Because he thinks that they're working against him?

13       A.   Yes, 'cause they want to mount an insanity defense and,

14  again, that diminishes his message.

15       Q.   And he -- do you recall him also saying that he refused

16  visits from doctors that -- that the attorneys had sent in to see

17  him?

18       A.   Yeah.  He's talked about meeting with one doctor, I

19  believe it's Dr. Martinez, that he had met with for about two

20  hours, but he does talk about refusing other visits, doesn't want

21  to talk to them.  He talks about visits coming, and he hadn't

22  decided if he was gonna meet with them or not; but he talks about

23  meeting with some and not meeting with others.

24       Q.   Okay.  And of course, you wouldn't know what -- what

25  would happen after the meeting, if there, in fact, was a meeting?

1       A.   Some of the phone calls he does talk about what was

2    talked about in the meetings with -- I know the meeting with

3    Dr. Martinez, there is some conversation in the phone calls about

4    what they talked about and kind of some of the crux of the

5    conversation, but other ones I don't know, no.

6       Q.   Okay.  Do you recall him, in his conversation with Amanda

7    Robb, talking about how this was a satanic attack?

8       A.   He wasn't referring to this incident as a satanic attack.

9    He's referring to abortion in general as a satanic event.

10       Q.   Okay.  Rather than --

11            THE DEFENDANT:  A satanic sacrifice.

12       Q.   Rather than what's happening to him?

13       A.   Correct.

14       Q.   During the interview you're in the room, but were there

15    other people who are watching the interview?

16       A.   Yes.  There was -- I don't know how many.  I know that

17    there were other law enforcement, both from the sheriff's office

18    and the police department, that were monitoring the interview, yes.

19       Q.   Okay.  Were there also members of the district attorney's

20    office present during the time you were interviewing Mr. Dear?

21       A.   At least monitoring portions of it, yes.

22       Q.   Okay.  During the time that you were questioning Mr.

23    Dear, was there a concern about whether or not he was competent to

24    waive his rights and talk to you?

25       A.   I -- I did not observe anything that gave me concern that

1   he didn't understand what was going on, didn't understand what I

2   had read to him.  We talked about his education, drug use,

3   everything like that.  He was answering the questions I asked.  He

4   was answering them appropriately.  I had no concerns at all.

5       Q.   All right.  Do you know if anyone else had concerns?

6            MS. BILLEK:  Objection, Your Honor; speculation.

7       Q.   Did anyone else tell you they had concerns?

8       A.   No.

9            THE COURT:  The Court will allow that question.

10            THE WITNESS:  No.

11   BY MS. ROY:

12       Q.   During the time that Mr. Dear has been at the jail, are

13   you aware that he has still had -- or still believes that the feds

14   are after him?

15       A.   Yes.

16       Q.   And that they're posing in the jail as workers or other

17   inmates?

18       A.   I don't know any of -- I'm not aware of any of that.  I

19   know he still talks about the feds, but I -- I don't recall any

20   conversations that I've heard or any reports that have come from

21   the sheriff's office indicating that he had thought that inmates or

22   employees were federal employees.

23       Q.   Okay.  Do you recall him talking about someone who was

24   with maintenance in the jail that came to fix the shower?

25       A.   Yeah.  There was a recent -- that may have been the very

1   last phone call that I -- from April 13th where there was a

2   maintenance person that had come to fix the shower that he had

3   interacted with and had some conversation about asking him if he

4   knew who he was.  And when the maintenance man told him no, he told

5   him that he was the Planned Parenthood shooter and that there was a

6   conversation about him not agreeing with what he had done that

7   went -- there was a conversation like that that took place.

8        Q.   Okay.  Are you aware of whether Mr. Dear then thinks --

9   thought that that person or expressed concern that that person was

10  against him?

11       A.   I don't -- not that I recall.  I remember him talking

12  about there's 95 percent of the people that think like this person

13  did and there's five percent that think like he did, but I don't

14  recall any conversation about that person being against him.

15       Q.   Okay.  Do you remember him talking about the -- well,

16  strike that.

17            MS. ROY:  Can I have just a moment, Judge?

18            THE COURT:  Yes.

19            (Short pause.)

20            MS. ROY:  That's all I have at this time.  Thank you.

21            THE COURT:  Cross-examination.

22                         CROSS-EXAMINATION

23  BY MS. BILLEK:

24       Q.   Good morning, Detective.

25       A.   Good morning.

1      Q.   I want to go over some of the things that Ms. Roy asked

2  you about with regard to your contact with Mr. Dear.

3      A.   Okay.

4      Q.   When you initially spoke with him in the car, the patrol

5  car on the way to the sheriff's office --

6      A.   Yes.

7      Q.   -- he recognized that you were a law enforcement officer?

8      A.   Yes.

9      Q.   He recognized that he had rights?

10     A.   Yes.

11     Q.   He knew what those rights were?

12     A.   Correct.

13     Q.   Started to repeat them to you, did he not?

14     A.   He started reciting them before I did.

15     Q.   So he recognized what you were going to read to him?

16     A.   Yes.

17     Q.   Tried to perempt you and saying, "You don't really have

18  to do that; I already know what they are"?

19     A.   Correct.

20     Q.   Was he correct in what he was giving you?

21     A.   Yes.

22     Q.   You read him his rights?

23     A.   Correct.

24     Q.   As you're required under your little form that you have,

25  little card you carry with you?

1      A.   Correct.

2      Q.   And he understood what those were?

3      A.   Yes.

4      Q.   And he waived those and agreed to speak with you?

5      A.   Yes.

6      Q.   He knew that he didn't have to; he told you, "I'm gonna

7   waive them"?

8      A.   Yes.

9           MS. ROY:  I'm gonna object on that.  That's speculation.

10          THE COURT:  Say what he said.  Objection sustained.

11   BY MS. BILLEK:

12     Q.   So did he tell you that he was going to waive his rights?

13     A.   Yes.

14     Q.   And how many times did he tell you he was going to do

15   that?

16     A.   Before I even read them to him, before I even told

17   them -- told him what I was going to read to him.  I believe he

18   said it once in the middle of me reading to him and then once at

19   the very end, when I asked him the typical:  "Having these rights

20   in mind, do you wish to talk to me now?"  And he waived them again.

21     Q.   Now, you were initially asked about when Mr. Dear was

22   brought from the Planned Parenthood after he surrendered to the

23   command post area.

24     A.   Yes.

25     Q.   Quite a lot of people around?

 1      A.   Yes.

 2      Q.   Media have lights on across the street?

 3      A.   Yes.

 4      Q.   Was it easy to see that there was a group of media there?

 5      A.   Absolutely.

 6      Q.   And then that's when he made that statement?

 7      A.   The...

 8      Q.   About saving the babies.

 9      A.   Yes.

10      Q.   An audience?

11      A.   Correct.

12      Q.   During the time frame that he spoke to you in the car,

13  were you able to understand what he was saying to you?

14      A.   Absolutely.

15      Q.   Did he understand where he was?

16      A.   Yes.

17      Q.   He knew that you were with the police department?

18      A.   Yes.

19      Q.   Never accused you of being with the feds?

20      A.   No.   He actually made a comment at one point in time --

21  Detective Mackey from the sheriff's office was in the interview

22  room with me and had pointed to him and said he didn't know if he

23  was a fed.  And we identified him as working for the sheriff's

24  office, but he never accused me at all of working for the feds.

25      Q.   After that did he ever accuse Detective -- Detective

1    Mackey from the El Paso County Sheriff's Office of being a fed?

2         A.   No.

3         Q.   And are you aware of whether or not he accused any of the

4    officers who were with him, who transported him either to the jail

5    or to the hospital, whether or not they were with the feds?

6         A.   Not that I'm aware.

7         Q.   You were asked about the Bible verse "Luke 10:18" and

8    that you were not aware of what it was prior to speaking to Mr.

9    Dear.

10        A.   Yes.

11        Q.   And he shared that with you?

12        A.   Correct.

13        Q.   You're also aware that in the jail phone calls that he

14   has told Amanda Robb that the Luke 10:18 is a sideshow?

15        A.   Yes.

16        Q.   It's not the real issue here?

17        A.   Correct.  Abortion's the real issue.

18        Q.   He's also said that he just wants to share that message?

19        A.   Correct.

20        Q.   The Luke 10:18 thing, is that a message, if you will, for

21   some within the political spectrum?

22             MS. ROY:  Objection.

23             THE DEFENDANT:  It's the word of God.

24             THE COURT:  And --

25             MS. ROY:  I think it's speculation.  It's also beyond the

1    scope of direct examination.

2              THE COURT:  It's not beyond the scope of direct.

3              Any response to speculation?

4              MS. BILLEK:  Your Honor, I don't think it's speculation.

5    And I can ask another question for foundation, if the Court will

6    allow me.

7              THE COURT:  Yes.

8    BY MS. BILLEK:

9        Q.   Have you had the opportunity to follow up on some of the

10   things that Mr. Dear shared with you during his interview or

11   mentioned during the phone calls?

12       A.   Yes.

13       Q.   Is one of those Luke 10:18?

14       A.   Yes.

15       Q.   Can you tell us what you determined about that.

16       A.   Luke 10:18 -- the information about Luke 10:18 isn't

17   isolated to Mr. Dear.  The -- in the conversation with Amanda Robb,

18   he directs her to the YouTube video, which is where he indicates he

19   first learned of it.  She plays portions of that for him, the

20   audio.  I recognized that audio as being a video that he had

21   emailed a link to a couple years ago to family members with that

22   YouTube video and the titled message was Luke 10:18.  That video --

23   that specific video alone has been viewed nearly 2 million times on

24   YouTube.

25             When I do a -- basically a Google search of Obama and

1   Antichrist, it reveals, like, 400,000 results, including Facebook

2   pages, about President Obama being the Antichrist, books written

3   that are on Amazon.com that are available for purchase that refer

4   to him as being the Antichrist.

5           So specific to the Luke 10:18, there's a ton of

6   information out there.  There's even a -- one of the things that I

7   found was a clip from the Rachel Maddow show on MSNBC where she

8   talks about the online references to President Obama being the

9   Antichrist.  And she refers to it as the tons of information out

10  there available indicating that.

11      Q.   Did Mr. Dear, during your contact with him or during the

12  phone calls that we've talked about today, indicate when he found

13  this video or this message?

14      A.   He says 2014, a couple years ago.

15      Q.   You were asked a little about Alex Jones.

16      A.   Yes.

17      Q.   Does -- during the interview that you have with Mr. Dear

18  or in the phone calls that you've been asked about today, does he

19  indicate how long he has been following or listening to or, if you

20  will, reading about Alex Jones?

21      A.   I don't recall the exact time frame, but I know it's been

22  at least since '99, 2000, because he refers to calling the show

23  after Y2K.  It's been a significant amount of time.  I don't

24  remember the exact years he had told me.

25      Q.   Are you aware or done a little bit more follow-up on who

1    Alex Jones is?

2         A.    Yes.

3         Q.    And who is he?

4         A.    He is a -- started off as a radio host, has a website

5    called infowars.com.  He's a -- I'm trying to think how to word it.

6    For lack of a better term, somewhat of a conspiracy theorist.  He

7    believes that 9/11 didn't happen -- or that 9/11 was a government

8    conspiracy, that Sandy Hook didn't happen, some of these other

9    things; they're just staged events.  He's a antigovernment

10   conspiracy theorist.

11        Q.    So with regard to that, you also -- were you able to

12   determine whether or not there were any articles or information

13   about Alex Jones and, if you will, the FBI honeypots or

14   sneak-and-peek warrants?

15        A.    Yes.  There's a couple things in my interview of Mr. Dear

16   he talks about -- he refers to it as the IntraGard.  It's actually

17   the InfraGard is the FBI program that is -- it was designed as an

18   antiterrorism thing where the FBI incorporates the assistance of

19   private business in terror-monitoring type of things, looking for

20   suspicious activity, that type of thing.

21              On Alex Jones's website and videos, there are segments

22   and articles where he talks about that being a government program

23   to spy on citizens.  There's information on there about the

24   sneak-and-peeks where basically it's a -- there's an argument that

25   there was -- and when the Patriot Act was extended a couple years

63

1    ago, that they allowed for sneak and peeks where government

2    agencies can get a warrant, go in and look in the house and -- or a

3    residence or a vehicle and then leave and not have to give any

4    information to the resident that they were even there, basically go

5    and sneak around, look and then leave and not have to give any

6    indication that they were there.  There's information about that on

7    his website as well.

8         Q.   And he's been -- Mr. Dear has been pretty specific that

9    he's been following Alex Jones for a number of years?

10        A.   Yes.

11        Q.   On November 27th he decided to take a stand; is that

12   right?

13        A.   That's what he said, yes.

14        Q.   And he told you that he was gonna go to the most evil

15   place he could figure out, and that would be Planned Parenthood?

16        A.   Yes.

17        Q.   Did he detail for you how he got to Planned Parenthood

18   and the different stages he had to go to find it?

19        A.   Yes, he did.

20        Q.   Okay.  So he had very specific moves that he did in order

21   to get there?

22        A.   Yes.

23        Q.   He stopped by to find the address?

24        A.   Multiple addresses.  He stopped multiple times.

25        Q.   And the reason for that was because at certain points he

1    couldn't -- there was no address available?

2        A.    Yes.

3        Q.    He made phone calls?

4        A.    Yes.

5        Q.    So he was utilizing phones and businesses to obtain that

6    information?

7        A.    Yes.

8        Q.    At any point when he -- did he tell you, during your

9    interview or in any of the phone calls, that during that time

10   frame, as he is trying to find the information for the Planned

11   Parenthood, that the feds were following him or the feds were

12   stopping him from getting that information?

13       A.    No.

14       Q.    He actually -- you were asked a bit about the

15   surrendering aspect and some of his wounds and all of that.

16            Did he also tell you that his plan was to take out more

17   officers?

18       A.    Yes.  When he injured his --

19            MS. ROY:  Objection, Judge; relevance --

20            MS. BILLEK:  It goes --

21            MS. ROY:  -- for the purposes of today's hearing,

22   competency.

23            MS. BILLEK:  Your Honor, it goes to specific thought

24   processes by the defendant about what his plan was, what he was

25   doing that day, his understanding of it.  It also goes to a number

1  of the --

2          THE COURT:  Objection's overruled.

3          THE WITNESS:  Yes.  He talks about his injury to his

4  right hand, when he had tried to make the officers think he had

5  committed suicide, was in a specific room, which is where a large

6  amount of the gunfire had taken place in.  He then said that he had

7  wanted them to think he committed suicide, jumped a counter to a

8  back hallway, and then expected the officers to sweep into that

9  room where they thought he was.  He was gonna pop up behind them

10  and, as he put it, take out a few more.

11  BY MS. BILLEK:

12      Q.   And he was clear to you in his interview that he was --

13  the feds had slithered away and was leaving it for the local guys

14  to do?

15      A.   Yes.

16      Q.   And you were one of those local guys?

17      A.   Yes.

18      Q.   But he didn't accuse you of being a fed or working with

19  the feds?

20      A.   No.

21      Q.   A matter of fact, when you initially asked him or some

22  point during your interview about what happened to his hand, he

23  joked with you and told you he wasn't gonna tell you what happened?

24      A.   Yeah.  He told me he didn't want -- he wasn't gonna tell

25  me.  I kind of begged a little bit, I guess.  We took a bathroom

1   break.  When we came back, he told me what had happened.

2       Q.   Do you recall during the phone calls and in your

3   interview that suicide would be against his religion?

4       A.   Yes.

5       Q.   With regard to the -- what's been referred to as the fake

6   rape charge --

7       A.   Yes.

8       Q.   -- didn't he tell you, and in also the phone calls, that

9   he didn't make that connection about the rape charge and the feds

10  until years later?

11      A.   Correct.

12           THE DEFENDANT:  Two months after the phone call.

13      Q.   With regard to November 27th, on that specific day, and

14  we've talked about some of the processes that he went through, did

15  he also drive past the sheriff's office?

16      A.   He did.

17      Q.   Did he tell you what his plan was there?

18      A.   After he left the first stop, when he attempted to get

19  the address for Planned Parenthood out of a phone book, there was

20  no address listed, so he just decided it was a sign that he wasn't

21  supposed to do it and he then decided he was gonna drive by the

22  sheriff's office and shoot at it, and he -- which he did do and

23  then he decided that that wasn't innocent enough blood to shed.  So

24  he decided to give it another attempt to try to find the address

25  for Planned Parenthood.

1    Q.   He didn't indicate that he thought that building was the

2    feds, did he?

3    A.   No.

4    Q.   He actually shared with you and in the phone calls to

5    many people why he moved to Colorado?

6    A.   Yes.

7    Q.   And that wasn't just because he was getting away from the

8    feds?

9    A.   He wanted to be left alone, and the legal marijuana.

10   Q.   In doing the review of where his RV is, is his RV fairly

11   close to the highway?

12   A.   I wouldn't say close.  It's several hundred yards off

13   of -- off of Highway 24.

14   Q.   But you can see the highway?

15   A.   Yes.

16   Q.   It's safe to say there's not a lot of vegetation in that

17   area?

18   A.   It's a clear view to the highway.

19   Q.   They call it the flats, actually?

20   A.   I didn't know that, but it's a clear view.

21   Q.   And he actually narrows down for you in the interview who

22   he thinks might have been asked to be part of the InfraGard; do you

23   remember that?

24   A.   Yes, some of the neighbors.

25   Q.   And they're his neighbors?

1    A.   Yes.

2    Q.   Not just everybody in Hartsel, but he narrows it down to

3  a couple of his neighbors?

4    A.   Yes.

5    Q.   Are you aware of whether or not that area that I've

6  referred as the flats, you didn't know how that was referred to, is

7  used for military training?

8    A.   I'm not aware of.

9    Q.   He did not initially -- or he did not in his interview

10  say that the fake radio shows were just directed at him, but that

11  the feds would create a radio show for people to listen to?

12    A.   Yes.

13    Q.   So it wasn't just directed at him?

14    A.   No.

15          THE COURT:  Ms. Billek, let's use this time to take our

16  morning recess.

17          MS. BILLEK:  That's fine, Your Honor.

18          THE COURT:  If you can all be ready to go, we'll

19  reconvene at 10:45.

20          And I'm not sure if the defendant needs to go to the

21  restroom or not.

22          THE DEPUTY SHERIFF:  We'll take him out either way, sir.

23          THE COURT:  Okay.  If you want to do that now, please.

24          All right.  We'll be in recess until 10:45.

25          (At 10:30 a.m. - recess.)

1            (At 10:44 a.m. - proceedings reconvened; all parties

2    present.)

3            THE COURT:  The Court will recall the Dear matter.  The

4    record should reflect all parties and the witness are present.

5            Counsel, you may continue.

6            MS. BILLEK:  Thank you, Your Honor.

7    Q.   Just for purposes of the record, Detective, could you

8    reintroduce yourself and spell your last name.

9    A.   Detective Jerry Schiffelbein, S-c-h-i-f-f-e-l-b-e-i-n.

10   Q.   And, Detective, we left off where -- at a point -- we

11   were talking about your interview and the phone calls that Mr. Dear

12   had made out of the jail.

13   A.   Yes.

14   Q.   You were asked by Ms. Roy about whether or not there was

15   any demeanor change with Mr. Dear at the time that you were with

16   him?

17   A.   Yes.

18   Q.   And you said there was a range of he was excited

19   initially and then he calmed down?

20   A.   Yes.

21   Q.   Did you have any behavioral problems with him at the time

22   that you were with him?

23   A.   No.

24   Q.   And he was able to, if you will, control his emotions?

25   A.   Yes.

1      Q.   He was able to stop, when he started crying when he

2   talked about Paul Hill, and then was able to compose himself?

3      A.   Yes.

4      Q.   Were you aware of whether or not he had any behavioral

5   problems on the way to the hospital or on the way from the hospital

6   to the jail?

7      A.   There were none, none reported.

8      Q.   Did he tell you how long he'd known about Paul Hill?

9      A.   I remember him talking about an episode -- a Donahue show

10   interview that Paul Hill had done.  That was back in, I believe,

11   the late '80s.  I know the incident that Paul Hill was executed for

12   took place in the '90s.  I guess I'm not for sure if he was aware

13   of Paul Hill before that or after that.

14      Q.   Okay.

15      A.   I'm not exactly for certain.

16      Q.   But Paul Hill killed an abortion provider?

17      A.   And his bodyguard, correct.

18      Q.   He also told you that he knew who Eric Rudolph was, but

19   he didn't want to talk to you about it 'cause he was tired?

20      A.   Correct.  He also talked about Scott Roeder, who was the

21   person that killed George Tiller, the abortion provider in Wichita,

22   Kansas.

23      Q.   You had the opportunity -- we've talked -- listened to

24   some of -- listened to all of the jail calls that you're aware of

25   that have been made?

 1      A.   Yes, through April 13th.

 2      Q.   Okay.  And you've mentioned that there is one person he

 3  calls that he has -- I think you described as more of a friendly

 4  conversation with, and that's Ms. Robb?

 5      A.   Amanda Robb, correct.

 6      Q.   And I want to focus in on the March 25th, 2016, phone

 7  call.

 8      A.   Okay.

 9      Q.   During that time frame -- or during that phone call with

10  Ms. Robb -- and you recognize this person on that jail phone call

11  as being Mr. Dear?

12      A.   Correct.

13      Q.   Does he complain about his attorneys?

14      A.   Can I look at my report --

15           MS. BILLEK:  Your Honor --

16      A.   -- to make sure I have the right phone call?

17           MS. BILLEK:  -- may he be allowed to review his report?

18           THE COURT:  He may.

19           THE WITNESS:  You said the March phone call?

20  BY MS. BILLEK:

21      Q.   March 25th.

22      A.   What page number?  I can't get my bookmark to work.

23      Q.   I'm not sure.

24      A.   I got it.

25      Q.   Okay.

```
 1      A.   You said March 25th?

 2      Q.   Yes.

 3      A.   I guess I'll go old school.  This is the one at 8:38

 4   a.m.?

 5      Q.   8:38 a.m.

 6      A.   Okay.  He does talk about his attorney, yes.

 7      Q.   And what does he say?

 8      A.   He talks about the attorneys telling him that he had been

 9   declared incompetent.  He talks about his attorney lying to him.

10   He refers to that attorney that lied to him by the last name of

11   King; that his -- that Mr. King was coming to see him in the next

12   couple of hours; that he is going to, his words, rake him over the

13   coals because he had said something to the newspaper and had told

14   him something else.

15      Q.   Does he also call him the crookedest lawyer he's ever

16   heard of in his life?

17      A.   Yes.

18      Q.   Was that a theme within the jail phone calls when

19   discussing in particular -- no disrespect to counsel -- Mr. King?

20      A.   Yes.

21      Q.   He also discusses what happened in a court hearing where

22   he's mad that his attorney is the one who requested that he be sent

23   back -- he, being Mr. Dear, sent back to the state hospital?

24      A.   Yes.

25      Q.   And Mr. Dear is not happy about that?
```

1       A.   No.

2       Q.   And, again, in that phone call for the second time,

3   you've mentioned one time, but for a second time he said his lawyer

4   was telling him one thing, the Court's telling him another?

5       A.   Yes.

6       Q.   He also discusses what he think's gonna happen at the

7   competency hearing during that phone call with Ms. Robb, doesn't

8   he?

9       A.   Yes.

10       Q.   And he says that his lawyer wants to send him back to the

11   nuthouse?

12       A.   Yes.

13       Q.   And the prosecutors have requested a hearing?

14       A.   Yes.

15       Q.   He knows what date the hearing is?

16       A.   Yes.   He says -- he gives the April 28th date several

17   times.

18       Q.   And that there was going to be a hearing?

19       A.   Yes.

20       Q.   He also repeats that the prosecution had asked for all of

21   the records from the psychiatrist, the mental hospital and the jail

22   so that the doctors could be cross-examined?

23       A.   Yes.

24       Q.   And those were the -- those were what -- that's what he

25   thought the process would be?

1      A.    Yes.

2      Q.    Were you present on the court date in which records were

3  requested by the prosecution?

4      A.    Yes.

5      Q.    And is that an accurate reflection for Mr. Dear as to

6  what happened in court?

7      A.    Yes.

8      Q.    He also -- Mr. Dear tells you that the defense will keep

9  sending him psychiatrists?

10     A.    Yes.

11     Q.    And that the most recent one he felt was working with

12  King?

13     A.    Yes.

14     Q.    And that the other attorneys just want to put him in the

15  nuthouse?

16     A.    Correct.

17     Q.    And he felt that his attorneys -- that what was happening

18  was crooked and every one of them you can't believe anything they

19  say?

20     A.    Correct.

21     Q.    And in the context of that, that was talking about his

22  attorneys?

23     A.    Yes.

24     Q.    He doesn't accuse them of working with the feds?

25     A.    No.

```
 1      Q.   Just not doing what he wants?

 2      A.   Correct.

 3      Q.   He was also concerned about his attorney lying to him?

 4      A.   Yes.

 5      Q.   And that's his word?

 6      A.   Yes.

 7      Q.   That his attorney would not reveal what happened in court

 8  with the evaluation?

 9      A.   That his attorney did not talk about in court what had

10  happened, yes.

11      Q.   Okay.

12           MS. BILLEK:  If I can have just a moment, Your Honor?

13           THE COURT:  Yes.

14           (Short pause.)

15      Q.   Now, on some of his other phone calls -- I think it's the

16  phone call after the March 25th one.  I think there's a phone call

17  on March 29th with Jacob Rogers from the Gazette?

18      A.   Yes.

19      Q.   And, again, do you recognize that it's Mr. Dear who's

20  making the phone call?

21      A.   Correct.

22      Q.   And during that phone call, he tells Jacob Rogers that:

23  "If my attorneys follow what my rules are, everything will be

24  fine"?

25      A.   Yes.
```

1      Q.    And that he would be willing to work with them?

2      A.    Correct.

3      Q.    And in the March 27th phone call with Amanda Robb is

4   where he says he's not going to plead innocent by insanity, and

5   that's how he uses the term?

6      A.    Yes.

7      Q.    Because it diminishes his cause and it was important for

8   him to save the babies?

9      A.    Correct.

10     Q.    In many of the phone calls to the media, does he describe

11  his desire in contacting them was to let everybody know that he is

12  competent?

13     A.    Yes.  He talks about wanting people to hear his voice,

14  asked them, "Do I sound incompetent?"  He talks about he's college

15  educated and he's not incompetent.

16     Q.    During the phone calls with Amanda Robb, he specifically

17  referenced that he knew one day was Easter?

18     A.    Yes.

19     Q.    During the phone calls, appears to be able to track with

20  days and times?

21     A.    Yes.

22     Q.    Even with the phone call as to where he is, if you will,

23  debating with Ms. Robb about her being Jewish and he wants to talk

24  about her being a Christian, he still says, "Well, we can still be

25  friends"?

1     A.   Yes.

2     Q.   And he continued further conversations with her?

3     A.   Correct.

4     Q.   Those further conversations do not go back to talking

5  about whether or not she should convert to Christianity?

6     A.   No, not yet.

7     Q.   As a matter of fact, Mr. Dear mentions that his attorneys

8  are mad that she is talking -- or that he is talking to her?

9     A.   Yes.

10     Q.   And they actually bring in an article that she wrote a

11  number of years ago?

12     A.   Yes.

13     Q.   Primarily involving her uncle's trial?

14     A.   Her uncle was the victim, yes.

15     Q.   Right.  He was also an abortion provider?

16     A.   Correct.

17     Q.   And he said that he's read that article and he

18  understands what's in that article?

19     A.   Yes.

20     Q.   That he appreciates her point of view but differs with

21  it?

22     A.   Correct.

23     Q.   He does mention in the jail phone call that he forgives

24  Stephanie?

25     A.   I don't remember a phone call.  I know that he had sent a

1    letter to his mother that he said he forgives Stephanie.  I don't

2    specifically remember any phone call, but I know he sends a letter

3    to his mom saying he does.

4         Q.   And with regard to the discussion about him mentioning

5    the judge -- and, again, I mean no disrespect to the Court --

6    taking the case out of the rotation?

7         A.   Yes.

8         Q.   And he -- Mr. Dear says it's because somebody higher than

9    the judge is telling him what to do?

10        A.   Yes.

11        Q.   He doesn't say that it's God telling the judge what to

12   do?

13        A.   No.

14        Q.   He doesn't say that it's the feds telling the judge what

15   to do?

16        A.   No.

17        Q.   And are you aware of the nature of that communication in

18   the courtroom when it happened, what the Court's reasoning was as

19   to why he had the case?

20        A.   Generally aware, yes.  I was not there for that court

21   hearing, but I am generally aware of that process.

22        Q.   And are you aware that it was the state court

23   administrator who recommended to the Court?

24        A.   Yes, since he is the chief judge.

25        Q.   During the phone call he mentions a number of times where

1    he is concerned about being sent to the mental health and people

2    forgetting about him?

3        A.   Yes.

4        Q.   And that's not what he wants to have happen?

5        A.   Yes, that they will silence him forever.

6        Q.   So during -- when you were asked about whether or not --

7    or Ms. Roy mentioned, "Well, the feds were following him all day on

8    the 27th," there are points in the defendant's timeline that the

9    feds are not around?

10       A.   Correct.

11       Q.   Okay.  So they wouldn't have been following him all day,

12   and Mr. Dear did not say that?

13       A.   No.

14       Q.   When he speaks on these jail phone calls, does he appear

15   to be fluent in his language?

16       A.   Oh, absolutely.  He's very articulate.

17       Q.   Uses, at times, large words?

18       A.   Yes.

19       Q.   That he is able to converse in a manner with the other

20   person on the telephone?

21       A.   Yes.

22       Q.   That he's not just off having his own conversation and

23   not connecting with the person he's talking to?

24       A.   No.  He's on task.

25       Q.   He actually has mentioned that he wants to plead guilty?

```
 1       A.   The early conversations, yes.

 2       Q.   Okay.

 3            THE DEFENDANT:  Until you put a hundred and 79 charges.

 4   You went overboard.

 5       Q.   He's also concerned about the doctors that he's been

 6   meeting with?

 7       A.   Yes.  He's concerned about psychiatry in general.

 8       Q.   And that's when you said he's made the phrase of

 9   "psychiatry is quackery"?

10       A.   Correct.

11       Q.   And he actually repeats that to a couple different people

12   at a couple different times?

13       A.   Yes.

14       Q.   Okay.  Is he able to give any distinct definition or

15   anything of a honeypot?

16       A.   He has talked about that being women that were sent to

17   get information from him.

18       Q.   But nothing -- no names, no details about them?

19       A.   He's talked about the female involved in the sexual

20   assault charge being a honeypot.  I believe that's the only

21   specific name -- named person he came up with, other than saying

22   that he thought Stephanie was working for the feds, but he never

23   actually refers to her as a honeypot.

24       Q.   On a March 16th phone call to Emily at -- I believe it's

25   KRDO; it might be KKTV, but Emily who's one of the media people?
```

 1       A.   Emily Allen.

 2       Q.   He's concerned that he's gonna be found incompetent and

 3  that justice will not be served?

 4       A.   Correct.

 5       Q.   He feels like the whole system is rigged against him

 6  right now?

 7       A.   Yes.

 8       Q.   And earlier on March 14th to -- I believe it's Cody

 9  Fisher --

10       A.   Okay.

11       Q.   -- he actually is concerned that "justice delayed is

12  justice denied."  And that's a quote that he uses?

13       A.   Those are his exact words, yes.

14       Q.   And that that's what he feels like this process is gonna

15  be?

16       A.   Yes.

17       Q.   He's also able to talk about current events; would you

18  agree?

19       A.   Yes.

20       Q.   And he's actually talked about the Oregon standoff?

21       A.   Yes.

22       Q.   You were asked about the maintenance person in the jail?

23       A.   Yes.

24       Q.   Other than the maintenance person who was there fixing

25  the showers, does he make any other either offhand comments or

 1    raise any other concerns during his jail phone calls that anybody

 2    working at the jail is out to get him or working with the feds?

 3         A.    Not that I can recall, no.

 4         Q.    Are you aware of whether or not he's been able to control

 5    his behavior in the jail?

 6         A.    There's been no reported issues.

 7         Q.    During your -- your interview with him, he would stay on

 8    task when he wanted to talk about things; would you agree?

 9         A.    Can you rephrase -- repeat that again.  I'm sorry.

10         Q.    During your interview with him, when you wanted to talk

11    to him about some things, he would stay on task and talk to you

12    about those?

13         A.    Somewhat.  He would then drift off a little bit and say

14    he wanted to tell me a story, but I could keep him on task.  As he

15    calmed down a little bit, I did a much -- I was much more

16    successful keeping him on task.

17         Q.    And you would agree that over the years you've done a

18    number of interviews?

19         A.    Yes.

20         Q.    And people can always start off a little excited and you

21    have that kind of "I need to get this out and tell you this," and

22    then they calm down and it's much more controlled, if you will?

23         A.    Absolutely.  And I -- initially I wasn't trying to stop

24    him too much.  I want him to feel comfortable talking to me.  So I

25    let him go down a lot of those paths.  I redirected him at times,

```
 1   but if he's talking, that's my goal.  So I let him go -- talk about

 2   a lot of those things.

 3        Q.   He was able to follow any directions you gave him?

 4        A.   Yes.

 5             MS. BILLEK:  If I can have just a moment, Your Honor?

 6             THE COURT:  Yes.

 7             (Short pause.)

 8        Q.   Detective, we talked a little bit about your -- your

 9   contact with reviewing the defendant's jail phone calls.  And we've

10   talked about him making a statement that "justice delayed is

11   justice denied."

12        A.   Yes.

13        Q.   Did he also mention concerns that that delay would also

14   affect the families?

15        A.   Yes.

16        Q.   And that he was concerned about that?

17        A.   Yes.

18        Q.   We talked a little bit about some of the very specific

19   things that Mr. Dear did that day.

20        A.   Yes.

21        Q.   And he talks about when he leaves the Woodland Park

22   hospital?

23        A.   Yes.

24        Q.   He thinks that he might be followed?

25        A.   Yes.
```

1     Q.    Were you able to determine any incidents that happened at

2   that time frame that would match that?  Were there any road rage

3   incidents on the highway or anything like that?

4     A.    No.  He had -- he had talked about running somebody off

5   the road.  I followed up with state patrol, with Park County

6   Sheriff's Office, with Teller County Sheriff's Office, with all the

7   agencies in that area if they had any reports of road rage,

8   reckless driving or anything similar to that, and there were no

9   reports of that.

10     Q.    So in his interview was Mr. Dear able to tell you where

11   he went after he left the Woodland Park hospital?

12     A.    Yes.

13     Q.    Where did he go?

14     A.    Walmart in Woodland Park.

15     Q.    Were you able to confirm that?

16     A.    Yes.

17     Q.    Did you -- is that on surveillance?

18     A.    It is.

19     Q.    Is there anything odd about his behavior on that

20   surveillance?

21     A.    No.

22     Q.    Where did he go after that?

23     A.    He goes to a Safeway gas station.

24     Q.    What does he do at the Safeway gas station?

25     A.    Purchase phone cards.

1     Q.    Did anyone indicate that there was any odd behavior of

2   him there?

3     A.    No.

4     Q.    Where did he go after that?

5     A.    He then drove to Colorado Springs and stopped at Rudy's

6   on West Col -- or Highway 24.

7     Q.    And what did he do there?

8           THE DEFENDANT:  Drug store.

9     A.    He went and purchased a soda or a beverage of some sort.

10  It's in a bottle.  I can't tell specifically what the beverage was.

11  He then goes to the counter.  He interacts with an employee.  He's

12  given a phone book.  He opens the phone book, one of the first few

13  pages in the book, closes it and sets it back down on the counter

14  and walks out.

15    Q.    Any indication of odd behavior during that?

16    A.    No.

17    Q.    Where did he go after that?

18    A.    At that point in time is when he drives by the sheriff's

19  office building.

20    Q.    And we've talked about that.

21    A.    Yes.

22    Q.    He actually drives by it twice?

23    A.    He comes -- yes.  He comes west on Vermijo, makes a

24  U-turn at Cascade, and then drives back east again past the

25  building.

1     Q.    Where does he go after that?

2     A.    The next, Lowe's on North Nevada.

3     Q.    During that time frame that he was in front of the

4  sheriff's office, did there appear to be any erratic driving or odd

5  behavior that would cause concern?

6     A.    No.  He slowed down significantly, virtually to a stop

7  right in front of the sheriff's office building, but that's it.

8     Q.    Where does he go after the sheriff's office?  I'm sorry.

9     A.    Lowe's on North Nevada.

10    Q.    What does he do at Lowe's on North Nevada?

11    A.    Goes and asks for a phone book.

12    Q.    Okay.  Is that also on surveillance?

13    A.    Yes.

14    Q.    Do you see that exchange on surveillance?

15    A.    Yes.

16    Q.    Is there any odd behavior there?

17    A.    No.

18    Q.    Any odd statements reported by any of the employees who

19  had contact with him?

20    A.    No.

21    Q.    Where did he go next?

22    A.    The next is a motel that we're still unable to confirm

23  which one it is.  We don't have any video surveillance on it.

24  It's, based on his description of it, likely the Academy Motel on

25  North Academy and I-25 there on the west side of Academy.  It's

 1   likely the motel he's describing, but we haven't been able to

 2   confirm anything from there.

 3        Q.   What's next?

 4        A.   The Howard Johnson on Voyager.

 5        Q.   And that is just up the street from the Academy Hotel

 6   you've talked about?

 7        A.   Correct.  Right there by Rudy's Barbecue and Cracker

 8   Barrel and all that.

 9        Q.   You got surveillance from there.  Did you talk to the

10   employees?

11        A.   We -- there was surveillance; however, in the employees'

12   attempts to download that, instead of downloading it, they deleted

13   it.  We do have their state -- we do have -- Detective Hengst and

14   Detective Somersalmi have went and viewed the video and saw Robert

15   Dear on the video using the telephone within the building.

16        Q.   But no reports of odd behavior or anything that would

17   cause concern?

18        A.   Nope.  Used the telephone call -- telephone, made a phone

19   call and then left.

20        Q.   Do you know where he called to?

21        A.   Yes.

22        Q.   Where did he call to?

23        A.   Planned Parenthood in Salida.

24        Q.   Do you know how he got Salida?

25        A.   Not exactly.  He says he called the number at one of the

1    stops, the mo -- I believe it's the motel that we're not for sure

2    which one it is.  He had torn a page out of the phone book.  We had

3    found that page in his Toyota truck.  He called the number.  And he

4    believed he'd put -- the number he had called was the Salida

5    office.  We did drive to the Salida Planned Parenthood office and

6    there is on their caller ID a call that's corresponding with the

7    time that he was on video initially at the Howard Johnson that

8    corresponds -- or those times match, and their caller ID says

9    there's a call from the Howard Johnson here that that call was

10   made.

11        Q.   The call made to the Salida office for Planned

12   Parenthood, any reports of kind of an odd phone call happening?

13        A.   The only -- the only thing was was the employee at the

14   Salida Planned Parenthood was adamant that the person that called

15   was a female with a raspy voice.

16        Q.   But could understand what the caller was asking for?

17        A.   Yes.

18        Q.   No concerns about language or threats being made or

19   anything of that nature?

20        A.   Nope.  Said -- thought that that was a female saying he

21   needed to find the Planned Parenthood in Colorado Springs for their

22   daughter.  And when she gave the address, the phone call -- he hung

23   up the phone -- or the person hung up the phone before she could

24   even provide the telephone number.

25        Q.   And what was the next step?

 1      A.   There was another women's clinic/SDT office north on

 2  Centennial a few blocks that he actually interacted with a U.S.

 3  Postal Service employee asking if this was the Planned Parenthood

 4  building.  The employee said no and pointed to where it was.

 5      Q.   Any concerns by the postal service worker about the

 6  person that asked for these directions?

 7      A.   No.

 8      Q.   No odd behavior, no threats being made, nothing of that

 9  nature?

10      A.   No.

11      Q.   No claims of the feds being after him?

12      A.   No.

13      Q.   Throughout any of that?

14      A.   No.

15           MS. BILLEK:  I don't believe I have any further questions

16  at this time for Detective Schiffelbein, Your Honor.

17           THE COURT:  All right.  Redirect.

18                          REDIRECT EXAMINATION

19  BY MS. ROY:

20      Q.   You were asked some questions about Mr. Dear's demeanor

21  in the video or during the interview?

22      A.   Yes.

23      Q.   Fair to say he was listening to you; he was polite to

24  you?

25      A.   Absolutely.

1      Q.   He wasn't hostile; he wasn't making any threats or

2  anything like that?

3      A.   Correct.

4      Q.   Okay.  You haven't heard of any kind of behavior, since

5  Mr. Dear has been in custody, that would be considered violent or

6  aggressive?

7      A.   No.

8      Q.   And I understand you haven't necessarily reviewed all of

9  the jail records, but certainly you haven't been told that he's

10  acted out in any way at all?

11      A.   No.  They -- a lot of the early interactions at CJC

12  were -- reports were done by their staff, and there's no -- in

13  those reports nothing indicating anything like that.

14      Q.   Any kind of -- nothing suggesting that he's a security

15  risk or that his behavior has gotten him put in the hole or in

16  trouble or anything like that?

17      A.   No.

18      Q.   With regard to the interview, you said you actually kind

19  of had to redirect him quite a few times but that he was able to

20  talk to you?

21      A.   Yes.

22      Q.   Did he also do some odd things during the interview?

23      A.   Well, if you're referring to urinating in the bottle,

24  yes, that was a couple times.

25      Q.   I would consider that odd.  Would you consider that odd?

1          MS. BILLEK:  Objection, Your Honor.  Her opinion is not

2     necessary for this hearing.

3          THE COURT:  Do you want to rephrase the question, please.

4     BY MS. ROY:

5     Q.    When you say he urinated in the bottle, tell us about

6     that.

7     A.    There was a couple times.  The first time he did it, he

8     had indicated he had to use the bathroom.  He had potential -- at

9     that point in time I thought he still had blood on his hands.  We

10    hadn't gotten that washed off yet.  I was concerned about some

11    evidentiary issues there.  So I didn't want him to go to the

12    bathroom and wash his hands until I had a chance to swab that.

13         So after I collect -- as I'm trying to get that set up,

14    again, I'm in -- not in my building, so trying to get those items

15    needed, he stood up -- and we had given him a bottle of water

16    initially -- and he urinated in that bottle.

17    Q.    And at that point you then were out of the room?

18    A.    Yes.

19    Q.    And he had asked to use the restroom, and you sort of

20    told him to wait?

21    A.    Yes.

22    Q.    Okay.  But he didn't wait?

23    A.    Correct.

24    Q.    Okay.  Did that happen more than once?

25    A.    Yes.  There were, I think, two more times in which I was

1    actually physically in the room when he used the restroom.

2         Q.   Okay.  Tell us about that.

3         A.   He stood up, turned his back to the -- to me and

4    Detective Mackey, turned his back away from the camera and went to

5    the bathroom.

6         Q.   In the bottle?

7         A.   Yes.

8         Q.   Okay.  A different bottle?

9         A.   I believe so, yes.  I think there was three total

10   bottles.

11        Q.   And you said turned his back to the camera.  Had you told

12   Mr. Dear where the camera was?

13        A.   No, but it's fairly obvious.  When you walk in the room,

14   it's right out in the open mounted up on the wall --

15        Q.   Okay.

16        A.   -- near the ceiling.

17        Q.   All right.  So that's the second time.  Tell us about the

18   next time.

19        A.   The second and third time I don't really differentiate

20   much.  They're basically the same thing.  He had stood up and

21   turned around and used the -- used the bottle to go to the

22   bathroom.

23        Q.   Okay.  And how about did he -- was there also a time when

24   he went in the trash can right in the center of the room?

25        A.   There was a time during the significant delay when we

1  were -- when I was preparing arrest warrant type of things and

2  getting those reviewed, there was, like I said, probably an hour

3  and a half to two hours that he was in that room by himself that he

4  did -- I don't think we had any bottles left in there.  He had used

5  the trash can.

6       Q.   Okay.  Had -- I assume that during that time, you had

7  made it clear that there's a restroom in the sheriff's office?

8       A.   Yeah.  I had told him just to -- I told him I didn't want

9  him to have to go to the bathroom in a bottle, just knock on the

10  door.  We had a couple officers right outside the room.  We would

11  get him to the bathroom.

12       Q.   So you offered to take him?

13       A.   Yes.

14       Q.   And even when you were sitting right there, he just stood

15  up and did it anyway?

16       A.   Correct.

17       Q.   You were asked a couple of questions about some of the

18  online research that you did.

19       A.   Yes.

20       Q.   And you said that you sort of went online and you looked

21  at different websites that you thought that Mr. Dear had accessed?

22       A.   Some -- yes and no.  There was the video that he had sent

23  a link to to -- I believe it was his oldest son, which is a YouTube

24  video that was posted by a gentleman named PPSIMMONS.  I think it's

25  Peter Simmons.  I viewed that one more than once.  And then based

1   on some of that information, some of the other statements that Mr.

2   Dear had given to me, then it was just some basic Google research,

3   YouTube searches, that type of stuff.

4       Q.   Okay.  And you said there's specific -- there's a site

5   that you accessed that you knew that he had accessed and there were

6   a lot of hits on that site?

7       A.   Well, there was the specific YouTube video that he talks

8   about where he learned about Luke 10:18 and the initial information

9   about President Obama.  That one -- that video itself has nearly 2

10  million YouTube views.

11      Q.   And of course, you don't know who's -- who's viewing it,

12  what kind of people are viewing it?

13      A.   Other than myself and him, no.

14      Q.   Okay.  You don't know if most of the people who are

15  viewing it are competent or not?

16      A.   Correct.

17           MS. BILLEK:  Objection to the form of the question, Your

18  Honor.

19           THE COURT:  Objection's overruled.

20  BY MS. ROY:

21      Q.   You -- this is consistent, though, with what Mr. Dear

22  told you in his statement, that it was a couple years ago that he

23  learned about Luke 10:18?

24      A.   I don't remember paying attention to when the YouTube was

25  posted, but I know when he told me he had learned about Luke 10:18,

1   that couple years ago corresponds with when he had sent the email

2   link to -- like I said, I believe it was his oldest son.

3       Q.   To his son.

4       A.   Yes.

5       Q.   So that sort of corroborated what he had told you about

6   when he learned of Luke 10:18?

7       A.   Yes.

8       Q.   And so a couple years ago.  You said it's sometime in

9   2014?

10      A.   Yes.

11      Q.   And Mr. Dear also described to you that after he went to

12   that -- viewed that YouTube, that the feds sort of stepped up that

13   surveillance on him?

14      A.   Not after he viewed it.  He talked about after he began

15   spreading the word --

16      Q.   Okay.

17      A.   -- of Luke 10:18 and telling people about it is when the

18   feds' stuff picked up.

19      Q.   Okay.  So he describes to you, many years prior to that,

20   examples of the feds, you know, sort of being on to him and

21   following him and doing the sneak-and-peek and things like that?

22      A.   Yes.

23      Q.   But that it stepped up once he starts spreading the word

24   of Luke 10:18?

25      A.   Correct.

1    Q.   And so that's been in the last couple of years that it's

2   really ramped up?

3    A.   Yes.

4    Q.   And you are aware that he had moved to Colorado during

5   that two-year period?

6    A.   Yes.  I believe he moved here October 2014.

7    Q.   Okay.  And during your investigation or during the

8   questioning of Mr. Dear, did you learn certain circumstances and

9   how he moved to Colorado?

10    A.   He had left -- at that point in time he lived out near

11   Asheville, North Carolina, Black Mountains, North Carolina, and

12   then there was another -- another residence that has another city,

13   but it's all in the same -- same area, same general area that he

14   drove out here from North Carolina, bought the place in Park

15   County.

16    Q.   Were you aware whether there was a planned move and

17   everyone was notified or whether he just sort of up and moved in

18   the middle of the night?

19    A.   Some of the family members knew, but a lot of his family

20   members -- Stephanie -- Stephanie's family members were not aware.

21   It was a -- just a last-minute thing.

22    Q.   Okay.  And so -- and you're aware that Stephanie came

23   with him from...

24    A.   Correct.  Stephanie Bragg and Mr. Dear moved out here

25   together.

1     Q.   They both came out here together.  Do you recall about

2  what time frame that was?

3     A.   I believe it was October 2014.

4     Q.   Okay.  And so it's after he learns about Luke 10:18 and

5  starts spreading the word that he up and moves to Colorado?

6     A.   I can't say that.  I don't know for certain.  Like I

7  said, I didn't pay -- I don't know exactly off the top of my head

8  when he sent that YouTube link to his son, but I know it was

9  October 2014 they moved out here.  I don't know.  I'd be guessing

10  if it was before or after.

11     Q.   Okay.  When Mr. Dear talked to you about what happened on

12  November 27th, he was describing the events in the hospital; is

13  that right?  That's where he started his day?

14     A.   Yes.

15     Q.   And then he described sort -- sort of this disappearing

16  out of there because of this janitor, the fake janitor with the

17  mop?

18     A.   There's a couple -- there's a couple days' events that we

19  talked about.  I believe the janitor was the night before.  I know

20  that the day of November 27th there was some interaction with an

21  employee, that they had tried to get him to look out the window to

22  look at something, and he thought that they were going to attack

23  him from behind at that point in time, which is when he realized

24  that it was all basically coming to an end.  He had seen --

25  believed he had seen feds out the window at the hospital and that

1    they were messing with his woman.

2         Q.    Okay.  And at that point in time he left and described

3    that he tried to call Stephanie at the hospital sometime after he

4    left?

5         A.    He said he had tried to call, but he couldn't get

6    through.

7         Q.    Okay.  And he tried to call her from a pay phone

8    somewhere?

9         A.    Yes.

10        Q.    Okay.  He told you that he wasn't able to call her

11   because they had blocked it?

12        A.    Yes.

13        Q.    Okay.  Do you know who he meant by "they had blocked it"?

14        A.    The feds.

15        Q.    And that he realized sort of this is the end?

16        A.    Yes.

17        Q.    This is all coming together at the same time?

18        A.    Yes.

19        Q.    Okay.  And in his conversation with the family member,

20   the telephone conversation, do you remember him describing to her

21   when he's talking about Stephanie and that he now realizes that

22   she's involved in this?  Do you remember?

23        A.    I mean, I remember the basics of that conversation --

24        Q.    Okay.  And at that point--

25        A.    -- that specific part.

1     Q.   And at that point he's actually saying that he believes

2  she wasn't even sick and that they had put a fake injury on her?

3     A.   Yes.

4     Q.   To get her into the hospital?

5     A.   Correct.

6     Q.   So he doesn't -- he doesn't even believe that she was

7  really sick, that, in fact, that was all a setup?

8     A.   Yes.

9     Q.   When he -- and then he does tell you -- and maybe he

10  doesn't specify kind of that day, but he describes that they then

11  picked up the following of him and there were more than ever --

12  more feds than ever following him?

13     A.   Yes.  As he left the hospital, yes.

14     Q.   Okay.  And so he leaves the hospital.  And you describe

15  he's sort of driving over these sort of random locations?

16     A.   Correct.  He went to -- again, he went to the Walmart,

17  the Safeway.  He did go to a Walgreens in Woodland Park before he

18  came to Colorado Springs.

19     Q.   Okay.  And he didn't -- you said you've done some

20  checking.  Did you check to see if the FBI was following him to any

21  of those locations?

22     A.   We've had interaction with the FBI; and there's nobody

23  that was following him to -- to their knowledge.

24     Q.   Okay.  At any point in time?

25     A.   Correct.

1     Q.   On November 27th of last year or any other date?

2     A.   Correct.

3     Q.   You -- I asked you a couple questions about how Mr. Dear,

4  after the fact, has made -- now believes that people -- some people

5  are part of the conspiracy against him; for instance, Stephanie.

6     A.   Yes.

7     Q.   Are you aware that Mr. Dear now believes that you are

8  part of the conspiracy?

9     A.   No.

10     THE DEFENDANT:  I never said that.

11     Q.   You -- well, let me ask you about Mr. Dear's comments

12  about his attorneys.

13     A.   Okay.

14     Q.   Okay.  So it sounds like most of what you're aware of is

15  coming from the telephone calls?

16     A.   Yes.

17     Q.   And in listening to the telephone calls -- and I think we

18  talked a little bit -- or you were referring to the one call with

19  Amanda Robb from March 25th.  Do you recall talking about that

20  phone call earlier?

21     A.   Okay.

22     Q.   And that phone call -- that's the call where Mr. Dear is

23  talking about his attorneys and that he did not want to cooperate

24  with them; do you recall that?

25     A.   Yes.

1      Q.   Do you recall that he told Ms. Robb that he didn't want

2   to cooperate with any of the experts that his attorneys sent in?

3      A.   Yes.

4      Q.   And that he believed his attorneys were lying to him?

5      A.   Yes.

6      Q.   Based on reading the newspaper?

7      A.   Yes.

8      Q.   And that also ties in a bit to his position about the

9   judge; is that right?  Something he read in the newspaper clued him

10   in that Judge Martinez was being controlled; is that fair to say?

11      A.   That was trying to silence him.

12      Q.   Right.

13      A.   I don't think he ever used the word "controlled."

14      Q.   Okay.  So fair to say that Mr. Dear sort of sees all the

15   parties as being out against him?

16           MS. BILLEK:  Your Honor, I would object to the "all the

17   parties statement."  I don't think the foundation's been laid for

18   that.

19           THE COURT:  Be more specific, please.

20           MS. ROY:  Sure.

21      Q.   Mr. Dear has talked about his attorneys not being

22   helpful?

23      A.   Yes.  Don't want to do what he wants them to do.

24      Q.   Not wanting to cooperate with them?

25      A.   Correct.

```
 1      Q.   Okay.  And he's talked about the judge?

 2      A.   Yes.

 3      Q.   And so he has expressed that he believes that they're

 4   against him, that his attorneys and the judge are against him?

 5      A.   Yes.

 6      Q.   Not trying to help him?

 7      A.   Not trying to -- trying to silence his message, yes.

 8      Q.   Not trying to help get the word out, would you say?

 9      A.   Yes.

10      Q.   Okay.  When you spoke to Mr. Dear, would you agree that

11   he was eager to provide you information?

12           MS. BILLEK:  Objection, Your Honor; asked and answered.

13           THE COURT:  I believe it has.  Objection sustained.

14           MS. ROY:  Okay.

15      Q.   You've observed Mr. Dear in court?

16      A.   Yes.

17      Q.   Even today?

18      A.   Yes.

19      Q.   That he's shouting out things?

20      A.   I wouldn't say shouting, but he's --

21      Q.   Well --

22      A.   -- saying things, yes.

23      Q.   -- he's not whispering it at the table to his attorneys,

24   is he?

25      A.   No.  When I think shouting, I think of my five-year-old.
```

1      Q.   Okay.

2      A.   He's not shouting like that.

3      Q.   Okay.  He's not necessarily following what you would know

4  to be proper courtroom demeanor?

5      A.   Correct.

6           THE DEFENDANT:  Trying to get the record straight, yes.

7      Q.   Do you recall him talking in one of the phone calls about

8  the fact that he won't give his attorneys any information about

9  where he grew up or where he went to school?

10     A.   Yes.  Amanda Robb had asked him some of that.  He said

11  she was asking the same questions that his attorneys were.  And he

12  wasn't gonna give it to her just like he wasn't gonna give it to

13  them.

14     Q.   And he did not like to sign things?

15     A.   Correct.

16     Q.   And he believes that he's competent?

17     A.   Yes.

18     Q.   And he believes that he's competent because he's gone to

19  college?

20     A.   He mentions that he's college educated.

21     Q.   Okay.  And that he's smart?

22     A.   Yes.

23     Q.   He seems to have the opinion that competency and

24  intelligence are connected; fair to say?

25     A.   That was a little harder for me.  I know he's talked

1    about he's competent, he's college educated.  I would say that

2    there's probably some truth to that.  I don't know -- without

3    jumping in his head, I don't know exactly if that's the only thing

4    he's linking.  I don't know.  I know that based on some of the

5    statements he's made in conversations, that that is part of it at

6    least, yes.

7        Q.   Okay.  And you know that he's been saying that in phone

8    calls and to other people that "I'm competent, I'm smart, I went to

9    college"?

10       A.   Yes.  He tells that -- he told to me, too, in my

11   interview with him when I went down the route if he had any medical

12   issues.  I asked about mental health issues, that type of stuff.

13   He tells me the same thing.

14            MS. ROY:  Thank you.

15            MS. BILLEK:  I have just a couple follow-up questions --

16            THE COURT:  Yes.

17            MS. BILLEK:  -- if the Court will allow me.

18                          RECROSS-EXAMINATION

19   BY MS. BILLEK:

20       Q.   Detective, with regard to Mr. Dear urinating in the

21   bottle --

22       A.   Yes.

23       Q.   -- he had presence of mind to turn away from you?

24       A.   Yes.

25       Q.   Even when you were in the room?

 1      A.   Correct.

 2      Q.   Didn't miss the bottle or the trash can?

 3      A.   Correct.

 4      Q.   Didn't just leave the bottle laying there?  He actually

 5 tucked it by a table closer to the wall near him?

 6      A.   Yes.

 7      Q.   You're aware that his RV has no electric or running

 8 water?

 9      A.   Yes.

10      Q.   And that similar methods are used for waste elimination

11 at his home?

12      A.   Yes.

13      Q.   So it would be consistent with the way he lived?

14      A.   Yes.

15      Q.   The times that you have been in court and he has spoken

16 out, isn't that -- is that in direct relation to something that he

17 disagrees with going on in court?

18      A.   Absolutely.

19      Q.   And does it respond to other --

20           MS. ROY:  Objection; speculation.  He has no way to know.

21           THE COURT:  Any response to the objection?

22           MS. BILLEK:  I'll rephrase the question.

23           THE COURT:  All right.

24 BY MS. BILLEK:

25      Q.   Detective, as you view it, are the responses that Mr.

 1   Dear makes in direct relation to what is currently happening in the

 2   courtroom when he makes, if you will, a statement?

 3        A.   Absolutely.

 4        Q.   And when he makes a statement, it's usually in

 5   disagreement -- your opinion, would it be in disagreement with

 6   what's happening in the courtroom?

 7        A.   Yes.

 8        Q.   And he has been very clear in his jail phone calls that

 9   he does not trust his attorneys and that he does not believe that

10   they are working for his best interests?

11        A.   Correct.  He talks repeatedly about them wanting to mount

12   an insanity defense, and he wants no part of it.

13        Q.   He's actually mentioned that he doesn't believe that his

14   attorneys respect him?

15        A.   Correct.

16        Q.   And that's what he tells Amanda Robb?

17        A.   Yes.

18             MS. BILLEK:  I don't believe I have any further questions

19   for the detective, Your Honor.

20             THE COURT:  All right.  You may step down.

21             THE WITNESS:  Thank you, sir.

22             THE COURT:  Thank you.

23             Next witness, please.

24             MS. NELSON:  The defense calls Dr. Jackie Grimmett.

25             THE COURT:  All right.

 1            (Short pause.)

 2            THE COURT:  Would you raise your right hand, please.

 3                        DR. JACKIE GRIMMETT,

 4  the witness herein, called at 11:33 a.m., was sworn by the Court,

 5  testified as follows:

 6            THE COURT:  Please be seated.

 7                        DIRECT EXAMINATION

 8  BY MS. NELSON:

 9     Q.   Good morning.

10     A.   Good morning.

11     Q.   Could you please state your name and spell your name for

12  the record.

13     A.   Jackie Grimmett, G-r-i-m-m-e-t-t.

14     Q.   Dr. Grimmett, what do you do for a living?

15     A.   I'm a forensic evaluator for the state hospital.

16     Q.   And did you, along with Dr. Kenneth Gray, conduct a

17  competency evaluation of the defendant in this case, Mr. Robert

18  Dear?

19     A.   I did.

20     Q.   I'd like to begin by talking with you a bit about your

21  qualifications and experience as a psychologist, and then we'll

22  talk briefly about your role in this case, about how you go about

23  preparing for and conducting competency evaluations, including the

24  one that you conducted with Mr. Dear.  And then, finally, we'll get

25  to your conclusions and findings about Mr. Dear's competency in

 1   that case.

 2        A.   All right.

 3        Q.   Does that sound okay?

 4        A.   That sounds okay.

 5        Q.   All right.

 6             MS. NELSON:  First, may I approach with what's been

 7   marked as Defendant's Exhibit CH-C?

 8             THE COURT:  Yes.

 9        Q.   Do you recognize that document, Dr. Grimmett?

10        A.   I do.

11        Q.   What is it?

12        A.   It is my resume.

13        Q.   Is it current?

14        A.   It is.

15        Q.   Is it a fair and accurate representation of your

16   education, honors and other professional accomplishments?

17        A.   Yes.

18             MS. NELSON:  Your Honor, at this time I'd move to admit

19   Exhibit CH-C.

20             MR. MAY:  If I might have a chance to look at it, Your

21   Honor.

22             THE COURT:  Sure.

23             MS. NELSON:  I apologize for that.

24             MR. MAY:  Thank you, Counsel.

25             No objection, Your Honor.

1          THE COURT:  All right.  The Court will admit C.

2          (Whereupon Defendant's Exhibit CH-C was received in

3   evidence.)

4   BY MS. NELSON:

5      Q.   Dr. Grimmett, I'd like to talk briefly about your

6   educational background as it relates to psychology.  What sort of

7   undergraduate degree do you have and where it is from?

8      A.   I have an undergraduate degree in psychology from the

9   University of Greenwich in London.

10     Q.   And you give us a summary --

11         THE COURT REPORTER:  I'm sorry, I can't understand you

12   through that mike.  It's echoing.

13         THE COURT:  Yes.  Scoot back a little bit.  Maybe --

14         THE COURT REPORTER:  Yeah.  And could you repeat your

15   answer.  I couldn't understand that.

16         THE WITNESS:  I have a bachelor's degree in psychology

17   from the University of Greenwich in London.

18   BY MS. NELSON:

19     Q.   Can you give us a summary of the different graduate

20   degrees that you hold.

21     A.   I hold a master's degree in psychology and health from

22   the University of Stirling in Scotland, a master's degree in

23   counseling from Rhode Island College, and a doctoral degree in

24   clinical psychology from the University of the Rockies.

25     Q.   And what is the doctoral degree that you hold from the

```
 1   University of the Rockies -- of the Rockies?  Is it a Ph.D.?  Is it

 2   a --

 3       A.   It's a Psy.D.  So a doctor of psychology rather than a

 4   doctor of philosophy.

 5       Q.   And what is the difference between a Psy.D and a Ph.D.?

 6       A.   A Psy.D is a more clinically focused degree.  It focuses

 7   on practice more than research.  A Ph.D. is more researched

 8   oriented.

 9       Q.   Are they both doctoral-level degrees?

10       A.   Yes.

11       Q.   What is a psychologist?

12       A.   A psychologist is somebody who studies human behavior.

13       Q.   And what is the difference between a psychologist and a

14   psychiatrist?

15       A.   A psychiatrist is a medical doctor that specializes in

16   medical health psychiatry.  A psychologist does assessments,

17   therapy, a variety of treatment services and evaluation services

18   but doesn't prescribe medications in Colorado.

19       Q.   As a psychologist are you qualified to diagnose people

20   with mental illnesses?

21       A.   Yes.

22       Q.   And remind us again, how are you presently employed?

23       A.   I'm a forensic evaluator for the state.

24       Q.   For the state.  And with respect to your employment with

25   the state, what do you spend most of your time doing?
```

1        A.    I exclusively complete competency evaluations.

2        Q.    Do you normally conduct competency evaluations by

3    yourself or do you usually work alongside someone?  How does that

4    work?

5        A.    It depends.  I do a lot of work by myself.  It's not

6    unusual to work with a colleague on a case.

7        Q.    And did you, in fact, work with a colleague on this case?

8        A.    Yes.

9        Q.    Who was that?

10       A.    Thomas Gray.

11       Q.    How many competency evaluations do you estimate that you

12   have conducted?

13       A.    Upwards of 500.

14       Q.    Are you a member of any professional organizations?

15       A.    I'm a member of the Colorado Psychological Association.

16   I'm a member of the American Psychological -- American Psychology

17   Law Society.  I am a member of the APA, Division 42, which is

18   psychologists in independent practice.  And I'm a member of the

19   EMDR International Association, which is a therapy technique that

20   I've been trained on.

21       Q.    And you mentioned that you are employed as a forensic

22   evaluator for the state.  What is forensic psychiatry?  Or, I'm

23   sorry, forensic psychology.

24       A.    Forensic psychology is the use of psychology to help

25   answer a legal question.

1      Q.   And so do competency evaluations fall under that umbrella

2   of forensic psychology?

3      A.   Yes.

4      Q.   Do you have any specific qualifications related to

5   forensic psychology?

6      A.   I've had much training.  I don't have any specific

7   qualifications.

8      Q.   Have you ever been qualified as an expert before in

9   court?

10      A.   Yes.

11      Q.   How many times?

12      A.   I believe about 10.

13      Q.   And are all -- have all of those times been in Colorado?

14      A.   Yes.

15           MS. NELSON:  Your Honor, at this time I'd move to qualify

16   Dr. Grimmett as an expert in forensic psychology pursuant to Rule

17   702.

18           MR. MAY:  Might I voir dire, Your Honor?

19           THE COURT:  Sure.

20           MR. MAY:  You don't have to move, Counsel, if you don't

21   want to.

22                         VOIR DIRE EXAMINATION

23   BY MR. MAY:

24      Q.   You've used the term "forensic evaluator"; is that

25   correct?

1      A.    Yes.

2      Q.    It's counsel that's used the term "forensic

3  psychologist"; is that correct?

4      A.    Well, they're interchangeable.

5      Q.    Okay.  Are you a forensic -- are you a licensed forensic

6  psychologist?

7      A.    There's no such thing as a licensed forensic

8  psychologist.

9      Q.    There is a way of being accredited, though, is there not?

10     A.    There's board certification to become a board certified

11 forensic psychologist.

12     Q.    Are you a board certified forensic psychologist?

13     A.    I am not.

14     Q.    Dr. Gray, who we may or may not see later, is; is that

15 correct?

16     A.    That's correct.

17     Q.    What is the difference between your status and his

18 status?

19     A.    He has more experience than I do.

20     Q.    Okay.  Is that all it takes to be accredited for that?

21     A.    Well, you have to be licensed for a certain amount of

22 time before you can sit for board certification.  He's been

23 licensed for longer than me.

24     Q.    And have you sat for board certification?

25     A.    I'm not eligible to sit for board certification yet.

1    Q.   Okay.  And so that -- can you use the title "forensic

2  psychologist" if you are not board -- if you have not sat for the

3  board?

4    A.   Yes.  It's not a protected term.  It reflects what I do

5  in my practice.

6    Q.   So why has the field of psychology gone to board

7  certification if it's not a protected term?

8    A.   The term "psychologist" is a protected term, but the

9  specialties that people pursue are not protected.  I can't

10  answer --

11    Q.   And why is it you've referred to yourself as a forensic

12  evaluator when initially introduced?

13    A.   Because I use the terms interchangeably.

14         MR. MAY:  I have no further questions, Your Honor.

15         THE COURT:  All right.  Any objection to the request to

16  have her qualified as expert?

17         MR. MAY:  I'd leave it to the discretion of the Court.

18         THE COURT:  All right.  The Court will qualify her as the

19  expert -- as an expert.

20                    DIRECT EXAMINATION (CONTINUED)

21  BY MS. NELSON:

22    Q.   Dr. Grimmett, let's talk briefly about how you became

23  involved in this case.  When did you first become involved in this

24  case?

25    A.   I believe it was sometime in January of this year.

1    Q.    And how did you become involved?

2    A.    I had been assigned the case by the hospital.

3    Q.    Just to be clear, were you hired by the defense in this

4    case?

5    A.    No.

6    Q.    And who has paid you for the work that you have done on

7    this case?

8    A.    I'm a salaried employee of the Colorado Department of

9    Human Services.

10    Q.    Before we start talking about your methodology for

11    conducting a competency examination, why don't we start by having

12    you please tell us, what is your understanding of the legal

13    standard of competency?

14    A.    The defendant needs to have sufficient present ability to

15    have a factual and rational understanding of the legal proceedings

16    against him and the ability to rationally consult and assist their

17    attorney in their defense.

18    Q.    Is there a component to the standard or the definition

19    for competency that involves a mental disability or a developmental

20    disability?

21    A.    Yes.

22    Q.    Can you explain how that relates to the issue of

23    competency.

24    A.    In order to be found incompetent, it has to be on the

25    basis of either a mental disability or developmental disability.

1      Q.   Where does that definition of competency come from, as

2  you understand it?

3      A.   From the statute.

4      Q.   Is that a Colorado statute?

5      A.   Yes.

6      Q.   So you -- you just said a moment ago that in order for a

7  defendant to be incompetent, that incompetency must be a result of

8  a mental or developmental disability --

9      A.   Correct.

10      Q.   -- is that right?  What is a mental disability?  How is

11  that defined?

12      A.   It's a significant disorder of mood, thoughts,

13  perceptions, cognition that impacts somebody's ability to function.

14      Q.   Would the term "mental disability" include, for example,

15  a serious mental illness?

16      A.   Yes.

17      Q.   What is a developmental disability?

18      A.   A developmental disability is a class of impairments that

19  would be diagnosed or present before the age of 22.  Usually

20  somebody who has some kind of intellectual deficit, if somebody has

21  a serious head injury when they're young and they don't develop

22  beyond what would be expected for an adult, that would be

23  considered a developmental disability.

24      Q.   So would it be fair to say that a threshold question you

25  have to answer, when conducting a competency examination, is

1   whether the defendant suffers from a qualifying mental or

2   developmental disability?

3        A.   Yes.

4        Q.   And so if the defendant does not have a qualifying mental

5   or developmental disability, then is the defendant, by definition,

6   competent?

7        A.   Technically, yes.

8        Q.   Then if the person does suffer -- if you conclude that

9   the person does suffer from a mental or developmental disability,

10  is that the point at which you go on to evaluate those functional

11  abilities that you mentioned earlier?

12       A.   Yes.

13       Q.   Okay.  And we'll get into more specifics about the

14  definition of those abilities a bit later, but would it be fair to

15  say that there are sort of two prongs to competency in terms of the

16  functional abilities?

17            MR. MAY:  Objection to the leading nature.

18            THE COURT:  The Court -- it is leading, but the Court

19  will allow it at this juncture.

20            THE WITNESS:  Yes.

21  BY MS. NELSON:

22       Q.   How would you characterize the first prong of competency?

23       A.   The way we structure our evaluations, the first prong is

24  a factual -- factual and rational understanding of the legal

25  proceedings, and the second prong relates to the ability to assist

 1   counsel.

 2            THE COURT:  I'm sorry, I couldn't understand the second

 3   prong.

 4            THE WITNESS:  The ability to assist counsel.

 5            THE COURT:  Okay.

 6   BY MS. NELSON:

 7       Q.   And with respect to the first prong, does a person have

 8   to have both a factual and rational understanding of the

 9   proceedings in order to satisfy that prong?

10       A.   Yes.

11       Q.   In order to be found competent under that prong?

12       A.   Yes.

13       Q.   And just so we're clear, when you're assessing for

14   competency, are you trying to determine what the person's mental

15   state was at the time of the offense or what the person's present

16   abilities are?

17       A.   It's a present state evaluation.

18       Q.   Now, let's talk a bit about methodology.  In general, how

19   do you prepare to conduct a competency evaluation?  What

20   information do you typically gather?

21       A.   We would reach out to both the prosecution and the

22   defense to get any information.  We review discovery that's

23   provided to us.  We review the NCIC for past criminal behavior, any

24   medical records that are made available.  That's kind of what you

25   do before you meet with the person.

1       And then when you meet with the person, you're looking at

2   where they're housed, what records there may be for where they're

3   being housed currently, any behavioral observations, the clinical

4   interview itself.

5       Q.   What records or material did you receive and review in

6   this case pertaining to Mr. Dear?

7       A.   We received the police reports.  We received audio and

8   video of Mr. Dear's interrogation.  We received video from the El

9   Paso County Criminal Justice Center, along with behavioral logs,

10  medical records from that facility, some phone calls that were made

11  from the facility, and Mr. Dear's mental health institute medical

12  records.

13      Q.   You said you received some videos from the El Paso County

14  detention facility.  Can you just describe what those videos are.

15      A.   I think they were transport videos.  Every time Mr. Dear

16  had his cell opened and he was going somewhere, he had to be

17  videoed, or if they were providing -- the staff was providing

18  meals.  There was just a video-recording of that.

19      Q.   And were those recordings taken from -- did they appear

20  to be taken, if you can tell, from, like, a surveillance camera

21  that's fixed or was it a handheld camera?

22      A.   No, a handheld.

23      Q.   And can you approximate how much time you spent reviewing

24  those materials prior -- prior to meeting with Mr. Dear?

25      A.   Well, I only reviewed the interrogation and the police

1    reports prior to meeting him the first time because the videos

2    weren't made available prior to then.  That took approximately 10

3    to 12 hours.  I honestly couldn't tell you how much time I spent

4    watching video because it spanned about six weeks, and it was a

5    long time.  The phone recordings were very extensive, but I'd

6    estimate certainly it's been more than 40 hours reviewing material.

7         Q.   And you mentioned reviewing the videotape of the

8    interrogation that was conducted with Mr. Dear.

9         A.   Um-hmm.

10        Q.   If what you're assessing for a competency is the

11   defendant's present ability to rationally assist counsel and to

12   have a rational factual understanding of the proceedings, then why

13   is it important to look at information from around the time of the

14   offense?

15        A.   It's important to identify any patterns of behavior,

16   consistency over time.

17        Q.   Did you talk to any members of Mr. Dear's family or his

18   significant other?

19        A.   No.

20        Q.   And why not?

21        A.   I don't believe it would have informed anything about his

22   competency that we didn't obtain from him and the records

23   available.

24        Q.   Do you normally do that?

25        A.   It depends on the case.

1     Q.   We talked a bit about background materials.  What about

2   the examination itself?  Does the competency evaluation always

3   include a face-to-face interview with the defendant?

4     A.   Ideally and usually, yes.

5     Q.   Why is that important?

6     A.   Because sometimes the defendant can present in different

7   ways to different people.  Somebody making notes may not be

8   qualified to necessarily be conveying things about mental illness

9   that can be misinterpreted.  I'd rather be relying on my own

10   judgment.

11     Q.   And when you conduct an interview as part of a competency

12   evaluation, do you go in with a list of specific questions you

13   intend to ask or how do you structure the interview?  How does that

14   work?

15     A.   We have an interview protocol that we work from that has

16   questions roughly outlined on there.

17     Q.   Are there any tests that you administer to determine

18   whether a person is competent?

19     A.   We do not use a formal forensic assessment instrument for

20   competency.  There are tests that exist.

21     Q.   And so if there are tests that exist, then why don't you

22   use them, as a general rule?

23     A.   The general standard of practice is that they're not used

24   more often than they are used.  They don't offer a conclusion on

25   competency, but, rather, there's a supplement in the interview that

1   you do.  Many of the questions that are asked in those tests are

2   actually included in our protocols.  So we cover the same ground.

3        Q.   Do you normally just conduct one interview of a defendant

4   or is it common to have multiple meetings?

5        A.   Normally it's sufficient to just have one meeting.

6        Q.   In Mr. Dear's case how many meetings did you have with

7   him?

8        A.   We had two.

9        Q.   Why?

10        A.   Our first meeting was interrupted by the hospital.

11             THE COURT:  I'm sorry, I missed that.

12             THE WITNESS:  The first meeting was interrupted.

13             THE COURT:  Okay.

14   BY MS. NELSON:

15        Q.   Do you know why it was interrupted?

16        A.   There was an unresolved legal issue.  And we were told to

17   discontinue the evaluation by hospital administration.

18        Q.   Do you remember the date of the first interview?

19        A.   It was the 20th of January.

20        Q.   And when you said -- you said subsequently interviewed

21   him a second time?

22        A.   Yes.

23        Q.   Do you remember the date of that second interview?

24        A.   The 3rd of February.

25        Q.   Does the fact that the first interview was interrupted --

1  well, let me ask you this:  How long was the first interview?

2       A.   I think we met with Mr. Dear for about an hour and a

3  half.

4       Q.   And how long was the second interview?

5       A.   A little under an hour.

6       Q.   Did the fact that the first interview was interrupted,

7  does that impact, in your opinion, the validity of your

8  examination?

9       A.   No.

10       Q.   Or the validity of your conclusions about competency?

11       A.   No.

12       Q.   And you said that you conducted this examination with Dr.

13  Gray.  How did you and Dr. Gray divide up this interview or what

14  was that arrangement in terms of how you -- what was the division

15  of labor?

16       A.   Dr. Gray and I have done several evaluations together.

17  And we -- we break the protocol in sections, and we alternate who's

18  doing what section potentially.  There's no particular reason for

19  it.

20       Q.   You stated that you spent approximately a total of two

21  and a half hours --

22       A.   Yes.

23       Q.   -- interviewing Mr. Dear?  Is there a set number of hours

24  you usually try to interview a person or how do you determine when

25  you have enough information to be finished?

1     A.   In each case it depends on how cooperative somebody is,

2  how vocal they are, how much information we get.  There's no

3  standard time prescribed in reports.

4     Q.   And do you feel that the amount of time that you spent

5  with Mr. Dear was sufficient to reach a solid conclusion about his

6  competency?

7     A.   I do.

8     Q.   And can you just briefly explain what steps you took,

9  after conducting the interviews with Mr. Dear, to complete the task

10  of assessing his competency?  What did -- did you and Dr. Gray have

11  discussions or how did that work?  How did you get to the point

12  where you generated your conclusions?

13     A.   Dr. Gray and I had a discussion.  I believe that after

14  the first meeting, my impression was that Mr. Dear was not

15  competent.  Dr. Gray was not so sure at that point in time.  We

16  reviewed some more discovery.  Obviously when we went back for the

17  second meeting, we were just adding to our observations.  There was

18  a significant amount of information that seemed to indicate that

19  not only does he have a mental illness but that his mental illness

20  is impacting his functional abilities.

21     Q.   And so did the two of you ultimately agree?

22     A.   We ultimately agreed, yes.

23     Q.   And who wrote the report that you submitted to the Court?

24     A.   We both wrote up our sections separately.  And then we

25  put them together and then reviewed the report together and made

1    changes together.

2         Q.   So let's now turn to the conclusions that you reached

3    about Mr. Dear in this case.  And let's start with your overall

4    conclusion about competency which you just alluded to and then

5    we'll break it down.

6         A.   Um-hmm.

7         Q.   In your opinion is Mr. Dear competent to stand trial?

8         A.   I do not believe Mr. Dear's competent to stand trial.

9         Q.   So now let's back up and unpack that.  And we can start

10   with the threshold question of mental disability.

11             THE COURT:  Let's do this.  Let's -- I think this is a

12   good point to stop and start again.  Let's come back and we'll

13   start at 1:30.

14             Can you be back at 1:30?

15             THE WITNESS:  I can do that.

16             THE COURT:  Thank you.

17             (At 11:54 a.m. - recess.)

18             (At 1:29 p.m. - proceedings reconvened; all parties

19   present.)

20             THE COURT:  The Court will recall the Dear matter.  The

21   record should reflect all parties and counsel are present.  The

22   witness is also present.

23             If you could just try to speak up a little bit for me,

24   maybe get back a little bit so that we don't have the echo.

25             THE WITNESS:  I've moved back.  Let me know if I need to

1    move back further.

2              THE COURT:  Thank you.

3              Counsel, you may continue.

4              MS. NELSON:  Thank you, Your Honor.

5    Q.   Good afternoon.

6    A.   Good afternoon.

7    Q.   Dr. Grimmett, just before we broke for lunch, I believe

8    that we had just started talking about your conclusions about Mr.

9    Dear's competency; does that sound right?

10   A.   I think so.

11   Q.   I'd like to talk first about the issue of mental

12   disability.  In your opinion does Mr. Dear suffer from a mental

13   disability, as defined by the competency statute?

14   A.   Yes.

15   Q.   What, in your opinion, is the mental disability that Mr.

16   Dear suffers from?

17   A.   We diagnosed him with a delusional disorder, persecutory

18   type.

19   Q.   What is a delusion?

20   A.   A delusion is a firmly held belief that is unchangeable,

21   even in the absence of information that supports it or evidence

22   that refutes it.

23             MS. NELSON:  Are you able to hear her?

24             THE COURT:  I am.

25             My court reporter?

1            THE COURT REPORTER:  Yes.

2            THE COURT:  Okay.

3    BY MS. NELSON:

4        Q.   Are there different types of delusions?

5        A.   There are.

6        Q.   What are some of the types?

7        A.   Well, persecutory types would be that somebody believes

8    they're being followed, harassed, poisoned, something along that

9    line.

10           An erotomatic -- erotomanic delusion would be believing

11   that somebody's in love with you when there's no indication of

12   that.

13           A somatic delusion would be that something's going on in

14   your body that there's no medical evidence of.

15           A jealous delusion would be believing that your spouse or

16   significant other is having an affair when there's no support for

17   that.

18           Referential delusions is when you make sense out of

19   things to which there's no connection.

20       Q.   And are there -- are there -- are delusions classified as

21   either bizarre or nonbizarre?

22       A.   Yeah.  There can be bizarre and nonbizarre delusions.

23       Q.   And what's the difference between bizarre and nonbizarre

24   delusions?

25       A.   A bizarre is something that defiles logic, believing that

1    aliens have removed your organs and replaced them with some

2    substance and there's no scars that indicate that anything's

3    happened to your body with the realm of normal.

4         Q.   And what would be an example of a nonbizarre delusion?

5         A.   A nonbizarre delusion is a belief that's not happening

6    but is within the realm of possibility.

7         Q.   In general -- we'll talk about Mr. Dear specifically in a

8    moment, but just in general how -- how, as a psychologist, do you

9    tell the difference between something that's just an odd belief or

10   an overvalued idea kind of delusion?

11        A.   It generally is how firmly that belief is held and how it

12   may or may not impact behavior.

13        Q.   When you say it may or may not impact behavior, does that

14   include how it may impact the choices that someone makes in their

15   life?

16        A.   Correct.

17        Q.   What's the difference between -- well, is there something

18   called an isolated delusion or a fragmented delusion?

19        A.   An isolated or a fragment delusion would be just one

20   singular belief; for example, believing that a TV personalty's in

21   love with you.

22        Q.   What is a systematized delusion?

23        A.   A systematized delusion is when there's a large amount of

24   information that feeds into the belief, but basically the person

25   who has systematized delusions uses their delusional belief system

1    to impact their entire world.

2        Q.   So we talked about what a delusion is.  What, then, is

3    delusional disorder?  How is delusional disorder defined?

4        A.   The criteria for a delusional disorder would be, one,

5    that you have a delusion.  It has to be present for one month or

6    more.  The person needs to not meet criteria for a schizophrenic

7    illness.  If they're having hallucinations, they're very specific

8    to the delusion and they don't occur inside of the delusional

9    belief.  If there's any mood instability, it is very short-lived,

10   though, compared to the length of the delusion being held; and the

11   delusions aren't a result of a medical issue or a substance-induced

12   issue.

13       Q.   Is another criteria for a delusional disorder that apart

14   from the impact of the delusions or its ramifications, that the

15   functioning of the person is not markedly impaired and the behavior

16   is not obviously bizarre or odd?

17       A.   Yes.

18       Q.   Does that sound right?  And where is this definition

19   coming from?

20       A.   It comes from the DSM-5.

21       Q.   What is the DSM-5?

22       A.   It's the Diagnostic and Statistical Manual, Fifth

23   Edition, that's put together by the American Psychiatric

24   Association.  It's the diagnostic manual we use to diagnose people.

25       Q.   Is that manual regularly relied on by psychologists and

1    psychiatrists --

2        A.   Yes.

3        Q.   -- to diagnose mental illness?

4        A.   Yes.

5        Q.   Dr. Grimmett, can you be oriented to date and time and

6    still suffer from delusional disorder?

7        A.   Yes.

8        Q.   Can you be oriented to date and time and be incompetent

9    legally?

10       A.   Not in and of itself, but yes.

11       Q.   Can you carry on a conversation with another person that

12   that other person can follow and still suffer from delusional

13   disorder?

14       A.   Yes.

15       Q.   Can you drive a car and still suffer from delusional

16   disorder?

17       A.   Yes.

18       Q.   Does the ability to do any of those things mean that you

19   do not suffer from a serious mental illness like delusional

20   disorder?

21       A.   No, not in of itself.

22       Q.   And would you necessarily know or recognize that a person

23   is delusional if you were just interacting with them on a

24   superficial level?

25       A.   Not necessarily.

1      Q.    And why is that?

2      A.    Because they may not discuss it.

3      Q.    They may not discuss what?

4      A.    Their delusional beliefs.

5      Q.    So would it be fair to say that unless the person is

6    discussing -- the delusional person is discussing the subject or

7    the content of their delusional beliefs, they may otherwise not

8    appear mentally ill?

9      A.    Yes.

10     Q.    Is a delusional disorder a serious mental illness?

11     A.    Yes.

12     Q.    What is psychosis?

13     A.    Psychosis is a cluster of symptoms.  It can be

14   hallucinations and delusions.  It can also be referred to as having

15   some kind of thought disorder where you're very disorganized in

16   thinking and get derailed when you're trying to convey information.

17     Q.    Would it be fair to say that psychosis is broadly defined

18   as sort of a loss of contact with reality in some way, shape or

19   form?

20     A.    That's an element.

21     Q.    Is delusional disorder a psychotic illness?

22     A.    According to the DSM, yes.

23     Q.    Let's talk about Mr. Dear's delusions specifically.

24   What, in your opinion, are the delusions that Mr. Dear suffers

25   from?

1      A.   Mr. Dear holds some very firmly held beliefs regarding

2   being persecuted by the FBI.  That's the core of where his beliefs

3   seem to stem from.

4      Q.   Would you describe his delusion as an isolated or

5   fragmented delusion or a systematized delusion?

6      A.   It certainly appeared to be a systematized delusion.

7      Q.   Why is that your opinion?

8      A.   Because he, with hindsight, would make sense of

9   everything that's happened to him through the lens of having been

10   persecuted.

11      Q.   And you said that the core delusion is that, in your

12   opinion, Mr. Dear suffers from is this idea that the FBI has been

13   following him for upwards of 22 years.  Are there other delusional

14   beliefs that he holds as well that are somehow related to that or

15   connected to that?

16      A.   There seems to have been some transient beliefs that have

17   come in and out during the course of the evaluation.  It's hard to

18   tell how -- how long they've been present because there's not

19   documentation to support that piece.  But, for example, he

20   expressed concern about being poisoned at CJC at one point in

21   time --

22           THE COURT:  I'm sorry, for example...

23           THE WITNESS:  He expressed concern about being poisoned

24   at CJC.

25   BY MS. NELSON:

1      Q.   And what is CJC?

2      A.   The criminal justice center.

3      Q.   What about the idea that Barack Obama is the Antichrist;

4  would you classify that as a delusion?

5      A.   That appears to be a delusion that he's held for quite

6  some time.

7           THE DEFENDANT:  That's a religious belief.

8      Q.   Dr. Grimmett, did you consider Mr. Dear's religious

9  beliefs when you were evaluating whether or not he suffers from

10  delusions?

11     A.   Yes.

12     Q.   And how would you describe the way that those religious

13  beliefs are connected to his delusional belief system, if at all?

14     A.   Mr. Dear seems to be a very social man.  And I very much

15  want to avoid pathologizing his --

16          THE COURT:  I'm sorry.  I'm sorry, I didn't understand

17  that.  Again, please.

18          THE WITNESS:  Do you need me to slow down?

19          THE COURT:  And speak up, yes.

20          THE WITNESS:  Speak up.  Speak up, slow down.

21          He seems to be a very spiritual man.  I want to be

22  respectful and not pathologize his relationship that he shares with

23  God.  However, in addition to expressing his religious beliefs, he

24  has incorporated his relationship with God in explaining some

25  things that have happened to him or feeling like God is reinforcing

1   that the FBI's trying to trick him, which my understanding falls

2   beyond the realm of what a person with a strong relationship to God

3   would support.

4   BY MS. NELSON:

5       Q.   Are his religious beliefs the primary reason that you

6   concluded he's delusional?

7       A.   No.

8       Q.   Is it possible, Dr. Grimmett, for a person to take an

9   idea or a theory that's held by other people, perhaps something

10  they found on the internet or even, you know, just something that

11  other people believe is within the spectrum of belief that some

12  people in society share, and incorporate that into a delusional

13  belief system?

14      A.   Yes.

15      Q.   Can you expand upon that a bit.

16      A.   Well, if somebody has a systematized delusion, they're

17  constantly seeing signs, indications that something supports what

18  they already believe.  And if they identify with something, they

19  may take somebody's overvalued idea or just a supposition and hold

20  on to it and don't let go because it becomes very significant to

21  them.

22      Q.   Would it be fair to say that many delusions start out

23  with some grain of truth?

24      A.   Yes.

25      Q.   But in order to become a delusional belief, it evolves to

1    something beyond that?

2         A.    That there's -- apart from bizarre delusions, I have no

3    evidence that aliens do implant things in the body, but generally

4    it's a misperception of an event that for one reason or another

5    gets distorted and very -- that the person becomes very attached to

6    that idea.

7         Q.    So in order for a belief to be considered delusional, it

8    doesn't have to be -- is what you're saying, it doesn't have to be

9    an idea that is original for that person?

10        A.    Correct.

11        Q.    So, for example, the idea that Luke -- the Bible verse

12   "Luke 10:18" suggests that President Barack Obama is the Antichrist

13   is maybe an idea that has been espoused by other people; correct?

14        A.    Correct.

15        Q.    But does that mean that that's not an -- actually a

16   delusional belief for Mr. Dear in any way?

17        A.    That does not mean that it's not an delusional belief to

18   him.

19        Q.    What makes it a delusional belief for him, in your

20   opinion?

21        A.    How firmly he's attached to it, and meaning he's attached

22   to it, in trying to explain what happens to him in his daily life.

23        Q.    Can you pinpoint at what point or identify at what point

24   Mr. Dear became delusional?

25        A.    I don't have the ability to do that.

1     Q.   Is that important to be able to do?

2     A.   For competency, no.

3     Q.   Is it your opinion that Mr. Dear has been delusional for

4   at least one month or longer?

5     A.   Significantly longer.

6     Q.   And were you and Dr. Gray in agreement about his

7   diagnosis?

8     A.   Yes.

9     Q.   Let's talk about -- a bit more specifically about how you

10  reached the conclusion that Mr. Dear suffers from systematized

11  delusions rather than just holding overvalued ideas.

12         Do you know the FBI is not following Mr. Dear?

13    A.   I have not read anything in the discovery that was made

14  available to me that would indicate that he is, in fact, being

15  followed by the FBI.

16    Q.   Doesn't some significant segment of the population

17  believe that the FBI follows people?

18    A.   I don't know what pop -- what percentage of the

19  population, but it's not an unusual belief to have some suspicion

20  over the dealings of the FBI.

21    Q.   Then tell us how you got to the point of concluding that

22  Mr. Dear is, in fact, suffering from a systematized delusional

23  belief system rather than just having an overvaluation?

24    A.   So according to Mr. Dear, he believes that he's been

25  followed by the FBI for 22 years.  In those 22 years it has

1   influenced his behavior, ultimately resulting in his move to

2   Colorado to try to escape the feds, as he puts it.  He has used the

3   FBI as a reason that he's said that people would be working with

4   counsel, that he's said people would be presenting in the courtroom

5   because he believes that everybody is being controlled by the FBI.

6   He's explained some medical issues that his girlfriend was having

7   that he believes the FBI set up to trick him, always seems with the

8   realm of what the FBI has the resources to do.

9        Q.   During your review of the materials and the discovery in

10  this case, as well as your conversations with Mr. Dear, were you

11  made aware of the fact that he believes that the FBI has snuck into

12  his home and cut holes in his clothing?

13       A.   He shared that with me, yes.

14       Q.   Is that part of your basis for concluding that he has

15  delusional beliefs?

16       A.   Yes.

17       Q.   Were you aware or did you come across information that he

18  believes the FBI would leave feathers behind in his home to show

19  that they had been inside his house?

20       A.   Yes.

21       Q.   Is that something that was significant to your diagnosis?

22       A.   It was another piece of information to consider, yes.

23       Q.   Were you aware of information that Mr. Dear shared that

24  he believes the federal government had blocked -- blocked him from

25  accessing the internet?

1      A.   Yes.

2      Q.   Was that something significant to your diagnosis?

3      A.   Yes.

4      Q.   Were you aware of if Mr. Dear -- Mr. Dear's belief that

5  when his girlfriend, Stephanie, was hospitalized, that federal

6  agents were snapping pictures of her outside of her hospital room?

7      A.   Yes.

8      Q.   Was that the thing that played into your diagnosis?

9      A.   Yes.

10      Q.   Are you aware of his belief that the federal government,

11  over the last 22 years, had sent him a series of women that he

12  described as honeypots or plants?

13           MR. MAY:  Object to the delayed nature of all of these

14  questions, especially that question.

15           THE COURT:  Objection's overruled.

16           THE WITNESS:  Yes.

17  BY MS. NELSON:

18      Q.   Was that significant to your diagnosis?

19      A.   Yes.

20      Q.   Were you aware that he believes that the doctors and

21  nurses who were treating his girlfriend at the hospital were fake

22  doctors and nurses?

23      A.   I'm aware of his assertion that they were fake, yes.

24      Q.   And that they were somehow affiliated with the FBI?

25      A.   Yes.

1     Q.   Was that significant to your diagnosis?

2     A.   Yes.

3     Q.   Are you aware that he believes that there was a janitor

4  at the hospital who was a fake and was intending to kill him?

5     A.   Yes.

6     Q.   Was that significant to your diagnosis?

7     A.   Yes.

8     Q.   Are you aware that Mr. Dear believes that President Obama

9  hates him for spreading the word about him being the Antichrist?

10    A.   Yes.

11    Q.   Was that significant to your diagnosis?

12    A.   Yes.

13         THE DEFENDANT:  Oh, I'm sure he loves it.

14    Q.   Do you recall, in your review of the materials given to

15  you in this case, Mr. Dear making a statement about describing

16  Barack Obama as the endtime farrow and that the federal agents

17  overheard him and then tried to run his son off the road?

18    A.   Yes.

19    Q.   Was that significant to your diagnosis?

20    A.   Yes.

21    Q.   Do you recall --

22         THE DEFENDANT:  I never talked to you about that.

23    Q.   Do you recall Mr. Dear making statements about taking his

24  car in for an oil change and believing that the FBI had hacked into

25  his car and taken control of his radio?

 1      A.    I did review material of that nature, yes.

 2      Q.    Is that significant to your diagnosis?

 3      A.    Yes.

 4      Q.    Do you recall hearing him state that he believes that

 5   certain members of his family have been cooperative in some way,

 6   shape or form by the feds?

 7      A.    Yes.

 8      Q.    Was that significant to your diagnosis?

 9      A.    I received that information after the evaluation.

10            THE COURT:  I'm sorry?

11            THE WITNESS:  I received that information after the

12   evaluation.

13            THE COURT:  Okay.

14   BY MS. NELSON:

15      Q.    Do you recall reviewing videos from the jail in which Mr.

16   Dear expressed concern that the federal government had placed an

17   implant in his hand?

18      A.    Yes.

19      Q.    Was that consistent to your diagnosis?

20      A.    Yes.

21      Q.    And do you recall reviewing videotapes of Mr. Dear in the

22   jail in which he expressed concern that the food and water was

23   being poisoned by federal agents?

24      A.    Yes.

25      Q.    Was that significant to your diagnosis?

1      A.   Yes.

2      Q.   In your and Dr. Gray's report, you mention at one point

3   that during your conversation with Mr. Dear, your interview with

4   Mr. Dear, he exhibited what you call illogical and perseverative

5   thinking.  Can you explain a bit what you meant by that and how

6   that played a role in your diagnosis.

7      A.   Mr. Dear preferred not to answer questions that were

8   posed to him, but, rather, talked spontaneously.  And much of his

9   spontaneous speech pertained to the federal government and Luke

10   10:18 and his understanding of his legal case.  It was very

11   difficult to get him to talk about something else.

12      Q.   How, if at all, did Mr. Dear make frequent personalized

13   attributions to ordinary events?  Can you describe that a bit for

14   the Court.

15      A.   Well, for example, the situation with his girlfriend in

16   the hospital.  He came to some conclusion that the janitor was

17   trying to kill him and he was a federal oper -- operant, I guess,

18   and because of his girlfriend had said to the janitor, "Oh, I

19   haven't seen you before," a very benign statement by all accounts,

20   but he incorporated that into his preexisting belief that the FBI

21   are out to get him, and he made sense of something that didn't seem

22   to have any foundation.

23      Q.   What was your conclusion about Mr. Dear's intellectual

24   functioning?

25      A.   He appears to have an average functioning.  He's college

1    educated.

2        Q.    What bearing does an intellectual functioning have on the

3    issue of whether or not he is mentally ill?

4        A.    It doesn't have any bearing.

5        Q.    Can intelligent people be mentally ill?

6        A.    Intelligent people can be mentally ill.

7        Q.    Talk a bit about his judgment for everyday social

8    situations.  Did you test that or evaluate that?

9        A.    Yeah.  We provide scenarios to see how somebody would

10   respond to events that may happen in everyday life just to see

11   how -- how they view the world, and he provided reasonable

12   responses to those questions.

13       Q.    What significance does that have to your diagnosis?

14       A.    It doesn't bear on his diagnosis of delusional disorder.

15   It can bear on competency and diagnoses in other instances, but it

16   wasn't informative in this instance.

17       Q.    So a person with intact social judgment can still suffer

18   from delusional disorder; is that what you're saying?

19       A.    Yes.

20       Q.    Can you describe what you know about his conduct and

21   behavior during his stay at the state hospital.

22       A.    He didn't appear to have any behavioral problems.  I

23   don't think he presented as a behavior management problem for the

24   staff.  He was quite isolated.  He minimally participated, I think,

25   in the groups -- in the treatment that was offered to him.  I don't

 1   think there was anything significant about his stay.

 2       Q.   Was he eating and drinking?

 3       A.   I believe so.

 4       Q.   How does that differ from his behavior -- some of the

 5   behavior that you observed or read about while he was staying in

 6   the El Paso County Jail?

 7       A.   He refused many meals and many cups of water in the

 8   videos I reviewed in his time at the jail.  So he was willing to

 9   eat the food at the hospital when he wasn't willing to eat in CJC.

10       Q.   What do you make of that --

11       A.   Well --

12       Q.   -- the difference in behavior?

13       A.   Well, he expressed that he believed he was being

14   poisoned.  He complained that the water had a chemical taste and a

15   cloudy appearance.  He felt like his food tray had a different

16   presentation than the other inmates.  We note that because he

17   believed he was being poisoned, from what he said on the video.  He

18   did not appear to have those concerns at the hospital.

19       Q.   Is that consistent with your diagnosis that he's mentally

20   ill?

21       A.   It's kind of related to these core beliefs that he has

22   and then he's interpreting his environment in new ways as new

23   information comes to him.  And it was significant then.  I can't

24   speak to why it wasn't significant anymore, but he had a shift in

25   his relationship to the food and the water.

1          THE DEFENDANT:  Because they backed off after I said,

2    "Have my hair analyzed *[sic]*."  So they quit doing it.

3          Q.    What is your opinion about whether Mr. Dear was

4    consciously trying to appear to be mentally ill, either while he

5    was at the jail or at the state hospital?

6          A.    My opinion is I don't believe he was trying to be

7    mentally ill or -- or offer that presentation.

8          Q.    What is -- what was your impression regarding the results

9    Mr. Dear desired from your competency evaluation?

10         A.    He made it very clear that he was competent.  And if we

11   didn't come to the conclusion he was competent, we were also

12   operating under the federal government.

13         Q.    Based on --

14         THE DEFENDANT:  Correct.

15         Q.    Based on your interactions with him, what is your opinion

16   about whether Mr. Dear regards himself as mentally ill?

17         A.    I don't believe he regards himself as mentally ill.

18         Q.    During your review of the materials that were provided to

19   you in this case, do you recall him stating to the detective -- or

20   describing the situation with his girlfriend at the hospital to the

21   detectives and at that point in time him believing that his

22   girlfriend was, in fact, ill?

23         A.    I honestly don't recall.  I'm remembering a conversation

24   I had with him where he didn't believe that she was ill, but I'm

25   afraid I don't remember what he said to the detective.

1      Q.   Have you seen, in your review of the materials in this

2   case, instances where Mr. Dear, in your opinion, makes --

3   incorporates certain ideas or things into his delusional belief

4   system, but there's some sort of delay in between the time of it

5   occurring and the time that he incorporates it into his delusional

6   belief system?

7      A.   Yes.

8      Q.   Can you provide an example of that.

9      A.   He -- he has talked about a fake rape charge that he was

10   alleged to have committed, I believe back in 1994.  I may be not

11   entirely accurate with the date.  In discussing that incident where

12   he was exonerated, he said, "It took me years to figure out it was

13   part of the FBI's plan."

14      Q.   And what do you make of the fact that sometimes it takes

15   him some time before he interprets things as having to do with the

16   FBI's persecution of him?

17      A.   I think it's within the normal course of the disorder.

18   He's -- he's maintained these core beliefs about the FBI, but

19   whether or not he's making referential statements or personal

20   attributions to things that have happened, I believe that the more

21   tightly held he's -- the more he has held this belief very tightly,

22   the more he has used his past experiences to explain what's

23   happened to him that wasn't immediately apparent to him at the

24   time.

25      Q.   The fact that he did not have any behavior problems

1  either at the jail or the state hospital, does that mean that he's

2  not mentally ill?

3       A.   No.   In fact, it would be expected with a delusional

4  disorder to not have his behavior disrupted like that.

5       Q.   The fact that he -- do you recall watching him urinate on

6  the videotaped interrogation with Detective Schiffelbein?

7       A.   Yes.

8       Q.   The fact that he was able to accurately urinate into a

9  bottle mean that he is not mentally ill?

10       A.   No.

11       Q.   The fact that he was able to follow directions mean that

12  he is not mentally ill?

13       A.   No.

14       Q.   Does the fact that he is fluent in language and can

15  communicate ideas, does that have any bearing on your diagnosis

16  that he suffers from delusional disorder?

17       A.   No.

18       Q.   Let's talk just a bit about the extent and depth of Mr.

19  Dear's delusional belief system and how it has impacted his

20  functioning.

21            How has his delusional belief, in your opinion, impacted

22  some of the decisions that he's made in his life prior to his

23  arrest?

24       A.   Well, one of the ones I mentioned was the fact that he

25  moved from North Carolina to Colorado to escape observation from

1    the feds, pretty significant.  He's moved to Park, Colorado, which

2    is very remote.  He wants to be off the grid.  He wants to not be

3    in society, essentially.  Those are the two things that

4    particularly stand out.

5        Q.   Do you recall reviewing -- or learning during your

6    evaluation in this case that once he moved to Colorado, he and his

7    girlfriend did not leave their home unattended?

8        A.   Yes.  He told me that the FBI would come into his home

9    whenever he left.  So for the past year one of them had always been

10   present at the trailer.  If one of them needed to leave, the other

11   one would stay.  And he said that that had been happening for the

12   past year.

13       Q.   While we're on the topic of how Mr. Dear's mental illness

14   has impacted his functioning, how would you describe Mr. Dear's

15   cooperation during his interview with you?

16       A.   I believe the word we used was "tenuous."  He -- he met

17   with us voluntarily the first time but was not very open to being

18   asked questions and complying with the interview as we would

19   normally administer it.  So there was a lot of spontaneous speech.

20   And we would just let him tell his story and get information that

21   way.

22            When he made observations -- like, if we stopped writing

23   notes and he thought we should be taking notes of what he was

24   saying, he would get upset, insist that we write certain things

25   down, trying to control the interview in that regard.  We would ask

1    him questions that he would avoid and promote his agenda like that.

2         In the second interview he was more resistant to meeting

3    with us because he believed that the interview being cut short last

4    time was a sign that he had spoken too much.  So he needed some

5    encouragement to come and meet with us.  He initially said that he

6    would come and meet with us but not talk.  And then he -- he said

7    he would talk but not about his legal case because he was concerned

8    about the disruption that had occurred.

9         Q.   In your opinion, is there a connection between Mr. Dear's

10   mental illness and his level of cooperation during the competency

11   evaluation?

12        A.   There certainly seemed to be.  He was very suspicious and

13   distractible.

14        Q.   And do you -- how is that suspicion and distrust related

15   in your opinions of his mental illness?

16        A.   Because it's -- in his speech he was indicating that his

17   concern was driven by the belief that he was being monitored and

18   the FBI were -- essentially controlled the judicial system.

19        Q.   What were your impressions about how he viewed you and

20   Dr. Gray and your intentions and your role in this process?

21        A.   The only statement he made was:  "If you find me

22   competent, I'll know that --" I won't say "you're the good guys," I

23   may be misquoting him, I didn't write that down, but "if you find

24   me incompetent, I'll know you're one of them."

25        Q.   Did you get the sense that you and Dr. Gray were

1   incorporated, on at least some level, into his delusional belief

2   system?

3       A.   Yes.

4       Q.   How confident are you in your diagnosis of Mr. Dear as

5   having delusional disorder?

6       A.   Very confident.

7       Q.   Was there any disagreement between you and Dr. Gray on

8   this point?

9       A.   No.

10      Q.   Is this a close -- is it a close call for you to conclude

11  that Mr. Dear's mentally ill?

12      A.   No.

13           MR. MAY:   Objection.   That's not the standard.

14           THE COURT:   It isn't the standard, but I'll allow the

15  question.

16  BY MS. NELSON:

17      Q.   You may answer again.

18      A.   I'm sorry, can you ask it again.

19      Q.   Is it a close call for you to conclude that Mr. Dear is

20  mentally ill?

21      A.   No.

22      Q.   I'd like now to turn to the two prongs of competency that

23  we were speaking about before lunchtime.

24           First, I'd like to talk about that first prong, which is

25  whether, in your opinion, Mr. Dear has a factual and rational

1    understanding of the proceedings.

2            Let's start with factual understanding.  And just so

3    we're clear, please explain to the Court what does it mean, in your

4    opinion, for a defendant to have a factual understanding of the

5    proceedings.

6       A.   The person would know what they're charged with, who the

7    key players are in the courtroom, the process of going to trial,

8    what the options are regard to entering a plea, what the rights are

9    regarding their Fifth Amendment, those kind of things.

10      Q.   In your opinion does Mr. Dear have a factual

11   understanding of the proceeding?

12      A.   He appears to have a factual understanding.

13      Q.   Why -- why is that your opinion?

14      A.   Again, he wasn't very cooperative with the questions, but

15   he certainly indicated that he knew who the judge was.  He knew who

16   his attorneys were.  He knew what pleas were available to him.  He

17   knew what the charges were.

18      Q.   Now let's talk about whether, in your opinion, he has a

19   rational understanding of the proceeding.  Please explain what it

20   means to have a rational understanding of the proceeding.

21      A.   That would be the defendant being able to evaluate the

22   situation they find themselves in and provide responses that were

23   based on reality.

24      Q.   In your opinion are there some infirmaries in Mr. Dear's

25   rational understanding of the proceeding?

1      A.   Yes.

2      Q.   Why is that your opinion?

3      A.   He believes that the judge is being operated by a higher

4  power; that all the parties involved do what they're told to do.

5      Q.   Actually let me interrupt you for just a moment.  When

6  you say he believes that the judge is being operated by a higher

7  power, did you get the impression that Mr. Dear believes the higher

8  power is the judge's boss --

9      A.   No.

10     Q.   -- or something beyond that?

11     A.   No.  It was his concern that the FBI was in charge of the

12  case.

13     Q.   Okay.  Please proceed.  You were talking about his

14  attorneys or the attorneys.

15     A.   Well, he indicated the judge does what he's told.  So he

16  doesn't appear to believe that the judge is operating off his free

17  will.  And he said the DA and the public defenders and the judge

18  all work for the government.  If they don't -- if they don't do

19  what they tell you to do, there's trouble.

20          So while he understands who the judge is and who his

21  attorneys are, he certainly doesn't appear to have an understanding

22  based on reality of how the system actually works.

23     Q.   So is it fair to say that he -- he believes his own

24  attorneys are working in some -- on some level for the government?

25     A.   Yes.

1     Q.   For the federal government?

2     A.   Yes.

3          THE DEFENDANT:   That's where you gets your checks, don't

4     you?

5     Q.   And did you also get the impression that it was not just

6     the defense attorneys that were incorporated into these delusional

7     beliefs but the district attorney as well?

8     A.   And the judge.

9     Q.   In your opinion does Mr. Dear's mental illness interfere

10    with his ability to realistically interpret and process information

11    and apply it to his case?

12    A.   Yes.

13    Q.   How?

14    A.   Because when he's looking at the facts of the case, his

15    beliefs are contaminated by his delusion that somehow the federal

16    government is instrumental in where he finds himself.

17    Q.   Are -- in your opinion are his delusional beliefs in some

18    sense informing the decisions that he is making during these

19    proceedings?

20    A.   I believe so.

21    Q.   How?

22    A.   He's expressed concern that his attorneys are trying to

23    trick him, which is obviously a barrier to working and assisting

24    counsel.  That's -- that's pretty major.

25    Q.   And do you believe -- in your opinion, based on your

1    assessment of Mr. Dear, is the belief that his attorneys are trying

2    to trick him tied into his systematized delusion or are they

3    based -- is that based on reality?

4        A.   It seems to be part of his delusions.  Do you want me to

5    give an example?

6        Q.   Yes, please.

7        A.   He -- he expressed concern that his attorneys were trying

8    to get him to say things to -- that they could use against him, is

9    obviously not how an attorney-client relationship usually works.

10       Q.   Was it your impression that Mr. -- the choices Mr. Dear

11   has been making during these legal proceedings are based on logic?

12       A.   They don't appear to be logical.

13       Q.   What do they appear to be based on?

14       A.   They appear to be based on a delusional belief that he's

15   engaging with the FBI, even as he tries to resolve his case.

16       Q.   And can you provide a brief description of -- while we

17   talked a bit about his understanding of the different plea options

18   in this case, can you talk a bit about what his response was when

19   you asked him about the not guilty by reason of insanity plea.

20       A.   He was -- I guess I best could describe it as rambling.

21   The answer he provided was very irrelevant to the question that was

22   posed.  And his response was they -- "anything to discredit, that's

23   how the feds operate," and then he starts talking about drawing

24   circles and then drawing bigger circles and circles off tangents

25   and then you put friends and family into these circles and you look

1    at each person and you find the weakest link, and that's who the

2    FBI targets to crucify against Mr. Dear.

3        Q.   So based on that response, do you believe he has a

4    rational understanding of what a not guilty by reason of insanity

5    plea involves?

6        A.   I do not.

7        Q.   Or why someone would enter into such a plea?

8        A.   I do not believe he has a rational understanding.

9        Q.   Let's now talk about the second prong of competency, the

10   ability to consult with his attorneys with a reasonable degree of

11   rational understanding to assist in his defense.

12           In your opinion what does it mean for a defendant to have

13   the ability to consult with his lawyers with a reasonable degree of

14   rational understanding?

15       A.   Well, they would have a logical understanding of their

16   case.  They would have a trusting relationship with counsel,

17   understand that counsel's there as a resource, understand the facts

18   of the case, the evidence, what their defense strategy may be,

19   based on logic, and working with counsel to come up with a solution

20   that would be more favorable.

21       Q.   And so it sounds like this prong has some connection to

22   this -- to that second aspect of the first prong, the rational

23   understanding of the proceedings; is that fair to say?

24       A.   Oh, yeah.  Rationality has to be present for both.

25       Q.   What is your opinion about whether Mr. Dear meets this

1    prong of the competency standard?

2         A.   I believe he has severe deficiencies in this prong.

3              THE COURT:  I'm sorry?

4              THE WITNESS:  Severe deficiencies.

5    BY MS. NELSON:

6         Q.   Why is that your opinion?

7         A.   Much of this was retrieved from his spontaneous speech

8    because he was very cooperative with the questions posed.  In fact,

9    I couldn't pose most of the questions.

10             But, for example, I asked him if he was able to tell his

11   attorney everything that happened.  And there's usually a follow-up

12   question of:  "Why is that important?"  And when I asked him:

13   "Were you able to tell your attorney everything that happened?", he

14   said:  "Yes, because I wanted to get the word out about Luke

15   10:18."

16        Q.   And why does that show deficiency, in your opinion?

17        A.   'Cause it's absolutely irrelevant to the matter at hand.

18   That's not why it's important for his attorney to know what

19   happened in the allegations.

20        Q.   After speaking with Mr. Dear and reviewing the materials

21   in this case, what is your opinion about whether he trusts his

22   attorneys?

23        A.   He, I think, explicitly stated he does not trust his

24   attorneys and gave very illogical reasons for not trusting his

25   attorneys.

```
1        Q.    And gave very...

2        A.    Illogical reasons.

3        Q.    Illogical reasons.  Can you give us an example of that.

4        A.    He believes that they were lying to him.

5        Q.    Why is that illogical, in your opinion?

6        A.    Well, the example he gave was kind of off-topic.  He

7   had -- he explained that his attorneys told him that his girlfriend

8   may be running out of wood or expressed concern that there wasn't

9   enough wood in the house.  And he said the next day he saw a

10  picture of his house and there was sufficient wood outside.  And he

11  believed that he was being tricked.  And that's when he said that

12  he wants -- "They wanted to -- they wanted me to say something they

13  could use."

14        So he felt like he was being set up.  I know I said,

15  "That doesn't make sense.  I'm sorry, that doesn't make sense."

16        So he believed that the attorneys used the relationship

17  with the girlfriend to try to get information from him that they

18  could use, which doesn't seem logical to me.

19        Q.    Did you get the impression that he believes that his

20  attorneys are conspiring with some of the other players in the

21  criminal justice system?

22        A.    Well, his belief is that they're all employed or somehow

23  under the control of the FBI.  And certainly I can extrapolate from

24  that that he wouldn't be trusting of an attorney because of his --

25  the umbrella bosses for all the parties involved.  He doesn't see
```

1    them to be impartial or aligned with him.

2         Q.   Is it your sense that this mistrust of counsel -- well,

3    let's talk a bit about statements that he made specifically about

4    Mr. King.  Can you recount some of those statements that he made

5    about Mr. King.

6         A.   He referenced him being the "Batman attorney" and "he has

7    to do everything his way."

8         Q.   Is it -- is it your impression that his mistrust is

9    exclusively connected with Mr. King, or does it extend to his

10   defense team more broadly as a whole?

11        A.   It appears to extend to the defense team as a whole.  He

12   mentioned Mr. King by name on a few occasions, but I believe he's

13   been rather uncooperative with the entire team.

14        Q.   And was it your impression that this was just sort of a

15   disagreement between Mr. Dear and his lawyers about how to best

16   proceed in his case or some sort of personality conflict or is it

17   bigger than that?

18        A.   It wasn't discussed in either of those contexts.  He

19   doesn't say, "I don't like that guy."  He doesn't say, "I don't

20   like what they want to do with me."  It was just a blanket

21   distrust.

22        Q.   And that distrust -- in your opinion is that connected to

23   his mental illness?

24        A.   It appears to be very connected to the delusional belief

25   he has about the FBI and their qualms.

1       Q.   And how have these delusional beliefs affected whether

2   Mr. Dear's able to clearly communicate and relay relevant

3   information to counsel, in your opinion?

4       A.   Well, I don't know how many conversations he's had with

5   counsel, but certainly when I ask him about his case and he

6   responds:  "I'm trying to get the word out about Luke 10:18," I

7   would imagine that's very -- that presents very much a barrier to

8   working with counsel, if he goes a similar position.

9            MS. NELSON:  May I have just a moment?

10           THE COURT:  Yes.

11           (Short pause.)

12           MS. NELSON:  May I approach, Your Honor?

13           THE COURT:  You may.

14      Q.   I'm handing you what's been marked as Defense Exhibit

15   CH-D.  Can you describe what that is.  Do you recognize it?

16      A.   It is the competency evaluation we conducted on Mr. Dear.

17      Q.   And is that examination -- is that a report --

18      A.   It is.

19      Q.   -- summarizing your opinions and conclusions about Mr.

20   Dear's competency?

21      A.   Yes.

22      Q.   And does that accurately -- accurately reflect in

23   substantial form the bases for your opinions and conclusions that

24   he is incompetent?

25      A.   From my cursory review, yes.

1        MS. NELSON:  All right.  Your Honor, I'd move to admit

2   Defense Exhibit CH-D into evidence for purposes of this hearing.

3        MR. MAY:  May I voir dire, Your Honor?

4        THE COURT:  Yes.

5                        VOIR DIRE EXAMINATION

6   BY MR. MAY:

7        Q.   You indicated that you wrote part of the report and that

8   Dr. Gray wrote part of the report and then part of it you modified

9   together.  Can you mark on that document what parts you wrote.

10       A.   Yes.

11       Q.   Do you need a pen?

12       A.   I do.

13       Q.   Do you want blue or red?

14       A.   Blue is fine there.

15       Q.   Okay.

16       MR. MAY:  While she's doing that, is counsel intending to

17   make this a public record?  Obviously the Court already has a copy

18   of this report in its file under seal.

19       THE COURT:  I do.  And it will remain under seal.  At

20   this point I'm not sure what counsel wishes to do.

21       MS. NELSON:  May I have a moment?

22       THE COURT:  Yes.

23       (Short pause.)

24       MS. NELSON:  Your Honor, it's not a request at this time

25   to make it a public record, but we did want to introduce it at this

1   hearing so that the record of the competency proceedings in this

2   case is complete so that the Court has it as a part of -- as an

3   exhibit as a part of this proceeding to consider when making its

4   decision about Mr. Dear's competency.

5            THE COURT:  Okay.

6            MR. MAY:  If I might inquire, have they consulted with

7   their client about his medical privilege?

8            THE COURT:  I don't know.  I will reserve ruling as to

9   whether or not I'll -- admissibility for this hearing's certainly

10  different than public record.  And I'll reserve ruling in regard to

11  whether I make it a public record or not.

12           Is there any objection to -- well, while she finishes

13  marking it, is there any objection to the exhibit?

14           MR. MAY:  No.  I think the Court already has it in front

15  of it; and I assume the Court has considered that as part of this

16  hearing.  So we have no objection for the Court to consider that

17  report as part of this hearing.

18           THE COURT:  All right.  The Court will admit CH-D, I

19  believe it was.

20           THE WITNESS:  Can I just clarify?

21           What I've marked is the sections that we were assigned,

22  and there's certainly some overlap when we were coming back

23  together, that we both contributed to certain paragraphs and what

24  have you.

25  BY MR. MAY:

1    Q.   So that, for instance, on the page -- second page of this

2    you've written your name on the top and then you've kind of put a

3    blue mark around the first paragraph.

4    A.   No.  I had Gray there, and then I realized that I did the

5    page, so...

6    Q.   That page.  And then on the third page you'd write Gray

7    and Gray next to the parts that he did; is that correct?

8    A.   Correct.

9    Q.   And so consistent with that you mark the particular

10   paragraph, although there's some paragraphs not marked.  What would

11   that -- what would my conclusion there be?

12   A.   Whatever the name was at the beginning of that section.

13   Q.   Until I get to the next name, that would be...

14   A.   Until that part.  I think that was the only part I did

15   that with.

16   Q.   Okay.  So you would write Dr. Gray in the middle there.

17   And that means everything until again I see your name, and that's

18   your part and back to his name?

19   A.   Yes.  That part I was initially assigned, but there's

20   some flexibility within that.

21        MR. MAY:  Based on what we've put on the record, I have

22   no objection for admission for this Court's evaluation.

23        THE COURT:  All right.  The Court will admit Exhibit D,

24   CH-D.

25        (Whereupon Defendant's Exhibit CH-D was received in

1    evidence.)

2           THE DEFENDANT:  Just for clarification, everybody talks

3    about Luke 10:18.  Do you know what it is?  Jesus said, "I've held

4    Satan as lighting fall from heaven."  And the Hebrew word for

5    lighting is Barack.

6           MR. MAY:  Might we get a copy of that particular exhibit,

7    Your Honor, as she's indicated what parts are which?

8           THE COURT:  Yes.

9                  DIRECT EXAMINATION (CONTINUED)

10   BY MS. NELSON:

11      Q.   Dr. Grimmett, how confident are you in your conclusion

12   that Mr. Dear's not competent to stand trial?

13          MR. MAY:  Objection; asked and answered.

14          THE COURT:  I don't believe that specifically has been

15   answered.

16          Go ahead and answer it.  I'm sorry.

17          THE WITNESS:  Within a reasonable degree of psychological

18   certainty.

19   BY MS. NELSON:

20      Q.   And do you have an opinion about the causal relationship

21   between Mr. Dear's serious mental illness and his incompetence?  In

22   other words, is his mental illness the cause of his incompetence to

23   stand trial?

24      A.   When we're looking at competency, we're looking at

25   functional ability.  And his functional ability seems to be

 1    impaired as a result of his mental illness.

 2              MS. NELSON:  No further questions at this time.

 3              THE COURT:  All right.  District attorney,

 4    cross-examination.

 5              MR. MAY:  Yes, Your Honor.

 6                         CROSS-EXAMINATION

 7    BY MR. MAY:

 8         Q.   Counsel asked you a lot about his delusions and how they

 9    affected his life.  Go ahead and get your water.

10         A.   Sorry.

11         Q.   So did you want a sip?

12         A.   Yes.  Thank you.

13         Q.   In fact, it's your opinion that it's one of those

14    delusions that caused him to surrender in this case; is that

15    correct?

16         A.   Well, he explained having a conversation with God.

17         Q.   And you've told us that it's a delusion that he had at

18    the time?

19         A.   Well, not all of his delusions -- not all of his beliefs

20    about God are likely delusional.

21         Q.   Right.

22         A.   I don't want to overstate that.

23         Q.   Do you recall telling us that it was a delusion that led

24    him to Planned Parenthood and it was a delusion that caused him to

25    give up at the end at Planned Parenthood?

 1      A.   I don't remember saying that it was causal.  It is

 2 certainly something to be considered.  If you have it documented

 3 like that that it was causal, then I will concede that I said that.

 4 Frankly, I don't remember saying that.

 5      Q.   Do you believe that his surrender was caused by his

 6 delusions, one of his delusions?

 7      A.   That's not something I considered in assessing his

 8 competency because it's not relevant at the present time.

 9      Q.   Do you remember -- did you know that Ms. Billek had sent

10 down to you a summary of our conversation with you and Mr. Gray,

11 Donna Billek and myself with you and Dr. Gray?  The second to the

12 last paragraph is a summary.

13      A.   Right.  And what I said was it was -- like, it was

14 something I considered, but it's not necessarily something I relied

15 upon.  It was information that was important to consider.

16      Q.   And --

17      A.   So I didn't indicate that that's how I got to my

18 conclusion.

19      Q.   And what was -- what was it that he did that caused him

20 to surrender?

21      A.   I don't have an opinion on that.  I wasn't asked to

22 access that.

23      Q.   Do you know what factually happened?

24      A.   I've read the police reports.

25           MS. NELSON:  Your Honor, I would object to relevance.

1          THE COURT:  Objection's overruled.

2          THE WITNESS:  I'm sorry, can you ask me again.

3    BY MR. MAY:

4      Q.   Do you recall what factually happened to cause him to

5    surrender?

6      A.   I believe so.

7      Q.   What is that?

8      A.   He flipped a card.  And he was going to decide whether he

9    was going to surrender or not.  And the way the card fell, he

10   believed it was a message from God telling him to surrender.

11     Q.   And didn't you tell us that was delusional on his part?

12     A.   It certainly seems to have some delusional content, yes.

13     Q.   Getting a message from God and the flipping of the card

14   what he should do on a major decision in his life?

15     A.   Right.  But in and of itself, I don't think that it

16   constitutes a conclusion.  It has to be used in the context of the

17   other beliefs that he holds.

18     Q.   And in that context you found that delusional; is that

19   correct?

20     A.   It appeared consistent with his other delusional beliefs.

21     Q.   And in that moment he wasn't saying he was talking to

22   God; is that correct?

23     A.   I don't believe so.  I don't recall reading or hearing

24   that.

25     Q.   Has he ever said that he actually -- God talking to him?

1      A.   He's indicated he received messages.  I'm not sure

2   whether they're conversations or -- excuse me.

3           He said that he feels the spirit moving through him.  I

4   don't recall whether or not he said that God actually talks to him.

5      Q.   He's never ever said anywhere that he said that God talks

6   to him?

7      A.   I don't recall if it's that specific.

8      Q.   But he had talked about the spirit moving through him and

9   receiving messages on important decisions in his life; is that

10  correct?

11     A.   Yes.

12     Q.   And the -- at the time that he flipped the card, he was

13  looking for a sign; is that correct?

14     A.   I think that's what he indicated.

15     Q.   Your report is dated, I believe, March 10th; is that

16  correct?

17     A.   7th.

18     Q.   7th?

19     A.   7th.

20     Q.   I guess the state hospital report that we get is dated

21  the 7th.  And so when was the last time you met with him?

22     A.   The last time I met with him was on the second meeting on

23  the 3rd of February.

24     Q.   The 3rd of February.  So the last time you met with him

25  is well over two months ago?

1       A.    Correct.

2       Q.    The last -- when you wrote your report is well over a

3    month ago?

4       A.    Yes.

5       Q.    And you're assessing his competency at a moment in time;

6    is that correct?

7       A.    Correct.

8       Q.    And in fact, when do you think that information becomes

9    stale?

10      A.    It's very hard to measure how long a competency opinion

11   is good for.  I -- I'm speaking to the point in time where I

12   evaluated him.  I cannot say necessarily today whether or not he's

13   competent, but what I would use to make that determination, has

14   there been any change since the time of the evaluation that would

15   indicate his functioning has improved?

16      Q.    And have you observed him since March 7th?

17      A.    Just today.

18      Q.    Have you reviewed other materials since March 7th?

19      A.    I don't believe I've reviewed anything since I submitted

20   the report.

21      Q.    And have you testified in another case that, in fact,

22   your evaluation's probably good for about a three-week period, if

23   you're not able to assess again?

24      A.    Well, it depends what the reason for incompetence is.  If

25   somebody's having an acute psychotic episode and they're taking

1    medications, it's very possible that their symptoms could improve

2    in that time.  If somebody has an intellectual disability, there's

3    probably more confidence that can be had over a greater period of

4    time.  And it's very case dependent.

5         If you're asking specifically in Mr. Dear's case, he's

6    suggesting he's had these delusions for 22 years.  I'm not sure

7    that two months is significant with that in mind, but I'm

8    certainly -- I'm speaking to my opinion at the time I met with him.

9    Q.   And the time you've met with him is -- first time, 90

10   minutes, maybe?

11   A.   Yes.

12   Q.   And the second time, 55 minutes?

13   A.   Yes.

14   Q.   That's the entire amount of time you've spent with him in

15   making your evaluation.  And after 90 minutes you felt you knew the

16   answer to competency whereas Dr. Gray did not?

17   A.   Well, 90 minutes was the amount of time we spent on the

18   interview.  The evaluation was a much more lengthy process and the

19   information in collateral sources that indicated that the delusions

20   were present above and beyond what we had observed in the

21   interview.

22   Q.   One of the things you said you listened or watched was

23   his interview with the detective?

24   A.   Yes.

25   Q.   Detective Schiffelbein.  Did you watch the entire

1  interview?

2       A.   I did.

3       Q.   How many hours is that?

4       A.   It was just over seven hours, I believe.

5       Q.   Seven and a half hours.  And you said that prior to that,

6  you'd spent a total of 10, 12 hours, which included that seven and

7  a half hours; is that correct?

8       A.   Watching -- reading the discovery that I had available at

9  the time and that video was obviously before I received all the CJC

10  videos and phone calls.

11       Q.   And how long did you spend watching the CJC videos and

12  phone calls?

13       A.   I didn't track it, but there was more than a month's

14  worth of footage.  It was many hours.

15       Q.   So did you have a chance to read many of the police

16  reports?

17       A.   I believe I read all of the police reports I was

18  provided.

19       Q.   How many pages did you get of police reports?

20       A.   Around a thousand, maybe.

21       Q.   Around a thousand.  And have you had a chance to read

22  anything about his family or how they've assessed him over the

23  years?

24       A.   No.

25       Q.   Did you see whether they see that this has been existing

1   for a number of years?

2        A.   No.

3        Q.   And I think earlier you testified before me that you've

4   put about 10 to 12 hours in, including that interview tape, and you

5   thought you'd done about a total of 14 hours?

6        A.   Forty.

7        Q.   Forty.

8             Let me go through some of the things that you do put in

9   your report.  He has an intact memory?

10       A.   Yes.

11       Q.   So that if somebody wanted -- if he chooses to cooperate

12   with somebody, he can explain what he was doing the day at Planned

13   Parenthood; what he was doing the day before; what he's done in his

14   life?  It's true that he has an intact memory; is that correct?

15       A.   Based on our time with him, that would be correct.

16       Q.   He was coherent and goal-directed?

17       A.   Yes.

18       Q.   And that would be true today, that he's coherent and

19   goal-directed?

20       A.   I haven't assessed him today.  He seems to be

21   goal-directed, for sure.

22       Q.   That's actually a point I was just making.  You have

23   assessed him today.  You were saying you felt your assessment was

24   still good as of today is the way I understood your response.

25       A.   Well, I'm saying that there doesn't seem to be

1    information to contradict that his behavior has changed or his

2    mental status has changed since that time.

3          Q.    You have no evidence that he has hallucinations?

4          A.    No.

5          Q.    That would be audible hallucinations, like God talking to

6    him?

7          A.    That's -- that's tricky.  I think many people will

8    experience feeling God may be talking to them whether or not they

9    actually hear a voice or it's a sense of the experience.  I didn't

10   perceive what he said to be an auditory hallucination.

11         Q.    In fact, your report says no hallu -- I mean, you look at

12   all the senses for hallucinations.  Your report indicates no

13   audible hallucinations, no visible hallucinations, no

14   feeling-on-the-skin hallucinations, no sense of hallucinations; is

15   that correct?

16         A.    That's correct.

17         Q.    Are you changing that today or modifying that?

18         A.    No.

19         Q.    Okay.  He doesn't read people's minds?

20         A.    He said he doesn't read people's minds.

21         Q.    Did you find that he read people's minds?

22         A.    No.  I have no way to prove that.

23         Q.    You indicated he was well-oriented?

24         A.    Yes.

25         Q.    That's something you wanted to assess as far as his

1    competency?

2        A.    It's part of any evaluation, yes.

3        Q.    You indicated in there he understood his current

4    situation?

5        A.    Yes.

6        Q.    Do you stand by that?

7        A.    Yes.

8        Q.    And, again, we have the intact memory.  He has at least

9    average intelligence?

10       A.    Yes.

11       Q.    He has insight into his current situation and is assessed

12   to be fair, his insight into the current situation?

13       A.    Yes.

14       Q.    Now, what does it -- what do you mean when you say the

15   current situation?

16       A.    Where he is, why he's there.  It wasn't in reference to

17   his legal situation; it's:  "Do you know where you are and what

18   you're supposed to be doing here?"  Those kind of things.

19       Q.    In his history you found that he had a BS from Missouri

20   State?

21       A.    That was self-reported, yes.

22       Q.    That he had no mental history in his family?

23       A.    That's what he reported.

24       Q.    He had actually at least one prior marriage?

25       A.    He didn't discuss his relationship status with us.

1      Q.   I think he told you one prior marriage, didn't he, at

2   least?

3      A.   If it's in the report, he told us.  I do remember him

4   saying, "I'm not getting into all that."

5      Q.   He's held jobs in the past?

6      A.   Yes.

7      Q.   He's a landowner?

8      A.   Yes.

9      Q.   You inquired about controlled substances because you were

10   concerned that could affect him.  And what did he indicate there?

11      A.   He indicated that he used marijuana -- marijuana on a

12   daily basis.

13      Q.   And that's one of the reasons he moved to Colorado; is

14   that correct?

15      A.   One of the reasons.

16      Q.   Did you discuss the actual charges with him?

17      A.   Minimally.

18      Q.   Did you know he knows exactly how many charges there are,

19   a hundred and 79 charges?

20      A.   He overstated, I believe.  He said a hundred and 89, but

21   he was aware that there were numerous charges.

22      Q.   And you discussed the top charges with him?

23      A.   Yes.

24      Q.   He understood what they were?

25      A.   Yes.

1    Q.   He understood what the penalties were?

2    A.   Yes.

3    Q.   He understands who the DA is in this courtroom, who the

4    prosecutors are in this courtroom?

5    A.   Yes.

6    Q.   He understands who the defense attorneys are?

7    A.   Yes.

8    Q.   He understands who the judge is?

9    A.   Yes.

10   Q.   By the way, aren't all three of us paid by the

11   government?

12        MS. NELSON:   Objection.   There's no basis to believe that

13   she knows that.

14        THE COURT:   Response.

15   BY MR. MAY:

16   Q.   Do you know whether the judge is paid by the government?

17   A.   I don't believe the judge is paid by the federal

18   government.

19   Q.   That's not what I asked.   I asked you do you know if the

20   judge is paid by the government?

21   A.   I'm sure the judge is paid by the government.

22   Q.   How about the prosecutors; do you believe they're paid by

23   the government?

24   A.   Yes.

25   Q.   How about the public defenders; are they paid by the

1   government?

2        A.   Yes.

3        Q.   Did he specifically say the federal government in your

4   notes?  Is that in your notes?

5        A.   I believe I wrote government in my notes.  It doesn't

6   mean he didn't say federal government.  My notes aren't usually

7   entirely verbatim like that.

8        Q.   In fact, when we talk about the judge, you -- actually

9   somebody -- didn't -- you've got it in front of you, but there's a

10  quote of who he said oversees the judge; right?

11       A.   Where are you looking?

12       Q.   In your report.  I'll try to find it here.  I'm looking

13  at -- it would be --

14       A.   Page 6.

15       Q.   -- the third from last page.  Is that page 6?  Yeah, page

16  6 there.

17       A.   Where he says:  "The judge does what he told"?

18       Q.   Right.  And what's the actual quote you wrote in here?

19       A.   "The judge does what he's told.  He has people higher up

20  telling him what to do."

21       Q.   That's the actual quote.  It doesn't say anything about

22  the federal government there, does it?

23       A.   Not in there, no.

24       Q.   Is that in your notes?

25       A.   I made reference to the government.  As I said, I didn't

1    write down everything Mr. Dear said.

2         Q.   Okay.  Did he know the judge is in charge of the

3    courtroom?

4         A.   I believe so.  He didn't answer that question directly,

5    but he appeared to have an understanding of that, yes.

6         Q.   By the way, let me show her --

7              The parties were given your and Dr. Gray's notes at about

8    4 o'clock yesterday afternoon, I think, late afternoon.  You're

9    familiar with that?

10        A.   Yes.

11        Q.   Okay.  Would you recognize yours and his notes if you saw

12   them?

13        A.   I would.

14        Q.   And showing you what we have paginated 42-393.  Whose

15   notes are those?

16        A.   That's Dr. Gray's.

17        Q.   And 42-379.  Whose are those?

18        A.   Those are mine.

19        Q.   And this appears to be a form that's filled out by each

20   of you?

21        A.   Correct.

22        Q.   Is this what -- how is this -- why is this form -- or

23   when is this form filled out?

24        A.   That's taken during interviews.

25        Q.   And so you would each fill out the same form --

1     A.   Right.

2     Q.   -- as your own notes?

3     A.   Right.

4     Q.   Under thought process, what are the things that you

5  indicated based on the defendant's thought processes?

6     A.   This doesn't necessarily relate to the text on here

7  because he wasn't answering questions as they were posed.  So I

8  needed places to write.  So this isn't necessarily in response to

9  these questions.

10         Do you mind if I read mine?  'Cause this is a better copy

11  of this.

12    Q.   Well, I'm actually looking at -- on the form there's a

13  printed portion that you can pick out certain words --

14    A.   Oh.

15    Q.   -- of what you're assessing of him at the moment.

16    A.   What I circled?

17    Q.   What did you circle --

18    A.   I circled --

19    Q.   -- that you saw in his thought process?

20    A.   -- illogical rambling perseveration.

21    Q.   And can you tell us on Dr. Gray's, as he checked things

22  off on his, what does he check?

23    A.   He checks coherent, logical, goal-directed.  And I don't

24  know what that symbol means about tangential.

25    Q.   So say in the same meeting you're seeing illogical and

1    he's seeing logical, you're seeing rambling, he's seeing coherent,

2    and you're seeing perseveration and he's seeing directed?

3         A.   So very often when you're interviewing somebody who

4    presents a way initially and then, as the interview progresses,

5    that changes.  I can't say whether Dr. Gray filled that out at the

6    same time as I was; we didn't exchange those afterwards, but he

7    wasn't necessarily observing what I was observing at that time.

8         Q.   During -- how -- are you guys in the same room together?

9         A.   We are.  What I mean was he may have been -- something

10   else may have been happening while he was filling out that portion

11   and another conversation may have been underway when I was filling

12   out mine.

13              So what I'm saying is we didn't both necessarily fill out

14   those pieces of paper in response to the same things that Mr. Dear

15   was saying at that precise time.

16        Q.   How big's the room that you're in when you're doing this

17   interview, these two interviews?

18        A.   It's not a large room.

19        Q.   Okay.  How many people can fit in the room?

20        A.   I don't know.  It's a group room with a conference table.

21        Q.   How close would the three of you be?

22        A.   We were -- we were close.

23        Q.   Comparing you to the court reporter, is that about how

24   close you were?

25        A.   Sure.  Yes.

1          MR. MAY:  And the record reflect approximately six feet,

2    four to six feet?

3          THE COURT:  You tell me.

4          MR. MAY:  I'll ask the record to reflect four to six

5    feet.

6          THE COURT:  Any objections to that record?

7          THE DEFENDANT:  Three feet.

8          MS. NELSON:  No.

9          THE COURT:  All right.  No objection.  The record will so

10   reflect, four to six feet.

11   BY MR. MAY:

12        Q.  I think you just heard the defendant say three feet.

13   Would you disagree with that?

14        A.  It was close.  I don't know how many feet it was.

15        Q.  Do you know if the defendant's had a chance to review the

16   evidence against him?

17        A.  I don't know that for a fact, no.  I would imagine that

18   he does.

19        Q.  Did you ask him?

20        A.  Well, he was familiar with the evidence against him.  I

21   don't know whether it's because he reviewed it with his attorneys

22   or because he was making his own conclusions about his case.

23        Q.  Have you had a chance to see some of the jail calls since

24   you interviewed him?

25        A.  I don't recall the time frame for the last set of phone

1    calls that we picked up at the unit.

2        Q.   Okay.  If you talked about even knowing that the

3    prosecution has recovered a wall out of the building that the SWAT

4    team was shooting through, does that indicate that he's familiar

5    with at least some of the evidence in the case?

6        A.   I'm not sure I heard the beginning of that sentence.

7    Would you mind repeating that.

8        Q.   He's talking about the fact that the prosecution

9    recovered a wall from Planned Parenthood, a wall that the SWAT team

10   shot through.  Does that indicate that he's got some idea of some

11   of the evidence collected?

12       A.   I'm not familiar with the wall.

13       Q.   And is he familiar with the facts in this case?

14       A.   He's -- yes.  He appears familiar with the facts of the

15   case.

16       Q.   It's a matter of whether he wants to share that or not?

17       A.   It's a matter whether or not he's logical in discussing

18   them.

19       Q.   Well, does the factual setting of driving there that day,

20   how he found out where Planned Parenthood is, what he did when he

21   got there, who he shot, who shot at him, how he surrendered, was

22   all of that accurate from what you can tell?

23       A.   Well, from what I remember hearing, he injected a good

24   deal of delusional thinking into that.  He was making phone calls

25   and the phone wasn't working, so he believed that the federal

1   government had put a block on the phone so he couldn't make a phone

2   call.  And that was all -- I believe I heard that from either the

3   transport video -- the audio or the jail -- I'm sorry, the

4   interrogation video.  There appeared to be delusional content in

5   his discussion of that date.

6        Q.   Well, was it accurate that he tried to make a phone call

7   and he was unsuccessful?

8        A.   Yes.

9        Q.   And so is he able to understand all of the facts of the

10  situation?  You're saying he may interpret some of it differently,

11  but does he understand the facts?

12       A.   Well, I would say that he's knowledgeable of the facts.

13  I'm not sure I feel comfortable saying he understands them.

14       Q.   By the way, do you realize that he actually sees three

15  different things here, that the federal government is different

16  than his religious belief about Luke 10:18, which is different

17  about his hatred of Planned Parenthood?

18       A.   The first two are very much intertwined, from my

19  understanding.  He believes that -- he's upset with Obama and Obama

20  is trying to prevent him from spreading the word, and that's where

21  the federal government comes in.  Obviously his delusional beliefs

22  of the federal government predates Obama being in office, so he had

23  that belief first, but he's incorporated Obama into that delusion.

24  And Luke 10:18 appears to be related to his beliefs about the

25  federal government and Obama.

1      Q.    Have you had a chance to see his phone call with Amanda

2    Robb?

3      A.    Who's Amanda Robb?

4      Q.    Okay.  So maybe you have not.

5      A.    I don't recall.

6      Q.    If, in fact, in a phone call with Amanda Robb he sees

7    those as three separate things --

8            MS. NELSON:  Objection, Your Honor.  She's stated that

9    she's not had the opportunity to review those phone calls.

10           MR. MAY:  I'll give it as a hypothetical question.

11           THE COURT:  Objection's overruled.

12   BY MR. MAY:

13     Q.    Hypothetically, if he has indicated to somebody that, in

14   fact, those are three totally different things for him, his

15   religious beliefs regarding 10:18 and President Obama, the federal

16   FBI or feds following him, and his loathing of the Planned

17   Parenthood and other clinics similar to that are three separate

18   issues in his mind --

19           MS. NELSON:  Objection; relevance.

20     Q.    -- would that change anything you've testified to?

21           THE COURT:  Objection's overruled.

22           THE WITNESS:  I believe that Mr. Dear's probably not the

23   best person to understand his delusions because he doesn't believe

24   he has any, but if he talks about them in three separate ways, I

25   would imagine that that's how he sees it.

1  BY MR. MAY:

2      Q.   The understanding proceedings, does he understand the

3  proceedings today?

4      A.   He's sitting and being quiet, for the most part.  I don't

5  know what he's understanding or what he's not understanding.

6  Certainly some of his statements seem to be missing the point.

7      Q.   He knows that he's here for a competency hearing; is that

8  correct?

9          MS. NELSON:  Objection.  What's the basis of -- it's

10 speculation.

11         MR. MAY:  Based from the way she's been talking about the

12 whole competency hearing, that's what she was assessing.

13         THE COURT:  Objection's sustained.

14 BY MR. MAY:

15     Q.   And did you inquire of him whether he knows what a

16 competency hearing is?

17     A.   Not competency hearing specifically, what a competency

18 evaluation is.

19     Q.   Okay.  He knew you were interviewing him for a competency

20 evaluation?

21     A.   Yes.

22     Q.   Doesn't he know the judge will be making a decision

23 whether he's competent or not?

24     A.   I don't know if he knows that.

25     Q.   I thought you -- I thought we heard testimony earlier

1   that if the judge found him incompetent, then it meant the judge

2   was part of the conspiracy?

3        A.   No, if myself and Dr. Gray found him incompetent.

4        Q.   If, hypothetically, he said that his lawyer wants to send

5   him back to the nuthouse and the prosecutors have said they wanted

6   a hearing on the 28th of April and he was going to -- and that

7   there was going to be a hearing and that he advised that the

8   prosecution was going to get all records from the psychiatrist, the

9   mental hospital and the jail so they could cross-examine the

10  doctor, is that a description of a competency hearing, in your

11  opinion?

12       A.   That sounds accurate.

13       Q.   And that, hypothetically, if a female on the phone call

14  said that they're thinking the prosecution did not want him to be

15  declared incompetent and wants this to go to trial, and he

16  responded right several times.  He went on to say that the

17  prosecution knows what he's saying and that they're fighting it by

18  saying they want a hearing next month so they can cross-examine the

19  psychiatrist.  Is that a description of the competency hearing?

20       A.   Well, we're not here to discuss insanity.  So there seems

21  to be some misunderstanding there.

22       Q.   Okay.  But otherwise the description he gave would

23  indicate he would know what a competency hearing is?

24            MS. NELSON:  Objection, Your Honor.  She's indicated

25  before that she's not familiar with the phone call.

 1          THE COURT:  Objection's overruled.

 2          THE WITNESS:  Apparently the statement is he has an

 3   awareness of what's going on, yes.

 4   BY MR. MAY:

 5      Q.   Actually he went over with you the fact that he knows he

 6   has certain constitutional rights?

 7      A.   Yes.  He knew many things.

 8      Q.   By the way, did you know that he actually started telling

 9   the police officer the *Miranda* rights before the police officer

10   told it to him?

11      A.   I did hear that.

12      Q.   When did you hear that?

13      A.   That was on the audio transport.  I heard it a couple

14   times.

15      Q.   What are the constitutional rights that he knows?

16      A.   His right to remain silent in regards to testifying and

17   clearly his *Miranda* rights.

18      Q.   And his what, *Miranda* rights?

19      A.   *Miranda* rights.

20      Q.   Did he go over with you that he also has a constitutional

21   right to represent himself?

22      A.   Yes, he's aware of that.

23      Q.   Is that accurate?

24      A.   Well, that's for the judge to decide.

25      Q.   Okay.  If it were accurate that he has a constitutional

1  right to represent himself, would that indicate some understanding

2  of the legal system?

3      A.   Consistent with many of the things in the legal system,

4  yes.

5      Q.   And in fact, isn't the context that we're here today not

6  a competency to stand trial, but a competency on whether he can

7  make a determination of whether he can represent himself or not?

8      A.   My understanding --

9           MS. NELSON:  Objection; a misstatement of the Court's

10 order.

11          THE COURT:  Objection's sustained.  It's not for a

12 competency evaluation, period.  It's pursuant to statute.

13 BY MR. MAY:

14     Q.   Were you aware that the judge ordered a competency

15 evaluation to assess whether the defendant -- initially to assess

16 whether the defendant could make a determination of whether he

17 could fire his legal representation?

18          MS. NELSON:  Objection; misstatement of the Court's

19 order.

20          MR. MAY:  Judge, that's my memory exactly how it started.

21          THE COURT:  It may have started that way, but that's not

22 the whole -- we're having a competency hearing pursuant to the

23 statute.  Objection sustained.  I ordered a general competency

24 hearing, period.

25          THE DEFENDANT:  'Cause I wanted to represent myself, fire

1    my lawyers.  That's why we're here.

2    BY MR. MAY:

3        Q.   You just heard what Mr. Dear said.  Is that correct, that

4    he wanted to fire his lawyers and that's why he's here?  So that

5    would be his perception of why even we're here?

6        A.   Well, if that's coming out of his mouth, that certainly

7    appears to be his perception.

8        Q.   And if something was said like that at one of the initial

9    hearings, is that something that you could, then, say is the reason

10   that we're here today?

11             MS. NELSON:  Objection; speculation.

12             THE COURT:  Any response?

13             MR. MAY:  I assume she's gonna answer what she --

14             THE COURT:  I'm asking for your response to the

15   objection.

16             MR. MAY:  Right.  I don't think it's speculative because

17   if she doesn't know, she won't -- the question was formed in the

18   way that she doesn't have to answer it if she doesn't know.

19             THE COURT:  Objection sustained.

20   BY MR. MAY:

21       Q.   Does he understand that he has a right to speedy trial?

22       A.   I didn't ask him -- we didn't ask him specifically.

23       Q.   Is it any attorney that he can't get along with or is

24   this specific attorney, Dan King?

25       A.   He made some statements specific to Dan King, but he also

1    referenced the rest of the team.  I don't believe it's a conflict

2    between him and Mr. King.

3        Q.    Did he ever reference the names of any of the others?

4        A.    He mentioned Ms. Roy by name.

5        Q.    But isn't he specifically focused on Dan King when he

6    says things like the person is lying, he can't trust him --

7        A.    It wasn't all --

8        Q.    -- he's corrupt?

9        A.    It wasn't all specific to Mr. King.  Obviously the

10   statement he made about him being the Batman guy was specific to

11   Mr. King, but he was not specific when he was talking about him

12   lying to him and trying to get him to make statements they could

13   use.

14       Q.    Are any of the calls that you have reviewed or any of the

15   evidence that you have a specific statement that you can point out

16   to me that he made a derogatory statement about any other attorney

17   on his team except Dan King?

18       A.    No.  From memory I can't do that.

19       Q.    You gave some generalities about the trial team, if

20   you're saying that there was a never specific treason about Rose

21   Roy?

22       A.    No, but he would say they instead of him.

23       Q.    But generally, when he would direct specific things to

24   Mr. King, he would say very specific things like lying, corrupt,

25   those sorts of things --

1      A.   I didn't have --

2      Q.   -- in a statement?  I apologize.  It should be crooked, I

3   think, is the word that he used.

4      A.   He did make statements about Mr. King, but he also talked

5   about that he was aware that he was being represented by a team;

6   and his statements about not being able to work with counsel were

7   not specific to Mr. King.

8      Q.   And did you ask him if he could work with other attorneys

9   if they were appointed on this case?

10      A.   I did.

11      Q.   What did he respond?

12      A.   He was vacillating.  We were trying to figure out

13   whether -- whether it was a conflict with Mr. King or not because

14   that's important.  And he said he would work with alternate defense

15   counsel and then he said, "No, I want to proceed pro se.  Well, I

16   don't know whether I want to proceed pro se."  He doesn't actually

17   provide an answer that he stuck with.

18      Q.   And actually in your notes, 42-386 on mine, and maybe I

19   can show your note, but a notation "I would work with ADC"?

20      A.   Right, but he also contradicts himself.

21      Q.   And ADC for the record is what?

22      A.   Alternate defense counsel.  That there was a conflict

23   with the public defender; he could be appointed an ADC.

24      Q.   And you were made aware, weren't you, that the first time

25   he came into the court and the first day that we had cameras here

1   that he recognized Mr. King as the Batman attorney; is that

2   correct?

3          A.   I didn't know if that was the first time he went with Mr.

4   King or not, but I believe I watched that video.

5          Q.   But you met with Donna Billek and myself?

6          A.   Yes.

7          Q.   Do you remember I asked you that the -- did he recognize

8   Mr. King from his work on the Holmes' case?

9          A.   Well, he identified him as the Batman guy, but I don't

10  know that he knows he's the Batman guy.

11         Q.   And did you know that when he was in the jail, he wasn't

12  taking visitations from his attorneys?

13         A.   Yes.

14         Q.   Did you know that when he was in the jail before that

15  hearing, he wasn't taking any phone calls?

16         A.   He was refusing to talk to counsel.

17         Q.   And not taking phone calls from the general public even?

18         A.   I wasn't informed of who he was refusing phone calls to.

19  I knew he wasn't communicating with counsel.

20         Q.   Did you know he had no visitors before that hearing?

21              MS. NELSON:  Objection; a misstatement of the evidence.

22              THE COURT:  Objection's overruled.  If she knows, she can

23  answer.

24              THE WITNESS:  I watched videos of him being transported

25  to the contact room where he refused visits.  I have no record of

1  who he refused to see, that he never actually walked in the videos.

2      Q.   Is it fair to say that for some reason he recognized Mr.

3  King as the Holmes' attorney?

4      A.   He did.

5      Q.   And do you know if he formed an opinion about Mr. King

6  based on what he knew about Mr. King's representation of

7  Mr. Holmes?

8      A.   He never expressed to us that he disliked Mr. King

9  because Mr. King failed Mr. Holmes in any way.  All he did was

10  mention that he's the Batman guy.  There was no discussion of

11  Holmes or the outcome of that case.

12      Q.   Did he indicate he didn't want to be like the Batman guy?

13      A.   He indicated he didn't want to be like the Batman guy in

14  the context of not wanting to be drugged up.

15          THE DEFENDANT:  Right.

16      Q.   And in fact, have you got a transcript of that hearing?

17  Have you had a chance to read that?

18      A.   I don't believe I have a copy of the transcript.

19      Q.   Were you given a copy of the film from that hearing?

20      A.   I don't recall.

21      Q.   Do you re -- do you recall, then, if I ask you that each

22  time Dan King would say, "I'm his attorney," the defendant in that

23  hearing would say, "No, you're not," and he was reacting

24  particularly to Dan King?

25      A.   If that's what your experience, then I will concede that

1    that's your experience.  I don't have an opinion on that.

2        Q.   And if we've gone through in previous testimony here

3    today some jail calls where he gives some specific instances where

4    he believes Mr. King has, in his terms, quote, lied to him, are you

5    familiar with those?

6        A.   I was likely familiar with them at the time of the

7    evaluation, but, unfortunately, I've reviewed a lot of discovery

8    since then.

9        Q.   One example he gave is that he said to Ms. Robb on March

10   25th that his lawyer had told him that he had been declared

11   incompetent, and he responded that was correct; that he said his

12   attorney would not reveal in court -- that in court he said to the

13   court they did not know yet whether Mr. Dear had been found

14   incompetent; it sounds like the attorney was lying in the

15   courtroom?

16       A.   This was after my evaluation with him.  So I haven't

17   reviewed any of that information.

18       Q.   Have you had a chance to see any transcripts of the more

19   recent hearings in terms of the way the attorneys are hiding their

20   positions on competency or incompetency?

21       A.   I haven't reviewed --

22            MS. NELSON:  Objection.

23       A.   -- any information.

24       Q.   Okay.  Have you had a chance to talk -- you had a chance

25   to talk with counsel on both sides; is that correct?

1       A.    Correct.

2       Q.    Several times?

3       A.    Well, I spoke with you guys once.

4       Q.    How many times have you spoke to the defense?

5       A.    Twice.

6       Q.    Twice.  Have you talked to Mr. King, for instance?

7       A.    Yes.

8       Q.    Has he indicated to you whether they've been forthright

9    about whether they feel -- to Mr. Dear whether they feel he's

10   incompetent and should be sent to the state hospital?

11           THE COURT:  Who's he?  Who's he?

12           MR. MAY:  Has Mr. King indicated to you whether he has

13   informed Mr. Dear his position on whether Mr. Dear should be found

14   incompetent or not?

15      A.    I --

16           MS. NELSON:  Objection.  She has no basis to know that,

17   as well as I object under attorney-client privilege.

18           MR. MAY:  I'm asking about what Mr. King's conversation

19   with her is.  I'm assuming that's waiving the attorney-client

20   privilege.

21           THE COURT:  Objection's overruled.

22           THE WITNESS:  I did not have a conversation with Mr. King

23   about that.

24   BY MR. MAY:

25      Q.    Have you talked to him about how forthright he is with

1    his attorney -- with his client?

2        A.   No.

3        Q.   Okay.  Isn't is that important in assessing the reason

4    their relationship is breaking down or not?

5            MR. KING:  My credibility?

6            THE COURT:  Counsel, we have the other counsel's witness.

7    She's to make the objection.

8            MS. NELSON:  Your Honor, I object under relevance.

9            THE COURT:  Objection sustained.

10   BY MR. MAY:

11       Q.   In the meeting that you had with us, did I raise the

12   issue that it could be that he just doesn't like Dan King?

13       A.   Yes.

14       Q.   And did you investigate that at all?

15       A.   Well, it was something we considered, but he'd been

16   having problems communicating and trusting his entire team.  There

17   was no reason to isolate Mr. King from that.  He certainly made no

18   statements about "I'll work with the other two if you get rid of

19   him.  I'll be more than happy to work with another attorney."  He

20   made no such statement when we offered that conversation to him.

21   And we concluded that it wasn't just a conflict that he was having

22   with Mr. King.

23           THE DEFENDANT:  I'm gonna represent myself, my

24   constitutional right.  My life on the line.

25       Q.   By the way, when we were talking about Luke 10:18, did

1    you hear Mr. Dear speak out earlier saying that that was a

2    religious belief on his part?

3        A.   He did say that.

4        Q.   And in reference to President Obama with Luke 10:18; is

5    that correct?

6        A.   Correct.

7        Q.   Just to put that into the record.

8             Actually, when you say initially he didn't -- he's been

9    reluctant to talk to you, particularly in the second interview; is

10   that correct?

11       A.   Correct.

12       Q.   But if you just stay with him and keep talking, he would

13   eventually talk with you; correct?

14       A.   Well, he was willing to talk about light topics that he

15   chose.  He wasn't willing to necessarily participate with the

16   interview.

17       Q.   Now, the first interview that got cut short, as I

18   understand, that was a response to a motion that the defense filed?

19       A.   That's my understanding also.

20       Q.   By the way, for instance, did you hear -- when you were

21   talking about the food being poisoned in the jail, did you hear Mr.

22   Dear commenting that he's now eating the food at the jail and

23   that's all been straightened out?

24       A.   I didn't hear him say that, but I imagine he is,

25   otherwise he'd be in pretty poor shape by now.

1       Q.   Well, did you hear, when he spoke up about that, saying

2    that they've worked out the issue that was bothering him about the

3    way that he got his food?  Did you hear him say that in the court

4    today?

5       A.   I don't recall hearing that.

6       Q.   Did you know that they started putting his food on a tray

7    and that made a big difference to him?

8       A.   I don't know anything about the food at this point in

9    time.

10      Q.   How old is your information on that he was being poisoned

11   at the jail?

12      A.   Those were from the beginning -- the early days from when

13   he was initially incarcerated, the end of November, beginning of

14   December.

15      Q.   Was it his concern it was just poisoned or do you

16   actually have in your notes that the federal government was

17   poisoning him?

18      A.   If I had it in my notes, that's what I took from the

19   videos that I was watching.  I don't recall.

20      Q.   I didn't see it in your notes that actually the federal

21   government was poisoning him.  I could be wrong.

22      A.   What notes are you referring to?

23      Q.   Do you have any notation that it was -- who was --

24      A.   Well, you're talking from my notes.  If you can direct me

25   to where it is, I'll be happy to verify that it's there.

 1      Q.   I have to say, I don't think it is in your notes, but if

 2   you can show me where in your notes the federal government was

 3   poisoning him.  That's my point.

 4      A.   It was my understanding from watching the video that

 5   that's what he said.  I did not write anything specific about that

 6   that I have here with me today.

 7      Q.   He has a factual understanding of the proceedings, you

 8   said today earlier?

 9      A.   Yes.

10      Q.   What proceedings are you talking about?

11      A.   Being in court and what happens when you're in court and

12   being in court.

13      Q.   And did you talk about, well, there are different

14   proceedings in court?

15      A.   Um-hmm.

16      Q.   Did you say there was a requested competency proceeding?

17      A.   Well, the evaluation and the competency to proceed

18   evaluation, so it covers competency proceedings.

19      Q.   And were there any particular parts of the court process

20   you went through with him or that was just a generalized

21   assessment?

22      A.   We weren't able to go through very many processes with

23   him because of his reluctance to answer questions, but he made some

24   spontaneous statements about the judge, about the proceedings that

25   indicated that he had an awareness of what happens here.

1      Q.   To the point that you can state that he has a factual

2   understanding of all the proceedings that end up in the

3   adjudicative process?

4      A.   I don't think we stated that he has a factual knowledge

5   of all of the proceedings through adjudication.  That was the

6   purpose of the evaluation.  This was not a standard evaluation

7   inasmuch as we didn't ask questions we would normally ask because

8   we weren't afforded the opportunity to.

9           MR. MAY:  One moment, Your Honor.

10          THE COURT:  Yes.

11          (Short pause.)

12     Q.   He was sent down to the hospital for the state hospital

13   to assess his competency; is that correct?

14     A.   Correct.

15     Q.   And so the state hospital, through you or others, could

16   have kept him as long as they wanted to make those evaluations; is

17   that correct?

18     A.   They could have, but our evaluation was complete.

19     Q.   Okay.  But -- so did you have adequate questions -- did

20   you have adequate time to get all your questions answered to make

21   an assessment or didn't you?

22     A.   We had adequate time, I suppose, but I wasn't afforded

23   the opportunity because Mr. Dear wasn't being cooperative.  It's

24   not that we ran out of time; he wasn't willing to answer the

25   questions on most occasions.

1    Q.   Well, one occasion you got cut off.  The attorney general

2    sort of cut things off because of motions; right?

3    A.   Right, but he also was very resistant to answering close

4    questions during that interview.

5    Q.   His perception is that what he wants to do with this case

6    is plead guilty; is that correct?

7    A.   At the time of the evaluation.  I can't speak to after

8    that because I don't know.

9    Q.   And that's -- his perception is different than what the

10   defense wants to do; he has a conflict with his attorneys over the

11   course of this case?

12           MS. NELSON:  Objection; speculative.

13           THE COURT:  Objection's overruled.

14           THE WITNESS:  I don't know how much detail we went into

15   what he wants to do vs. What his attorney wants him to do.  He

16   wasn't willing to talk about other options at the time that we met

17   with him in terms of considering a plea deal that may or may not be

18   offered or other defenses that might be available to him other than

19   what conversation he engaged in.

20   BY MR. MAY:

21   Q.   You didn't -- you didn't have a chance to discuss that at

22   all.  Well, he didn't talk about plea deal; he just talked about

23   pleading guilty; is that correct?

24   A.   I tried to engage him in conversation about taking a

25   plea, hypothetically, to affect his thought process.

1      Q.   Okay.  And did he express he thinks his attorneys wanted

2   him to plead insanity?  That's what I got.

3      A.   I don't know that he specifically said that.  In fact, he

4   expressed that his attorneys wanted him to plead not guilty so they

5   could drag the trial out for years like the attorneys wanted to do.

6      Q.   Okay.  And he's in disagreement with that, with that

7   particular -- what would happen on his case and that's the

8   conflict, isn't it, between he and his attorney?

9           MS. NELSON:  Objection; speculation about his current

10   state of mind.

11           THE COURT:  Any response to the objection, Mr. May?

12           MR. MAY:  I'll rephrase the question.

13           THE COURT:  Objection sustained.

14   BY MR. MAY:

15      Q.   At the time that you evaluated him and you wrote this

16   report, isn't that the issue that he has, that the course of the

17   case that he wanted to do is in conflict with the course of the

18   case his attorneys wanted to do; that is, he wanted to plead

19   guilty, and you've just said they wanted to drag the case out

20   several years and plead not guilty?

21      A.   Well, that was one of the issues he expressed about his

22   attorneys.  It wasn't the only issue, because you have to consider

23   that he believes that they're lying and trying to catch him and

24   make him say things and all these other things that didn't make

25   sense in the context of the conversation, but, yes, he appeared to

1    be having a disagreement about strategy.

2            THE DEFENDANT:  And Dr. Gray brought up I could plead

3    innocent by reason of insanity.

4        Q.   Did you hear what Mr. Dear just said?

5        A.   I did.

6        Q.   He said Dr. Gray brought up and said he's innocent by

7    reason -- be innocent by reason of insanity?

8        A.   No.  I think he said that Dr. Gray brought up that he

9    could plead innocent by reason of insanity, which doesn't sound

10   accurate 'cause that's not a plea available to him, and that's

11   certainly not something Dr. Gray would have said.

12       Q.   Okay.

13           THE DEFENDANT:  Oh, he said it.

14           MR. MAY:  I have no further questions of this witness.

15           THE COURT:  Redirect.

16           MS. NELSON:  May I have just a moment, Your Honor?

17           THE COURT:  Yes.

18           (Short pause.)

19                        REDIRECT EXAMINATION

20   BY MS. NELSON:

21       Q.   Dr. Grimmett, Mr. May began by asking you a series of

22   questions about Mr. Dear's relationship with God; do you recall

23   that?

24       A.   Somewhat.

25       Q.   And Mr. May asked you a question something along the

 1    lines of Mr. Dear has never said that God actually talks to him.

 2    Do you remember that?

 3         A.   Yes.  I think so.

 4         Q.   Is it, in your opinion, necessary for God to speak to a

 5    person in order for that person to have a delusional belief?  Is

 6    that a necessary component of delusions?

 7         A.   To be able to hear the voice that way?

 8         Q.   Yes.

 9         A.   No.

10         Q.   And Mr. May asked you whether Mr. Dear believed that God

11    helped him with important decisions that he's made in his life.  Do

12    you remember that?

13         A.   Yes.

14         Q.   Is that the primary basis for your conclusion that he

15    suffers from delusional disorder?

16         A.   No.

17         Q.   Can you explain, once again -- just summarize what your

18    opinion is regarding the relationship of his religious beliefs to

19    this systematized delusion that he has.

20         A.   Chronologically, it appears that Mr. Dear's delusions

21    began with feeling persecuted by the federal government.  He's

22    talked extensively about a phone call he made after Waco referring

23    to the FBI as the Federal Bureau of Incineration that has persisted

24    throughout somewhere.  Along the line he has picked up this idea

25    about Luke 10:18 and wanting to spread the message and Obama very

1    much not wanting that message spread and incorporating the feds --

2    the federal government into playing psychological tricks on him

3    throughout the years and expending massive resources to try to stop

4    him from getting the word out and he's determined and because he

5    embarrassed him.

6         How much his relationship to God and Luke 10:18 are

7    related, it's hard to tell.  Certainly if I made an extended

8    observation, that would become clearer.  But he very much

9    spontaneously talks about what God has informed him of and wanting

10   to get Luke 10:18 out, expressing to other people that they're now

11   in danger because he's shared information about Luke 10:18 with

12   them.  And it's all very convoluted and things intertwined in

13   there.

14        THE DEFENDANT:  It's called the Bible.

15   Q.   Even if you set aside all of those religious beliefs,

16   would it still be your opinion that he suffers from a delusional

17   disorder?

18   A.   Yes.

19   Q.   Irrespective of any of the religious-based...

20   A.   Yes.  It seems like that's a newer aspect of the

21   delusions he's operating from, but the concern about the federal

22   government has been longstanding.

23   Q.   You were asked a series of questions about the date that

24   you completed your competency evaluation, the fact that some length

25   of time has passed.

1     A.   Yes.

2     Q.   And you stated that it sort of depends on the case

3   whether that is an issue or not.  Is that a concern for you in this

4   case, the fact that several months have passed from the time of

5   your evaluation to the time of this hearing?

6     A.   I have not received any information to indicate that Mr.

7   Dear's symptoms have spontaneously remitted or even subsided.  And

8   certainly given his speech today, it seems like he's still trying

9   to let people know his message and seems to be saying very similar

10   things that I observed when -- when we met with him.

11     Q.   And is the fact that these delusions appear to have

12   existed for many years relevant to your opinion that this delay is

13   not a concern?

14     A.   It's certainly been a demonstration.  I mean, I haven't

15   seen records from 22 years ago, but I'm going off of what he

16   informed me.  Having held the delusion for 22 years has given me

17   more confidence, with three months passing, that he likely still

18   holds this belief.

19     Q.   And the district attorney went through a long list of

20   things that Mr. Dear is able to do or pathos that he possesses,

21   such as having an intact memory, being coherent and goal-oriented,

22   not thinking he can read people's minds, being of average

23   intelligence -- being of average intelligence.  Do any of those

24   things affect your opinion that he suffers from a serious mental

25   illness?

1      A.   No.

2      Q.   Are any of those things inconsistent with suffering from

3  a serious mental illness?

4      A.   No.

5      Q.   Are any of those things inconsistent with suffering from

6  delusional disorder?

7      A.   No.

8      Q.   You were asked about the fact that he does not appear or

9  did not endorse suffering from any hallucinations.  If he had

10  endorsed suffering from hallucinations, would that have changed

11  your diagnosis, potentially?

12      A.   Potentially.

13      Q.   To what?

14      A.   We would have started to see if there was any

15  similarities or symptoms we would expect to see with a

16  schizophrenic illness.

17      Q.   And is the presence of hallucinations -- is that a

18  diagnostic criteria for delusional disorder?

19      A.   No.

20      Q.   Do any of those abilities that Mr. Dear possesses, such

21  as having intact memory and being well-oriented, et cetera, affect

22  your opinion about whether he is incompetent -- that he's

23  incompetent to proceed?

24      A.   No.  Those are necessarily what we call

25  competency-related functional abilities.  And those are very much

1    specific to the requirements of the statute.  And you can have many

2    abilities intact, but if you're compromised in the areas that

3    you're required to have the competency, that's what leads us to

4    that conclusion.

5         Q.    You were asked a question about Mr. Dear's statements

6    that the DA, the public defender, and the judge are all paid by the

7    government.  Was it your impression, from speaking with him and

8    reviewing the materials in this case, that that statement was

9    connected to his delusional beliefs about the federal government?

10        A.    That was my interpretation.

11        Q.    Are all of his delusional beliefs about the federal

12   government in particular?

13        A.    They appear to be.  I'm trying to think of one that he

14   may have suggested, but, no, I think they're all related to the

15   federal government.

16             THE DEFENDANT:  I can prove that the feds had talked -- I

17   mean, Detective Schiffelbein said that he checked with the radio

18   station.  And I was on the radio station on the 29th and I talked

19   about Obama and that the feds said that they're not following me.

20   Do you really think that I could be on a radio station and say

21   something about Obama and the FBI not want to check out this person

22   if I said something about the president?  You don't think they're

23   gonna check that out?  Wake up, people.  Of course they lie.  They

24   don't want to admit anything.

25        Q.    Dr. Grimmett, you were asked a series of questions by the

1    district attorney about whether or not Mr. Dear has a factual

2    knowledge of his case.  Does that bear upon your assessment -- or

3    how does that bear, if at all, on your assessment that he is

4    incompetent?

5         A.   The ability to have a factual knowledge about your case,

6    most people have the ability to have a factual knowledge of their

7    case.  Most people are not found incompetent because they don't

8    have a factual knowledge of their case.  What -- what competency's

9    all about doesn't -- so you can know facts, but if you're not able

10   to use those facts and make decisions, then that is apparent.

11        So having a factual knowledge is not sufficient to

12   indicate that somebody has, in fact, competency or related

13   functional abilities.

14        Q.   And what are Mr. Dear's decisions based on, in your

15   opinion of this case?

16        A.   It's based on his delusional belief system that he's

17   being persecuted by the FBI.

18        Q.   You were asked a series of questions about whether -- his

19   concern about defense counsel specific to Mr. King.

20        During your review of the materials in this case, did you

21   watch videos of -- from the El Paso County detention center of Mr.

22   Dear refusing visits with people in addition to or other than Mr.

23   King?

24        A.   I -- I have a memory of seeing Mr. King and others in the

25   room.  I cannot state who those people were, but he has refused

1   visits with more than just Mr. King.  I'm aware that he refused a

2   visit with a psychiatrist.  I don't recall all he refused visits

3   with.

4        Q.   And Mr. May referred to a conversation that you and Dr.

5   Gray had with himself and Ms. Billek in preparation for this

6   hearing.

7             And do you recall you and Dr. Gray explaining to the

8   prosecution during that hearing, according to their memorandum that

9   they shared with you afterwards, that it is very likely that the

10  defendant will believe that a different attorney would be sent by

11  the federal government as he thinks the same of Mr. King?

12       A.   Yes.

13       Q.   And is the standard -- under the second prong of

14  incompetency, is the standard whether he's willing to or able to

15  work with counsel?

16       A.   It's the ability.  It's not willingness.

17       Q.   And is it an ability that is based on rationality?

18       A.   That's how I interpret the statute.

19       Q.   And does Mr. Dear possess that ability, given what you

20  know of his mental illness?

21       A.   My opinion is at the current time he does not.

22       Q.   So is it your opinion that this is more than just a

23  personality conflict with one or more of his attorneys?

24       A.   Yes.

25       Q.   And you were asked the questions about his concerns over

1    his food and water being poisoned in the jail and the fact that

2    that issue appears to have been resolved or appears to no longer be

3    an issue.

4         A.   Right.

5         Q.   And is that relevant or does that change your diagnosis?

6         A.   It doesn't really bear on his competency at all.  He can

7    still technically be refusing food and be competent notwithstanding

8    everything else, if that was the only issue.  Him refusing food

9    certainly speaks to the widespread notion that he's being

10   persecuted one way or another, poisoned, but if that was the only

11   issue, that would not be sufficient.  That would not necessarily

12   impact his ability to whether or not these things -- it doesn't

13   represent terribly much in regards to competency.

14        Q.   Does the fact that he's eating now mean that he wasn't

15   delusional of -- delusional about his food being poisoned at an

16   earlier time?

17        A.   I have no information to support that.

18        Q.   Is it your opinion that he at some point in time did

19   suffer from delusions that his food and water was being poisoned?

20        A.   From what I observed, it seemed like a very real belief

21   of his, yes.

22             MS. NELSON:  May I have a moment?

23             THE COURT:  Yes.

24             MS. NELSON:  I have nothing further.

25             MR. MAY:  If I might, Your Honor?

1            THE COURT:  Yes.

2                         RECROSS-EXAMINATION

3  BY MR. MAY:

4      Q.   In reference to Mr. Dear speaking out today while you've

5  been in here, isn't it each time a response something is going on

6  at the moment?

7      A.   Yes.

8      Q.   So he's gone to the appropriate topic of whatever is

9  being discussed at the moment?

10     A.   Yes.

11     Q.   You had indicated that it has been made to counsel that

12  whenever he talked about -- whenever he talked about the

13  government, it was your interpretation that it was the federal

14  government.  Did you have the opportunity, though, to really

15  question him each and every time to determine if it was the federal

16  government or was that, as you said, it's your interpretation?

17     A.   Well, he used the term "the feds" several times.  So when

18  he used the term "government," it was my opinion he was just

19  abbreviating the federal government, but, no, I did not ask him

20  each and every time.

21     Q.   He -- have you seen any of the phone calls with Amanda

22  Robb?

23     A.   I'm not familiar who she is.

24          MS. NELSON:  Objection; asked and answered.

25          THE COURT:  It was asked.  Objection sustained.

1  BY MR. MAY:

2      Q.   He has the ability to talk with some people, if he wants

3  to; is that correct?

4           MS. NELSON:  Objection; speculation.

5           THE COURT:  Objection's overruled.

6           THE WITNESS:  He has the ability to talk, yes.

7  BY MR. MAY:

8      Q.   He did that with Detective Schiffelbein?

9      A.   Yes.

10     Q.   He's clearly a member of the government and paid by the

11  government?

12     A.   (Nodding.)

13     Q.   Did you explore the possibility that something -- that he

14  had strong opinions about Mr. King and something happened between

15  them that would cause him not to talk to Mr. King the way he did to

16  Detective Schiffelbein?

17     A.   He expressed that Mr. King had given him reason not to

18  trust him.  The examples he gave did not seem to be relevant to the

19  matter at hand.  Who he decides is part of his delusion and not

20  part of his delusion, I can't explain that.  It's unique to him and

21  his disorder.

22     Q.   My question was:  Did you explore with him -- did he have

23  an opinion of Mr. King because of the Holmes' case and did he have

24  an opinion of Mr. King because of something that happened between

25  the two of them --

1    A.    Right.

2    Q.    -- before that?

3          MS. NELSON:  Objection; asked and answered.

4          THE COURT:  Objection's overruled.

5          THE WITNESS:  I did just state that we asked him if Mr.

6  King gave a reason not to trust him, and he gave illogical answers

7  and he expressed concern that he was going to be medicated like

8  Mr. Holmes was.  He did not express any concern about the outcome

9  of that case, and that was the extent of our discussion.

10         THE DEFENDANT:  Because in the newspaper Mr. King said I

11  was incompetent the day after our first hearing.  So when you say

12  somebody's incompetent, is that helping my case?  I don't think so.

13  BY MR. MAY:

14   Q.    Did you hear what the defendant just said?

15   A.    I did.

16   Q.    What did he say?

17   A.    He said that -- paraphrasing, he objects to Mr. King

18  saying he's incompetent because it doesn't help his case, which

19  does not appear to be consistent with my understanding of raising

20  the issue.

21   Q.    Actually he said Mr. King said he was incompetent after

22  the first hearing.

23   A.    Right.

24         THE DEFENDANT:  'Cause the newspaper said.

25   Q.    According to the newspaper; is that correct?

 1      A.   That's what he said, yes.

 2           THE COURT:  All right.  Let's take an afternoon recess.

 3   If you all can be ready to go at 25 to 4:00, please.

 4           May this witnesses be excused?  I'm sorry.

 5           MR. MAY:  Yes, Your Honor.

 6           THE WITNESS:  I wasn't sure if I was.

 7           THE COURT:  Yes.

 8           MR. MAY:  From the prosecution she can be excused.

 9           THE COURT:  I'm sorry?

10           MR. MAY:  She can be excused from our side.

11           THE COURT:  Okay.  All right.  And the defense as well?

12           MS. NELSON:  Yes, sir.

13           THE COURT:  Okay.

14           (At 3:21 p.m. - recess.)

15           (At 3:36 p.m. - proceedings reconvened; all parties

16   present.)

17           THE COURT:  The Court will recall 15CR5795.

18           I'm guessing that we are not gonna finish today.  And I

19   will address the issue of when the next hearing will be about

20   quarter to 5:00 and stop a little bit early to try to coordinate

21   schedules at that time.

22           MS. BILLEK:  Thank you, Your Honor.

23           THE COURT:  Okay.  You may call your next witness.

24           MR. KING:  Judge, given the fact that it's 25 minutes to

25   4:00 and that Dr. Grimmett has testified fully; that she testified

1    that Dr. Gray has the same opinions that she does; that Dr. Gray's

2    report -- and that they wrote the report together containing the

3    same opinions, that report is now in evidence, we think that we've

4    met our burden.  And I don't want to waste the Court's time just

5    going over the same thing again with a different doctor who has the

6    same conclusion.

7            So we don't have any more evidence to present.

8            THE COURT:  District attorney, any evidence?

9            MS. BILLEK:  Your Honor, may I have just a moment?  We

10   were not told that that was going to be their plan.  May I have

11   just a moment?

12           THE COURT:  Sure.

13           (Short pause.)

14           MS. BILLEK:  Your Honor, we would call Dr. Gray.

15           THE COURT:  Okay.

16           MS. BILLEK:  And may I have just one moment to retrieve

17   him from the hallway?

18           THE COURT:  Sure.

19           MR. MAY:  He needs to pass through the metal detector.

20           (Short pause.)

21           THE COURT:  Would you raise your right hand, please.

22                   DR. B. THOMAS GRAY,

23   the witness herein, called at 3:39 p.m., was sworn by the Court,

24   testified as follows:

25           THE COURT:  Please be seated.

1          THE WITNESS:  Thank you.

2                    DIRECT EXAMINATION

3    BY MS. BILLEK:

4          Q.    Good afternoon, Dr. Gray.

5          A.    Good afternoon.

6          Q.    Can you please introduce yourself to everyone and spell

7    your last name for the court reporter, please.

8          A.    My name is B. Thomas Gray, G-r-a-y.

9          Q.    And can you please tell us how you're currently employed.

10         A.    I am a psychologist with the title of director of

11   training in the court services department at the Colorado Mental

12   Health Institute at Pueblo.

13         Q.    What are your primary duties at the Colorado Mental

14   Health Institute at Pueblo?

15         A.    I conduct some evaluations of competency to proceed and

16   sanity or mental condition at the time of offense.  I also do a

17   good deal of supervision and training with the several other

18   evaluators we have in the department.

19         Q.    And how long have you been working for the Colorado

20   Mental Health Institute at Pueblo?

21         A.    Almost 10 years.

22         Q.    And can you tell the Court what your background is,

23   educationally and prior to arriving at the state hospital.

24         A.    For these purposes the pertinent educational background

25   is that I have a Ph.D. in psychology, counseling psychology from

1    Texas A&M University.  I, after completing that degree, went to

2    work at the North Texas State Hospital, which is the maximum

3    security hospital in the Texas state system.  I spent seven years

4    there.  The last two and a half of those years I was the chief

5    psychologist on the competency restoration unit.  I then came up to

6    Colorado to do -- I was hired initially to do competency

7    evaluations.  Two months after I started the hospital got sued, and

8    I don't believe that was my fault.

9         Q.   Thank you for clarifying that for us.

10        A.   I hadn't been there long enough to cause the problems.

11   But I then was moved into a supervisory position; and we began the

12   process of hiring more evaluators and training them.

13        Q.   Over the course of your career, how many competency

14   evaluations do you think you've completed?

15        A.   On the order of 1,600.

16        Q.   And do you have a forensic certification or board

17   certification with regard to forensic psychology?

18        A.   I do.  In 2006 I was board certified by the American

19   Board of Forensic Psychology in forensic psychology.

20        Q.   And what is -- what would be the general requirements to

21   become a forensic psychologist?  In other words, what do you have

22   to do to get that board certification?

23        A.   To earn the board certification, one has to first pass a

24   written examination, then submit -- assuming you're able to pass

25   that, then submit two work samples from different -- different

1    areas within the general field of forensic psychology.  Those two

2    work samples then become the primary focus of a three-hour oral

3    examination.

4         Q.   Do you have to recertify at any point?

5         A.   They have just implemented a -- what they call a

6    maintenance of certification process.  It's brand-new, and I can't

7    give you details on that.  I mean, literally just a few days ago

8    the emails came out.  So I haven't looked into that yet.

9         Q.   At some point you will have in order to maintain your

10   board certification?

11        A.   Technically, I wouldn't have to.  They -- because it's

12   new, they offer an exemption for people who were board certified as

13   far back as I was.  I suspect if I did not participate in that,

14   though, someone such as yourself would be asking me to explain why

15   not.

16        Q.   Could very well be.

17        A.   Yes.

18        Q.   When you have your board certification and you then have

19   the credentials to then call yourself a forensic psychologist;

20   would you agree?

21        A.   No, not entirely.  There are a number of practicers who

22   identify themselves as forensic psychologists who have not gone

23   through the board certification process.

24        Q.   Much like Dr. Grimmett?

25        A.   Such as Dr. Grimmett.  Dr. Grimmett is on track to do so,

1   but she has not -- not jumped through all the hoops yet.

2       Q.   And you work with Dr. Grimmett at the state hospital;

3   correct?

4       A.   Yes, I do.

5            MS. BILLEK:  Your Honor, at this time I would ask that

6   Dr. Gray be admitted as an expert in forensic psychology.

7            MR. KING:  I have no objection.

8            THE COURT:  All right.  He'll so be qualified.

9            THE WITNESS:  Thank you, Your Honor.

10  BY MS. BILLEK:

11      Q.   Dr. Gray, we spent a lot of time going through with Dr.

12  Grimmett about what the process was with regard to Mr. Dear.  And

13  you were part of the competency evaluation for Mr. Dear; correct?

14      A.   Yes, I was.

15      Q.   And when did that happen?

16      A.   It was the beginning of this year.  I believe our first

17  meeting was on January 20th of this year.  And we then met a second

18  time in early February.

19      Q.   Why did you have two meetings?

20      A.   Late in our interview during the first meeting, we were

21  interrupted and told to stop the interview.  I'm not entirely sure

22  exactly how the message came to us, but the message essentially was

23  that because of some motions that had been filed by the defense, we

24  were to suspend the evaluation until those motions had been ruled

25  on by His Honor.

1       Q.   At that time you were in the middle of an interview with

2   Mr. Dear?

3       A.   Yes.

4       Q.   Was that explained to Mr. Dear or were you just told to

5   stop?

6       A.   We were -- we were just told to stop.  We didn't really

7   know what had caused that.  So, no, we were not able to explain

8   that to him at the time.  We did try to explain it to him when we

9   went back for the second interview.

10      Q.   And the second interview was -- how much further -- how

11  many days after the first?

12      A.   If I could refer to my report.

13           MS. BILLEK:  Your Honor, if he may be allowed to do so?

14           THE COURT:  Yes.

15           THE WITNESS:  Thank you.

16           The second evaluation took place -- or the second

17  interview, I should say, took place on February 3rd.  So about two

18  weeks.

19  BY MS. BILLEK:

20      Q.   So it wasn't that it happened a day later or anything of

21  that nature?

22      A.   Correct.

23      Q.   Why did two weeks pass?

24      A.   Because we were told not to do anything until -- until

25  His Honor had ruled on the motions.  That took up roughly half of

1    that time.  And Dr. Grimmett had a fairly full evaluation schedule.

2    I had other obligations as well.  So it took that additional time

3    to be able to arrange it where we could both be there.

4         Q.   How -- how did the information get to you that you -- the

5    Court had then ruled on whatever the issue was the defense raised

6    at the AG's office?

7         A.   We received an email from the assistant attorney general

8    that handles affairs with the state hospital.

9         Q.   And did she indicate to you where she obtained the

10   information?

11        A.   Not to my recollection.

12        Q.   But it certainly wasn't any contact that you had with the

13   district attorney's office regarding that?

14        A.   That is correct.

15        Q.   You operate under a very specific definition when you're

16   looking at competency; would you agree?

17        A.   Yes.

18        Q.   What is that definition?

19        A.   I can't quote it to you verbatim.  It's in Colorado

20   Revised Statute 16-8.5-101.

21        Q.   So if I read to you the statute, do you think you would

22   recognize it, the words?

23        A.   Pretty close, yes.

24        Q.   Okay.  If the statute says:  "Competent to proceed means

25   that the defendant does not have a mental disability or

1    developmental disability that prevents the defendant from having

2    sufficient present ability to consult with the defendant's lawyer

3    with a reasonable degree of rational understanding in order to

4    assist in the defense or prevents the defendant from having a

5    rational and factual understanding of the criminal proceeding."  Is

6    that what you're operating off of?

7        A.   That sounds right.

8        Q.   Okay.  And that's a whole bunch of legal mumble jumble.

9    Break it down for us as to what it means to you when you meet with

10   someone.

11       A.   In less technical terminology, essentially we're looking

12   for evidence that the individual is able to understand the

13   proceedings, understand how the court system works, to understand

14   how -- how their case might operate within that context.  Are there

15   any nuances that specifics of their case might introduce to the

16   process?  And the other piece is whether they are able to work with

17   their attorney and to make reasonable decisions concerning their

18   legal options.

19       Q.   Would you agree with me that competency is rather a fluid

20   thing?

21       A.   Very much so, yes.

22       Q.   Can you explain to the Court why.

23       A.   Competency has to do with the individual's current

24   functioning.  And people change over time.  Even people with

25   serious mental illness will -- the symptoms that they experience

1    will wax and wane over time.

2         Q.    And when you say over time, is there a time frame by

3    which you go by or is it kind of person by person?

4         A.    It varies a great deal from individual to individual.  I

5    would be reluctant to give you a magic number as far as time's

6    concerned.

7         Q.    So when you are doing an evaluation, you essentially

8    operate off of a 10-page form, if you will, that has various

9    questions on it, words on it, things for you to go through with a

10   particular patient you're seeing?

11        A.    Yes.

12        Q.    And is that standardized for a reason?

13        A.    It's standardized for a couple of reasons.  I actually

14   developed the particular form that we use.  It was based on one

15   that I brought with me from Texas.  It -- it draws on a variety of

16   different -- different sources that are generally well-accepted.

17   And it's good to have a reasonably standard format to follow to

18   make sure you touch all the bases, so to speak, that the pertinent

19   areas are covered.

20        Q.    One of the people you're training is Dr. Grimmett;

21   correct?

22        A.    Correct.

23        Q.    And the form that we just talked about, would it be a

24   form that you would share with your trainees, if you will?

25        A.    Absolutely, yes.

1       Q.   Are they told to change the form in any way?

2       A.   They are -- what I typically do with anyone who goes

3    through any kind of training is provide them with an electronic

4    copy.  And so they can adjust that form to -- different individuals

5    have different interviewing styles.  And so they can adjust it to

6    accommodate their own interviewing style.

7       Q.   And when you mean that, what would they be changing,

8    space, for instance or would they be changing the substance of the

9    form?

10      A.   Not for the most part, no.  No.  People might change the

11   sequence of the questions.  They might change some of the wording

12   to make things more comfortable for them, something of that nature.

13      Q.   Do you know whether or not your notes are different than

14   that of Dr. Grimmett's?

15      A.   I'm sure there are some differences.  We didn't actually

16   compare our notes line-by-line.

17      Q.   Would you normally?

18      A.   I don't recall any case where I've done that, no.

19      Q.   Okay.  Why not?

20      A.   In retrospect, that might be a useful thing to do.  We've

21   never -- we've never really found a need to do so.

22      Q.   I'm just asking a question --

23      A.   Yeah.

24      Q.   -- as to why you would choose not to.

25      A.   And then my response would be to essentially turn the

1    question back around.  We've just never found it necessary to do

2    so.

3         Q.   You worked on this particular competency evaluation with

4    Dr. Grimmett together.  So the two of you were in the same room

5    conducting the same sequence of questioning, if you will, at the

6    same time with Mr. Dear?

7         A.   Yes.

8         Q.   When you met with him, did he know who you were,

9    recognize who you were?

10        A.   I believe so, yes.

11        Q.   I mean, not on a personal level --

12        A.   Yes.

13        Q.   -- "Hey, Dr. Gray," but that he knew why you were there?

14        A.   Yes.  We told him why we were there.

15        Q.   And how did he respond to that?

16        A.   He -- he didn't respond directly to the information that

17   we provided to him.  He spoke rather negatively about the situation

18   in general, giving me the impression he was not at all happy to be

19   at the hospital.

20        Q.   What was the negativity about?

21        A.   He didn't want to be there.

22        Q.   Did he tell you why he didn't want to be there?

23             THE DEFENDANT:  'Cause I'm not nuts.

24        A.   As Mr. Dear just said, he was -- and he told us more than

25   once he didn't think that he had any sort of issues that might give

1    cause to -- for him to be placed in a psychiatric facility.

2        Q.   So as he just shared with you now, that he didn't want to

3    be there because he didn't feel he's nuts, those were his words,

4    was that what he also shared with you when you met with him during

5    your evaluation?

6        A.   He did, at various times during the evaluation, indicate

7    to us that he did not think he was mentally ill, yes.

8        Q.   Did he use the words "mentally ill" or what words did he

9    use?

10       A.   I don't recall specifically.

11       Q.   Okay.  When you were talking to him about what the scope

12   of the evaluation would be, which is at the beginning, you know,

13   why you're here, confidentiality, those types of things, did he

14   seem to understand you?

15       A.   As far as we could tell, yes.

16       Q.   He was not happy about being there?

17       A.   Yes.

18       Q.   So would you describe him as rather dismissive about it

19   when you tried to talk -- when you tried to talk to him?

20       A.   I think I actually used the word "dismissive" in -- in my

21   report.

22       Q.   Yes.

23       A.   Yes.  He -- I'm not sure he gave it a great deal of

24   consideration.

25       Q.   Uncommon for someone who's unhappy about having to be

1    there for an evaluation?

2        A.   It's not terribly uncommon for many people that -- that

3    we see.

4        Q.   Okay.  He was -- when you start your evaluation, you

5    start off with kind of obtaining relevant background information?

6        A.   Correct.

7        Q.   Okay.  You want to know how long they think they've been

8    there at the state hospital?

9        A.   That's a -- I think of it as kind of an icebreaker kind

10   of a question.

11       Q.   Okay.  But it would be important as to whether or not

12   they would have sense of time, would you agree, at least in that

13   respect?

14       A.   If their answer were wildly -- if it differed wildly from

15   the reality, then that might be important information, yes.

16       Q.   And he was able to tell you how long he had been there?

17       A.   Yes.

18            MR. KING:  Objection; leading.

19       Q.   Was he --

20            MS. BILLEK:  I'll rephrase the question, Your Honor.

21            THE COURT:  And customarily you stand up when you make an

22   objection.

23            MR. KING:  I'm sorry, Your Honor.

24            THE COURT:  Objection's overruled.

25   BY MS. BILLEK:

1    Q.   Will you please answer the question about whether or not

2    he was able to tell you how long he had been there.

3    A.   Yes, he was.

4    Q.   And was he accurate in the length of time?

5    A.   I believe he was, yes.

6    Q.   With regard to one of your other background questions,

7    you asked:  "Do you know why you're here?" or something to that

8    nature?

9    A.   Yes.

10    Q.   What's the reason why you're here?  Do you recall how Mr.

11    Dear responded to that question?

12    A.   Yes.  Well, I have it in my notes.

13         MS. BILLEK:  Your Honor, may he review his notes?

14         THE COURT:  Any objection?

15         MR. KING:  No objection, Your Honor.

16         THE COURT:  Yes, you may.

17         THE WITNESS:  Okay.  He stated it was all in the court

18    record and indicated he had wanted to replace his attorney.  I then

19    asked him what he thought of his attorney, and he made some

20    negative comments concerning Mr. King.

21    Q.   And what were the negative comments concerning Mr. King?

22    A.   He initially told us that he had said it all in court and

23    then stated:  "He's just the Batman lawyer" and said that -- Mr.

24    Dear said that he, Mr. Dear, wanted to do everything his way.

25    Q.   And what did he mean by that?  Did you inquire any

1    further about Mr. Dear wanting to do things his way?

2        A.   I didn't inquire at the time.  We did go into that to

3    some extent with him later on.  And he -- he wanted to be able to

4    dictate the course of his own defense.

5        Q.   Is he not allowed to do so as defendant?

6             MR. KING:  Objection; beyond the scope.

7             MS. BILLEK:  I think it goes to the very crux of the

8    issues we're on here, Your Honor.

9             THE COURT:  Objection's overruled.

10            THE WITNESS:  To a large degree.  That's my

11   understanding.

12   BY MS. BILLEK:

13       Q.   You note that there are classes -- at least in your

14   notes, that there are classes available for patients to take when

15   they're at the state hospital?

16       A.   Correct.

17       Q.   And one of those is restoration to competency classes or

18   legal classes?

19       A.   There are two or three different kinds of classes that

20   are available, classes or activities.

21       Q.   Do you recall which one Mr. Dear attended while he was

22   there?

23       A.   I believe what he was offered was a class that's usually

24   called basic legal knowledge, which is exactly as the name implies,

25   basic information about how the court system works, the roles of

1    the two different attorneys, the role of the judge, the role of the

2    jury, the different pleas available, what a plea bargain is, that

3    sort of thing.

4        Q.   And in the notes for the state hospital in general, which

5    you review in creating your evaluation, it shows that Mr. Dear

6    attended that class?

7        A.   He attended a few of those, yes.

8        Q.   And did the notes reflect that there were any problems

9    with him understanding the nature of those classes?

10       A.   Not that I recall, no.

11       Q.   Or the concepts?

12       A.   Not that I recall.

13       Q.   Did he act out behaviorally?

14       A.   I don't believe so, no.

15       Q.   Did he participate in some of them, actually talking

16   about certain things?

17       A.   I believe he did to a limited degree.

18       Q.   And do you recall what he talked about?

19       A.   No, I don't.

20       Q.   Do you recall that he asked whether or not Colorado still

21   had the death penalty in one of his classes?

22       A.   I don't recall that.  I think he asked us that or he made

23   some reference to death penalty in -- in the course of our

24   interviews with him.

25       Q.   The staff members who were conducting those classes

1    raised no concerns about whether or not Mr. Dear understood the

2    legal concepts discussed in those classes?

3         A.   Not to my recollection, no.

4         Q.   It would be something important for you if you did see

5    that; would you agree?

6         A.   Yes.

7         Q.   You also get kind of his background, employment history,

8    family history, that kind of thing?

9         A.   Yes.

10        Q.   Are people always willing to give information about that

11   when they meet you when they're unhappy about being there?

12        A.   No.  No.

13        Q.   So the fact that Mr. Dear wouldn't give you some

14   information, might give you a little bit here and a little bit

15   there, is not an abnormal thing?

16             MR. KING:  Objection; leading.

17             THE COURT:  That did sound leading.  Objection sustained.

18   BY MS. BILLEK:

19        Q.   In the various areas in the evaluation that we're talking

20   about with regard to background, was Mr. Dear forthcoming in all

21   areas?

22        A.   Not in all areas, no.

23        Q.   Over the course of your time conducting competency

24   evaluations, is that uncommon?

25             MR. KING:  Objection; relevance.

1          THE COURT:  Overruled.

2          THE WITNESS:  It certainly happens.  I'm not quite sure

3     how to quantify that, but it's -- it certainly wasn't the first

4     time I've come across that.

5     BY MS. BILLEK:

6          Q.   And probably wouldn't be the last?

7          A.   I would suspect not.

8          Q.   Okay.  You know that, from talking to Mr. Dear, he was

9     employed at some point?

10         A.   Yes.

11         Q.   So he has a job?

12         A.   Yes.

13         Q.   Owns property?

14         A.   That's what he says, yes.

15         Q.   Okay.  He was able to save money?

16         MR. KING:  Objection; leading.

17         THE COURT:  It is leading; however, the Court will allow

18    it.

19         THE WITNESS:  He -- he did indicate that -- that he had

20    been able to manage his finances adequately.

21    BY MS. BILLEK:

22         Q.   He told you he was very frugal?

23         A.   Yes.

24         Q.   You talked to him about what his prior substance abuse

25    history was.  Was he able to give you some information about that?

 1     A.   He gave us some information.  He didn't provide -- he

 2   provided very little detail, but he did talk a bit about his

 3   substance use history.

 4     Q.   What did he share with you?

 5     A.   He indicated that he drank relatively little.  He said

 6   that he consumed one beer every other day.  He also said he smoked

 7   one joint of marijuana every day.

 8     Q.   And prior -- did he give you any prior substance abuse

 9   history with regard to his marijuana use?

10     A.   He indicated he'd been smoking marijuana for quite some

11   time.

12     Q.   Okay.  Did he indicate that it was only occasional use in

13   South Carolina?

14     A.   He did say that he had used less often when he was in

15   South Carolina.

16     Q.   Now, you talked about mental health.  Did he give you any

17   background with regard to his prior mental health?

18     A.   He talked about having seen a court -- a psychologist and

19   then he said it was a psychiatrist for a couple of sessions related

20   to a court case.  I believe that was back east.  And he said he'd

21   been offered some antidepressant medication.

22     Q.   Did he tell you whether or not he denied that or not --

23   or refused the medication?

24     A.   I believe he said that he -- he never bothered to obtain

25   it.

1     Q.   Did he mention anything to you about Waco?

2     A.   Yes, he did.

3     Q.   And what did he mention to you about Waco?

4     A.   He talked about having called a radio station during the

5     time of the Branch Davidian issues that arose there.  When was

6     that?  Early '90s.

7     Q.   Early '90s.

8     A.   Early '90s.  And indicated that he had, among other

9     things, referred to the FBI as the Federal Bureau of Incineration.

10    And he said that he -- he pretty strongly suggested that this was

11    where many of his problems with the federal government had begun.

12    Q.   Is at that point?

13    A.   Yes.  He thought -- he thought the federal government had

14    taken great offense at this.

15    Q.   Did he tell you why he called the radio station?  What

16    was it about Waco that made him call the radio station?

17    A.   I don't recall specifically.

18         THE DEFENDANT:  'Cause it was Christian to get burned up,

19    and I'm a Christian.

20    Q.   Is that same notation that Mr. Dear has just shared with

21    us in your notate -- in your notes --

22    A.   There is --

23    Q.   -- in your interview with him?

24    A.   There is a statement to that effect, yes.

25    Q.   That he was upset that -- he felt that the federal

```
 1   government was murdering Christians and that's why he was upset?

 2        A.   Yes.

 3        Q.   That's why he made a phone call?

 4        A.   That's what -- that's what he indicated.

 5        Q.   And that's why --

 6             THE DEFENDANT:  And that's what put me on the list.

 7        Q.   And that's why he called them the Federal Bureau of

 8   Incineration?

 9        A.   Yes.

10        Q.   For the most part, Mr. Dear has no prior legal contact

11   with the court system?

12        A.   He had a very limited legal history, yes.

13        Q.   Okay.  And when you meet with him, you check speech,

14   emotional state, those types of things?

15        A.   Yes.

16        Q.   And what is your recollection about Mr. Dear?

17        A.   For the most part, he spoke clearly.  He could be

18   understood well.  We didn't have any significant difficulties

19   communicating with him.

20        Q.   He appeared to be articulate?

21        A.   Yes.

22        Q.   Appropriate in his language with you?

23        A.   Yes.

24        Q.   Did he ever use bad language, cussing words, anything of

25   that with you?
```

1     A.   No, he did not.

2     Q.   When he first met with you, did he accuse you of being an

3   agent with the federal government?

4     A.   I don't think so.  He did later suggest that perhaps both

5   Dr. Grimmett and I were operating on instructions from someone in

6   greater authority than us, presumably ultimately from the federal

7   government.

8     Q.   And you're making that as a presumption?

9     A.   I'm -- yes.  I'm connecting dots there, yes.

10    Q.   That the dot may or may not be there, that's an

11  assumption on your part; would you agree?

12    A.   It's an inference on my part, yes.

13    Q.   Fair enough.

14         And that part of it didn't happen until the interview was

15  actually right about the point where it was told stop?

16    A.   I believe that's right.

17    Q.   So up until that point, there was no claim that you were

18  working for the federal government?

19         MR. KING:  Objection; leading.

20         MS. BILLEK:  Your Honor, I'm just trying to narrow this

21  down.

22         THE COURT:  Objection's overruled.

23         THE WITNESS:  I'm sorry, could you repeat that, please.

24  BY MS. BILLEK:

25    Q.   Up until that point, he made no comment that he thought

1    you were working for the federal government?

2        A.    I don't recall him actually having said anything to that

3    effect, no.

4        Q.    He also, you noticed, had full range of emotion and he

5    was stable in his affect.  What does that mean?

6        A.    That means that he was -- he wasn't unduly emotionally

7    reactive.  He -- he exhibited -- well, a full range of emotion.  He

8    became pretty upset when he was talking about certain issues,

9    became tearful.  That was reasonably appropriate to the content of

10   what he was saying, particularly given his stated beliefs.

11       Q.    Explain for us what you're talking about there.

12       A.    He, particularly at one point, engaged in a fairly

13   lengthy statement that went on for a few minutes concerning babies

14   being killed.  And he was fairly upset about it.

15       Q.    Did he talk -- was that in reference to Paul Hill?

16       A.    He mentioned Paul Hill in that context, yes.

17       Q.    And he was tearful during that?

18       A.    He was.

19       Q.    Was he able to control his emotion after he was done

20   talking about that with you?

21       A.    Yes.

22       Q.    Would you say he was able to control his emotions and his

23   affect throughout your interview?

24       A.    Yes.

25       Q.    Would you consider Mr. Dear a religious man?

1      A.   He gave every appearance of being so, yes.

2      Q.   How so?

3      A.   He made a number of references to his -- his Christian

4  beliefs.  He identified himself as a religious person.  And he

5  talked -- talked at some length about religious -- religiously

6  related issues.  He focused a good deal on one particular passage

7  from the Bible.

8      Q.   Okay.  And that -- we've talked a little bit about that

9  today.  That's Luke 10:18?

10     A.   Yes.

11     Q.   Did he share with you that he was kind of getting through

12 this -- this time frame in his life because God helped sustain him?

13 Would it help to review your notes?

14     A.   It probably would.  I know that he did, on more than one

15 occasion, indicate that things were going to turn out the way

16 that -- that God dictated.

17     Q.   Okay.  Did you want to look at your notes, Dr. Gray?

18     A.   I've got 14 pages here.  Perhaps you could help point me.

19     Q.   The specific one that I'm referencing is at the bottom of

20 page 3 of your notes.  It's in the margin.

21     A.   Yes.  He did say:  "God is the one that sustains me."

22     Q.   When you also are working with someone, do you have tests

23 that you complete?

24     A.   Sometimes, yes.

25     Q.   Did you use them here?

1      A.   The only standardized measure that we administered with

2   Mr. Dear was an instrument known as the Montreal Cognitive

3   Assessment.

4      Q.   And what is that?

5      A.   That's a general tool that assesses for various aspects

6   of cognitive functioning.  It's a screening measure to identify

7   significant cognitive impairments.

8      Q.   And how does that assist you in your determination of

9   competency?

10      A.   Well, if someone is very badly cognitively impaired, then

11   there's a good chance that they're gonna have related impairments

12   in some sort of competency-related functional ability.

13      Q.   Did you do that testing on Mr. Dear?

14      A.   We attempted to.  He wasn't particularly cooperative with

15   it.  And we did not obtain data that -- that we could use to obtain

16   a meaningful score.

17      Q.   Does that affect your opinion?

18      A.   No, not directly.

19      Q.   Would it have been helpful?

20      A.   Potentially, although we didn't -- we didn't note any

21   significant issues that were apparent in terms of memory or

22   attention and some of the other basic cognitive functions.

23      Q.   Why would memory and attention be important to you on a

24   competency evaluation?

25      A.   If one is -- if one has severely impaired memory, for

1   example, keeping in mind that the ability to make reasoned

2   decisions is an important piece of the picture, if you can't

3   remember things long enough to be able to hold two pieces of

4   information in your mind so you can compare them, then there's no

5   way you can make a reasoned decision.

6        Q.   So memory --

7        A.   That would be a simple explanation.

8        Q.   So memory would be important -- one of those important

9   considerations for you as to whether or not someone's competent?

10       A.   It -- yeah.  Sure.  It could be.

11       Q.   Now, you actually get into this whole aspect of whether

12   or not somebody has an understanding of why they're with you and

13   why they're undergoing this competency evaluation; right?

14       A.   Yes.

15       Q.   What the underlying legal basis for why they're there;

16   that is, the charges?

17       A.   Oh, yes.  We ask -- we ask them what the charges are.  We

18   think it's important that a person be aware of what they're up

19   against, essentially.

20       Q.   Do you always use legal terminology with them or do you

21   try to break it down, make it more conversational?

22       A.   I generally prefer to be conversational.

23       Q.   Okay.  Were you able to do that with Mr. Dear?

24       A.   Yes.

25       Q.   Even though he's a little uncooperative at times?

1     A.   Yes.

2     Q.   Was he able to share with you that information as to what

3  his charges were and what did they say he did?

4     A.   He identified the most serious of the charges.  When we

5  read some of the additional charges to him, he indicated he

6  recognized those, and he complained about what he apparently

7  considered to be an excessive number of charges.

8     Q.   Okay.  It didn't make him feel happy?

9     A.   He expressed displeasure at that, yes.

10    Q.   But he recognized the top charges?

11    A.   Yes.

12    Q.   Recognized there was a number of them?

13    A.   Yes.

14    Q.   Did you talk to him about whether or not he understood

15  what the outcomes would be for those charges?

16    A.   Yes.

17    Q.   And what did he tell you?

18    A.   He was aware that he could potentially face a life

19  sentence or potentially even a death penalty.

20    Q.   Did you talk to him about what he thinks might be the

21  best outcome?

22    A.   We, I believe, asked him about that.  Again, if I can

23  refer to my notes.  That was, I believe, the first time that he --

24  that he referred to:  "Things will work out the way God wants them

25  to work out."

1    Q.   Did you talk to him about courtroom procedure, how he

2  should act in the courtroom?

3    A.   Yes.

4    Q.   Is there a reason why most of your notes are not

5  completed on that section?

6    A.   We -- well, there's a couple of reasons.  I don't always

7  ask every single question that's on the -- on the protocol.  And in

8  this instance what he told us was that he didn't think that he had

9  ever had any kind of difficulty in the courtroom, even though he

10  did acknowledge, when I asked him directly that -- that His Honor

11  had been unhappy with him over some of his behavior, and I didn't

12  see a need to make all of those inquiries.

13    Q.   Is that also where he shared with you about his concern

14  about how the judge got the case?

15    A.   I'm sorry, how the...

16    Q.   Is that also the same time frame that he shares with you

17  his concern about how Judge Martinez got the case?

18    A.   Oh, yes, he did.  Yes.

19    Q.   And was there any complaints about the federal government

20  controlling that?

21    A.   I don't recall him specifically saying that, no.

22    Q.   Okay.  Did he say anything about the attorneys?

23    A.   He indicated that both the defense attorneys and the

24  prosecution wanted publicity and suggested that that was a major

25  issue in this case.

1      Q.   So it was at his expense, if you will?

2      A.   He didn't state that per se.  I think that was a

3   reasonable inference.

4      Q.   But not that they were being controlled by anybody or the

5   judge was being controlled by the federal government or anything of

6   that nature?

7      A.   I don't believe he said that explicitly, no.

8      Q.   You also did not complete the section about what the main

9   job of the district attorney was or what the main job of his

10   attorneys were.  Was there a reason why you didn't complete that

11   section?

12      A.   He had made enough comments to pretty clearly indicate

13   that he understood the, essentially, adversarial nature of the

14   process, that the prosecution was not working on his side.  And he

15   indicated that he had at least a general awareness of ideally the

16   protective role a defense attorney can serve.  He didn't -- he

17   certainly didn't indicate he thought that was happening in this

18   instance.

19      Q.   Why not?  What did he share with you that makes you say

20   that he didn't share that particularly -- like, he understood the

21   general concept but that wasn't working for him here?

22      A.   He -- he indicated that he understood that that's the way

23   it's supposed to happen, but in this case he -- he didn't believe

24   that Mr. King and his colleagues were working in his interests.

25      Q.   And that's the language that you use in your report,

 1    would you agree, that they weren't working in his best interests?

 2         A.   That's pretty close, yes.

 3         Q.   Do you recall any more specifics about what he shared

 4    with you about that?

 5         A.   Specific quotes, no, I don't.

 6         Q.   Your report does not indicate that it was because he

 7    thought his attorneys were working for the federal government?

 8         A.   No.  And I don't recall him stating that explicitly.

 9         Q.   And this is where he also reiterated to you about the

10    judge, that the judge is just doing what he's told to do by

11    somebody higher up?

12         A.   Yes.

13              THE DEFENDANT:  That's why they sealed my case illegally.

14         Q.   Did you at that time have the opportunity to express

15    further what he meant by somebody higher up?

16         A.   Well, certainly the opportunity could have been -- could

17    have been there.  I don't recall if we inquired specifically what

18    he meant by that.

19         Q.   Was there an assumption that he meant God?

20         A.   I -- I inferred that he was referring instead to

21    machinations by the federal government.

22         Q.   Okay.

23         A.   And I made that inference because he had spoken

24    frequently of his beliefs that the feds were essentially out to get

25    him.

1      Q.   But, again, that was an inference on your part?

2      A.   Correct.

3      Q.   Hypothetically, if the information that had been imparted

4   to him was that the state court administrator's office told the

5   judge what to do, would it also potentially be an inference that

6   that was the judge's boss, somebody higher than him?

7      A.   Hypothetically.

8      Q.   Could be a reasonable inference; would you agree?

9      A.   It could be.  He didn't speak of any such office.  He

10  talked about the feds, though.

11     Q.   But he did talk about the feds specifically with regard

12  to that?

13     A.   Correct.

14     Q.   Did he tell you what his -- what a plea bargain was?

15     A.   No, he didn't.  He -- and I didn't ask him specifically

16  what a plea bargain was.  The reason being, that we were attempting

17  to gather as much information as we could.  He had already made

18  statements indicating that he had some experience with the process.

19  He was familiar with it.

20     Q.   So he was familiar with it.  So it was just something you

21  didn't think you needed to go into any further?

22     A.   Correct.

23     Q.   But he understood what guilty was?

24     A.   Yes.

25     Q.   And he understood what not guilty was?

1      A.   Yes.

2      Q.   Not particularly happy when the issue of not guilty by

3   reason of insanity came up?

4      A.   No.

5      Q.   Why not?

6      A.   Why was he unhappy with it?

7      Q.   Um-hmm.

8      A.   Well, I would guess because he didn't think he was

9   mentally ill.

10          THE DEFENDANT:  Right.

11      Q.   Now, when you asked him about the plea bargain process,

12   did he tell you what his plan was?

13      A.   He told us that he intended to plead guilty unless God

14   told him differently.

15      Q.   Did he understand that he had a Fifth Amendment right?

16      A.   Yes.

17      Q.   Did you talk to him about what his rights were, his

18   constitutional rights?

19      A.   No.

20      Q.   So did he just bring up that he had a Fifth Amendment

21   right or how does that come up?

22      A.   No.  The way we typically inquire about that is to ask a

23   person if their case goes to trial, is there anyone that can

24   require them to testify?  And he indicated that he was aware that

25   he could exercise Fifth Amendment rights.

1      Q.    Are you aware, in your review of the jail records, that

2  he also shared that with jail staff?

3      A.    I don't recall seeing that specifically.

4      Q.    When you have the opportunity to meet with someone,

5  you're trying to determine whether or not they do have a mental

6  illness?

7      A.    Yes.

8      Q.    And you're trying to take a snapshot picture in roughly

9  two and a half hours?

10      A.    Oftentimes less --

11      Q.    Okay.

12      A.    -- yes.

13      Q.    And if you felt like you needed more time, you would of

14  had more time to say, "Hey, let's have a third interview with him"?

15      A.    If we thought we needed additional information, we would

16  have certainly asked for more time, yes.

17      Q.    At the end of the first interview, did you and Dr.

18  Grimmett agree as to what your competence decision or your mental

19  health diagnosis would be?

20      A.    Not entirely, no.  We were both cognizant of the fact

21  that we weren't done yet.  And we -- I don't recall specifically

22  articulating this, but I was certainly aware that I was not gonna

23  write a report without another opportunity to meet with Mr. Dear.

24          And so our ideas at that point were somewhat provisional.

25  At that time Dr. Grimmett was more convinced that Mr. Dear had

1   significant delusional thinking.  I was a bit more skeptical.  Some

2   will tell you I'm just a skeptical guy.

3        Q.   Okay.  You would be professionally unsound, would it not

4   be, to jump too quickly?

5        A.   It pays to be skeptical in my line of work, yes.

6        Q.   Okay.  Now, when you are reviewing all of the information

7   with regard to Mr. Dear, you've mentioned he has a number of

8   beliefs.  What are those beliefs?

9        A.   He outlined a rather elaborate set of seemingly

10  delusional ideas concerning the federal government's persecution by

11  the FBI.  It wasn't always well articulated or very coherently

12  organized, but he attached great significance to facts such as

13  Barack being the ancient Hebrew word for lightening; and he did not

14  think it was coincidental that that was also the president's first

15  name.

16       Q.   Okay.  So religion would be a belief?

17       A.   Yes.  It included religious themes and a good deal of

18  persecution by various -- various arms of the federal government.

19       Q.   Would you agree that he also has some political beliefs?

20       A.   Yes, he appeared to.

21       Q.   Such as his stance on the government?

22       A.   His stance on the government, his stance on abortion

23  certainly had political overtones to it.

24       Q.   And he was able to share those with you?

25       A.   Yes.

1      Q.    You may not agree with them, but he was able to share

2   them with you?

3      A.    Well, it's really neither here nor there if I agreed with

4   him.

5      Q.    Fair enough.

6      A.    Yes.  He was able to express those ideas.

7      Q.    And when you get done, you arrive at a diagnosis?

8      A.    Correct.

9      Q.    What was that diagnosis?

10     A.    We gave Mr. Dear a diagnosis of a delusional disorder.

11     Q.    And how did you arrive at that?

12     A.    The most prominent aspect of his presentation was this

13   rather elaborated delusional system, which fits the criteria for

14   delusional disorder.

15     Q.    Just because one might have a delusional disorder, does

16   that automatically mean that they are incompetent?

17     A.    No.

18     Q.    Why not?

19     A.    Because competency is not defined in terms of diagnosis;

20   it's defined in terms of functional abilities.  And so the question

21   is whether there's a mental illness and that mental illness impacts

22   the individual's competency-related abilities.

23     Q.    What did you feel were Mr. Dear's inabilities?

24     A.    Our concerns with his functional abilities rested

25   primarily in his rational understanding of events, his rational

 1   understanding of his case, which in turn affected both his -- his

 2   ability to plan any kind of strategy or to participate in that.

 3   And given his -- his rather marked paranoia and suspiciousness of

 4   others, his ability to work with defense counsel certainly looked

 5   to be compromised.

 6        Q.   How was it compromised?  What was the issue?

 7        A.   The issue would primarily be his -- his willingness or

 8   ability to share information with defense counsel to allow for

 9   development of a proper defense.

10        Q.   Why do you feel he's unable to share that information?

11        A.   Because he cannot trust anyone, basically.

12        Q.   Anyone?

13        A.   Very few people.  And -- and he's quick to incorporate

14   people into -- into that delusional circle of suspect individuals.

15        Q.   How quickly did he include Mr. King into that?

16        A.   He had -- Mr. King had been representing him for a while

17   before I saw Mr. Dear.  So I can't tell you exactly how long it

18   took for that to happen.  I know he -- he indicated that he had

19   suspicions about Dr. Grimmett and myself that he developed within a

20   couple of hours.

21        Q.   After his interview was stopped?

22        A.   That may well have contributed to it.  His suspicion of

23   us appeared to be greater when we met with him the second time than

24   it was the first.

25        Q.   Because he thought that you would find him incompetent?

 1          MR. KING:  Objection; leading.

 2          THE COURT:  That does sound leading to me.  Objection

 3   sustained.

 4   BY MS. BILLEK:

 5      Q.   Why do you think he was suspicious of you?

 6      A.   He -- I don't recall the exact wording, but he intimated

 7   that we were simply going to do what we were told to do by those

 8   above us.

 9      Q.   And what did he mean by that?

10      A.   My inference -- again, I did not explore this in detail

11   with him.  My inference was that he ultimately thought that there

12   would be some sort of governmental control that would filter its

13   way down to -- to those of us who were evaluating him.

14      Q.   And that was your inference?

15      A.   Correct.

16      Q.   He didn't share that with you?

17      A.   Correct.

18      Q.   Now, did he tell you whether or not he thought his

19   attorney was doing a good job for him?

20      A.   He said quite to the contrary.  He didn't believe that he

21   was being well-represented.

22      Q.   Why didn't he feel like he was being well-represented?

23      A.   Because he didn't think Mr. King was representing his

24   interests.

25      Q.   What did he feel his interests were?

```
 1       A.   I didn't explore that with him --

 2       Q.   Why --

 3       A.   -- explicitly.

 4       Q.   Why did you not explore that with him if that becomes the

 5  crux of the issue?

 6       A.   It was not the sole crux of the issue.  And, you know, in

 7  an interview of that nature, one has to pick and choose where

 8  one -- where one goes.

 9       Q.   Do you think that one of the issues was to try to

10  determine whether or not it was a conflict that Mr. Dear had with

11  his attorney vs. Whether or not it was a sort of delusional aspect

12  affecting him in working with his attorney?

13       A.   I want to be sure I understand exactly what you're

14  asking.  Are you asking me was this because he didn't like Mr. King

15  personally or...

16       Q.   No, that he's having a conflict with his attorney, a

17  conflict -- proceeding that I don't get along with my attorney, I

18  don't like my attorney, whatever it might be vs. Whether or not it

19  is mental health driven.  Did you explore that?

20       A.   Not explicitly in great detail.  Well, his presentation

21  gave every appearance that at least a significant part of his

22  difficulty with Mr. King was related to his marked suspiciousness

23  of others and his beliefs that probably most everyone that he came

24  in contact with with regard to his case was in some way being

25  influenced by the federal government.
```

1      Q.   Why didn't he -- or when he mentions to you or he does,

2   what -- does he mention whether or not he thinks his attorney

3   respects him?

4      A.   I don't recall that specifically.

5      Q.   Would it help for you to review your notes on page 9?

6      A.   Probably.  Yeah.  He did state that they, meaning his

7   defense team, don't show me respect.

8      Q.   Did you explore that with him at all anymore?

9      A.   He actually elaborated on that and complained that --

10   that his -- excuse me.

11          Mr. King had stated in court that Mr. Dear was out of

12   control and he was quite offended that the issue of competency had

13   been raised, and he considered that disrespectful.

14      Q.   Driven by his delusion or that he just felt he was being

15   disrespected?

16      A.   I'm not sure that those are necessarily entirely mutually

17   exclusive.  He certainly took great offense at the notion that he

18   would be considered mentally ill by anyone.  His, from what we

19   could tell, notably delusional suspiciousness of other people

20   played a role in this as well.

21      Q.   So with all this information, the Court goes along with

22   your conclusions, what is the path from here?  What does competency

23   for Mr. Dear look like?

24          THE DEFENDANT:  Forced medication.  That's what they

25   want.

1          MR. KING:  Judge, I'm going to object to the relevance of

2     this question at this point.

3          MS. BILLEK:  I think it's important for the Court to know

4     what it would look like in weighing whether or not the defendant is

5     currently incompetent.

6          THE COURT:  Objection sustained.

7     BY MS. BILLEK:

8          Q.   Those with delusional disorders, can they be restored --

9          A.   Oftentimes.

10         Q.   -- to competency?

11         A.   Oftentimes.

12         Q.   Okay.  Is there a time frame by when that could be?

13         MR. KING:  Objection; relevance.

14         THE COURT:  Overruled.

15         THE WITNESS:  I'm sorry, could you repeat it, please.

16    BY MS. BILLEK:

17         Q.   Is there a time frame?

18         A.   Not a definitive one, no, given that many -- many

19    individuals with mental illnesses of a variety of sorts respond

20    differently and at different paces.  Delusional disorders can take

21    many months.  Occasionally they can respond fairly quickly if -- if

22    a person takes medication.

23         Q.   If you have a person who may or may not take medication

24    and you have them down at the state hospital, is it possible that

25    they could just be somebody who has specific belief systems but are

1   not delusional?  In other words, they're deeply religious, they

2   have firm political beliefs, but it's not delusional; is that

3   possible?

4           THE DEFENDANT:  That's me.

5       A.   That's possible, yes.  I've seen people like that.

6       Q.   How do draw that -- how do you draw that distinction

7   between them?

8       A.   There -- there is a term in the diagnostic and

9   statistical manual known as overvalued ideas, which is essentially

10  the kind of thing that you're referring to.  These are deeply held

11  convictions that are not necessarily widely known.  And the -- the

12  DSM is quite clear there is no bright line between overvalued ideas

13  and delusions.

14          In this instance Mr. Dear's repeated statements about his

15  apparent beliefs and the way we saw his suspiciousness of others

16  escalate and play out we consider to rise to the level that it was

17  delusional.

18      Q.   But with more time and more time at the state hospital of

19  observation, that may not necessarily be the case?

20          MR. KING:  Objection; relevance.

21          THE COURT:  Objection sustained.  I think that question

22  was asked before.  A similar kind of question was sustained with

23  the last witness.

24          MS. BILLEK:  May I have just a moment, Your Honor?

25          THE COURT:  Sure.

1          THE DEFENDANT:  Do you remember, Mr. Gray, when I said to

2   you, "You do what you're told," and you said, "Oh, I do."  And then

3   I said, "Yeah.  They say jump and you say how high."  And then you

4   went, "Ha-ha-ha-ha."  You didn't like me and I didn't like you.

5   BY MS. BILLEK:

6      Q.   Dr. Gray, when you met with Mr. Dear, did he share with

7   you what he believed his defense would be?

8      A.   Yes.  As I said before, he told us that he intended to

9   plead guilty unless God instructed him differently.

10     Q.   Would that be incongruent to what his attorneys want him

11  to do?

12     A.   I don't know.  I don't know what -- what ideas defense

13  counsel might have in terms of strategies.

14     Q.   It would be -- would you agree that a defense attorney's

15  job is to attempt to mitigate any outcome to their client?

16     A.   As a general principle, yes.

17     Q.   So if Mr. Dear wanted to walk in and plead guilty, that

18  would be against what they would do?

19          MR. KING:  Objection.  This is beyond the scope of this

20  witness's expertise.

21          MS. BILLEK:  I don't think it is when he's looking at

22  whether or not he can communicate with his attorneys.

23          THE COURT:  Objection sustained.

24  BY MS. BILLEK:

25     Q.   Did Mr. Dear tell you whether or not he was going to

1    speak to another attorney besides Mr. King?

2         A.   I don't recall that we specifically asked that.

3         Q.   Would -- if Dr. Grimmett indicated that Mr. Dear

4    mentioned to you he would meet with ADC or talk with ADC, do you

5    just not recall that coming up or would that be a misnotation in

6    her notes?

7         A.   Well, you'd have to ask her about her notes.  I could

8    have missed it.

9         Q.   Okay.

10        THE COURT:  All right.  If we can do this:  Let's have

11   counsel approach my clerk and see if we can try to coordinate a

12   date to finish this up.

13        And if you can stay on the stand 'cause we need to

14   coordinate a time with you as well.

15        THE WITNESS:  Yes, sir.

16        (Short pause.)

17        THE COURT:  All right.  Back on the record.

18        We're gonna go ahead and stop today's proceedings.  We'll

19   continue the matter to May 10th at 1 o'clock.

20        MS. BILLEK:  Yes.

21        THE COURT:  Okay.  All right.  Thank you.

22        MR. KING:  Thank you.

23        THE COURT:  Doctor, that works for you?

24        THE WITNESS:  Yes, sir.  Yes, sir.

25        THE COURT:  All right.  May 10th at 1 o'clock.

1        And just for the record, we'll figure out which courtroom

2    we will use when we can all be back.

3            (At 4:45 p.m. - hearing adjourned.)

4                        *****

5

6                    REPORTER'S CERTIFICATE

7

8        This document is a true and complete transcription

9    of my stenographic notes taken in my capacity as Official Reporter

10   of the Fourth Judicial District, District Court, El Paso County,

11   Colorado, at the time and place noted.

12           Dated at Colorado Springs, Colorado, May 9, 2016.

13

14                _Cindy A. Pressprich_

15            Cindy A. Pressprich, RPR, RMR, CRR

16

17

18

19

20

21

22

23

24

25