```
DISTRICT COURT, EL PASO COUNTY      |
STATE OF COLORADO                   |
270 South Tejon                     |
Colorado Springs, CO  80903         |
————————————————————————————————————|
                                    |
THE PEOPLE OF THE STATE OF COLORADO |
                                    |
the Plaintiff,                      |
                                    |
v.                                  |
                                    | *FOR COURT USE ONLY*
                                    |
ROBERT LEWIS DEAR,                  |_____
                                    |
the Defendant.                      | Case No. 15CR5795
                                    | Division 10
————————————————————————————————————|
For Plaintiff:                      |
      Daniel H. May, #11379         |
      Donna Billek, #30721          |
      Jeffrey D. Lindsey, #24664    |
      105 East Vermijo              |
      Colo. Springs, CO  80903      |
      Attorney for Plaintiff        |
                                    |
Telephone:  (719) 520-6000          |
Facsimile:  (719) 520-6185          |
                                    |
For the Defendant:                  |
      Daniel King, #26129           |
      Rosalie Roy, #26861           |
      Kristen Nelson, #44247        |
      19 North Tejon, Suite 105     |
      Colo. Springs, CO  80903      |
      Attorney for Defendant        |
                                    |
Telephone:  (719) 475-1235          |
Facsimile:  (719) 475-1476          |
```

---

### REPORTER'S TRANSCRIPT

---

This Matter came on for Hearing on Tuesday,

May 10, 2016, before the HONORABLE GILBERT MARTINEZ,

Judge of the District Court.

Ex. D

<u>I N D E X</u>

<u>WITNESS FOR THE PEOPLE (CONT'D)</u>:


<u>DR. B. THOMAS GRAY</u>

     Direct–Examination by Ms. Billek (Cont'd)   6
     Cross–Examination by Mr. King             50
     Redirect Examination by Ms. Billek     84

1           <u>TUESDAY, MAY 10, 2016, AFTERNOON SESSION</u>.

2                              * * *

3                (Whereupon, the following proceedings were had

4      to the Court with the defendant present, in custody,

5      represented by counsel:)

6                THE COURT:  The Court will call 15CR5795, People

7      versus Robert Dear.

8                Are counsel ready to proceed?

9                MS. BILLEK:  We are, Your Honor.

10               THE COURT:  All right.  You may proceed.

11               The record should reflect that all parties and

12     counsel are present.  And if I could have you raise your

13     right hand again, please.

14                         <u>DR. B. THOMAS GRAY</u>,

15     having been first duly sworn, was examined, and testified as

16     follows:

17                    CROSS-EXAMINATION CONT'D

18     BY MS. BILLEK:

19          Q.    Good afternoon, Dr. Gray.

20          A.    Good afternoon.

21          Q.    Could you please reintroduce yourself so that

22     the court reporter has the name in the record, please?

23          A.    B. Thomas Gray.  G-r-a-y.

24          Q.    And just for purposes of the record, could you

25     just repeat for us where you work?

1          A.      I'm a psychologist at the State Hospital in

2     Pueblo.

3          Q.      Thank you for coming back today.

4                  When we left off, a little over a week ago, we

5     were going through your notes that you had of your two

6     meetings that you had with Mr. Dear.

7                  Do you recall that?

8          A.      Yes.

9          Q.      I want to talk to you about some other

10    observations that you had.

11                 You also had the opportunity to review the

12    records at the State Hospital by -- or, notes that are kept

13    by staff members and other personnel at the State Hospital?

14         A.      Yes, I did.

15         Q.      And you reviewed those in conjunction with

16    issuing your opinion?

17                 It's something that you review when you are

18    trying to determine what your opinion would be in a

19    particular case?

20         A.      Yes.  Yes, we routinely rely on information

21    contained in the medical record.

22         Q.      When you reviewed those records, did you review

23    whether or not there were any behavioral problems with

24    Mr. Dear while he was at the State Hospital?

25         A.      Yes.

1          Q.    And were there any?

2          A.    I don't recall there being any notable issues.

3          Q.    So, for the most part, he was able to conform

4    with the rules that are described to him as to what he's

5    supposed to do, when he's supposed to do things, things of

6    that nature?

7          A.    Yes.  He was generally compliant with

8    expectations.

9          Q.    Did he have any problems with his food and/or

10   water?

11         A.    No.

12         Q.    So no mention of his water or food being

13   tainted?

14         A.    No.

15         Q.    Poisoned by the Feds?

16         A.    No.

17         Q.    Nothing of that nature?

18         A.    No.

19         Q.    He was to use the facilities?

20               And by that I mean the classrooms, snack tables,

21   those kinds of things, appropriately?

22         A.    I don't recall seeing anything to the contrary.

23         Q.    Okay.  Was he also able to have conversations

24   with other staff members that did not involve his political

25   beliefs, religious beliefs, or the reason why he was

1      there -- his disagreement with his attorneys?

2           A.    To some degree, yes.  He was not terribly

3      social, but he did engage in some normal social exchange,

4      yes.

5           Q.    And do you have an example of that that you can

6      recall from the records?

7           A.    Nothing specific, no.  It's been a little while

8      since I looked at that.

9           Q.    Do you recall looking at the records, and there

10     being a staff member that Mr. Dear had a conversation with

11     about growing up and walking in the mountains with his

12     father and his grandfather?

13          A.    I don't recall that specifically, no.

14          Q.    Okay.  If I provided you the page, would it help

15     refresh your recollection if that document was in there?

16          A.    I don't have a copy of that document.

17               MS. BILLEK:  Your Honor, may I approach the

18     witness?

19               THE COURT:  You may.

20               MS. BILLEK:  And just for the record, Your

21     Honor, I have shown this to defense counsel.

22               THE COURT:  All right.

23               (Pause.)

24          Q.    (By Ms. Billek)  Dr. Gray, does that refresh

25     your recollection with regard to that particular document

1      or notation?

2          A.    Not specifically, no.  It's been a few months.

3      I've read a lot of documents in the interim.

4          Q.    Fair enough.

5              But you recognize that as a document that would

6      be kept in the normal course of business; and it relates to

7      Mr. Dear, would you agree?

8          A.    Yes.  Yes.

9          Q.    And that's an example of Mr. Dear being able to

10     converse with staff members of things outside of his

11     religious or political beliefs?

12             MR. KING:  Judge, I'm going to object.  He said

13     it did not refresh his recollection.

14             THE COURT:  The objection is sustained.

15             MS. BILLEK:  May I approach, Your Honor?

16             THE COURT:  Yes.

17         Q.    (By Ms. Billek)  Do you have any specific

18     recollections of any conversations Mr. Dear was able to

19     have that did not involve his political beliefs or his

20     religious beliefs?

21         A.    No, I don't.  As I say, it's been some time

22     since I reviewed that record.

23         Q.    And even reviewing the record doesn't refresh

24     your recollection at all?

25         A.    I don't recall having seen that specific note,

1       no.

2                    THE DEFENDANT:  I guess you're incompetent.

3       Q.    (By Ms. Billek)  There are times in the record

4       that staff mentions Mr. Dear wanting to discuss his

5       religious view, particularly Luke 10:18.

6                    Do you recall those parts of the document in his

7       record?

8       A.    I do recall there were at least occasional notes

9       to that effect, yes.

10      Q.    And in those, how did the staff member deal with

11      those, do you recall?

12      A.    I don't recall, specifically.

13                   I don't believe anyone engaged him in a lengthy

14      discussion on those topics.

15      Q.    Do you recall that they would redirect him to a

16      different topic or tell them they didn't want to speak

17      about the topic?

18      A.    That sounds entirely plausible.

19      Q.    And Mr. Dear was able to do that?

20      A.    I'm sorry?

21      Q.    Was Mr. Dear able to do that?

22      A.    Yes.

23      Q.    Okay.  Did he have any complaints while he was

24      at the State Hospital about the Feds implanting any chips

25      in his head, or anything of that nature?

1        A.     Not to my knowledge, no.

2        Q.     In your review of the records, were there any

3    complaints by Mr. Dear at the State Hospital that the

4    federal government was controlling staff members or those

5    who were on his particular ward?

6        A.     Aside from intimations that, perhaps,

7    Dr. Grimmett and I were being influenced, no.

8        Q.     And that's what you talked about earlier when

9    you were going through your notes -- that you had made

10   inferences about -- and "inferences" was your words --

11   about things when you were meeting with Mr. Dear?

12       A.     Yes.

13              THE DEFENDANT:  Yeah, and who cut our meeting

14   short?  Those delusional Feds pulled your strings.

15              How about put the name out there for the Court.

16   Who cut our meeting short?

17       Q.     (By Ms. Billek)  Do you know who cut the meeting

18   short, Dr. Gray?

19       A.     The person who came to the door was Dr. Scott

20   Young, who is a psychologist who works at the hospital.  He

21   said that he was sent over by Deborah Foster, who is the

22   director of the Court Services Department.

23       Q.     And do you know what transpired with regard to

24   why Dr. Young -- I think you said was the one who knocked

25   on the door -- why Dr. Young was there?

1          MR. KING:  Judge, I'm going to object as to

2    asked and answered.  We went through all of this last time.

3          THE COURT:  We did -- I'm not sure with this

4    witness.  I'm not sure why we have to go through it again,

5    but I'm not sure we did it with this witness.

6          MS. BILLEK:  Fair enough, Your Honor.  I'll move

7    on.

8          THE COURT:  Okay.

9    Q.    (By Ms. Billek)  Ultimately, Dr. Gray, you

10   issued a report.

11         And, I believe, we've heard that some of it was

12   written by you and some of it was written by Dr. Grimmett.

13   But both of you signed it?

14   A.    Correct.

15   Q.    And you reviewed the parts that you didn't

16   write?

17   A.    Yeah, and there was a good deal of back and

18   forth between Dr. Grimmett and myself as the report was

19   produced.

20   Q.    Okay.  And what was your diagnosis with regard

21   to Mr. Dear?

22   A.    We rendered a diagnosis of delusional disorder.

23   Q.    Okay.  Could you tell us what you mean by a

24   delusional disorder?

25   A.    Delusions are basically untenable beliefs that

1    are maintained in the face of strong evidence to the

2    contrary.

3         Q.    Okay.  So it was untenable, and there is strong

4    evidence to the contrary?

5         A.    Yes.

6         Q.    What is an overvalued idea?

7         A.    Overvalued ideas are strongly held ideas that a

8    person maintains.

9         Q.    So when you have an overvalued idea, does it

10   necessarily have to be a mainstream idea?

11        A.    No.

12        Q.    It can be a subcultural idea, if you want to

13   label it that way?

14        A.    It can.

15        Q.    It doesn't have to even be a popular belief?

16        A.    No.

17        Q.    Can people have strong political beliefs, and

18   may not be an overreaching or overvalued idea?

19        A.    I'm not entirely clear what you are asking, I'm

20   sorry.

21        Q.    People can have political beliefs?

22        A.    Sure.

23        Q.    And they can have strong political beliefs?

24        A.    As we all see on a daily basis anymore.

25        Q.    True.  True, especially during an election year.

 1              When somebody has a very strong political

 2    belief, does that necessarily mean that it is an overvalued

 3    idea?

 4         A.    No.

 5         Q.    Does it necessarily mean it's delusional?

 6         A.    No.

 7         Q.    Same with religion?

 8         A.    Yes.

 9         Q.    How do the two differ between a delusion and an

10    overvalued idea?

11         A.    It is -- and, I believe, we discussed this to

12    some extent when I was here before -- it is not a

13    bright-line distinction.

14              It is -- the distinction is based, in large

15    part, on the degree to which it dominates a person's

16    thinking and influences their behavior.

17         Q.    So what specifically is Mr. Dear's delusion?

18         A.    He has a complex delusional system revolving

19    around persecution by the federal government over a period

20    of decades that includes some religious themes, some degree

21    of grandiosity.

22         Q.    How does it include -- what do you mean by it

23    "includes some religious themes"?

24         A.    When he talks about his ideas, typically he

25    incorporates religious ideas into it; and specifically,

1    attributes the onset of the persecution by the federal

2    government to a phone call he made to a radio station in

3    Waco after the Branch Davidian event was brought to an end.

4              And, at that point, he said he referred to the

5    F.B.I. as the "Federal Bureau of Incineration," upset the

6    federal government, and they've been pursuing him since.

7              THE DEFENDANT:  And two months after that phone

8    call I get a fake rape charge just by delusional.

9         Q.   (By Ms. Billek)  So when you draw this line with

10   regard to whether or not it's a delusion or an overvalued

11   idea, where did you draw that line if it's -- if you say

12   it's not a bright line that's between the two?

13        A.   Dr. Grimmett and I agreed that Mr. Dear in his

14   presentation was so focused on this, and so -- his thinking

15   was so wrapped around these ideas that it qualified as a

16   delusion.

17        Q.   Other than the Waco incident, was there anything

18   else you could point to with regard to what is in this

19   delusion?

20        A.   He talked about -- repeated numerous instances

21   of being followed, being persecuted by the federal

22   government -- by the F.B.I.

23        Q.   How many instances?

24        A.   I didn't count them up.

25        Q.   You went through your notes last time, do you

1      recall how many there were?

2          A.    I didn't count them up.

3          Q.    Okay.  Any other part of his delusion that you
4      can point to?

5                You have various things that you said are in
6      there, but you didn't count them up.  Anything else
7      specific that you can point to?

8          A.    That's the essence of it:  Is his focus on being
9      persecuted by the federal government.

10                I can tell you that I did not write down every
11     single event that he described.  One never does in an
12     interview of that nature, you just -- you can't write down
13     every single thing that the person says, so -- I didn't
14     record everything in my notes.

15         Q.    You also didn't then record them in the report
16     or record them after your interview as you recalled them
17     either, did you?

18         A.    Not event by event as he described it, no.

19         Q.    And you did not audiotape or videotape this
20     interview either?

21         A.    No.  We don't have facilities to do that at the
22     hospital.

23                THE DEFENDANT:  You don't have a tape recorder,
24     huh?

25         Q.    (By Ms. Billek)  So when you talk about there

1    were various instances, that's the number you put on it.

2    You can't put an exact number, because you didn't count

3    them up?

4         A.    Correct.

5         Q.    Can you recall all of them?

6         A.    Probably not.

7         Q.    Much like you can't recall all of the things in

8    the notes at the hospital either?

9         A.    Having not reviewed them in some time, no.

10        Q.    You are not saying that religion is false, are

11   you?

12        A.    I don't believe I said anything that would come

13   anywhere close to that.

14        Q.    Well, in the DSM-5 it lists a delusion as a

15   fixed false belief.

16              You wouldn't be saying that religion is false?

17              THE COURT:  That's been asked and answered,

18   Counsel.

19              He just answered that, let's move on.

20        Q.    (By Ms. Billek)  How do you determine something

21   is false when you look at a delusion?

22        A.    One looks for evidence to the contrary.

23        Q.    So when Mr. Dear mentions things like Luke

24   10:18, did you do any further follow-up on what that was or

25   his line of thinking regarding that?

1          A.     I don't think I did follow-up on that one, no.

2          Q.     Okay.  He mentioned to you during his interview

3     about Paul Hill.

4                 Did you follow anything up about Paul Hill?

5          A.     I looked him up.

6          Q.     Okay.  Did you ask Mr. Dear about him?

7          A.     I didn't have to.  Mr. Dear volunteered that

8     information.

9          Q.     Okay.  What did he volunteer to you about it?

10         A.     He told us who Mr. Hill was and what he had

11    done.

12         Q.     Okay.  The only thing in your notes on Paul Hill

13    is that he told you about, If you want to see how I'm

14    thinking, check out Paul Hill?

15                MR. KING:  Objection.  Leading.

16                THE COURT:  It does sound like leading, but

17    she's pointing him to a certain area, so the Court will

18    allow it.

19         A.     So again, I'm not quite sure what you are

20    asking.

21         Q.     (By Ms. Billek)  Other than in your notes where

22    you marked that he told you what he was -- if you want to

23    know what I'm thinking, check out Paul Hill, is there any

24    other information that you asked him about that is recorded

25    in your notes regarding Paul Hill?

1      A.    I actually don't think I wrote down that quote

2   that you just gave.  I've got a note here concerning

3   Reverend Paul Hill.

4      Q.    And what is the note?

5      A.    Reverend Paul Hill executed in Florida in 1995.

6      Q.    Okay.  And I may have -- maybe it's my mistake,

7   and I apologize about that, but that's all you have written

8   down in your notes regarding Paul Hill?

9      A.    Yes.

10      Q.    But Mr. Dear talked to you extensively about it?

11      A.    I wouldn't say "extensively."

12          THE DEFENDANT:  Oh, yeah, I did.  And I cried

13   quite a while talking about him.

14      Q.    (By Ms. Billek)  Mr. Dear has told you that he

15   shared that information with you and cried.  Do you recall

16   that?

17          THE COURT:  Counsel, approach the bench.

18          (Whereupon, the following discussion was had at

19   the bench out of the hearing of the courtroom:)

20          THE COURT:  I'm not sure we're going to get

21   anywhere if when Mr. Dear makes a statement, you follow-up

22   with that statement.

23          MS. BILLEK:  I understand that, but this is an

24   actual direct thing that we need in the --

25          THE COURT:  Well, I think it just inflames

1      Mr. Dear, so -- Counsel, proceed.

2                  MS. BILLEK:  Well, may I ask:  Are his outbursts

3      being recorded?

4                  THE COURT:  I'm sure they are.

5                  MS. BILLEK:  Okay.  I just wanted to make sure

6      that they are being recorded.

7                  (Whereupon, the following proceedings were had

8      in the presence and hearing of the entire courtroom:)

9                  MS. BILLEK:  Your Honor, may I continue with the

10     last question?

11                 THE COURT:  You may.

12         Q.   (By Ms. Billek)  I'm sorry.  Dr. Gray, do you

13     recall the last question?

14         A.   No.  I'm sorry.

15         Q.   Do you recall when you met with Mr. Dear that he

16     did share with you about Mr. Hill -- about Paul Hill, and

17     that he was crying when he did so?

18         A.   Mr. Dear became tearful at one point.

19                 It was when he was talking about the topic of

20     abortion and his perception that babies were being killed

21     in large numbers.

22                 THE DEFENDANT:  Four-thousand a day.

23                 THE COURT:  Counsel, if I can just interrupt for

24     a moment?

25                 (Pause.)

1                  All right.  I'm sorry.  Go ahead.

2        A.    He did not -- I don't believe he talked about

3    Paul Hill at that exact same time.  He talked about

4    Mr. Hill separately.

5        Q.    (By Ms. Billek)  Okay.  And is that in the first

6    interview or the second?

7        A.    He talked about Mr. Hill in both interviews.  He

8    became tearful -- significantly tearful in the second.

9        Q.    And when did you look up Paul Hill?

10        A.    In the interval between.

11        Q.    And did you further any conversation with him

12    about Paul Hill and any information you located about him?

13        A.    No.

14        Q.    Why not?

15        A.    I hate to answer a question with a question, but

16    my response would be:  Why?

17              I didn't see any purpose in terms of addressing

18    the issue of competency that would be served by that.

19        Q.    Did you do any further investigation into Paul

20    Hill, and determine if there was any correlation between

21    Paul Hill and Mr. Dear's actions?

22        A.    Between Paul Hill and Mr. Dear's --

23        Q.    Paul Hill's background and what Mr. Dear did --

24    what he was asking for?

25        A.    I learned enough about Mr. Hill to know that

1        there were, perhaps, some parallels.

2                Again, that was not a major concern for me in

3        addressing the issue of competency.

4           Q.    Why did you research it then?

5                MR. KING:  Objection, Judge.  Relevance?

6                THE COURT:  Sustained.

7           Q.    (By Ms. Billek)  Based on your report, you

8        opined that Mr. Dear's delusional belief system affected

9        his ability to consult with his lawyers with a reasonable

10       degree of rational understanding in order to assist in his

11       defense?

12          A.    Yes.

13          Q.    Right?

14               So how is this delusion working against his

15       ability to work with his attorneys?

16          A.    He's incorporating Mr. King into his delusions.

17               He's indicating that he believes defense counsel

18       are being controlled by the federal government -- that both

19       you and the defense counsel are more concerned with

20       publicity than with anything else.

21          Q.    Anything else?

22          A.    That was sufficient to convince me that there

23       would be significant problems in his abilities to work with

24       defense counsel.

25          Q.    Now, we talked last time that in your notes you

1    made a lot of inferences that Mr. Dear -- when he would say

2    something, you inferred that it was federal government

3    related.

4              Do you remember that?

5              MR. KING:  Judge, I'm going to object -- that

6    that's leading.

7              MS. BILLEK:  I'm trying to direct him to a

8    specific area, Your Honor.

9              THE COURT:  Well, you may direct better than

10   that, because "a lot of inferences" goes directly to a lot

11   of different places.

12        Q.   (By Ms. Billek)  I want to talk specifically

13   about statements Mr. Dear made that his attorney was

14   working for the federal government.

15             What statements can you point to that are in

16   your notes?

17        A.   I don't recall specifically.

18             He did say defense counsel was -- had lied to

19   him repeatedly.

20        Q.   He doesn't say that that's because he is being

21   controlled by the federal government?

22             MR. KING:  Objection.  Leading.

23             THE COURT:  Sustained.

24        Q.   (By Ms. Billek)  Does he say that that is

25   because his attorneys are controlled by the federal

1      government?

2           A.    I do not have that in my notes, no.

3                 Yeah, I don't think I have anything specific on

4      that in my notes.

5                 THE DEFENDANT:  Because I read it in the

6      newspaper.

7           Q.    (By Ms. Billek)  Did he mention anything else

8      about Mr. King?

9                 MS. BILLEK:  And we talked about some of those,

10     Your Honor.

11                I would ask to be able to lead him into a

12     specific area with regard to this, because it did come up a

13     little bit at our last hearing.

14          Q.    (By Ms. Billek)  You talked about when we went

15     through your notes that Mr. Dear shared that his

16     attorney -- he felt his attorneys lied to him.  And we've

17     just discussed that one.

18                MR. KING:  Objection.  Asked and answered.

19                THE COURT:  It has been.

20                MS. BILLEK:  I'm just trying to lay the

21     foundation for the question, Your Honor.

22          Q.    (By Ms. Billek)  With regard to the next step,

23     you also -- he also told you about that he didn't think his

24     attorneys were working in his best interests?

25                MR. KING:  Objection.  Asked and answered.

 1                    THE COURT:  Overruled.

 2           Q.    (By Ms. Billek)  Do you recall that particular

 3      point?

 4           A.    I'm sorry.  Could you repeat it again?

 5           Q.    In your notes you have a section about Mr. Dear

 6      not getting along with his attorneys.  And specifically,

 7      I'm trying to get to the area where he said he felt his

 8      attorney was not working in his best interests.

 9                 Do you recall that in your notes?

10           A.    Yes.

11           Q.    And in your notes, are there any references that

12      that is specifically because his attorneys work for the

13      federal government?

14           A.    I don't find anything, no.

15           Q.    Are there any specific notations in your notes

16      or in the report about Mr. Dear claiming his attorneys were

17      working for the federal government?

18                 THE COURT:  It's been asked and answered.

19                 He just answered that, Counsel.  He just

20      answered that, move on -- more than once.

21                 MS. BILLEK:  Thank you, Your Honor.

22           Q.    (By Ms. Billek)  Can you point out where in your

23      notes you reflect that he thought that the D.A. or the

24      Prosecution was being controlled by the federal government?

25           A.    Not specifically, no.

1          Q.     So if the federal government is part of his

2     delusion, then how is that affecting his ability to talk to

3     his attorneys when those notations are not in your notes?

4          A.     As I said a moment ago, I don't record every

5     single thing that is said, nor do I take my notes for

6     purposes other than to assist me in writing a report.

7          Q.     So were these statements that Mr. Dear made, or

8     were those inferences that you took?

9          A.     Those would have been primarily inferences.

10         Q.     Were you aware when Mr. Dear got to the State

11    Hospital that there was communication difficulties between

12    he and his attorneys?

13         A.     Yes.

14         Q.     Did you have contact with the Defense attorney

15    about what the Defense thought was the problem?

16         A.     I spoke with Mr. King more than once, actually.

17         Q.     And what did he share with you about what he

18    thought the problem was?

19         A.     I don't recall specifically what was said in

20    that regard.

21              THE DEFENDANT:  You can't remember, huh?

22         A.     Yeah, I don't recall specifically what was said

23    there.

24         Q.     (By Ms. Billek)  Is that not -- would that

25    information not be important to you when you are conducting

1    an evaluation?

2         A.    What I learned from Mr. King was that he thought

3    that -- he was of the opinion that Mr. Dear had significant

4    mental health issues, and that was the primary thing I

5    needed to know.

6         Q.    (By Ms. Billek)  And that was all he said to

7    you?

8         A.    As I say, I don't recall the specifics of the

9    conversation, so -- I'm sure we spoke of more than just

10   that, but those -- that was the primary thing that was of

11   concern for the purposes of this evaluation.

12        Q.    Are those reflected -- those conversations

13   reflected anywhere in your notes?

14        A.    No.

15        Q.    Is there a reason why not?

16        A.    The flippant answer would be because I didn't

17   write them down.

18        Q.    I'm just asking a question, Dr. Gray, so I'm

19   just trying to find the information.

20        A.    Yes.

21              I didn't record that.

22        Q.    And it's not recorded in the report either?

23        A.    No.

24        Q.    When you talked to Mr. King, do you recall if

25   there was a discussion about difference of strategy in

1      handling the case between he and his client?

2           A.    I don't recall that we specifically discussed

3      that, no.

4           Q.    After your first meeting with Mr. Dear, did you

5      inquire of the defense attorney further regarding any of

6      those issues?

7           A.    My experience in doing a goodly number of these

8      kinds of evaluations is that defense attorneys are

9      generally loath to discuss strategy with me for what, I

10     think, are probably fairly obvious reasons.

11          Q.    Afraid you might put them in your notes?

12          A.    Might put them in my notes, might have to reveal

13     that kind of information in a context such as this.

14                They don't want that information necessarily

15     revealed early on, so I generally don't pursue that

16     particularly aggressively.

17          Q.    Did you not pursue the possibility that this is

18     a conflict between Mr. King and Mr. Dear in strategy of his

19     case, and whether or not that was a crash collision?

20                MR. KING:  Objection.  Leading.

21                THE COURT:  Overruled.

22          A.    A crash collision?

23          Q.    (By Ms. Billek)  Yeah, the two of them are at

24     odds about what should go on with the case?

25          A.    I was certainly aware that Mr. Dear's ideas

1     about how to approach the case were not going to be in

2     agreement with things that I would think most defense

3     attorneys would be willing to follow -- or, at least eager

4     to follow.  I was certainly aware of that.

5              The fact that Mr. Dear was -- was so suspicious

6     of others, and so convinced that others were out to get

7     him, so to speak, and watching him wrap others into that,

8     led me to that conclusion.

9        Q.   And some of that was based on inferences that

10    you made?

11             MR. KING:  Objection.  Leading.

12             THE COURT:  That's not leading.  That's a

13    statement.

14       Q.   (By Ms. Billek)  Were portions of that opinion

15    based on the inferences that you previously talked about?

16       A.   In dealing with these kinds of issues, I think

17    one almost always relies on inference to a reasonable

18    degree, so -- yes.

19       Q.   One also relies on their notes, as well; would

20    you agree?

21             MR. KING:  Objection.  Leading.

22             THE COURT:  Sustained.

23       Q.   (By Ms. Billek)  We talked about that there was

24    differences -- you've been a little unclear about what

25    those differences are, but differences between Mr. King and

1     Mr. Dear, and that those differences would certainly affect

2     somebody wanting to communicate with their attorney?

3          A.     Potentially.

4          Q.     Not necessarily that they are suspicious of

5     them, but because somebody may not be working against what

6     they think are their best interests?

7          A.     Potentially.

8          Q.     Did you further investigate that conflict, if

9     you will -- for lack of a better word -- to determine

10    whether or not Mr. Dear could consult with his attorney?

11             MR. KING:  Objection.  Asked and answered.

12             THE COURT:  Overruled.

13         A.     The extent of Mr. Dear's suspiciousness of

14    others is -- his assertions, almost immediately, that

15    Mr. King was just the Batman lawyer, and that he was using

16    this for publicity and to further his career, were all

17    consistent with his marked suspiciousness of others.

18             And so, no, I didn't pursue that further.

19         Q.     (By Ms. Billek)  Being suspicious of somebody

20    does not necessarily make them delusional, does it?

21         A.     On the face of it, no.

22         Q.     And you've mentioned that he talked about his

23    attorney being -- I think you put it -- just the Batman's

24    attorney, out for publicity, and to further his career.

25             How did you tie that to the delusion of Mr. Dear

1    with the federal government?

2         A.    I didn't necessarily tie it directly to federal

3    influence, but I did tie it to his notable and unfounded

4    suspiciousness of other people.  And considered that to be

5    problematic.

6         Q.    What was unfounded about him being suspicious of

7    other people?

8         A.    The extent to which he became suspicious of

9    others, and the way in which he, during the course of our

10   two interviews, wrapped his girlfriend -- for lack of a

11   better term -- into all of that, it made for a coherent

12   picture of someone who is inordinately and delusionally

13   paranoid.

14             THE DEFENDANT:  Well, the love of your life,

15   she's in your life, so, you know, she's part of it.  That's

16   not a delusion.

17             And I was right to be suspicious of you.  It's

18   called intelligence.

19        Q.    (By Ms. Billek)  With regard to Mr. Dear's

20   ability to work with his attorney, did you ask any further

21   questions about what he meant by he's "just the Batman

22   attorney"?

23        A.    No.

24        Q.    Why not?

25        A.    The primary reason I didn't pursue that specific

1    statement is because he made it very early in our first

2    interview.

3              And actually, I believe he made it before I had

4    even finished informing him of the restrictions on the

5    evaluation, so I didn't pursue that.

6         Q.   What was the context upon which he raised it to

7    you and what were his concerns that he raised?

8         A.   It was merely a statement that he made.  He

9    started out complaining about his physical condition when

10   he arrived at the hospital, and jumped to complaining about

11   his attorney.

12        Q.   Did he mention anything about -- what about the

13   Batman case that he didn't like, or make any facial

14   expressions or anything of that nature, when he was

15   describing it to you?

16        A.   I don't believe I noted facial expression

17   because I was busy writing.  That was pretty much the

18   extent of it.

19             I wanted to go back to providing him with the

20   requisite warning about the nature of the evaluation before

21   we got into anything further.

22        Q.   He shared with you that he didn't want to be at

23   the State Hospital, right?

24        A.   Yes.

25        Q.   And he shared with you his concerns about being

1     at the State Hospital and it diminishing his message, or

2     something along those lines?

3          A.    I'm not recalling that, specifically.

4          Q.    Okay.  Did you draw any correlation between

5     the -- for lack of a better term, the Batman trial in

6     relation to Mr. Dear and his ability to work with Mr. King?

7               MR. KING:  Objection.  Asked and answered.

8               He said he didn't follow up on that.

9               THE COURT:  Overruled.

10               Go ahead and answer the question, if you can.

11     I'm sorry.

12               THE WITNESS:  Okay.  Thank you, Your Honor.

13               I'm sorry.  Could you repeat that?

14          Q.    (By Ms. Billek)  Did you draw any connection

15     between Mr. Dear not wanting to work with his attorney and

16     Mr. King being on -- for lack of a better term -- the

17     Batman trial?

18          A.    Mr. Dear -- and I don't recall exactly what he

19     said, but he did make a statement that tied Mr. King's

20     representation of Mr. Holmes to wanting to use this for

21     publicity and to further his career.

22          Q.    Did he raise any concern with you about mental

23     health aspects of the Batman trial's attorney, and that --

24     how that whole process worked -- that it might be imposed

25     upon him?

1          THE DEFENDANT:  Right.

2          A.    I don't recall him saying anything specifically

3    to that.

4          THE DEFENDANT:  Bull.

5          Q.    (By Ms. Billek)  You were provided with court

6    transcripts and media.

7          Do you recall that coming up at any point during

8    those -- when you reviewed those?

9          A.    I don't recall seeing that specifically, no.

10          THE DEFENDANT:  I said it at the first hearing.

11          THE COURT:  Mr. Dear, I've been very patient.

12    We can do this with or without you.

13          THE DEFENDANT:  Please do it without me.

14          I don't want to hear lies.  And I don't want to

15    hear you sealing my case being unlawful, and now you are

16    going to unlawfully put me in the nut house, and unlawfully

17    drug me up and unlawfully do everything.

18          THE COURT:  Are you finished?  Get it out of

19    your system.

20          Were you finished?

21          THE DEFENDANT:  Unless I hear more lies.

22          THE COURT:  All right.  Go ahead.

23          Q.    (By Ms. Billek)  You noted in the report that

24    Mr. Dear was, as you put it -- or, maybe Dr. Grimmett's

25    words, but, either way, your report together -- that he was

1       largely uncooperative with some questions posed about his

2       level of comprehension of the case.

3                Do you recall that in the report?

4       A.      I didn't quite follow that, I'm afraid.

5       Q.      Do you recall that in the report you noted that

6       Mr. Dear was largely uncooperative with questions posed

7       about his level of comprehension about his case?

8       A.      Yes.

9       Q.      What were those?

10      A.      I'm sorry.  What?

11      Q.      What were those questions that were posed that

12      he didn't answer that --

13      A.      Particularly during the second interview we had

14      a good deal of difficulty getting responses to him to most

15      any question that directly pertained to his case.

16      Q.      Did you try to inquire further of him or do a

17      third interview with him?

18      A.      No, we didn't.

19      Q.      Okay.  And when those types of questions -- what

20      would have been those types of questions that he was

21      largely uncooperative about answering?

22      A.      Questions about how he would propose to manage

23      the case, questions about -- we even had difficulty with

24      basic questions about the factual workings of the judicial

25      system, questions about his awareness of evidentiary issues

1        in this particular case.

2                Q.      Are those some of the same things you went over

3        with him in the first interview?

4                A.      Some of it was, some of it was not.

5                Q.      So was it in the first interview or the second

6        interview that he was able to tell you about the phases for

7        sentencing in the potential death penalty case?

8                A.      That was a comment that he made that indicated

9        his awareness of that particular bit of factual

10       information; and that, I believe, came during the initial

11       interview.

12               Q.      He shared with you what his strategy was during

13       the two interviews you met with him?

14               A.      He did, particularly in the first interview --

15       stated what he proposed as a strategy, yes.

16               Q.      Okay.  And again, he knew who his attorneys

17       were?

18               A.      He did.

19               Q.      He knew his basic rights?

20               A.      Yes.

21               Q.      You stated also in the report that his

22       spontaneous speech indicated his approach to resolving his

23       legal case is severely tainted by his delusional belief

24       system.

25                       Do you recall that statement in the report?

1      A.    Yes.

2      Q.    How so?

3      A.    I'm sorry.  Could you point --

4      Q.    Page 7 of 8.

5      A.    In discussing his legal case, he frequently went

6    back and forth between talking about persecution by the

7    federal government and issues of his case.

8           He seemed unable to separate those -- unable to

9    tease those apart.

10     Q.    What were those issues specifically that he was

11   unable to tease apart?

12     A.    It was the process -- the means by which he

13   expressed his ideas.

14          He would begin to talk about managing his case,

15   and then he's engaged in a monologue concerning persecution

16   by the federal government, being followed, and tying these

17   ideas together in some way that wasn't entirely clear.

18     Q.    Did you try to redirect him, or did you just let

19   him go on a monologue?

20     A.    We let him talk.  That's sometimes one of the

21   best ways to gather information from people.

22     Q.    But you didn't try to redirect him to see if he

23   could be redirected -- or, put back on task, if you will?

24          MR. KING:  Objection.  That was just asked and

25   answered.

1            MS. BILLEK:  I'm just trying to clarify if you

2    ever redirected him.

3            THE COURT:  Overruled.

4       A.   I don't think we did, no.

5       Q.   (By Ms. Billek)  Once he was done with what you

6    described as a monologue, you were able to then continue on

7    with whatever your next questions would be?

8       A.   We would continue on.  We would see the same

9    kind of thing again -- a similar kind of process where he

10   would begin talking.

11           He was difficult to interrupt during some of

12   those -- speeches is probably not quite the right word, but

13   it's the best I can come up with at the moment.

14      Q.   Are some of those speeches related to his

15   religion or political beliefs?

16      A.   They included elements of those beliefs, yes.

17      Q.   Would you agree that someone can be

18   delusional -- or, have a delusional diagnosis, and still be

19   competent?

20           MR. KING:  Objection.  Asked and answered.

21           THE COURT:  Overruled.

22      A.   Yes.

23      Q.   (By Ms. Billek)  We talked about whether or not

24   you've developed any further with regard to the difference

25   of opinion between Mr. Dear and his attorneys, and how they

1     wanted to handle the case.

2           The standard for competency doesn't require that

3     a defendant have to agree with his attorneys to be

4     competent, correct?

5           A.    Correct.

6           Q.    And a defendant has a right to disagree with his

7     attorneys, would you agree?

8           A.    That's my understanding of things, yes.

9           Q.    Isn't that what Mr. Dear shared with you -- is

10    that he disagrees with the process of his case -- the way

11    his attorney wants to handle it?

12          A.    He did indicate that he was not in agreement

13    with his attorneys' approaches.  We concluded that the

14    difference went deeper than that, however.

15          Q.    Did you inquire further regarding that -- or,

16    did you just stop at that point, and make that decision?

17          A.    We had gathered a good deal of information.  And

18    we were having difficulty obtaining additional information

19    from him, so we stopped.

20          We felt we had adequate information to reach a

21    conclusion and offer an opinion.

22          Q.    Were you concerned at all about Mr. Dear not

23    wanting to meet with his attorneys?

24          A.    Well, yes --

25          Q.    Okay.

1           A.      —— of course.

2           Q.      And were you provided with some additional

3     information that there were media reports or some jail

4     phone calls about his ability to work with his attorneys in

5     the time frame between you asking for the Court to give you

6     more time to write a report and a report being provided to

7     the Court?

8           A.      Yeah.

9                   And, in that interval, we received actually a

10    good deal of additional information.

11          Q.      Did you make a decision to utilize that

12    information?

13          A.      We reviewed it.

14          Q.      Is it contained in your report?

15          A.      There is not specific reference to it in the

16    report.

17          Q.      Are you looking —— when you determine under this

18    status that we've had —— whether or not it's an ability or

19    a willingness to communicate with one's attorney?

20          A.      Per statute, it's ability.  It has nothing to do

21    with willingness.

22          Q.      So how did you draw that distinction for

23    Mr. Dear?

24          A.      In this instance we looked at the extent to

25    which it appeared that his delusional thinking was

1      influencing his approach to the case, to his attorneys, and

2      so forth.  And we concluded that his impairments were

3      affecting his abilities.

4           Q.    Mr. Dear shared with you that possibly one of

5      the strategies he might utilize is pleading guilty to some

6      of the charges?

7           A.    Yes.

8           Q.    How is that tied to his delusional belief

9      system?

10          A.    I'm not sure that it is.

11                THE DEFENDANT:  Because I'm not delusional.

12          Q.    (By Ms. Billek)  But you said that that is a —

13     that his strategy is tainted by his delusional system.  So,

14     how so?

15          A.    His ability to be able to consider alternatives

16     is markedly limited by his undue suspiciousness, by his

17     firmly established beliefs that he is being persecuted, and

18     then this impacts his ability to work with defense counsel,

19     and it also affects his — therefore, his ability to

20     consider alternatives.

21          Q.    Does he have to consider alternatives if he

22     wants to plead guilty?

23                If somebody has a firm conviction that they want

24     to plead guilty, do they have to consider other

25     alternatives?

1          MR. KING:  Judge, I'm going to object to

2     relevance to the issue of competency.

3          THE COURT:  The objection is sustained.

4     Q.    (By Ms. Billek)  You've given us the statements

5     that Mr. Dear has shared with you about not being able to

6     work with his attorneys.

7          How did you distinguish between that being a

8     volitional choice not to communicate with his attorneys

9     versus it being controlled by his delusion?

10    A.    The extent of his paranoia, the extent of his

11    suspiciousness, the depth of his beliefs that –– his stated

12    beliefs that the federal government was out to get him, all

13    pointed in that direction.

14         THE DEFENDANT:  What does that got to do with my

15    constitutional right to represent myself?

16         I don't have to work with these attorneys.  I've

17    got a constitutional right.

18    Q.    (By Ms. Billek)  So when you are focusing on

19    whether or not a defendant can communicate with his

20    attorneys, do you ignore all other possibilities?

21         MR. KING:  Objection.  Argumentative.  Leading.

22         MS. BILLEK:  I don't think it's argumentative.

23    I'm asking other possibility, such as other attorneys,

24    other ways about going about it.  I don't think there is

25    anything argumentative about it.

1          THE COURT:  The objection is sustained.  It's

2     based on leading.

3          Q.    (By Ms. Billek)  Did you discuss with Mr. Dear

4     other ways of working with his attorneys or working with

5     other attorneys?

6          A.    "No" to the first part.  Actually, "no" to the

7     second part as well.  I did not perceive it as my role to,

8     if you will, rehabilitate his relationship with defense

9     counsel.

10          As far as his ability potentially to work with

11     alternate defense counsel, no, we didn't pursue that --

12     primarily because, as I think I've stated, he was so quick

13     to become suspicious of others and to incorporate people

14     into his sphere of those who he didn't trust of whom he

15     was -- he was markedly paranoid, we concluded that if he

16     had different attorneys, the result would probably be the

17     same.

18          Q.    But you are saying you didn't inquire of him as

19     to whether or not he would be willing to work with other

20     attorneys?

21          MR. KING:  Objection as to relevance as to the

22     issue of competency.

23          THE COURT:  Overruled.  Go ahead.

24          If you can answer the question, go ahead.

25          A.    So did we ask specifically about working with

 1    other attorneys, no, I don't believe we did.

 2         Q.    (By Ms. Billek)  You were in the same room as

 3    Dr. Grimmett when you were conducting the evaluation,

 4    correct?

 5         A.    Yes.

 6         Q.    I'm just making sure that the two of you are

 7    doing this at the same time.  I'm not trying to be

 8    argumentative, I'm just trying to make sure I'm

 9    understanding.

10         A.    Yeah.  I think that's been made fairly clear,

11    Ms. Billek.

12         Q.    Fair enough.  I am just making sure there was

13    not a point where you left the room at some point.

14              Could you explain why Dr. Grimmett would have a

15    notation in her notes about asking the defendant about

16    whether or not he could work with A.D.C., and he said he

17    could.

18         A.    Well, I would imagine that the explanation is

19    that she asked, she wrote it down; and either I missed it

20    or I didn't attend to it adequately to recall.

21         Q.    Would the two of you have shared that

22    information when you come up with a combined opinion that

23    he wouldn't be able to work with other attorneys?

24         A.    I don't recall that we discussed that specific

25    issue in our --

1           MS. BILLEK:  May I have just a moment, Your

2     Honor?

3           THE COURT:  Yes.

4           THE DEFENDANT:  Put me on the stand, then.  Hear

5     if I'm competent.  Ask me questions.  Get it right from my

6     mouth.

7      Q.    (By Ms. Billek)  When you look at whether or not

8     someone has delusional thinking and that it impairs their

9     reasoning, and you look at whether or not they are well

10    reasoned choices -- I think, that's the language from the

11    report -- who determines whether or not a particular

12    strategy or discussion point is considered well-reasoned?

13     A.    We do.

14     Q.    It wouldn't be about whether or not you agree

15    with a choice --

16     A.    No.

17     Q.    -- that a particular defendant tells you, I want

18    to seek this strategy, you don't try to talk them out of

19    it?

20     A.    No.

21           No, and the example that I usually use when I am

22    training others is that we do sometimes encounter

23    individuals who say that they don't want to even consider a

24    plea offer because they can't do probation.

25           They would rather go to D.O.C., do straight

1    time, and come out off paper, which wouldn't work very well

2    for me; but, for them, that's a rational choice.

3        Q.    Would it then also be a rational choice when

4    somebody tells you honesty is the best policy, and I want

5    to plead guilty; I did what I did?

6        A.    It could be.

7              THE DEFENDANT:  No, you told me to plead

8    innocent by reason of insanity.

9        Q.    (By Ms. Billek)  Such a decision could be

10   opposed to that particular person's attorney, do you agree?

11       A.    Such a --

12       Q.    Pleading guilty, honesty is the best policy --

13   that could be in contradiction to what the attorney wants

14   to do?

15       A.    It could be.

16       Q.    One desiring to enter a plea of guilty is not

17   inherently incompetent, are they?

18       A.    No.

19       Q.    Mr. Dear's delusion -- that appears to focus on

20   the F.B.I., the federal government?

21       A.    Yes, the federal government in general.  He

22   mentioned the F.B.I. specifically on multiple occasions.

23       Q.    Would it be fair to label that as

24   anti-government?

25       A.    Well, it would seem to fall under that general

1     heading, yes.

2           Q.    And are you aware of whether or not there are

3     others who share similar sentiments?

4           A.    Anti-government sentiments?

5           Q.    Yes.

6           A.    Of course, there are.

7           Q.    That doesn't necessarily make them incompetent,

8     does it?

9           A.    Well, I doubt all of them are facing criminal

10    charges, for starters.

11          Q.    Some may, some may not; but that, in and of

12    itself, does not make one inherently incompetent?

13          A.    Correct.

14          Q.    I think you mentioned that there are a lot of

15    those sentiments that come out during election years; and

16    big brother is part of those sentiments, do you agree?

17          A.    Oftentimes.

18          Q.    Can you medicate somebody's political beliefs

19    away?

20                MR. KING:  Objection.  Relevance?

21                THE COURT:  How is that relevant?

22                MS. BILLEK:  It goes to the course -- we'll

23    actually get into it a little later, what the course was

24    with regard to what Dr. Gray's opinion and report was.

25                THE COURT:  The objection is sustained.

1           THE DEFENDANT:  Well, you can medicate their

2    minds totally away.

3           Q.    (By Ms. Billek)  You mentioned that Mr. Dear

4    would have to be, I guess, flexible to other options

5    available to him.  Would you agree?

6           Right now, you are saying he's inflexible about

7    other options; and that's what is making him incompetent?

8           MR. KING:  Objection.  That's leading, and it's

9    a misstatement of the testimony, Judge.

10          THE COURT:  The objection is sustained based on

11   leading.

12          Q.    (By Ms. Billek)  What did you mean by when

13   Mr. Dear is inflexible to consider other options?

14          A.    What I meant was that his thinking is so rigid

15   and so rigidly controlled by his delusional beliefs that he

16   is unable to consider alternatives.

17          Q.    If he is in disagreement with his attorneys over

18   conflict about how to --

19          THE COURT:  Counsel, you've asked this probably

20   ten times.

21          Q.    (By Ms. Billek)  When you provide your report,

22   that report is provided directly to the Court?

23          A.    Yes.

24          Q.    You are not hired by either the Prosecution or

25   the Defense?

1          A.     Correct.

2          Q.     Your main goal as an evaluator would be to be

3     not invested in the case or the outcome, right?

4          A.     Correct.

5          Q.     That's the ultimate goal for you?

6          A.     Correct.

7          Q.     Do you have to maintain a sense of neutrality,

8     i.e., not take sides?

9          A.     Yes, that's the goal.

10         Q.     And why is that important?

11         A.     Because that helps to ensure objectivity.  It

12    makes it easier for us to develop and offer unbiased

13    opinions.  That's why I don't watch the news very often.

14         Q.     I suppose there are other reasons not to watch

15    the news as well, but --

16         A.     I couldn't agree with you more.

17         Q.     But part of that is because you don't want to

18    show a bias to one side or the other?

19         A.     Correct.

20         Q.     So would it be appropriate to hug, congratulate,

21    or high five the other side in the hallway?

22                MR. KING:  Judge, I'm going to object to the

23    relevance of hug and congratulate or high five the other

24    side.

25                MS. BILLEK:  Your Honor, if I may, if the Court

1    could give me a little bit of leeway, it will become clear

2    as soon as Dr. Gray answers the question.

3              THE COURT:  All right.  Go ahead.

4         A.   As a general statement, yes, I would -- that

5    would probably be true.

6         Q.   (By Ms. Billek)  It would be inappropriate or

7    appropriate to do so?

8         A.   Probably inappropriate.  It would depend to some

9    extent on the circumstances.

10        Q.   Okay.  Was there a reason why you high-fived

11   Dr. Grimmett and the defense attorneys hugged her after her

12   testimony in front of you after the last hearing?

13             MR. KING:  Judge, I'm going to object to that as

14   a misstatement of fact.

15             MS. BILLEK:  It is not a misstatement of the

16   fact, Your Honor.

17             MR. KING:  Yes, it is.

18             THE COURT:  The objection is sustained.

19             MS. BILLEK:  Your Honor, may we approach?

20             THE COURT:  No, you may not.  The objection is

21   sustained.

22             THE DEFENDANT:  You got caught.  You are under

23   oath.

24             MS. BILLEK:  Your Honor, if I may approach

25   briefly on an issue?

1              I don't believe I have any further questions for

2     Dr. Gray at this point, but I do want to address an issue

3     with the Court.

4              THE COURT:  Okay.

5              (Whereupon, the following discussion was had at

6     the bench out of the hearing of the courtroom:)

7              MS. BILLEK:  I will tell the Court that I may

8     seek to have additional witnesses.

9              We do have a security video from outside in the

10    hallway after the last hearing that reflects this hug from

11    the Defense and high-fiving between Dr. Gray and

12    Dr. Grimmett after she testified.

13             THE COURT:  All right.

14             MR. KING:  Judge, I would object to that.  I

15    don't think it's relevant to anything in any way.

16             THE COURT:  You can play it.  Okay.

17             MS. BILLEK:  I'm sorry?

18             THE COURT:  Do you want to play it or submit it

19    as an exhibit?

20             MS. BILLEK:  I will need to call additional

21    witnesses here.  I believe one of them is in the hallway.

22             THE COURT:  You better get them quick.

23             MS. BILLEK:  Thank you.

24             (Whereupon, the following proceedings were had

25    in the presence and hearing of the entire courtroom:)

1           MS. BILLEK:  Your Honor, would the Court like me

2      to do that with Dr. Gray?

3           THE COURT:  I'm not going to tell you how to do

4      it -- whatever you want to do.

5           Do you have any more questions of this witness?

6           MS. BILLEK:  May I have just one moment?

7           THE COURT:  Yes.

8           MS. BILLEK:  Your Honor, I don't have any

9      further questions for Dr. Gray at this time.

10          THE COURT:  Cross-examination?

11          MR. KING:  Sure.

12               CROSS-EXAMINATION

13   BY MR. KING:

14      Q.   Doctor, why don't we just start where we left

15      off, as vial a place as that is.

16           How long have you known me?

17          MS. BILLEK:  Objection, Your Honor.

18           Relevance?

19          MR. KING:  We're going to get into this, Judge.

20          THE COURT:  It's overruled.

21      A.   Since early on in the Holmes case.

22      Q.   (By Mr. King)  Okay.  Have there been other

23      cases that you've worked on that I've worked on, as well?

24      A.   Not that I recall, but I've worked with a lot of

25      attorneys.

1          Q.     Right.

2                 Do we have what you may call a friendly

3     professional rapport?

4          A.     I think that would probably be fair.

5          Q.     Cordial?

6          A.     Yes.

7          Q.     Do we have anything other than a friendly

8     professional relationship?

9                 Do I know you personally?

10                Do you know any of the other lawyers here on the

11    team personally?

12         A.     No.

13         Q.     Do you have any investment in the outcome of

14    this case, whatsoever?

15         A.     None.

16         Q.     Have you been a professional psychologist

17    working at the State Hospital doing competency exams for a

18    long time?

19                How long has it been?

20         A.     I've been doing this kind of work for seventeen

21    years.

22         Q.     Have we, in any way, told you what the results

23    of your findings should be in this case or influenced your

24    opinions or Dr. Grimmett's opinion in any way?

25         A.     No.

1    Q.    Do you recall what counsel's describing as a

2    high-fiving between you and Dr. Grimmett in the hallway?

3    A.    I don't recall that specifically.  I know that

4    Dr. Grimmett --

5    THE DEFENDANT:  You don't recall?

6    A.    This is the first case of this magnitude that

7    Dr. Grimmett has worked on.

8    Her testimony was something of an ordeal for

9    her, and she was quite relieved when she was excused from

10   the stand.  And I congratulated her on simply having

11   endured the process.

12   Q.    (By Mr. King)  Was there anything other than

13   that going on in the hallway?

14   A.    Certainly not.

15   I had no idea, at that point, what had been said

16   or anything of the sort, so --

17   THE DEFENDANT:  You had no idea they were

18   watching you -- that you would get caught.

19   Q.    (By Mr. King)  You were qualified as an expert

20   in forensic psychology.

21   And I noticed in looking at your C.V., Doctor,

22   that prior to coming here to Colorado in terms of your

23   experience, it seems like you spent a significant amount of

24   time in a place called the North Texas State Hospital in

25   Vernon, Texas.

1              Is that true?

2         A.    Yes, it is.

3         Q.    What is that place?

4         A.    The North Texas State Hospital is one of seven

5    hospitals in the Texas State Hospital system, because it's

6    a much larger system instead of having a maximum security

7    facility building, such as we have in Pueblo, in Texas,

8    they have an entire hospital that is maximum security.  And

9    that happens to be the one in Vernon.

10        Q.    And did you conduct competency and other

11   evaluations of folks in that hospital?

12        A.    I did.

13              In fact, for the last two and a half years that

14   I was there, I was the chief psychologist on the competency

15   restoration unit.

16        Q.    There seems to be some question about your

17   opinion and Dr. Grimmett's opinion that these beliefs that

18   Mr. Dear holds are delusions and not just strange beliefs.

19              Are you familiar with the difference, even

20   though it's not a bright law?

21        A.    Yes, I am.

22              And certainly this is an issue that comes up

23   from time to time; and it's not all together surprising

24   that there is some controversy about it, because it's not a

25   bright line.

1        Q.    Okay.  Are there cases -- in all of the cases --

2    you said you've done -- how many competency evaluations

3    have you done?

4        A.    On the order of 1600.

5        Q.    In all of the 1600 competency evaluations that

6    you've done, have there been situations where it's been a

7    difficult call to make about whether or not this person is

8    suffering from delusions or whether these are just

9    overvalued ideas as they are described in the DSM-5?

10       A.    There have been some -- not many, but there have

11   been some.

12             In most instances when delusions are involved,

13   it's relatively clear that they are present and to the

14   degree to which they impact competency-related abilities.

15   But there have been a few cases that I've worked on where I

16   spend a good deal of time scratching my head.

17       Q.    By the time you completed your second interview

18   in this case, were you still scratching your head?

19       A.    No.

20       Q.    Or was it perfectly clear to you as a

21   professional that Mr. Dear was suffering from delusions,

22   and not just overvalued ideas?

23       A.    I was satisfied that what we were seeing was

24   delusional.

25             THE DEFENDANT:  Then why did you ask for a time

1     extension?

2          Q.     (By Mr. King)  When you are evaluating

3     competency, Doctor, is there a prescribed amount of time or

4     prescribed procedures or specific notes that have to be

5     taken, or is it the kind of thing that when you reach the

6     point where you've formed the opinion that the person is

7     incompetent, you've reached that point and you have enough

8     information?

9               Does that make sense?

10         A.     Most of it.

11         Q.     Help me out.

12         A.     Ideally, we follow a structured interview

13    protocol.  Not all people that we interview are necessarily

14    amenable to that; they want to control the flow of

15    conversation, and we sometimes have to deviate from the

16    routine interview.

17              With that, once we've gathered sufficient

18    information to establish an opinion, in some instances it's

19    helpful to continue to try to gather some additional

20    information to bolster that opinion.  In some instances,

21    that's just not possible.

22              I hope that answered your question.

23         Q.     It does.  Thank you.

24              And I'm trying to move this process along

25    here -- you know, rather than going through each individual

1    piece of information that you've been provided, you

2    indicated that subsequent to your evaluation and writing

3    your report you've been provided with more information in

4    the form of phone calls that Mr. Dear has made to

5    individuals from the jail, for example; is that correct?

6          A.    Yeah.

7                And, actually, I believe most of that arrived in

8    the interim between the time we completed the second

9    interview and the time we actually signed the report.

10         Q.    And you've been present here for -- well, during

11   your testimony anyway -- to hear Mr. Dear's interjections

12   during court?

13         A.    Yes.

14         Q.    Does there appear to be any change to you in the

15   construct -- the delusional construct that is affecting the

16   way that Mr. Dear's thinking is happening based upon the

17   new information you got, or does it all seem consistent?

18         A.    It does seem consistent, yes.

19               Of course, I couldn't say that -- I couldn't --

20   base solely on his commentary during the two days I've been

21   in the courtroom, I couldn't say that that was necessarily

22   delusional.  But it's certainly consistent with what we saw

23   when we met with him at the hospital.

24         Q.    Now, how did it come that you -- you are the

25   person that is basically in charge of competency

1        examinations; am I correct in saying that?

2            A.    I'm the director of training.

3                 I no longer supervise everyone, but I'm –– I'm

4        the old guy, I'm the guy that people go to with their

5        questions.

6            Q.    And who selected you for this case?

7            A.    When we knew that the issue of competency had

8        been raised, I was present at a meeting in the

9        superintendent's office, where, among others, the

10       superintendent, the director of Court Services, the

11       president of the medical staff, and the hospital's medical

12       director, were all present; and they didn't tell me I had

13       to do this case, but they strongly encouraged me to do so.

14           Q.    I know the feeling.

15               MS. BILLEK:  Objection, Your Honor.

16               THE COURT:  Sustained.

17           Q.    (By Mr. King)  Let me ask you this –– counsel

18       asked you questions about how you test the falsehood of

19       these beliefs that are delusions, so let me ask you about

20       one right now:

21               You talked about the fact that Dr. Grimmett and

22       yourself seem to be incorporated into the delusion.  Do

23       you, in fact, work for the federal government or the

24       F.B.I. –– or, are you working at their direction in this

25       case?

```
1              A.    No.

2              Q.    You were asked about what you reviewed.

3                    You reviewed the videotape of the

4       interrogation -- the seven-hour videotape of Mr. Dear right

5       after his arrest; is that correct?

6              A.    Yes.

7              Q.    Did he -- was he talking about the same types of

8       subjects, the delusional persecutory beliefs, during that

9       extended interview that he discussed with you and

10      Dr. Grimmett?

11             A.    Yes, the general content was quite similar.

12                   THE DEFENDANT:  Why is it sealed?  Why not let

13      everybody hear it?

14             Q.    (By Mr. King)  You reviewed a video recording

15      from the jail; is that correct, as well?

16             A.    Yes.

17             Q.    So you are familiar then that there were times

18      when Mr. Dear felt in the jail that he was being poisoned?

19             A.    Yes.

20             Q.    And refused to drink the water?

21             A.    Yes.

22             Q.    And there was one occasion in early December

23      when Mr. Dear was incoherent and had feces smeared on

24      himself.  Do you recall that?

25                   THE DEFENDANT:  Bull.
```

1         A.    Yes.

2               THE DEFENDANT:  Bull.

3         Q.    (By Mr. King)  There were instances -- did you

4    observe on December 7th and December 12th of Mr. Dear

5    drinking from the toilet, and drinking his own urine from

6    the toilet?

7         A.    Yes.

8         Q.    Does that seem consistent with you?

9               Is it a reasonable inference that he was

10   drinking water from the toilet because he delusionally

11   believed that the jail was poisoning his water?

12              THE DEFENDANT:  They were.

13              MS. BILLEK:  Objection.  Speculation.

14              THE COURT:  The objection is overruled.

15        Q.    (By Mr. King)  Is that a reasonable inference?

16              THE DEFENDANT:  They've got a lot of different

17   kind of poisons -- some that make you dizzy, some that make

18   you sick.  You don't think they have access to that -- and

19   how much they hated me for what I did?

20              They wanted to play a game, and they played it.

21        A.    I don't know exactly why he would have done

22   that.

23              I mean, poisoning would be one possible

24   explanation.

25        Q.    (By Mr. King)  If that was the case, would that

```
 1      be an example of his delusional construct interfering with

 2      his decision-making process, and affecting his

 3      decision-making process?

 4           A.     Yes, you could easily frame it that way.

 5           Q.     Resulting in something that we wouldn't

 6      normally -- that people don't normally drink their own

 7      urine?

 8           A.     Not typically, no.

 9           Q.     You gave Mr. Dear something called the Montreal

10      Cognitive Assessment; is that right -- or, you attempted

11      to?

12           A.     We attempted to, yes.

13           Q.     And that is a brief, kind of, a one-page form

14      with some questions so you can figure out how the person's

15      cognitive function is?

16           A.     Yes.

17           Q.     Was there anything about your interaction with

18      Mr. Dear to make you think that he's not a fairly

19      intelligent man?

20                  He's not stupid, is he?

21           A.     No.  He did not strike me that way, at all.

22           Q.     Does that have anything to do with competency in

23      this case -- his intelligence?

24           A.     No.

25           Q.     You are not saying he has a developmental
```

1      disability that is making him incompetent such that he

2      can't function in that regard, are you?

3           A.    No, I'm not.

4           Q.    You are saying he has a mental disability,

5      correct?

6           A.    Correct.

7           Q.    A delusional disorder?

8           A.    Yes.

9           Q.    And that that disorder has resulted in a

10     functional disability interfering with his adaptive

11     behavior, right?

12          A.    I wouldn't call it adaptive behavior, but I

13     would say it is interfering with his competency-related

14     abilities.

15          Q.    Delusional disorder -- and the exact diagnosis

16     is not necessarily the important factor for determining

17     competency, is it?

18               It's the existence of a mental disability --

19          A.    That's correct.

20          Q.    -- not the name of that mental disability,

21     necessarily?

22          A.    Correct.  The real issue is the impairment in

23     the person's functional abilities.

24          Q.    But in doing the course of the examination, you

25     assign a diagnosis, fair to say?

 1          A.    Yes.

 2          Q.    A delusional disorder, as defined in the DSM-5,

 3     is a psychotic disorder; is that right?

 4          A.    It's one of several disorders that fall under

 5     the heading of "psychotic disorders," yes.

 6          Q.    I wanted to ask you, because I want to dispose

 7     of a lot of these questions that were asked in direct

 8     examination here -- you were asked a lot of questions about

 9     Mr. Dear being able to drive a car and about Mr. Dear being

10     able to hold a conversation --

11               MS. BILLEK:  Objection, Your Honor.

12               I asked no question about him being able to

13     drive a car.

14               THE COURT:  I don't believe she did.

15          Q.    (By Mr. King) -- about Mr. Dear being able to

16     hold conversations with individuals, about Mr. Dear being

17     able to be aware of his surroundings, of Mr. Dear stopping

18     and getting directions and being able to communicate with

19     other people without acting bizarrely or strangely, or

20     without people noticing bizarre kinds of behavior.

21               The diagnostic criteria for delusional disorder

22     require a) the presence of one or more delusions for a

23     month or longer, correct?

24          A.    I believe that's right, yes.

25          Q.    And you've identified Mr. Dear's delusional

1      scheme as beginning with the events of the Branch Davidian

2      compound in Waco?

3            A.    That's certainly what it appeared to be, yes.

4            Q.    And that would be Spring of 1993?

5            A.    I'll take your word for that.

6            Q.    And criteria b) is that there are other criteria

7      for schizophrenia haven't been met -- in other words, the

8      person isn't hallucinating, the person isn't exhibiting

9      grossly disorganized behavior, correct?

10           A.    Yes.

11           Q.    And the third criteria is apart from the impact

12     of the delusions or ramifications functioning is not

13     markedly impaired, and behavior is not obviously bizarre or

14     odd.

15                 Can you comment on that?  How can someone have a

16     psychotic mental disorder, but not appear overtly sick --

17     like, we envisioned someone, you know, unable to function?

18           A.    The difficult thing about delusional disorders

19     is that in many instances the person can initially present

20     as very put together, very organized, very coherent, and

21     appear to be functioning quite well.

22                 And it isn't until something happens -- you ask

23     a question, or something happens that leads you to touch on

24     the issues that are at the core of their delusions; and,

25     then suddenly, things can change very substantially.  But

1    if you don't touch on those specific issues then you may

2    not see it.

3            The first true delusional person with a

4    delusional disorder that I recall seeing was at a state

5    hospital in Texas, and I spoke with her for fifteen or

6    twenty minutes before she began -- in response to a

7    question that I asked -- telling me about her affiliations

8    with various different federal intelligence agencies; until

9    I touched on it, though, I was wondering why on earth is

10   she here?

11       Q.    Is it -- therefore, would we expect someone with

12   a delusional disorder to be necessarily exhibiting bizarre

13   behaviors or be incapable of functioning in the world?

14       A.    No.  People with delusional disorders, more

15   often than not, do not appear floridly psychotic.

16            They don't -- they can't act like they are

17   hearing voices and things that we more stereotypically

18   associate with mental illness.

19       Q.    So if someone had a delusion, for example, that

20   they were pregnant -- if I believed I was pregnant, and you

21   asked me about the Rockies baseball team, or you asked me

22   about any number of subjects, might it never be clear to

23   you that I'm mentally ill?

24       A.    Potentially, yes.

25       Q.    Is there something in particular about

1        Mr. Dear's delusional construct -- that being that he

2        believes that he's been pursued by the federal government

3        for more than twenty years, and he believes that everyone

4        in this room is working for the federal government, does

5        that particular type of delusion -- persecutory delusion --

6        affect his competency to proceed in this proceeding more

7        than some other type of delusion -- for example, if he

8        thought he was pregnant or whatever the other delusion

9        might be?

10              MS. BILLEK:  Your Honor, I'm going to object to

11       compound.  And I'm also going to object to misstatement of

12       facts.

13              There has been no information that Mr. Dear

14       includes everybody in this room as part of the delusion.

15              THE DEFENDANT:  Right.

16              THE COURT:  The objection is overruled.

17              If you can answer the question, go ahead.

18       A.     I'm sorry.  Could you give me a Reader's version

19       of the question?

20       Q.     (By Mr. King)  Given the nature of his

21       delusionary construct -- that it involves the government

22       persecuting him, government actors persecuting him, does

23       that then affect his competency to proceed in this

24       proceeding because of the nature of the delusions that --

25       his beliefs, as opposed to some other types of beliefs?

1          A.     In this instance, the delusions that Mr. Dear

2     appears to harbor have a bearing on his -- on his legal

3     situation and his ability to work with defense counsel.

4               That is the essence of the conclusion that we

5     reached in our evaluation.  If he maintained delusions of a

6     different nature that didn't bare on the case at hand, then

7     we may never have seen them.  We may never have even

8     learned that they existed, and we probably would not have

9     concluded that they impacted his competency related

10    abilities.

11         Q.     Now, competency under the statute requires both

12    a factual and a rational understanding of the court

13    proceedings and the actors involved in the court.

14              And let me give you an example, and see if you

15    can talk to us about how this plays out for Mr. Dear:   In

16    this case, for Mr. Dear, does he understand who the Judge

17    is?

18         A.     Yes, he appears to understand that.

19         Q.     Does he understand that a judge is supposed to

20    be an impartial magistrate to rule on issues of law, do you

21    think?

22         A.     Yeah, I don't recall that he stated that

23    specifically, but we didn't see anything that would lead us

24    to conclude that he lacks the ability to understand that.

25         Q.     What a judge is?

1          A.    Right, and the ideally impartial role of the

2     Judge.

3          Q.    However, in this case, the fact that he believes

4     that this Judge is involved somehow, is that affecting his

5     rational understanding of what a judge is?

6                THE DEFENDANT:  He took my case off the roster.

7     He took my case off the roster.

8                The Prosecutor already admitted that.  He sealed

9     my case illegally.  That's not fiction.

10         A.    Yes.

11               THE COURT:  All right.  Let's do this:  Let's

12    take an afternoon recess.

13               If the parties could be ready to go at 2:45,

14    please.

15               THE DEFENDANT:  Time for another high five,

16    Dr. Gray.

17               (Whereupon, a brief recess was taken; after

18    which, the following proceedings were had:)

19               THE COURT:  The Court will recall 15CR5795.

20               The record will reflect that the witness is

21    present and all parties are present.

22               And, Counsel, you may continue.

23               MR. KING:  Thank you, Your Honor.

24         Q.    (By Mr. King)  You were asked about interactions

25    that you had with myself, the Defense team, prior to

1    conducting your examination, and I think that what you

2    said —— well, first, you had interactions with the

3    Prosecution, as well; is that fair to say?

4         A.    Yes, I did.

5         Q.    And you interacted with Ms. Billek on more than

6    one occasion prior to conducting your examination?

7         A.    Yes.

8         Q.    And you listened to everything that she had to

9    say?

10        A.    Yes.

11        Q.    And when you spoke to me, I think you said that

12   I —— well, she asked what my opinion was, and you said that

13   I expressed some concern about Mr. Dear being mentally ill?

14        A.    Yes.

15        Q.    Do you recall that I told you that I wasn't ——

16   Mr. Dear didn't have a personal problem with me at first,

17   that he was meeting with me, and we were —— that things

18   were going fine, but that over time, he seemed to now

19   believe that I was also working for the federal government

20   and that that was creating problems.

21             Do you recall me telling you that?

22        A.    I don't recall that specifically, no.

23        Q.    Do you recall in the interview when you were

24   asked about your notes?

25             Your notes are fairly sparse.  If you don't mind

1      me saying so, would you agree with that?

2              A.    Well, it's not the word I would use.

3              Q.    Okay.  They are very thorough, but not as wordy.

4      How about that?

5              A.    They are adequate.

6              Q.    And you said that the purpose of your notes is

7      not to document every single aspect of the conversation or

8      every statement that was made; is that fair?

9              A.    Yes.

10             Q.    The purpose of the notes is for you to be able

11     to write a report?

12             A.    Correct.

13             Q.    So the purpose of the notes is not so that we

14     can come here and ask you to recite every single thing that

15     was said and expect it to be in your notes.

16                   Is that a fair assessment of how a competency

17     works?

18             A.    That would be generally accurate, yes.

19             Q.    And you were asked about why it's not in your

20     notes that Mr. Dear said that lawyers on both sides are

21     implicated in this.

22                   Would it surprise you that that appears in

23     Dr. Grimmett's notes, but not in your notes?

24             A.    No.

25             Q.    Does that seem consistent with you with the

1     statements that Mr. Dear was making about the various

2     actors in the courtroom?

3          A.   Yes, that was very consistent with the general

4     tenor of his commentary.

5          Q.   You said that when you spoke to me I indicated

6     some concern about Mr. Dear's mental state.

7               Now, you received a call from Ms. Billek on the

8     date of the offense as Mr. Dear was being interrogated, as

9     you now know; is that right?

10         A.   Yes.

11         Q.   And why was Ms. Billek calling you while the

12    interrogation was going on?

13              What did she say?

14         A.   I never did know exactly what -- what her

15    purpose was.  All she indicated to me was that she was

16    looking for someone -- a mental health person to go look at

17    him.

18              I made the inference -- but it was an

19    inference -- that perhaps there were concerns about his

20    capacity to waive Miranda rights.  That was -- that was an

21    assumption on my part.

22              I made a few phone calls to other people.  I

23    wasn't able to get a hold of anyone.  I finally did find

24    someone 24 hours later -- 24 or 36 hours later.  I called

25    her back and never heard back, so nothing came of that.

1          Q.    Does that mean you are taking direction from

2     Ms. Billek in this case?

3          A.    No.

4          Q.    And you don't know what her concern was -- or,

5     if there was a concern?

6          A.    No, she never told me exactly what the purpose

7     was.

8          Q.    But that was the day after Thanksgiving?

9          A.    Yes, it was.

10         Q.    You were asked about whether Mr. Dear had

11    owned -- had a job before in the past, about whether he had

12    owned property, about whether he could save money, about

13    whether he could get on the Internet, about whether he

14    could follow directions, about whether he was aware of his

15    Miranda rights.

16              Did any of these things change or affect your

17    diagnosis or your opinion on competency in any way?

18              MS. BILLEK:  Your Honor, I would object to the

19    statement regarding the Internet.

20              I don't think any questions came out about

21    whether or not Mr. Dear could utilize the Internet.

22              THE COURT:  I don't believe that did either --

23    not with this witness, anyway.

24         Q.    (By Mr. King)  Okay.  Let me rephrase the

25    question then, and I'll ask you the same question without

1     the "on the Internet" part.

2             MS. BILLEK:  Your Honor, I'm fine with Dr. Gray

3     answering it without particularly that point if Dr. Gray

4     can answer it.

5             THE COURT:  And my question is:  Why do we have

6     an objection in the first place?

7             MS. BILLEK:  Because it's a misstatement of the

8     information that is being presented at the hearing.

9             THE COURT:  Okay.  It's sustained.

10            Rephrase the question.

11            THE DEFENDANT:  One of three laptops they

12    seized —— why would I have three laptops if I couldn't get

13    on the Internet?

14            THE COURT:  Do you want to rephrase the

15    question, please.

16            MR. KING:  Yes.

17       Q.   (By Mr. King)  Does the ability to be aware of

18    your —— the fact that you have Miranda rights, to have a

19    job, to own property, to save money, to be able to follow

20    directions, to be able to speak, to be able to understand

21    what other people are saying to you —— do any of those

22    things affect your diagnosis of a delusional disorder or

23    your opinions about Mr. Dear's competency in any way?

24       A.   Short answer, no.

25            I don't recall discussing his awareness of

1      Miranda rights either; but, be that as it may, no, that

2      does not -- that does not give me a cause to reconsider the

3      diagnosis.

4          Q.    Now, it's true, is it not, that some paranoia

5      about the federal government is -- occurs in our society

6      among certain individuals?

7          A.    Yes.  I think that would be a reasonable

8      statement.

9          Q.    Suffice it to say, some of those people are

10     probably delusional about it; some of them are probably

11     not?

12              Fair to say?

13              MS. BILLEK:  Objection, Your Honor.

14              Speculation?

15              MR. KING:  Well, you either are or you aren't.

16              THE COURT:  The objection is sustained.

17         Q.   (By Mr. King)  Would it be fair to say that

18     there would be both people who would have delusional

19     beliefs about the federal government and people whose

20     beliefs don't rise to the level of delusion?

21              MS. BILLEK:  Objection, Your Honor.

22     Speculation.  It's the same question.

23              THE COURT:  Sustained.

24         Q.   (By Mr. King)  Hypothetically, is it possible to

25     have --

1          MR. KING:  I'm trying to help Ms. Billek here.

2          MS. BILLEK:  Objection, Your Honor.

3          THE COURT:  We don't need commentary, Mr. King.

4          Just ask your question.

5     Q.    (By Mr. King)  Is it possible to have a belief

6     about being persecuted by the federal government without

7     being delusional?

8     A.    Yes.

9     Q.    Is that what is going on with Mr. Dear?

10    A.    Not in my opinion, no.

11    Q.    And is that because every aspect of his reality

12    appears to be affected by this delusional belief or that

13    the federal government is pursuing him?

14    A.    Those general ideas seem to pervade much of his

15    thinking and his behavior, yes.

16    Q.    And would you agree with me -- is it your

17    opinion that he seems to incorporate everyone -- or, nearly

18    everyone, I think, was your testimony last week -- into

19    this delusional belief system over time?

20    A.    He certainly readily incorporates people with

21    whom he comes into contact.

22          If I said "nearly everyone," that may have been

23    an overstatement.  But it certainly -- certainly seems to

24    happen with some regularity.

25    Q.    Is a good example of that what happened with his

1      girlfriend?

2              A.      Yes, I think so.

3              Q.      Can you explain that, please?

4              A.      He went back and forth a little bit.  He talked

5      about her -- about them having been together for seven

6      years, and then he talked about their being some unusual

7      occurrences after she was hospitalized, and then later made

8      the statement that she was being used by the Feds to trick

9      him.

10             Q.      So does it appear that she's now been

11     incorporated into this delusional scheme, as well?

12             A.      Yes.

13             Q.      How about his relatives?  Did he say anything to

14     you about his relatives?

15             A.      I don't recall that.

16             Q.      Do you recall him in the interrogation videotape

17     talking about how some of his relatives have been

18     incorporated by the F.B.I.?

19             A.      Yes.

20             Q.      And his neighbors?

21             A.      Yes.

22             THE DEFENDANT:  It's called Program InfraGard.

23             Q.      (By Mr. King)  Various other women that he's

24     been involved with romantically throughout his life were

25     also working for the F.B.I.?

1          A.    Yes.

2          Q.    And this happened -- he said that when the

3    F.B.I. heard him make that phone call calling them the

4    "Federal Bureau of Incineration," they took some offense to

5    that, and that's why they've been pursuing him for all of

6    these years?

7          A.    Yes.

8          Q.    Does that sound like a rational belief to you in

9    your opinion?

10         A.    That's a -- certainly, at a minimum, an

11   exaggerated response.

12              THE DEFENDANT:  Well, it can be documented.

13              Document the phone call.  Two months later a

14   fake rape charge.  Do you think that's a coincidence?

15              MR. KING:  Yes.

16         Q.    (By Mr. King)  You also said that the

17   persecution by the federal government ramped up after he

18   started spreading the word about Luke 10:18?

19         A.    Yes.

20         Q.    And he talked about the Feds running him off the

21   road on his motorcycle trying to kill him?

22              THE DEFENDANT:  That's right.

23         A.    Yeah, I'm not recalling that specifically in my

24   interviews with him.

25              THE DEFENDANT:  You say something against the

1    President, you see what happens to you.

2          Q.    (By Mr. King)  You talked about the federal

3    government, the F.B.I., after he started spreading the word

4    about Luke 10:18, bringing up fake rape charges against him

5    in South Carolina?

6          A.    And that actually, I believe, predated him

7    beginning to spread the word about Luke 10:18.

8          Q.    You were asked some questions about whether or

9    not it's really the federal government -- did he mention

10   specifically the Feds, and you were asked about whether

11   that was something that you implied or whether that was

12   something that he actually said.

13          Do you recall whether he -- every time he made a

14   statement about being persecuted he specifically said the

15   Feds or the F.B.I.?

16          A.    No, I don't believe he did.

17          Q.    Do you remember him ever saying he had been

18   persecuted by the State government?

19          A.    No, I don't.

20          Q.    Do you remember him ever saying he was

21   persecuted by local governments?

22          A.    No.

23          Q.    Does he always talk about the federal

24   government, the Feds, the F.B.I.?

25          A.    Yes, when making statements about being

1    persecuted –– when he made attributions, it was

2    consistently to some sort of federal authority.

3        Q.    When your first interview was interrupted, and

4    then you went back for the second interview, he indicated

5    to you that the fact that the first one had been

6    interrupted was a sign, correct?

7        A.    Yes.

8             THE DEFENDANT:  Because I was talking about

9    controversial things when I got cut off.

10       Q.    (By Mr. King)  Is that an example of referential

11   thinking –– that something has, in part, special meaning

12   from something?

13       A.    Yes.

14       Q.    Is that a type of psychotic thinking?

15       A.    Yes.

16       Q.    Did you ever tell Mr. Dear to plead not guilty

17   by reason of insanity?

18            Did you tell him that?

19       A.    Absolutely not.

20       Q.    So if he believes that you told him that, you

21   are asserting that's a false belief?

22            You never told him that?

23            THE DEFENDANT:  Then why didn't you tape this

24   meeting, Dr. Gray?

25            You didn't want any evidence, did you?

1          Q.    (By Mr. King)  Now, some of the things that

2     Mr. Dear refers to in his statements about his beliefs we

3     can confirm actually took place.

4               We know that the Branch Davidian compound was

5     burned in Waco.  We know, for example -- I'll just give you

6     a couple of examples:

7               We know that he made a phone call into a radio

8     show called "Mandy in the Morning" that he reported to the

9     police in his interrogation.  And that's been followed up

10    on.  You are aware of that; is that right?

11         A.   Yes.

12         Q.   Some of the folks he's had contact with, that he

13    reports, have been followed up on; fair to say?

14         A.   Yes.

15         Q.   Have you seen any information in the follow-up

16    investigation that indicates to you credible information

17    that he's being followed or pursued by the F.B.I. or the

18    federal government?

19         A.   No.

20              THE DEFENDANT:  How can he have that?  He wasn't

21    with me.

22         Q.   (By Mr. King)  Another thing, or an example, is

23    Alex Jones, who is a political commentary, someone who

24    covers political commentary on the radio.

25              He brought up that person to you, correct -- and

1    to the police?

2         A.    Yeah, I don't recall him bringing up that

3    individual during our interviews.

4         Q.    Okay.

5         A.    With the police, yes.  But --

6         Q.    And you are aware that that is a real

7    individual?

8         A.    I didn't follow up on that, so I don't know.

9         Q.    Okay.  You don't know about that?

10        A.    I don't.

11        Q.    So I won't ask you any more questions.

12             THE DEFENDANT:  Yeah, he's a real individual.

13   And I called into his radio station, and I cut down the

14   government, and people started following me.  That's right.

15        Q.    (By Mr. King)  Other individuals have been

16   mentioned or incorporated into this delusional scheme.

17             Jay Leno?

18        A.    He mentioned four our five.

19             THE DEFENDANT:  Jay Leno got fired because he

20   started making fun of Obama.  Robin Williams, he got --

21   suicide two weeks after he started making fun of Obama.

22             There has been a lot of other people that

23   suddenly have bad things happen to them when they start

24   going against Obama.

25        Q.    (By Mr. King)  Robin Williams, Princess Diana --

1          THE DEFENDANT:  No, Princess Diana had nothing

2     to do with Obama.

3          Q.    (By Mr. King)  There are other individuals that

4     are brought up in these conversations during the

5     interrogation with the police?

6          A.    Yeah.  And he mentioned some of this during our

7     interviews, as well.

8          Q.    Antonin Scalia, for example?

9          THE DEFENDANT:  Right.  No autopsy on Scalia,

10    that's right.  That was strange.

11          And since he was Obama's biggest opponent on the

12    Court, he just took the Supreme Court out of the equation

13    so that when he declares martial law.

14          A.    I don't recall him mentioning Justice Scalia.

15          During our interview he did mention Jay Leno,

16    Robin Williams, and Joan Rivers.

17          THE DEFENDANT:  Oh.  And, yeah, Bill Cosby too.

18          He started making fun of Obama, and he got the

19    fake rape charges of all of these women that for twenty or

20    thirty years nobody ever said anything until he started

21    making fun of Obama, then it starts coming out, and he's

22    been destroyed.

23          They will destroy you.  They will kill you.

24    They will run you off the road.  That's their game, that's

25    their business.

1          Q.    (By Mr. King)   I'm going to try to finish this

2     up here.

3                In terms of the competency assessment and his

4     ability to cooperate with counsel -- his ability to

5     rationally be able to assist, when you conducted an

6     interview with him, you said during that second interview,

7     especially, every time you tried to bring up the case, he

8     started incorporating the F.B.I. and the persecution by the

9     federal government, and involved that in his understanding

10    and perception of the case, correct?

11         A.    Yes.

12         Q.    How does that affect his competency to proceed

13    if all of the aspects of his case he views in terms of the

14    federal government directing and persecuting him?

15         A.    His perception of his case, of his circumstances

16    at the time and of what happened, and therefore his entire

17    approach to the case, are all in explicably interwoven with

18    his suspiciousness with his delusional ideas about

19    persecution at the hands of the federal government.

20         Q.    Does it speak to the very nature and strength of

21    delusion, itself -- the fact that throughout this entire

22    process, throughout all of your examination and this

23    hearing and the court proceedings, that Mr. Dear is aware

24    of what is going on here, right?

25                He's not stupid?

1          A.    He certainly appears to be aware.

2          Q.    But he still believes his reality, and not ours?

3                MS. BILLEK:  Your Honor, I'm going to object to

4     the term of "reality."

5                THE COURT:  The objection is overruled.

6          A.    His perceptions of a lot of the key elements

7     appear to be distorted.

8          Q.    (By Mr. King)  And they are distorted by this

9     delusional disorder that he suffers from, and appears to

10    have been affecting him for more than twenty years?

11         A.    That would appear to be the case, yes.

12         Q.    In your opinion, is this a personal conflict

13    between Mr. Dear and his attorneys -- or, is this a

14    situation where due to his disability, his mental

15    disability, his delusional disorder, he does not have the

16    capacity to have a rational understanding of the court

17    proceedings or to rationally cooperate with his attorneys?

18         A.    Although I cannot rule out that there is some

19    component of a personal conflict involved, it certainly

20    seems to go well beyond that.

21                And his delusional thinking, in my expert

22    opinion, impacts his rational understanding and his

23    capacity to work with defense counsel.

24         Q.    Final issue, sir, and that is the issue of

25    malingering.

1        Any indication that Mr. Dear is faking this

2    mental illness or feigning the symptoms of these delusions?

3            MS. BILLEK:  Your Honor, I'm going to object.

4    It's beyond the scope of what was discussed during direct.

5            THE COURT:  The objection is overruled.

6        A.    We saw nothing to make us think that Mr. Dear

7    was feigning or exaggerating symptoms of mental illness.

8        Q.    (By Mr. King)  In fact, is it quite to the

9    contrary:  Is he completely convinced that he has no mental

10    problems whatsoever, and is competent to proceed?

11            THE DEFENDANT:  Right.

12        A.    He was -- has been rather adamant on that point,

13    yes.

14            THE DEFENDANT:  I just love babies.  I'm trying

15    to save babes.

16            MR. KING:  I don't have any other questions,

17    Your Honor, at this time.

18            THE COURT:  Redirect?

19            MS. BILLEK:  May I have just a moment, Your

20    Honor?

21                    REDIRECT EXAMINATION

22    BY MS. BILLEK:

23        Q.    Dr. Gray, you were asked about whether or not

24    you followed your form.  And, I think, defense counsel

25    referred to it as "sparse."

1           You did not agree with that, but you don't reach

2     your opinion just purely on the basis of filling out that

3     form, do you?

4           A.    No.

5           Q.    There is other items you would review?

6           A.    Yes.  We look at any records we can find.  We

7     review a variety of materials depending on the case.

8           Q.    You could have taped your interviews with

9     Mr. Dear; is that correct -- you could have had a hand-held

10    tape recorder, or something of that nature?

11          A.    No.

12          Q.    Why not?

13          A.    Because hospital policy precludes taking any

14    sort of recording device into the high security building.

15          Q.    Is that for your safety?

16          A.    I believe it is primarily intended to protect

17    the confidentiality of individuals -- of patients that are

18    housed in the building.  I believe it focuses largely on

19    concerns around HIPAA.

20          Q.    So that would make your notes even more

21    important if you had to refer to them some years down the

22    line about what you put in there and the detail you put in

23    there?

24          A.    Potentially.

25          Q.    How many times in the notes that you reviewed --

1    whether at the State Hospital or at the El Paso County Jail

2    or during your time -- did Mr. Dear drink his own urine?

3         A.    Could you repeat that, please?

4         Q.    Defense counsel asked you about observations of

5    Mr. Dear drinking his own urine?

6         A.    Yes.

7         Q.    How many times was that observation made?

8         A.    I believe only once or twice.

9         Q.    And that was early on; would you agree?

10        A.    That was not too long after he was arrested,

11   yes -- within a month, or so.

12             THE DEFENDANT:  No.  When I was in solitary with

13   no toilet, no sink, and no water; and you have to beg them

14   for water, and then you get so thirsty, you will do

15   anything for something to drink, including drinking out of

16   a toilet.

17             And that's why I lost fifty-some pounds since my

18   first thing here.  They can do things to you in your little

19   jail here.

20             People, wake up.

21        Q.    (By Ms. Billek)  When Mr. Dear was at the State

22   Hospital, you did not make that observation of him?

23        A.    Correct.

24        Q.    And his conditions that he was in were different

25   than what the conditions were at the jail?

 1          A.    Yes.

 2          Q.    You were asked —— and, I believe, the wording

 3     used by defense counsel was every aspect of Mr. Dear's

 4     reality is affected.

 5               Is every part of his life affected by his

 6     delusion, or is it only the times when someone touches upon

 7     or triggers the delusion?

 8          A.    Yeah.  I don't believe I said every aspect was

 9     affected.  In truth, I don't know, because I didn't inquire

10     about every aspect of his existence.

11               His beliefs appear to be sufficiently pervasive

12     that we didn't have to work very hard to touch on topics;

13     they triggered him making statements revealing his

14     distorted thinking.

15          Q.    I think the question that was posed to you by

16     defense counsel was that every aspect of his life was

17     affected by this.

18               And you are saying, Well, yes or no, only if you

19     touch upon it.  Is that a fair assessment of what your

20     statement is?

21               I just want to clarify, essentially, is what I'm

22     doing.  The question you were asked was:  Does every aspect

23     of his life —— is it controlled by this?

24               Is that a true statement?

25          A.    I can't say that it is or is not.  I suspect

1    not.

2              With delusional disorders, in many instances you

3    never see it unless you happen to make a statement or ask a

4    question that touches on that.

5        Q.    You were asked about him incorporating everybody

6    into the delusional system and for everyone he comes into

7    contact with.

8              Do you recall that line of questioning to you by

9    Mr. King?

10       A.    Yes.

11       Q.    Does everybody get incorporated into that

12   delusion?

13       A.    Again, I haven't observed his interactions with

14   everyone.  I'm certainly not aware that he incorporates

15   everyone.

16             What I did observe, though, is that he is quick

17   to do so with a variety of people.

18       Q.    Is there usually a reason, such as -- that

19   relate some how to mistrust?

20             That person has lied to him, that person has

21   said something about him that he disagrees with -- there is

22   some sort of negative component?

23       A.    That would very possibly pertain to the

24   instances that I observed of it.

25             Again, he's very quick -- he's highly suspicious

1      of people, and very quick to make negative assumptions

2      about their motives.

3           Q.    You are aware in the interview with Detective

4      Schiffelbein that Mr. Dear had -- the length of that?

5           A.    The length of?

6           Q.    The length of the interview that Detective

7      Schiffelbein had with Mr. Dear -- the time length?

8           A.    Yeah, it was a fairly lengthy interview.  I

9      don't --

10          Q.    At any point, did Detective Shiffelbein get

11     wrapped into this delusion that you are aware of?

12          A.    Not to my knowledge.  I didn't inquire about

13     that.

14          Q.    But no statements were made about that?

15          A.    No.

16          Q.    You were asked about whether or not there were

17     any statements made by Mr. Dear as to whether or not the

18     local and state governments were being discussed?

19          A.    Yes.

20          Q.    Do you recall that line of questioning?

21                Are you aware of whether or not there are any

22     notes from the State Hospital staff as to whether or not

23     Mr. Dear commented on any other forms of government or

24     offices of the government?

25          A.    I don't recall anything specific.

1          Q.     Do you recall anything specific about relating

2     to the Governor?

3          A.     Again, having not reviewed that material in

4     several weeks, no.

5               MS. BILLEK:  If I can have just a moment, Your

6     Honor?

7          Q.     (By Ms. Billek)  If he mentions the Governor,

8     that would be somebody who is part of the State system,

9     would you agree?

10         A.     That's my understanding of things.

11         Q.     Did Mr. Dear incorporate Jay Leno, Robin

12    Williams, Joan Rivers, and Princess Diana into his

13    delusion -- or, is it more of a sympathetic connection?

14              THE DEFENDANT:  It's called critical analysis.

15         A.     I don't know that I would call it a sympathetic

16    connection.

17              Certainly he used them, and he didn't speak -- I

18    don't recall him speaking to us about Princess Diana.

19         Q.     (By Ms. Billek)  Fair enough.

20         A.     He did speak about Jay Leno, Robin Williams,

21    Joan Rivers, and pretty clearly indicated that he believed

22    the federal government had inflicted itself upon them as

23    well.

24         Q.     But he didn't include them directly in his

25    delusion?

1        A.    Well, in a way, yes, he did.

2              THE DEFENDANT:  No.

3        Q.    (By Ms. Billek)  How so?

4        A.    Because they were part of the far reaching

5    federal conspiracy of which he is very, very critical.

6              THE DEFENDANT:  You could say that about --

7        A.    And they were impacted by it, as well.

8              THE DEFENDANT:  They are members of the human

9    race.

10             We're all victims of crimes.  I just happen to

11   love people, I don't like to see them get wacked.

12       Q.    (By Ms. Billek)  You are not saying that it's

13   not possible that Mr. Dear -- that it's not impossible that

14   Mr. Dear can work with his attorneys, are you?

15       A.    At present, I don't believe he has the ability

16   to do so.

17             As to whether he could down -- at some point in

18   the future, I would certainly think that would be possible.

19             THE DEFENDANT:  With lots of medications, I

20   presume, Dr. Gray -- the biggest drug pusher there is.

21             What a disgrace.

22       Q.    (By Ms. Billek)  With regard to Mr. Dear and

23   your diagnosis that he has a delusional disorder, unable to

24   relate to his attorneys and the aspects of his case, it is

25   possible that you could be wrong, do you agree?

1          A.    With if I was perfect, Ms. Billek -- yeah, I'm

2    certainly not perfect.

3          I don't believe that's the case in this

4    instance, but -- but I'm fallible just like everybody else.

5          Q.    With additional information, could your opinion

6    shift?

7          MR. KING:  Objection to relevance.  We're here

8    to determine competency now.

9          THE COURT:  The objection is sustained.

10         Q.    (By Ms. Billek)  Well, we're here to determine

11   competency now.

12         When was the last time you saw Mr. Dear?

13         A.    It was in February.

14         Q.    And the only other contact you've had directly

15   with him would be some statements he made here in the

16   courtroom today?

17         A.    That's correct.

18         THE DEFENDANT:  And yet, Dr. Gray said he can't

19   recall whether he did a high five.

20         He can't even recall that.

21         MS. BILLEK:  I don't believe there are any

22   further questions for Dr. Gray at this time, Your Honor.

23         MR. KING:  Judge, I don't have any other

24   questions, unless the Court does.

25         THE COURT:  May this witness be excused?

1           MS. BILLEK:  Yes, Your Honor.

2           THE COURT:  All right.  Thank you, sir.

3           THE WITNESS:   Am I excused, Your Honor?

4           THE COURT:  You are.

5           THE WITNESS:  Thank you.

6           THE COURT:  The District Attorney's next

7    witness?

8           MS. BILLEK:  Your Honor, I don't believe I have

9    any further witnesses at this time.

10          However, I do have a procedural motion to make

11    to the Court.

12          THE COURT:  Yes.

13          MS. BILLEK:  I do think that the Court needs to

14    inquire of the defendant with regard to whether or not he

15    wants to testify at this hearing.

16          THE DEFENDANT:  I do.

17          MS. BILLEK:  I think he has a right to testify,

18    and I think the Court needs to inquire of that.

19          I will tell the Court that when I initially

20    looked at this issue, I wanted to make sure that

21    procedurally we were okay.

22          I looked at it in the context of whether or

23    not -- how we handle suppression hearings; and the issue of

24    suppression hearings ultimately becomes a trial strategy

25    issue, which was directly dealt with in People v. Krueger,

1    where they said the defendant did not have a right to

2    testify at a suppression hearing.

3            When looking at whether or not a competency

4    hearing, however, is a tactical decision or not, it's not;

5    it's considered a critical stage.

6            And within that, then becomes the defendant's

7    right to testify.

8            THE DEFENDANT:  Right.

9            MS. BILLEK:  So --

10           THE COURT:  Do you have any cases that say that?

11           MS. BILLEK:  I can tell the Court that I did

12   find nothing in Colorado that specifically addressed the

13   direct issue with regard to a defendant's right to testify

14   at a competency hearing.

15           I did find some Ninth Circuit case law that does

16   indicate that a defendant has a constitutional right to

17   testify at a competency hearing; that it's a defendant's

18   right to testify, and that the Court -- it's in United

19   States v. Gillenwater.

20           The Court in that case then looked to Rock v.

21   Arkansas, and indicated that a right to testify reaches

22   beyond that of the criminal trial, and that procedural due

23   process is required for some extra judicial proceedings

24   which includes the right of the affected person to testify.

25           That then ties into the Supreme Court when they

1    actually -- in Estelle v. Smith -- say that the right to

2    self-incrimination applies to competency examinations which

3    then, by implication, would apply to the actual hearing

4    itself.

5            And in Gillenwater they also noted that a

6    defendant's right to testify is personal, and can only be

7    relinquished by the defendant; and the defendant's

8    relinquishment of that right must be knowing and

9    intentional.

10           They indicate that it is ultimately the decision

11   that the defendant must make with regard to whether or not

12   he seeks to testify.

13           In that particular case, the Court also then

14   ordered -- issued an order that any information obtained

15   during the course of that hearing when the defendant

16   testifies can only be used later for impeachment, which I

17   think tracks with what our statute indicates.

18           I think that also in 16-8.5-109, paragraph (2),

19   subsection (c).

20           THE COURT:  I'm sorry.  Hold on a second.

21   "109"?

22           MS. BILLEK:  109 (2)(c) says that the defendant

23   can introduce evidence, summon witnesses, cross-examine

24   opposing witnesses, or witnesses called by the Court --

25   that it also indicates that the defendant has a personal

1     right to introduce the evidence, so summoning witnesses

2     would also include himself.

3               THE COURT:  And where does it say that?

4               MS. BILLEK:  It does not say that, but when it

5     says he can summon witnesses, he, himself, could be a

6     witness in a case.

7               THE DEFENDANT:  Right.

8               MS. BILLEK:  In 16-8.5-110 it goes further and

9     says that he can call lay witnesses to testify about

10    actions and conduct that bear upon his mental condition.

11              And I think that the ability to call witnesses

12    also includes the ability to call himself.

13              THE COURT:  Okay.

14              MS. BILLEK:  I think if the Court does do the

15    advisement, which I think the Court should do the

16    advisement, that it would be something similar to a Curtis

17    advisement much like we would do in a trial setting that

18    touches on all of the issues that are involved.

19              And if I can just look at my notes, Your Honor?

20              I just want to make sure that -- and I have some

21    of the cases if the Court wants copies of them, if the

22    Court does not already have them.

23              THE COURT:  I'm fine.  Thank you.

24              Mr. King -- or, Counsel?

25              MR. KING:  Well, first of all, Judge, I would

1           say that we're completely blindsided by this.

2                    If the Court is –– and I can't imagine that the

3           Court would seriously consider this tenuous request based

4           upon some strange inferences that counsel wants to draw

5           from non–binding authority from other jurisdictions.

6                    But if the Court is seriously going to consider

7           it, we want a chance to brief it in full and file the

8           appropriate pleading.

9                    But I will say, right off the bat, this is not a

10          trial; this is a competency proceeding.  If Mr. Dear is

11          incompetent to proceed, this Court can't do anything.

12                   At this point in time, the Office of the Public

13          Defender has been appointed to represent Mr. Dear.  And we

14          represent Mr. Dear, and we make the decisions about who to

15          call at hearings, and we make the decisions about who not

16          to call at hearings.

17                   And there is no constitutional right for a

18          defendant to testify at a pretrial hearing, and certainly

19          not when that defendant is, by every shred of evidence that

20          has been presented in Court, incompetent to proceed.

21                   And so, to put it incompetent person on the

22          witness stand and give counsel the chance to examine that

23          mentally ill incompetent person, seems to me a gross

24          violation of constitutional principles.

25                   So we would object to that, Your Honor.  And we

1    do not intend to call Mr. Dear as a witness in this

2    hearing.  There is ample evidence before the Court for the

3    Court to rule.

4              THE DEFENDANT:  Wrong.

5              THE COURT:  The Court is not -- if defense

6    counsel does not want to call Mr. Dear, the Court will

7    honor defense counsel's request.

8              THE DEFENDANT:  Of course.

9              THE COURT:  It's also similar to an analogy of,

10   I believe, defense counsel can waive a preliminary hearing

11   of a defendant even if the defendant doesn't want to waive

12   the preliminary hearing.

13             That's a strategic decision that defense counsel

14   makes.  This isn't a trial.

15             THE DEFENDANT:  Yes, it is a trial.  My sanity.

16             THE COURT:  Certainly in a trial, a jury trial

17   or a trial to the Court, the Court does have to give a

18   Curtis advisement.  It is his choice as to whether or not

19   he wants to testify at trial.

20             I'm also looking at 16-8.5-109, which talks

21   about a competency hearing shall be granted as a matter of

22   right.  And then it talks about at a competency hearing,

23   the defendant and the prosecuting attorney are entitled

24   to -- and it gives (a) through (d).

25             And I would think that if the legislature, in

1    fact, wanted or -- or, gave the ability of the defendant to

2    testify, they would put it as subsection (e) -- or,

3    certainly one of those subsections.

4              With all due respect to motions hearing, with

5    all due respect to the State of Arkansas, I could not find

6    a Colorado case, as well, that says a defendant had the

7    right to testify at a competency hearing, so --

8              THE DEFENDANT:  Because nobody has ever done it.

9              THE COURT:  -- so the District Attorney's

10   request will be denied.

11             THE DEFENDANT:  Of course.  Because you want to

12   silence me and send me to the nut house.

13             THE COURT:  Do we have any additional witnesses

14   from the defense counsel?

15             MR. KING:  No, Your Honor.

16             THE COURT:  Closing argument?

17             MR. KING:  I'm not going to belabor the Court

18   with a lengthy argument.

19             I do think that probably the most appropriate

20   case -- on point case for the Court to review, and I would

21   ask the Court to review is People v. Mondragon,

22   M-o-n-d-r-a-g-o-n, 217 P.3d 936, which is a Colorado Court

23   of Appeals case from 2009.

24             And that's where the Court basically elaborates

25   on the adoption of the Dusky standard and the requirements

1     of the federal case law with regard to competency hearings.

2              And the point in that case, and under Dusky, is

3     that the defendant lacks the requisite rational

4     understanding of the court proceedings if he does not have

5     a, quote, sufficient contact with reality; that is, if his

6     mental conditions precludes him from perceiving accurately,

7     interpreting, and/or responding appropriately to the world

8     around him.

9              So you've heard, Judge, extensive evidence about

10    this delusional construct and all of these statements and

11    these beliefs that Mr. Dear --

12             THE DEFENDANT:  No evidence.

13             MR. KING:  -- believes in, and has for the past

14    twenty years.

15             You've heard the testimony of two experts who

16    have been qualified as experts; one of which who is a

17    relatively new expert, and who is in training; the second

18    of which is a very, very experienced expert, who has been

19    conducting, you know, thousands of competency examinations

20    over his career.

21             And they both agree.  They both say, This isn't

22    a close call.  They both say he's clearly delusional.  They

23    both say that his delusional mental disability clearly

24    prevents him from having the capacity to have a rational

25    understanding of the proceedings and of what is going on in

1     the courtroom.

2          And it also prevents him from having a rational

3     ability to work with counsel and to evaluate the options

4     present for him in his case in a rational way.

5          And so there is just no evidence to the

6     contrary, Judge.  You've got abundant evidence that he's

7     incompetent, and the Prosecution has presented no evidence

8     to suggest that he's competent to proceed.  And so I think

9     it's pretty much a proforma.

10          THE DEFENDANT:  I became incompetent when I

11     fired you.  That's when I became incompetent.

12          You and Dr. Gray worked out your little deal,

13     yeah.

14          MR. KING:  So that's all I have, Judge.  I think

15     that the evidence is clear.

16          THE COURT:  Okay.  The District Attorney?

17          MS. BILLEK:  Your Honor, primarily the People

18     would rest on the record.  I think there have been

19     instances shown to the Court that there is lack of

20     neutrality on the part of the two experts.

21          I think that there is also failure to follow-up

22     on some very critical issues, including teasing out the

23     issue with regard to conflict between the defendant and his

24     attorney, and whether truly his delusion affects that

25     ability to be able to discuss with his attorneys.

1          And, I think, that there has been multiple

2     instances where there has been reliance on inferences and

3     failure to follow-up with things that Mr. Dear has said

4     that would give us this more complete picture.

5          THE COURT:  The Court is going to -- as a

6     practical matter, I've had the transcript prepared of the

7     previous testimony of April 28th.  And I've reviewed that

8     transcript.  I also want to review my notes from today of

9     Dr. Gray's testimony.

10          I will issue my opinion tomorrow at 1:30 back

11     here in this courtroom.

12          Does that work for counsel?

13          MS. BILLEK:  Can I have just a moment?

14          THE COURT:  Well, there is three of you here, so

15     it better work for one of you counsel on each side, because

16     I'm going to issue an opinion tomorrow at 1:30.

17          MR. KING:  Yes, Your Honor.

18          MS. BILLEK:  I believe that at least one of us

19     can be here, Your Honor.

20          May I just check with the victims' families?

21          THE COURT:  All right.  I'll issue my opinion

22     tomorrow at 1:30.

23          Court is in recess.

24          (Whereupon, the hearing concluded.)

25

<u>REPORTER'S CERTIFICATE</u>

The foregoing is a true and complete transcription of my stenotype notes taken in my capacity as Official Reporter of Division 10, District Court, El Paso County, Colorado, at the date and place previously set forth.

Dated at Colorado Springs, Colorado, this 10th day of June, 2016.

*Sundae A. Stoa*, RPR, FCRR
Certified Shorthand Reporter