```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 19-CR-00506-PAB
 3
    UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
    vs.
 6
    ROBERT LEWIS DEAR, JR.,
 7
         Defendant.
 8  _____

 9                     REPORTER'S TRANSCRIPT
                      Sell Hearing, Volume 1
10  _____

11         Proceedings before the HONORABLE PHILIP A. BRIMMER,

12  Judge, United States District Court for the District of

13  Colorado, commencing at 9:52 a.m., on the 30th day of August,

14  2022, in Courtroom A1001, United States Courthouse, Denver,

15  Colorado.

16

17

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106
```

APPEARANCES

1             APPEARANCES

2     Pegeen Rhyne, U.S. Attorney's Office,

3 1801 California Street, Suite 1600, Denver, CO 80202;

4     Maura White, U.S. Department of Justice,

5 950 Pennsylvania Avenue, N.W., Washington, DC 20530, appearing

6 for the Plaintiff.

7     Natalie Stricklin and Jennifer Beck, Office of the

8 Federal Public Defender, 633 17th Street, Suite 1000, Denver,

9 CO 80202, appearing for the defendant.

10

11            PROCEEDINGS

12     *THE COURT:*  Please open the record now in Case

13 19-CR-506, United States of America versus Robert Lewis Dear.

14     The matter comes on before this Court for hearing and

15 consideration of the government's motion for *Sell* hearing,

16 Docket No. 128, filed December 28, 2021.

17     Commencing with the government and transitioning to

18 the defense, may I have your appearances, please?

19     *MS. RHYNE:*  Good morning, Your Honor.  Pegeen Rhyne

20 with the United States Attorney's Office and Maura White with

21 the Civil Rights Division, as well as Ken Harris with the FBI

22 for the government.

23     *THE COURT:*  Good morning.

24     *MS. STRICKLIN:*  Good morning, Your Honor.  Natalie

25 Stricklin and Jennifer Beck on behalf of Mr. Dear.  He also

1    joins us at counsel table.

2         THE COURT:  And good morning.

3         I assume we are prepared to proceed to the

4    presentation of evidence which causes me to exercise my

5    discretion under 611(a)(1) to dispense with opening statements.

6    To the extent, counsel, you feel cheated, to that extent

7    commensurately you have my apologies.

8         Is anyone requesting an order of sequestration under

9    Rule 615?

10        MS. RHYNE:  No, Your Honor.  In fact, we've agreed

11   that that order should not be entered.

12        MS. STRICKLIN:  That's correct, Your Honor.

13        THE COURT:  Then we will proceed on that basis.

14        THE DEFENDANT:  I want it on the record what this *Sell*

15   case is.  It is chemical lobotomy.  That's what they are doing,

16   chemical lobotomy.

17        THE COURT:  Mr. Dear, please bear with us.  We are

18   going to try to give you a fair hearing here, but --

19        THE DEFENDANT:  I have a right to take the stand in my

20   own defense.  I want that right today.

21        THE COURT:  Well, you will need to take that up with

22   your attorneys, and we will get to that when it's your turn to

23   present evidence.

24        Right now the government may call its first witness

25   having both the burden of production and ultimately persuasion.

Lea Ann Preston Baecht - Direct

1      *MS. RHYNE:*  Thank you, Your Honor.  The government

2   calls Lea Ann Preston Baecht.

3      (Lea Ann Preston Baecht was sworn.)

4                      **DIRECT EXAMINATION**

5   *BY MS. RHYNE:*

6   *Q.*  Can you state and spell your name for the report?

7   *A.*  Yes.  My name is Lea Ann Preston Baecht.  My first name is

8   spelled L-E-A, space, A-N-N.  Preston is spelled P-R-E-S-T-O-N

9   and Baecht is spelled B-A-E-C-H-T.

10  *Q.*  What do you currently do for a living?

11  *A.*  I am currently in private practice conducting forensic

12  evaluations.

13  *Q.*  What is your area of expertise?

14  *A.*  Predominantly I do competency evaluations, as well as

15  mental state at the time of the offense, risk of future

16  dangerousness and mitigation factors.

17  *Q.*  Are you a psychologist?

18  *A.*  I am.

19  *Q.*  Did you previously work at the Bureau of Prisons?

20  *A.*  I did.

21  *Q.*  When did you retire from the BOP?

22  *A.*  My official retirement date was December 31st, 2021.

23  *Q.*  Which facility did you work at while you were with the BOP?

24  *A.*  The United States Medical Center for federal prisoners in

25  Springfield, Missouri.

Lea Ann Preston Baecht - Direct

1    Q.  What was your position there?

2    A.  I was a staff psychologist conducting forensic evaluations.

3    Q.  How long were you in that position?

4    A.  Since January of 2000.

5    Q.  Did you have any prior positions at the BOP?

6    A.  I did.  I completed a one-year internship prior to

7    completing my doctoral degree.  Following that I did a one-year

8    post-doctoral fellowship in forensic psychology.

9    Q.  And your current practice, is that a private practice?

10   A.  It is.

11   Q.  As a result of your retirement from the BOP, are you

12   currently under contract with the United States for your work

13   and testimony after you retired?

14   A.  Yes, I am.

15   Q.  What is your hourly rate?

16   A.  $300 per hour.

17   Q.  What is your educational background?

18   A.  I have a bachelor's degree in psychology from Western

19   Illinois University.  I have a master's degree and a Ph.D. in

20   clinical psychology from Southern Illinois University in

21   Carbondale.

22   Q.  Do you have any training in your field in addition to your

23   education?

24   A.  I do.  I completed a one-year post-doctoral fellowship in

25   forensic psychology.

1    *Q.*  Do you have any board certifications?

2    *A.*  I do.  I am board certified in forensic psychology from the

3    American Board of Professional Psychology.

4    *Q.*  How long have you held that certification?

5    *A.*  I believe since 2012.

6    *Q.*  During your time at the Bureau of Prisons, did you do

7    evaluations on -- or excuse me, of Mr. Robert Lewis Dear, Jr.?

8    *A.*  I did.

9    *Q.*  What was the purpose of the first evaluation?

10   *A.*  He was first sent to Springfield for an initial competency

11   evaluation.

12   *Q.*  How frequently did you do competency evaluations while you

13   were at BOP?

14   *A.*  With great regularity.  Early in my time at that facility

15   we used to do the short studies for initial competency.  Later

16   in my career we predominantly did competency restoration cases,

17   but I would estimate I have done in excess of 500 competency

18   evaluations.

19   *Q.*  Based on your experience at the BOP, are you familiar with

20   the legal standard for determining competency under Title 18,

21   United States Code, Section 4241?

22   *A.*  I am.

23   *Q.*  What is that standard?

24   *A.*  It essentially is looking at whether or not a defendant has

25   a severe mental disease or defect; and as a result, would they

Lea Ann Preston Baecht - Direct

1   be unable to understand the nature and potential consequences

2   of the proceedings against them and would they be unable to

3   assist properly in their own defense.

4   Q.   When did your evaluation for Mr. Dear's competency begin?

5   A.   I believe he arrived on May 6, 2021.

6         MS. RHYNE:   If we could show Exhibit 1, please.

7   BY MS. RHYNE:

8   Q.   And there is a binder in front of you.  Do you have that?

9   A.   I do.

10  Q.   What is Exhibit 1?

11  A.   It is my initial competency report dated June 30th, 2021.

12        MS. RHYNE:   Your Honor, the government offers

13  Exhibit 1.

14        THE COURT:   Response?

15        MS. STRICKLIN:   No objection.

16        THE COURT:   Government's Exhibit 1 for identification

17  admitted in evidence.

18  BY MS. RHYNE:

19  Q.   Did Mr. Dear cooperate with his competency evaluation?

20  A.   No, he did not.

21  Q.   What does that mean?

22  A.   He arrived that first day and he -- we did conduct an

23  interview with him that day in receiving and discharge.  He

24  made it very clear that he did not believe an evaluation was

25  necessary, that he had been evaluated approximately 15 times

Lea Ann Preston Baecht - Direct

1   previously.  He said that he would not cooperate with

2   individual clinical interviews with me.

3          *THE DEFENDANT:*  I never did.

4          *THE COURT:*  Mr. Dear, please.

5   *A.*  And for the remainder of that evaluation.  He would speak

6   with me during weekly rounds, but he consistently declined to

7   participate in individual clinical interviews.

8   *BY MS. RHYNE:*

9   *Q.*  Can you describe the nature of your interactions with

10  Mr. Dear during that competency evaluation period?

11  *A.*  Certainly.  Like I mentioned, first I conducted the intake

12  interview which was more lengthy, probably 30 to 45 minutes.

13  Subsequent to that I met with him on roughly a weekly basis at

14  his door and we would speak for approximately five to 10

15  minutes.

16  *Q.*  And when you say at his door, do you mean the door to his

17  cell?

18  *A.*  Correct.

19  *Q.*  What were the types of conversations that you had during

20  the initial intake and these weekly visits with Mr. Dear?

21  *A.*  In the initial intake, I explained why he was there at the

22  facility, what my role would be.  I tried to gather some

23  background information from him.  In the weekly interactions, I

24  typically encouraged him to come out and speak with me so I

25  could do a thorough assessment of his competency.  Typically he

Lea Ann Preston Baecht - Direct

1    declined.  And we would talk about how he was coping currently

2    and he often shared experiences that he had had with either law

3    enforcement or at the prior institution he was at in Englewood.

4    Q.  Did he share any complaints about occurrences at the

5    facility at Springfield?

6    A.  Yes.  He complained about not being able to get his phone

7    set up, things of that nature.

8    Q.  What clinical diagnosis did you make for Mr. Dear as part

9    of that evaluation?

10   A.  Delusional disorder.

11   Q.  Can you explain what that is?

12   A.  Certainly.  Under the DSM-5, and the DSM refers to the

13   Diagnostic and Statistical Manual of Mental Disorders,

14   delusional disorder is a type of psychotic disorder.  It is

15   characterized by delusions; that is, fixed false beliefs.  They

16   could be either bizarre or non-bizarre in nature.  And that is

17   the predominant symptom.  Other psychotic symptoms such as

18   hallucinations, disorganized speech, negative symptoms

19   catatonic behavior are not prominent.

20   Q.  Now, you mentioned a delusion is a fixed false belief.  How

21   do you know something is a fixed false belief?  How do you

22   decide that that's what it is?

23   A.  Sometimes it's difficult to tease out what is a delusion

24   and what is perhaps an overvalued idea.  I think most

25   clinicians probably think about belief systems on a continuum.

Lea Ann Preston Baecht - Direct

1   In circumstances where there is clearly evidence to show that

2   the belief is not accurate but they continue to hold that

3   belief, that would be one that would be considered as a

4   delusion.

5   Q.  And you referenced the DSM.  Is that something that is

6   commonly relied upon by psychiatrists and psychologists in your

7   field?

8   A.  It is.

9   Q.  Does delusional disorder have subtypes?

10  A.  Yes, it does.

11  Q.  What is Mr. Dear's subtype as diagnosed?

12  A.  Persecutory subtype, which refers to the belief that people

13  are trying to harm him.

14  Q.  In his report, Dr. Martinez stated Mr. Dear's delusional

15  system also involved grandiose beliefs.  Do you agree with

16  that?

17  A.  Possibly, yes.  He has some grandiosity.  However, his

18  persecutory beliefs in my view were more prominent than the

19  grandiose ones.

20  Q.  What is the main theme of Mr. Dear's persecutory delusions?

21  A.  He believes that the FBI has monitored and harassed him

22  since, I believe, 1993.  He also shared that he believes that

23  President Obama was the anti-christ and was trying to silence

24  him, and at one point he shared that he believed he was trying

25  to kill him.

Lea Ann Preston Baecht - Direct

1  *Q.*  Obama was trying to kill him?

2  *A.*  President Obama had sent agents to kill him, yes.

3        *THE DEFENDANT:*  I have said that on the radio and

4  that's why they sent the agents.

5  *BY MS. RHYNE:*

6  *Q.*  Focusing on the idea that the government or FBI might be

7  pursuing somebody, is that uncommon at the BOP?

8  *A.*  No.  Persecutory delusions are common among the patients

9  that I work with for competency restoration.

10  *Q.*  Do you believe that Mr. Dear's delusional disorder

11  negatively impacts his life?

12  *A.*  Yes.

13  *Q.*  Why?

14  *A.*  He is in distress by those beliefs.  He often shares them.

15  And it is -- to think that somebody is trying to harm you I

16  think would upset most people, and so I believe he is in

17  distress.

18        *THE DEFENDANT:*  I turned to God. I turned to God.

19  That's what got me through it.

20  *BY MS. RHYNE:*

21  *Q.*  What opinion did you reach about Mr. Dear's competency?

22  *A.*  It was my opinion that he was not competent to proceed.

23  *Q.*  And why not?

24  *A.*  Again, he did not fully cooperate in my evaluation, but in

25  reviewing statements that he had made to clinicians in the

1    Colorado state system, it appears that his delusional beliefs

2    impacted his ideas about defense strategy, as well as ability

3    to meaningfully communicate with his defense counsel and make

4    well-reasoned decisions about his case.

5    Q.  During your interactions with Mr. Dear, did he express his

6    opinion to you about whether or not he had any type of mental

7    illness?

8    A.  Yes, he did.

9    Q.  What did he say?

10   A.  He said he was not mentally ill.

11   Q.  Is that common for people who have delusional disorder?

12   A.  Yes.  It's common for individuals with psychotic disorders

13   in general.

14   Q.  That they deny that they have any illness?

15   A.  Correct.  They often lack insight into their illness.

16   Q.  Was Mr. Dear kept in a locked housing unit while you were

17   at Springfield?

18   A.  He was, yes.

19   Q.  Why?

20   A.  Initially everyone who arrived at Springfield would go to a

21   locked housing unit until such a time as they could be observed

22   to ensure that they could behave appropriately on a less

23   restrictive unit.  Of course, he also arrived during the COVID

24   pandemic, so he was initially on a two-week quarantine status.

25   Q.  At some point when he was out of that quarantine status,

Lea Ann Preston Baecht - Direct

1  did you explain the rules to him as far as moving to an

2  unlocked unit?

3        *THE DEFENDANT:*  No.

4  *A.*  At that point in time he was concerned about skin heads

5  from an interaction that he had had at the detention center in

6  Englewood.  He did not express a desire to move to a less

7  restrictive unit.

8        *THE DEFENDANT:*  No.

9  *A.*  Additionally, he did share at a later point that he was

10  interested, but in that initial period he did not.  Since he

11  was only there for -- at that point I believe six weeks is what

12  the court order allotted for at the initial evaluation, it

13  would have been unlikely that even if he had said he wanted to

14  move to a less restrictive unit, that he would have been moved

15  due to bed space issues.

16        *THE DEFENDANT:*  I was there eight months.

17        *THE COURT:*  Mr. Dear, please.

18        *THE DEFENDANT:*  I just want the record to show the

19  truth.  That's why we are here.

20        *THE COURT:*  This isn't a part of the record because

21  you're not speaking under oath yet.

22        *THE DEFENDANT:*  I can say anything to get it on the

23  record.  If I don't get it on the record, I can't use it in an

24  appeal.  You're the law.

25        *THE COURT:*  You are not going to be able to use this

Lea Ann Preston Baecht - Direct

1   in an appeal in any event because it is not admissible

2   evidence.  It is not your sworn testimony.  You would be better

3   advised to communicate your thoughts and your opinions to your

4   counsel.  If you continue to simply engage in these periodic

5   outbursts, I will have no -- I will have nothing left to do

6   other than to exclude you from the hearing in a nearby holding

7   cell.  I don't want that.  You don't want that.  So please

8   afford us the minimum requirements of decorum here, please.

9          Counsel?

10  *BY MS. RHYNE:*

11  *Q.*  Dr. Preston Baecht, to finish this idea, at a later date

12  was there a discussion about moving him to an unlocked unit?

13  *A.*  Yes, there was.

14  *Q.*  And did you explain the rules to him of making that

15  transition?

16  *A.*  I did.

17  *Q.*  And was there --

18          *THE DEFENDANT:*  No.

19  *BY MS. RHYNE:*

20  *Q.*  What happened in that discussion?

21  *A.*  I explained to Mr. Dear that I had been told that he had

22  been found to be incompetent to proceed and he was going to be

23  at our facility for approximately four months at that point.  I

24  asked him if he was interested in moving to a less restrictive

25  unit.  He said yes.  I explained the behavioral expectations

Lea Ann Preston Baecht - Direct

1    for moving to a less restrictive unit.

2            More specifically, I shared that I had read in his

3    records that when he was at the state hospital, he had

4    encouraged other patients not to take their psychiatric

5    medication and he was disruptive to their treatment.  And I

6    explained that given the environment at Springfield, that most

7    of the patients were receiving treatment, that he could not

8    interfere in their treatment, that we would not allow someone

9    to be on a housing unit if they were -- an unlocked housing

10   unit if they were encouraging patients to not comply with

11   treatment.

12           And at that point he shared that he could not give me

13   assurances that he would not interfere with others' treatment

14   because he thought that it was his right to share his opinions.

15   And I explained that while he has the right to those opinions,

16   he doesn't have the right to disrupt the orderly running of the

17   institution or interfere with the treatment of others.

18   Q.  And as a result of that, his refusal to agree to that term

19   of being in an unlocked unit, did he remain in the locked unit

20   at least as long as you were at Springfield?

21   A.  Yes, although another thing that occurred was he received

22   an incident report.  And because of that incident report, he

23   was placed on a status where correctionally he was unable to

24   move to a less restrictive unit until that was processed.

25           THE DEFENDANT:  What was that incident report?

Lea Ann Preston Baecht - Direct

1    *BY MS. RHYNE:*

2    *Q.*  During your time at the Bureau of Prisons, did you also

3    work with Mr. Dear for the purpose of restoring his competency

4    pursuant to Title 18, United States Code, Section 4241(d)?

5    *A.*  Yes, I did.

6    *Q.*  How many competency restoration evaluations did you do

7    while you were employed at the BOP?

8    *A.*  A rough estimate would be approximately 750.

9    *Q.*  And what did Mr. Dear's competency restoration evaluation

10   entail?

11   *A.*  I continued to see him during routine rounds.  He continued

12   to refuse to come out to meet with me.  He was referred to our

13   competency restoration class which met weekly.  It was a

14   didactic where the defendants would learn about the court

15   system and how it worked.  He attended one competency

16   restoration class, and I believe he refused another six or

17   seven.

18        I also encouraged him to consider taking psychiatric

19   medication because I thought it would be helpful to him.  He

20   consistently refused.  So we did what is --

21   *Q.*  Let me pause you there.

22   *A.*  Sure.

23   *Q.*  Now, just getting back to the frequency of your

24   interactions, I want to make sure we have the full

25   understanding.  Was there a period of time between you writing

Lea Ann Preston Baecht - Direct

1   your competency report at Exhibit 1 and the Court ordering a

2   restoration that was your second evaluation?

3   *A.*   Yes.  So I believe I submitted my report on June 30th of

4   2021 and I don't believe he was found to be incompetent until

5   September, so there was approximately two and a half months

6   where he was in essentially a hold-over status.

7   *Q.*   And during that gap in time, did you continue to see him on

8   a weekly basis?

9   *A.*   Either myself or the post doc that I was working with met

10  him on a weekly basis.  When I went back and I reviewed my

11  notes, I saw him approximately seven times, I think, during

12  that time period, and then Dr. Welch, who was a new

13  psychologist, met with him when I did not.

14  *Q.*   And what was the function of those interactions given the

15  gap of having an evaluation in process?

16  *A.*   It was of monitoring him to make sure he was doing all

17  right, to make sure that we addressed any concerns that we

18  could that he had.

19  *Q.*   Did Dr. Sarrazin also work with you during Mr. Dear's

20  restoration evaluation?

21  *A.*   He did.

22  *Q.*   Can you explain the roles that each of you played in that

23  process?

24  *A.*   Certainly.  I am a psychologist, so I don't prescribe

25  medication.  I am the primary clinician assigned to cases, and

Lea Ann Preston Baecht - Direct

1    so I generally saw patients more frequently on my case load

2    than what Dr. Sarrazin would.  He had more of a consultant

3    role.  However, when I had patients that I believed were in

4    need of medication, I often would have him meet with them on

5    occasion with me.  And with Mr. Dear I believe Dr. Sarrazin

6    rounded with me on one or two occasions at least.  He also,

7    like I mentioned before, attended the intake interview.  He

8    also attended the *Harper* hearing that was held.  And after that

9    *Harper* hearing, he stayed for that interview that I had with

10   Mr. Dear.

11   *Q.*  Let's take a moment and talk about that *Harper* hearing.

12   What is that?

13   *A.*  So there is an administrative hearing that can be held.  It

14   follows the C.F.R. 549.43.  It's an administrative hearing to

15   see if patients would meet the criteria for involuntary

16   medication under the criteria of grave disability or danger to

17   others in a correctional environment.  A psychiatrist not

18   associated with the case is the hearing officer.  And in that

19   hearing they would review the relevant information, speak to

20   the patient, and then decide if they met those criteria of

21   grave disability and dangerousness to others to be

22   involuntarily medicated.

23   *Q.*  To your knowledge, is it legally required to go through

24   that hearing before you consider or recommend a *Sell* process?

25   *A.*  Yes.  Most jurisdictions have ruled that that

Lea Ann Preston Baecht - Direct

1    administrative hearing must be completed first.

2    *Q.*   What was the result of Mr. Dear's *Harper* hearing?

3    *A.*   The hearing officer agreed that he had a mental illness,

4    but did not believe that he met the criteria at that time for

5    involuntary medication under grave disability or danger to

6    others in the correctional environment.

7    *Q.*   Now, you mentioned that there was a post-*Harper* interview

8    with Mr. Dear.  What was that?

9    *A.*   So because he had agreed to come out of his room to attend

10   the hearing, once the hearing was complete, myself and

11   Dr. Sarrazin remained in the interview room with him and spoke

12   to him.

13   *Q.*   And approximately how long did that last?

14   *A.*   Again, I would estimate 30 to 40 minutes.

15   *Q.*   And what was the nature of that conversation?

16   *A.*   He elaborated more on his belief system.  He spoke at

17   length about why he believed President Obama was the

18   anti-christ.  He also spoke about how he believed that would

19   impact the fairness of a trial believing that President Obama

20   would somehow prevent him from testifying.

21          *THE DEFENDANT:*  No, liar.

22   *BY MS. RHYNE:*

23   *Q.*   Did you write a report to the Court about your competency

24   restoration findings for Mr. Dear?

25   *A.*   I did.

Lea Ann Preston Baecht - Direct

1   Q.  Do you see that at Exhibit 2?

2   A.  I do.

3   Q.  What is that?

4   A.  It is a report dated November 15th, 2021 addressing

5   competency restoration.

6          MS. RHYNE:  Government offers Exhibit 2.

7          THE COURT:  Response?

8          MS. BECK:  No objection.

9          THE COURT:  Government's Exhibit 2 for identification

10  admitted in evidence.

11  BY MS. RHYNE:

12  Q.  In forming the opinions in Exhibit 2 in addition to the

13  interactions you've described, did you also consider reports

14  and documents relevant to this case that were provided to you?

15  A.  I did.

16          MS. RHYNE:  If we can show Exhibit 2, Page 2, the list

17  that begins at the bottom.

18  BY MS. RHYNE:

19  Q.  Is that a list, continuing on to the next page, of all the

20  materials that you reviewed prior to writing this report?

21  A.  It is.

22  Q.  To go through it briefly, did you review Mr. Dear's medical

23  records provided by the Colorado Mental Health Institute at

24  Pueblo?

25  A.  I did.

Lea Ann Preston Baecht - Direct

1  *Q.* And if I refer to that institution as CMHIP, will you

2  understand what I mean?

3  *A.* Yes.

4  *Q.* Did you also review the competency reports that were

5  completed at CMHIP?

6  *A.* I did.

7  *Q.* Did you review notes about Mr. Dear completed by

8  Dr. Richard Martinez dated December of 2015 and February of

9  2016?

10  *A.* I did.

11  *Q.* Did you review your own competency report about Mr. Dear?

12  *A.* I did.

13  *Q.* Did you review a sampling of the investigative materials

14  that were provided to you?

15  *A.* I did.

16  *Q.* And why did you review only a sampling?

17  *A.* There were an incredible amount of records that were sent

18  to me in the case, so there were a lot of audio recordings and

19  I believe video recordings as well.  Given that competency was

20  present focused, it didn't seem necessary to review all of

21  those recordings in order to form my opinion.

22  *Q.* Was the volume in this case different than the standard

23  case you're used to?

24  *A.* Yes.  It was more records than I had ever received in any

25  other case in my career probably.

22

Lea Ann Preston Baecht - Direct

1   *Q.* Did you also review Mr. Dear's BOP medical records?

2   *A.* I did.

3   *Q.* After writing the report at Exhibit 2, did you also review

4   the proposed treatment plan that Dr. Sarrazin wrote which is

5   located at Exhibit 4?

6   *A.* I did.

7   *Q.* Did you also review after again authoring this Exhibit 2

8   materials provided by the defense pertaining to the opinions of

9   Drs. Martinez, Drs. Woods and Doctor of Pharmacology Morton?

10  *A.* I did.

11  *Q.* Do you believe your history of interactions with Mr. Dear

12  gave you a good understanding of him as an individual?

13  *A.* Yes, I think it gave me a good understanding of the type of

14  illness that he is suffering from.

15  *Q.* What are some of the challenges in treating a patient with

16  delusional disorder?

17  *A.* One of the challenges is that they typically lack insight

18  into their illness and are unwilling to cooperate with

19  treatment recommendations.

20  *Q.* Do patients with delusional disorder usually respond well

21  to psychotherapy alone?

22  *A.* No.

23  *Q.* Why not?

24  *A.* Typically because they lack insight into their illness and

25  do not believe that their beliefs are inaccurate.

23

Lea Ann Preston Baecht - Direct

1          *THE DEFENDANT:*  And we don't want a chemical lobotomy.

2    *BY MS. RHYNE:*

3    *Q.*  Did you offer Mr. Dear psychotherapy while he was at BOP?

4    *A.*  No, I wouldn't say I offered him psychotherapy.  If he had

5    requested to be involved in that, it could have been provided

6    to him, but he made it very clear that he was not interested in

7    participating in any interactions that were referred to him.

8    *Q.*  And did that impact your decision as to deciding whether or

9    not psychotherapy would be beneficial?

10   *A.*  Yes --

11   *Q.*  Why?

12   *A.*  -- it did.  Well, because if someone is not willing to

13   participate in psychotherapy, it's not going to be effective.

14   Additionally, my review from the records when he was at the

15   state hospital suggested that they too offered him that

16   opportunity and he declined.

17   *Q.*  What is the standard treatment protocol for treating

18   delusional disorder?

19   *A.*  My read of the literature is that it is -- antipsychotic

20   medication is considered to be an appropriate treatment for

21   that disorder.  There is some research to say a combination of

22   medication and psychotherapy may have the best outcome.

23   However, for a stand-alone treatment medication is typically

24   viewed as being the better option for success.

25   *Q.*  And if psychotherapy were to be successful, do you believe

Lea Ann Preston Baecht - Direct

1   that the medication needed to have some impact first?

2   *A.*  Yes.  Typically what would happen is the medication would

3   be helpful in reducing the intensity of their delusions and

4   hopefully make them more open to participating in talk therapy.

5   *Q.*  Is antipsychotic medication the standard protocol for all

6   psychotic disorders?

7   *A.*  Yes, I believe so.

8   *Q.*  Now, you mentioned that antipsychotic medications have the

9   impact of lessening or reducing delusions.  Does a delusion

10  need to go away entirely for a patient to be restored to

11  competency?

12  *A.*  No, it does not.

13  *Q.*  Why not?

14  *A.*  Oftentimes defendants or patients will never let go of a

15  delusional belief entirely.  Oftentimes they will find that it

16  no longer preoccupies their thoughts all the time.  It may

17  reduce an intensity then that they can set it aside and work

18  cooperatively with their defense counsel and make well-reasoned

19  decisions about their case.  So even though there may still be

20  a part of them that still believes that something happened to

21  them in the past, even though it didn't, they recognize that

22  other people won't believe that and that it's unlikely to be

23  successful in their case.  And they are willing to consider

24  other avenues of defense.

25  *Q.*  And have you personally observed that in other patients

25

Lea Ann Preston Baecht - Direct

1  with delusional disorder while you worked at the BOP?

2  *A.*  I have.

3  *Q.*  I think you mentioned that you recommended to Mr. Dear that

4  he take the antipsychotic medications; is that right?

5  *A.*  That's correct.

6  *Q.*  What was his response?

7  *A.*  He typically said no.  And on at least two occasions that I

8  could think of he said he would be willing to take lithium

9  because it was natural.

10  *Q.*  And what was your response to that?

11  *A.*  That my understanding is that's not the medication that

12  psychiatry staff would recommend for his particular illness.

13  *Q.*  Setting lithium aside, was Mr. Dear adamant in his refusal

14  to take any other form of medication for his delusional

15  disorder?

16  *A.*  Yes, he was.

17  *Q.*  And based on your review of the records from CMHIP, do you

18  know whether he was offered antipsychotic medications while he

19  was in that hospital?

20  *A.*  I believe he was.  And from my read of the records, it

21  appears he may have been involuntarily treated on one or two

22  occasions briefly while he was at that facility, but not for

23  any length of time.

24       *THE DEFENDANT:*  Just long enough to give me a heart

25  attack.

Lea Ann Preston Baecht - Direct

1   *BY MS. RHYNE:*

2   *Q.*  And did he refuse to take any of the medicines voluntarily?

3   *A.*  Yes, he did.

4   *Q.*  Based on your own interactions of Mr. Dear, what was your

5   opinion about his factual understanding of his case?

6   *A.*  Mr. Dear presents as a bright individual.  Although he

7   didn't cooperate in my formal assessment of competency, my

8   review of the records indicated that there was no concerns

9   about his factual understanding of how court proceedings work.

10          *THE DEFENDANT:*  Thank you.

11  *BY MS. RHYNE:*

12  *Q.*  Did you observe him have any difficulty remembering facts

13  relating to his circumstances or his case?

14  *A.*  No.  He actually showed good memory from one interaction to

15  the next.

16  *Q.*  And based on your review of the records from CMHIP, did

17  they also agree that he had a solid factual understanding of

18  his case and the legal system?

19  *A.*  Yes.

20          *THE DEFENDANT:*  Then why can't I represent myself?

21  *BY MS. RHYNE:*

22  *Q.*  In your opinion, what prevents Mr. Dear from being

23  competent?

24  *A.*  I believe his delusional beliefs impact his rational

25  appreciation of his current legal circumstances, and it impacts

Lea Ann Preston Baecht - Direct

1    his decisions about defense strategy and his ability to work

2    cooperatively with his defense counsel.

3              *THE DEFENDANT:*  There is no defense.  I did it.

4    *BY MS. RHYNE:*

5    *Q.*  What conclusion did you reach about whether Mr. Dear was

6    likely to be restored to competency in the foreseeable future

7    without any antipsychotic medication?

8    *A.*  It was my opinion that he was unlikely to be restored to

9    competency in the foreseeable future in the absence of

10   psychiatric medication.

11   *Q.*  Why did you reach that conclusion?

12   *A.*  Because although spontaneous remission is possible, it's

13   incredibly rare, and I thought it would be highly unlikely that

14   it would occur in his case.

15   *Q.*  And none of the other treatments were successful or seemed

16   promising?

17   *A.*  Correct.  He was not interested in talk therapy,

18   involuntarily taking medication nor participating in competency

19   restoration class.

20   *Q.*  While you were at the Bureau of Prisons, how many *Sell*

21   hearings did you participate in?

22   *A.*  Actual hearings or reports written?

23   *Q.*  Let's start with reports written.

24   *A.*  So the vast majority of cases that I had for restoration

25   for individuals with psychotic illnesses, most took medicine

Lea Ann Preston Baecht - Direct

1    voluntarily or met criteria under *Harper*.  I would estimate

2    roughly a hundred times where I wrote a report explaining that

3    if the government chose to pursue involuntary medication, this

4    is how I thought they would meet criteria.  Oftentimes the

5    government declined to pursue involuntary medication or in some

6    circumstances the courts ruled on medication without testimony

7    being required.  So of the hundred reports that I wrote,

8    roughly I probably testified in -- maybe 60 percent of the

9    time.

10   *Q.*  So approximately 60 hearings?

11   *A.*  Approximately.

12   *Q.*  And is that a rough estimate?

13   *A.*  That's a rough estimate.  I lost count.

14   *Q.*  Approximately what percentage of your restoration cases

15   resulted in a *Sell* hearing?

16   *A.*  Probably about whatever the percentage would be of 60 out

17   of -- out of total cases, 750 cases, knowing, however, that

18   some of the cases I had, they didn't have a psychotic illness.

19   *Q.*  So is that a little less than 10 percent if my math is

20   right?

21   *A.*  I will trust your math.

22   *Q.*  I don't want you to trust my math, but --

23   *A.*  Yes.

24   *Q.*  Okay.  And in the cases that did not go to *Sell* hearing or

25   a *Sell* report, what happened to those cases?

Lea Ann Preston Baecht - Direct

1   *A.*  Like I said, the vast majority of cases that I had, they

2   either, A, didn't require medication because they had a

3   neurocognitive or intellectual disability or they took medicine

4   voluntarily or they met criteria under *Harper* to be medicated.

5   So relatively few of my cases were situations where the person

6   refused medicine and did not meet *Harper* criteria and

7   ultimately had a *Sell* hearing.

8   *Q.*  And just taking a moment back, is it the case that there

9   are mental illnesses that cause someone to be incompetent that

10  are not psychotic disorders?

11  *A.*  Correct.

12  *Q.*  And for which antipsychotic medications might not be

13  appropriate at all?

14  *A.*  Correct.

15  *Q.*  Focusing on the other cases, were there any cases where the

16  patient remained incompetent and you did not recommend

17  involuntary medication with antipsychotics?

18  *A.*  Yes.

19  *Q.*  How many patients?

20  *A.*  I would estimate around five patients that I can think of

21  off the top of my head that I believed had a psychotic illness.

22  They would not take medication, but I did not think that they

23  would likely meet the criteria under the *Sell*, so I did not

24  write a report saying that they would be substantially likely

25  to be restored to competency.

Lea Ann Preston Baecht - Direct

1    *Q.* And why did you not believe those five patients met that

2    standard?

3    *A.* Generally it was because they had a treatment history where

4    the records show that despite adequate therapeutic doses for

5    sufficient periods of time, they still did not improve. And so

6    for those cases their poor treatment history is a pretty strong

7    predictor that it's unlikely that they would be restored to

8    competency in the future.

9         *THE DEFENDANT:* Yeah, like a heart attack?

10   *BY MS. RHYNE:*

11   *Q.* Were there other predictors in those five cases?

12   *A.* Yes. If they also had a co-occurring intellectual

13   disability or neurocognitive issues. I believe one of my

14   patients that I can think of, he was an elderly gentleman who

15   also likely had some memory and neurocognitive issues. And

16   then I can also think of one other patient where it was not

17   that they were substantially unlikely to be restored. It was

18   that they had a medical contraindication.

19        *THE DEFENDANT:* I never threatened anybody there and I

20   never threatened myself. You don't have any right to drug me.

21        *THE COURT:* Mr. Dear, please.

22        *THE DEFENDANT:* That's the law.

23        *THE COURT:* Please.

24        *THE DEFENDANT:* I want it on the record.

25        *THE COURT:* The record doesn't do you any good. It

Lea Ann Preston Baecht - Direct

1    doesn't constitute evidence.

2            *THE DEFENDANT:*  I guess you are right.  It is no jury

3    trial.  I have no rights.

4            *THE COURT:*  Not yet is there a jury trial.

5            *THE DEFENDANT:*  On six and a half years, not long

6    enough?

7            *THE COURT:*  Mr. Dear, you are simply backing me into a

8    corner and leaving me no choice but to have you removed from

9    the courtroom.  I don't want to do that.  I am sure that you

10   don't want to do that.

11           *THE DEFENDANT:*  Put me on the stand, then.

12           *THE COURT:*  Please don't talk over me.  Your attorneys

13   will have an opportunity to present evidence on your behalf.

14   Take that up with them, but not with me.  That's not my

15   decision.  Now, please remain quiet.

16           Counsel?

17           *MS. RHYNE:*  Thank you, Your Honor.

18   *BY MS. RHYNE:*

19   *Q.*  Are you familiar with the criteria set forth in *Sell* v.

20   United States?

21   *A.*  I am.

22   *Q.*  I want to go through those factors, but first because the

23   initial factor, the very first factor is a legal issue for the

24   Court to decide, let's skip to the second factor of whether the

25   administration of medications is substantially likely to render

Lea Ann Preston Baecht - Direct

1   Mr. Dear competent and substantially unlikely to interfere with

2   his ability to assist counsel.  Can you turn to Exhibit 4?

3   *A.*   Yes.

4   *Q.*   What is that?

5   *A.*   Exhibit 4 I believe is my competency restoration report.

6   *Q.*   No, I think you are at the wrong exhibit.

7   *A.*   Oh, there we go.  I am sorry, that is Dr. Sarrazin's

8   proposed treatment plan.

9   *Q.*   Have you reviewed that plan?

10   *A.*   I have.

11        *MS. RHYNE:*  The government offers Exhibit 4.

12        *THE COURT:*  Response?

13        *MS. BECK:*  No objection.

14        *THE COURT:*  Government's Exhibit 4 for identification

15   admitted in evidence.

16   *BY MS. RHYNE:*

17   *Q.*   Do you see the four medications listed in Paragraph 1?

18   *A.*   I do.

19   *Q.*   Are you familiar with those four antipsychotic medications?

20   *A.*   I am.

21   *Q.*   Do you have an opinion -- first, actually if you could go

22   ahead and pronounce all of those, that would be of great

23   assistance.

24   *A.*   Certainly.  The first is paliperidone and that is spelled

25   P-A-L-I-P-E-R-I-D-O-N-E, and the tradename is Invega,

Lea Ann Preston Baecht - Direct

1    I-N-V-E-G-A.

2    Q.   I appreciate you spelling it for the court reporter.  We

     will provide her a copy of the exhibit.  Thank you.

4    A.   Okay.  Also is aripiprazole, tradename Abilify;

5    haloperidol, tradename Haldol; and olanzapine, tradename

6    Zyprexa.

7    Q.   Are you familiar with those medications?

8    A.   I am.

9    Q.   And the tradenames that you just read out, is that for the

10   oral doses?

11   A.   Well, those medications can be referred to by either name,

12   so you can refer to olanzapine or Zyrexa.  It's the same

13   medication.

14   Q.   Do you have an opinion about whether these four

15   antipsychotic medications are substantially likely to render

16   Mr. Dear competent?

17   A.   Yes.

18   Q.   What is your opinion?

19   A.   I believe that any of these four antipsychotic medications

20   would be substantially likely to restore competency.

21   Q.   How are you defining what meets the "substantially likely"

22   threshold?

23   A.   That's a really good question.  When the *Sell* decision

24   first came out, there wasn't much guidance on what that term

25   meant, and so clinicians were kind of scrambling because they

Lea Ann Preston Baecht - Direct

1  didn't have a clear definition of what substantially likely

2  meant.  Subsequent case law, however, gave some guidance.

3  For example, some of the appellate courts had found

4  that a 70 percent likelihood met that threshold for

5  substantially likely, and so that's kind of the number that I

6  keep in mind.

7  Q.  Broadly speaking, what background or sources of information

8  did you draw upon to conclude that these medications are

9  substantially likely to render Mr. Dear competent?

10 A.  My clinical experience conducting competency restoration

11 with hundreds of patients over 22 years, my review of the

12 relevant literature and my assessment of the relevant

13 prognostic factors with Mr. Dear.

14 Q.  What specific individualized factors go into a

15 determination about whether a particular patient could be

16 restored to competency with antipsychotic medications?

17 A.  There are several factors that have been consistently found

18 to be some of the best predictors, and those are the ones that

19 I look to first.  One would be if you have the opportunity to

20 look at prior history of treatment.  So as I mentioned before,

21 if you have a history of somebody responding poorly to

22 treatment in the past, that's pretty powerful indication that

23 they are less likely to be restored to competency.  Similarly,

24 if somebody has a good history of responding well to

25 medication, you know then that they are very likely to respond

Lea Ann Preston Baecht - Direct

1   positively in the future as well.

2          In situations like this, though, where we don't have a

3   good treatment history, we have to look more broadly at other

4   factors.  One of the more powerful predictors of poor treatment

5   response would be if somebody has a co-occurring intellectual

6   disability or neurocognitive disorder.

7          Another predictor would be if they have a history of

8   being psychiatrically hospitalized for long periods of time.

9   One study in particular mentions defendants who had been in a

10  state hospital for more than 10 years tended to have lower

11  success rates for competency restoration.

12         Other factors that we might look at that aren't as

13  powerful, but things like age, older people tend to do less

14  well, although it's likely that that's because there is a

15  correlation between individuals being over 65 and having a

16  greater incidence of dementia.  Another factor that people are

17  starting to look at more frequently now is duration of

18  untreated psychosis.

19  Q.  What about whether someone had premorbid functioning at a

20  higher level?

21  A.  That is another factor that -- I wouldn't place as being as

22  strong as the prior treatment history and intellectual

23  disability and neurocognitive deficits, but it's another one

24  that can be helpful, and that's looking at how well someone

25  functioned prior to their illness occurring.

Lea Ann Preston Baecht - Direct

1    Q.  And so when I use the word premorbid, that simply means

2    prior to their illness?

3    A.  Correct.

4    Q.  What about someone's level of intellect?

5    A.  Again, that goes along with whether or not they have a

6    co-occurring intellectual disability.  People who are higher

7    functioning tend to have higher -- more positive treatment

8    response.

9    Q.  And what about Mr. Dear?  What does his level of intellect

10   tell you about his prognosis?

11   A.  I think Mr. Dear is a bright man.  I saw no evidence that

12   he was suffering from neurocognitive deficits when I met with

13   him.  That would be one of the better prognostic factors for

14   him.

15   Q.  And what was his level of premorbid functioning before his

16   arrest in 2015?

17   A.  You know, I don't have a great deal of information about

18   that, but one thing that appears to be the case and that's that

19   he never functioned so poorly that he was in a psychiatric

20   hospital as far as I know.  He was able to function

21   independently and not rise to the level of being involuntary

22   hospitalized.  But again, I don't have a great deal of

23   information.  That's just what I was able to glean from the

24   available information.

25   Q.  And his ability to live independently prior to his arrest,

Lea Ann Preston Baecht - Direct

1  how does that fit into the prognosis factors?

2  A.  Again, I think that's a sign of better premorbid

3  functioning.

4  Q.  Now, you mentioned long hospitalizations.  Since his arrest

5  in 2015, Mr. Dear spent many years in various -- well, in the

6  CMHIP and then some period of time at Springfield.  Does that

7  count when you're talking about prior hospitalizations?

8  A.  Not in the sense of how I would approach it as someone

9  before they became involved in the restoration process.

10  Typically we would be looking at prior to them coming into this

11  piece of competency restoration.

12  Q.  Now, you mentioned that Mr. Dear was given antipsychotics

13  on an involuntary basis briefly while he was at CMHIP.  Why

14  does that not help you when you are looking at prior treatment

15  history?

16  A.  I would have to refer to my report to get details on

17  exactly how long he was on the medications, but it was from my

18  recollection for very brief periods of time, a matter of days,

19  which would not be a sufficient trial for treatment to see if

20  it would be effective.

21      THE DEFENDANT:  Because I had a heart attack.

22  BY MS. RHYNE:

23  Q.  Turning to the literature, is there a body of literature

24  about the restoration of people with delusional disorder?

25  A.  There is more literature on restoration of psychotic

Lea Ann Preston Baecht - Direct

1    disorders in general.  Schizophrenia is much more common than

2    delusional disorder.

3    Q.  Let me pause you there.  Do you believe that the literature

4    pertaining to schizophrenia and the restoration or treatment of

5    schizophrenia with antipsychotic medications is relevant to

6    delusional disorder?

7    A.  Yes, in the sense that from what research I have read, it

8    suggests that the restoration rates are comparable.

9    Q.  So let's start with that.  What is the restoration rate for

10   schizophrenia being treated by antipsychotic medications?

11   A.  There are a number of studies that look at that.  And

12   roughly they find success rates between 75 and 90 percent of

13   defendants who are treated with antipsychotic medication are

14   successfully restored to competency.

15   Q.  And because of the breadth of literature available about

16   schizophrenia, is that restoration rate generally accepted or

17   is it controversial at all?

18   A.  No, I think that because it's been replicated in various

19   state systems, as well as the federal system, that I don't

20   think that that is controversial.

21   Q.  Can you look at Exhibit 3, please?

22   A.  Yes.

23   Q.  What is Exhibit 3?

24   A.  This is a supplemental expert disclosure from me talking

25   about diagnostic criteria of the DSM-5 versus the DSM-IV, which

Lea Ann Preston Baecht - Direct

1    is the earlier edition of the Diagnostic and Statistical Manual

2    of Mental Disorders.

3    Q.  And does this discuss some relationship between

4    schizophrenia and delusional disorder as set forth in

5    Exhibit 3?

6    A.  Yes.  It essentially -- it explains that the DSM, when the

7    latest edition, the DSM-5 was published, it changed the

8    diagnostic criteria for delusional disorder.  And it spoke to

9    the fact that under the DSM-IV, I think it's highly probable if

10   I had evaluated Mr. Dear in 2010, I would have thought that the

11   appropriate diagnosis at that point in time was schizophrenia,

12   paranoid type.

13   Q.  Why?

14   A.  So in the DSM-IV, delusional disorder was defined very

15   narrowly as when an individual had fixed delusions that were

16   non-bizarre in nature.  If someone had delusions that were

17   bizarre, and the definition of bizarre was not plausible, not

18   understandable, not taken from everyday life, if their only

19   symptom was a bizarre delusion, then they would be diagnosed

20   with schizophrenia, paranoid type.

21   Q.  And did the DSM recognize there was a problem with hanging

22   the distinction between two different illnesses on that

23   distinction, bizarre versus non-bizarre?

24   A.  Yes, because if you view bizarreness on a continuum, on one

25   end, you know, things that are non-bizarre like, for example,

Lea Ann Preston Baecht - Direct

1   the belief that your spouse is cheating on you, that's

2   plausible.  It's something that's taken from everyday life.  I

3   think everybody could agree that's not bizarre.

4          On the other end of the spectrum, if someone believes

5   that aliens removed all of their organs and they are living

6   with no scar, without a heart or a lung, that's obviously

7   bizarre.  Everyone would agree that's bizarre.  Unfortunately,

8   a lot of delusions fall in that gray area in the middle, and it

9   was difficult for clinicians sometimes to agree on what was

10  bizarre and what was not.

11         MS. RHYNE:  First, I would like to pause and ask the

12  Court, the government seeks to offer Government's Exhibit 3?

13         THE COURT:  Response?

14         MS. BECK:  No objection.

15         THE COURT:  Government's Exhibit 3 for identification

16  admitted in evidence.

17  BY MS. RHYNE:

18  Q.  And so how did the -- first, during what period of time was

19  the DSM-IV published such that that was the operational

20  definition of delusional disorder?

21  A.  DSM-IV I believe was published in 1994.  And the DSM-5 was

22  published in 2013, I believe.

23  Q.  And what did the DSM-5 do to alleviate the problem of the

24  bizarre distinction being so critical?

25  A.  So in the DSM-5, they now indicate that anyone who has a

Lea Ann Preston Baecht - Direct

1    delusion as their only prominent system, whether it be bizarre

2    or non-bizarre, would be delusional disorder.  And in that way

3    there no longer has to be that clinical judgment as to whether

4    or not the delusion was bizarre.

5    Q.  Going back to this continuum idea and the difference

6    between schizophrenia and delusional disorder, is this idea of

7    these mental illness symptoms being on a continuum particularly

8    prevalent in Mr. Dear's case?

9    A.  Yes.  I think that -- in the DSM they refer to the

10   psychotic disorders as a spectrum.  Sometimes some patients

11   will fit neatly into one diagnostic category and sometimes it's

12   a little bit less clear.  We know that they have a psychotic

13   disorder, but there may be some disagreement among clinicians

14   as to whether or not it's schizophrenia, schizo-effective or

15   delusional disorder.

16   Q.  And did any of Mr. Dear's treatment providers diagnose him

17   with schizophrenia?

18   A.  Yes.  In my review of the Colorado state records, it

19   appears that his treating psychiatrist, I believe his name is

20   Dr. DeQuardo, said that the more time he spent with him, the

21   more he thought that Mr. Dear suffered from schizophrenia as

22   opposed to delusional disorder.

23        THE DEFENDANT:  Then why didn't they bring that up in

24   that Sell case?

25   BY MS. RHYNE:

Lea Ann Preston Baecht - Direct

1  *Q.*  Do you maintain your diagnosis of delusional disorder?

2  *A.*  Yes.  Under the DSM-5, I think that delusional disorder

3  probably best captures Mr. Dear.  I think there are times when

4  it could be argued that perhaps he is a little bit disorganized

5  in what he is saying, but again I think that even though he may

6  not fit neatly into that category, I think delusional sort of

7  probably best captures his symptoms under the DSM-5.

8  *Q.*  I think you mentioned that some of his delusions are

9  bizarre in nature.  I think you gave some examples in

10  Exhibit 3.  Can you provide those examples to the Court of his

11  bizarre delusions?

12  *A.*  Sure, if I can find it here.  Again, this is a clinical

13  judgment, but I can explain to you why I think they are

14  bizarre.  So his assertion that Barack Obama is the

15  anti-christ, that he was going to use his case to start a civil

16  war, that the masons behind the Las Vegas shooting -- were

17  behind the Las Vegas shooting.  And he cited the 32nd floor as

18  evidence of the 32nd level of masons.  At one point he asserted

19  that he was being tested by an elite religious figure, that

20  staff at the hospital in Colorado were witches and warlocks.

21  In my view, those assertions are not what I would consider

22  plausible or taken from everyday life.

23       *THE DEFENDANT:*  I think you're a witch.

24  *BY MS. RHYNE:*

25  *Q.*  In going through the disclosures provided by Dr. Woods,

Lea Ann Preston Baecht - Direct

1   Dr. Martinez and Pharmacologist Morton, did they also

2   frequently make reference to literature about schizophrenia?

3   *A.*   Yes, some of them did.

4   *Q.*   Now, is there also, focusing on the literature, literature

5   of studies that focuses specifically on delusional disorder?

6   *A.*   I am aware of one publication that looks specifically at

7   restoration rates with delusional disorder.  And there is

8   another study that looked at restoration rates under *Sell*

9   hearings.  In those they pulled out delusional disorder as one

10  category.

11  *Q.*   Perfect.  Let's start with Exhibit 5, please.  What is this

12  exhibit?

13  *A.*   This is the article Involuntary Medication Treatment for

14  Competency Restoration of 22 Defendants With Delusional

15  Disorder, and it's authored by Herbel and Stelmach.

16  *Q.*   What is the date?

17  *A.*   2007.

18  *Q.*   Did you rely on this in your evaluation of whether or not

19  these medications would be substantially likely to render

20  Mr. Dear competent?

21  *A.*   I did.

22          *MS. RHYNE:*   The government offers Exhibit 5.

23          *THE COURT:*   Response?

24          *MS. BECK:*   No objection.

25          *THE COURT:*   Government's Exhibit 5 for identification

Lea Ann Preston Baecht - Direct

1    admitted in evidence.

2    *BY MS. RHYNE:*

3    *Q.*  Can you briefly describe this study for the Court?

4    *A.*  Certainly.  Dr. Herbel was a psychiatrist at the Federal

5    Medical Center in Butner, North Carolina.  And he looked

6    retrospectively at 22 defendants who were diagnosed with

7    delusional disorder and who were treated for competency

8    restoration.  And he found that approximately 77 percent of

9    those defendants with delusional disorder were found to be

10   restored to competency with antipsychotic medication.

11   *Q.*  Okay.  Now, at the beginning of this or towards the

12   beginning of this article, does this study also summarize

13   literature that came out previously about the treatment of

14   delusional disorder?

15   *A.*  Yes.  They note several studies.

16   *Q.*  And focusing on this particular study, what were the years

17   that these 22 patients were treated during at the BOP?

18   *A.*  I believe it was 1990 through June of 2003.

19   *Q.*  Okay.  And if we can turn to Page 8, focusing your

20   attention on the first paragraph in the left column, you

21   mentioned before that delusional disorder has subtypes.  In

22   this study what were the subtypes for these 22 patients?

23   *A.*  I apologize.  This is not numbered in that way.  It's got

24   the numbers from the articles.

25   *Q.*  You are right.  If you could direct your attention to the

Lea Ann Preston Baecht - Direct

1    screen.

2    *A.*   Sorry.

3    *Q.*   In the upper left-hand corner, do you see?

4    *A.*   So of the 22 individuals, 16 were persecutory type.   Five

5    were mixed persecutory and grandiose type.   And one was

6    grandiose.

7    *Q.*   So the majority had the same type as Mr. Dear.

8    *A.*   That's correct.

9    *Q.*   In fact, all but one did; is that right?

10   *A.*   Correct.

11   *Q.*   And you mentioned that all 22 were treated with

12   antipsychotics on an involuntary basis?

13   *A.*   I believe so, yes.

14   *Q.*   I believe you already stated the restoration rate.   What

15   was that?

16   *A.*   77 percent.

17   *Q.*   I think that is 17 out of the 22 patients; is that right?

18   *A.*   Yes.

19   *Q.*   Of the 17 patients who were restored, did they all have

20   complete remission of their delusions?

21   *A.*   They did not.

22   *Q.*   Why were they considered competent if they didn't have

23   remission of their delusions?

24   *A.*   Because the delusions had reduced sufficiently in intensity

25   that they were able to set those delusions aside and work

Lea Ann Preston Baecht - Direct

1    cooperatively with their defense counsels and make

2    well-reasoned decisions about their case.

3              *THE DEFENDANT:*  Because they were zombies.

4    *BY MS. RHYNE:*

5    *Q.*  If we could turn to Page 9 of the exhibit, which is Page 55

6    in the article, focusing on the right column under the heading

7    Time to Response, if we could zoom in on that entire sentence.

8    *A.*  Yes.

9    *Q.*  Of the 17 patients who were restored, can you break down

10   how long it took each group to be restored to competency?

11   *A.*  It indicates that five individuals had a fairly rapid

12   response within four weeks.  Two responded within the first six

13   weeks.  However, the other 10 did not show improvement until

14   they had received at least three months of continuous treatment

15   with some requiring a total of five months' medication prior to

16   being restored to competency.

17   *Q.*  And is that three to five-month period required to try the

18   medication consistent with your own experience at the Bureau of

19   Prisons for delusional disorder patients?

20   *A.*  Yes.

21   *Q.*  Are you aware of earlier literature that had showed poor

22   prognosis or outcomes for the use of antipsychotic with

23   delusional disorder?

24   *A.*  Yes.

25   *Q.*  How did the medication trial periods of those earlier

Lea Ann Preston Baecht - Direct

1    studies compare to this three to five-month period that this

2    study found was necessary?

3    A.   Many of them were shorter.  Many of them were six to eight

4    weeks as opposed to the longer three to five months.

5    Q.   And did the authors of this study, Herbel and Stelmach, say

6    that was significant in any way, that the prior literature was

7    too short?

8    A.   Yes.  They noted that perhaps the conclusion the medication

9    wasn't working wasn't accurate; that, in fact, the trial of

10   treatment was simply too short to see sufficient improvement.

11   Q.   And to your knowledge, were any of those much older studies

12   focused on competency restoration as opposed to full recovery?

13   A.   My understanding is that none of those other studies on

14   delusional disorder were looking specifically at competency

15   restoration as the outcome goal.

16   Q.   And if we could turn to Page 8 in the exhibit, which is

17   Page 54 in the study, the right column, specifically the second

18   and third paragraphs.  Are you familiar with a concept called

19   duration of untreated psychosis?

20   A.   I am.

21   Q.   Is that -- first of all, what is that?

22   A.   Basically that is looking at how long somebody was ill

23   without treatment, so what is the duration or the length of

24   illness in the absence of medication.

25   Q.   Is it also referred to as DUP?

Lea Ann Preston Baecht - Direct

1    A.   Yes.

2    Q.   Is it sometimes hard to calculate what the length of DUP is

3    where prior forensic evaluations don't exist?

4    A.   Yes.  It's often very difficult.

5    Q.   How did they attempt to do that in this study?

6    A.   I believe they did that by looking at the age at the time

7    of admission and subtracting the age from the onset of their

8    illness.

9    Q.   Now, focusing again at this study, the right-hand column,

10   Paragraphs 2 and 3, I believe it shows they had nine patients

11   that had a DUP of five years or less.  Do you see that?

12   A.   I do.

13   Q.   How many of them were restored?

14   A.   Seven.

15   Q.   And was that a percentage of 78 percent?

16   A.   It was, 78 percent.

17   Q.   And the next group, were there six patients with a DUP of

18   seven to 10 years?

19   A.   There was.

20   Q.   What percentage of that group was restored?

21   A.   100 percent.

22   Q.   And then the final group, were there four patients that had

23   a DUP of between 13 and 24 years?

24   A.   Yes.

25   Q.   And what percentage of that group was restored?

Lea Ann Preston Baecht - Direct

1   A.   One out of the four defendants for 25 percent.

2   Q.   Focusing on that last group, did the authors, Herbel and

3   Stelmach, highlight another issue that could have contributed

4   to that poor outcome?

5   A.   Yes, they did.

6   Q.   What was that?

7   A.   They noted that in two of the patients, they believe that

8   they had an inadequate duration of treatment.  So those two

9   patients were not successfully restored to competency, but they

10   cautioned in drawing conclusions from that because they don't

11   believe they were treated for a long enough period of time.

12   Q.   And what problem does that create for drawing conclusions

13   if you had an inadequate trial period?

14   A.   If they weren't treated for a sufficient period of time,

15   it's unknown if they would then later have been restored to

16   competency if they had been treated for an appropriate length.

17   Q.   And what conclusion, if any, did the authors say about

18   whether the data supported -- excuse me, let me rephrase that.

19   What did the authors say about whether their data supported a

20   conclusion that a DUP of more than 13 years was a predictor of

21   a poor restoration outcome?

22   A.   They concluded that DUP was not a useful predictor of

23   non-response to antipsychotic medication.

24        THE DEFENDANT:   Look at 1984.  Drugs solve everything.

25   BY MS. RHYNE:

Lea Ann Preston Baecht - Direct

1   Q.  Is that because this study didn't have sufficient data?

2   A.  Correct.  They didn't have a sufficient sample size.

3   Q.  Now, if we could turn to Page 10 in the exhibit.  It's 56

4   in the study.  Focusing on the left-hand column, the second

5   paragraph, did the authors also look to the length of time of

6   the medication trial of the five patients overall who were not

7   restored?

8   A.  They did.

9   Q.  And what did they determine about that medication trial

10  time?

11  A.  I am trying to read here.  Are you on the left side or the

12  right side?  I apologize.

13  Q.  I believe I am on the left side.  Are you on the same page

14  if you look at my marking on the screen?

15  A.  If an adequate medication trial for delusional disorder

16  requires four consecutive months of treatment, then three of

17  the five patients who did not respond to treatment had a

18  medication trial of inadequate duration.

19  Q.  Did this -- the authors in this study also list the

20  strengths and limitations of this study.

21  A.  They did.

22  Q.  Is that common for a study of this type in your field?

23  A.  Yes.

24  Q.  In fact, would it be somewhat unheard of for authors not to

25  cite the limitations and strengths of their own study?

Lea Ann Preston Baecht - Direct

1   A.   It would be.

2   Q.   And why is that?

3   A.   Because the ethical way of approaching this is to cite

4   limitations in the research that was conducted.

5   Q.   And so the fact that they list limitations doesn't mean

6   that they are disrespecting their own research?

7   A.   No.   It's -- the purpose is to inform science.   And so you

8   need to address what the strengths were, what the weaknesses

9   were, and then hopefully it will help guide future researchers

10   on what other areas they can look at.

11   Q.   And what were some of the limitations that the authors

12   identified in this study?

13   A.   One, that it was a retrospective inpatient chart review.

14   It was not something where they were able to randomly assign to

15   groups in a controlled way.   They note that as a result, that

16   some of them lacked standardized clinical assessments, a lack

17   of interrater reliability studies.   They note that some

18   patients could have been misdiagnosed and therefore wrongfully

19   included or excluded from the study.   They talked about the

20   possibility of bias, and then they also noted the small sample

21   size.

22   Q.   And did they list any strengths?

23   A.   They did.   Specifically they referred to the fact that it

24   was selected in a real world manner.   And that unlike research

25   that was looking at delusional disorder in the community, this,

Lea Ann Preston Baecht - Direct

1  they were able to better control for treatment adherence and

2  know what treatment compliance was occurring.

3  Q.  So let's take a moment and talk about that concept.

4        THE COURT:  Right after the mid-morning recess I am

5  about to declare.  We are going to be in recess concerning this

6  hearing until 11:15 a.m., during which the witness may stand

7  down.  Thank you.

8        Counsel, you may be seated at your convenience.

9        Madam clerk.

10     (Recess at 11:00 a.m. until 11:20 a.m.)

11        THE COURT:  Counsel, you may resume your examination.

12        MS. RHYNE:  Thank you, Your Honor.

13        THE COURT:  You're welcome.

14  BY MS. RHYNE:

15  Q.  Focusing on the entire body of literature regarding

16  delusional disorder that you are aware of, what is consistently

17  said about the issue of medication non-compliance and patients

18  with delusional disorder?

19  A.  It's consistently noted that in most of the research, they

20  were concerned about medication compliance.

21  Q.  Why is that?

22  A.  Because, one, most of the research I believe was done on a

23  largely outpatient basis where there wasn't an avenue to ensure

24  that the patients were being compliant.  And two, the

25  individuals often, like we talked about before, lacked insight

Lea Ann Preston Baecht - Direct

1    into their need for treatment and often would not take

2    medication as a result.

3    Q.  And why is medication non-compliance a problem in a study

4    looking at the efficacy of antipsychotic medication on

5    delusional disorder?

6    A.  Because it's important for patients to take their medicine

7    consistently for a sufficient period of time in order for them

8    to actually have the best optimal result.  If they are only

9    taking the medication three days out of seven, they are not

10   going to have the level of improvement than they would have if

11   they would have taken it every single day for that sufficient

12   period of time.

13   Q.  And is it hard to discern whether the medications would

14   have worked had it been taken properly?

15   A.  Certainly.  It's unknown, although the research suggests

16   that when people do take adequate doses for long enough periods

17   of time, they have good outcomes.

18   Q.  Turning back to the study at Exhibit 5, the Herbel and

19   Stelmach study, turning to Page 12 which is 58 in your study,

20   and I am looking in particular at the left column, the sentence

21   right before the Conclusion heading, what did Herbel and

22   Stelmach observe about the issue of medication non-compliance?

23   A.  They noted that the real obstacle to a positive treatment

24   response in delusional disorder may not be the intrinsic

25   biological features of the illness, but may instead be the

54
Lea Ann Preston Baecht - Direct

1    difficulties and convincing these patients to adhere to an

2    adequate trial of medication.

3         MS. RHYNE:  Could I ask the courtroom deputy to --

4    thank you.

5         THE DEFENDANT:  It's against my religion.  I will not

6    participate in it.

7    BY MS. RHYNE:

8    Q.  In the context of involuntary treatment, what happens to

9    the risk of medication non-compliance?

10   A.  It's not entirely eliminated, but almost entirely

11   eliminated in the sense that in an inpatient setting nurses are

12   able to monitor to see if they are taking oral medicine if that

13   is what is prescribed.  If they are not taking oral medication,

14   it's known when they receive the injectable medication and

15   documented.

16   Q.  And when you have medication compliance that can be

17   verified, how would you expect that to impact the overall

18   success rates of the treatment of delusional disorder with

19   antipsychotics?

20   A.  I would expect that it would improve the success rates and

21   definitely give better information on what happens when you

22   have good compliance.

23   Q.  Can you turn now to Exhibit 6, please?

24        What is Exhibit 6?

25   A.  It is the article the *Sell* effect:  Involuntary Medication

Lea Ann Preston Baecht - Direct

1  Treatment is a "Clear and Convincing" Success by Cochrane

2  Herbel, Reardon and Lloyd.

3  Q.  Did you rely on this study in making your assessments?

4  A.  I did.

5        MS. RHYNE:  Government offers Exhibit 6.

6        THE COURT:  Response?

7        MS. BECK:  No objection.

8        THE COURT:  Exhibit 6 for identification admitted in

9  evidence.

10 BY MS. RHYNE:

11 Q.  What year was this study published?

12 A.  It was published on July 2nd, 2012.

13 Q.  Can you briefly describe this study?

14 A.  The authors of this study worked at the Federal Medical

15 Center in Butner, North Carolina.  And I believe at that time

16 it was just Butner and Springfield facilities that were doing

17 competency restoration in the federal system.  They looked at

18 all of the cases from June of 2003 after the *Sell* decision was

19 made up until I believe it was December of '09 where

20 involuntary treatment under *Sell* was considered.  They then

21 looked at the number of defendants that were involuntarily

22 treated under *Sell* and determined what the success rate was for

23 a successful competency restoration.

24 Q.  We will get to those data results, but does this study also

25 summarize at the beginning the prior literature that it

56

Lea Ann Preston Baecht - Direct

1   considered in coming up with this study or before it did this

2   study?

3   A.   Yes.

4   Q.   If we turn to Page 3, which is Page 132 in the study --

5   excuse me.  I am incorrect.  It's Page 112 in the study.  How

6   many patients were included in the study based on their

7   involuntary treatment at those two prisons?

8   A.   The total number, I believe it was a total of 287 for the

9   entire sample.

10  Q.   And how many actually went into the study for having been

11  involuntarily treated?

12  A.   For those where *Sell* was granted, it was 133.

13  Q.   Was one of those patients eliminated?

14  A.   It was.

15  Q.   Why?

16  A.   I believe it was because the decision was appealed.

17  Q.   So the sample set analyzed was 132 patients?

18  A.   Yes.

19  Q.   How many of those patients had delusional disorder?

20  A.   I believe it was 15.

21  Q.   That were -- where *Sell* was granted?

22  A.   Yes.

23  Q.   Of the 132 patients who were involuntarily treated with

24  antipsychotic medication, what percentage did the clinicians

25  determine as having been restored to competency?

Lea Ann Preston Baecht - Direct

1    A.   I believe it was 78.8 percent.

2    Q.   And did the authors try to determine the level of agreement

3    between the opinions of the clinicians and ultimately judges

4    presiding over the cases?

5    A.   They did.

6    Q.   And what did they determine that level of agreement was?

7    A.   It was very high.  I believe it was like 98 percent,

8    something along those lines.

9    Q.   And if we could turn to Page 7 and look at Table 4.  Were

10   the restoration rates in this study roughly consistently high

11   across all diagnoses?

12   A.   They were.

13   Q.   And specifically looking at delusional disorder, what was

14   the restoration rate of those 15 patients?

15   A.   11 out of 15 was restored for a percentage rate of

16   73.3 percent.

17   Q.   And what did this particular study find about older

18   patients?

19   A.   What was interesting about this study is that they found

20   that older patients actually performed or got better faster

21   than younger patients.

22   Q.   Is that consistent with other studies?

23   A.   No.  Other studies found that there were typically poor

24   treatment outcomes with older patients.

25   Q.   And how do you then assess that conflicting data when you

Lea Ann Preston Baecht - Direct

1    look at someone like Mr. Dear?

2    *A.*  I think that one explanation that they offered is perhaps

3    the older patients, they had more treatment histories for them

4    to be able to help guide their decision making.  Another

5    possibility is that age isn't as strong of a predictor of

6    success as some other factor.  Some of the research I looked at

7    indicated 65 and older was more of the poor prognostic factor.

8    And again, it may well be that it's because older individuals

9    have a higher likelihood of neurocognitive deficits, but I

10   don't know that it's a hundred percent clear.

11   *Q.*  To your knowledge, is Mr. Dear approximately 64 years old?

12   *A.*  Yes, I believe he is.

13   *Q.*  Now, focusing again on this study, what did it find about

14   whether the element of coercion involved in the involuntary

15   treatment impacts the outcome of that treatment?

16   *A.*  The finding was that it did not appear to impact the

17   success of treatment.

18   *Q.*  Did the authors of this study recite the possible strengths

19   and limitations of this study?

20   *A.*  They did.

21   *Q.*  And what did they note one of the limitations were if we

22   are looking at Page 115 of the study, Page 9 of the exhibit?

23   *A.*  They noted again that this was a retrospective

24   observational study.  This wasn't, you know, a controlled

25   experiment where they were able to randomly assign individuals

Lea Ann Preston Baecht - Direct

1   to treatment groups.

2        They also noted the possibility of bias on the part of

3   the opinion of the examiners noting, though, that that was to

4   some degree likely offset by the independent judiciary review.

5   They also noted that there wasn't standardized clinical

6   assessments used.  There wasn't interrater reliability studies

7   or a lack of blinded outcome measures.

8   Q.  Focusing on the second paragraph of this page where it

9   says, "Random assortment and use of a placebo control group

10  will likely never be used in a pretrial population undergoing

11  involuntary treatment for restoration of competency because of

12  ethical and legal issues," do you agree with that?

13  A.  Yes.

14  Q.  Why is that?

15  A.  Because individuals in that circumstance are involved in

16  legal settings and they have a right to, you know, proceed

17  through their legal proceedings quickly.  There is not -- it

18  would not be practical to not provide them with treatment if

19  that was in their best interests for their court proceedings.

20  Also it wouldn't be considered ethical to withhold treatment

21  for people who were in need of it.

22  Q.  Now, the next sentence says, "If randomly allocating

23  patients is neither practical nor ethical, the principles of

24  evidence-based medicine require clinicians to search for the

25  highest quality available evidence to guide treatment

Lea Ann Preston Baecht - Direct

1   recommendations, such as the observational study design used in

2   the current data set."

3          Do you agree with that?

4   *A.* I do.

5   *Q.* Why?

6   *A.* Because that should always be our goal, to be guided by the

7   best available information that we have.

8   *Q.* And do you believe Exhibits 5 and 6 provide some of the

9   best available data regarding the involuntary treatment of

10  patients with delusional disorder with antipsychotics?

11  *A.* I do.

12  *Q.* I think that it is data from real world settings and it

13  does provide some of the best information we have.  It's not --

14  there is not a great deal of research out there on the topic of

15  competency restoration for delusional patients, but this is

16  what we have?

17          *THE COURT:*  So you want me to be a guinea pig.

18  *BY MS. RHYNE:*

19  *Q.* I want to focus on your personal experience of treating

20  patients at the Bureau of Prisons.  I think you testified you

21  worked on more than -- was it 750 competency restorations?

22  *A.* Correct.

23  *Q.* Approximately how many of those patients had a diagnosis of

24  delusional disorder?

25  *A.* I think that I can fairly confidently say that probably 600

Lea Ann Preston Baecht - Direct

1    out of the 750 had a psychotic disorder.  In trying to

2    determine the number that had delusional disorder, obviously

3    it's a more rare condition than schizophrenia.  And it's a

4    little bit hard to make the estimate because the diagnostic

5    criteria has changed over the course of my career.  I would say

6    a safe conservative estimate, though, would be maybe 30 to 40

7    patients over the course of my 22-year career.

8    Q.  Just for clarity, does that number include the patients who

9    were diagnosed with schizophrenia under the DSM-IV between the

10   years, I guess when you started, 2000 and 2013?

11   A.  Yes.

12   Q.  How many of those patients were treated with antipsychotic

13   medications during the restoration process?

14   A.  I would say most of them.  I can think of two patients

15   where medication was not authorized.

16   Q.  And of the patients who received the medication, how many

17   of them were rendered to competency based on your clinical

18   opinion?

19   A.  I don't have exact numbers in front of me.  From my

20   recollection when I would periodically look at my case load to

21   see where I was with success rates, I was always struck by the

22   fact that the restoration rates for those with delusional

23   disorder was comparable to the restoration rates for

24   individuals with other psychotic disorders.

25   Q.  And what was that restoration rate?

Lea Ann Preston Baecht - Direct

1   A.  Usually between 70 and 75, 76 percent.

2   Q.  How many of the patients with delusional disorder that you

3   treated had the persecutory subtype?

4   A.  Nearly all of them.

5   Q.  And did that impact at all the outcome of their restoration

6   success?

7   A.  No.

8   Q.  Now, you mentioned that approximately 600 of your patients

9   had some form of psychotic disorder.  What percentage of them

10  or what number of them were treated with antipsychotic

11  medications?

12  A.  Most of them would have been.  I cannot think of -- other

13  than a handful of cases where perhaps we didn't request

14  involuntary medication, most of those patients either took

15  medicine voluntarily or medicated under a *Harper* hearing or

16  were medicated under *Sell* proceedings.

17  Q.  For those who received the medication, what percentage were

18  restored by it?

19  A.  Probably between 75 and 80 percent.

20  Q.  Based on your own experience, does a patient's lack of

21  cooperation impact the efficacy of antipsychotic medications?

22  A.  No, it does not.

23  Q.  Do you have an opinion about whether the four recommended

24  antipsychotic medications listed in the treatment plan are

25  substantially unlikely to interfere with Mr. Dear's ability to

Lea Ann Preston Baecht - Direct

1   assist his counsel?

2   *A.*   I do.

3   *Q.*   What is that opinion?

4   *A.*   I don't believe that they would be substantially unlikely

5   to restore -- let me back up.  I don't believe that they would

6   result in side effects that would cause him to be incompetent.

7   I think that's substantially unlikely to occur.

8   *Q.*   So just to make sure we get the formulations of the

9   negatives correct, did I hear you correctly that you believe it

10  is substantial unlikely that these medications would interfere

11  with his ability to assist his counsel?

12          *THE DEFENDANT:*  Bullshit.

13          *THE COURT:*  Just a moment.  Mr. Dear, please.

14          *THE DEFENDANT:*  Hey, it's my brain.

15          *THE COURT:*  I continue to be extremely patient and

16  forgiving.

17          *THE DEFENDANT:*  They want to turn me into a zombie.

18          *THE COURT:*  If you can't refrain from these outbursts,

19  sir, you leave me no choice but to remove you from the

20  courtroom.  Again, I am trying to avoid that.

21          *THE DEFENDANT:*  I'm going to speak the truth.  That's

22  it.

23          *THE COURT:*  When it's your opportunity, you may do so.

24          *THE DEFENDANT:*  Put me on the stand.

25          *THE COURT:*  Please be quiet.

Lea Ann Preston Baecht - Direct

1    Counsel?

2        MS. RHYNE:  Thank you, Your Honor.

3    BY MS. RHYNE:

4    Q.  Focusing on all your Bureau of Prisons patients who

5    received antipsychotic medication under your care, how many of

6    them experienced side effects?

7    A.  Many of them experienced mild side effects such as feeling

8    of restlessness.  Perhaps they refer to it as akathisia.  Some

9    of them may have also initially had some sedation on the

10   medication.

11   Q.  And in your role in the restoration process, did you

12   participate in monitoring for side effects?

13   A.  I did.

14   Q.  What do you do when side effects are detected?

15   A.  For those types of side effects, I would be observing to

16   see if I witnessed that.  So for example, if they appeared to

17   be sedated, I would ask them about that.  If I witnessed them

18   perhaps pacing or moving from one foot to the other, I would

19   notice that and ask them about that.

20        I would also, even if I didn't witness any of those

21   types of side effects, directly ask them if they felt as if

22   they were experiencing side effects and then follow up

23   appropriately if the answer was yes.

24   Q.  And what does that mean to follow up appropriately?  What

25   would you do with that information?

Lea Ann Preston Baecht - Direct

1    *A.* I would relay that to Dr. Sarrazin and share with him what

2    the patient had shared with me or what I observed, and then he

3    would make any necessary adjustments to the medication to

4    address and alleviate the side effect to the best of his

5    ability.

6    *Q.* What are the steps that would be taken to alleviate those

7    side effects?

8    *A.* With sedation he could and he would --

9         *MS. BECK:* Objection, lacks foundation, Your Honor.

10        *THE COURT:* Response?

11        *MS. RHYNE:* I can lay more foundation, Your Honor.

12        *THE COURT:* That's a concession essentially of the

13   objection which is sustained, and you may proceed.

14   *BY MS. RHYNE:*

15   *Q.* Did you discuss with Dr. Sarrazin the steps that needed to

16   be taken when those side effects are observed?

17   *A.* We would discuss that, yes, and he would share with me his

18   plan of how to address them.

19   *Q.* And what would he discuss with you about what he was going

20   to do about those side effects?

21   *A.* If sedation was an issue and the individual was receiving

22   the medication, for example, in the morning, he could move the

23   dosage time to the evening so that that sedation would simply

24   assist them in falling asleep at night.

25   *Q.* Did you ever discuss dosage issues?

Lea Ann Preston Baecht - Direct

1    *A.*  If they appeared to be overmedicated, I would also share

2    that with him, and then he would assess the patient and make

3    that determination if he thought they were overly medicated and

4    then adjust as necessary.

5    *Q.*  Was there ever a discussion of adding a secondary

6    medication?

7    *A.*  If a patient reported muscle stiffness or restlessness,

8    like akathisia, and I shared that with him, he would voice an

9    intent to prescribe a second medication that could alleviate

10   those motor symptoms.

11   *Q.*  And was there ever a discussion of changing the type of

12   antipsychotic being used?

13   *A.*  If, for example, someone had -- in addition to my

14   monitoring for sedation and motor systems with some of the

15   second generation medications, they would also have monitoring

16   for their blood glucose levels, their weight and their

17   cholesterol.  If he thought that it was appropriate because

18   somebody was having a metabolic side effect, that the medicine

19   was causing that, he would make the determination of whether or

20   not he needed to adjust the dose or possibly change to a

21   different medication.

22   *Q.*  Do you recall any instances where any number of those

23   precautions or remedial steps were taken and then the side

24   effects still persisted despite the best efforts to alleviate

25   them?

Lea Ann Preston Baecht - Direct

1    A.   It's possible there were cases where metabolic side effects

2    may have persisted.  I don't recall.  In terms of the other

3    symptoms, which I would be more concerned about them impacting

4    competency, so things like sedation and being restless where

5    they are unable to focus, it was my experience that

6    Dr. Sarrazin was usually able to address those concerns such

7    that they did not impact their competency-related abilities.

8    Q.   And in your subsequent interactions with the patient, did

9    you observe those side effects to be ongoing in nature?

10   A.   I think I may have observed a handful of patients that

11   might have had like a slight tremor possibly related to

12   medication, but certainly not any side effects that I thought

13   impacted their competency to assist their counsel or proceed.

14   Q.   Now, in his report Dr. Morton, who I understand is a doctor

15   of pharmacology, opines that there is a substantial likelihood

16   that Mr. Dear will experience mild to moderate side effects of

17   sedation, drowsiness, apathy, inability to focus his attention

18   and lack of motivation.  Do you agree with that?

19   A.   That's not been my clinical experience working in a

20   psychiatric hospital for 20-plus years.

21   Q.   And are there any of those side effects -- for example, you

22   said you have seen sedation occur, but it can be addressed,

23   correct?

24   A.   Correct.

25   Q.   Are there any of those side effects that you simply have

Lea Ann Preston Baecht - Direct

1   never seen whether they were addressed or not?

2   A.   I am sorry, could you refer me to the list again just to

3   make sure I don't miss any of them?

4   Q.   I will read it for you:  Sedation, drowsiness, apathy,

5   inability to focus his attention and lack of motivation.

6   A.   So two of those that were listed, the lack of motivation

7   and the apathy could actually be what we refer to as negative

8   symptoms of schizophrenia as opposed to a side effect from a

9   medication.  And what the literature shows is that oftentimes

10  those negative symptoms don't respond as well to medication.  I

11  would not view them or I haven't experienced them as being a

12  side effect of the medication; more so as simply negative

13  symptoms of schizophrenia.

14  Q.   Now, Dr. Morton further opines that these side effects

15  would interfere with Mr. Dear's ability to work with his legal

16  team.  Is that consistent with your experience where remedial

17  measures are taken for the true side effects of the medicines?

18  A.   No.

19  Q.   Why not?

20  A.   In my experience, these medicines, although I think they

21  are often viewed by others in a negative light -- mind-altering

22  drugs is how some people refer to them -- in my experience they

23  are lifesaving medications.  They allow people to think more

24  clearly, to communicate more rationally.  And I see defendants'

25  abilities to work with their attorneys improve on these

Lea Ann Preston Baecht - Direct

1   medications.  If I had concerns that they were overly sedated

2   or unable to focus because of distracting side effects, I

3   wouldn't form the opinion that they were competent to proceed.

4   Q.  In all of your years at the Bureau of Prisons, did you ever

5   observe side effects from antipsychotic medications that

6   actually interfered with a patient's ability to work with his

7   counsel?

8   A.  Not by the end of an evaluation.  I have seen patients that

9   were transferred in possibly being overmedicated, and that

10  would be addressed by Dr. Sarrazin so that they were not

11  overmedicated.

12  Q.  And so after remedial measures were taken, have you ever

13  seen someone who was still unable to work with their counsel

14  because of the medications?

15  A.  No, not because of side effects from the medications.

16  Q.  Now I would like you to focus very specifically on Mr. Dear

17  as an individual patient and how that impacted your opinion

18  that he is substantially likely to be restored to competency

19  with the recommended medications.

20      First, how does the degree of Mr. Dear's impairment

21  compare to the other restoration patients that you have worked

22  with at the Bureau of Prisons?

23  A.  It's actually in many ways fairly typical, the types of

24  delusions, the level of irrational thinking.  In some ways his

25  presentation is better than other individuals in the sense that

Lea Ann Preston Baecht - Direct

1    he has not met the criteria for involuntary medication under a

2    *Harper* hearing.

3              *THE DEFENDANT:*   Thank you.

4    *BY MS. RHYNE:*

5    *Q.*  Based on Mr. Dear's own descriptions, do you have some

6    estimate of how long he may have been suffering from delusional

7    disorder?

8    *A.*  That's a bit challenging.  If you take it from when he said

9    he believes they started monitoring him in 1993, then possibly

10   it could be close to 30 years.  Sometimes, however, individuals

11   will say something started at a certain time, but if you were

12   actually to have talked to them at that time, perhaps they

13   didn't have the beliefs then.  It may have been that the

14   beliefs started later and they were attributing them to

15   earlier.  So I am not exactly certain on how long.  I think

16   it's possible it could be up to 30 years, but it may only be

17   15.  I honestly don't know.

18   *Q.*  And does that potential 15 to 30-year span of his possible

19   time of untreated psychosis impact your decision about whether

20   or not he is substantially likely to be restored to competency?

21   *A.*  As the one study noted, there is not sufficient data to

22   suggest that duration of untreated psychosis of that length is

23   a strong predictor.  It's not very common to come across that

24   level of untreated psychosis.  I have had other cases where

25   they have been ill for more than 10 years.  I can think of a

1    case where they were ill more than 20 years.  And I even had a

2    case where they were ill for approximately 40 years and not

3    treated.  That's a small number, but all of those cases were

4    successfully restored to competency.

5    Q.  In his report, Dr. Martinez opines that where Mr. Dear's

6    delusional beliefs have persisted for many years, it is

7    questionable and unlikely that psychotropic medications would

8    result in the resolution of Mr. Dear's delusional beliefs.

9            First, is the complete resolution of his delusional

10   beliefs required for competency?

11   A.  No, it is not.

12   Q.  And do you agree that the complete resolution is perhaps

13   unlikely?

14   A.  I agree with that.  I often saw defendants not completely

15   let go of their delusional beliefs.  Nevertheless, they reduced

16   sufficiently in intensity that they were able to proceed with

17   their case in a competent fashion.

18   Q.  And I think you mentioned that one of the things you like

19   to have is a treatment history that tells you whether someone

20   had a good or poor outcome to prior treatment.  Does Mr. Dear

21   have a sufficient treatment history to give you that

22   indication?

23   A.  No.

24   Q.  And I believe you have already discussed this briefly, but

25   based on your own observations, what is your assessment of his

Lea Ann Preston Baecht - Direct

1    intelligence level?

2    *A.*  I think he is bright.

3    *Q.*  Does that influence your opinion about his outcome?

4    *A.*  Yes, in the sense that he doesn't have a co-occurring

5    intellectual disability or obvious neurocognitive deficits that

6    would compromise his competency-related abilities.

7    *Q.*  Did you ever observe any evidence of dementia or any other

8    cognitive impairment with Mr. Dear?

9    *A.*  I did not.

10   *Q.*  Did you see anything in his medical records that suggests

11   any type of cognitive impairment?

12   *A.*  I did not.

13   *Q.*  Did you ever observe Mr. Dear to have a mood disorder?

14   *A.*  No.

15   *Q.*  Based on your review of the records from CMHIP, are you

16   aware that Mr. Dear used to regularly play chess with staff and

17   inmates?

18   *A.*  I read that, yes.

19   *Q.*  What, if anything, does that tell you about Mr. Dear and

20   his prognosis for outcome?

21   *A.*  Again, that speaks to the fact that he is intellectually, I

22   think, higher functioning than most of the patients that I have

23   worked with and he does not have a co-occurring intellectual or

24   neurocognitive disorder.

25   *Q.*  What did you observe about Mr. Dear's efforts to interact

Lea Ann Preston Baecht - Direct

1   with others?

2   *A.*   Although Mr. Dear was unwilling to come out and speak with

3   me for interviews, he was consistently friendly and wanted to

4   talk.   And so he would speak to me, as well as my colleagues

5   and the individuals that I supervised on rounds.

6   *Q.*   Do you believe he is withdrawn?

7   *A.*   No, I would not characterize him as withdrawn.

8   *Q.*   In his report Dr. Woods says that psychotic disorders have

9   positive, negative and cognitive symptoms.   Is that true for

10   delusional disorder specifically?

11   *A.*   Delusional disorder under both editions, the DSM-IV and the

12   DSM-5, specifically states that negative symptoms are not

13   present or prominent nor do they list cognitive symptoms in the

14   DSM.

15   *Q.*   If there were negative symptoms present, what would that

16   lead a diagnosis toward?

17   *A.*   If an individual had negative symptoms, then the diagnosis

18   according to the DSM-5 would be schizophrenia.

19   *Q.*   And can you give some examples of what negative symptoms

20   are?

21   *A.*   Sure.   Negative symptoms would be things like a lack of

22   facial expression.   They often refer to that as flattened

23   affect.   It could also be a lack of motivation to engage in

24   goal-directed activities, so such individuals may simply lay in

25   bed all day and not interact with others or do other

Lea Ann Preston Baecht - Direct

1   activities.

2   Q.  Did you ever observe Mr. Dear to have any negative

3   symptoms?

4   A.  I did not.

5   Q.  In his report Dr. Woods opines that Mr. Dear's negative

6   symptoms include isolation, decreased motivation and impaired

7   social skills.  First, do you agree that all of those are

8   actually negative symptoms?

9   A.  No, I would not characterize all of those as negative

10  symptoms.

11  Q.  What do you think is not appropriately called that?

12  A.  What was the last one?  Did you say social skills?

13  Q.  Impaired social skills.

14  A.  Impaired social skills is a characteristic that's common in

15  populations with mental illness and without mental illness.  I

16  would not consider it to be a negative symptom per se.

17  Q.  Based on your interactions, did you ever display Mr. Dear

18  to seek isolation or be isolated or have decreased motivation?

19  A.  My interactions with Mr. Dear suggested to me that when he

20  was motivated to do something, he would; and when he was not

21  motivated to do something, he would choose not to do it.  So it

22  was a more willful decision-making process as opposed to a

23  pervasive lack of motivation to do anything.  He also, like I

24  said, seemed to enjoy having some verbal contact with others,

25  and he certainly -- I believe even today he said that he wanted

Lea Ann Preston Baecht - Direct

1   to be in open population and be around others.

2        *THE DEFENDANT:*  But you wouldn't let me.

3   *BY MS. RHYNE:*

4   *Q.*  Dr. Woods also opines that Mr. Dear suffers from cognitive

5   symptoms of psychotic disorder and he has difficulty problem

6   solving, understanding context and picking up on social cues.

7   First, do you agree that those are cognitive symptoms?

8   *A.*  I am not -- I suppose they are in some ways.  Normally when

9   I think of cognitive symptoms, I am thinking more of deficits

10  in like executive functioning.

11  *Q.*  Did you observe any of those traits in Mr. Dear?

12  *A.*  Only to the extent that his delusional beliefs impacted his

13  ability to rationally make decisions and interact with others.

14  It wasn't a lack of cognitive ability.  It was more simply the

15  impact of his delusions on his behavior.

16  *Q.*  And as an example, Dr. Woods points out that Mr. Dear

17  consistently demonstrated a lack of understanding of the roles

18  of both clinical staff and the forensic examiner.  First, did

19  you observe that in Mr. Dear?

20  *A.*  No, I wouldn't say that he had a lack of understanding.  I

21  mean, he often referenced what my role was.  He was cynical

22  about it, but he referenced my role; that no, I wouldn't agree

23  with that characterization of his abilities.

24  *Q.*  Do you believe his delusions impacted how he viewed the

25  roles of clinical staff or the forensic examiners?

Lea Ann Preston Baecht - Direct

1  *A.*  Yes.  His delusions and his kind of pervasive paranoia

2  about others was the main problem.

3  *Q.*  Moving on to the third *Sell* factor, do you have an opinion

4  about whether there is any lesser intrusive treatment to the

5  involuntary use of medication that would achieve the same

6  result as that medication?

7  *A.*  I do have an opinion.

8  *Q.*  What is your opinion?

9  *A.*  I don't believe there is a less intrusive alternative in

10  Mr. Dear's case.

11         *THE DEFENDANT:*  Marijuana.

12  *BY MS. RHYNE:*

13  *Q.*  Why not?

14  *A.*  Mr. Dear has no insight into his illness and need for

15  treatment.  He does not have an interest in psychotherapy.  He

16  has been offered that in the state hospital and did not

17  participate in psychotherapy.  And beyond that, I think most of

18  the research suggests that the most efficient and effective

19  treatment for delusions is medication and that any

20  psychotherapy that would be offered would likely be most

21  beneficial as a secondary treatment.

22  *Q.*  Dr. Woods asserts that psychotherapy is the primary

23  treatment for delusional disorder.  Do you agree with that?

24  *A.*  I do not.

25  *Q.*  Why not?

77
Lea Ann Preston Baecht - Direct

1   *A.*  Again, psychotherapy is beneficial as a secondary

2   treatment.  As a stand-alone treatment, I know there has been

3   some work looking at it helping to reduce anxiety and

4   depression, maybe some work on helping to reduce the intensity

5   of delusions, but from what I have read, it's very time

6   intensive.  They have to be motivated.  And it's unlikely to

7   have results in four to five months like you would with

8   medication.

9          *THE DEFENDANT:*  I'll do psychotherapy to keep me off

10  drugs.

11  *BY MS. RHYNE:*

12  *Q.*  Do you believe that cognitive behavioral therapy would be

13  effective to restore Mr. Dear to competency?

14  *A.*  I do not.

15  *Q.*  Why not?

16  *A.*  Cognitive behavioral therapy would probably be the primary

17  type of psychotherapy offered.  They are essentially the same

18  thing.  And again, I don't think that it would effectively

19  decrease is delusions nor do I think -- even if it did, it

20  would take a very, very long time, and I don't think that he

21  has the insight to be successful at psychotherapy.

22  *Q.*  Moving on to the fourth *Sell* factor, whether the

23  administration of medication is medically appropriate, i.e., in

24  the patient's best medical interests in light of his medical

25  condition.  For this factor I understand that you are not a

Lea Ann Preston Baecht - Direct

1   medical doctor, correct?

2   *A.* Correct.

3   *Q.* So my question focuses solely on your role as a

4   psychologist. As a psychologist, do you believe that the

5   antipsychotic medications listed in the treatment plan will

6   improve the quality of Mr. Dear's life?

7   *A.* I do.

8   *Q.* Why?

9           *THE DEFENDANT:* No.

10  *A.* One, I think that if his delusions are reduced in

11  intensity, he will have less distress in believing that those

12  things are happening. Also my understanding is that he has

13  consistently refused medical treatment for his hypertension.

14  He has shared -- at times it's because of religious beliefs,

15  but at other times he's agreed to medications to treat other

16  illnesses.

17          I think that if he were effectively treated with

18  antipsychotic medication, his ability to reason and make good

19  decisions about his own health would be improved, and so I

20  think that it would be twofold. I think that his mental health

21  would improve and hopefully that would also impact his ability

22  to make good medical decisions about his own health.

23  *BY MS. RHYNE:*

24  *Q.* In your role as a BOP psychologist, what was your goal in

25  treating Mr. Dear?

Lea Ann Preston Baecht - Direct

1   *A.* My goal is to try to fulfill the Court order of restoring

2   competency, obviously, but one of the rewarding things in

3   working in the hospital setting was seeing people get better.

4   *Q.* And are you exclusively focused on the goal of legal

5   restoration or is that simply one factor?

6   *A.* In my role there, I knew that I was directed by the court

7   to try to restore somebody to competency.  Nevertheless, if I

8   had a patient in a different circumstance and I saw them with

9   the exact same belief system, I would make the same

10  recommendation.

11  *Q.* If the Court were to order the involuntary use of these

12  medications for Mr. Dear, does the BOP have a standard practice

13  to attempt to first gain a patient's cooperation in taking the

14  medications?

15  *A.* They do.

16  *Q.* And I am going to ask Dr. Sarrazin about that in some

17  detail, but could you explain the role of the psychologist in

18  explaining or talking to that patient and trying to gain the

19  cooperation?

20  *A.* Sure.  The psychologist assigned to the case would meet

21  with the defendant usually with the psychiatrist and go over

22  the court order and what it means.  They would be encouraged to

23  talk cooperatively about the medications and try to gain their

24  cooperation in maybe picking one of them so they have a little

25  bit of buy-in on their treatment.  They would be encouraged to

80

Lea Ann Preston Baecht - Direct

1   take an oral medication.  And the hope would be that they could

2   be persuaded to cooperate.

3   Q.  And during your time at the Bureau of Prisons, how frequent

4   was it that actual force was required to administer these

5   medications?

6   A.  Very rare.

7        THE DEFENDANT:  No.

8   A.  Under *Sell* proceedings.

9        THE DEFENDANT:  Every day.

10  BY MS. RHYNE:

11  Q.  Based on your experience at the Bureau of Prisons, how long

12  does it typically take for a patient with delusional disorder

13  to be restored to competency as a result of the antipsychotic

14  medications?

15  A.  Typically between probably five to eight months.

16       THE COURT:  Counsel, excuse the interruption.  We have

17  arrived at our noon recess over which, ma'am, you may stand

18  down, but at the conclusion of which you must return to

19  continue and complete your testimony.  Will you do that?

20       THE WITNESS:  I will.

21       THE COURT:  Very well.  You may stand down.

22       Counsel, you may be seated at your convenience.  We

23  are in recess until 1:00 o'clock p.m. as measured by the

24  courtroom clock.

25       Madam clerk.

Lea Ann Preston Baecht - Direct

1          (Recess at 12:00 p.m. until 1:05 p.m.)

2               *THE COURT:*  Ms. Rhyne.

3               *MS. RHYNE:*  Thank you, Your Honor.

4     *BY MS. RHYNE:*

5     *Q.*  Just before the break, Dr. Preston Baecht, I believe you

6     stated that in your experience it takes often up to five to

7     eight months to restore someone who has delusional disorder

8     with the antipsychotic medications.  Do you recall that?

9     *A.*  Yes, I do.

10    *Q.*  I believe the current treatment plan asks the Court for

11    four months of authorization.  What is the role of the BOP

12    psychologist if it looks like progress is being made but more

13    time is needed?

14    *A.*  If at the end of four months a defendant appears to be

15    making improvements at that point in time but they are not yet

16    restored to competency, the assigned primary clinician would

17    make an assessment of whether or not they thought it was

18    substantially likely the person would be restored to competency

19    in the foreseeable future if granted a reasonable extension.

20    *Q.*  And based on your experience at the BOP, is it also

21    important for a court's order authorizing involuntary

22    medication to specify that the involuntary use of medication

23    should conclude throughout the defendant's legal proceedings?

24    *A.*  Yes.

25    *Q.*  Why?

Lea Ann Preston Baecht - Cross

1    A.   Because oftentimes what can happen is they may be

2    successfully restored to competency, leave the medical facility

3    where they were receiving treatment and then stop their

4    medication.  And if they were to stop the medication, then it

5    is likely that the symptoms would return.

6              MS. RHYNE:  Your Honor, I have no further questions.

7              THE COURT:  Thank you.

8              Cross-examination for Mr. Dear?

9              THE DEFENDANT:  You mean I am allowed to say

10   something?

11             THE COURT:  No.  I am talking to your counsel,

12   Mr. Dear.

13             THE DEFENDANT:  Oh, okay.

14                        **CROSS-EXAMINATION**

15   BY MS. BECK:

16   Q.   Good afternoon, Dr. Baecht.

17   A.   Good afternoon.

18   Q.   Mr. Dear was admitted to Springfield on May 6, 2021,

19   correct?

20   A.   Correct.

21   Q.   And you were tasked with evaluating his competency from May

22   6th through November 15th.

23   A.   No.  I believe that I was tasked with assessing his

24   competency in probably 45 days.  I don't have the court order

25   in front of me, so the opinion was formed on June 30th is when

Lea Ann Preston Baecht - Cross

1    I wrote the report.

2    Q.  And then after you wrote that report, you were subsequently

3    tasked with attempting to restore his competency, correct?

4    A.  Correct.  I believe that was in September when that order

5    on was received.

6    Q.  Mr. Dear was largely uncooperative with your efforts to

7    interview him?

8    A.  Correct.

9    Q.  You attempted to interview him the day he was admitted to

10   Springfield on May 6?

11   A.  Yes.  We did interview him at that point.

12   Q.  You were able to meet with him you testified for about 30

13   minutes or so?

14   A.  Yeah, about 30 to 45 minutes in receiving and discharge in

15   a private interview room.

16   Q.  And he repeatedly told you he did not wish to participate?

17   A.  Correct.

18   Q.  He repeatedly declined to leave his room to be interviewed

19   privately?

20   A.  Correct.

21   Q.  And so nearly all of your interactions with him were at the

22   door of his locked room.

23   A.  Yes, with the exception of the due process hearing meeting.

24   Q.  In forming your opinion about Mr. Dear's mental illness,

25   you relied on the previous competency evaluations that were

Lea Ann Preston Baecht - Cross

1   done by the staff at the Colorado Mental Health Institute at

2   Pueblo, right?

3   A.   Correct.

4   Q.   You reviewed all of those evaluations?

5   A.   I did.

6   Q.   And those evaluations were done between January 2016

7   through October 2019.

8   A.   Yes.  I believe there were 15 of them.

9   Q.   They were done by Dr. Gray?

10   A.   Correct.

11   Q.   Dr. Grimmett?

12   A.   Correct.

13   Q.   Dr. Mack?

14   A.   Yes.

15   Q.   Dr. Torres Miller?

16   A.   Correct.

17   Q.   And Dr. Reis.

18   A.   Yes.

19   Q.   So five different doctors.

20   A.   Yes.

21   Q.   All of those doctors opined that Mr. Dear suffers from

22   delusional disorder, persecutory type.

23   A.   Correct.

24   Q.   Their diagnoses that he has delusional disorder was in

25   large part based on his positive symptoms of delusions,

Lea Ann Preston Baecht - Cross

1    correct?

2    *A.*   Correct, in the absence of the additional possible positive

3    symptoms of psychosis.

4    *Q.*   And his delusionary thinking includes things like

5    repetitive statements about former President Obama being satan?

6    *A.*   Correct.

7    *Q.*   About various biblical verses?

8    *A.*   Yes.

9    *Q.*   Especially Luke 10:18?

10   *A.*   That's correct.

11   *Q.*   The FBI's conspiracy against him for the past 30-plus

12   years?

13   *A.*   Yes.  I believe he mentioned 1993 as when it began.

14   *Q.*   In addition to that delusionary thinking, Mr. Dear also

15   routinely expressed that the various participants in the

16   criminal legal system were conspiring against him and his

17   goals.

18   *A.*   Correct.

19   *Q.*   So that includes the judges?

20   *A.*   Yes.

21   *Q.*   The defense attorneys?

22   *A.*   Yes, I believe he said that about prior defense counsel.

23   *Q.*   The prosecutors?

24   *A.*   Yes.

25   *Q.*   And the evaluators at the state hospital in Pueblo.

Lea Ann Preston Baecht - Cross

1    *A.*  Yes.  At various times he accused them of also being part

2    of a larger conspiracy.

3    *Q.*  Even though your interactions with Mr. Dear were limited,

4    you observed his delusional thinking yourself.

5    *A.*  Yes.  He shared those beliefs with me as well.

6    *Q.*  He went into some detail with you about that delusional

7    thinking.

8    *A.*  He did.

9    *Q.*  And among other things that he discussed with you, he

10   talked with you about his belief in the FBI's conspiracy

11   against him?

12   *A.*  Correct.

13   *Q.*  And that appears to have begun in 1993 with him calling the

14   radio station about the FBI being the Federal Bureau of

15   Incineration?

16   *A.*  That's what he said, yes.

17   *Q.*  And that was in relation to the Waco Branch Davidian

18   standoff?

19   *A.*  Correct.

20   *Q.*  When you met with him in September of 2021, he talked to

21   you about how the FBI followed him?

22   *A.*  Correct.

23   *Q.*  And when you gently challenged his assertions, you were

24   unsuccessful in being able to do that.

25   *A.*  Correct.

87

1    *Q.*  And in October of 2021, he again talked to you about his

2    belief system, right?

3    *A.*  Yes.

4    *Q.*  That was after the *Harper* hearing?

5    *A.*  Correct.

6    *Q.*  And he cited scripture and discussed his beliefs about

7    President Obama being the Antichrist.

8    *A.*  That is correct.

9    *Q.*  He also talked about how President Obama sent a hit team

10   for him, right?

11   *A.*  Yes.

12   *Q.*  And that there were three miracles that occurred after one

13   of his court appearances.

14   *A.*  That's correct.

15   *Q.*  You agree that delusional disorder and schizophrenia are

16   both psychotic disorders, right?

17   *A.*  That's correct.

18   *Q.*  And that psychotic disorders are defined by abnormalities

19   in one or more of the following domains:  Delusions, right?

20   *A.*  Correct.

21   *Q.*  Hallucinations?

22   *A.*  Correct.

23   *Q.*  Disorganized thinking?

24   *A.*  Yes.

25   *Q.*  Grossly disorganized or abnormal motive behavior?

Lea Ann Preston Baecht - Cross

1   A.  Correct.

2   Q.  And negative symptoms.

3   A.  Yes.  Those are the criteria that they cite as possible

4   symptoms of schizophrenia.  If you have two of those five, the

5   diagnosis would be schizophrenia.

6   Q.  Because while schizophrenia and delusional disorder are

7   both psychotic disorders, they are not the same thing.

8   A.  Correct.

9   Q.  Okay.  And delusional disorder specifically is

10  characterized by the presence of one or more delusions in the

11  absence of prominent hallucinations.

12  A.  That is correct.

13  Q.  Mr. Dear never appeared to attend to hallucinations.

14  A.  I never witnessed him engage in those behaviors.  I know

15  the notes from Colorado State Hospital, there were a couple

16  notations where he maybe was talking to himself.  There was one

17  notation where he said the FBI, I think soon after he was

18  arrested, was putting sounds into his room, but those were --

19  in the context of the length of time that he was held, those

20  were very rare instances.

21  Q.  In 2015 or 2016.

22  A.  Yes.

23  Q.  You testified on direct examination about how Mr. Dear's

24  state hospital treating psychiatrist, Dr. DeQuardo, opined that

25  Mr. Dear may have schizophrenia, right?

Lea Ann Preston Baecht - Cross

1    A.   That's correct.

2    Q.   But all evaluating clinicians retained the diagnosis of

3    delusional disorder.

4    A.   Yes.

5    Q.   Dr. Gray?

6    A.   Correct.

7    Q.   Dr. Grimmett?

8    A.   Correct.

9    Q.   Dr. Mack?

10   A.   Correct.

11   Q.   Dr. Race?

12   A.   Correct.

13   Q.   Dr. Torres?

14   A.   Correct.

15   Q.   And you.

16   A.   Correct.

17   Q.   You've also opined that Mr. Dear is incompetent because of

18   his delusional thinking, right?

19   A.   That's correct.

20   Q.   You opined that his rational understanding is hindered by

21   his delusional beliefs.

22   A.   That's correct.

23   Q.   That his delusional thinking also appears to significantly

24   hinder his ability to assist properly in his defense.

25   A.   That is correct.

Lea Ann Preston Baecht - Cross

1   *Q.*  That his ability to communicate in a rational manner is

2   often hindered by his delusional thinking.

3   *A.*  That is correct.

4   *Q.*  And that his delusional thinking would likely hinder his

5   ability to communicate meaningfully with his defense counsel.

6   *A.*  That is correct.

7   *Q.*  And you have opined that Mr. Dear currently displays

8   deficits in his ability to make well-reasoned decisions due to

9   the influence of his delusional thinking.

10  *A.*  That is correct.

11  *Q.*  Mr. Dear does not think that he is mentally ill.

12  *A.*  Correct.

13  *Q.*  And when you attempted to interview him on June 15th of

14  2021, he specifically told you, "I do not believe I'm mentally

15  ill."

16  *A.*  I think on June 15th he was interviewed by Dr. Welch, and

17  he shared with her that he did not believe he was mentally ill.

18  *Q.*  So she observed him make that statement.

19  *A.*  Correct.

20  *Q.*  Okay.  Mr. Dear doesn't believe that he is in need of

21  mental health treatment, right?

22  *A.*  That is correct.

23  *Q.*  And throughout this process he has consistently refused to

24  take psychiatric medication.

25  *A.*  That is correct.

Lea Ann Preston Baecht - Cross

1   Q.   During the period of time that he was suggested to attend

2   competency restoration classes, he only attended one?

3   A.   That is correct.

4   Q.   His refusal to take antipsychotic medication dates all the

5   way back to when he was at the state hospital, right?

6   A.   Correct.

7   Q.   Back to 2016.

8   A.   That's correct.

9   Q.   When you met with him in November of 2021, he told you he

10  would never consider taking medication voluntarily, right?

11  A.   Yes.  He, as I said before, he said the only medicine he

12  would consider was lithium because it was natural.

13  Q.   And when you spoke with him on November 17 of 2021, you

14  encouraged him to cooperate with the treatment recommendations,

15  which didn't include lithium, right?

16  A.   I am sorry, say that last part.  I missed it.

17  Q.   You encouraged him to cooperate with the treatment

18  recommendations, right?

19  A.   Yes.

20  Q.   And he told you he wouldn't.

21  A.   Correct.

22  Q.   You would agree that Mr. Dear's psychotic symptoms are

23  chronic?

24  A.   Yes.

25  Q.   And that his symptoms might date all the way back to 1993.

Lea Ann Preston Baecht - Cross

1   A.  Yes.  I generally don't know when the onset of his symptoms

2   occurred.

3           THE DEFENDANT:  Waco.

4   BY MS. BECK:

5   Q.  It could be longer than that, right?

6   A.  It's possible.  I don't know that there is any collateral

7   information that would allow us to know definitively.  And if

8   it's there, I haven't seen it yet.

9   Q.  Okay.  The longer that someone goes with untreated

10  psychosis, the more likely it is that they won't have a good

11  outcome, right?

12  A.  Yeah.  Some of the research that has focused on how to

13  improve outcomes with first psychotic breaks have found that

14  the earlier the intervention with treatment, the better the

15  long-term prognosis.  Like I testified to previously, that

16  research wasn't -- most of it was not focused on competency

17  restoration outcomes.  It was more global functioning.  But

18  certainly there is a small correlation between the length of

19  untreated illness and less favorable outcomes.

20  Q.  Okay.  Now, you testified that Mr. Dear was bright.

21  A.  Yes.

22  Q.  And you testified that you didn't observe any evidence of

23  cognitive issues, right?

24  A.  Correct.

25  Q.  But you never did any cognitive testing of him, correct?

Lea Ann Preston Baecht - Cross

1    A.   I did not.  I simply had behavioral observations.

2    Q.   Okay.  And we'll get into the studies a little bit more,

3    but you also testified that with respect to Mr. Dear's age, the

4    studies really differ regarding whether age is a factor in

5    whether or not someone is more likely to be restored or not.

6    A.   From my reading, I believe that there are several studies

7    that indicated that age, the older age is correlated with less

8    favorable outcomes.  The study that was done by Cochrane and

9    colleagues in 2012 actually found the opposite to be true.

10   Q.   So the studies are inconsistent.

11   A.   There is some inconsistencies there, yes.

12   Q.   You would agree that delusional disorder is quite rare

13   among mental illnesses.

14   A.   It is more rare than the other psychotic illnesses,

15   although I think that given that the diagnostic criteria are

16   now more broad under the DSM-5, that it will probably be

17   diagnosed with some more frequency just because, as I said

18   before, some of the individuals that I would have diagnosed

19   with schizophrenia paranoid subtype under the DSM-IV would now

20   likely fall into delusional disorder.

21   Q.   And when you're talking about it being more broad, you're

22   really just referring to whether the delusions are bizarre or

23   non-bizarre.

24   A.   Correct.

25   Q.   And you would agree that whether they are bizarre or

Lea Ann Preston Baecht - Cross

1   non-bizarre is sort of on a spectrum, right?

2   *A.*   Correct.   It's on a continuum.

3   *Q.*   Right.   But at the end of the day, delusional disorder, the

4   incidence of it in inpatient admissions is like 1 or 2 percent,

5   right, of inpatient admissions?

6   *A.*   Yes.   It's less frequent than schizophrenia.

7   *Q.*   And that the prevalence within the general population is

8   only .03 percent.

9   *A.*   Correct.

10  *Q.*   So it's not very common compared to other mental illnesses.

11  *A.*   Correct.

12  *Q.*   And because it is uncommon, there is less research about

13  it.

14  *A.*   That is correct.

15  *Q.*   Now I want to go into some more detail about the two

16  studies that you were discussing during your direct

17  examination.

18          So you referenced the Herbel and Stelmach 2007 study?

19  *A.*   Correct.

20  *Q.*   And the Cochrane study from 2012.

21  *A.*   Correct.

22  *Q.*   Referring specifically to the Herbel and Stelmach study

23  from 2007, which is Government's Exhibit 5, in that study there

24  is a 1998 study that's referenced by Silva and colleagues,

25  correct?

Lea Ann Preston Baecht - Cross

1   A.   Yes.

2   Q.   And that study concluded that there was no significant

3   clinical improvement in a medication trial of seven patients

4   diagnosed with delusional disorder; is that right?

5   A.   Yes.  It was only a six-week trial, which is a very short

6   period of treatment, but that is correct.

7   Q.   Excuse me.  There was also a small sample size.  You would

8   agree with me seven patients is a very small sample size.

9   A.   Correct.

10  Q.   In that same study, they refer to a 2002 study by Stephens

11  and colleagues.  And in that study over 50 percent of the

12  patients diagnosed with delusional disorder were found to be

13  unimproved, right?

14  A.   I am sorry, I am looking to see the exact number.  Yes,

15  52 percent were unimproved.

16  Q.   Now, you touted the Herbel study as evidence that

17  delusional disorder can respond to treatment, right?

18  A.   Yes.  I think the results did indicate that 77 percent of

19  those patients were successfully restored to competency with

20  treatment.

21  Q.   But that Herbel study does have several limitations that

22  were noted by its authors.

23  A.   Correct.

24  Q.   First of all, it had a small sample size of 22 individuals,

25  right?

Lea Ann Preston Baecht - Cross

1   A.   Correct.

2   Q.   Another noted limitation is that because it's a retroactive

3   study, some patients may have been misdiagnosed.

4   A.   Correct.

5   Q.   And because they may have been misdiagnosed, they may have

6   been wrongly included in the study.

7   A.   Correct.

8   Q.   Another limitation is that opinions of the forensic

9   examiners may have been biased in favor of finding a positive

10  response to treatment?

11  A.   Yes.  There is always a risk of bias.

12  Q.   And the study did -- strike that.

13        So there are some things, though, that I wanted to

14  draw your attention to that you didn't testify to on direct

15  examination, which is that in that Herbel study, it found that

16  only one of the four defendants whose duration of untreated

17  psychosis was between 13 and 24 years was actually restored,

18  right?

19  A.   Yes.  We talked about that.  There were, I think, four

20  patients that had that length of duration of entry to

21  psychosis.  They noted that two of them appeared to have an

22  inadequate trial of treatment.  So if you were to exclude

23  those, that number would go instead of one of four to one of

24  two, but again, incredibly small sample sizes.

25  Q.   Sure.  You would agree that Mr. Dear would fit into the

Lea Ann Preston Baecht - Cross

1  category of someone whose duration of untreated psychosis was

2  the somewhere between 13 and 24 years, if not more than that,

3  right?

4  A.  Correct.

5  Q.  And that response rate was similar to the response rate of

6  schizophrenia patients whose duration of untreated psychosis

7  was greater than 15 years, right?

8  A.  Could you refer me to where that statistic came from?

9  Q.  Sure.  If you are looking at the Government's Exhibit

10  No. 5, it's on Page 8.  We can pull it up for you if you would

11  like.

12  A.  Thank you.  Those are numbered differently.

13  Q.  I am looking at the right-hand column in the paragraph

14  beginning with "In contrast"?

15  A.  Thank you.

16  Q.  So again, the response rate of schizophrenia patients whose

17  duration of untreated psychosis was greater than 15 years, that

18  was a similar response rate, right?

19  A.  Yes.  They defined that -- it doesn't appear from that.  I

20  would have to look at the exact reference, but it looks like it

21  was good clinical outcome as opposed to a competency

22  restoration study.

23  Q.  Okay.

24  A.  It was.

25  Q.  Let's move on to the Cochrane study.  First of all, that

98

Lea Ann Preston Baecht - Cross

1  study was published in 2012, right?

2  A.  Correct.

3  Q.  But again, it's a retroactive study?

4  A.  Correct.

5  Q.  Looking at data from 2003 to 2009.

6  A.  That's correct.

7  Q.  And this study acknowledges that there is limited empirical

8  data on the results of involuntary psychiatric treatment of

9  incompetent defendants whether there was clear and convincing

10  evidence that the treatment effectively restores competency,

11  right?

12  A.  Yes.  That was the goal of the study was to look at that.

13  Q.  And that study looked at three of the four medications that

14  are proposed by Dr. Sarrazin, right?

15  A.  Yes.

16  Q.  So paliperidone was not considered in that study.

17  A.  No, it was not.

18  Q.  Okay.  That study also looked at side effects, right?

19  A.  It did.

20  Q.  And one defendant in that study developed new onset

21  diabetes and elevated serum lipids, right?

22  A.  That is correct.

23  Q.  Those side effects persisted even when the medication was

24  switched to aripiprazole -- I am sorry, I am horrible at

25  pronouncing these medications' generic names -- when it was

Lea Ann Preston Baecht - Cross

1   switched.  And I will refer you to the Cochrane study, which is

2   Government's Exhibit 6.  If we pull up Page 5, the left-hand

3   column with the last paragraph starting, "Regarding metabolic

4   side effects here"?

5   *A.*   Yes.

6   *Q.*   Looking at that.  So those side effects persisted in that

7   defendant even when the medication got switched, right?

8   *A.*   That's correct.

9   *Q.*   And that resulted in that defendant requiring treatment

10   with insulin, right?

11   *A.*   Correct.

12   *Q.*   Metformin?

13   *A.*   Correct.

14   *Q.*   And a statin?

15   *A.*   That is correct.

16   *Q.*   Another defendant developed new onset diabetes following

17   treatment with olanzapine, correct?

18   *A.*   That's correct.

19   *Q.*   And two defendants died.

20   *A.*   That's correct.

21   *Q.*   Both were diagnosed with schizophrenia, right?

22   *A.*   Correct.

23   *Q.*   One required hospitalization after being treated with

24   olanzapine for acute renal failure?

25   *A.*   Let me find where you are on that paragraph.  Yes.

Lea Ann Preston Baecht - Cross

1   *Q.* I am looking at Government Exhibit 6, Page 5.

2   *A.* Yes.

3   *Q.* It's the first full paragraph starting, "Two deaths

4   occurred"?

5   *A.* Yes, I see it.  It talked about a man in his fifties who

6   had a history of hypertension, hyperlipidemia, type 2 diabetes,

7   congestive disorder and previous and stroke.  Is that the one

8   you are referring to?

9         *THE COURT:* Could I ask you to slow down, each of you,

10  just a bit, please.

11        *MS. BECK:* Sure.

12  *BY MS. BECK:*

13  *Q.* We were talking about the two defendants who died that were

14  documented in that Cochrane study.  So one required

15  hospitalization after being treated with olanzapine for acute

16  renal failure, right?

17  *A.* I am sorry, I am trying to find that exact phrase.

18  *Q.* Sure.  So let me find it here.  One defendant -- where I

19  marked with the blue, one in his thirties, he developed renal

20  failure, right?

21  *A.* That's correct.

22  *Q.* Then there was another defendant, which is about halfway

23  down that paragraph that begins with, "The second death

24  involved a man in his fifties."  Do you see that?

25  *A.* Yes, I do.

Lea Ann Preston Baecht - Cross

1   *Q.*  And he is the defendant who had a history of hypertension,

2   hyperlipidemia, diabetes, congestive heart failure, seizure

3   disorder and previous stroke, right?

4   *A.*  Yes.

5   *Q.*  And he was treated with haloperidol, right?

6   *A.*  Yes, I believe so.

7   *Q.*  Okay.  And he ultimately, he refused most of the

8   recommended medical interventions.

9   *A.*  That's correct.

10  *Q.*  Now, the study looked at a number -- at the number of

11  requests for involuntary medication during that six-year time

12  frame from 2003 to 2009, right?

13  *A.*  Correct.

14  *Q.*  There were a total of 287 requests?

15  *A.*  That's correct.

16  *Q.*  Is that right?  And courts authorized involuntary

17  medication treatment in only 46 percent of those cases, right?

18  *A.*  That's correct.

19  *Q.*  Of the 287 requests that were made to the courts in that

20  six-year time frame, the diagnosis with delusional disorder was

21  only in 44 of those cases, right?

22  *A.*  Let me see here.

23  *Q.*  It's on Page 3 of that exhibit in Table 1 is where I am

24  looking at.

25  *A.*  Okay, yes.  From the total sample there were 44 defendants

Lea Ann Preston Baecht - Cross

1   with delusional disorder.

2   *Q.*  And that's roughly 15 percent of 287, right?  Will you

3   trust me on my math?

4   *A.*  I will totally trust you on your math.

5   *Q.*  Involuntary medication was denied in 29 of those 44 cases,

6   right?

7   *A.*  That's correct.

8   *Q.*  So courts denied about 66 percent of *Sell* requests in cases

9   where the diagnosis was delusional disorder.

10          *MS. RHYNE:*  Objection, asked and answered.

11          *MS. BECK:*  I didn't ask a question about the

12   percentage, Your Honor.

13          *THE COURT:*  Overruled.  You may answer counsel's

14   question if after all of this you recall it and can.

15   *A.*  I am not exactly sure I recall the original question, but I

16   can tell you from the table that they have a list of every

17   diagnosis where it was denied.  And under delusional disorder,

18   29 defendants who had delusional disorder, the *Sell* petition

19   was denied for whatever reason.

20   *BY MS. BECK:*

21   *Q.*  As to the efficacy of the medications that we're talking

22   about, it was reported that 73 percent of defendants with

23   delusional disorder were restored?

24   *A.*  Yes.  I believe it was 11 out of 15.

25   *Q.*  Okay.  With respect to the delusional disorder, there was

Lea Ann Preston Baecht - Cross

1   no data that was provided as to the subtype of delusional

2   disorder.

3   *A.*   I don't recall off the top of my head if it did.

4   *Q.*   Let's pull up Government's Exhibit 6.  If you look at

5   Page 7, Table 4, the diagnosis is simply whether or not the

6   person had delusional disorder.

7   *A.*   Correct.

8   *Q.*   It doesn't specify the subtype.

9   *A.*   Correct.

10  *Q.*   Okay.  And additionally in that study no data was provided

11  as to the duration of untreated psychosis.

12  *A.*   That's correct.

13  *Q.*   Just like in the Herbel and Stelmach study, the Cochrane

14  study talks about the limitations of the study, right?  The

15  authors address that?

16  *A.*   Yes.

17  *Q.*   And some of those limitations include things like the

18  potential that the opinions of the examiners may have been

19  biased in favor of finding positive response to treatment.

20  *A.*   Correct.

21  *Q.*   And the potential that some patients were misdiagnosed,

22  right?

23  *A.*   Correct.

24  *Q.*   Or that they had treatment responses recorded

25  inconsistently across different examiners.

Lea Ann Preston Baecht - Cross

1    *A.*  Correct.

2    *Q.*  They also noted the limitation of the small sample size for

3    less common disorders like delusional disorder.

4    *A.*  Yes.  The full data set was a decent size sample size but

5    for delusional disorder that was obviously much smaller.

6    *Q.*  Okay.  The Cochrane study also specifically stated that the

7    future research should focus on treatment effectiveness for the

8    rare disorder that is delusional disorder.

9    *A.*  I don't recall exactly where that's located in the

10   document.

11   *Q.*  Taking a look at the Cochrane study, Government's Exhibit

12   6, Page 9, in the right-hand column, it's the first full

13   paragraph.  I am sorry, the right-hand column, the first full

14   paragraph.

15   *A.*  Correct.

16   *Q.*  Okay.  Now, the Cochrane study references the 2007 Mossman

17   study which concluded that there are two categories of

18   defendants whose restorability was 35 percent or lower, right?

19   *A.*  Correct.

20   *Q.*  Those are defendants who are diagnosed with irredeemable

21   cognitive disorders, right?

22   *A.*  Correct.

23   *Q.*  And defendants with long-standing psychotic disorders.

24   *A.*  Yes, and those that resulted when those long-standing

25   psychotic disorders resulted in lengthy hospital periods of

Lea Ann Preston Baecht - Cross

1    more than 10 years.  So it was referring to individuals who

2    were so ill they remained in a state hospital setting for more

3    than 10 years before they came to the attention of competency

4    restoration.

5    Q.  Okay.  The Cochrane study also references a 2011 Colwell

6    and Gianesini study which concluded that patients diagnosed

7    with comorbid psychotic and cognitive or intellectual disorders

8    were restored at lower rates, right?

9    A.  Correct.

10   Q.  Now, as a whole these studies can provide information,

11   right?

12   A.  Correct.

13   Q.  But no study can tell us what's going to happen with

14   Mr. Dear.

15   A.  Right.  I think that any clinician who is attempting to

16   make a prediction on the likelihood of restorability has to

17   look at the base rates of the number of defendants who are

18   restored, as well as trying to look at particular factors that

19   the research has shown are good or poor prognostic factors.

20   Q.  Now, you are relying in part in forming your opinion on

21   this literature, right?

22   A.  Correct.

23   Q.  And you are also relying on your anecdotal experience in

24   working in the hospital.

25   A.  That's correct.

Lea Ann Preston Baecht - Cross

1    Q.   Now, you're not a medical doctor.

2    A.   I am not.

3    Q.   You are not a psychiatrist.

4    A.   I am not.

5    Q.   And you're not a neuropsychiatrist.

6    A.   Correct.

7    Q.   You are a psychologist.

8    A.   Correct.

9    Q.   And your role is not to prescribe medication.

10   A.   That is correct.

11   Q.   Okay.  But you have told us a little bit about the side

12   effects and what your role at the medical center through the

13   BOP looks like.  So you would agree that there are side effects

14   to these antipsychotic medications, right?

15   A.   Correct.

16   Q.   Those side effects can include things like restlessness and

17   sedation?

18   A.   Correct.

19   Q.   And restlessness and sedation can impact competency, right?

20   A.   Yes.

21   Q.   Now, your role in monitoring side effects is purely an

22   observational role, right?

23   A.   Correct.

24   Q.   You're looking at the patient, right?

25   A.   Correct.

Lea Ann Preston Baecht - Cross

1    Q.   You're also asking them about whether they're experiencing

2    any side effects.

3    A.   That's correct.

4    Q.   Relying on them to self-report whether they are

5    experiencing side effects.

6    A.   Correct.

7    Q.   And then you would relay those side effects, whether it's

8    your observations or the report of the patient, to

9    Dr. Sarrazin.

10   A.   Dr. Sarrazin, yes.

11   Q.   Sarrazin, excuse me.  So Dr. Sarrazin then would use that

12   information to go and do an assessment of the patient.

13   A.   Correct.

14   Q.   And if necessary, adjust the medications.

15   A.   That is correct.

16   Q.   Okay.  But that's not your role to adjust those

17   medications.

18   A.   Correct.

19   Q.   You haven't -- well, strike that.

20          In your 20-plus years of experience in working at the

21   BOP, you testified that you worked with about 750 patients on

22   issues of competency and restoration to competency, correct?

23   A.   Correct.

24   Q.   And that of that 750, 600 of them had psychotic disorders.

25   A.   Yes.

Lee Ann Preston Baecht - Redirect

1   *Q.* And then of that 600 who had psychotic disorders, there

2   were 30 to 40 who had delusional disorder.

3   *A.* Yes, that's correct.

4   *Q.* And you would agree that's a small number compared to the

5   750 people that you were dealing with over time.

6   *A.* Correct.

7   *Q.* And even compared to that 600 number of people with

8   psychotic disorders.

9   *A.* Correct.

10          *MS. BECK:* May I have a moment?

11          *THE COURT:* You may.  Thank you.

12          *MS. BECK:* I don't have additional questions at this

13   time.

14          Redirect examination for the government.

15          *MS. RHYNE:* Thank you, Your Honor.  Just briefly.

16          *THE COURT:* You are welcome.

17                   **REDIRECT EXAMINATION**

18   *BY MS. RHYNE:*

19   *Q.* I want to take a moment and revisit the Stephens and

20   colleagues study that is featured in Exhibit 5.  Do you recall

21   answering questions about that?

22   *A.* Yes.

23   *Q.* And counsel asked you whether there was 52 percent of

24   patients who were unimproved in that study; is that right?

25   *A.* Yes.  And I apologize.  Could you refer me to the page

Lee Ann Preston Baecht - Redirect

1    again for where they --

2    Q.  Yes.  So Exhibit 5, and it's study -- Page No. 48, I

3    believe it's the bottom right-hand corner.  So Exhibit No. --

4    excuse me, exhibit Page 2?

5    A.  Thank you.

6    Q.  In that study does it indicate how long these patients had

7    that trial medication for?

8    A.  No, not that I can find.

9    Q.  And is it clear whether this study is focused on competency

10   restoration or recovery?

11   A.  They do not mention specifically competency restoration.

12   Q.  And you mentioned the other study, the 1998 Silva and

13   colleagues.  You pointed out in that study the trial period of

14   medication was limited to six weeks; is that right?

15   A.  That's correct.

16   Q.  Do you believe that's a weakness in that study?

17   A.  Yes.

18   Q.  Why?

19   A.  Certainly in the research of Herbel and Stelmach, they

20   found that it took a longer period of time for them to see a

21   decrease in the intensity of the symptoms of delusional

22   disorder, so six weeks is quite short.

23   Q.  And if we turn now to Exhibit 6, and it's going to be study

24   Page No. 111 and exhibit Page No. 5, I believe, looking at the

25   lower right-hand column, defense counsel asked you about two

Lee Ann Preston Baecht - Redirect

1    deaths that occurred in this study.  I am sorry, we should be

2    on Exhibit 6, Page 5.  We're getting there.

3    *A.*  Okay.

4    *Q.*  If we could focus in on this part.  Looking at those two

5    deaths, does this article state:  Review of the data underlying

6    these two deaths indicated that one was unforeseeable and the

7    other might have been prevented if involuntary psychiatric

8    treatment had been initiated prior to the progression of his

9    underlying cardiovascular disease?

10   *A.*  Yes, it does.

11   *Q.*  And what does that indicate to you regarding Mr. Dear's

12   health and how it might benefit from antipsychotics?

13   *A.*  Like I testified to earlier, Mr. Dear has a pretty

14   well-documented history of hypertension.  He has not been

15   cooperative with recommendations to take medications for his

16   health conditions.  And in my experience, that's not uncommon

17   when individuals are mentally ill to view -- to make poor

18   decisions about their medical treatment.  And I have seen on

19   numerous occasions that once their mental illness is

20   effectively treated, they begin to make better medical

21   decisions that benefits them in the long term.

22        *MS. RHYNE:*  Thank you.

23        No further questions, Your Honor.

24        *THE COURT:*  May this witness be excused and released

25   from subpoena?  Any objection by the government?

Robert Sarrazin - Direct

1          *MS. RHYNE:*  No, thank you.

2          *THE COURT:*  Or the defense?

3          *MS. BECK:*  No, Your Honor.  Thank you.

4          *THE COURT:*  Doctor, you are both excused and released

5     from subpoena with our thanks.

6          *THE WITNESS:*  Thank you.

7          *THE DEFENDANT:*  Can I take the stand?

8          *MS. RHYNE:*  Your Honor, the government calls

9     Dr. Sarrazin.

10          *THE COURT:*  Very well.

11       (**Robert Sarrazin** was sworn.)

12          *THE WITNESS:*  Yes.

13          *THE COURT:*  Ms. Rhyne, you may inquire.

14          *MS. RHYNE:*  Thank you.

15                       **DIRECT EXAMINATION**

16    *BY MS. RHYNE:*

17    *Q.*  Can you please state and spell your name for the record?

18    *A.*  Robert Sarrazin; R-O-B-E-R-T, Sarrazin, S-A-R-R-A-Z-I-N.

19    *Q.*  What do you currently do for a living?

20    *A.*  I am currently the chief of psychiatry at the United States

21    Medical Center for federal prisoners in Springfield, Missouri.

22    *Q.*  How long have you been chief of psychiatry there?

23    *A.*  I have been employed at the medical center since November

24    of 2002, and I have been the chief of psychiatry since March of

25    2004.

Robert Sarrazin - Direct

1    Q.  What are your positions -- what are your duties in that

2    position as chief?

3    A.  I have clinical and administrative duties.

4    Administratively I am in charge of the psychiatric mid-level

5    practitioners.  We have other psychiatrists that are part of

6    that.  I am involved with involuntary medication hearings.  I

7    am part of the risk assessment panel.  Up until recently I also

8    did the consultations at our medical center for the medical and

9    surgical patients, the dialysis unit.  And also for the regular

10   work cadre inmates, I was the psychiatrist that did any of

11   those consults or saw them in kind of a prison outpatient

12   setting.

13   Q.  And prior to being chief, what was your position at BOP?

14   A.  I was a staff psychiatrist.

15   Q.  How many years were you a psychiatrist prior to your work

16   at BOP?

17   A.  I finished my residency at the University of Missouri -

18   Columbia in 1992 and did a one-year as a staff psychiatrist at

19   Mid Missouri Mental Health Center in Columbia, Missouri.  Then

20   I moved to Springfield, Missouri, and I was a staff

21   psychiatrist at Burrell Behavioral Health, which is a community

22   mental health center.

23   Q.  So if I am getting my math right, were you a psychiatrist

24   for 10 years prior to BOP?

25   A.  Yes.

Robert Sarrazin - Direct

1    *Q.*  What is your educational background?

2    *A.*  I completed a BA in biology and my medical doctorate degree

3    at the University of Missouri - Kansas City in 1988.  And then

4    in 1988 I joined the internal medicine residency program at the

5    University of Missouri - Columbia and did one year of internal

6    medicine and then joined the psychiatry program in 1989 which I

7    completed in 1992.

8    *Q.*  Do you have any board certifications?

9    *A.*  I am board certified in general psychiatry and I am also

10   board certified in forensic psychiatry and consult liaison

11   psychiatry.

12   *Q.*  What is consult liaison psychiatry?

13   *A.*  It is medical psychiatry.  It's also been called

14   psychosomatic medicine in the past.  It's doing consultations

15   in hospital settings for obstetrics/gynecology, surgical,

16   cardiac, any of the number of patients, neurology, ICU,

17   neurosurgical ICU, and then also seeing those same types of

18   patients in less acute settings and outpatient settings.

19   *Q.*  Have you also taught in the field of psychiatry?

20   *A.*  I have.  I have been a -- it's always confusing whether

21   it's assistant or associate professor, but I most recently have

22   been working with the University of Missouri - Columbia.  They

23   have a branch campus in Springfield, Missouri over the last

24   five to six years, and many of the third-year medical students,

25   they do their clerkship at our medical center.  And

Robert Sarrazin - Direct

1  unfortunately, COVID has stopped that.

2  *Q.*  Okay.  At the Bureau of Prisons had you been involved or

3  have you been involved in competency evaluations?

4  *A.*  Yes.

5  *Q.*  During what period of time?

6  *A.*  Well, I did competency evaluations basically since the

7  beginning, a limited number of competency evaluations.  I have

8  been involved in the competency restoration program since

9  really I started there, but since being chief of psychiatry

10  that has been my primary clinical duty.

11  *Q.*  The restorations?

12  *A.*  The restorations, yes.

13  *Q.*  So if you said you were involved in restorations since --

14  did you say 2002?

15  *A.*  Yes, 2002, and it's been my really primary clinical

16  responsibility since March of 2004.

17  *Q.*  Approximately how many restoration cases have you been

18  involved with during your time at the BOP?

19  *A.*  Considering that we have a number of psychiatrists earlier

20  on involved in those and then subsequent it's been myself, I

21  would say probably seven to 800 or more.

22  *Q.*  And during those restorations, did you use the legal

23  standard for competency under Title 18, United States Code,

24  Section 4241 as your touchstone?

25  *A.*  Yes.

1  Q.  What interactions did you have with Mr. Dear from the time

2  he arrived at Springfield on May 6, 2021 through his departure

3  of being sent back to Colorado for this hearing?

4  A.  So Mr. Dear arrived at our facility as a 4241(b) competency

5  study and was assigned to the forensic psychologist, Dr.

6  Preston Baecht.  I am the consultant psychiatrist that works

7  with our forensic psychologists.  So if any individuals are on

8  medications, in need of medications, medical issues, I am

9  involved in those.  And in the case of Mr. Dear, I actually saw

10  him with Dr. Preston Baecht upon his arrival in the receiving

11  and discharge area of the facility.

12  Q.  After that intake interview, how frequently did you see

13  him?

14  A.  I saw him at least on a monthly basis.  Sometimes I saw him

15  more than that, but at least monthly.

16  Q.  And on those monthly interactions, what was the length of

17  time you spoke with him?

18  A.  It would vary between very brief if Mr. Dear was

19  particularly dismissive that day or it may extend into 10 to 15

20  minutes.  There was one particular time when he was involved in

21  the competency restoration after the *Harper* hearing that I

22  spent more time with him and Dr. Preston Baecht together

23  outside of his cell.

24  Q.  What types of conversations did you have on those occasions

25  with Mr. Dear?

116

Robert Sarrazin - Direct

1  *A.*  Mostly I was checking with Mr. Dear to see how he was

2  doing, doing a quick mental status examination, discussing

3  whether he would take medications, what kind of issues or

4  problems he might be having, and also keeping touch if he had a

5  deterioration in his mental status that particularly made him a

6  danger to himself, others, or gravely disabled.

7  *Q.*  And did you ever find evidence of that, that he met those

8  standards?

9  *A.*  No.  A concern that we've had, there was history of this in

10  Colorado and then subsequently at our facility, he spent

11  time -- I do not remember whether it was subsequent to

12  Dr. Preston Baecht's 41(b) report or during that time or

13  subsequently after that, Mr. Dear was convinced that we were

14  putting medications or drugs into his food.  And I assured him

15  that we were not doing that.

16      So when we do hear those sorts of things, which

17  unfortunately does occur, we monitor closely, if necessary, to

18  see, make sure they are eating their meals.  So we may talk to

19  the correctional staff.  We will talk with the nursing staff as

20  a team and we'll discuss whether they are not eating their

21  meals.

22  *Q.*  In your role as the chief of psychiatry with the Bureau of

23  Prisons at Springfield, did you propose a treatment plan for

24  Mr. Dear?

25  *A.*  Yes, I did.

Robert Sarrazin - Direct

1   *Q.*  Can you look at Exhibit 4 which I believe has been

2   admitted?  Did you prepare this treatment plan?

3   *A.*  Yes, I did.

4   *Q.*  Focusing on the four medications that are referenced there,

5   are you recommending those medications for the treatment of

6   Mr. Dear?

7   *A.*  Yes.

8   *Q.*  And are they all antipsychotic medications?

9   *A.*  They are all antipsychotic medications.

10  *Q.*  Now, I think there is two names.  Why are there two names

11  listed for each medication?

12  *A.*  One is the generic name, such as paliperidone, and then the

13  name in parenthesis is the trade name, in that case Invega.

14  *Q.*  Invega, is that specific to the oral medication form of

15  that pill?

16  *A.*  No.  The long-acting injectable version of paliperidone

17  would be known as Invega Sustenna.

18  *Q.*  So it has an additional name attached to it.

19  *A.*  Correct.

20  *Q.*  And below, if we could scroll down a little bit, I believe

21  we see reference to Sustenna, but that simply means a version

22  of the paliperidone?

23  *A.*  Yes.  It's a long-acting injectable, the monthly

24  long-acting injectable.

25  *Q.*  First, how do you approach treating someone with delusional

Robert Sarrazin - Direct

1   disorder?

2   *A.*  Well, try to work with them to get cooperation and that

3   they will start antipsychotic medications.

4   *Q.*  And why is it antipsychotic medications that you begin

5   with?

6   *A.*  He -- it is a psychotic disorder.  It has significant

7   psychotic symptom hallucinations.  Hallucinations respond to

8   antipsychotic medications, so that is where you start.  It is

9   the -- it's the clinical practice to start with antipsychotic

10  medications.  Psychotherapy can be helpful.  It can be a

11  helpful adjunct in treatment of any of the psychotic illnesses,

12  particularly with helping with medication compliance, but --

13  *Q.*  Let me back up for a moment.  Did you say that Mr. Dear has

14  hallucinations or delusions?

15  *A.*  Pardon me, delusions.

16  *Q.*  Okay.  So that was a slip of the tongue?

17  *A.*  If I said hallucinations, it was a slip of the tongue.

18          *THE COURT:*  Incompetent.

19  *BY MS. RHYNE:*

20  *Q.*  Do the antipsychotic medications address the delusions?

21  *A.*  Yes, they do.

22  *Q.*  In what way?

23  *A.*  Lessen the delusions, lessen the intensity of them, make

24  them so they are not as forefront in an individual mind,

25  individual's mind.

Robert Sarrazin - Direct

1   Q.  If we could go back to Exhibit 4, why are you recommending

2   these four specific medications for Mr. Dear?

3   A.  So when we have a situation when an individual is in our

4   facility that requires antipsychotic medications for psychosis,

5   no matter what the reason they are there, if they have a

6   treatment history, so if an individual has been on a particular

7   antipsychotic medication at a particular dose over time and has

8   responded to it, that is where we would want to start, with

9   that medication.  We do not have that particular history with

10  Mr. Dear.

11          The history we have is that he has had two occasions

12  of emergency medication where he was treated with oral

13  olanzapine, the pill version, and then also the dissolving

14  Zydis version of the olanzapine and where you stick it under

15  your tongue and that helps with compliance.  And it looks like

16  he may have received a haloperidol injection.  But all of those

17  were either one time and at most I believe he was on the

18  olanzapine for two weeks at I believe possibly 5 to

19  10 milligrams, if I remember correctly.  So neither one of

20  those were at therapeutic dosages over a significant amount of

21  time for me to say that that is where we need to start.

22  Q.  Do those brief usages of those medicines give you any

23  information regarding the safety of their administration for

24  Mr. Dear?

25  A.  It does tell us that he did not have an untoward reaction

Robert Sarrazin - Direct

1    to them.  He didn't have a dystonic reaction.  He did not have

2    significant sedation, at least what I read, or -- but mainly he

3    didn't have an allergic reaction, which is very, very uncommon

4    with antipsychotics, but he also did not have an acute dystonic

5    reaction where an individual will have marked stiffness of

6    their body.

7    Q.   I want to take a step back.  Are any of these four

8    medications FDA approved for the treatment of delusional

9    disorder?

10   A.   No, they are not.

11   Q.   Is their use for delusional disorder called or considered

12   off label?

13   A.   Yes.

14   Q.   Is the use of off label medication a normal practice in

15   your field?

16   A.   Yes, it is.

17   Q.   Why?

18   A.   Because it is a common practice ethically and legally

19   supported to use medications off label because many of these

20   medications are simply the FDA approved for schizophrenia or,

21   excuse me, schizoaffective disorder.  There has been with the

22   second generation antipsychotics, there has been some more

23   movement to possibly do some of the mood disorders such as

24   mania and that, but there is still a large group of people with

25   psychotic disorders and psychotic depression and dementia with

Robert Sarrazin - Direct

1    psychosis where these medications are used off label, used

2    effectively and safely.

3    Q.  Approximately how many patients with delusional disorder

4    have you personally been involved with treating while at the

5    Bureau of Prisons?

6    A.  Probably somewhere between 30 and 50.

7    Q.  I am sorry, I didn't hear the last number.

8    A.  30 and 50.

9    Q.  And in addition to your own cases, were there other

10   patients with delusional disorder who were treated by your

11   Bureau of Prisons colleagues?

12   A.  Yes.

13   Q.  That you were involved with in some consulting fashion or

14   learning about?

15   A.  Yes.

16   Q.  Approximately how many additional?

17   A.  Probably, because we have a large treatment population at

18   our facility also that are not there for forensic reasons,

19   probably another additional 20 to 25, I would assume.

20   Q.  Based on your experience, what is the impact of

21   antipsychotic medications on delusional disorder?

22   A.  It improves.  It lessens the delusions and has improvement

23   in their functioning and their ability to navigate our facility

24   and also in the case of forensic competency restoration allows

25   them to work with their attorneys and to move forward in their

Robert Sarrazin - Direct

1   cases.

2   Q.  And based on your experience in prescribing the four

3   specific medications listed in your treatment plan, have you

4   observed that those medications in particular have lessened the

5   delusions of patients with delusional disorder?

6   A.  Yes, I have.

7   Q.  Does a delusion need to go away entirely for a patient to

8   be restored to competency?

9   A.  It does not.

10  Q.  Why not?

11  A.  Because oftentimes individuals with delusional disorder but

12  also individuals with schizophrenia, the delusion may still be

13  there.  If you asked them specifically about it, they may say,

14  yeah, you know, I still kind of think I'm the king of England,

15  but that has nothing to do with my case.  It has nothing to do

16  with me moving forward or it's not -- it's kind of in the

17  background and not the forefront of all their decisions.  It's

18  when they are able to talk with their attorneys, they don't

19  say, well, I don't have to listen to you because I am the king

20  of England or whatever the case may be.

21  Q.  Have you personally observed the reduction of delusions in

22  patients that you've treated at BOP?

23  A.  Yes.

24  Q.  When you were writing your treatment plan, what categories

25  of information did you review?

Robert Sarrazin - Direct

1    *A.*  I reviewed Dr. Preston Baecht's reports, both of them.  I

2    reviewed the electronic medical record of the Bureau of

3    Prisons, including laboratory studies.  I also reviewed some,

4    if not all, of the competency assessments that were done at the

5    Colorado hospital and also reviewed some of the medical records

6    that are included in Mr. Dear's old records that were provided

7    to us.

8    *Q.*  Now, did you take Mr. Dear's medical information into

9    account when you created this treatment plan?

10   *A.*  Yes.

11   *Q.*  If we could look at this page, the last two paragraphs on

12   this.  In the second to last paragraph on the first page of

13   Exhibit 4, you discuss his essential hypertension.  Why did you

14   take that into account?

15   *A.*  Looking at -- because it's a medical condition that

16   Mr. Dear has that he's currently not taking any medications

17   for, so we would want to select medications that would likely

18   not have drug-drug interactions on medications that he is on.

19   We would not want medications that would particularly raise his

20   blood pressure or have difficulties in regards to those.

21   *Q.*  And did you select these four medications with that in

22   mind?

23   *A.*  It did take that into account, yes.

24   *Q.*  In the paragraph above that, it says in the second

25   sentence:  Mr. Dear reported that he had a heart attack after

Robert Sarrazin - Direct

1    being prescribed olanzapine.

2           Reviewing the records from the Colorado Mental Health

3    Institute at Pueblo did not reveal any issue of a heart attack

4    after being given olanzapine.  Did you confirm that?

5    A.  Yes.  I did not see that when I reviewed the records.

6    Q.  Now, Mr. Dear appears to believe that.  You have heard him

7    make those statements?

8    A.  Yes.

9    Q.  But the documents do not support that contention?

10   A.  They do not support that contention.

11          THE DEFENDANT:  You lie.  The EKG --

12          THE COURT:  Mr. Dear, please restrain yourself and be

13   quiet.

14          Counsel?

15          MS. RHYNE:  Thank you.

16   BY MS. RHYNE:

17   Q.  Are you retiring towards the end of this year,

18   Dr. Sarrazin?

19   A.  Yes.  I am retiring from the Bureau of Prisons after 20

20   years on November the 30th.

21   Q.  Congratulations.  If the Court authorized the involuntary

22   medication of Mr. Dear, would a new BOP psychiatrist assigned

23   to Mr. Dear's case be required to follow the treatment plan in

24   Exhibit 4?

25   A.  Yes.

Robert Sarrazin - Direct

1   *Q.*  Why is that?

2   *A.*  Because the court order specifically -- would likely

3   specifically state the medications in the treatment plan to

4   follow the treatment plan as it is currently presented.  And

5   the Court also might add other aspects of it.  In court orders

6   we've seen additional monitoring that may occur or -- not this

7   medication, but the -- with the court order, the physician

8   would follow that.

9   *Q.*  Now, with evolving staffing issues, do you know for certain

10  whether Mr. Dear would go to Springfield or Butner, which is

11  another medical facility?

12  *A.*  I do not know exactly where Mr. Dear would return to, no.

13  *Q.*  There are a couple of places in your treatment plan where

14  you make reference specifically to Springfield.  Should the

15  Court read that more broadly and assume that applies to

16  whatever Federal Medical Center Mr. Dear might end up at?

17  *A.*  Yes, particularly Butner.  I know that they do follow a

18  similar protocol in regards to monitoring.  And as far as the

19  use of involuntary medications, they follow Bureau policy.

20  *Q.*  In following this treatment plan, can you walk the Court

21  through what the assigned BOP psychiatrist and psychologist

22  would do in order to gain Mr. Dear's cooperation in taking

23  these medications even though it's involuntarily administered.

24  *A.*  When we have a court order from the judge authorizing

25  involuntary medication, we would make a copy of that court

Robert Sarrazin - Direct

1  order, and myself or the BOP psychiatrist and the forensic

2  psychologist would go to Mr. Dear and hand him a copy of that

3  court order.  We also may also have patient information sheets

4  that are available through our electronic medical records,

5  specifically for the Invega and the Abilify, and bring those

6  with us.

7          And to attempt to get Mr. Dear's cooperation with

8  taking oral medications, we would ask any questions -- answer

9  any questions that he might have and attempt to get his

10  cooperation because the inevitability of it is, with the court

11  order, that he is involuntarily medicated, but we really want

12  him to cooperate with us, to start different trials of oral

13  medications.

14  Q.  Is that standard BOP practice to attempt to gain the

15  cooperation?

16  A.  Yes.

17  Q.  And if you gained his cooperation or the psychiatrist did,

18  why would you start with oral doses?

19  A.  With the oral doses you can begin with a particular

20  medication.  You can start at the lower end of the dosing range

21  which we have listed here.  With each medication we have the

22  lower end and then the upper end of the dosing.  And we can

23  start the medication at a low dose.  If there is a particular

24  problem with that medication or if the patient just says that

25  one makes me feel funny with no specific thing, they just, you

Robert Sarrazin - Direct

1    know, I don't want to take that one, that particular oral

2    medication is in the system and out of the system rather

3    quickly.  Then we could move to a different medication.  And we

4    can move the doses steadily up.  We start at the lower end of

5    the dosing scale, slowly move up, and what we are looking for

6    is the lowest dose that's effective.

7    Q.  Do you have a specific plan as to which of these

8    medications should be attempted first?

9    A.  Start -- either paliperidone or the aripiprazole.

10   Q.  Why is that?

11   A.  The paliperidone is available both as an oral medication

12   and as a long-acting injectable.  It is not available as a

13   short-acting injectable.  It is a second generation

14   antipsychotic.  Aripiprazole also is available as an oral

15   medication and as a long-acting injectable, and it also is a

16   second generation antipsychotic.  So each of those has, which I

17   am assuming we will get to, have less issues with what are

18   called extrapyramidal side effects, which are more common with

19   the first generation antipsychotics.

20   Q.  Go ahead and tell us what you mean by that.

21   A.  First generation antipsychotics, such as haloperidol, have

22   more issues with extrapyramidal side effects.  That is the

23   shakiness, the stiffness, some of the Parkinsonian symptoms.

24   There are acute dystonias someone can have that it's not

25   common, it's 1 to 2 percent, but they respond very quickly to

Robert Sarrazin - Direct

1    adjunct medications such as benztropine, diphenhydramine or

2    benzodiazepine.

3         The Parkinsonian type, maybe a slight tremor, they

4    also can be resolved with the benztropine, the Benadryl.  The

5    akathisia, which Dr. Preston Baecht spoke of, which is the

6    internal restlessness and that feeling of people feeling like

7    they are needing to move their feet, that can also be improved

8    with the medication propranolol or benzodiazepines that are

9    added.  Sedation --

10   Q.  Why don't we come back to that in a moment, but was it your

11   testimony that the second generation drugs --

12   A.  Have less issues with those particular things.  They can

13   have issues with sedation, such as the first generation, but

14   generally speaking, those can be resolved with shifting the

15   dosage to bedtime, possibly dividing the dose up, at lowering

16   the dose if that is tolerated and still have the effect, the

17   therapeutic effect that we are looking for.

18   Q.  Okay.  Now, in your report there is also a dose range.  Can

19   you explain what that range represents?

20   A.  Certainly.  So the paliperidone target dose range is from

21   3 milligrams to 12 milligrams.  So that is the FDA Physician

22   Desk Reference, PDR, approved ranges.  Psychiatrists oftentimes

23   will go above that range of 12 milligrams, again prescribing

24   off label.  And if it's indicated and tolerated, it is

25   completely ethically and legally and medically appropriate to

Robert Sarrazin - Direct

1    do so.  Because of the -- with the evidence, case and whatnot,

2    these particular dosing ranges of these four medications are

3    where we would stay.  We would not exceed the FDA

4    recommendations on our oral dosages.  We would not go above

5    those.

6    Q.  Would you exceed them on any of the injectables either?

7    A.  No.  The injectables are also -- I speak of the dosings

8    also in the injectables.

9    Q.  Okay.  Now, in the rare circumstance where force is

10   required because you're not able to gain a patient's

11   cooperation, can you walk the Court through those processes?

12   A.  Certainly.  So I've mentioned the first two medications are

13   second generation antipsychotics.  The haloperidol is a first

14   generation antipsychotic, but the reason that I have that

15   medication listed is because it is available as a oral dosage,

16   a short-acting and a long-acting injectable.

17          So Mr. Dear, in reviewing the records it appears that

18   he received a dose of Haldol, short-acting injectable, as an

19   emergency dose, but I would assume, making the assumption that

20   I would treat him, that he did not have that particular dose of

21   medication.  So if Mr. Dear did not cooperate with oral dosing

22   of the paliperidone or the aripiprazole, we can't start with a

23   long-acting injectable because he has never had the medication

24   before.

25          So if he was someone who had a, again, allergic

Robert Sarrazin - Direct

1    reaction, which is very, very, very uncommon with

2    antipsychotics or some untoward dystonic reaction or some

3    issue, once that long-acting injectable is in the system, we

4    can't get it back.  So we need to have an individual take that

5    medication for a number of dosages orally to make sure that

6    they tolerate the medication without some untoward unexpected

7    condition.  So if Mr. Dear did not cooperate with us, we would

8    use haloperidol short-acting injectable.

9            Now, the olanzapine that's mentioned here, if I can

10   digress a little bit, it is mentioned here as an oral dosing.

11   And Mr. Dear has had dosages of that before, but as a second

12   generation antipsychotic, it has less issues with the stiffness

13   and the tremors, but it does have issues with weight gain,

14   metabolic syndrome, the elevated cholesterol, elevated blood

15   glucose.

16           So when I list the olanzapine here, it's not really as

17   a primary medication, but as an adjunct because we have noted,

18   and there is literature with this also, individuals that are on

19   the paliperidone, the aripiprazole and the Haldol, if you have

20   them on the therapeutic dose of the medication but they still

21   are not as good as they can be, then adding on a low dose

22   olanzapine as an adjunct 5 milligrams to 10 milligrams often is

23   helpful.  So that's really what we are using the olanzapine

24   for.

25           So going back to the involuntary medication, we would

Robert Sarrazin - Direct

1    have to begin with haloperidol, short-acting injectable,

2    5 milligrams.  And we would do our best to have Mr. Dear

3    cooperate.  We would offer the oral medication.  So if Mr. Dear

4    stated, I'm not taking anything, I would go ahead and write an

5    order for either the paliperidone or the aripiprazole, write an

6    order for the oral dosing.  It would be offered by the nursing

7    staff at least two to three days, if not longer, to see if he

8    would take any of the dosages, again continue to talk to him to

9    try to get his cooperation.

10           Then we would order the short-acting injectable,

11   haloperidol, offer the oral medication.  If he refused it, we

12   would go with the short-acting medication.  Nursing staff,

13   psychiatry staff, the psychologist involved in the case would

14   attempt to have him cooperate, to submit to hand restraints so

15   he could be given the injectable medication.  If that was not

16   successful, then the lieutenant of the correctional staff and

17   correctional services, the lieutenant then would attempt to put

18   him in hand restraints so the medication could be injected.

19   *Q.*  And how frequently is the true use of force necessary when

20   you have received an order for involuntary medication?

21   *A.*  Very seldom.  Individuals such as Mr. Dear, they -- when

22   the inevitability that the court order says you're going to

23   take medications, they, generally speaking, will cooperate.

24   They will deny they need medications, will refuse it.  Some may

25   want it on video so they can say I am doing this against my

Robert Sarrazin - Direct

1    will and such not, but they do not require a use of force.

2           Unfortunately, the individuals that require a use of

3    force are people who with schizophrenia that have been a danger

4    to themselves, dangerous to others or are gravely disabled.

5    And even if they are there for competency restoration, they

6    have already met the criteria for emergency medication and the

7    *Harper* hearing.

8           So by the time we get to a *Sell* hearing, those

9    individuals, they are already not that.  They are not dangerous

10   to themselves.  They are not dangerous to others.  They are not

11   gravely disabled.  We have already done a *Harper* hearing.  We

12   have already continued to have them for a period of time where

13   we are looking for those types of criteria, if necessary, to

14   make sure that if they are dangerous to themselves, that we

15   intervene.  And when we come to a *Sell* hearing, while they are

16   mentally ill, have psychosis, generally speaking, and are

17   incompetent, they are not as sick as many of the other

18   individuals that we treat on a daily basis.

19   *Q.*  When you do need to use force, why is the injectable

20   version used as opposed to the oral?

21   *A.*  It is very hard to force an oral medication on anyone and

22   so that is why.  You know, it's just not practical.  You could

23   possibly use an oral medication and do an NG tube and do it

24   that way, but that just does not seem to be very effective and

25   really appropriate.  So when we are using the medications,

Robert Sarrazin - Direct

1   we're using the short-acting injectables.

2   *Q.*   How long do you need to try the short-acting injectable

3   before you can transition to the long-acting injectable?

4   *A.*   In the case of the haloperidol, we are looking at using it

5   if at all possible, the short-acting injectable, about five

6   days at 5 milligrams a time because then we will have a -- they

7   will reach a steady state of about 5 milligrams in their

8   system.  And that correlates roughly to about 50 milligrams of

9   haloperidol decanoate, which can be given anywhere between

10  every two, three, four weeks.  And it's most unlikely that that

11  would be enough medication.

12       So we would do a long-acting injectable, then in a

13  week or two we would do probably 75 milligrams, during this

14  time continuing to try to get the patient, in this case

15  Mr. Dear's, cooperation to work with us and we could switch to

16  one of the second generation oral medications.

17       Now, with long-acting injectables we have many

18  patients that that is their preference.  We may have them on

19  oral medications, and for whatever reason they don't want to

20  take a daily pill.  They would just like to do one injection

21  every four weeks as in the case of the Invega Sustenna.  And

22  that way that helps with compliance issues.  It helps when they

23  leave our facility that we try to time the injection so when

24  they get to court or to their holding facility, they've just

25  got an injection, so the next one is not due for four weeks.

Robert Sarrazin - Direct

1    It allows people to make arrangements.

2    Q.  Okay.  You have already talked a little about the side

3    effects of these medication.  I want to go back to that topic.

4    What types of side effects do you see in addition to -- I think

5    you said it was the -- I am going to get it wrong, the extra --

6    A.  Extrapyramidal side effects?

7    Q.  Thank you, yes.

8    A.  So other side effects, the extrapyramidal side effects, I

9    think I mentioned most all of those.  Metabolic side effects

10   which can occur with any of these four antipsychotics, but they

11   are less of an issue with the aripiprazole, the Abilify, and a

12   little bit less with the paliperidone, so that's elevated blood

13   glucose, elevated cholesterol, those sorts of issues.

14          Now, there is other issues such as acute dystonias.

15   Q.  I am sorry, I want to make sure we cover the more common

16   ones first.  You mentioned sedation; is that right?

17   A.  Correct?

18   Q.  What about restlessness?

19   A.  The akathisia, yes.

20   Q.  What else is pretty common?

21   A.  Those really are the most common.  The stiffness,

22   cog-wheeling, slight tremors, those are kind of the

23   extrapyramidal side effects that are more common.  And then we,

24   as I said, with the second generations we monitor closely for

25   any elevations in blood glucose, cholesterol, et cetera.

Robert Sarrazin - Direct

1   Individuals are weighed at least on a monthly basis, and then

2   also laboratory studies are drawn on an every three-month

3   basis.

4   Q.  Now, I think you started to talk about some of the more

5   serious side effects, how do you say that, tardive dyskinesia?

6   A.  Tardive dyskinesia, but I was going to talk about acute

7   dystonias first.  Acute dystonia is an individual will get --

8   oftentimes it's an injection of haloperidol, and they'll have

9   an acute reaction, a stiffness of their face, body.  And those

10  respond very quickly to benzodiazepines that can be given

11  injectably.  Benadryl works very well as an IM injection.

12  Cogentin also can work.

13          So when we talk about these acute dystonias and then

14  when we talk about other side effects that individuals have,

15  our patients and defendants are prescribed these medications

16  in -- really in an acute psychiatric care hospital setting.  We

17  have nursing staff 24 hours a day.  Our correctional staff are

18  there 24 hours a day needless to say, but they also have

19  experience with -- many of them have years of experience

20  working with our patients, have seen people started on new

21  medications, know when something doesn't look right.  They can

22  call the nurse.

23          We have two physician assistants and a medical

24  physician whose only job is to work with our patients on any

25  medical concerns they have.  We have psychiatrists,

Robert Sarrazin - Direct

1    psychologists, social workers, so we have lots of people who

2    are there during the day and at night.  Nursing staff will give

3    each one of the medications individually in a pill line setting

4    either at their cell door if they are locked and are making

5    sure they take it, but also people are making rounds knowing

6    how people are doing.

7            These medications are started in ER settings, clinic

8    settings, community mental health settings all over the country

9    every day.  So if an individual may get a sample box of

10   medications, antipsychotics to take home with them or get a

11   prescription that they fill at their local pharmacy, but their

12   first dose may be at home.  So these medications aren't always

13   started in an acute care setting, but in our case they are so

14   people can watch closely.  So if someone had an acute dystonic

15   reaction, they would not have to drive themselves to the

16   emergency room.  They would be right there where the staff know

17   what's going on, know what's happening, and can deal with

18   those.

19           The tardive dyskinesia is a longer term potential side

20   effect usually with high dosages of first generation

21   antipsychotics over a longer period of time.

22   Q.  What is a longer period of time?

23   A.  Years.  Could it occur earlier?  Yes, but it's very

24   uncommon.  It's usually over many years at higher dosages of

25   first generation antipsychotics.

Robert Sarrazin - Direct

1   *Q.* How common is it even during the use over many years?

2   *A.* With the first generation antipsychotics, I believe it's

3   5 percent a year, and then with second generations it's

4   approximately 2 percent.

5   *Q.* Focusing on some of the other ones that we haven't gotten

6   to yet, is there something called a neuroleptic malignant

7   syndrome?

8   *A.* Yes.  Neuroleptic malignant syndrome is also more of an

9   issue with first generations, although it is possible to occur

10  with second generation antipsychotics.  It is a very uncommon,

11  rare reaction that an individual can have where they will

12  become very, very stiff.  They will have a high temperature.

13  They will have muscle stiffness, breakdown and -- the muscle

14  breakdown that can occur that will have kidney damage.

15          Those individuals, with close observation as they get

16  medications, it's usually early on first dosages or if dosages

17  are increased.  And, of course, the medication is stopped.  The

18  individual is then sent to our local hospital.  We have a

19  relationship with a local hospital, so ambulances will come and

20  pick up our individuals.  If they require a higher level of

21  medical care than we can provide at the prison, such as ICU

22  care, they will go to that hospital.

23          We have many of the medical side inmates that are down

24  at our hospital frequently.  And as I said, we have a very

25  large kidney dialysis mission, so we have a lot of nephrology

Robert Sarrazin - Direct

1    patients that oftentimes require downtown, so we have that

2    available to us where they will be downtown rather quickly.

3    Q.   How rare is that syndrome?

4    A.   It's extremely uncommon.  I would say definitely under

5    1 percent.  It's not common.  That's something that we watch

6    for and observe, but it's an uncommon occurrence.

7    Q.   And what about something called sudden cardiac death?

8    A.   Also a situation that is uncommon.

9    Q.   How uncommon?

10   A.   I would say that also is probably less than 1 percent of

11   the time.  And individuals -- I believe -- I believe it's

12   seven, five to seven incidences per a thousand patient years or

13   for -- as a baseline.  And then with antipsychotics it may go

14   up to 10 to 15 events per thousand patient years, so both of

15   these are very, very uncommon situations.

16           And when you look at sudden cardiac death with

17   individuals on antipsychotic, the antipsychotics may have a

18   part of this, but also unfortunately our individuals who are on

19   antipsychotics, schizophrenias, people who have schizophrenia,

20   they have very poor follow-up on medical conditions.  They have

21   a high rate of smoking, poor diet, poor exercise, not having

22   medical care at all, so part of the socioeconomic medical

23   condition may have some part of that increase incident with

24   individuals on antipsychotics.

25   Q.   Okay.  Now, I think you previously mentioned that you

Robert Sarrazin - Direct

1   anticipate an order allows laboratory testing to monitor for

2   many of these side effects; is that right?

3   *A.*   That's correct.

4   *Q.*   Can you tell us what type of testing again?

5   *A.*   It would be laboratory testing to address blood glucose,

6   cholesterol, lipids.  We would monitor weight situations.  Also

7   we would order EKGs, which is electro-cardiac, looking at the

8   electrical activity of the heart, and particularly looking at

9   the QTC or the QT interval, so that is something that we would

10  want to be able to do.

11  *Q.*   And if Mr. Dear didn't cooperate with any of those

12  laboratory tests?

13  *A.*   We will use -- if necessary, we can use involuntary

14  laboratory where basically Mr. Dear would be put in hand

15  restraints.  The laboratory staff would draw the laboratory

16  studies.  That is not an uncommon occurrence.  We unfortunately

17  have -- many of our patients require involuntary laboratory

18  studies, so it's something that we do do.  Involuntary EKGs, a

19  little bit more difficult because the individual needs to stay

20  still while the machine is getting the electro activity because

21  if they are move around, you have too much artifact.

22  *Q.*   Does your treatment plan contemplate and ask for permission

23  to use these involuntary laboratory tests, if necessary, to

24  monitor?

25  *A.*   Yes, it does.

140

Robert Sarrazin - Direct

1   Q.   Focusing on more of those common side effects, the

2   sedation, the restlessness, how do you deal with those side

3   effects when they present?

4   A.   We change dosaging of medications, particularly like with

5   sedation, we will move the dose to bedtime.  If we can lower

6   the dose of the medication, we will lower the dose of the

7   medication.  In the case of some of the tremors, the stiffness,

8   there are adjunct medications that I mentioned before like the

9   benztropine, the diphenhydramine, the benzodiazepines that we

10  could use, so that's kind of how we would address those.

11  Q.   Do you ever have to change the type of antipsychotic

12  medication?

13  A.   We have before.  If an individual -- we know pretty early

14  on if an individual just is not going to be able to tolerate

15  this particular medication.  In spite of our other ways of

16  dosing changes or adding adjunct medication, that they are just

17  simply not going to be able to tolerate that, we will make

18  changes.  It does not happen often, but when it does, we'll

19  make the change to a different antipsychotic.

20  Q.   And what percentage of your patients have experienced these

21  symptoms at all such that it needs to be addressed?

22  A.   The sedation, the tremors and that are -- they do happen.

23  They happen not infrequently, so we make in adjustments in

24  those all the time.

25  Q.   So let me stop you because what I am looking for is a

Robert Sarrazin - Direct

1  percentage of your patients.  Is it more than 50 percent or

2  less?

3  A.  I would say it's probably less than 50 percent, but

4  probably close to 40 percent of individuals will have some type

5  of side effect such as that that we can easily ameliorate.

6  Q.  If you could turn to Exhibit 7.  Have you reviewed

7  Dr. Holland's report and the recommendations that he has made?

8  A.  Yes, I have.

9  Q.  And if we can go to Page 4.  Focusing on the top third of

10  this page, do you agree with those recommendations or do you

11  agree that they could be helpful?

12  A.  Yes.

13  Q.  And based on your experience at BOP, are any of those

14  already part of the current monitoring system that is already

15  happening there?

16  A.  The electrolytes, glucose, creatinine and the serum

17  potassium.  Magnesium levels is not something we always do.

18  The EKGs, yes, we do EKGs on the individuals who are on

19  antipsychotic medications.  Now, do we do them at each dose

20  escalation?  Not always, no, but we do do them.  On individuals

21  who are on those particular medications, we do do EKGs.

22  Q.  And if after the Court heard from Dr. Holland and felt that

23  perhaps the repeat EKGs with those escalations ought to be

24  happening, could the Court include that in its order such that

25  it became part of the treatment plan?

Robert Sarrazin - Direct

1    A.   Certainly.

2    Q.   Now, focusing on your experience treating patients with

3    antipsychotic medications at the Bureau of Prisons, have there

4    been instances when side effects have persisted despite the

5    remedial measures that you've talked about, and I am including

6    changing the dosage time, the dosage level, adding a secondary

7    medication or changing the type of antipsychotic medication

8    prescribed?

9    A.   Generally speaking, no.  There may be some slight tremor

10   at -- if an individual is on a very therapeutic dose of a

11   medication and they are doing very well, they are out of locked

12   housing, they have had marked improvement in their condition

13   and they have a slight tremor, in spite of our best efforts to

14   do that, we would -- it's oftentimes we would discuss with the

15   patient, do kind of a risk benefit looking at those sorts of

16   things.  But by and large these tactics of changing medications

17   and dosaging and using other medications really take care of

18   the vast -- take care of the side effects.

19   Q.   How many *Sell* hearings have you participated in during your

20   time at BOP?

21   A.   Because I started in November of 2002, I have probably

22   participated in somewhere between 80 and a hundred.  This is my

23   eighth one this year.

24   Q.   Okay.  What percentage of your competency restoration cases

25   results in a *Sell* hearing?

Robert Sarrazin - Direct

1   A.  I would say that it's probably similar to Dr. Preston's.

2   It's not uncommon, but we currently have been doing six new

3   competency restorations a month, so about 72-plus competency

4   restoration cases a year and I am probably averaging six to

5   seven of those in a year, so probably 10 percent or less are

6   *Sell* hearings.

7   Q.  And what happens to the cases that don't go to a *Sell*

8   hearing?

9   A.  So if you're talking about they may voluntarily take a

10  medication?

11  Q.  Whatever happens.

12  A.  Voluntarily take a medication, they may be an individual

13  who, as I have mentioned before, is quite ill and requires

14  emergency medication followed by a *Harper* hearing or they may

15  have a situation where they qualify for involuntary medications

16  following the *Harper* hearing.  And then there is those

17  individuals who may not need medications at all.  They are

18  there for -- because of intellectual disability and they are

19  basically there for education or we do have cases where an

20  individual, simply it's not likely that they are going to be

21  restored to competency due to --

22  Q.  Let me stop you there.  Have there been cases where someone

23  has a patient who has remained incompetent and you did not

24  recommend an involuntary medication despite that patient being

25  psychotic?

Robert Sarrazin - Direct

1    *A.*   Yes.

2    *Q.*   How many?

3    *A.*   I would say most likely five to 10.

4    *Q.*   And why in those cases did you not recommend involuntary

5    medication?

6    *A.*   The majority of them had significant neurocognitive issues,

7    dementia.  They may have been of an advanced age and they had

8    dementia where involuntary medication may be helpful and it may

9    be -- help them, but it's not substantially likely that they

10   would be restored to competency.

11   *Q.*   Have you had any patients with developmental disabilities?

12   *A.*   Yes.

13   *Q.*   Was that among that category?

14   *A.*   That would be among that category also.

15   *Q.*   And any patients who had prior history of unresponsive

16   treatment?

17   *A.*   Yes.  So there have been individuals who have had multiple

18   episodes of treatment with antipsychotics, I believe it might

19   have been involuntary, in, say, state settings for competency

20   restoration and did not respond.  When we have documentation of

21   that, those are individuals that we would not recommend a *Sell*

22   hearing for.

23   *Q.*   Do you have an opinion about whether the use of the four

24   antipsychotic medications described in the treatment plan are

25   substantially likely to render Mr. Dear competent?

Robert Sarrazin - Direct

1    A.   Yes.

2    Q.   What is your opinion?

3    A.   That it is substantially likely that Mr. Dear would be

4    restored to competency with antipsychotic medication.

5    Q.   And, in particular, the four you recommended?

6    A.   Yes.

7    Q.   In rendering your opinion, how are you defining what meets

8    the "substantial likely" threshold?

9    A.   Similar to Dr. Preston's, the hearing -- court decisions

10   that have been made following about clear and convincing, that

11   about 70-plus percent is considered substantially likely.

12        THE COURT:  Counsel, excuse the interruption, but a

13   propitious time for our next recess during which time, Doctor,

14   you may stand down.

15        Counsel, you may be seated at your convenience.

16        We are in recess until 2:45 p.m.  Madam clerk.

17        (Recess at 2:30 p.m. until 2:47 p.m.)

18   BY MS. RHYNE:

19   Q.   I believe immediately prior to the break, Dr. Sarrazin, you

20   had opined Mr. Dear was substantially likely to be rendered

21   competent with these four medications.  Upon what do you base

22   that opinion?

23   A.   My experience as a psychiatrist, my experience with 20

24   years, almost 20 years at the Bureau of Prisons, 18 plus of it

25   being involved in competency restorations, the literature that

Robert Sarrazin - Direct

1  has already been discussed during Dr. Preston Baecht's

2  testimony.

3  Q.  What about an assessment of Mr. Dear himself?

4  A.  Yes.  The times that I have spoken with Mr. Dear, reviewing

5  prior records that have accompanied him, reading Dr. Preston

6  Baecht's reports, consultations with Dr. Preston Baecht, taking

7  all that into account.

8  Q.  What specific individualized factors go into a

9  determination about whether a particular patient could be

10  restored to competency with antipsychotic medications?

11  A.  Well, specifically you are looking at whether they have

12  been on medications prior, so if they have responded positively

13  to medications in the past, tolerated them, had improvement.

14  Ideally, if they even had a previous episode of competency

15  restoration, all that would be positive.

16          In the case of Mr. Dear, we don't have that history,

17  but we also don't have the history that he has failed trials of

18  antipsychotic medications; that he has had extended periods of

19  time either in a psychiatric hospital, state hospital, or that

20  he has had episodes of being on therapeutic dosages of

21  antipsychotic medications for a length of time necessary, three

22  months, two to three months or longer, or that he has been on

23  multiple medications.  If he had just failed one specific

24  medication at one specific time, I also would not opine that he

25  would be not likely to be restored or substantially likely to

147

Robert Sarrazin - Direct

1    be restored.

2    Q.   But in his case you don't have any history other than the

3    few brief or the two brief emergency initiations at the state

4    hospital?

5    A.   Yes.

6    Q.   And were those therapeutic doses over a sufficient period

7    of time to tell anything?

8    A.   They were not.

9    Q.   What about cognitive disorder?

10   A.   Yes.   Individuals who have significant neurocognitive

11   problems, neuro-developmental, they have developmental

12   disabilities, dementias, any of those, head injuries, previous

13   head injuries, any of that can kind of be a negative prognostic

14   factor, and Mr. Dear doesn't have any of those either.

15   Q.   What about someone's level of intelligence?

16   A.   Yes.   In an individual who particularly if they have

17   intellectual disability, a lot of that will impacts -- if they

18   only have that, education can help; but if they have

19   intellectual disabilities and psychosis, that is -- makes it

20   less likely.

21   Q.   Now, let's turn to the literature.   First, is there more

22   literature about the efficacy of using antipsychotics to treat

23   schizophrenia?

24   A.   Yes.

25   Q.   And what does the literature say about the success rate of

Robert Sarrazin - Direct

1    restoration with antipsychotics for schizophrenia?

2    *A.*   The literature actually states when you're looking at the

3    literature that it's -- it's a high level of success with

4    individuals with involuntary medication to treat psychotic

5    disorders, so 70 to 85.  I think one they were looking at like

6    95 percent of individuals were restored to competency.

7    *Q.*   Focusing on the literature specific to delusional disorder,

8    are you aware of older studies from the 1990s or so that

9    espoused opinions about whether antipsychotic medications were

10   effective or ineffective in treating delusional disorder?

11   *A.*   Yes.

12   *Q.*   And what was the general opinion held back then?

13   *A.*   That delusional disorders because of the set delusions that

14   those individuals have, that they were less responsive to

15   antipsychotic medications than the delusions that occur with

16   individuals with schizophrenia.

17   *Q.*   Has that opinion evolved over time?

18   *A.*   It has.

19   *Q.*   Why or how?

20   *A.*   Well, that now when you have an individual with delusional

21   disorder, the treatment of choice is antipsychotic medications

22   to treat the delusions.  And like I said and Dr. Preston Baecht

23   said in her testimony, the psychotherapy can be beneficial.  It

24   can be very good adjunct and it can be helpful in those

25   regards, but by themselves it's not very effective.

Robert Sarrazin - Direct

1   Q.  Can you turn to Exhibit 5.?  Is this the Herbel and

2   Stelmach study?

3   A.  Yes.

4   Q.  Is this one of the items of literature that you relied on

5   in formulating your opinion?

6   A.  Yes.

7   Q.  Are you aware of any other studies that specifically

8   analyzed the efficacy of involuntarily medicating patients with

9   delusional disorder?

10  A.  I am not.

11  Q.  And what did this study find the overall restoration was?

12  A.  77 percent.

13  Q.  Now, Dr. Preston Baecht already went through this article

14  in some detail, so I would like to focus you on the side effect

15  portion of the discussion.  If we could turn to Page 9, which

16  is really Page 55 in the study, in the bottom left column in

17  the top right.

18  A.  Okay.

19  Q.  What did this study find about the side effects resulting

20  from antipsychotic medications?

21  A.  That they were well tolerated by most patients with side

22  effects being readily managed by dose adjustments, use of

23  adjunct medication such as benztropine, or switch to another

24  antipsychotic drug.

25  Q.  Is that consistent with your own experience at the Bureau

150

Robert Sarrazin - Direct

1    of Prisons?

2    *A.*   It is.

3    *Q.*   Did any of the 22 patients show potentially lethal --

4    symptoms of a potentially lethal condition?

5    *A.*   No, they did not.

6    *Q.*   If we move on to the *Sell* effect, Exhibit 6, is that also

7    one of the items of literature that you relied upon?

8    *A.*   Yes.

9    *Q.*   Now, while these two exhibits are marked specifically, is

10   there a broader body of literature that you relied on in

11   formulating your opinion?

12   *A.*   Yes.

13   *Q.*   And again Dr. Preston Baecht already spoke about Exhibit 6

14   in some detail, so I want to focus your attention on the side

15   effects.  If we could go to Page 5 of Exhibit 6, looking at the

16   left column in the middle where it starts off saying "Overall,"

17   right here.

18   *A.*   Yes.

19   *Q.*   What did this study find about the side effects of the

20   antipsychotic medications used?

21   *A.*   The medication treatment was well tolerated.  Minor

22   complaints such as sedation, restlessness and muscle stiffness

23   were easing managed with a dose adjustment, switch to a

24   different antipsychotic medication or the use of adjunct

25   medications.

Robert Sarrazin - Direct

1   Q.  And is that consistent with your experience with the Bureau

2   of Prisons?

3   A.  Yes, it is.

4   Q.  Were there any cases of tardive dystonia?

5   A.  I don't recall -- there were no cases of tardive dystonia,

6   neuroleptic malignant syndrome or unexpected sudden cardiac

7   death.

8   Q.  This study, if we turn to Page 111 -- I think we are on

9   that page -- did this study indicate there was actually an

10  improved physical health as a result of the antipsychotics for

11  any of the patients?

12  A.  Yes.

13  Q.  What did it find?

14  A.  It found that with the lessening of the delusions, the

15  individuals were then more apt to cooperate with their medical

16  providers and to address their medical conditions.

17  Q.  And is that finding relevant to Mr. Dear?

18  A.  It is.  Mr. Dear has essential hypertension which he

19  refuses to take anti-hypertensive medications for for many

20  years.  It was addressed with him many times at our location by

21  myself, the medical providers and whatnot.  And he made it

22  quite clear that he was not going to take medications.

23  Q.  So is there at least some hope that after he takes

24  antipsychotics he would be willing to an antihypertensive?

25  A.  Yes.

Robert Sarrazin - Direct

1          *THE DEFENDANT:*  No.

2     *BY MS. RHYNE:*

3     *Q.*  Were there two deaths in this patient group?

4     *A.*  Yes, there were.

5     *Q.*  What caused those deaths?

6          *MS. RHYNE:*  If we could turn to Page 9, please.

7     Excuse me, Page 7.

8          May we have a moment, Your Honor?

9          *THE COURT:*  You may.  Thank you.

10    *BY MS. RHYNE:*

11    *Q.*  What were those two deaths caused by?

12    *A.*  One of them was caused by Wegener's granulomatosis, an

13    extremely rare autoimmune disorder with an annual incident in

14    one study of 9.8 cases per million.  And the other was a

15    gentleman who had -- was in his fifties and had a history of

16    multiple medical problems, including hypertension,

17    hyperlipidemia, Type 2 diabetes, congestive heart disorder,

18    seizure disorder and a previous stroke.

19    *Q.*  Focusing on the first person, it says -- do you see where I

20    am pointing on the screen?  The olanzapine was discontinued,

21    although it was unclear whether this medicine was the etiology

22    of the autoimmune disorder.

23         What does etiology mean?

24    *A.*  The cause of it.

25    *Q.*  And then -- go ahead.

Robert Sarrazin - Direct

1  *A.*  It is not my -- my knowledge that olanzapine is a

2  medication that is -- causes issues with autoimmune disorders.

3  *Q.*  And then the cause of death was pneumonia somehow related

4  to this autoimmune disorder?

5  *A.*  Correct.

6  *Q.*  And if we scroll down the page, please.  You mentioned that

7  the other gentleman had significant heart -- cardiovascular

8  disease.  Was there some opinion that perhaps he would have

9  done better to have been medicated by the antipsychotics

10  sooner?

11  *A.*  Yes.

12  *Q.*  In what way?

13  *A.*  With the hope that if there had been intervention sooner

14  with the antipsychotics, that that gentleman would have become

15  more cooperative with medical treatment and had not continued

16  to decline over the time that he wasn't medicated with

17  antipsychotics.

18  *Q.*  If we can turn to Exhibit 6, Page 9, and focus on the left

19  column where it says in the second paragraph:  Random

20  assortment and use of a placebo control group will likely never

21  be used in a pretrial population undergoing involuntary

22  treatment for restoration of competency because of ethical and

23  legal issues.

24        Do you agree with that statement?

25  *A.*  Yes.

Robert Sarrazin - Direct

1    Q.  Why?

2    A.  Well, individuals that are sent to our facility for

3    competency restoration are there for four months for us to

4    determine whether they are substantially likely to be restored

5    to competency in the future, and so the Court kind of puts

6    their case on hold.  And so for us to say that -- let's say

7    they voluntarily took medication and we wanted to put them into

8    a double blind placebo controlled sudden that lasted six months

9    and during that time they got a placebo and did not improve and

10   were not able to return to court or if the judge ordered

11   involuntary medication after a *Sell* hearing and then we said,

12   no, we are not going to put them in a double blind controlled

13   study, I don't think the judge would be very happy with us,

14   particularly if that individual got the placebo.

15   Q.  The next sentence says:  If randomly allocating patients is

16   neither practical nor ethical, the principles of evidence-based

17   medicine require clinicians to search for the highest quality

18   available evidence to guide treatment recommendations such as

19   the observational study design used in -- let me try that

20   again -- such as the observational study design used in the

21   current dataset.

22          Do you agree with that statement?

23   A.  Yes.

24   Q.  In the context of treating delusional disorder with

25   antipsychotic medications, what do you believe is the highest

Robert Sarrazin - Direct

1  quality of evidence currently available to you to guide

2  recommendations.

3  A.  For delusional disorder particularly for competency

4  restoration, it's studies such as this, the observational

5  studies.  And then the other studies, there is really, as I

6  think Dr. Preston stated, it's a very uncommon illness.  They

7  do not believe they're ill.  They do not approach treatment

8  very often, and oftentimes when they do, it's involuntarily at

9  hospitals and such not.  So they are not likely to sign up for

10  studies because they are not ill, and so we are talking a small

11  number of people that don't think they are ill are not going to

12  be involved in studies.

13  Q.  Now I would like to focus on your personal experience in

14  treating patients at the Bureau of Prisons.  Approximately how

15  many competency restoration cases have you worked on?  I think

16  you told us the number already.

17  A.  Yeah.  I believe it was 800 plus over the course of my

18  career.

19  Q.  And approximately how many of those patients had delusional

20  disorder?

21  A.  I believe I said 40 to 50.

22  Q.  And how many of those patients, the delusional disorder

23  patients, were treated with antipsychotic medications?

24  A.  If they consented to them or were involuntarily medicated,

25  all of them.

Robert Sarrazin - Direct

1    Q.  And of the patients who received antipsychotic medications

2    who had delusional disorder, based on your assessment of

3    competency, how many of those patients were restored to

4    competency with the use of antipsychotics?

5    A.  My experience across the board with individuals with

6    competency restoration that are treated with antipsychotics,

7    whether they are voluntarily become an emergency or *Harper*

8    hearing or a *Sell* case, no matter the diagnosis it's

9    approximately 75 to 80 percent.

10   Q.  And just to be specific, the delusional disorder patients

11   fit in that range?

12   A.  Yes, they do.

13   Q.  Of those delusional disorder patients, how many had

14   persecutory subtype?

15   A.  It's the most common, so I would say that the majority of

16   them do.

17   Q.  And did you observe that to impact the restoration

18   competency rate?

19   A.  I did not.

20   Q.  Based on your personal experience, does a patient's lack of

21   cooperation impact the efficacy of antipsychotic medications?

22   A.  No.  An individual, if they are cooperative with us, it's

23   easier and we can make medication changes faster; but

24   involuntary medication by themselves, no, it does not impact.

25   Q.  Do you have an opinion about whether the antipsychotic

Robert Sarrazin - Direct

1    medications listed in your treatment plan are substantially

2    unlikely to interfere with Mr. Dear's ability to assist his

3    counsel?

4    *A.*  Yes.

5    *Q.*  What is that opinion?

6    *A.*  That they are unlikely to affect his ability to work with

7    his counsel.

8    *Q.*  Are they substantially unlikely?

9    *A.*  Substantially unlikely.

10   *Q.*  And why is that?

11   *A.*  Because the side effects that we would be dealing with are

12   most easily ameliorated with dosing changes and adjunct

13   medications, things that we've already discussed, medication

14   changes if necessary.  And also if an individual was so

15   impaired with sedation or so impaired that their thinking was

16   slowed down from the medications, the forensic psychologist

17   would not opine that they are competent to proceed.

18   *Q.*  How do you believe the antipsychotic medications will

19   impact Mr. Dear's ability to communicate with his attorneys?

20   *A.*  It will improve his ability to work with his attorneys.

21        *THE DEFENDANT:*  No, no.

22   *BY MS. RHYNE:*

23   *Q.*  Why?

24   *A.*  Because it will reduce his delusions and it will reduce

25   that intensity with the delusions where no matter what

Robert Sarrazin - Direct

1    statement you make to Mr. Dear, somehow it gets wrapped up in

2    things, where he will be able to put those delusions at least

3    aside.  They probably will not go away, but they are going to

4    lessen to the point where he will be able to work with his

5    attorneys and rationally look at defense strategies.

6    Q.  Have there been instances when side effects persisted

7    despite the remedial measures that you have described such that

8    they interfered with any of your patients' abilities to

9    interact with their counsel?

10   A.  No.

11   Q.  In his report Pharmacologist Morton states that the

12   antipsychotic medications have long-lasting side effects that

13   continue for weeks, months or a lifetime.  Do you agree with

14   that statement where the remedial measures you've described are

15   taken?

16   A.  No.  As we said with tardive dyskinesia, which is usually

17   higher dosages of first generation antipsychotics over a long

18   period of time, yes, that can be permanent.  But when we are

19   looking at sedation and those, no.  Those usually almost always

20   respond to dosing changing or that -- no, they do not persist.

21   Q.  And in his report Pharmacologist Morton also opines that

22   there is a substantial likelihood that Mr. Dear will experience

23   mild to moderate side effects of sedation, drowsiness, apathy,

24   inability to focus his attention and lack of motivation.

25   First, do you agree that all of those side effects are likely

Robert Sarrazin - Direct

1    as a result of these antipsychotic medications?

2    *A.*   No.

3    *Q.*   And which ones do you think are not likely?

4    *A.*   I don't think those are necessarily likely with Mr. Dear.

5    Are they possible?  Are some of those sedation possible?  Some

6    of those others that you mentioned, are they possible with

7    Mr. Dear?  They are possible, but they can be, as we've stated,

8    lessened and removed with strategies.  But there is nothing

9    unique about Mr. Dear that tells me that here is a man that's

10   going to have significant problems with antipsychotic

11   medications, that he definitely is going to be sedated and

12   definitely going to have those issues, no.

13   *Q.*   Pharmacologist Morton's report also states that agitation,

14   restlessness known as akathisia is a common side effect.

15   First, do you agree with that?

16   *A.*   It is not an uncommon side effect, so yes, akathisia does

17   occur.  And we had mentioned it earlier in my testimony where

18   there are strategies of lessening the dose, completely

19   switching if necessary, adjunct medications such as

20   propranolol, which is an anti-hypertensive medication, or

21   benzodiazepines are useful and really reduce and get rid of

22   akathisia.

23   *Q.*   What is the frequency of akathisia occurring overall?

24   *A.*   I believe -- I do not believe it's over 20 percent.  I do

25   not have that number right at the top of my head, but I believe

160

Robert Sarrazin - Direct

1     it's somewhere between possibly 15 and 20 percent.

2     *Q.*   And you specifically discuss akathisia in your treatment

3     plan; is that correct?

4     *A.*   I believe I do.

5     *Q.*   At Page 3?

6     *A.*   Yes.

7     *Q.*   And that's where you discuss those adjunct medicines, the

8     secondary medications to treat those tremors?

9     *A.*   Yes.

10    *Q.*   Pharmacologist Morton also states that very seldom to

11    patients report that they feel comfortable or enjoy taking an

12    antipsychotic.  Is that consistent with your experience?

13    *A.*   Well, individuals that don't feel that they're ill when we

14    first begin antipsychotic medications oftentimes will not be

15    happy about taking the medication, particularly if it's

16    involuntary, but do they enjoy taking the medication?

17    Sometimes over time individuals, even those that were

18    involuntarily medicated in settings, once their symptoms have

19    recovered and that some of them are thankful for the coercion,

20    that they've had improvement.  So to say that they are

21    definitely going to be uncomfortable for the rest of their

22    lives due to an antipsychotic, if there is a difficulty that

23    they are having, then certainly we would be aware of that and

24    again use our strategies to mitigate those.

25              *THE DEFENDANT:*  They break the Eighth Amendment.  You

Robert Sarrazin - Direct

1    are breaking the Eighth Amendment, cruel and inhumane.

2          THE COURT:  Mr. Dear, once again, that's enough.

3    Thank you.

4          Counsel?

5    BY MS. RHYNE:

6    Q.  Pharmacologist Morton suggests that even if the type of

7    medication were changed, the effects of prior medication would

8    be with Mr. Dear for days, weeks or months.  Do you agree with

9    that?

10   A.  Oral medications are going to last as long as the half life

11   of the medication, and so their effects -- the medication is

12   going to be out of the system.  And largely if we are looking

13   at sedation and akathisia and stuff, those particular side

14   effects are going to go away over the course of a week or two

15   depending on the -- what medication it is and usually the half

16   life is somewhere between -- around a week.

17         Long-acting injectable medications, yes.  Their half

18   life is much longer because that's what they are designed to do

19   is to just get an injection once every four weeks.  So what

20   that is designed to do is you give the injection here.  It

21   slowly moves into the system.  And then it stays in the system

22   and it starts to drop, and then your next injection happens so

23   you can keep that steady state.  Once you stop that dose, this

24   falls off over time.  So yes, with the long-acting injectables,

25   the medication is still going to be in the system for possibly

Robert Sarrazin - Direct

1    another four weeks or so and even longer with certain other

2    medications.

3    Q.   And is that why you don't start with a long-lasting

4    injectable?

5    A.   That's why you just don't do that without them having had

6    either a short-acting injectable or an oral dose of that

7    medication because once it's in the system, it's in the system.

8    Q.   And you want to make sure they tolerate it before you give

9    them a long-lasting injectable.

10   A.   Yes.

11   Q.   Pharmacologist Morton also opines that the long-term use of

12   antipsychotic medications is associated with lifelong

13   involuntary movement disorders stuff as tardive dyskinesia.  Do

14   you agree with that?

15   A.   They can be, yes.

16   Q.   And again, how many years does it take for that type of

17   side effect to occur?

18   A.   Usually it's long term, many years.  Can it occur with

19   short term?  Yes, but that's very uncommon.  And we are usually

20   looking at high dose of first generation over many, many years.

21   Q.   And I think you previously testified that that was a rare

22   side effect?

23   A.   Yes.

24   Q.   Now I would like to shift your focus specifically on to

25   Mr. Dear as an individual patient and how that impacted your

Robert Sarrazin - Direct

1    opinion that he is substantially likely to be restored to

2    competency with the recommended medications.  Does it matter to

3    you that prior to November 2015 Mr. Dear was living

4    independently in the community?

5    *A.*  Yes.

6    *Q.*  Why?

7    *A.*  It shows that he hasn't had the, you know, the

8    deterioration that can occur with psychotic disorders,

9    particularly schizophrenia where you have the socioeconomic

10   decline, you can have cognitive decline and issues such as

11   that, not caring for yourself, some of the medical things we

12   discussed earlier.  And homelessness unfortunately is extremely

13   common in our patients in the community with psychosis.

14   *Q.*  And why does that impact the prognosis of restorability?

15   *A.*  Well, as Dr. Preston Baecht has testified to and I have

16   testified to, looking at the literature, Mr. Dear doesn't have

17   the decline in functioning.  He doesn't have any neurocognitive

18   issues that we are aware of.  He doesn't have any intellectual

19   disability.  He has not been hospitalized for long periods of

20   time.  He doesn't have multiple episodes of being treated with

21   antipsychotic medications at a therapeutic dose for a

22   therapeutic length of time and had failures.  He simply does

23   not have that.

24   *Q.*  Does his age influence your opinion?

25   *A.*  Age is taken into account, yes.  So sometimes age is a

Robert Sarrazin - Direct

1    proxy for severity when you're looking at psychotic disorders,

2    but as the -- I think it was the Cochrane study showed that

3    sometimes it was the reverse there where older people actually

4    responded quicker.  So there is nothing about age that at age

5    64, such as Mr. Dear with no previous failures that I would

6    say, no, here is a guy who is not going to respond.  An

7    individual who is 85 or much older, then one might say the

8    chances of them responding are not substantially likely.

9    Q.  What about the length -- the apparent length of Mr. Dear's

10   untreated psychotic disorder?

11   A.  Yes.  It was taken into account.  But then again -- yes,

12   earlier treatment is better.  And the studies with the duration

13   of untreated psychosis really is looking at schizophrenia and

14   it's really looking at first episode schizophrenia.  So they

15   are looking at individuals who have their first episode in

16   their twenties, a lot of that research in their twenties.  And

17   yes, if you can start treatment earlier as close as you can to

18   that first episode, it does appear to have positive -- better

19   positive outcomes in the future.

20        So as you get farther away from that, yes, it does --

21   it's taken into account, so earlier is better than never.  But

22   in the case of Mr. Dear, again we don't have those negative

23   prognostic things to where it tells me that because he's had

24   possibly up to 30-plus years of untreated psychosis, that that

25   would tell me no, absolutely he can't be restored.  That's not

Robert Sarrazin - Direct

 1   my experience.

 2   Q.   And based on your observations, what is Mr. Dear's

 3   intelligence level?

 4   A.   As Dr. Preston Baecht, he is a bright individual.  He is

 5   certainly not intellectually disabled at all, no.

 6        THE DEFENDANT:  I agree.  For once I agree with you.

 7   BY MS. RHYNE:

 8   Q.   And how does that influence your opinion?

 9   A.   Again, there is nothing that is telling us that he has

10   dementia or other neurocognitive issues that are going to make

11   it less likely for him to respond to the antipsychotics.

12   Q.   Did you see anything in his medical record that suggested

13   any kind of cognitive impairment?

14   A.   I did not.

15        THE DEFENDANT:  Until they drug me.  They drug me and

16   I will.

17   BY MS. RHYNE:

18   Q.   In his report Dr. Woods states that psychotic disorders

19   have positive, negative and cognitive symptoms.  Is that true

20   for delusional disorder specifically?

21   A.   When you are looking at negative symptoms, as Dr. Preston

22   Baecht testified to, that's really -- if you are looking at

23   negative symptomatology and looking at delusions, then you're

24   looking at schizophrenia.  So, now, the cognitive, yes, there

25   appears to be some cognitive issues that do occur with

Robert Sarrazin - Direct

1   psychotic disorders that individuals have over time, but again

2   there is nothing that with my interactions with Mr. Dear, my

3   evaluations of him and the records that I've reviewed, there is

4   nothing in there that is suggesting that there are cognitive

5   difficulties that he is having.

6   Q.  And so I want to make sure I'm clear.  For delusional

7   disorder you do not expect and the diagnosis would not be

8   appropriate if you saw negative symptoms?

9   A.  Yes.

10  Q.  And did you ever observe any negative symptoms from

11  Mr. Dear?

12  A.  No, I did not.

13  Q.  Dr. Woods also opines that Mr. Dear suffers from cognitive

14  symptoms of psychotic disorder and that he has difficulty

15  problem solving, understanding context and picking up on social

16  cues.  First, do you agree that those are cognitive symptoms?

17  A.  Not necessarily.  As Dr. Preston Baecht also stated, the

18  social cue part is really not what you are looking at with

19  cognitive decline, memory issues, some of those other things,

20  executive functioning, but not that.

21        Part of what may be his inability, socialness, may be,

22  very well is the psychosis, the delusions where his defense

23  doesn't go right along with what he is saying, does not believe

24  everything he says, is not going with his plan, so that's

25  really not having -- lacking social cues as he keeps telling

Robert Sarrazin - Direct

1    them over and over and over and they try to explain to him.

2    That's not issues with social cues.  That's issues with

3    psychosis.

4    Q.  Dr. Woods asserts that psychotherapy is the primary

5    treatment for delusional disorder.  Do you agree with that?

6    A.  I do not.

7    Q.  Why not?

8    A.  It's not particularly effective.  And the literature and

9    the practice over the decades really since I did my training,

10   antipsychotics have been effective in treating the delusions of

11   delusional disorder.  Yes, they may be a little more -- the

12   effects might not be as robust and as quick as they can be with

13   like an individual with first generation, I mean, a first

14   episode psychosis, but they do respond and they do respond over

15   time.

16   Q.  Turning now to the fourth *Sell* factor, what is your opinion

17   about whether the administration of the four psychotic

18   medications in your treatment plan is in Mr. Dear's best

19   medical interests in light of his medical conditions?

20   A.  It is in his best medical interest to take antipsychotic

21   medications.

22   Q.  As a psychiatrist, do you believe that the recommended

23   antipsychotic medications will improve the quality of

24   Mr. Dear's life?

25   A.  I do.

Robert Sarrazin - Direct

1    *Q.*   Why?

2    *A.*   Mr. Dear is -- he believes people are trying to kill him.

3    He believes people have been trying to kill him for many, many

4    years.  Even at our facility he thought we were putting drugs

5    in his food.  He had -- he thought that other inmates were

6    trying to kill him, that they were saying things about him and

7    that officers were involved.  There is no grand conspiracy, but

8    it's preventing him from in this case directly moving on with

9    his case, but also he has been in locked housing at our

10   facility and he just is not able to move forward because he is

11   afraid everyone is trying to kill him.

12   *Q.*   Are there medical risks associated with untreated

13   delusional disorder?

14   *A.*   Again, in Mr. Dear's case and in cases of other patients of

15   mine, individuals, particularly if they have underlying medical

16   conditions that they are not getting treated, so if they are,

17   you know, not taking the antihypertensives in the case of

18   Mr. Dear, but also in the case of other individuals if they are

19   not taking care of their congestive heart failure, not taking

20   care of their diabetes, not working with their medical

21   providers because they are so distrustful of them that anything

22   they say or do is trying to kill them, so yes, it is medically

23   beneficial to him in that regard.

24   *Q.*   In your treatment plan, you discuss Mr. Dear's untreated

25   essential hypertension.  Why do you believe the four

Robert Sarrazin - Direct

1   medications you recommend are in his best medical interest

2   despite that untreated hypertension?

3   *A.*   They will improve his mental status so he would be more

4   likely to work with his medical providers, and also they are

5   not likely to impact the hypertension and the potential drug

6   interaction.  So if Mr. Dear, we had an involuntary medication

7   order, he cooperated with a particular medication and we were

8   able to move forward with that, and then he cooperated with

9   anti-hypertensives, there would be the medical providers and us

10   would talk and we also would consult with our pharmacy and make

11   sure that there wasn't drug-drug interactions.

12   *Q.*   And the robust level of monitoring that you described

13   earlier, would that also take into account his hypertension and

14   look for effects that are affecting his hypertension?

15   *A.*   Yes.

16   *Q.*   In your review of Mr. Dear's medical records, did you see

17   any other medical condition that would present risk factors for

18   the four recommended medications?

19   *A.*   No, I did not.

20   *Q.*   Based on your experience while at the Bureau of Prisons,

21   how long does it typically take for a patient to be restored to

22   competency as a result of antipsychotic medications?

23   *A.*   When are looking at involuntary medications, in

24   particularly if someone doesn't cooperate with us early on and

25   it takes some time to kind of move forward, it's usually

Robert Sarrazin - Direct

1   somewhere around four to six months.

2   Q.  And if more time than the initial four months allotted was

3   required, what would happen?

4   A.  The forensic psychologist would do a report to the Court

5   requesting an extension and looking at this that there has been

6   some improvement, but there is still improvement that is

7   necessary and there is plan for that.  And it is still

8   substantially likely that with continued treatment and more

9   time, that he would be substantially likely to be restored to

10  competency.

11  Q.  Based on your experience at the Bureau of Prisons, is it

12  also important that a court's order authorizing involuntary

13  medication specify that the involuntary medication should

14  continue through their legal proceedings?

15  A.  Yes.

16  Q.  Why?

17  A.  Unfortunately, individuals with psychotic disorders

18  oftentimes will stop their medications when they are out of our

19  facility or if it's an injectable, they may refuse a dose, and

20  the location that they are at may not feel that they have the

21  ability to give that either injectable or continue the

22  medication.  But with the Court's order that continues forward,

23  and it also makes the marshals aware of if this guy stops his

24  medication, we need to know, and we'll move forward from there.

25          MS. RHYNE:  No further questions, Your Honor.

Robert Sarrazin - Cross

1      *THE DEFENDANT:*  I cite Tom Cruise and the Church of

2    Scientology.  They're all quacks.

3      *THE COURT:*  Ms. Stricklin, cross-examination.

4      *MS. STRICKLIN:*  Thank you, Your Honor.

5                    **CROSS-EXAMINATION**

6    *BY MS. STRICKLIN:*

7    *Q.*  Good afternoon, Dr. Sarrazin.

8    *A.*  Good afternoon.

9    *Q.*  So you testified that you are the chief of psychiatry at

10   the Springfield Federal Medical Center.

11   *A.*  Yes.

12   *Q.*  And in that role you spend time in administrative duties as

13   well as clinical duties.

14   *A.*  Correct.

15   *Q.*  And you testified that on the clinical side you work with

16   individuals who are there for competency restoration.

17   *A.*  Yes.

18   *Q.*  Now, you used the word consultant.  You testified that you

19   are a consultant psychiatrist.

20   *A.*  Correct.

21   *Q.*  Is that synonymous with a treating psychiatrist?

22   *A.*  Yes.  I am not the one that is doing the evaluation, so I

23   am not the one that's asking the questions in regard to

24   competency.  I am not addressing if the individual defendant

25   knows who the players are in the court.  I am not writing the

Robert Sarrazin - Cross

1   report.  The forensic psychologist is.

2   *Q.*  You are the doctor, however, who is solely responsible for

3   coming up with the treatment plan, for example.

4   *A.*  Correct.

5   *Q.*  Now, Mr. Dear has a treatment team at the Federal Medical

6   Center, correct?

7   *A.*  Yes.

8   *Q.*  And that treatment team consists of you?

9   *A.*  Yes.

10  *Q.*  The evaluating psychologist?

11  *A.*  Yes.

12  *Q.*  The psychiatric physician's assistant?

13  *A.*  Yes.

14  *Q.*  I assume that person works under you.

15  *A.*  Correct.

16  *Q.*  And a medical physician's assistant.

17  *A.*  Yes.

18  *Q.*  In addition to you in terms of physicians, Springfield

19  employs a clinical director?

20  *A.*  Yes.

21  *Q.*  Another psychiatrist.

22  *A.*  Yes.

23  *Q.*  A medical physician.

24  *A.*  Yes.

25  *Q.*  A family practice physician?

Robert Sarrazin - Cross

1    *A.*   Yes.

2    *Q.*   And an internal medicine physician, correct?

3    *A.*   Correct.

4    *Q.*   And those are the physicians that are there employed by

5    Springfield there on a day-to-day basis?

6    *A.*   Well, there is -- from the psychiatric side there is myself

7    and one other staff psychiatrist and the clinical director.  I

8    believe we currently have the clinical director and six

9    other -- oh, seven other physicians at this time.

10   *Q.*   Now, as the consultant psychiatrist, you diagnosed Mr. Dear

11   with delusional disorder.

12   *A.*   Yes.

13   *Q.*   And you did that in conjunction with Dr. Preston Baecht.

14   *A.*   Yes.

15   *Q.*   Delusional disorder is a disorder which is significantly

16   less common that other mental disorders.

17   *A.*   Correct.

18   *Q.*   It's less common in the population in general, at least

19   that we know about, and the same is true in the patient

20   population at the Federal Medical Center at Springfield.

21   *A.*   Is it less common than schizophrenia?  Yes.

22   *Q.*   Than other mental disorders.

23   *A.*   Yes.

24   *Q.*   Mr. Dear also suffers from persecutory delusions?

25   *A.*   Yes.

Robert Sarrazin - Cross

1    Q.   Now, when we're talking about the total patient population

2    at Springfield, what would you estimate that number to be?

3    A.   Currently I believe it's around 200 psychiatric patients.

4    It varies, but I believe we are at about 200 at this time.

5    Q.   Is that within the total facility or those that are there

6    for forensic purposes?

7    A.   No, those are -- that's currently our total psychiatric.

8    We have a separate psychiatric ward and a separate psychiatric

9    area at our facility.  And currently we have approximately 200.

10   That includes individuals that are there for treatment that are

11   sentenced inmates, ones that are there civilly committed and

12   also individuals that are there for forensic reasons.

13   Q.   And you testified that you thought there were about maybe

14   55 to 75 of that total population there with delusional

15   disorder?

16   A.   Currently?  No.

17   Q.   That number seems too high, right?

18   A.   Yeah.  I believe I -- if I said that, I believe I said that

19   during my entire career there.  I did not say that we had 55 to

20   75 there now, no.

21   Q.   So what is the number that I am asking?  Of the about 200

22   total population, how many of those individuals would you

23   estimate are diagnosed with delusional disorder?

24   A.   At this particular point in time, I would have to say

25   probably four to five.

Robert Sarrazin - Cross

1   *Q.* Now, specifically with Mr. Dear's delusional disorder, his

2   delusions are long-standing?

3   *A.* Yes.

4   *Q.* And if we take him at his word, that delusional

5   symptomatology appears to extend back to 1993.

6   *A.* Yes.

7   *Q.* And we are getting that date by using the Waco, Texas

8   incident that involved the Branch Davidians.

9   *A.* Yes.

10  *Q.* And that occurred in February to April of 1993.

11  *A.* I believe it did.

12  *Q.* And it is that incident in which Mr. Dear describes the FBI

13  began following him after that.

14       *THE DEFENDANT:* Because I made a call to the radio.

15  *A.* Yes.

16  *BY MS. STRICKLIN:*

17  *Q.* And he has said multiple times that it started because he

18  made a call to a radio station.

19  *A.* That's correct.

20  *Q.* In which he essentially name called the FBI.

21  *A.* That is what he has told me, yes.

22  *Q.* Referring to the FBI as the Federal Bureau of Incineration.

23  *A.* Yes.

24       *THE DEFENDANT:* It's documented.

25  *BY MS. STRICKLIN:*

Robert Sarrazin - Cross

1   Q.  If we are doing that math right, that's about 30 years ago,

2   February 1993.

3   A.  Yes.

4   Q.  Now, you've testified quite a bit about the efficacy of

5   treating delusional disorder with antipsychotic medications.

6   Now, it is true that the forensic psychiatric literature has

7   historically asserted that delusional disorder is more

8   treatment resistant as compared to other disorders.

9   A.  Are we talking specific forensic or are you discussing the

10  psychiatric literature in general?

11  Q.  The psychiatric literature in general.

12  A.  Okay.  Yes, in the past, yes, it has been -- well, to

13  answer your question, yes, the delusional disorder appears to

14  be more difficult in treatment and less robust response and

15  maybe as quick of a response as in schizophrenia.

16  Q.  And there is a lack of empirical data on the rate of

17  treatment outcomes for individuals diagnosed with delusional

18  disorder as compared to other mental illnesses.

19  A.  You mean less data available to us?

20  Q.  Yup.

21  A.  Yes, there are less articles, less data.

22  Q.  And part of that may be because it is more significantly

23  more rare.

24  A.  Yes.

25  Q.  And the other reasons that the articles cite are that

Robert Sarrazin - Cross

1   individuals with delusional disorder typically don't view

2   themselves as mentally ill?

3   *A.*   Yes.

4   *Q.*   Mr. Dear fits into that category.

5   *A.*   Yes, he does.

6   *Q.*   And that individuals with delusional disorder are unlikely

7   to seek treatment voluntarily.

8   *A.*   Correct.

9   *Q.*   Mr. Dear fits into that category.

10   *A.*   Yes, he does.

11   *Q.*   And Mr. Dear throughout the course of his hospitalization

12   has not participated in mental health treatment.

13   *A.*   At Springfield.

14   *Q.*   Yes, at Springfield.

15   *A.*   Yes, he did not cooperate.

16   *Q.*   Also at the Mental Health Institute at Pueblo?

17   *A.*   That is my understanding also.

18   *Q.*   He has consistently refused to take antipsychotic

19   medication?

20   *A.*   Yes, he has.

21   *Q.*   That includes during his hospitalization at Springfield?

22   *A.*   Yes.

23   *Q.*   That includes at his hospitalization at the Colorado Mental

24   Health Institute at Pueblo?

25   *A.*   Yes.

178
Robert Sarrazin - Cross

1    Q.   In fact, his refusals have been rather adamant.

2    A.   Yes.

3            THE DEFENDANT:   It's against my religion.

4    BY MS. STRICKLIN:

5    Q.   Now, you spent a bit of your direct talking about the

6    different side effects of antipsychotic medications.   And it is

7    true that these medications can have side effects that affect

8    multiple systems in the body.

9    A.   Correct.

10   Q.   And I want to go through a list of side effects, many of

11   which you have already testified to, but these adverse side

12   effects can include weight gain.

13   A.   Yes.

14   Q.   And that is a metabolic side effect?

15   A.   Yes.

16   Q.   And that side effect is important because weight gain has

17   the potential to affect other systems in your body.

18   A.   Correct.

19   Q.   Particularly it can impact heart function, for example.

20   A.   Yes.

21   Q.   These medicines also can lead to glucose abnormalities in

22   the blood.

23   A.   Yes.

24   Q.   That's another metabolic side effect.

25   A.   Correct.

Robert Sarrazin - Cross

1   Q.  And that's important to consider because of someone's risk

2   for diabetes.

3   A.  Yes.

4   Q.  Or prediabetes.

5   A.  Correct.

6   Q.  Another metabolic side effect is hyperlipidemia?

7   A.  Yes.

8   Q.  And that's an important side effect to consider because

9   that's when the blood has too many lipids?

10  A.  Correct.

11  Q.  The best example of that is cholesterol?

12  A.  Yes.

13  Q.  You talked about these extrapyramidal side effects?

14  A.  Yes.

15  Q.  Examples you gave were akathisia?

16  A.  Yes.

17  Q.  And we used this to describe agitation, distress,

18  restlessness, right?

19  A.  Yes.

20  Q.  You talked about Parkinsonism?

21  A.  Yes, I did.

22  Q.  And that is a brain condition that causes slowed movements?

23  A.  Yes.

24  Q.  Rigidity?

25  A.  Yes.

180

Robert Sarrazin - Cross

1   Q.   Tremors?

2   A.   Yes.

3   Q.   Another extrapyramidal side effect that you testified to

4   was dystonia?

5   A.   Yes.

6   Q.   Now, that is involuntary muscle contractions that occur in

7   the body?

8   A.   Correct.

9   Q.   And those can be painful.

10  A.   They can be.

11  Q.   Uncomfortable.

12  A.   Yes.

13  Q.   You talked about tardive dyskinesia.  Now, this is a less

14  common side effect, but this is involuntary movements of the

15  jaw, of your lips, of your tongue?

16  A.   Yes.

17  Q.   And it's permanent.

18  A.   It can be, yes.

19  Q.   There are other adverse side effects, prolactin elevation?

20  A.   Yes.

21  Q.   And this is known to be associated with the production of

22  breast milk?

23  A.   You can have -- yes.

24  Q.   It also can lead to osteoporosis.

25  A.   Yes.

Robert Sarrazin - Cross

1    Q.   And other neuropsychological disturbances.

2    A.   Yes.

3    Q.   You talked about the common side effect of sedation.

4    A.   Yes.

5    Q.   And that has its common meaning, right?  Sedation, you are

6    tired, lethargic?

7    A.   Correct.

8    Q.   Now, there are also anticholinergic --

9    A.   Anticholinergic.

10   Q.   Anticholinergic effects?

11   A.   Yes.

12   Q.   So some examples of those are dry mouth?

13   A.   Yes.

14   Q.   Constipation?

15   A.   Yes.

16   Q.   Urinary retention?

17   A.   Correct.

18   Q.   Blurred vision?

19   A.   Yes.

20   Q.   This can also lead to an increase in heart rate?

21   A.   Yes.

22   Q.   Sweating?

23   A.   Yes.

24   Q.   Now, some of the more serious side effects that you have

25   testified as rare but serious can be orthostatic hypotension?

Robert Sarrazin - Cross

1    *A.*  Yeah, orthostatic hypotension is less common, but as far as

2    the seriousness of it, it's if an individual is sitting down

3    and if they stand up quickly, they can have that kind of tunnel

4    vision.  So when that occurs, we make sure -- lab studies make

5    sure the person is not dehydrated.  We can also address that

6    with medication change; in the meantime, having them move

7    slowly as they move up.

8    *Q.*  I mean, this is getting up and then it's a rapid drop in

9    blood pressure.

10   *A.*  Yes.

11   *Q.*  And it can lead to a fall risk?

12   *A.*  It can.

13   *Q.*  Which can be serious.

14   *A.*  Yes.  Sometimes I am having a hard time when it's a

15   question.

16   *Q.*  Okay.  You testified to the adverse side effect of

17   neuroleptic malignant syndrome; is that correct?

18   *A.*  Yes, I did.

19   *Q.*  And you testified that was rare?

20   *A.*  Yes.

21   *Q.*  But that can lead to death?

22   *A.*  Yes, it can.

23   *Q.*  There is another adverse side effect potential for QTC

24   prolongation?

25   *A.*  Yes.

Robert Sarrazin - Cross

1   *Q.*  That can be serious because that can lead to an increase

2   risk of a cardiac event?

3   *A.*  Yes.

4   *Q.*  You testified about sudden cardiac death, correct?

5   *A.*  Yes, I did.

6   *Q.*  Again death?

7   *A.*  Yes.

8   *Q.*  Now, you testified that many of these more common side

9   effects can be treated with more medications?

10  *A.*  With adjunct medications, yes.

11  *Q.*  You labeled those adjunct medications.  Some examples you

12  gave were benzodiazepines.

13  *A.*  Yes.

14  *Q.*  So you are giving somebody medication.  They experience an

15  adverse side effect, and you give them a medication to treat

16  that side effect, correct?

17  *A.*  Correct.

18  *Q.*  Now, if we're talking about in the realm of involuntary

19  medication, you're giving someone to start with a medication

20  that they do not want, the antipsychotic, correct?

21  *A.*  Correct.

22  *Q.*  The medication that they have refused to take voluntarily,

23  correct?

24  *A.*  Correct.

25  *Q.*  If they experience a side effect, your solution is to treat

184

Robert Sarrazin - Cross

1   them with another medication, correct?

2   A.   If necessary, yes.

3   Q.   That they may not want.

4   A.   Correct.

5   Q.   Now, I want to go specifically into some of these side

6   effects that we discussed that are relevant to Mr. Dear.   I am

7   going to focus on not the common ones like sedation.   I think

8   you talked a lot about those, but let's talk about

9   hyperlipidemia.   A potential adverse side effect of

10   antipsychotics is hyperlipidemia.

11   A.   Correct.

12   Q.   Each of the four medications that you have proposed all

13   include a risk of hyperlipidemia.

14   A.   All of them do include that, yes, some less than others,

15   but yes.

16   Q.   And you testified that you reviewed the Colorado Mental

17   Health Institute at Pueblo medical records.

18   A.   I reviewed some of them, yes.

19   Q.   Well, these records do document hyperlipidemia in Mr. Dear.

20   A.   Correct.

21   Q.   Now, going all the way back to 2016, they document Mr. Dear

22   having been diagnosed hyperlipidemia, correct?

23   A.   Correct.

24   Q.   They also document in ASCVD score in a range that would

25   recommend medication?

Robert Sarrazin - Cross

1   A.   I believe they did.

2   Q.   And that would be treatment with a statin.

3   A.   Correct.

4   Q.   Mr. Dear refused to take the statin.

5   A.   Yes, he did.

6   Q.   And that was recommended to him by Dr. Jenna Stamey.  She

7   was one of the treating physicians at the Colorado Mental

8   Health Institute at Pueblo.

9   A.   Correct.

10   Q.   Now, you've also reviewed the Bureau of Prisons medical

11   records?

12   A.   Yes.

13   Q.   And Mr. Dear's most recent lab results do show that he

14   suffers from high cholesterol?

15   A.   What is the date of those?

16   Q.   March 7th, 2022.

17   A.   Yes.

18   Q.   His cholesterol levels are still high?

19   A.   Yes.

20   Q.   It's noted right on that record.

21   A.   That is correct.

22   Q.   And again, when we are talking about hyperlipidemia, that

23   is associated with high cholesterol.

24   A.   Correct.

25   Q.   Meaning too many lipids in your blood, the most common of

Robert Sarrazin - Cross

1  which we talked about was cholesterol.

2  A.   Correct.

3  Q.   So he still probably should be treated with a statin.

4  A.   Yes.

5  Q.   And he refuses that medication.

6  A.   Yes, he does.

7  Q.   Have you reviewed records from Parkview Hospital in

8  Colorado Springs?

9  A.   I have.

10 Q.   Just to come full circle, those records also document

11 hyperlipidemia in Mr. Dear?

12 A.   Yes.

13 Q.   And those are from 2018.  So 2016 records document

14 hyperlipidemia, correct?

15 A.   Yes.

16 Q.   2018 records document hyperlipidemia, correct?

17 A.   Yes.

18 Q.   2022 records document high cholesterol.

19 A.   Correct.

20 Q.   Now, all but one of your proposed medications have the

21 adverse side effect of QTC prolongation.

22 A.   Yes.

23 Q.   We're exempting aripiprazole.

24 A.   Yes.

25 Q.   Mr. Dear is a patient who is at risk for cardiac disease,

Robert Sarrazin - Cross

1   correct?

2   *A.*   Correct.

3   *Q.*   And that's in part due to long-standing untreated

4   hypertension?

5   *A.*   Correct.

6   *Q.*   And anytime that Mr. Dear has allowed his blood pressure to

7   be taken, the results have been undoubtedly consistent with

8   hypertension, correct?

9   *A.*   Correct.

10  *Q.*   He has refused to treat that long-standing hypertension

11  with any medications?

12  *A.*   That is correct.

13  *Q.*   Meaning anti-hypertensive medications?

14  *A.*   Correct.

15  *Q.*   You proposed that directly to him.

16  *A.*   Oh, yes.

17  *Q.*   He has refused?

18  *A.*   Yes.

19  *Q.*   And he has refused that throughout the course of his

20  hospitalization --

21  *A.*   Yes.

22  *Q.*   -- at Springfield.

23  *A.*   Yes, he has.

24  *Q.*   As well as at the Colorado Mental Health Institute at

25  Pueblo?

Robert Sarrazin - Cross

1   A.   Correct.

2   Q.   Mr. Dear is also nearing 65 years old?

3   A.   Yes.   He is 64 currently.

4   Q.   His birthday is it in April of 1958.   Does that sound

5   right?

6   A.   I believe so.

7   Q.   His age alone places him at increased risk for cardiac

8   disease?

9   A.   Yes.

10  Q.   He also has a family history of cardiovascular disease?

11  A.   I am not aware of that, no.

12  Q.   You are unaware that his father had cardiac --

13  cardiovascular disease?

14  A.   I do not believe I knew that, no.

15  Q.   Mr. Dear also suffers from stage three chronic kidney

16  disease.

17  A.   Correct.

18  Q.   That kidney disease could be an organ damaged from his

19  long-standing untreated hypertension?

20  A.   Yes.

21  Q.   The Bureau of Prisons medical records, they document stage

22  three chronic kidney disease?

23  A.   Yes.

24  Q.   CMHIP records also document kidney disease?

25  A.   Yes.

Robert Sarrazin - Cross

1   Q.  And stage three doesn't require dialysis.

2   A.  No.

3   Q.  However, if it progresses, he could require dialysis.

4   A.  He could.

5   Q.  Which again places him at additional risk.

6   A.  Correct.

7   Q.  I would like to review with you your contacts with Mr. Dear

8   throughout the time that he was at the Springfield Federal

9   Medical Center.  He was transferred there on May 6 of 2021.

10  A.  Correct.

11  Q.  Does that sound right?  So he was there just shy of 10

12  months?

13  A.  Yes.

14  Q.  He was transferred out around March 15 of 2022?

15  A.  Yes.

16  Q.  During the time that you were there, you met with him 13

17  times.

18  A.  Correct.

19  Q.  Which is consistent with what you said about once a month.

20  A.  Correct.

21  Q.  A couple times more.

22          Now, when you first met Mr. Dear, how did you first

23  introduce yourself to him?

24  A.  I believe I was introduced to him as the chief of

25  psychiatry and that I was also part of the evaluation team, so

Robert Sarrazin - Cross

1   things that he told us would not necessarily -- they are not

2   necessarily confidential like you would have a doctor/patient

3   confidentiality, and that I may be asked to write a report

4   and/or testify.

5   Q.   Did he have any particular reaction to that introduction?

6   A.   I don't recall.

7   Q.   Now, on May 6th of 2021 you met with him with Dr. Preston

8   Baecht.

9   A.   Yes.

10   Q.   This was the longest interaction that you had with him.

11   A.   The initial one?

12   Q.   Yes.

13   A.   I also had interaction with Dr. Preston Baecht and him at

14   the time right after his -- the due process hearing, the *Harper*

15   hearing.

16   Q.   Is your recollection consistent with Dr. Preston Baecht in

17   that you met with him initially for about 30 to 45 minutes?

18   A.   Yes.

19   Q.   And then after that *Harper* hearing about how long?

20   A.   I believe that was probably close to 30 minutes, 20 to 30

21   minutes.

22   Q.   Now, you heard Dr. Preston Baecht testify about her

23   recollection about the May 6, 2021 intake meeting.  Do you have

24   a similar recollection of how that went?

25   A.   Yes.

Robert Sarrazin - Cross

1   Q.   So, for example, do you recall that Mr. Dear reported that

2   the FBI had been following him since Waco?

3   A.   Yes.

4   Q.   He also would not answer social history questions about

5   himself, correct?

6   A.   Correct.

7   Q.   What are some examples of things that he was asked that he

8   wouldn't answer?

9   A.   I would have to look at my notes to see what things he did

10  answer.  I don't recall exactly what the things were that he

11  didn't answer.  I don't believe he gave us much in the way of

12  history.

13  Q.   And one of the things that he did tell you was that he

14  graduated from Missouri State University.

15  A.   Yes.

16  Q.   In 1981 with a bachelor of science degree.

17  A.   Correct.

18  Q.   Were you able to confirm that that was true?

19  A.   I did not, no.

20  Q.   With the exception of the things that we referenced, were

21  you able to glean anything really useful about him from his

22  intake interview?

23  A.   Again, I would probably need to look at my initial note to

24  see what he stated during that time.

25  Q.   I can pull that up for you if that would assist you.

Robert Sarrazin - Cross

1    A.   Certainly.

2    Q.   Does this look familiar to you, Dr. Sarrazin?

3    A.   Yes, it does.

4    Q.   Is this your notes from the May 6, 2021 intake interview?

5    A.   Yes.

6         THE COURT:   Just a moment.   If you can enlarge the

7    exhibit, would you?   Thank you.   Right on cue.

8    BY MS. STRICKLIN:

9    Q.   Other than the things that either you have testified or

10   Dr. Preston Baecht has testified to, is there any additional

11   information that you learned that was useful?

12   A.   No, I do not think so.   Oh, let's see, a concussion seven

13   weeks ago.   Past medical history, he reported a concussion

14   seven weeks ago, and then no previous mental health treatment

15   or hospitalizations which we were aware of.

16   Q.   This concussion that he reported, do you recall any details

17   about that?

18   A.   No, I do not.

19   Q.   Do you know if he was assessed for a head injury?

20   A.   I do not recall.

21   Q.   Now --

22        THE DEFENDANT:   Incompetence.

23   BY MS. STRICKLIN:

24   Q.   Your next contact with him was on June 14th.   Does that

25   sound right?

Robert Sarrazin - Cross

1   *A.*   Yes.

2   *Q.*   About a month later?  And in this particular context, you

3   documented that the week prior Mr. Dear had refused to

4   participate in blood pressure testing.  Does that sound right

5   or do you need to see the note?

6   *A.*   I would like to see the note.

7          *MS. STRICKLIN:*  Can you please pull up that same one,

8   D-1 but start on Page 4, please?

9   *BY MS. STRICKLIN:*

10  *Q.*   So if we review this note, this contact was an example of

11  when you saw Mr. Dear briefly at his cell door?

12  *A.*   Correct.

13  *Q.*   And if we look further down in the document -- I guess you

14  can see it there.  Toward the bottom do you see where it

15  says --

16  *A.*   Yeah, he refused his blood pressure on 6/3, yes.

17  *Q.*   And also he refused to have his weight taken on that same

18  date, June 6, 2021.

19  *A.*   Yes.

20  *Q.*   Now, before we continue to move through your contacts with

21  Mr. Dear, there are some things that are common throughout your

22  contact with him.  For example, that other than the two

23  interactions that you have described, the intake interview and

24  after the *Harper* hearing, the contacts were at Mr. Dear's cell

25  door.

194

Robert Sarrazin - Cross

1   *A.*  Correct.

2   *Q.*  Are there times that you saw him when Dr. Preston Baecht

3   was not present?

4   *A.*  Yes.

5   *Q.*  And the majority of the contacts which were at his cell

6   door were brief.

7   *A.*  Correct.

8   *Q.*  I think you testified at most maybe 10, 15 minutes?

9   *A.*  Yes.

10  *Q.*  You testified that there were times where he was

11  uninterested in talking to you.

12  *A.*  Correct.

13  *Q.*  And in all of these interactions, was he given an

14  opportunity to leave his cell to speak with you?

15  *A.*  I do not believe that I asked him each and every one of

16  those times to leave the cell to speak with me, but I also knew

17  that he was not leaving his cell to speak with Dr. Preston

18  either.

19  *Q.*  So your impression at least is that if he were provided

20  with an opportunity to leave his cell to speak with you, he was

21  likely to have refused that opportunity.

22  *A.*  Yes.

23  *Q.*  Based upon anecdotal information provided to you by

24  Dr. Preston Baecht.

25  *A.*  Correct.

Robert Sarrazin - Cross

1   *Q.*  Who saw him more frequently than you did.

2   *A.*  Yes, she did.

3   *Q.*  Now, the next meeting you had with him occurred on July 19

4   of 2021.  Would you like to see that record to refresh your

5   memory as to the date?

6   *A.*  Yes.

7   *Q.*  That starts on Page 5.  Again, this is another contact at

8   his cell door?

9   *A.*  Yes.

10  *Q.*  And you note here that he is unwilling to undergo an

11  evaluation.

12  *A.*  Yes.

13  *Q.*  I am assuming, but correct me if I'm wrong, that that is a

14  competency evaluation you are referencing.

15  *A.*  I believe it is.

16  *Q.*  As opposed to some type of medical evaluation.

17  *A.*  I believe that is in regard to his competency.

18  *Q.*  And we see again on this record that I guess probably the

19  week prior he again refused to have his blood pressure taken?

20  *A.*  Yes.

21  *Q.*  He refused to have -- if we continue down through the

22  document -- his temperature taken as well as his pulse?

23  *A.*  Correct.

24  *Q.*  Or his oxygen value?

25  *A.*  Correct.  He refused his vital signs and his weight.

Robert Sarrazin - Cross

1   Q.   Now, you don't have many notes from this interaction.  My

2   assumption is this was brief.

3   A.   Yes.

4   Q.   Is that a fair assumption?  The next contact was on

5   August 13th of 2021.

6        MS. STRICKLIN:   And Mr. Cohen, that begins on Page 7

7   of this exhibit.

8   BY MS. STRICKLIN:

9   Q.   Now, this is one of the incidents that you described on

10  direct in which Mr. Dear talked to you about drugs being put in

11  his food.

12  A.   Correct.

13  Q.   He also informed you that he thought that because his heart

14  was racing?

15  A.   Yes.

16  Q.   Did you explain to him that drugs were not being put in his

17  food?

18  A.   Yes.

19  Q.   Did he appear to accept that assurance from you?

20  A.   No, he did not.

21  Q.   Now, in this particular interaction, you document that his

22  thought content was delusional, and that's toward the bottom of

23  this page.  It might be on the next page which would be Page 8.

24  Do you see that there, thought content?

25  A.   Yes.

Robert Sarrazin - Cross

1    *Q.*  Was that because of his comments about drugs being put in

2    his food?

3    *A.*  Yes.

4    *Q.*  This is again another incident where he had previously

5    refused to have his blood pressure taken on August 2nd of 2021?

6    *A.*  Correct.

7    *Q.*  And refused those other vital sign assessments as well.

8    *A.*  Yes.

9    *Q.*  The next time you met with Mr. Dear was September 10th of

10   2021.

11        *MS. STRICKLIN:*  Mr. Cohen, this begins on Page 9 of

12   the exhibit.

13   *BY MS. STRICKLIN:*

14   *Q.*  So about a month later and maybe a little less than a month

15   later from your prior contact on August 13?

16   *A.*  Yes.

17   *Q.*  Again he told you that he thought his food was drugged.

18   *A.*  Correct.

19   *Q.*  And again you described his thought content as delusional.

20   *A.*  Correct.

21   *Q.*  And again he had recently refused blood pressure testing as

22   well as these vital signs assessments that we previously

23   discussed?

24   *A.*  Yes.

25   *Q.*  Now, your next contact with him was again about a month

Robert Sarrazin - Cross

1   later on October 18th of 2021.  In this contact again this

2   happens outside of his cell door, correct?

3   A.  Correct.

4   Q.  At this point he tells you that he was threatened by

5   another inmate?

6   A.  Yes.

7   Q.  Do you recall the specifics of this contact?

8   A.  No.

9   Q.  Do you recall why you would have described his speech as

10  rapid?

11  A.  Probably because he was speaking very rapidly, I would

12  assume.

13  Q.  Or disorganized thinking?

14  A.  I believe there was something about his presentation at

15  that time that he seemed to be more disorganized to me than he

16  had previously.

17  Q.  You also notated that he was unable to educate?

18  A.  Yes.

19  Q.  Can you recall specifically what that was about?

20  A.  Probably that he was not forthcoming in discussing, you

21  know, things with me and with his disorganization, so I wasn't

22  able to educate in regard to how to access services and

23  whatnot.

24  Q.  Is this another contact with him where he was not

25  cooperative with you, at least in terms of your questioning?

Robert Sarrazin - Cross

1    *A.*  Correct.

2    *Q.*  Or advice?

3    *A.*  Correct.

4    *Q.*  And just to close that gap, this is another incident in

5    which he had recently refused blood pressure testing on

6    September 1st of 2021?

7    *A.*  Yes.

8    *Q.*  As well as those vital signs assessments of temperature,

9    pulse, oxygen and weight, correct?

10   *A.*  Correct.

11          *THE COURT:*  Counsel, excuse the interruption, but a

12   propitious time of our last recess of today and this afternoon

13   during of which, Doctor, you may stand down.

14          Counsel, you may be seated at your convenience.

15          We are in recess until 4:12, I say again 4:12 p.m.

16   Thank you.

17       (Recess at  4:00 p.m. until 4:12 p.m.)

18          *THE COURT:*  Ms. Stricklin, you are on.

19   *BY MS. STRICKLIN:*

20   *Q.*  Dr. Sarrazin, when we left off we were talking about your

21   contact with Mr. Dear on October 18 of 2021.

22   *A.*  Okay.

23   *Q.*  Does that sound right?

24   *A.*  Yes.

25   *Q.*  Now, moving to your next contact with Mr. Dear, that

Robert Sarrazin - Cross

1    occurred on October 28th of 2021.

2         *MS. STRICKLIN:*  And Mr. Cohen, this is on Page 13 of

3    this exhibit.

4    *BY MS. STRICKLIN:*

5    Q.  And on this particular contact you noted that Mr. Dear

6    voiced delusional ideas.

7    A.  Yes.

8    Q.  And made it clear that he was not mentally ill.

9    A.  Correct.

10   Q.  And made it clear that he would not take antipsychotic

11   medications.

12   A.  Correct.

13   Q.  This was another instance in which Mr. Dear had -- I guess

14   it was about a month prior, but had refused to have his blood

15   pressure taken on October 1st of 2021?

16   A.  Yes.

17   Q.  And he refused to have his weight taken as well.

18   A.  Yes.

19   Q.  Now, Dr. Sarrazin, we have gone through seven of your 13

20   contacts with Mr. Dear.  My understanding is that you have a

21   plane to catch relatively soon?

22   A.  Yes.

23   Q.  So in order to expedite this, I will ask you in your

24   contacts with Mr. Dear, oftentimes there are patterns that have

25   emerged, correct?  For example, oftentimes he had refused to

Robert Sarrazin - Cross

1    have his blood pressure taken near in time to when you met with

2    him.

3    A.   Yes.

4    Q.   Also your assessment of delusional disorder stays

5    consistent throughout your contacts with him?

6    A.   Yes.

7    Q.   And as we discussed previously, these contacts are for the

8    most part short in duration.

9    A.   Yes.

10   Q.   And outside Mr. Dear's cell door.

11   A.   Correct.

12   Q.   I am going to skip several of your contacts with him.  If

13   you don't have any notes in the subjective part, is it safe to

14   assume that Mr. Dear didn't engage with you?

15   A.   You would have to show me that specific, what that specific

16   note was.

17   Q.   Okay.  We'll get there.

18   A.   Yeah, because I do believe there is one where it was simply

19   an order.

20   Q.   That's right.  Now, the next contact was on November 15 of

21   2021.  This starts on Page 15.  And in this particular contact

22   you referenced that Mr. Dear remains delusional, correct?

23   A.   Yes.

24   Q.   He continues to refuse to take psychotropic medications?

25   A.   Yes.

Robert Sarrazin - Cross

1   *Q.*  Psychotropic is interchangeable with antipsychotic?

2   *A.*  Yes.  Psychotropic medications is any of the psychiatric

3   medications, but in this case, yes.

4   *Q.*  Again, he had refused vital sign testing?

5   *A.*  Correct.

6   *Q.*  The next contact was on December 20th of 2021.

7            *MS. STRICKLIN:*  And Mr. Cohen, this begins on Page 17.

8   *BY MS. STRICKLIN:*

9   *Q.*  In this contact he repeated what he had told you about

10  taking Zyprexa, correct?

11  *A.*  Correct.

12  *Q.*  Again refuses to take medications?

13  *A.*  Correct.

14  *Q.*  Moving on to January 6th of 2022, and this begins on

15  Page 19, again this is probably a quick contact, correct?

16  *A.*  Correct.

17  *Q.*  Same information?

18  *A.*  That is correct.

19  *Q.*  The next contact was on February 14th of 2022.  Nothing new

20  here?

21  *A.*  Correct.

22  *Q.*  The next contact was on February 23rd of 2022?  And this

23  one I want to highlight for you because this one is a little

24  bit different.  Now, on February 23rd, 2022, you have a number

25  of notes that you took in the subjective portion of this

Robert Sarrazin - Cross

1   document.

2   *A.*   Yes.

3   *Q.*   Now, in your contact with Mr. Dear on February 23rd of

4   2022, he told you that he is against pharmaceuticals.

5   *A.*   Correct.

6   *Q.*   And did you understand that to mean medications generally?

7   *A.*   The specific contact was with Dr. Christianson who was the

8   forensic psychologist who was managing Mr. Dear's case after

9   Dr. Preston Baecht's leaving.  And PA Zongker was the physician

10  assistant who is now a psychiatric assistant, but at the time

11  he was on the medical side.  And he had an elevated blood

12  pressure as noted on that date 212 over 112.

13  *Q.*   That's pretty elevated, correct?

14  *A.*   It is.  And the reason for that evaluation was to talk to

15  him about taking medications and specifically about taking

16  antihypertensive medications.  That is what we were addressing

17  there was not antipsychotics, but antihypertensive medications.

18  And I wanted to sit down with him with the psychologist and the

19  physician assistant and make sure that it was quite clear how

20  danger his blood pressure was.

21          And we were also assessing on whether his refusal to

22  take antihypertensive medications reached the level of an

23  emergency under *Harper*, that the reason he wasn't taking the

24  antihypertensives was due to delusional issues.  And that is

25  the reason for that particular note.  It's the reason for how

Robert Sarrazin - Cross

1   those notes are written out, to make it clear that the kidney

2   damage, the blood pressure, you know, he made it quite clear he

3   wasn't going to take those, and we wanted to make sure that he

4   understood what was going on with his blood pressure and to try

5   to get a reason why.

6        *THE DEFENDANT:*  I don't want to be a drug addict.

7   *BY MS. STRICKLIN:*

8   *Q.*  Let's break the things that you said down a little bit.  So

9   he said that he was against pharmaceuticals?

10  *A.*  Yes.

11  *Q.*  In this specific instance, you were talking about

12  anti-hypertensive medications?

13  *A.*  Yes.

14  *Q.*  He said to you:  We are all going to die.

15        That is a true statement?

16  *A.*  Yes.

17  *Q.*  And his opinion of it was let God handle it?

18  *A.*  Yes.

19  *Q.*  You, as you just testified, it was important for you to

20  make sure that Mr. Dear understood the risks involved.

21  *A.*  Yes.

22  *Q.*  And you've calculated those risks as kidney damage?

23  *A.*  Correct.

24  *Q.*  Which we did discuss earlier, his chronic kidney disease

25  may be the result, and organ damage stemming from hypertension.

Robert Sarrazin - Cross

1    A.   Yes.

2    Q.   Risk of stroke?

3    A.   Yes.

4    Q.   Heart attack?

5    A.   Yes.

6    Q.   And eye damage.

7    A.   Correct.

8    Q.   Mr. Dear does not have good eye sight, correct?

9    A.   Well, I don't know the exact testing, but I know he wears

10   glasses, but I do not know exactly what his eyesight is, no.

11   Q.   You also made it also clear to him that his headaches and

12   dizziness could be symptoms of his high blood pressure?

13   A.   Yes.

14   Q.   And as you just testified to, none of your advice mattered

15   to him in his ultimate decision not to take an antihypertensive

16   medication.

17   A.   Correct.

18   Q.   And one of the other things that you just testified to was

19   that it was important to you to establish whether or not in

20   your opinion as a treating psychiatrist his refusal to take an

21   antihypertensive medication was the result of his delusional

22   symptomatology.

23   A.   Correct.

24   Q.   And you found that it was not.

25   A.   It was not.

206

Robert Sarrazin - Cross

1   *Q.* And you opined that although in your opinion his refusal

2   was unreasonable --

3   *A.* Yes.

4   *Q.* -- it did not relate to his delusions.

5   *A.* Correct.

6   *Q.* Your last contact with Mr. Dear occurred on March 10th of

7   2022. This is documented on Page 26 of this exhibit.

8          And here again you report that Mr. Dear remained

9   delusional?

10  *A.* Yes.

11  *Q.* And Mr. Dear was taken -- transferred out of Springfield

12  five days later on March 15th, correct?

13  *A.* That is my understanding, yes.

14  *Q.* Now, as we have discussed, in your specific contacts with

15  Mr. Dear while at the Springfield Medical Center, Mr. Dear

16  refused almost all medical testing that he was asked to

17  participate in.

18  *A.* Yes. He did some laboratory testing which you alluded to

19  on 3/10 of 2022, yes.

20  *Q.* And you just testified and you referred to the physician's

21  assistant, Tyler Zongker?

22  *A.* Yes.

23  *Q.* Oftentimes at the Federal Medical Center at Springfield it

24  was a different physician or physician's assistant who was

25  asking Mr. Dear to participate in various medical testing,

Robert Sarrazin - Cross

1   correct?

2   *A.*   It might have been Dr. Lorenzino.

3   *Q.*   And Tyler Zongker is the physician assistant?

4   *A.*   He is the physician assistant, correct.

5   *Q.*   Now, one of the tests that Mr. Dear refused to participate

6   in was a fecal occult blood test?

7   *A.*   Fecal occult.

8   *Q.*   Blood test?

9   *A.*   Yes.

10  *Q.*   I am going to show you what's been marked as Defense

11  Exhibit 13.

12          *MS. STRICKLIN:*   Your Honor, the government informs me

13  that they will stipulate to the admission of this exhibit, so I

14  would move to admit it into the record.

15          *THE COURT:*   Response?

16          *MS. RHYNE:*   To save all time, Your Honor, we will

17  admit to admissibility of all of the BOP records that they have

18  for exhibits including this one.

19          *THE COURT:*   Well, for now Defense Exhibit 13 for

20  identification is admitted in evidence.

21  *BY MS. STRICKLIN:*

22  *Q.*   Now, Dr. Sarrazin, this is a written Medical Treatment

23  Refusal form.

24  *A.*   Yes.

25  *Q.*   And at times the Federal Medical Center will ask patients

Robert Sarrazin - Cross

1   to review or sign this Medical Treatment Refusal.

2   A.   Correct.

3   Q.   Now, in Mr. Dear's case he refuses to sign it.

4   A.   Yes.

5   Q.   But what is the purpose of having a written refusal

6   documented in Mr. Dear's records from the Federal Medical

7   Center at Springfield?

8   A.   To document that he refuses the order -- the nursing staff,

9   PA Zongker, ordered the fecal occult test.  And then the

10  nursing staff will collect the sample and Mr. Dear refuses, so

11  the nursing staff then will do a refusal form because there was

12  an order in place and they are documenting the refusal.

13  Q.   Now, this test is designed to check for blood in the stool,

14  correct?

15  A.   Yes.

16  Q.   And that's important because that could indicate colon

17  cancer?

18  A.   Yes.

19  Q.   Or a polyp in the colon?

20  A.   Yes, that there is blood in the fecal material so it needs

21  to be investigated.

22  Q.   And when Mr. Dear arrived at Springfield, that was a health

23  concern that was reported in his medical record, correct?

24  A.   I believe it was.

25  Q.   In fact, his Bureau of Prisons medical records reflect a

Robert Sarrazin - Cross

1    polyp of the colon.  Does that sound right?

2    A.  That does sound right.

3    Q.  And that specifically is documented in the Bureau of

4    Prisons inmate intrasystem transfer paperwork?

5    A.  Okay.

6    Q.  Do you remember it being there or would you like to see

7    that document?

8    A.  No, I do not recall that particular document, but I do

9    recall that that was an issue, so yes, that's where it would be

10   documented.

11   Q.  Okay.  So this test that Mr. Dear refused, this fecal

12   occult?

13   A.  Occult.

14   Q.  Blood test was one that was deemed to be important.

15   A.  Yes.

16   Q.  And also important enough that the Bureau of Prisons felt a

17   written medical treatment refusal should be in Mr. Dear's

18   record?

19   A.  Correct.

20   Q.  He, Mr. Dear, also refused on several different dates to

21   participate in vital sign assessments?

22   A.  Correct.

23          MS. STRICKLIN:  Your Honor, I will move to admit

24   Defense Exhibits 14 through 17 into evidence.

25          THE COURT:  Response?

Robert Sarrazin - Cross

1          *MS. RHYNE:*  No objection.

2          *THE COURT:*  Defense Exhibits 14 through 17 for

3      objection admitted into evidence.

4      *BY MS. STRICKLIN:*

5      *Q.*  To go through these very quickly, Mr. Dear refused vital

6      sign assessments in July of 2021.  Would you like to see it?

7      *A.*  No.  I -- during my encounters it was clear that he had

8      refused his vital signs.  And the documentation was done at the

9      time that he refused them, again because there is order in

10     place and there is -- nursing staff document the refusals.

11     *Q.*  So you were one of the medical professionals that

12     recommended this testing, this assessment?

13     *A.*  The vital signs, yes.

14     *Q.*  And why is that important?

15     *A.*  Why are the vital signs important?

16     *Q.*  Yes.

17     *A.*  He is in an inpatient facility, so we do at least monthly

18     vital signs and monthly weights.  And particularly that is also

19     the case when individuals are on involuntary medications or

20     voluntary medications.  If anyone is on a second generation

21     antipsychotic, basically everyone in our facility has orders

22     for monthly vital signs and monthly weights.

23     *Q.*  Just to be clear, you testified you do these vital signs

24     monthly.

25     *A.*  Yes.

Robert Sarrazin - Cross

1   *Q.*  Unless someone refuses.

2   *A.*  Yes.

3   *Q.*  Which Mr. Dear actually did.

4   *A.*  Yes.

5   *Q.*  He also refused to participate in a metabolic profile.

6   *A.*  Yes, he refused blood work.

7            *MS. STRICKLIN:*  And I will move to admit Defense

8   Exhibit 18 into the record.

9            *THE COURT:*  Response?

10           *MS. RHYNE:*  No objection.

11           *THE COURT:*  Defense Exhibit 18 for identification

12  admitted in evidence.

13           *MS. STRICKLIN:*  Mr. Cohen, I will have you pull this

14  one up, please.

15  *BY MS. STRICKLIN:*

16  *Q.*  That refusal was on June 8th, 2021?

17  *A.*  Yes.

18  *Q.*  That metabolic profile includes a creatinine measurement?

19  *A.*  Yes.

20  *Q.*  That's a measure of kidney function?

21  *A.*  Correct.

22  *Q.*  And, of course, as we've discussed, that's important here

23  because Mr. Dear does suffer from stage three chronic kidney

24  disease?

25  *A.*  Yes, he does.

Robert Sarrazin - Cross

1   *Q.*   That profile also includes a lipid test, correct?

2   *A.*   Yes.

3   *Q.*   In which we have discussed that is important because

4   Mr. Dear has a history of dyslipidemia?

5   *A.*   Correct.

6   *Q.*   Or hyperlipidemia, correct?

7   *A.*   Correct.

8   *Q.*   The lipids test also would provide a cholesterol reading?

9   *A.*   Correct.

10  *Q.*   Which is important because Mr. Dear has a history of high

11  cholesterol, correct?

12  *A.*   Correct.

13  *Q.*   That test also assesses for glucose.

14  *A.*   Yes, it does.

15  *Q.*   Which as we discussed is important because it gives us

16  information about someone's risk for diabetes or prediabetes,

17  correct?

18  *A.*   Correct.

19  *Q.*   Mr. Dear was also asked to participate in EKG testing while

20  he was at the Springfield Medical Center?

21  *A.*   Yes, he was.

22        *MS. STRICKLIN:*   Your Honor, I will move for the

23  admission of Exhibits 19 through 21.

24        *THE COURT:*   Response?

25        *MS. RHYNE:*   No objection.

Robert Sarrazin - Cross

1          THE COURT:  Defense Exhibits 19 through 21 for

2   identification admitted in evidence.

3          MS. STRICKLIN:  Thank you, Your Honor.

4          THE COURT:  You are welcome.

5          MS. STRICKLIN:  Mr. Cohen, I will ask you to pull up

6   Exhibit 19.

7   BY MS. STRICKLIN:

8   Q.  Mr. Dear refused a chest x-ray and EKG on March 11, 2022?

9   A.  Yes, he did.

10          MS. STRICKLIN:  Mr. Cohen, I will next ask you to pull

11   up Exhibit 20.

12   BY MS. STRICKLIN:

13   Q.  Similar refusal on May 27 of 2021?

14   A.  Yes.

15          MS. STRICKLIN:  Mr. Cohen, will you please pull up

16   Exhibit 21?

17   BY MS. STRICKLIN:

18   Q.  And this one is written a little bit differently, but this

19   is also a refusal to participate in EKG, correct?

20   A.  Correct.

21   Q.  And just to be clear, this refusal specifically says an

22   electrocardiogram, but them in parenthesis says EKG?

23   A.  Yes.

24   Q.  Do you know which test this was getting at?

25   A.  They are the same thing.

Robert Sarrazin - Cross

1    *Q.*   And this was on January 10th of 2020, correct?

2    *A.*   Yes.

3    *Q.*   Now, each of the testing that Mr. Dear refused was

4    recommended for him by a medical professional at the Federal

5    Medical Center at Springfield, correct?

6    *A.*   Correct.

7    *Q.*   And each would or could give you important insight into his

8    health?

9    *A.*   Correct.

10   *Q.*   The functions of his organs?

11   *A.*   Yes.

12   *Q.*   Specifically his kidneys?

13   *A.*   Correct.

14   *Q.*   His heart?

15   *A.*   Yes.

16   *Q.*   His risk of disease?

17   *A.*   Correct.

18   *Q.*   Specifically cardiovascular disease?

19   *A.*   Yes.

20   *Q.*   Or diabetes?

21   *A.*   Yes.

22   *Q.*   And all of this information could better inform a decision

23   on what medications to prescribe, correct?

24   *A.*   It's important information, yes.

25   *Q.*   And Mr. Dear has refused any of the medications that would

Robert Sarrazin - Cross

1   have been recommended based upon this testing?

2   A.   Correct.

3   Q.   And Mr. Dear also -- there is also a written medical

4   treatment refusal documenting his refusal to take

5   antihypertensive medications, correct?

6   A.   I believe there is, yes.

7           MS. STRICKLIN:   Your Honor, we will move for the

8   admission of Defense Exhibit 12.

9           THE COURT:   Response?

10          MS. RHYNE:   No objection.

11          THE COURT:   Defense Exhibit 12 for identification

12  admitted in evidence.

13          MS. STRICKLIN:   Mr. Cohen, can you please pull 12 up

14  on the screen, please?

15  BY MS. STRICKLIN:

16  Q.   And this written refusal was executed on May 6 of 2021.

17  A.   Yes.

18  Q.   That's the day he arrived, correct?

19  A.   Correct.

20          MS. STRICKLIN:   You can remove the exhibit, please,

21  Mr. Cohen.

22  BY MS. STRICKLIN:

23  Q.   Now, I would like to discuss with you the administration of

24  the four proposed antipsychotics.

25          Now, you -- your plan first proposes to Mr. Dear that

Robert Sarrazin - Cross

1  he cooperate in oral medications.

2  *A.*  Yes.

3  *Q.*  And oral medications are taken through a typical pill line,

4  correct?

5  *A.*  Correct.

6  *Q.*  So patients line up.  A nurse administers the medications?

7  *A.*  Yes.

8  *Q.*  And a nurse checks to make sure that they were swallowed.

9  *A.*  Correct.

10  *Q.*  Your plan, however, has also anticipated that Mr. Dear may

11  refuse to taking oral medications.

12  *A.*  Correct.

13  *Q.*  And if he were to refuse, that would be consistent with

14  refusal since 2016.

15  *A.*  Yes.

16  *Q.*  When Mr. Dear refuses to take these oral medications, you

17  then propose intramuscular injectables.

18  *A.*  Yes.

19  *Q.*  Now, your oral medications, there are four of them.

20  *A.*  Yes.

21  *Q.*  The intramuscular injectables, there are three, correct?

22  *A.*  All four of them do have intramuscular injectables.

23  *Q.*  You have removed olanzapine from your list of proposed

24  intramuscular injectables.

25  *A.*  Correct.

Robert Sarrazin - Cross

1   Q.  Now, is that because you are thinking olanzapine will be

2   used as an adjunct medication or for a different reason?

3   A.  Well, because olanzapine has a short-acting injectable.

4   The long-acting injectable olanzapine requires a specific REMS

5   program, which you try to -- there is side effects of that

6   long-acting injectable where an individual has to get that

7   injectable at a location that can do advanced cardiac life

8   support because there is concerns that if it gets into the

9   system a certain way, that you would have a delirium.

10          So while we as a medical center and Butner will also

11  qualify to be able to give that particular long-acting

12  injectable at our location, there are very few other BOP

13  facilities or other facilities, such as detention facilities,

14  that would have the capability of using that particular

15  medication.  So even if we were to stabilize an individual such

16  as Mr. Dear on that long-acting injectable, the chances of that

17  being able to be given outside of our facility is not likely,

18  so it's a medication we don't use.

19  Q.  And your testimony as to that medication is an example of

20  some of the risk that can be involved in these medications?

21  A.  Correct.

22  Q.  The three medications that you have recommended for

23  intramuscular long-action injectables are paliperidone

24  sustenna?

25  A.  Yes.

Robert Sarrazin - Cross

1    Q.   Aripiprazole lauroxil?

2    A.   Yes, or aristada.

3    Q.   And then the haloperidol decanoate?

4    A.   Yes, decanoate.

5    Q.   And the first two are the second generation antipsychotics?

6    A.   Yes.

7    Q.   Paliperidone again is the first generation?

8    A.   Correct.

9    Q.   And you described on direct, that can be given as a

10   short-acting injectable?

11   A.   Yes.

12   Q.   But as you discussed on direct, these first generation

13   antipsychotics also carry higher risk of certain side effects.

14   A.   Correct.

15   Q.   And you described in particular those extrapyramidal side

16   effects.

17   A.   Yes.

18   Q.   Now, when we are talking about the side effects that are --

19   the adverse side effects that apply to the oral medications,

20   the same is true of the intramuscular injectables, correct?

21   A.   That is correct.  It does seem that in some individuals the

22   long-acting injectable medications because it's a slower onset

23   continues at a therapeutic level and then drops off without the

24   oral medication coming up and coming down and multiple issues

25   that sometimes the side effects of sedation, the tremors, the

Robert Sarrazin - Cross

1   cog-wheeling and some of those symptoms are actually less on

2   the long-acting injectables.

3   Q.   So the side effects -- the potential side effects remain

4   the same.

5   A.   Yes, that is correct.

6   Q.   But the risk of the side effect can be different between

7   the oral medication and the long-acting intramuscular

8   injectable.

9   A.   Yes.

10   Q.   And that is because the intramuscular injectable is

11   injected directly into the muscle.

12   A.   Correct.

13   Q.   And once that drug is injected, you can't get it out.

14   A.   Correct.

15   Q.   So if a side effect were to occur, you cannot discontinue

16   the medication the same way you can with an oral medication.

17   A.   Are you talking about the long-acting injectables?

18   Q.   Yes.

19   A.   Yes.

20   Q.   And because with these long-acting injectables you can't

21   discontinue the medication until the body has metabolized what

22   you have injected into it.

23   A.   Correct.

24   Q.   And the long-acting injectables that you have proposed, you

25   propose a new dose every four weeks.

Robert Sarrazin - Cross

1    A.   Yes.

2    Q.   Because it would take about four weeks for the body to

3    metabolize the dose and need a new one.

4    A.   That is -- yes, the prescription prescribing information,

5    it's an every-four-week medication of the aripiprazole aristada

6    and the paliperidone sustenna.

7    Q.   Now, if Mr. Dear continues in his refusal to take these

8    oral medications, the next step is to propose the long-term

9    intramuscular injectables -- long-acting, excuse me,

10   intramuscular injectables?

11   A.   Yes.

12   Q.   And should he refuse to cooperate with the administration

13   of those medications, the next step is to ask him to submit to

14   hand restraints.

15   A.   Correct.

16   Q.   And hand restraints means someone is taking his hand and

17   strapping his hands and strapping it down.

18   A.   Well, no.  Hand restraints are that he would be placed in

19   hand restraints behind his back, and then that would allow the

20   staff to give him the injection.

21   Q.   So it's asking him to voluntarily submit to being

22   handcuffed basically.

23   A.   Yes.

24   Q.   And if Mr. Dear were to refuse or say "I'm not cooperating

25   with hand restraints," then the next step is to bring in the

221

Robert Sarrazin - Cross

1    use-of-force team.

2    *A.*   Correct.

3    *Q.*   And when we are talking about a use-of-force team, we are

4    talking about several individuals.

5    *A.*   Yes.

6    *Q.*   How many would you estimate, six?

7    *A.*   Well, there is a lieutenant and then there is five

8    correctional officers.

9    *Q.*   Six?

10   *A.*   Yes.

11   *Q.*   And this team opens the door to his cell.

12   *A.*   Yes.

13   *Q.*   Correctional officers physically restrain him.

14   *A.*   Correct.

15   *Q.*   Nursing staff comes in, gives the injection.  And then

16   everybody backs out.

17   *A.*   Correct.

18   *Q.*   Closes the door.

19   *A.*   Now, you did forget the confrontation avoidance part of it.

20   So as I stated, during my time I would address Mr. Dear with

21   the psychologist or the psychiatrist that was prescribing the

22   medication.  We would discuss this over the course of many days

23   to weeks.  The lieutenant would come and talk to Mr. Dear.  And

24   then at the time that the use-of-force team, if it was

25   necessary, then there would be another psychologist that would

Robert Sarrazin - Cross

1    spend the time to do what's called confrontation avoidance,

2    give Mr. Dear another opportunity to submit to hand restraints

3    so the injection could be given.

4    Q.  And as my question stated, if he refuses the hand

5    restraints, so refuses to be essentially handcuffed, the

6    use-of-force team comes in?

7    A.  Correct.

8    Q.  And when they leave, they all back out.

9    A.  Correct.

10   Q.  And they leave him in a cell.

11   A.  Yes.

12   Q.  By himself.

13   A.  Yes.

14        THE DEFENDANT:  They already did that.  Colorado.

15   BY MS. STRICKLIN:

16   Q.  Now, how much Mr. Dear will resist taking his medications

17   is unpredictable, correct?

18   A.  Correct.

19   Q.  But if we take him at his word, he does not want to take

20   antipsychotic medications?

21   A.  That's correct, he does not want to.

22   Q.  Now, the proposed treatment plan also takes into account

23   that the administration of antipsychotic medications requires

24   monitoring.

25   A.  Correct.

Robert Sarrazin - Cross

1   Q.  And you and Dr. Preston Baecht have talked about what I am

2   going to categorize as three different areas of monitoring, the

3   first being observation, correct?

4   A.  Yes.

5   Q.  And Dr. Preston Baecht testified that when she meets with a

6   patient, she is also observing them to determine whether they

7   are experiencing any side effects, correct?

8   A.  Correct.

9   Q.  Now, there are certain side effects that she may be able to

10  observe.  There are others that are occurring internally within

11  the body that she may not be able to observe.

12  A.  Correct.

13  Q.  The second way that I have categorized monitoring is

14  self-reporting of the patient.

15  A.  Yes.

16  Q.  Dr. Preston Baecht testified that she would ask the patient

17  how they are doing.

18  A.  Correct.

19  Q.  Now, the success of this monitoring depends on the

20  patient's willingness to self-report how they are doing.

21  A.  Correct.

22  Q.  And there are times in which a patient will not do that.

23  A.  That is correct.

24       THE DEFENDANT:  That's me.

25  BY MS. STRICKLIN:

224

Robert Sarrazin - Cross

1    *Q.*  Now, the third type of monitoring as I have categorized

2    them is testing.

3    *A.*  Yes.

4    *Q.*  And you testified that you believe monitoring includes at a

5    minimum a blood test about every three months?

6    *A.*  Correct.

7    *Q.*  A weight assessment about every month?

8    *A.*  Yes.

9    *Q.*  And then for Mr. Dear it should include EKG testing?

10   *A.*  Yes.

11   *Q.*  And blood pressure testing?

12   *A.*  Yes.

13   *Q.*  And that monitoring also requires his cooperation.

14   *A.*  That is correct.

15   *Q.*  Or a court order is what you testified to, correct?

16   *A.*  The laboratory tests, if the Court has that specifically

17   into the order, then yes, we would do involuntary laboratory

18   studies.

19   *Q.*  Now, I think you were asked on direct whether or not if the

20   Court ordered EKG testing with more frequency than your plan

21   proposes, whether or not you would accommodate that, correct?

22   *A.*  Yes.

23   *Q.*  And the answer was yes?

24   *A.*  Correct.

25   *Q.*  And again, this would require some level of cooperation on

Robert Sarrazin - Cross

1    the part of Mr. Dear?

2    *A.*  Yes, it would.

3    *Q.*  And as we've discussed, so far he has not been cooperative?

4    *A.*  That is correct.

5    *Q.*  You also testified that a court order I guess specifically

6    for the laboratory testing is not uncommon.

7    *A.*  Involuntary laboratory studies is not uncommon and to have

8    that part of the *Sell* order is not uncommon.

9    *Q.*  So there are patients that continue to refuse to

10   participate in laboratory testing.

11   *A.*  Yes.

12   *Q.*  And that is not uncommon.

13   *A.*  That is correct.

14   *Q.*  Despite testimony that after patients begin taking

15   medications, they suddenly cooperate.

16   *A.*  They oftentimes do, yes.  But do they always?  No.

17   *Q.*  And if an emergency were to happen, you may be reliant on

18   the patient reporting it, correct?

19   *A.*  Such as what?

20   *Q.*  Someone has a cardiac event, someone experiences heart

21   racing, those types of things, an emergency.

22   *A.*  Yes.  Again, we have staff members that are there doing

23   rounds, nursing staff, correctional staff.  And then yes, if

24   Mr. Dear had any complaints or problems, he would make us aware

25   of those, yes.

Robert Sarrazin - Cross

1    *Q.*  So you are reliant on either someone reporting that they

2    are experiencing something or a correctional officer noticing

3    it for a patient who is in a locked cell, correct?

4    *A.*  Yes, and other staff making rounds when they make their

5    rounds, yes, checking up on him and making sure he is doing

6    okay; but no, he is not on one-on-one observation, no.

7    *Q.*  Now, I just want to review this with you one additional

8    time, Dr. Sarrazin.  Now, the proposed treatment plan is in

9    existence because Mr. Dear has refused to take antipsychotic

10   medications.

11   *A.*  Correct.

12   *Q.*  If Mr. Dear is involuntarily given antipsychotic

13   medications and he experiences a side effect, whether it be a

14   common or uncommon side effect, oftentimes the plan is to

15   ameliorate that by giving him additional medications, correct?

16   *A.*  Correct.

17   *Q.*  For example, this is the benzodiazepine.

18   *A.*  Yes.

19   *Q.*  The plan also presumes that for Mr. Dear to safely be given

20   these antipsychotic medications, he may need to take other

21   adjunct medications like an antihypertensive, correct?

22   *A.*  Correct.

23   *Q.*  Or a statin, correct?

24   *A.*  Correct.

25   *Q.*  Which he does not want to take.

Robert Sarrazin - Cross

1   A.  Correct.

2   Q.  So now we are on the level of forcing upon him an

3   antipsychotic medication and one or more adjunct medications,

4   correct?

5   A.  Correct.

6   Q.  And the plan also presumes that to effectively monitor

7   Mr. Dear, there is a series of testing that needs to be done

8   including laboratory testing?

9   A.  Correct.

10  Q.  EKG testing?

11  A.  Correct.

12  Q.  Vital sign assessments?

13  A.  Yes.

14  Q.  Which Mr. Dear has routinely refused.

15  A.  Correct.

16  Q.  So now we are in a place where we are forcing upon him

17  antipsychotic medications, adjunct medications and testing,

18  correct?

19  A.  Correct.

20       MS. RHYNE:  Objection, calls for speculation,

21  argumentative, asked and answered.

22       THE COURT:  Well, we are in luck.  It's a hearing to

23  the Court.  The objection is overruled.  Eventually I will sift

24  the wheat from the chaff, if you will.

25       MS. STRICKLIN:  Your Honor, if I may have one moment,

Robert Sarrazin - Redirect

1  please.

2          THE COURT:  You may.

3          MS. STRICKLIN:  And I have no further questions, Your

4  Honor.  Thank you.

5          THE COURT:  Thank you.

6          Redirect examination, Ms. Rhyne.

7          MS. RHYNE:  Thank you, Your Honor.

8                    **REDIRECT EXAMINATION**

9  BY MS. RHYNE:

10 Q.  First, Dr. Sarrazin, did I hear you testify that in order

11 to safely be given these antipsychotic medications, Mr. Dear

12 would need to be on a hypertensive medication?

13 A.  No.

14 Q.  Okay.  If I heard that, I misunderstood it?

15 A.  I misunderstood the question if that was what I stated.

16 No.

17         THE COURT:  Ms. Rhyne, will you please pull that

18 microphone closer to you.

19         MS. RHYNE:  Thank you.

20 BY MS. RHYNE:

21 Q.  Just to be clear, did I hear you testify that he needed to

22 be on a statin in order to safely take these antipsychotic

23 medications?

24 A.  No, he does not need to be on a statin.

25 Q.  Ms. Stricklin asked you how much of the monitoring requires

Robert Sarrazin - Redirect

1   on a patient self-reporting their symptoms.  If someone had an

2   emergency event in which hypothetically they collapsed to the

3   floor, does your monitoring system at the medical facility

4   allow for that?  Does it provide for that type of observation?

5   A.  Yes.  If someone is in a locked cell, our correctional

6   staff round frequently on the units.  If it's during the

7   daylight hours, we have many staff on the units at all times.

8   In the evening there are correctional staff there, so if

9   someone is in a locked housing and they have some issue, they

10  can -- they are rounded on to see if there are any problems,

11  but they also can get staff's attention at any time.

12  Q.  For some of these more serious side effects is there

13  usually some sort of physical component to the reaction that

14  one of your staff members would observe and respond to?

15  A.  Yes.

16  Q.  So you're not relying on self-reporting by the patient for

17  one of these severe serious side effects?

18  A.  That is correct.

19  Q.  Now, Ms. Stricklin talked to you about how you had that

20  involved discussion with Mr. Dear about taking hypertensives.

21  Do you recall that?

22  A.  Yes.

23  Q.  And you wanted to make sure it was documented that he

24  understood all the risks, and he still refused the medicine; is

25  that right?

1    A.   That is correct.

2    Q.   In your assessment, that refusal was not related to his

3    delusions; is that right?

4    A.   That is correct.

5    Q.   Does that change your testimony that you believe that

6    taking antipsychotics might make him more receptive to this

7    kind of health treatment in the future?

8    A.   No, not at all.  I think the underlying issues over and

9    over that he refuses laboratory studies, refuses treatment, all

10   the things that he refuses just underlines the importance of

11   treating his mental illness and treating his delusional

12   disorder so he becomes less obsessed with that and less -- you

13   know, that's everything to him and that he is able to work both

14   with his attorneys, but also with us and with our medical staff

15   to address these medical issues that he has, and that is not

16   uncommon.  The fact that Mr. Dear's delusions aren't directly

17   related to why he doesn't take his antihypertensive does not

18   change my testimony that with treatment the likelihood that he

19   will become more cooperative on all levels of his treatment.

20             MS. RHYNE:  Thank you.  No further questions.

21             THE DEFENDANT:  To resist abortion.

22             THE COURT:  Just a moment, Mr. Dear.

23        May this witness be excused and released from

24   subpoena?  Any objection by the government?

25             MS. RHYNE:  No, Your Honor.  Thank you.

1          *THE COURT:*  By the defense?

2          *MS. STRICKLIN:*  No, Your Honor.  Thank you.

3          *THE COURT:*  Doctor, you are both excused and released

4    from subpoena with our thanks.

5          I state the obvious.  That brings us to a conclusion

6    of this first day of hearing.  I propose that we resume

7    tomorrow at 8:30 a.m., but I inquire is that unreasonable or

8    terribly inconvenient for any party in interest including the

9    Marshal Service?  I discern no objection.  We are in recess as

10   concerns this case and hearing until tomorrow at 8:30 a.m.

11         *THE DEFENDANT:*  You denied me my right to take the

12   stand.  I had a right to take the stand you bastard.  Go to

13   hell.  Blackburn in hell.

14      (Recess at 4:55 p.m.)

15                              INDEX

16   Item                                                     Page

17   WITNESSES

18      Lea Ann Preston Baecht

19            Direct Examination By Ms. Rhyne                  4

20            Cross-examination By Ms. Beck                    82

21            Redirect Examination By Ms. Rhyne               108

22      Robert Sarrazin

23            Direct Examination By Ms. Rhyne                 111

24            Cross-examination By Ms. Stricklin              171

25            Redirect Examination By Ms. Rhyne               228

1                           INDEX (Continued)

2                               EXHIBITS

3    Exhibit       Offered  Received  Refused  Reserved  Withdrawn

4    Government's 1            7

5    Government's 2           20

6    Government's 3           40

7    Government's 4           32

8    Government's 5           44

9    Government's 6           55

10   Defense 12              215

11   Defense 13              207

12   Defense 14 - 17         210

13   Defense 18              211

14   Defense 19 - 21         213

15                      REPORTER'S CERTIFICATE

16       I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.  Dated

18   at Denver, Colorado, this 18th day of November, 2022.

19

20                              S/Janet M. Coppock

21

22

23

24

25