1    IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
2
     Criminal Action No. 19-CR-00506-PAB
3
     UNITED STATES OF AMERICA,
4
          Plaintiff,
5
     vs.
6
     ROBERT LEWIS DEAR, JR.,
7
          Defendant.
8    _____

9                   REPORTER'S TRANSCRIPT
                   *Sell* Hearing, Volume 2
10   _____

11          Proceedings before the HONORABLE PHILIP A. BRIMMER,

12   Judge, United States District Court for the District of

13   Colorado, commencing at 8:50 a.m., on the 31st day of August,

14   2022, in Courtroom A1001, United States Courthouse, Denver,

15   Colorado.

16

17

18

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                            APPEARANCES

 2          Pegeen Rhyne, U.S. Attorney's Office,

 3  1801 California Street, Suite 1600, Denver, CO 80202;

 4          Maura White, U.S. Department of Justice,

 5  950 Pennsylvania Avenue, N.W., Washington, DC 20530, appearing

 6  for the Plaintiff.

 7          Natalie Stricklin and Jennifer Beck, Office of the

 8  Federal Public Defender, 633 17th Street, Suite 1000, Denver,

 9  CO 80202, appearing for the defendant.

10

11                           PROCEEDINGS

12          THE COURT:  Good morning and please be seated.

13          Very well.  During yesterday's hearing Mr. Dear

14  repeatedly engaged in disruptive behavior consisting of

15  unsolicited and largely irrelevant comments, many of which were

16  obviously intended to offend and insult the witnesses as they

17  testified.  On more than one occasion the Court admonished and

18  warned Mr. Dear that if this disruptive behavior continued, the

19  Court would have him removed from the courtroom.

20  Notwithstanding, Mr. Dear persisted in his froward antics in

21  acting up and out.

22          For the most part, I chose initially to ignore this

23  recusant and contumacious conduct.  However, the coup de gras

24  came at the end of the day when Mr. Dear erupted and launched

25  into a tantrum during which he cursed the Court wishing it
```

1    harm.

2              In my initial analysis, I concluded, albeit

3    erroneously, that Mr. Dear's disruptive behavior was a

4    manifesta of his mental illness.  However, after a review of

5    the evidence educed during yesterday's hearing, I now conclude

6    that this was conduct born of a selfish, childish and

7    disaffected arrogance for which Mr. Dear is personally

8    responsible and countable and cannot claim mental illness as an

9    explanation or defense.

10             This conduct evinces a philosophy of abject disrespect

11   for our judicial system and the rights of others.  As such,

12   this disruptive behavior is offensive to the dignity and

13   authority of the Court and impedes the orderly administration

14   of justice.

15             Mr. Dear's flagrant and unexcused disregard in the

16   courtroom of the elementary standards of proper conduct will no

17   longer be tolerated.  This continuing demonstration of

18   disrespect for the Court cannot and will not continue with

19   impunity.  No longer will the Court turn a blind eye to such

20   disruptive behavior.

21             Thus for the last time the Court admonishes and warns

22   Mr. Dear that further verbal outbursts will result in his

23   immediate summary removal from the courtroom to the adjacent

24   holding cell where he may listen to the hearing and consult

25   with his counsel during recesses.  If removed for such

Matthew Richard Holland - Direct

1    disruptive behavior, Mr. Dear may return if he credibly

2    promises to conduct himself properly.

3          Very well.  If the government is prepared to proceed,

4    it may call its next witness.

5          MS. WHITE:  Thank you, Your Honor.  The government

6    calls Dr. Matthew Holland to the stand.

7       (**Matthew Richard Holland** was sworn.)

8          THE WITNESS:  I do.

9          THE COURT:  Counsel, you may inquire.

10         MS. WHITE:  Thank you, Your Honor.

11                      **DIRECT EXAMINATION**

12   BY MS. WHITE:

13   Q.  Doctor, can you please state and spell your name for the

14   record?

15   A.  Matthew Richard Holland, H-O-L-L-A-N-D.

16   Q.  And can you spell your first name as well?

17   A.  M-A-T-T-H-E-W.

18   Q.  Thank you.  Dr. Holland, what do you do for a living?

19   A.  I am a cardiologist.

20   Q.  Where do you work?

21   A.  I am at Denver Health.

22   Q.  What do you do at Denver Health?

23   A.  I am the director of interventional cardiology.

24   Q.  How long have you held that position?

25   A.  Almost six years.

Matthew Richard Holland - Direct

1    Q.  Can you describe your prior employment for the Court?

2    A.  Yes.  So I graduated medical school in '85; did residency,

3    '88; fellowship done in '92.  So after '92 I was on faculty at

4    University of New Mexico, director of the Albuquerque VA

5    cardiac cath lab.  And then in '95 I moved to Boulder, Colorado

6    in private practice.  I was in private practice until early

7    2017 when I joined faculty of University of Colorado as

8    director of the Denver Health interventional cardiology

9    program.

10   Q.  You mentioned your education briefly.  Can you please

11   explain your educational background for the Court?

12   A.  Sure.  I went to college in Colorado at Colorado College,

13   graduated in '85 -- no, '81; graduated from Johns Hopkins for

14   medical school in '85; did residency in internal medicine for a

15   three-year internal medicine residency at Johns Hopkins; and

16   then a four-year cardiology fellowship at University of Utah.

17   Q.  Do you hold any medical licenses or certifications?

18   A.  I am licensed to practice in the state of Colorado.  I am

19   board certified in internal medicine, general cardiovascular

20   diseases and interventional cardiology.

21   Q.  Are you familiar with the use of antipsychotic medications

22   in patients with underlying cardiovascular issues?

23   A.  I am.

24   Q.  How have you become familiar?

25   A.  Well, cardiovascular disease is very common and use of

Matthew Richard Holland - Direct

1    antipsychotic medications is relatively common, so there is

2    frequently the need to either start antipsychotic medication in

3    a patient with known cardiovascular disease or a patient who is

4    on antipsychotic medications presents with cardiovascular

5    disease.  So I frequently have had the opportunity to consult

6    with and partner with psychiatrists, general medicine

7    practitioners, neurologists and clinical pharmacists in the

8    administration, safe administration of antipsychotic medication

9    in patients with cardiovascular disease.

10   Q.  So I think if I got my math right, you have been a

11   cardiologist for about 30 years; is that correct?

12   A.  That's correct.

13   Q.  Approximately how many times during your 30-year career

14   have you consulted like that with psychiatrists and other

15   doctors?

16   A.  It's tough to give an exact answer, but I would say that

17   when I was in private practice and the patients were solely my

18   responsibility, which I was in private practice for 23 years,

19   it was not infrequent at all, maybe once a month or 10 times a

20   year, so that's at least 200.  In my current practice, there is

21   a much larger multi-disciplinary team taking care of patients,

22   you know, so I see the interaction, but my exact consultation

23   with the psychiatrist is only happening, you know, probably two

24   or three times a year.

25   Q.  Approximately what percentage of your patients are being

Matthew Richard Holland - Direct

1    treated with antipsychotics in your current role?

2    *A.*    It's tough to say for sure, but the population of patients

3    we treat at Denver Health has a fairly high use of psychotropic

4    medications, both antipsychotics as well as others, so I would

5    say on the top end it's probably around 10 percent of the

6    patients that I see, but it's a significant number.

7    *Q.*    Do you ever consult with pharmacologists or pharm Ds?

8    *A.*    Yes, all the time.

9    *Q.*    In what capacity?

10   *A.*    The standard most common interactions I have with pharm Ds

11   has to do with anti-coagulation monitoring.  A lot of patients

12   with cardiovascular disease are on various anticoagulants, and

13   monitoring and adjustments because of drug interactions,

14   patient interactions, it frequently needs adjustment.  And

15   that's done through our anti-coagulation clinic with pharm Ds.

16   Do a lot of adjustment of lipid lowering medication and

17   antihypertensive medication.  And then on rounds every day we

18   have a pharm D in the ICU rounding with us to discuss the

19   medications we are using and drug interactions.  And then, you

20   know, certainly when we are starting, let's say, an

21   anti-arrhythmic drug in a patient on multiple other drugs, we

22   frequently involve the pharm D.

23   *Q.*    Are pharm Ds medical doctors?

24   *A.*    No, they are not.

25   *Q.*    Based on your experience, are antipsychotic medications

Matthew Richard Holland - Direct

1    safely prescribed to people with cardiac or cardiovascular

2    disease?

3    A.   Yes.

4    Q.   Even with significant cardiovascular disease?

5    A.   Yes.

6    Q.   Have you been retained by the United States in this case?

7    A.   I have.

8    Q.   Were you hired to review Mr. Dear's medical records and to

9    opine whether -- about his cardiac and cardiovascular history?

10   A.   I was, yes.

11   Q.   Were you also asked to opine whether that history or any

12   other medical condition caused the four recommended

13   antipsychotic medications to be contraindicated for Mr. Dear?

14   A.   Yes.

15   Q.   Are you being paid for your time?

16   A.   I am.

17   Q.   How much per hour?

18   A.   $300.

19   Q.   Approximately how many hours have you spent on this matter?

20   A.   Probably up to 30.

21   Q.   As part of your review in this case, did you ever meet with

22   or examine Mr. Dear?

23   A.   I have not.

24   Q.   Did you review all of the materials that the United States

25   sent you?

Matthew Richard Holland - Direct

1   *A.*   I have.

2   *Q.*   Did that initially include approximately 1800 pages of

3   Mr. Dear's medical records?

4   *A.*   Yes.

5   *Q.*   Including his Bureau of Prisons medical records?

6   *A.*   Yes.

7   *Q.*   And his medical records from Colorado Mental Health

8   Institute at Pueblo?

9   *A.*   Yes.

10   *Q.*   The testimony of Dr. DeQuardo and Morton from Mr. Dear's

11   state *Sell* hearing?

12   *A.*   Yes.

13   *Q.*   Dr. Sarrazin's recommendation and treatment plan?

14   *A.*   Yes.

15   *Q.*   After you completed your expert report in this case, did

16   the government send you additional materials that we received

17   from the defense to review?

18   *A.*   Yes.

19   *Q.*   Did that include records from Parkview Hospital where

20   Mr. Dear was admitted in January of 2018?

21   *A.*   Yes.

22   *Q.*   Additional medical and mental health records from the

23   Bureau of Prisons?

24   *A.*   Yes.

25   *Q.*   Dr. Morton's May 23rd, 2022 expert opinion?

Matthew Richard Holland - Direct

1   *A.*  Yes.

2   *Q.*  And Dr. Woods' May 23rd, 2022 expert opinion?

3   *A.*  Yes.

4   *Q.*  Did your review of those additional materials change your

5   opinions about Mr. Dear in any way?

6   *A.*  They answered the question about whether Mr. Dear ever

7   suffered a heart attack in my opinion.  The records from

8   Parkview were only alluded to in the first set of information I

9   had received, but when I actually reviewed the records from

10  Parkview, it was clear that he had not suffered a heart attack.

11  And so it made my feelings -- you know, even if he had suffered

12  a heart attack, I felt the same but just made them stronger.

13  *Q.*  Do you have an opinion regarding whether the four

14  recommended medications are contraindicated for Mr. Dear based

15  on his cardiac history?

16  *A.*  Yes.

17  *Q.*  What is that opinion?

18  *A.*  Those four medications that have been outlined in the

19  treatment plan are not contraindicated based on the information

20  I have received and reviewed for use in Mr. Dear.

21  *Q.*  I am going to show you what has been marked as Government's

22  Exhibit 7 for identification.  And you should also have a

23  binder, Dr. Holland, that you can review as well.

24  *A.*  Okay.

25  *Q.*  What is Government's Exhibit No. 7?

Matthew Richard Holland - Direct

1    *A.*  It is -- it's my written expert opinion from May 23rd,

2    2022.

3              *MS. WHITE:*  Your Honor, I seek that Government's No. 7

4    be admitted into evidence at this time.

5              *THE COURT:*  Response?

6              *MS. STRICKLIN:*  Your Honor, at this time I would

7    object on foundation grounds for this expert exhibit being

8    admitted.

9              *THE COURT:*  Well, what component, if any, of the

10   foundational predicate for admission is missing?

11             *MS. STRICKLIN:*  I don't think that Dr. Holland has

12   been qualified as an expert.

13             *THE COURT:*  Well, he doesn't have to be formally

14   offered.  That all stopped in 1972.  And therefore, the

15   objection is overruled.  Instead, the Court finds on the

16   evidence deduced *pro tanto* that this physician, this

17   cardiologist, is well qualified by his education, background,

18   training, experience and knowledge which is sufficient for him

19   to opine under Rule 702 as an expert witness.  And Government's

20   Exhibit's 7 for identification is admitted in evidence with

21   leave to publish and discuss.

22             *MS. WHITE:*  Thank you, Your Honor.

23             And I request that Dr. Holland be allowed to refer to

24   this report as necessary during his testimony as well.

25             *THE COURT:*  Well, subject to cogent objection to the

Matthew Richard Holland - Direct

1    contrary, you may proceed.

2         MS. WHITE:  Thank you, Your Honor.

3    BY MS. WHITE:

4    Q.  First, Dr. Holland, what does contraindicated mean?

5    A.  Contraindicated is a fairly broad and nonspecific term.  We

6    have -- we use terms in medicine such as relatively

7    contraindicated or absolutely contraindicated, and they are

8    just sort of warnings to us to look and see why we -- there

9    might be risk or some other reason for giving a medication,

10   doing a procedure.  And so something that's relatively

11   contraindicated suggests that you better have a good reason for

12   doing it and certainly having looked at alternatives and made

13   sure that everyone involved in the treatment, especially, you

14   know, the entire team, that you are making the right decision

15   and that anything that you do has been well thought out.

16        There are things that are theoretically, you know,

17   absolutely contraindicated.  It doesn't mean you don't do them,

18   but you do them with your eyes wide open and making sure that

19   you're doing that in the patient's best interest.

20   Q.  Are the four recommended medications absolutely

21   contraindicated for Mr. Dear?

22   A.  No.

23   Q.  Are any of the four recommended medications relatively

24   contraindicated for Mr. Dear?

25   A.  No.

Matthew Richard Holland - Direct

1   Q.   How prevalent is heart disease?

2   A.   Heart disease is extremely prevalent.  It depends on how

3   you define heart disease, but things like hypertension can

4   affect about 50 percent of American adults.  25 percent of all

5   caused mortality in this country is directly related to

6   ischemic heart disease, which is coronary artery disease, so

7   heart disease is very prevalent.

8   Q.   Are patients who suffer serious cardiac events typically

9   aware that they have heart disease prior to that event?

10  A.   No, unfortunately not.  The majority of patients with

11  underlying cardiovascular disease don't know that they have it

12  and are pretty unaware of their risk until they have an initial

13  event.

14  Q.   Why is that important with respect to the safety of

15  antipsychotic medication?

16  A.   Well, the majority of patients who receive antipsychotic

17  medications don't have a cardiologist involved in the decision

18  to start antipsychotic medication.  It's generally initiated by

19  their psychiatrist or other treatment -- primary treatment

20  provider.  So there is this overlap of and a great deal of

21  knowledge from beginning these medications and sustaining the

22  use of these medications in patients who have significant

23  cardiovascular risk without established heart disease.

24  Q.   Let's start with your review of Mr. Dear's medical records.

25  Based on your review, does Mr. Dear suffer from any medical

Matthew Richard Holland - Direct

1    condition?

2    A.   Yes.

3    Q.   What?

4    A.   Hypertension.

5    Q.   What is hypertension?

6    A.   Hypertension is high blood pressure.  And, you know, in its

7    simplest form it's what we get measured with the blood pressure

8    cuff.  And without going into too much minutia, we have

9    understood probably since the 1920s or 1930s that people with

10   higher blood pressure have a higher risk of certain diseases.

11   We finally started treating blood pressure in the 1970s, which

12   really wasn't that long ago.  And the guidelines continue to

13   change where we understand that treating blood pressure can be

14   beneficial and we get stricter and stricter as to what we're

15   trying to do.

16   Q.   Why do you believe that Mr. Dear has hypertension?

17   A.   Well, it's pretty clear in his medical record that although

18   there aren't a ton of blood pressure readings, there are a

19   significant number, and just about every single one is

20   elevated.

21   Q.   Is he currently medicated for his hypertension?

22   A.   To the best of my knowledge, no.

23   Q.   Has he ever been medicated for his hypertension?

24   A.   Yes.  When he was in Parkview, I saw that he was started

25   initially on two intravenous medications, nicardipine and

Matthew Richard Holland - Direct

1   labetalol, and then transitioned to oral medications which were

2   prescribed at discharge.  And my understanding based on the

3   record was that those were not continued.

4   Q.  And why were they not continued?

5   A.  From what I could tell, Mr. Dear refused to take the

6   medication.

7   Q.  Would Mr. Dear benefit from taking medication to control

8   his hypertension?

9   A.  The broad answer is yes.  The -- there can be a lot of

10  people who have high blood pressure never have a negative event

11  related to that, but when you look at large populations and the

12  level of Mr. Dear's blood pressure, my opinion is yes.

13  Q.  Is uncontrolled hypertension by itself dangerous to a

14  patient?

15  A.  Yes.

16  Q.  Why?

17  A.  Prolonged uncontrolled high blood pressure is known to lead

18  to a number of significant what are called end organ events or

19  end organ damage.  From a cardiologist standpoint the most

20  common is something called left ventricular hypertrophy which

21  is thickening of the heart muscle.  It's sort of like you are

22  thinking if the heart has to pump at a higher pressure, it's

23  like a weightlifter lifting weights and your muscle gets

24  bigger, it thickens.  And that over time can lead to heart

25  dysfunction and something called congestive heart failure.

Matthew Richard Holland - Direct

1      It can lead to -- uncontrolled hypertension is one of

2  the leading causes of kidney dysfunction and certainly the most

3  dreaded risk of uncontrolled hypertension is stroke.  And there

4  are other end organ involvement including vascular disease and

5  in the periphery in the heart and in the eyes.

6  Q.  Are any of those things that you mentioned potentially life

7  threatening?

8  A.  Yes, just about all of them.

9  Q.  Was Mr. Dear admitted to Parkview Hospital on January 30th

10  of 2018?

11  A.  Yes.

12  Q.  What happened during that admission?

13  A.  Based on my review of the records, he wasn't feeling well.

14  He did have some dizziness and nausea it sounded like

15  initially.  His blood pressure was extremely high with a

16  systolic pressure that's the top number of 240, which is quite

17  high.  He ended up admitted to Parkview Hospital, was found to

18  be severely hypertensive, dehydrated, and ultimately was

19  diagnosed with something called gallstone pancreatitis and

20  underwent a cholecystectomy, which is removal of the

21  gallbladder, and appears to have been uneventfully discharged.

22  Q.  Is it common to have severe hypertension during an acute

23  illness like that?

24  A.  Yes, acute illness, especially something that is associated

25  with either pain, nausea, fever can all exacerbate

Matthew Richard Holland - Direct

1  hypertension, that is make baseline blood pressure worse.  And

2  certainly people who are not hypertensive at baseline can

3  present with hypertension in the setting of acute illness.

4  Q.  Did Mr. Dear receive any EKGs while he was hospitalized at

5  Parkview?

6  A.  He did.

7  Q.  Have you reviewed the EKGs from that hospital admission?

8  A.  I have.

9  Q.  Dr. Holland, I would like to ask you to explain what an EKG

10  is.  Is there anything that would aid in your testimony?

11  A.  Well, I can -- rather than trying to explain it in words,

12  it's sometimes easier to actually draw you a picture and show

13  you what it is.  I think I could make it pretty simple with a

14  cartoon.

15  Q.  So would a pad of paper and --

16  A.  That would be great.

17      MS. WHITE:  Your Honor, with the Court's permission, I

18  ask that Dr. Holland be permitted to step down from the witness

19  stand and use the large pad of paper and marker during this

20  portion of his testimony.

21      THE COURT:  Leave is granted as requested.

22      Doctor, you may step down for that exercise.

23  A.  This is a very simple cartoon.  This is my depiction of the

24  heart.  And the heart has four chambers.  There is the right

25  atrium, the left atrium, the left ventricle and the right

Matthew Richard Holland - Direct

1    ventricle.  The whole point of the heart is to pump blood.  The

2    left ventricle pumps oxygenated blood out to the body.  The

3    right ventricle pumps the blood that the oxygen has been used

4    up to the lungs.  This blood from the lungs comes back to the

5    left atrium.  And blood from the body where there is no oxygen,

6    the venous blood comes back to the right atrium.  So you need

7    to have a coordinated activity between the upper and lower

8    chambers.

9         Up here in the right atrium are the normal pacemaker

10   cells of the heart.  They are programmed to let out what I

11   would consider a little spark every time the heart is to beat.

12   So if you are sitting at rest with a heart rate of 60 beats a

13   minute, a little spark comes out every second.  And that spark

14   spreads across the atrium.  They contract.  And on the EKG we

15   see a little blip that we call the P wave.

16        There is insulation between the upper and lower

17   chambers because you've got to give time for the blood to pass

18   from the upper to lower chambers.  That takes about a fifth of

19   a second before the electrical activity is passed through some

20   specialized fibers to the ventricles which then squeeze and we

21   see this big spike everyone is aware of on the EKG.  That is

22   the ventricles contracting are called depolarization.  And on

23   the EKG because there is potentially three waves here, it's

24   called the QRS.  Then the ventricles relax, and as they relax

25   they do something called repolarization.  And on the EKG that

Matthew Richard Holland - Direct

1    is shown is something called the T wave.  And then the next

2    beat starts again.

3            So we are going to talk a little about something

4    called the QT interval, which is just the time from the start

5    of the depolarization to when the ventricles repolarize.  And

6    it turns out that when the QT -- there is certain drugs and

7    other conditions that can make that repolarization take longer

8    and can indicate the potential for development of abnormal

9    heart rhythms.  That's it, I think.

10           THE COURT:  Does either party request or require that

11   this demonstration, artistic demonstration, be marked as a

12   hearing exhibit?

13           MS. WHITE:  Yes, Your Honor, on behalf of the

14   government.

15           THE COURT:  Any objection?

16           MS. STRICKLIN:  No.

17           THE COURT:  I propose this be marked as Government's

18   Exhibit 8?

19           COURT DEPUTY CLERK:  Your Honor, Government's Exhibit

20   9 is the next on the list.

21           MS. RHYNE:  I apologize, Your Honor.  I think we would

22   request 12.  There may be other things coming.

23           THE COURT:  12 it is.

24   BY MS. WHITE:

25   Q.  Doctor, what happens when the QT is prolonged?

Matthew Richard Holland - Direct

1    *A.* Well, in general, nothing happens, but the QT prolongs --

2    you know, on a physiologic basis it just means that there is

3    delay in the repolarization, which is the getting back to the

4    normal electrical charge of the cell membrane within some of

5    the heart muscle cells.

6    *Q.* Are there any risks associated with a prolonged QT?

7    *A.* Yes.

8    *Q.* What are they?

9    *A.* Prolonged QT is known to be a risk factor for the

10   development of certain -- potentially severe and potentially

11   fatal cardiac rhythm disturbances.

12   *Q.* Does that include arrhythmia?

13   *A.* Yes.  Arrhythmia is another way of saying that same thing.

14   *Q.* Okay.  Getting back to Mr. Dear's EKGs, what did Mr. Dear's

15   EKGs from his Parkview Hospital admission show?

16   *A.* I believe there were four EKGs, and for the most part they

17   were normal.  I believe there were two that had something

18   called a PVC or a premature ventricular contraction.  And other

19   than that there were -- there might have been one with a PAC,

20   which is a premature atrial contraction.  These are very common

21   known extra beats, but the QT interval was not significantly --

22   was not prolonged.  And there was certainly no evidence of --

23   again without getting into too much detail, when someone has a

24   heart attack in the acute phase, there are things called ST and

25   T wave changes, and someone who has had a heart attack will

Matthew Richard Holland - Direct

1   have things called Q waves, and none of those were present.

2   *Q.*  Did Mr. Dear also have a screening for his triponin levels

3   while he was admitted at Parkview?

4   *A.*  He did.

5   *Q.*  What were those readings?

6   *A.*  There was four -- I believe there were four triponin

7   measurements, and one of them was barely out of the upper end

8   of normal range.  I believe it was the second one.

9   *Q.*  What is triponin?

10   *A.*  Triponin is an enzyme, well, a protein, but an enzyme that

11   is specifically found in heart muscle.  And when -- normally

12   you should not be able to find triponin in peripheral blood, so

13   when you draw a blood sample, there should not be triponin.

14   *Q.*  What is the medical significance of -- and I believe you

15   testified of a level just outside the normal range as were

16   Mr. Dear's?

17   *A.*  None, but it depends on the context.

18   *Q.*  If it's a -- one just outside the normal range in someone

19   who presents with classic findings of a heart attack, say with

20   chest pain, EKG changes, and then the next triponin is a

21   hundred times or a thousand times outside the normal range, the

22   first triponin was a sign of an early onset heart attack.

23        But when you have a single triponin value, and I

24   believe triponin is relatively new in its use, in the last 10

25   to 12 years, and the assays have been changing.  We are now

Matthew Richard Holland - Direct

1    using something a little different than the one Mr. Dear had at

2    Parkview even.  We are now using something called the high

3    sensitivity triponin.  So I had to look back, and I believe his

4    value that was out of range, the upper end of normal was .034.

5    His was .037.  And on the -- for that particular assay for it

6    to be considered significantly elevated would have to be

7    greater than .12, so more than four times what his was.

8            And then the next one a few hours later was normal.

9    So, you know, in this particular situation, it was not

10   considered by the doctors there, from what I can tell, to be of

11   any significance, and it certainly doesn't look significant to

12   me.

13   Q.  Dr. Holland, can you spell the word assay for the record?

14   A.  A-S-S-A-Y.

15   Q.  Thank you.  And just to circle back to what you were saying

16   earlier about the levels with someone who is having a heart

17   attack, what level of triponin would you expect to see in

18   someone who has had a heart attack?

19   A.  Yeah.  So again this is a little more nuanced in that it

20   takes time for the triponin to leak out of the heart muscle

21   cell if there is damage.  So like very early in the course of a

22   heart attack, very low levels, you know, like -- but still

23   outside that for this assay that.12 would be expected.  And

24   then depending on how you treat the heart attack, within six to

25   12 hours the numbers would be in the thousands.  And like today

Matthew Richard Holland - Direct

1   with the high sensitivity triponin assay, just about everyone I

2   treat with a heart attack in putting a stint in will have a

3   triponin within the first 12 hours of 125,000.  And that with

4   the assay that was used at Parkview, if I did the conversion

5   correctly, that would be somewhere in the like 1200 to 1500

6   range.

7   *Q.*  In the clinical setting, would you be involved in a

8   patient's care with a triponin level such as that?

9   *A.*  Not just based on the triponin.  There would have to be

10   a -- for the emergency department or one of the hospitalists or

11   internists to call me, there would have to be a clinical story

12   to go along with it, such as something that had them worried

13   that this was actually a primary cardiac issue or other

14   findings that would make them worried.  But I see -- you know,

15   I get called with borderline and low elevation triponin every

16   day and every night I am on call which is, you know, 13 nights

17   a month around, so ...

18   *Q.*  Is it your opinion that Mr. Dear had his heart attack based

19   on the 2018 Parkview records?

20   *A.*  It is my opinion he did not have a heart attack.

21   *Q.*  Why not?

22   *A.*  There is a definition of what -- and I guess we should say

23   what a heart attack is.  A heart attack is heart muscle damage

24   due to a blocked coronary heart artery, which are these three

25   pipes that sit on the surface of the heart and give the heart

Matthew Richard Holland - Direct

1    muscle blood.  There is a particular definition of what a heart

2    attack is.

3            A heart attack, to meet criteria, you need to have a

4    biomarker, which is what triponin is, elevation that fits a

5    particular pattern where it goes, you know, up.  And then once

6    the heart attack is complete, depending which biomarker you are

7    using, it then comes down.  There has to be evidence of heart

8    muscle damage, structural damage either with an echocardiogram

9    or a cardiac catheterization and there has to be a clinical

10   story.  That is now what is called a Type 1 myocardial

11   infarction.  That is also something called a Type 2 myocardial

12   infarction, which can also can be called a heart attack, but it

13   is also frequently called a non-MI or non-myocardial infarction

14   Type 2 triponin elevation.

15           And there are lots of -- this triponin assay is so

16   sensitive, there are lots of conditions that will give you

17   minor elevations in triponin ranging from just being sick,

18   underlying lung disease, bad high blood pressure, so

19   hypertensive urgency or emergency.  We see it in athletes who

20   just complete a marathon or triathlon or something like that.

21   That does not indicate real heart muscle damage and certainly

22   no heart muscle damage that we could using sophisticated

23   imaging that we could identify.  It's considered a mismatch of

24   supply and demand.  That is, in certain conditions they are

25   just not getting enough oxygen to the heart muscle as it's

Matthew Richard Holland - Direct

1    demanding, and so you get a slight leak of triponin into the

2    blood.

3    Q.  And is that what you believe happened to Mr. Dear back in

4    January 2018?

5    A.  Yeah, based on my review and certainly from what is absent

6    from the physician reports in his -- at Parkview you're seen by

7    an ER doctor, a hospitalist, a pulmonary critical care doctor,

8    a surgeon, an anesthesiologist, there was no mention that any

9    of them thought that he had a real heart attack that I saw, and

10   that this fits the classic pattern of a Type 2 or non-MI

11   triponin elevation.

12   Q.  Does a lack of mention of those things tell you anything

13   about Mr. Dear's medical records and what happened?

14   A.  Well, I don't know the doctors who wrote in that chart, but

15   I know doctors.  And I know, you know, anesthesiologists and

16   pulmonary critical care doctors especially, if they were

17   concerned that his very minor elevation of triponin was

18   anything but a, you know, just an aberrant laboratory finding

19   really, they -- I would have expected them to mention it,

20   especially when you're taking somebody to put them under

21   anesthesia to have urgent surgery.

22          The fact that -- it was mentioned but then just

23   dropped from their notes.  It was like, yeah, there was a

24   slight elevation triponin, normalized, on the next two values

25   were normal, and didn't go beyond that.

Matthew Richard Holland - Direct

1   Q.  You previously testified that you reviewed Dr. Morton's

2   expert report.  Is he a medical doctor?

3   A.  No.

4   Q.  What type of doctor is he?

5   A.  He is a pharm D or a doctor of pharmacology.

6   Q.  In his report Dr. Morton states that the triponin reading

7   may be specific for cardiac damage.  Do you agree?

8   A.  Well, as I mentioned, you know, triponin is, except for

9   very rare occasions, is nowhere else in the body except in the

10  heart.  But in this particular case the level was so miniscule

11  and it was on a single reading, it probably came from his

12  heart, but it didn't indicate any damage.

13  Q.  According to Dr. Morton's report, Mr. Dear has a history of

14  cardiac conduction problems.  Do you agree with that?

15  A.  I do not.

16  Q.  Why not?

17  A.  Well, based on my cartoon illustration, we see that -- and

18  looking at the EKG, his cardiac conduction, that generation of

19  the P wave and then conduction of the P wave through what's

20  called the AV node to the ventricles where you get that big

21  spike in the QRS is completely normal, so I just didn't see any

22  evidence of cardiac conduction disease.

23  Q.  Dr. Morton's report also states that Mr. Dear has a history

24  of cardiac artery vascular disease.  Do you agree with that?

25  A.  I do not.

Matthew Richard Holland - Direct

1    *Q.* Why not?

2    *A.* I am assuming that Dr. Morton, and this is my assumption,

3    that what he was referring to was coronary artery disease,

4    which is coronary atherosclerosis or the No. 1 leading cause of

5    death of Americans which is cholesterol plaque buildup in the

6    walls of coronary arteries.  And I have seen no evidence either

7    conclusive or anything circumstantial that he has

8    atherosclerotic disease.

9         I looked at all the records I could.  There is not an

10   overwhelming amount there, but let's say he had a CT scan done

11   at Parkview to look at -- it was an abdominal CT to look at his

12   pancreatitis and his gallbladder when he presented.  And what

13   was mentioned specifically by the radiologist was normal

14   appearing abdominal aorta.  Again, I am reading something into

15   these knowing how these reports are read.  I haven't seen the

16   images.

17        But when you someone has atherosclerotic disease, you

18   can pick up clues looking at a CT scan of any part of the body

19   and the easiest place is an abdominal CT scan because the aorta

20   is big and you can see atherosclerotic plaque.  You can see

21   calcification within the wall of the aorta.  Now, I am not

22   saying he didn't have it because I didn't see the CAT scan, but

23   what the radiologist read was normal appearing abdominal aorta.

24   And there was nothing else that I saw in the records to suggest

25   he has coronary atherosclerosis or coronary artery disease.

Matthew Richard Holland - Direct

1    Q.  In his report Dr. Woods states that Mr. Dear's EKG results

2    and elevated glucose levels demonstrate that he already

3    suffered from cardiac conduction and other cardiovascular

4    problems.  First, do Mr. Dear's EKG results tell you anything

5    about prior cardiac conduction issues?

6    A.  No.  They just tell me that he doesn't have them.

7    Q.  Do elevated glucose levels tell you whether a patient has

8    cardiac issues?

9    A.  No.

10   Q.  Based on Mr. Dear's medical history, is he the type of

11   patient you would normally be asked to provide a cardiac

12   consult for with respect to antipsychotic medication?

13   A.  No.

14   Q.  Why not?

15   A.  Mr. Dear's medical history is fairly common for the

16   patients that get prescribed antipsychotic medications.  You

17   know, the patients that I generally would consult with a

18   psychiatrist in either adjusting, starting antipsychotic

19   medication or in me recommending to start cardiac medication in

20   someone who is already on an antipsychotic medication have a

21   much more complex cardiac history.  And usually the

22   consultation is because of -- you know, the most common type of

23   drug by far that has effects on this repolarization and the QT

24   interval are prescribed by cardiologists.  They are

25   anti-arrhythmic drugs, so we use those drugs relatively

Matthew Richard Holland - Direct

1    frequently.  And then we really have concerns when we are

2    mixing drugs that can affect repolarization.  So those are the

3    times I would normally be consulted, not in something as

4    straightforward as this.

5    Q.  I am going to now show you Government's Exhibit 4, which

6    has previously been admitted into evidence.  This is

7    Dr. Sarrazin's recommended treatment plan.  What medications

8    does Dr. Sarrazin recommend?

9    A.  Thank you for putting it in front of me.  Paliperidone,

10   aripiprazole, haloperidol and olanzapine.

11   Q.  Are you familiar with these antipsychotic medications?

12   A.  I am.

13   Q.  In your opinion, are any of these medications

14   contraindicated for Mr. Dear?

15   A.  No.

16   Q.  Are any of these medications unsafe for Mr. Dear in light

17   of his medical history?

18   A.  No.

19   Q.  Did you specifically consider Mr. Dear's history of

20   hypertension?

21   A.  I did.

22   Q.  Did you see any other medical condition in his medical

23   records that would cause any of these four recommended

24   medications to be unsafe?

25   A.  No.  I did see that he does have, especially on his most

1    recent blood work, I believe which was from March, mild renal

2    insufficiency or chronic kidney disease or CKD.  The names keep

3    changing in the medical literature, but he has the first real

4    stage of chronic kidney disease, which is stage 3A, and I

5    believe paliperidone has significant renal clearance which

6    would mean that a dose adjustment is usually made for the drugs

7    that are renally cleared.

8    Q.  Just to be clear, are the recommended medications

9    contraindicated in patients with chronic kidney disease?

10   A.  No, not at all.

11   Q.  Okay.  In your experience, can antipsychotics be safely

12   administered to people who have documented hypertension?

13   A.  Yes.

14   Q.  Can you explain why?

15   A.  Well, for the most part they just have no effect on people

16   with hypertension, but there are some drugs and some

17   recommendations that -- in people with hypertension you can use

18   these drugs very safely because they have a modest blood

19   pressure lowering effect.

20   Q.  When partnering with psychiatrists in the administration of

21   antipsychotics, are there specific issues that you are

22   concerned with?

23   A.  Yes.

24   Q.  What issues?

25   A.  Well, as I mentioned briefly earlier, No. 1 is drug-drug

Matthew Richard Holland - Direct

1   interactions.  You know, we always want to know what other drug

2   someone is on or might potentially be placed on.  Certainly

3   concerned about if one is on a diuretic, let's say, that can

4   lead to electrolyte abnormalities, we always want to check

5   baseline electrolytes and correct any electrolyte

6   abnormalities.

7   Q.  Based on your review of Mr. Dear's medical records, is he

8   currently taking any drugs that would create a concern or a

9   risk for you?

10  A.  No.  I didn't see that he was taking any medication.

11  Q.  Are you also concerned about QT intervals when you are

12  making a decision about an antipsychotic medication?

13  A.  Oh, well, yes.  When I am consulted regarding the

14  initiation or adjustment of antipsychotic medication, it is

15  almost always because of someone's concern regarding QT

16  interval.

17  Q.  Why are you concerned about QT intervals?

18  A.  As again mentioned briefly earlier, the QT interval is a

19  marker for abnormal cardiac repolarization.  And we know that

20  there are certain rhythm disturbances that can be very serious

21  that are more commonly -- that can occur more commonly in

22  people with prolonged QT interval.

23  Q.  And are antipsychotic medications associated in some cases

24  with the prolonged QT interval?

25  A.  Yes.

Matthew Richard Holland - Direct

1  *Q.* What is the overall risk for development of a potentially

2  fatal cardiac arrhythmia to patients who take antipsychotic

3  medications?

4  *A.* Again, this is not something that is fully described.

5  There is -- but the risk of QT prolongation with the three --

6  second generation antipsychotics, not the haloperidol, is

7  probably around 1 percent.  Aripiprazole might be a little

8  lower.  Olanzapine might be a little higher, but they are in

9  that 1 percent range.  Haloperidol is probably in the 2 percent

10 range unless you are giving large doses or IV doses.  So the

11 risk of QT prolongation, let's say, is around 1 percent.  And

12 we know that not everyone who has QT prolongation will develop

13 a serious arrhythmia.

14         I cited one study in my opinion that is the best and

15 largest that I could find where people who develop prolonged QT

16 interval that is called an acquired QT interval prolongation

17 while hospitalized -- and these had all different conditions,

18 but most of them were due to drug therapy, but it also could be

19 related to metabolic abnormalities -- the risk of developing a

20 serious arrhythmia was 6 percent.  So that means if you take

21 10,000 people and you give them a drug that has a 1 percent

22 risk of QT prolongation, you're going to end up with a hundred

23 people with QT prolongation.  And based on this data, six of

24 them would develop a potentially serious arrhythmia, so six out

25 of 10,000, or the number I came up with was one out of 1650.

265

Matthew Richard Holland - Direct

1   *Q.*  How would you categorize that level of risk?

2   *A.*  Low.

3   *Q.*  You mentioned the three second generation antipsychotics

4   having around the 1 percent risk associated with them.  What

5   about haloperidol?

6   *A.*  The risk is felt to be slightly higher, especially when

7   given intravenously or at high doses.  Probably up to 4 percent

8   risk is what's reported.

9   *Q.*  In light of these possible risks, why do you believe that

10  all four recommended medications can be safely administered to

11  Mr. Dear?

12  *A.*  Well, Mr. Dear is very similar in many ways to just about

13  any middle to slightly older-aged man getting started on

14  antipsychotic drug therapy.  He has no particular history or

15  condition that places him at higher than average risk.  These

16  drugs are used widely with great benefit to many patients

17  throughout this country and the world.  And, you know, if we

18  were to say that because you have high blood pressure or that

19  you might have had a heart attack in the past or anything that

20  you can't take these medicines, they would be taken off the

21  market, No. 1, and we also -- we would lose a great deal of

22  benefit.

23          You know, these drugs are well-tested.  And I read the

24  treatment plan with regard to monitoring and follow-up, and

25  that is, you know, an aggressive treatment and follow-up plan.

Matthew Richard Holland - Direct

1   It's the same as I would have recommended for patients who are

2   getting multiple QT prolonging drugs, and we are talking just

3   about one.

4   Q.  Thank you.  And we will get to that in just a minute.  Do

5   these medications worsen preexisting hypertension?

6   A.  No.  There are cases of sort of rebound hypertension, but

7   no.  In general, they lower blood pressure.

8   Q.  Of the recommended medications, have any been found to

9   specifically lower blood pressure?

10  A.  Yes.

11  Q.  Which ones?

12  A.  I believe it was paliperidone and olanzapine, but actually

13  now I can't remember.

14  Q.  Would anything refresh your recollection?

15  A.  Yeah, my notes.

16       MS. WHITE:  I would ask if we could pull up

17  Government's Exhibit No. 7.  It should be Page 4.

18  A.  I don't know, I don't see it in here.  None of them -- I

19  can't find it right here, but for some reason I am pretty sure

20  it was paliperidone and olanzapine are the ones that are most

21  likely to lower blood pressure, but it's not like these are

22  super antihypertensives.  They can just lower the blood

23  pressure.  And the other ones just don't have any effect in

24  general on blood pressure.

25  BY MS. WHITE:

267

Matthew Richard Holland - Direct

1    Q.   Thank you.  Are there other cardiovascular side effects

2    that you as a cardiologist think should be monitored when a

3    patient takes these medicines?

4    A.   Well, yes.  I think, you know, there is standard monitoring

5    for the metabolic effects of these medications.

6    Q.   And is metabolic syndrome one of them?

7    A.   Yes.  When I say metabolic effects, I am sorry, I should

8    have been more clear, it's elevated glucose, elevated serum

9    lipids, elevated weight.  And that is all sort of lumped

10   together in something called metabolic syndrome.

11   Q.   What is dyslipidemia?

12   A.   Dyslipidemia is I think just a fancier way of saying high

13   serum lipids, but it then gets a little more nuanced than that

14   because for a long time everyone knew their cholesterol level,

15   but knowing cholesterol level turns out to not be nearly as

16   important as knowing things like your LDL, HDL, particle sizes,

17   things like that.  But dyslipidemia, the short answer is, is a

18   serum lipid disorder, elevated serum lipids, which there is a

19   whole familiar of lipids.

20   Q.   What is hyperlipidemia?

21   A.   Same thing.

22   Q.   How are these side effects screened for?

23   A.   They are screened with blood tests to look for increases,

24   potentially significant increases in the serum lipid levels.

25   Q.   How are these side effects treated?

Matthew Richard Holland - Direct

1    *A.*  It is very individualized.  You know, it really depends on

2    what the lipid abnormality is, what the patient's risk is, what

3    their history is.  But if you want to treat serum lipid

4    disorder, they are easily treated with medication, the most

5    common being statin drugs.

6    *Q.*  How common is metabolic syndrome?

7    *A.*  Metabolic syndrome, I can't give you an exact number, but

8    it is very common and becoming more common as we hear about the

9    obesity epidemic and increases in younger adults getting

10   diabetes or at least prediabetes.  It is a very common issue.

11   *Q.*  Does Mr. Dear appear to suffer from diabetes or

12   prediabetes?

13   *A.*  Not that I could find in his records.

14   *Q.*  Does he appear to suffer from obesity?

15   *A.*  Not that I can tell.  I actually didn't calculate a body

16   mass index, but not that I know of.

17   *Q.*  Did he appear -- does he appear to suffer from dyslipidemia

18   or hyperlipidemia?

19   *A.*  Probably.  It's hard to say.  I saw lipid panels from 2016

20   and 2018, I believe, that were pretty normal.  And then the one

21   I saw most recently from March, I believe, of this year, it was

22   either 2021 or '22, was -- would have fallen into my definition

23   of elevated LDL cholesterol.  The HDL was fine, but the LDL was

24   above 130.  I can't remember the exact number, but I think it

25   was in the 140 range.

Matthew Richard Holland - Direct

1    *Q.*  Does Mr. Dear need to be on hypertensive medication to be

2    safely administered the four recommended antipsychotic

3    medications?

4    *A.*  No.

5    *Q.*  Does Mr. Dear need to be on a statin in order to safely

6    take the four recommended antipsychotic medications?

7    *A.*  No.

8    *Q.*  Dr. Morton states in his report that antipsychotic users

9    have an increased risk of cardiac mortality, all cause

10   mortality and sudden cardiac death compared to an antipsychotic

11   nonuser cohort.  Do you agree with that statement?

12   *A.*  Not as broad as it is, but there is clear data to suggest

13   that in large populations of users of antipsychotic medication,

14   there is a higher incidence of all cause mortality.  When this

15   was initially looked at by the FDA and a black box warning was

16   placed on these medications, it is for use in elderly patients

17   with dementia-induced psychosis.  This continues to get looked

18   at.  And there's no clear explanation for a -- it is a slight

19   but significantly significant increase in all cause mortality,

20   especially in the elderly with these medications.

21   *Q.*  What is considered elderly?

22   *A.*  I am getting there.  In these studies, the bottom level

23   cutoff for elderly was 65.  However, the studies that showed

24   the most significant change in mortality when they were looking

25   at psychosis of dementia was mainly looking at octogenarians,

Matthew Richard Holland - Direct

1    people in their eighties.

2    Q.  In your report you state:  Although while meaning some of

3    Dr. Morton's opinions and cardiac concerns are rather basic,

4    rudimentary and broad.  What did you mean by that note?

5    A.  I meant that there is -- there are no absolutes and there

6    were some very absolutely broad statements, everything from the

7    patient having conduction disease, which demonstrates to me not

8    a clear understanding of what we're talking about when we're

9    talking about QT interval.  That is not a conduction issue.

10   It's a repolarization issue.

11        To the description of a heart attack, you know, a

12   heart attack is not a heart attack is not a heart attack.  They

13   are not all the same.  And the fact that in a situation like

14   this in a patient without even established cardiovascular

15   disease, to assign, you know, such dire concerns just seemed to

16   miss the understanding of what was really going on in the heart

17   with these medications.

18   Q.  In his report, Dr. Woods states:  That titrating and

19   monitoring metabolically active medications which impact one's

20   cardiac health, especially given Mr. Dear's age and cardiac and

21   hypertensive disease, is a potentially dangerous

22   pharmacological game.  Do you agree with that statement?

23   A.  No.

24   Q.  Why not?

25   A.  Well, I -- I don't see this as a pharmacological game.  I

Matthew Richard Holland - Direct

1    see this as being standard prescription and monitoring of very

2    straightforward and standard medical therapy.  To state that

3    there is something particular about Mr. Dear that makes this

4    more difficult or dangerous than anyone else really doesn't

5    make much sense to me.  You know, and then the idea that there

6    is some previous cardiac issue that makes it more difficult or

7    more dangerous just doesn't make medical sense.

8    Q.  You mentioned earlier in your testimony that you reviewed

9    Dr. Sarrazin's proposed treatment plan as well; is that

10   correct?

11   A.  Yes.

12        MS. WHITE:  I am going to ask to pull up Government's

13   Exhibit No. 4, Page 3.

14   BY MS. WHITE:

15   Q.  I am going to direct your attention to Page 3, Paragraph 5

16   of Dr. Sarrazin's report, which is at the bottom of the page.

17   Can you please read that recommendation for the Court?

18        THE COURT:  Oh, spare me.  I am still literate.  Thank

19   you.

20   BY MS. WHITE:

21   Q.  Do you agree with that recommendation?

22   A.  Yes.

23   Q.  Directing your attention to Government's Exhibit No. 4,

24   Page 4, Paragraph 6 at the top, I will give you a chance to

25   review that recommendation.  Let me know when you are ready.

Matthew Richard Holland - Direct

1  A.  I am ready.

2  Q.  Do you agree with that recommendation?

3  A.  I do.

4  Q.  Did you make additional recommendations with respect to

5  Mr. Dear?

6  A.  I did.

7      MS. WHITE:  I am going to ask to pull up Government's

8  Exhibit No. 7, top of Page 4, please.

9  A.  Yes.

10  BY MS. WHITE:

11  Q.  Can you describe your recommendations, please?

12  A.  Yes.  I recommend obtaining a baseline EKG, baseline blood

13  work, which includes electrolytes, magnesium, glucose and

14  creatinine, creatinine being a measure of kidney function.  I

15  have a fairly broad recommendation of maintain serum potassium

16  and magnesium levels in the normal range.  These are my

17  standard recommendations for any QT prolonging medication.  And

18  usually my patients are the patients on diuretics, so we need

19  to supplement the potassium and magnesium if need be, and then

20  obviously avoid other medications that are known to prolong QT

21  interval.

22      And there is -- I put a link there because there are a

23  lot of medicines ranging from herbal supplements to certain

24  antihistamines or antibiotics, but there are also a lot of

25  medicines that don't prolong QT, so there is usually always an

273

Matthew Richard Holland - Direct

1     alternative.  And then standard follow-up for metabolic effects

2     which is standard in the psychiatric literature as well to look

3     for blood pressure changes, weight gain, blood glucose, again

4     the serum lipids.  And I put a link into where the standard

5     follow-up program is, you know, how often to get this testing.

6          And then I did recommend -- again, this is my standard

7     approach, especially when dealing with patients who are on

8     multiple QT prolonging medications together, to repeat an EKG

9     with any dose escalation or any significant medical or clinical

10    change, that is -- or addition of any medication.  And medical

11    or clinical change is usually when someone is acutely ill such

12    as they have a gastrointestinal illness where you can have

13    dehydration and electrolyte abnormalities, things like that.

14    Q.  Based on Mr. Dear's medical history, are these additional

15    recommendations necessary to initiate the recommended

16    medications?

17    A.  No.

18    Q.  Why not?

19    A.  As I mentioned earlier, I normally would not have even been

20    consulted as a cardiologist in a patient like Mr. Dear given

21    his lack of significant other QT prolonging medication.  So

22    normally none of these are absolutely recommended to be -- that

23    have to be done before starting these antipsychotic

24    medications.  I think it's a reasonable idea to do these, but

25    they don't have to be done.

Matthew Holland - Cross

1   *Q.* Can the recommended medications be safely administered if

2   Mr. Dear refuses a baseline EKG?

3   *A.* Yes.

4        *MS. WHITE:* Your Honor, if I may have one moment.

5        *THE COURT:* You may.  Thank you.

6        *MS. WHITE:* I have nothing further of this witness,

7   Your Honor.

8        *THE COURT:* Ms. Stricklin, cross-examination?

9                         **CROSS-EXAMINATION**

10  *BY MS. STRICKLIN:*

11  *Q.* Dr. Holland, you have testified that the four proposed

12  medications are not contraindicated for Mr. Dear.

13  *A.* Correct.

14  *Q.* But the decision whether or not to prescribe a medication

15  is more nuanced than simply whether or not it's

16  contraindicated, correct?

17  *A.* Yes.

18  *Q.* Meaning you have to engage in a far more thorough risk

19  benefit analysis than just looking at whether something is

20  contraindicated.

21  *A.* Yes.  I am looking at risk.  The psychiatrist usually is

22  looking at benefit.  And so my assessment of risk, you know,

23  every decision we make in medicine is risk/benefit decision.

24  And, you know, there are certain things we do that have very

25  high risk but extremely high benefit, and if we have something

Matthew Holland - Cross

1    that has risk over benefit, we don't do it.  All I am giving an

2    opinion on is the risk right now, and in my opinion, the risk

3    of these medications are quite low.  I can't give the other

4    side of that equation.  That's where the psychiatrist comes in.

5    Q.  That's right.  Because if the goal is to restore Mr. Dear

6    to legal competency, you can't opine at all on that.

7    A.  That's correct.

8    Q.  And you also stated on your direct, however, that these

9    medications can be a great benefit to people.

10   A.  Yes.

11   Q.  And you've never worked in a prison.

12   A.  That is correct.

13   Q.  Or a jail or a penal institution.

14   A.  That's correct.

15   Q.  Nor have you worked in a psychiatric institution.

16   A.  Correct.

17   Q.  So when you are talking about this great benefit, you are

18   talking about people who voluntarily seek medical treatment.

19   A.  Yeah, I am talking about benefit by reading and saying I

20   cannot comment on my direct prescribing of these medications,

21   no.

22   Q.  Okay.  Now, you did testify that nearly all antipsychotic

23   medications can prolong the QT interval.

24   A.  Yes, that's correct.

25   Q.  And that this is important because when the QT interval is

Matthew Holland - Cross

1  prolonged, there is this increased risk for a potentially fatal

2  cardiac arrhythmia.

3  A.  Yes.

4  Q.  You've categorized that risk as low, but it is still a

5  statistically significant risk?

6  A.  Yes.

7  Q.  And although you as the practitioner have categorized that

8  risk as low, the patient who is assuming the risk may

9  categorize it as higher.

10  A.  Yes.

11  Q.  Now, you've opined that for Mr. Dear an abnormal QT result

12  would be greater than 470 milliseconds.

13  A.  That is correct.

14  Q.  There is literature that supports that a QT greater than

15  450 milliseconds for males would be considered abnormal.

16  A.  Yeah.  And there is -- are we talking a QTCF, a QTCD, a

17  QTCZ?  There are multiple different ways of measuring the QT

18  interval.  And I won't argue if there is a paper out there that

19  says a man of Mr. Dear's age, because usually you're looking at

20  sex, because women have a longer baseline QT interval in the

21  general population, and there is age related, and then there is

22  some relation to the pattern of depolarization that has an

23  effect on repolarization.

24         But what -- so the base -- as long as the baseline QT

25  interval -- you know, in a single reading of a QT, unless it's

Matthew Holland - Cross

1   really long doesn't really mean much, but yeah, 450, 460, 470,

2   it depends how you measure it, which of the formulas you use,

3   but my reading of Mr. Dear's EKGs are that his QT at baseline

4   in 2018, you know, I think that was the last EKG I saw, was

5   normal.

6   Q.  Now, I think to sort of summarize what you've testified to,

7   there are -- there is not one set number.  Any practitioner

8   could disagree.

9   A.  As far as what -- yeah, even when you measure the QT, in

10  our EKG conference we argue over where is -- which is the best

11  lead in a particular patient in a 12-lead EKG to measure the QT

12  interval and there are not absolute cutoffs; so yes, there is

13  some wiggle room there.

14  Q.  And you are not a treating physician for Mr. Dear.

15  A.  That is correct.

16  Q.  You have, however, reviewed his medical records from the

17  Colorado Mental Health Institute at Pueblo.  And in those

18  medical records there is a QTC result of 478 milliseconds,

19  correct?

20  A.  Uh-huh.

21  Q.  It dates back to 2016?

22  A.  Right.

23  Q.  But it is in the record.

24  A.  Uh-huh.

25  Q.  That is above 470, correct?

Matthew Holland - Cross

1    A.   It is.

2    Q.   You have talked a lot about the Parkview records from

3    January and February of 2018?

4    A.   Yes.

5    Q.   There is a QTC interval that's reported at 458

6    milliseconds?

7    A.   Correct.

8    Q.   There is also a record that documents a result of 485

9    milliseconds.

10   A.   Yeah, I never saw that EKG.

11   Q.   In the records nonetheless?

12   A.   Yeah.  And I -- if it's -- but it was alluding to an EKG at

13   the same time as one of the four EKGs that I did review.  So I

14   am not sure what they were alluding to because when I looked

15   at -- there were a couple things I looked at.  One, the patient

16   had a potassium of three at the same time, which is a very low

17   potassium level which is known to prolong QT.  And the other

18   thing was the QT interval by, you know, what I saw on the EKG,

19   not what was alluded to elsewhere, was under 460 milliseconds.

20   Q.   Now, you are correct in your testimony that there are no

21   EKG results in the record after 2018.  Mr. Dear's medical

22   records as it stands is not very helpful in determining what

23   his baseline is, correct?

24   A.   Baseline?

25   Q.   What a baseline EKG looks like for him?

Matthew Holland - Cross

1    A.   I know what his EKG looked like in 2018.  I don't know what

2    his EKG looks like today.

3    Q.   Now, these antipsychotic medications alone can pose risk to

4    prolong the QT interval.

5    A.   Yes.

6    Q.   But medication in addition to certain metabolic

7    abnormalities together increase the risk of dangerously

8    prolonging the QT interval.

9    A.   Yes.

10   Q.   And metabolic abnormalities are hypokalemia?

11   A.   Yes.

12   Q.   And Mr. Dear has experienced hypokalemia in the past.

13   A.   He did when he had acute pancreatitis.

14   Q.   And, in fact, you just referenced that low potassium value

15   that is seen in the Parkview Hospital medical records?

16   A.   Yes.  That's why it's important when someone gets sick that

17   you monitor -- that's why my recommendation is in there.

18   Q.   And the discharge paperwork from Parkview medical records

19   still list hypokalemia as an ongoing issue, correct?

20   A.   I can't remember, but if you say so.  It appears -- I don't

21   know how the discharge summary was listed, but if it was listed

22   as a diagnosis or was it listed as an ongoing issue, I just

23   don't know because discharge summaries generally list all the

24   diagnoses that occurred during that hospital stay.  The way we

25   do discharge summaries and we list a -- whether they -- how we

Matthew Holland - Cross

1   treated them and what follow-up is required, and I just can't

2   remember that from the Parkview.

3   Q.   Would you like to see the discharge summary?

4   A.   Yeah, that would be great.

5        MS. STRICKLIN:   Mr. Cohen, can you please pull up D14,

6   Page 5?

7   BY MS. STRICKLIN:

8   Q.   If we look at the discharge diagnoses, No. 7 is

9   hypokalemia.

10  A.   Yeah.   So can you start at the top and go down?   So you see

11  that his discharge potassium there is 3.6 which is normal, but

12  3.5 is normally -- and above is normal.   And so you can -- this

13  was a diagnosis that occurred in the hospital and it's listed

14  and -- yeah.

15  Q.   So potentially an ongoing problem; maybe not.

16  A.   Yeah.   I mean, I believe there was a basic metabolic -- or

17  comprehensive metabolic panel done in March that had a normal

18  potassium, but that was one -- or maybe it was only creatinine

19  on that one, whatever, but yes.   And that's why I have a

20  recommendation in there that you should check the potassium

21  level.

22  Q.   Another metabolic abnormality which taken together with an

23  antipsychotic medication that can increase the risk of

24  dangerously prolonging the QT interval is hypomagnesia?

25  A.   Yeah, yes.

Matthew Holland - Cross

1   Q.   The Parkview records also show that Mr. Dear was treated

2   for hypomagnesia while he was at the hospital, correct?

3   A.   Yes.  They typically go hand in hand.  When you have low

4   potassium, you usually have low magnesium and you usually

5   correct both.

6   Q.   These levels can fluctuate over time?

7   A.   Yes.

8   Q.   And we see that in Mr. Dear.

9   A.   Yeah.  I haven't seen enough to say that they actually

10  fluctuate over time, but they do fluctuate when you get sick.

11  Q.   And the big issue here is that if one of these

12  abnormalities occurs in conjunction with taking the medication,

13  that could trigger a severe cardiac event.

14  A.   Stated that way, if I have to answer yes or no, I will say

15  yes, you are correct.

16  Q.   Now, I would like to move on from talking about the risk of

17  QT interval prolongation to just general metabolic side effects

18  of antipsychotic medications which can impact cardiovascular

19  risk.

20          Now, you discussed on your direct different metabolic

21  syndromes, correct?

22  A.   Yes.

23  Q.   You listed glucose elevation, weight gain and dyslipidemia?

24  A.   Yes.

25  Q.   And during your direct you did report that Mr. Dear has

Matthew Holland - Cross

1   been diagnosed with hyperlipidemia, correct?

2   A.   Yes.  I said the most recent lipid panel I saw had at least

3   a mild lipid disorder.  The two previous ones I had seen were

4   normal.

5   Q.   Now, there are medical records from the Colorado Mental

6   Health Institute at Pueblo dating back to 2017 which list

7   dyslipidemia as a diagnosis, correct?

8   A.   That is correct.

9   Q.   Those records also list an ACSVD score which would

10  recommend a statin medication, correct?

11  A.   That's listed in there, yes.

12  Q.   And then again the Parkview Hospital records also show in

13  past medical history hyperlipidemia.

14  A.   It's listed in there.  The lipids at Parkview were normal.

15  Q.   You referenced the March 2022 metabolic profile that you

16  reviewed?

17  A.   Yes.

18  Q.   And again just to confirm, that profile does show elevated

19  cholesterol levels.

20  A.   Can you show it to me?  Do you have that like really handy?

21  I just can't remember the exact number so I can be clear.

22          MS. STRICKLIN:   Yes.  Just one moment, Your Honor.

23          THE COURT:   Let's do this.  A propitious time for us

24  to take a modest recess this morning during which time, Doctor,

25  you may stand down.  And we will be back on the record at

Matthew Holland - Cross

1    10:35 a.m. as measured by the courtroom clock.

2           Madam clerk.

3       (Recess at 10:21 a.m. until 10:37 a.m.)

4        *THE COURT:*  Ms. Stricklin you may resume and continue

5    your cross-examination.

6    *BY MS. STRICKLIN:*

7    *Q.*  Dr. Holland, during the break were you able to review the

8    March 7, 2022 profile?

9    *A.*  I have.

10   *Q.*  And were you able to confirm that the cholesterol levels

11   were reported as high?

12   *A.*  Yes.  The total cholesterol is high.  The HDL is normal.

13   The LDL is elevated.  And as an aside, the potassium is normal.

14   *Q.*  Now, Dr. Holland, you testified that in your review of

15   Mr. Dear's medical record, particularly the Parkview Hospital

16   medical records, Mr. Dear did not suffer a traditional heart

17   attack.

18   *A.*  That's correct.

19   *Q.*  And one myocardial infarction?

20   *A.*  Say that again?

21   *Q.*  Myocardial infarction.

22   *A.*  Yes, that's a very generic term, but he didn't suffer a

23   classic what we call a Type 1 myocardial infarction, yes.

24   *Q.*  Now, there are several notations within Mr. Dear's medical

25   record that note an old myocardial infarction.

Matthew Holland - Cross

1   A.   Correct.

2   Q.   That notation first appears in the February 2018 Parkview

3   Hospital records?

4   A.   Yes.

5   Q.   But it also carries through to the more recent Bureau of

6   Prisons medical records.

7   A.   Yes.

8   Q.   In fact, in several places they do notate the words "old

9   myocardial infarction"?

10   A.   Yes.

11   Q.   So it's not that the notations don't occur in the records.

12   They do, correct?

13   A.   Yes; oh, yeah.

14   Q.   It's just you reviewed the record and you disagree that

15   what you saw was a traditional heart attack.

16   A.   That's correct.

17   Q.   You do agree that Mr. Dear is at risk for developing

18   cardiac disease due to long-standing untreated hypertension?

19   A.   Yes.

20   Q.   And hypertension is one of the five major risk factors for

21   developing cardiac disease?

22   A.   Yes.

23   Q.   The records also show that Mr. Dear has been diagnosed with

24   Stage 3 chronic kidney disease?

25   A.   Yes.

Matthew Holland - Cross

1  *Q.*  And it's entirely possible that his kidney disease is end

2  organ damage from the untreated hypertension.

3  *A.*  It's possible.  He doesn't have protein in his urine.  And

4  usually when it's hypertensive kidney disease, 80 percent of

5  the time you have proteinuria, so I cannot say one way or the

6  other.

7  *Q.*  Now, if kidney disease develops to the point of requiring

8  dialysis, it can become its own cardiac disease risk?

9  *A.*  Oh, yes, if it ever gets there, yes.

10  *Q.*  And family history of cardiovascular disease also increases

11  risk?

12  *A.*  Depending, but yes.  Again, there is just not a yes-or-no

13  answer.  There is first-degree relative, number of first-degree

14  relatives, second-degree relative, age of onset, smoking

15  history, that all need to be taken into account when addressing

16  family history.

17  *Q.*  Why don't I phrase it this way.  Family history of

18  cardiovascular disease can increase risk.

19  *A.*  Yes.

20  *Q.*  And Mr. Dear's age, he is nearly 65 years old, this also

21  can place him at increased risk?

22  *A.*  As we all age, our risk goes up, yes.

23  *Q.*  Now, Dr. Holland, I am going to end by asking you a couple

24  questions about the recommendations that occur on the last page

25  of your report.  Now, to implement those recommendations, you

Matthew Holland - Redirect

1    need a baseline test, several baseline tests?

2    A.   Yes.

3    Q.   Also follow-up testing?

4    A.   Yes.

5    Q.   And possible supplementation with adjunct medications or

6    other supplements.

7    A.   Potentially, yes.

8         MS. STRICKLIN:   Your Honor, I have no further

9    questions.   Thank you.

10        THE COURT:   Thank you.

11        Redirect examination for the government?

12        MS. WHITE:   Thank you, Your Honor.

13                      **REDIRECT EXAMINATION**

14   BY MS. WHITE:

15   Q.   Dr. Holland, counsel asked you some questions about the

16   myocardial infarction in Mr. Dear's -- or mention of it in

17   Mr. Dear's medical records.   To be clear, is there any

18   indication in his Parkview medical records that he suffered a

19   heart attack?

20   A.   No.

21   Q.   Why do you think that references to a heart attack or a

22   myocardial infarction is mentioned later in his medical

23   records?

24   A.   There are a couple of possibilities.   I saw notation in the

25   records that Mr. Dear had told people that he had had a heart

Matthew Holland - Redirect

1    attack while he was at Parkview, but also once something -- all

2    it needs to do is get in the record once and it just kind of

3    carries forward.  And so I don't know how -- who put it there

4    initially and based on what evidence, but the evidence that I

5    saw, there was no evidence based on the Parkview records that

6    he had a heart attack or myocardial infarction.  And certainly

7    on the EKGs, which the last I saw was 2018, there is no

8    evidence of an old heart attack.

9    Q.  Counsel asked you questions about hypokalemia,

10   hypomagnesia, and the fact that Mr. Dear was listed as being

11   diagnosed with them in his Parkview discharge paperwork.  Does

12   a mention of that in discharge paperwork necessarily indicate

13   an ongoing issue for a patient?

14   A.  No, it does not.  It's not unusual for someone with a

15   condition such as gallstone pancreatitis where they mention

16   that he was dehydrated and had I believe vomiting to have those

17   electrolyte disturbances.  And as we saw, his discharge

18   potassium was normal and his follow-up potassium in 2022, March

19   of 2022, was normal.  You know, as I mentioned, usually in the

20   discharge summary you try to list every diagnosis that occurred

21   during the hospital stay.  And, you know, it's for informative

22   reasons, but also for billing reasons for the hospital.

23   Q.  Counsel asked you about whether hypokalemia and

24   hypomagnesia could increase your risk for prolonged QT.  You

25   answered yes if it's a yes-or-no question.  Are there caveats

Matthew Holland - Redirect

1    to your answer?

2    A.   Yes.

3    Q.   What are those?

4    A.   The caveat is that developing hypokalemia and hypomagnesia

5    just out of the blue doesn't really happen.  You need to have

6    something to trigger that.  You either need to be on a

7    starvation diet and not be getting any nutrients and

8    electrolytes or you have to be losing them either in your

9    urine, so that's with diuretics typically, or by

10   gastrointestinal illness.  We will see it occasionally in

11   people who have, let's say, abused laxatives or have severe

12   diarrhea, nausea or vomiting.  Even with stage 3A chronic

13   kidney disease, the kidneys are way smarter than we are and

14   they figure out your potassium and magnesium very well.  So

15   generally unless we have done something like give a diuretic,

16   take a bunch of laxatives or be sick, you don't have to worry

17   about that.

18   Q.   You testified earlier about the black box warning for

19   antipsychotic medications including those who are elderly with

20   dementia.  That does not include Mr. Dear, correct?

21   A.   Based on what I have read, you know, he does not have

22   dementia.  And since we are almost the same age, I don't think

23   he is elderly.

24        MS. WHITE:  May I have one moment, Your Honor?

25        THE COURT:  You may, thank you.

Matthew Holland - Redirect

1          *MS. WHITE:*  Nothing further.

2          *THE COURT:*  Doctor, once a person sustains an MI-1,

3     what would you expect the S and T waves to look like following

4     that heart attack even over a substantial period of time?

5     Would it be normal?

6          *THE WITNESS:*  So what occurs is when there is heart

7     muscle damage, that's what a true heart attack is, you lose the

8     electrical -- since the muscle is no longer working, you lose

9     the electrical force, so the wave -- and it depends on which

10    lead you are looking at, but you develop what's called a Q

11    wave, which is where it's all downward rather than to have the

12    upward portion of the spike.  And you can -- with a lot of

13    caveats and limitations, you can localize actually the portion

14    of the heart muscle that has been damaged based on, you know, a

15    standard 12 lead EKG.

16         So when someone presents with what we call acute

17    injury, you get that ST segment.  The segment between the S

18    wave and the T wave goes up.  And that's due to the membrane of

19    the heart muscle cell is losing its integrity and it loses the

20    electrical charge across the membrane, so you see something

21    called ST elevation.  And then as the heart attack progresses,

22    you then see the T wave.  The repolarization becomes abnormal

23    and you get T wave inversion.  And then when there is true

24    damage, you then develop over a course of days the Q waves

25    within the EKG.

Matthew Holland - Redirect

1          *THE COURT:* Does the Q wave persist?

2          *THE WITNESS:* Yes.

3          *THE COURT:* And for what period of time?

4          *THE WITNESS:* For life. We have seen -- there is a

5    condition called hibernating myocardium. And this is getting

6    off the subject a little bit, but when a part of the heart

7    muscle, let's say the artery is completely blocked to that part

8    of the heart muscle, and there are three arteries, you can grow

9    what's called collateral circulation, which is a new -- sort of

10   your own bypass where you are now feeding the blocked artery

11   and it didn't block acutely, so it happened over time. So that

12   heart muscle went to sleep, but it's still alive but it's

13   hibernating. And you can see the development of Q waves. And

14   then if we go and open up the blocked artery and restore normal

15   blood flow, the Q waves can go away.

16          And then we have other imaging modalities to try and

17   determine whether someone -- if I am going to open up someone's

18   completely blocked artery, there is risk to that. So I want to

19   make sure that that muscle is hibernating and that it will --

20   and it's not dead. So I have other imaging modalities that can

21   be done to say that it's worth it to do it, and then you might

22   see the Q waves disappear.

23          *THE COURT:* Doctor, thank you. You said you were

24   slightly off topic, but I want you to know that in my chambers

25   we speak of little else.

George W. Woods, Jr. - Direct

1          May this witness be excused and released from

2     subpoena?  Any objection by the government?

3          *MS. WHITE:*  No, Your Honor.

4          *THE COURT:*  Or the defense?

5          *MS. STRICKLIN:*  No, Your Honor.  Thank you.

6          *THE COURT:*  Doctor, you are both excused and released

7     from subpoena with our thanks.

8          *THE WITNESS:*  Thank you.

9          *THE COURT:*  You are welcome.

10         Very well.  The government may proceed.

11         *MS. RHYNE:*  The government rests, Your Honor.

12         *THE COURT:*  If the defense is prepared to proceed, it

13    may by calling its first witness.  Ms. Beck?

14         *MS. BECK:*  The defense calls George W. Woods, Jr.

15         *THE COURT:*  Very well.  Thank you.

16     (**George W. Woods, Jr.** was sworn.)

17         *THE WITNESS:*  I do, Your Honor.

18                         **DIRECT EXAMINATION**

19    *BY MS. BECK:*

20    *Q.*  Good morning.  How are you?

21    *A.*  I am fine.

22    *Q.*  Can you please state your name and spell your last name for

23    the record?

24    *A.*  Sure.  Let me -- George W. Woods, Jr., G-E-O-R-G-E,

25    W-O-O-D-S.

George W. Woods, Jr. - Direct

1   Q.   And do you go by doctor?

2   A.   I do.

3   Q.   Dr. Woods, what do you do for a living?

4   A.   I am a physician specializing in neuropsychiatry.

5   Q.   Are you board certified?

6   A.   I am board certified in psychiatry.

7   Q.   Do you have any subspecialties?

8   A.   My subspecialty is neuropsychiatry and consultation

9   liaison.

10  Q.   Can you tell us what neuropsychiatry is?

11  A.   Sure.  Neuropsychiatry is the study of the impact of brain

12  function on emotion and behavior.

13  Q.   And what is consultation liaison psychiatry?

14  A.   Consultation liaison psychiatry is the study of psychiatric

15  manifestation of medical disease and the medical manifestation

16  of psychiatric disease.

17  Q.   Now I would like to talk about your education a bit.  Where

18  did you go to college?

19  A.   Westminster College, Salt Lake City, Utah.

20  Q.   And where did you receive your medical degree?

21  A.   The University of Utah Medical Center in Salt Lake City.

22  Q.   I am sorry to interrupt.  When did you receive your medical

23  degree?

24  A.   In 1977.

25  Q.   Can you briefly describe for us what you did after medical

George W. Woods, Jr. - Direct

1  school?

2  *A.*  Sure.  I did what we call a rotating internship that was

3  nonpsychiatric based, so I did medicine, surgery, ER,

4  infectious diseases, OB-GYN as an internship.  And then I did a

5  psychiatric residency at Pacific Presbyterian in San Francisco,

6  California.  And then I did a fellowship with the Institute

7  of -- National Institute of Mental Health and the American

8  Psychiatric Association in geriatric cycle pharmacology.

9  May I?

10  *Q.*  Please help yourself.

11  *A.*  Hopefully that's better.

12  *Q.*  Do you participate in any continuing education or training?

13  *A.*  Yes.  I take continuing education in several subjects.

14  Every year I take a course at Harvard called internal medicine

15  for non-internists.  I also, every other year I take an update

16  at Harvard on psychopharmacology.  And probably every two to

17  three years I take an update on geriatric medicine.

18  *Q.*  Can you describe for us your current clinical practice?

19  *A.*  Sure.  Approximately 20 percent of it is the geriatric

20  population, and these are folks that have a variety of

21  disorders, depression, schizophrenia, other cognitive disorders

22  and delusional disorder as well.  Another portion of my

23  clinical practice is people that are younger.  The geriatric

24  population is sort of identified at 65, so the idea that

25  someone is 65 is not geriatric is unfortunately not correct.

George W. Woods, Jr. - Direct

1   But I also see people that are younger, into their teens, and I

2   also see people that have neurodevelopmental disorders.  For

3   example, fragile X, fetal alcohol, other type of cognitive

4   disorders that have psychiatric manifestations, intellectual

5   disability.

6   Q.  Where are you currently employed?

7   A.  I am employed at Crestwood Behavioral Health, which is in

8   Sacramento, California, but I have an office, a satellite

9   office in Oakland, California.

10  Q.  What is your title at Crestwood Behavioral Health?

11  A.  Chief scientific officer.

12  Q.  What do you do in that role?

13  A.  I oversee -- we have 140 providers, 140 providers that

14  serve 7,000 clients.  Our clients are in what are called

15  congregate care facilities, so they are similar to skilled

16  nursing facilities.  And we do have about a 20 percent elderly

17  population, but the majority of the population are people that

18  have been conserved and are in their twenties, thirties and

19  forties.  And I have developed the research arm for this group.

20  As I said, we have 7,000 of those we serve in 30 facilities,

21  and my role is to monitor the treatment, develop assessment

22  programs.  We also have two facilities that do incompetency to

23  stand trial restoration, and we are developing two more, and my

24  role is also to oversee those.

25  Q.  Let me break some of that down.  So the services that you

George W. Woods, Jr. - Direct

1    are providing in those 140 centers to those 7,000 patients,

2    what kind of services are you providing?

3    A.  They are 140 providers, 140 doctors and nurse

4    practitioners.

5    Q.  Excuse me.

6    A.  That's okay.

7    Q.  What sort of services are those providers providing?

8    A.  We do case consultation.  At noon today I am missing our

9    provider meeting, our weekly provider meeting, but I do case

10   consultation.  I look at complex cases if there are issues that

11   come up that require perhaps another eye.  I do training in

12   polypharmacy and psychopharmacology.  I do training in

13   assessing cognitive disorders, the early assessment of

14   cognitive disorders.  Those are -- and we also are developing a

15   research arm in those areas as well.

16   Q.  You mentioned that there are two programs that are tasked

17   with restoration of competency.  Can you talk a little bit more

18   about your forensic work?

19   A.  Sure.  I have a forensic practice and then within this

20   particular job we are looking at restoration.  We have a new

21   contract in the last two years with the California State

22   Department of State Hospitals where we are developing a

23   cognitively-oriented restoration program looking at how brain

24   function impacts restoration.  And we have perhaps 150 people

25   at any one time either in our restoration program, either the

George W. Woods, Jr. - Direct

1    felony or the misdemeanor restoration programs.

2    Q.  Can you tell the Court about some of your distinctions and

3    awards?

4    A.  I am currently president of the International Academy of

5    Law and Mental Health, and this is my second stint in the last

6    six years.  It's quite an honor.  I am also -- I was honored to

7    be alumni of the year at the University of Utah Medical Center

8    for 2018.  I was the first psychiatrist given that honor.  I am

9    a life fellow of the American Psychiatric Association.

10         I am on the board of directors for Stanford

11   University's Accountable Care Association, an organization

12   where we are looking at questions of healthcare in marginalized

13   populations which includes the elderly, and that's really my

14   role.  And recently I was -- I really had the opportunity to go

15   back to Utah and was a key note speaker for our 2022 white coat

16   ceremony for incoming medical students.  It was really a lot of

17   fun.

18   Q.  Have you taught or trained others in your field?

19   A.  I have.

20   Q.  Can you talk a little bit about your role as someone who

21   does teach and train others in your field?

22   A.  Sure.  I taught at the University of California - Davis

23   from 1994 through 2000.  And I taught there in the postgraduate

24   psychiatric forensic fellowship and I taught criminal

25   responsibility and competency.  From 2002 through 2016 I was --

George W. Woods, Jr. - Direct

1    and these are as adjunct professors.  I should make that point.

2    These are as adjunct professors.  From 2002 to 2016 I taught at

3    Morehouse School of Medicine in the department of psychiatry.

4    And I taught two courses, introduction to geriatric psychiatry

5    and introduction to forensic psychiatry.

6              And currently I am teaching at the University of

7    California - Berkeley, Berkeley law.  And I have been there for

8    about 10 years.  And I am teaching -- co-teaching with an

9    attorney a course on mental health and the law.  I also up

10   until about 2019 had a webinar on Westlaw on Where Mental

11   Health Meets the Law and did that for perhaps nine years.  And

12   I am a faculty member of the Practising Law Institute out of

13   New York City.

14   Q.  Thank you.  Are you familiar with the *Sell* criteria?

15   A.  I am.

16   Q.  Have you ever conducted any trainings on the *Sell* criteria?

17   A.  I have.

18   Q.  Have you ever conducted any trainings about the restoration

19   of competency?

20   A.  I have.

21   Q.  Have you published in the field about the restoration of

22   competency?

23   A.  I have not published on the *Sell* criteria, but I have

24   published on competency.

25   Q.  And have you ever conducted any trainings regarding the

1  medical appropriateness of antipsychotic medications?

2  A.  Oh, yes, I have.

3  Q.  Have you ever been retained as a mental health expert?

4  A.  I have.

5  Q.  How many times, if you can estimate?

6  A.  Yeah, I said 200.  I really don't know.  It's been over 40

7  years, so I really can't give you a number.

8  Q.  And have you ever testified as an expert witness?

9  A.  Yes.

10  Q.  Have you ever testified in a *Sell* hearing?

11  A.  Yes.

12  Q.  Have you ever testified as an expert witness regarding

13  restoration of competency?

14  A.  I have.

15  Q.  And have you ever testified as an expert witness regarding

16  the medical appropriateness of antipsychotic medications?

17  A.  Yes, I have.

18       *MS. BECK:*  Mr. Cohen, can we please pull up Defense

19  Exhibit 3?

20  *BY MS. BECK:*

21  Q.  If you will take a look at your screen, Dr. Woods, does

22  that look familiar to you?

23  A.  Yes, it does.

24  Q.  And what is that?

25  A.  This appears to be my CV.

George W. Woods, Jr. - Direct

1          MS. BECK:  Your Honor, at this time I would move for

2     the admission of Defendant's Exhibit 3.

3          THE COURT:  Response?

4          MS. WHITE:  No objection.

5          THE COURT:  Defendant's Exhibit 3 for identification

6     admitted in evidence.

7          MS. BECK:  Thank you, Your Honor.

8     BY MS. BECK:

9     Q.  Dr. Woods, now I want to turn your attention to your work

10    on this case specifically.  How did you become involved in

11    Mr. Dear's case?

12    A.  I was contacted I believe in 2019 to do an evaluation of

13    the quality and rigor of competency evaluation that had been

14    done within the Colorado system on Mr. Dear from about 2015 up

15    through about 2019, and that was my first contact with

16    Mr. Dear's case.  And then later I was asked to opine on the

17    Sell factors in Mr. Dear's case.

18    Q.  What materials have you reviewed to familiarize yourself

19    with this case, then?  Sounds like all the competency

20    evaluations that were done at the state hospital in Pueblo; is

21    that correct?

22    A.  Correct.

23    Q.  And then did you also review Dr. Sarrazin's treatment plan?

24    A.  I did.

25    Q.  And did you also review Dr. Preston Baecht's competency

George W. Woods, Jr. - Direct

1    evaluation and later report regarding restoration?

2    A.   I did.

3    Q.   Additionally, did you review the available audio and video

4    recordings of Mr. Dear?

5    A.   Yes.

6    Q.   And did you also review jail records?

7    A.   I did.

8    Q.   Did you review all of the records from the Colorado Mental

9    Health Institute at Pueblo?

10   A.   Yes.

11   Q.   And did you also review all of the records from the Bureau

12   of Prisons?

13   A.   I am sorry?

14   Q.   The records from the Bureau of Prisons, from FMC

15   Springfield?

16   A.   Yes, I did, and I actually re-reviewed those records.

17   Q.   Have you also reviewed in preparation for testifying today

18   the *Sell* hearings that were conducted in the state?

19   A.   Yes.

20   Q.   Did you rely on those materials that you reviewed in

21   forming your opinion about Dr. Sarrazin's treatment plan?

22   A.   I did.

23   Q.   And in forming your opinion, did you also rely on your

24   experience as a licensed neuropsychiatrist?

25   A.   Yes.

George W. Woods, Jr. - Direct

1   Q.   And as a treating psychiatrist?

2   A.   That's correct.

3   Q.   And on your expertise in forensic psychiatry?

4   A.   Yes.

5   Q.   Now, with respect to the *Sell* criteria, have you formed an

6   opinion about whether Dr. Sarrazin's proposed treatment plan is

7   substantially likely to make Mr. Dear competent to proceed in

8   this prosecution?

9   A.   I have.

10  Q.   And what is that opinion broadly?

11  A.   It's my opinion that I have to respectfully disagree with

12  Dr. Sarrazin.  It's my opinion that his approach would not

13  create a substantial likelihood that Mr. Dear could be restored

14  to competency using his protocol.

15  Q.   And do you have an opinion about whether Dr. Sarrazin's

16  proposed treatment plan is medically appropriate and in

17  Mr. Dear's best medical interest?

18  A.   I do.

19  Q.   And what is your opinion broadly?

20  A.   Again, I would have to respectfully disagree with

21  Dr. Sarrazin.  I have concerns about the medical -- both

22  necessity and appropriateness of the plan as he has it laid

23  out.

24  Q.   Now, let's take each of those opinions one by one,

25  Dr. Woods.  I would like to start with your opinion that the

George W. Woods, Jr. - Direct

1    plan is not substantially likely to render Mr. Dear competent

2    to proceed with his prosecution.

3              First of all, can we start by talking about Mr. Dear's

4    mental illness.  So you would agree that several evaluators at

5    the state hospital diagnosed Mr. Dear with delusional disorder,

6    right?

7    A.   Yes, a late onset delusional disorder, that's correct.

8    Q.   And all of the evaluators who were evaluating him for

9    competency diagnosed him with delusional disorder persecutory

10   type?

11   A.   That's correct.

12   Q.   Can you describe for us what delusional disorder is?

13   A.   Sure.  A delusional disorder is a disorder of psychosis.

14   There are various stages of delusional disorder.  You can have

15   an early onset delusional disorder.  You can have a late onset

16   delusional disorder typically after 45 or 50.  And delusional

17   disorders tend to present later anyway.  Most -- the delusional

18   disorder is part of what we call the schizophrenic form

19   spectrum of disorders from schizoid personality, schizotypal

20   personality, delusional disorder, schizophrenia,

21   schizoaffective.  And what we see is these are not silos.

22   These are unfortunately interactive predominant, so the

23   criteria is really designed to help you categorize, but it

24   doesn't necessarily speak to the finite boundaries of the

25   disorder.

George W. Woods, Jr. - Direct

1          Delusional disorder most commonly does not have the

2  same degree of social deterioration, Your Honor.  And what that

3  means is that we often see in someone that is schizophrenic,

4  they will have a social deterioration.  They can't work.  They

5  rarely are married.  They don't have the type of impairment

6  that one sees, but that is not to say that they don't have

7  social deterioration.  But their prominent feature is what we

8  call positive symptoms are delusions or hallucinations, and

9  those can be various types, namely persecutory.  They can be

10 grandiose.  They can be what we call erotomanic, someone is in

11 love with them or they are in love with someone else.  So

12 that's really the depth of -- a brief on delusional disorders.

13 Q.  Dr. Woods, you mentioned positive symptoms as being a form

14 of symptoms of psychotic disorders on that schizophrenic form

15 spectrum you were describing?

16 A.  Yes.

17 Q.  There are different classes of symptoms as well, right, not

18 just positive symptoms?

19 A.  Absolutely.

20 Q.  What are the other?

21 A.  In 2022, we now understand that there are really at least

22 three types, three constellations of symptoms across the board,

23 bipolar disorder, delusional disorder, particularly late onset

24 delusional disorder, schizophrenia.  And the ones that we are

25 most familiar with are positive symptoms, hallucinations.

George W. Woods, Jr. - Direct

1        Hallucinations -- if this has already come out, just

2   tell me to stop, Your Honor.  Hallucinations are alterations of

3   reality that are sensory based.  You hear something.  You smell

4   something.  You taste something.  You feel something.  So

5   hallucinations are alterations that have to do with how the

6   senses are off.

7        Delusions, on the other hand, are systems of

8   organization that are designed to help people organize and

9   explain the ways in which their brain is no longer functioning.

10  The reality, I am hearing something.  There must be something

11  in my tooth.  It must have been planted, something in my tooth.

12  So delusions are -- can be bizarre and non-bizarre, but they

13  often are either out of the realm of what the culture

14  understands or they are, in fact, bizarre.  That's positive

15  symptoms.

16       Negative symptoms, however, are really what we see

17  with impaired motivation, often problems with isolation or not

18  being active, problems with initiation, being able to get up

19  and do things and make things work, problems with context,

20  understanding how to act appropriately in context.  And so

21  those are really the -- and also you can have problems with

22  language.

23       Cognitive symptoms, however, are really in 2022 what

24  we understand to be the basis of brain disease, and certainly

25  you will see this across the board.  And positive symptoms are

George W. Woods, Jr. - Direct

1    when the brain doesn't work.  It has nothing to do with

2    intelligence.  It has to do with functioning, being able to

3    weigh and deliberate, being able to sequence one's thinking,

4    being able to problem solve, being able to pick up social cues

5    and act appropriately in one's -- and if I could perhaps give a

6    quick example.

7    Q.  Sure.

8         THE WITNESS:  Your Honor, if I may.

9         THE COURT:  Certainly.

10   A.  When we think of dementia formed illnesses, we always rush

11   to dementia, and yet there are stages before dementia for

12   someone.  And they are not memory.  They are impairments of

13   emotion.  As one person described it, it's like the world has

14   lost its color.  And when a person is in those impairments of

15   emotion, what you see as cognitive symptoms are this inability

16   to really problem solve that can often become very disruptive.

17        The simple one is I have lost my keys.  You know, I

18   tend to lose my keys.  And luckily I am at a place where if I

19   lose my keys, I know they are in the house.  I know they are in

20   the car, all right?  But there are others if they lose their

21   keys, they don't have that cognitive connection to go back and

22   say let me look at where I left them or let me look at where

23   I've been.  And suddenly you took my keys.  Someone has broken

24   in and stolen my keys.  And those are how cognitive symptoms

25   can relate to positive symptoms.

George W. Woods, Jr. - Direct

1          Today we know that in psychosis you have positive

2   symptoms.  You have negative symptoms.  You have cognitive

3   symptoms.  And they all interplay to make the psychotic

4   landscape.

5   *BY MS. BECK:*

6   *Q.*  Now, Dr. Woods, in your review of the case materials, did

7   you form an opinion about whether Mr. Dear has a mental

8   illness?

9   *A.*  Yes.

10  *Q.*  Do you believe he has a psychotic disorder?

11  *A.*  I do.

12  *Q.*  Has Mr. Dear exhibited positive symptoms based on your

13  review of the records?

14  *A.*  He has.

15  *Q.*  And what are some of the positive symptoms that you have

16  identified?

17  *A.*  Mr. Dear over a course of time, at least since 2015 and the

18  history says even before that, he has just exhibited positive

19  symptoms.  He has believed that the FBI has been after him,

20  that they have run him off the road when he was living outside

21  of Denver.  He has put holes in his building as a way to

22  monitor.  He believes that when he was at the Bureau of

23  Prisons, that they were taping him -- I am sorry, in Colorado,

24  that they were taping him constantly.

25          He has had what we call fixed delusions that people

George W. Woods, Jr. - Direct

1    have been poisoning his food or that people have been putting

2    medicine, attempting to put medication in his food.  He

3    believes that as it relates to competency, that the evaluators

4    and his attorneys have been in -- I think the word is cahoots

5    where Dr. Gray is giving a high five to the defense attorney or

6    Dr. Preston Baecht withheld a finding of a COVID test for an

7    hour.  And so consequently, he has seen these and responded to

8    them in very negative symptom fashion over time.

9         The history that we see, however, is that these did

10   not just start in 2015, that historically, according do his

11   sons and others, we have seen these paranoid ideation for

12   decades.

13   Q.  In addition to those positive symptoms, has he exhibited

14   negative symptoms?

15   A.  Yes.

16   Q.  And can you describe those?

17   A.  And I might note that when we talk about negative symptoms,

18   particularly in his delusional disorder, we are talking about

19   negative symptoms that, like cognitive symptoms, that are more

20   common in late onset in delusional disorder.  Negative

21   symptoms, you can find them throughout his record.  He has a

22   record of isolation.  And am I saying that he never gets out?

23   No, I am not saying that.  But it is significant enough that in

24   the Pueblo records, that in the FDC records, that in the Bureau

25   of Prisons records, they all discuss him being isolated, being

George W. Woods, Jr. - Direct

1    withdrawn.

2            The term that they used in -- repeatedly in the Bureau

3    of Prisons records was isolated both because of case state and

4    mental illness.  So you see this impairment of socialization.

5    And as I said, that's not to say he never socializes, but often

6    the type of socialization you see is when someone approaches

7    him, what we call provoked socialization, rather than when he

8    is just out and about.

9    Q.  Did you notice in the records whether Mr. Dear attended any

10   of the competency restoration classes at the Bureau of Prisons?

11   If you did review those records, what, if anything, did they

12   tell you about whether he was exhibiting negative symptoms?

13   A.  Rarely did he go to the competency.  Even with

14   encouragement, even with attempted bribing did he -- would he

15   go.

16   Q.  Can you describe whether Mr. Dear has cognitive symptoms?

17   A.  Mr. Dear has cognitive symptoms.

18   Q.  And how do they present themselves?

19   A.  Sure.  Cognitive symptoms are the foundation of positive

20   symptoms.  And cognitive symptoms present in problem solving,

21   being able to see the big picture, being able to act

22   appropriately in certain environments, being able to pick up

23   social cues and respond to them, being able to sequence one's

24   behavior.  And there are specific parts of the brain that help

25   with executive functioning.

George W. Woods, Jr. - Direct

1          We talk about the frontal lobes.  And it's really no

2    longer accurate to just talk about certain atomic areas because

3    the brain is so interconnected, but there is no question that

4    the frontal lobes help us solve problems, help us pick up

5    social cues.  There is no question that the right side of the

6    brain, the right parietal lobe helps us see the big picture,

7    kind of take that information from the frontal lobe and really

8    kind of say, okay, what's the best thing for me to do here?

9          There is no question that the hippocampus,

10   H-I-P-P-O-C-A-M-P-U-S, that the hippocampus, which is

11   mid-brain, deep in our -- is the file cabinet for the brain.

12   So you have to be -- that's where you have to go in and pull a

13   memory out and use it.  As we get older, that becomes difficult

14   for all of us, but some things are non-pathological aging and

15   some things are pathological aging.

16   Q.   So what cognitive symptoms has Mr. Dear exhibited?

17   A.   Mr. Dear has exhibited a number of cognitive symptoms.  He

18   has certainly shown impairment in problem solving.  He has

19   shown a misidentification syndrome which is really pretty

20   fascinating where he will identify someone as a uniformed

21   officer, not just a person, but he identifies them as a

22   uniformed officer when, in fact, it was a staff member or he

23   will identify staff as working for the FBI, and this is really

24   what we call a misidentification syndrome.  So we see numerous

25   examples of this throughout Mr. Dear's records.

George W. Woods, Jr. - Direct

1  *Q.*  You weren't here yesterday during Dr. Preston Baecht's

2  testimony, were you?

3  *A.*  No, I am sorry.

4  *Q.*  She testified that Mr. Dear's memory was good from one

5  moment to the next.  Do you agree with that in your review of

6  the records?

7  *A.*  Well, I am not sure what she means by one moment or the

8  next.  There are 17 different types of memory, so the idea of

9  him being able to remember something from one moment to the

10  next, my question would be, well, is he remembering names?  Is

11  he remembering a story?  Is he remembering numbers?  What is he

12  in fact remembering?

13      The idea that you can remember something from one

14  moment to the next is not just a function of this mega memory

15  that everything is thrown into.  There are different types of

16  memory, and there are indications that Mr. Dear has some issues

17  in certain types of memory whereas he may have -- he may do

18  perfectly well in others.

19  *Q.*  Dr. Preston Baecht and Dr. Sarrazin also described Mr. Dear

20  yesterday as bright and intelligent.  Do you agree with that

21  based on your review of records?

22  *A.*  Well, I would suggest that Mr. Dear completed college, that

23  he worked.  You cannot look at someone nor listen to someone

24  and make a judgment about how their brain functions, and that's

25  different than someone being intelligent.  And this is

311

George W. Woods, Jr. - Direct

1    something that's often confusing is that someone may be, quote,

2    intelligent, but that doesn't mean that their brain is

3    functioning properly.

4    Q.  Did anyone administer any screening tools to assess whether

5    Mr. Dear had any cognitive symptoms?

6    A.  Yes.

7    Q.  First of all, what is a screening tool?

8    A.  A screening tool is a -- an instrument to make you aware

9    that there may be a more serious problem.

10   Q.  In this case what screening tools or tool were or was

11   administered?

12   A.  The Montreal Cognitive Assessment.  It's called the MOCA.

13   Q.  Who administered that?

14   A.  Dr. Grimmett, I believe, with Dr. Gray.

15   Q.  When was that administered to Mr. Dear?

16   A.  I believe it was administered either January of 2015 -- it

17   was maybe 2016.  It was the first interview they had with him.

18   Q.  What does the Montreal Cognitive Assessment screen for?

19   A.  The Montreal Cognitive Assessment screens for cognitive

20   impairment.  Are there problems in the brain that require us

21   looking at it a bit closer?  It is not just a test for

22   dementia.  It's really a test looking at various categories of

23   brain function and how those categories of brain function

24   should be working.  It's normed for age and education as well.

25   Q.  Have you ever administered the MOCA?

George W. Woods, Jr. - Direct

1    A.  I administer it to every patient.

2    Q.  So you are certified to administer it, then?

3    A.  I am.

4         MS. BECK:  Mr. Cohen, can we pull up defense

5    Exhibit 4, please?

6    BY MS. BECK:

7    Q.  Dr. Woods, looking at your screen, what is this document?

8    Can you see it okay?

9    A.  I am sorry, I didn't hear you.

10   Q.  Can you see Defendant's Exhibit 4 on your screen?

11   A.  I can.

12   Q.  What is this document?

13   A.  This is the Montreal Cognitive Assessment.  This is the

14   version 7.1, so this would be the version that would have been

15   appropriate at that time.

16   Q.  And it was administered in 2016.

17   A.  That's correct.

18        MS. BECK:  Your Honor, at this time I would move for

19   the admission of Defense Exhibit 4.

20        THE COURT:  Response?

21        MS. WHITE:  No objection, Your Honor.

22        THE COURT:  Defendant's Exhibit 4 for identification

23   admitted in evidence.

24        MS. BECK:  Thank you, Your Honor.

25   BY MS. BECK:

313

George W. Woods, Jr. - Direct

1    *Q.* Dr. Woods, I want to take you through this form, this

2    screening tool, and I would like you to walk us through each

3    category to explain what the purpose of that category is for,

4    what it's looking at.

5    *A.* Sure.

6    *Q.* So the first category, if you look in the left-hand corner,

7    it's called Visuospatial/Executive. Visuospatial is, can you

8    see the big picture? Executive refers to executive

9    functioning. Can you weigh and deliberate? Can you sequence

10   your thinking? Can you monitor your thinking? There are

11   three -- ostensibly there are three tasks here. The first task

12   is really a very simple sequencing task. You start at 1. You

13   go to A. You go to 2. Then you go to B and go to 3, C, and so

14   you alternate between number and letter, number and letter in

15   ascending fashion.

16         So it requires three things. It requires, No. 1, do

17   you remember the instructions? No. 2, how is your processing

18   speed? Because if you can't attend and your processing speed

19   is slow, you have difficulty with memory. No. 3, what is your

20   ability to sequence? Very simple. This is very, very

21   straightforward. This can become much more complex and it's a

22   test of left lateral frontal lobe function.

23         And what we see here is there are -- the dots really

24   are cues to tell you how to do it, but we see that there is

25   nothing that is filled out in this. Now, if you go to the

George W. Woods, Jr. - Direct

1    record, you will see that Dr. Grimmett, I think it was

2    Dr. Grimmett who actually gave the test, that she will note

3    that Mr. Dear, there were times when he refused, that he just

4    said, I guess, I don't want to do this.  And as we go further

5    down, you will see that she noted those times that he refused.

6         However, what you see on the right-hand side are the

7    points that these are to get.  And you see that in this

8    particular case she did give him a point score, zero points.

9    So based upon the fact that she noted those that he refused, I

10   have to assume that he did not do this task.

11        MS. BECK:  And Mr. Cohen, if we can zoom out a bit

12   just so we could look at the document.  And Mr. Cohen, if you

13   would highlight the areas where it says refused.

14   BY MS. BECK:

15   Q.  Are those the instances, Dr. Woods, that you are talking

16   about where Dr. Grimmett noted his refusal rather than his

17   failure to do well?

18   A.  That's correct.  So that's the first test is the

19   visuospatial executive test.  The second test is a -- it's

20   really -- that's more executive.  This is more visuospatial.  I

21   am sorry.  Can we go down -- I mean, go back to -- yes, thank

22   you.

23        The next test is what is called the Cube test.  And

24   the cube test is a test of again visuospatial.  Can you figure

25   out how to make this cube?  Now, again because this is a

George W. Woods, Jr. - Direct

1  screening instrument, you actually have the cube and you are

2  asked to copy it.  If you were to do a more comprehensive

3  neuropsychological, you would just tell someone to draw a cube.

4  You wouldn't give them the cube to copy.  Copying is a cue that

5  allows them to say okay, I know how to do this.  I can look at

6  it.  Again, we see that there is no response.

7        And the last test in the completely empty area -- oh,

8  I can draw in that.  Okay.  It's called the clock test.

9        Can you erase what that I just drew?

10        Okay.  So in this area you tell the person I want you

11  to draw a clock.  I want you to put the hands at 10 minutes

12  after 11:00.  And this is a test of memory, attention and of

13  visuospatial ability.  It seems -- because each of the

14  instructions speaks to what we call elements.  So drawing the

15  circle is an element.  Putting the numbers, 12, 1, 2, 3, 4, 5,

16  6, 7, 8, 9, 10, 11 are elements.  Drawing the hands are

17  elements.  Putting a shorter hand for the hour and a longer

18  hand for the minute are elements.

19        And what you are really looking there is to see -- and

20  the perception, the distance between the hands, I mean between

21  the numbers, et cetera, are all taken into consideration.  And

22  you look at those from a neurological point of view to see do

23  they capture as much as of the elements as possible.  And again

24  we see that in this particular instance he didn't draw that.

25  So Dr. Grimmett gave him a zero of a possible five.

George W. Woods, Jr. - Direct

1          Here we are looking at left lateral frontal lobe.  We
2   are looking at right parietal lobe.  And we are looking at
3   really -- how can I describe this -- it's called the superior
4   gyrus of the frontal lobe.  So we are actually looking at
5   specific type areas of the brain when we are doing this
6   screening.
7   Q.  Moving on to the naming section, how did Mr. Dear do on the
8   naming section?
9   A.  He did fine.  If you look at it, you see he did three of
10  three.
11  Q.  And what is that test asking him to do?
12  A.  That's telling you that from a naming point of view, and do
13  you remember earlier when I said that there are memories for
14  different things, for numbers, for letters?  There are -- there
15  is memory for names.  And so what this is telling us, I mean,
16  that Mr. Dear was able to reach into his hippocampus and pull
17  out the category of animals and get them correct.
18  Q.  Moving to the Memory section, Mr. Dear refused to do that
19  section, correct?
20  A.  That's correct.
21  Q.  Moving to the Attention section of the test, there were
22  multiple subparts of that, correct?
23  A.  Correct.
24  Q.  He -- it looks like he appeared to do the first test,
25  right?

317

George W. Woods, Jr. - Direct

1    *A.*  He appeared to, yes.  He made an effort in the first.  He

2    refused the second, and he made an effort in the third.

3    *Q.*  And how did he do in that Attention section?

4    *A.*  Well, in the first, he got one out of two points.  And this

5    goes to that -- again that idea about what's smart.  The idea

6    is to -- it's called digit span.  And what you do is you have

7    the person read a number of digits forward.  Now, we are

8    over-learned in forward digits.  We have a Social Security

9    number.  We have a telephone number.  We are used to reading

10   digits forwards, so reading digits forwards doesn't really tell

11   you much unless a person is really cognitively impaired.  Of

12   course, we are over-learned that way.

13          So the real test is to have them read digits

14   backwards.  So what we see is that Mr. Dear did fine and got

15   one point on reading the numbers forward, but got zero points

16   in reading them backwards.  So what does that mean?  Does that

17   mean that's a processing speed problem?  Could he remember the

18   numbers?  What does that really mean?  And again, it speaks to

19   certain parts of the brain and certain types of memory.

20   *Q.*  Moving on to the Language section, Mr. Dear appears to have

21   completed that section.  How did he do?

22   *A.*  On the list of letters?

23   *Q.*  Yes.

24   *A.*  Yes.  He refused to do that.  I can explain it to you, but

25   he refused, so I will just go on.

318

George W. Woods, Jr. - Direct

1   Q.   Sure.   Sorry, I jumped down to the Language section of the

2   test.   So there is two parts to that test, correct?

3   A.   Right.

4   Q.   How did he do on that?

5   A.   Well, okay, the list of letters is a test of attention and

6   impulse.   So the idea is every time you hit A, and as you can

7   see, as you can see, there is a number of different letters?

8   Every time you hit an A, you are supposed to tap.   FBA tap,

9   CMNAAJKLBAFAKDEAAAJAMOFAAB.

10  Q.   Just to be clear, you are looking at the part of the test

11  under the Attention?

12  A.   Right.

13  Q.   And you are talking about reading the list of letters,

14  right?

15  A.   Right, and he refused that.

16  Q.   I want to jump down to the Language section.   Do you see

17  that?

18  A.   Okay.

19  Q.   How did Mr. Dear do on that section?

20  A.   He did not do well.

21  Q.   Okay.   Can you elaborate on that?

22  A.   This is called Verbal Fluency, and Verbal Fluency again has

23  a number of different categories.   In this particular, the idea

24  is to get an instruction, remember the category, go into your

25  memory, only pull out words of that category.   And again, this

George W. Woods, Jr. - Direct

1    is the hippocampus function of the brain, basically the memory

2    storage, the filing cabinet of the brain.  And in this case you

3    are to give all the words that start -- that you can recall

4    that start with the letter F in a minute.  And with his age and

5    education norming, he should have been able to get equal to or

6    above 11.

7    Q.   Did he?

8    A.   No.  He got eight.

9    Q.   So what does that tell us?

10   A.   That tells you that there is something that is impaired

11   about his retrieval function.  Again, this is a screening

12   system, so you would want to look more carefully to see is it

13   processing speed?  Is it -- he certainly was able to retrieve

14   the animals, right?  So is it a category speed, a category

15   impact?  But there is something cognitively that's not working

16   for him.  May I just, if you don't mind, quickly go up one?

17   Q.   Sure.

18   A.   Because I think it's important if we look under Attention

19   at the Serial 7 subtraction.  What we see, and this test is

20   starting at a hundred, subtracting seven, subtracting seven,

21   subtracting seven.  Mr. Dear did very well.  He got all of

22   them.  He got three points out of three.  Okay.

23   Q.   Thank you.  If we could look at the Abstraction test that

24   is a part of this screening tool, can you talk to us about what

25   he was tasked with doing and how he did?

320

George W. Woods, Jr. - Direct

1    A.  The abstractions are understanding a similarity between

2    different factors.  What is similar between a banana and an

3    orange?  They are both fruit.  What is similar between a train

4    and a bicycle?  They are all -- they are both transportation.

5    What's similar between a watch and a ruler?  Both of them can

6    measure.  And you will get different answers.  You will get

7    what's similar between a banana and orange?  They both have

8    peeling.  Well, that's right, but it's not quite right.  What's

9    the difference between a train and a bicycle?  They both have

10   wheels.  Well, but in this case with a two out of two, Mr. Dear

11   did fine.

12   Q.  Looking at the Delayed Recall section of the screening

13   tool, how did Mr. Dear do on that one?

14   A.  If you will notice, there are no answers to that.  And

15   Dr. Grimmett did not score it.  There is no zero there.  So he

16   refused the first trial, so she could not do the delayed recall

17   trial.

18   Q.  Okay.  And lastly, how did he do on the Orientation section

19   of the screening tool?

20   A.  He got six out of six.  He did well on that.

21   Q.  Okay.  Now, overall in looking at this screening tool, what

22   does it tell you about Mr. Dear's cognitive deficits or lack

23   thereof in 2016?

24   A.  Sure.  So when you have a MOCA like this, this is not a

25   MOCA that you score.  This is a MOCA that you look to see what

George W. Woods, Jr. - Direct

1   are the areas of impairment?  What are the areas in which a

2   person is not doing well?  What are the areas in which they are

3   doing well?  And that gives you some sense of their cognitive

4   landscape.  What are their areas that are islands of success?

5   But what are these deficits that you would want to look more

6   carefully into.  And what we see are deficits in problem

7   solving, deficits in picking up cues, deficits in understanding

8   context, seeing the big picture.  We see strengths in being

9   able to pull out categories of like animals, but some weakness

10  in being able to pull out verbal fluency of letters.  So that

11  tells you -- and this happens with aging.

12          Non-pathological aging means, you know, I know that

13  name, but I just can't get it, right?  That's non-pathological

14  aging.  Pathological aging, however, is exactly what we see

15  here, not being able to pull out a number out of an array of

16  words that could start with F, not being able to pull out a

17  number within a timed period.  And the timing is important

18  because timing puts a certain amount of stress on you in order

19  to do that.

20          So we see that -- we see that there are memory

21  problems with retrieval.  We see that there are problems with

22  hippocampal function.  We see that there are these problems

23  with left lateral brain function and perhaps what we call

24  superior gyrus function, as well as right parietal function.

25  We also see that there are strengths in terms of math.  And

George W. Woods, Jr. - Direct

1  this is very, very important because math is -- and this type

2  of math is one of the earliest things that one gets in fourth

3  grade, fifth grade, you are doing this type of subtraction.

4  And that's still intact, right?

5          And we also see that in learned functioning of memory,

6  of numbers, he does okay, but he has a real problem coming back

7  even with only three numbers.  There are multiple ways you

8  could do this.  You could do this by if you give me the months.

9  There are multiple ways in which you could test this.

10 Q.  So this test is from 2016.  If Mr. Dear were given a new

11 MOCA today, would we expect a different result?

12 A.  Well, Ms. Beck, we may expect a different result if he

13 doesn't refuse and we have the opportunity to look at the areas

14 that he did not cover, that type of memory.  But we certainly

15 can't expect a different result in the areas that he did and

16 did poorly.  Unfortunately, that would probably be the same.

17 Q.  If this is a test or a screening tool for cognitive

18 decline, does it matter that he was in his late fifties at the

19 time that it was administered?

20 A.  The test is normed for his age.  So if someone in their

21 late fifties -- he was probably 58 at the time, somewhere in

22 there -- if someone were normed in their late fifties, I would

23 have to respectfully disagree with Dr. Holland that 65 is

24 elderly, and getting into your late fifties is really a place

25 where your body does start to change significantly.  However,

George W. Woods, Jr. - Direct

1  the test is normed for that.

2  Q.  Now, I would like to discuss --

3          MS. BECK:  And Mr. Cohen, you can take that down.

4  Thank you.

5  BY MS. BECK:

6  Q.  I would like to discuss with you the relationship between

7  Mr. Dear's mental illness and his competency to proceed in this

8  case.

9  A.  Sure.

10  Q.  Do you agree with all of the previous evaluators of his

11  competency that he is currently incompetent to proceed?

12  A.  I do.

13  Q.  Do his positive symptoms impact his rational understanding

14  of the proceedings in this case?

15  A.  Absolutely.

16  Q.  Can you talk a little bit about that?

17  A.  Sure.  Positive symptoms impact one's ability to understand

18  the process that's in front of you, to weigh and deliberate

19  your options, to sequence.  If this is going to happen, then

20  this may happen.  And that isn't a function of -- I am sorry,

21  that isn't a function of positive symptoms.  That's a function

22  of cognitive symptoms.  Those are brain functions.  So you may

23  be very, very positive symptom heavy and still be able to do

24  those things.

25          However, if you have cognitive symptoms, cognitive

George W. Woods, Jr. - Direct

1    symptoms can undermine your ability to do that, to really -- to

2    see the big picture.  This is probably the best way for me to

3    go.  It also impairs your ability to see options.  What are the

4    options here?  And we see that, for example, with Mr. Dear when

5    they asked him to take a test for his kidney function and he

6    says, well, I am not going to give you what you need if I don't

7    get what I need.  What does that mean, right?  This is really

8    for you.  This isn't for the staff person.  So that's the kind

9    of thing that people say, oh, that's psychotic, but where in

10   psychosis is it?  And where it is, it's in that cognitive lack

11   of understanding.

12   Q.  Okay.  So you've testified that Mr. Dear has positive,

13   negative and cognitive symptoms, and I really want to hone in

14   on how each of those classes of symptoms affect his competency

15   to proceed.

16   A.  Sure.

17   Q.  So we are talking about cognitive symptoms and the impact

18   that that has on his competency.  Would you agree that his

19   cognitive symptoms affect his ability to assist in his defense?

20   A.  To rationally assist, yes.

21   Q.  Can you describe that for me?

22   A.  His inability to problem solve.  Positive symptoms derive

23   from cognitive symptoms.  And I am not trying to jump ahead,

24   okay?  Cognitive symptoms derive from positive symptoms, and so

25   they are the foundation.  So if you are afraid that your

George W. Woods, Jr. - Direct

1   attorney is working for the FBI, okay, or if you are afraid

2   that the judge is in cahoots, yes, that is a delusion, right,

3   but the basis for that delusion is your inability to

4   effectively weigh and deliberate.

5   Q.   So Mr. Dear has exhibited those delusions that his defense

6   is the FBI.

7   A.   Exactly.

8   Q.   And the judge is in cahoots, right?

9   A.   Correct.

10  Q.   And that's affecting his ability to rationally assist in

11  his defense.

12  A.   That's correct.

13  Q.   Would you also agree that his cognitive symptoms are

14  impacting his ability to communicate in a rational manner?

15  A.   Yes.

16  Q.   Okay.  Can you talk about how his cognitive symptoms are

17  affecting his ability to communicate in a rational manner?

18  A.   Sure.  One of the things that we see with Mr. Dear is that

19  his perception of events is often mistaken.  He believed that,

20  as I said, that there was a uniformed guard or uniformed

21  policeman.  That's just not true.  Not only was it not a

22  correctional -- it was a staff person.

23          Dr. DeQuardo also describes instances when Mr. Dear

24  had difficulty separating out the reality of their

25  conversations.  They would be commenting on something, and

326

George W. Woods, Jr. - Direct

1   Dr. Baecht talks about in her report how Mr. Dear believed that

2   she was putting -- or she was having medicine put into his

3   food.  And she said no, that's impossible.  He said, well, I'm

4   having racing -- my heart is racing, so there must be some food

5   that's been put into my medicine -- I mean, some medicine put

6   into my food.

7          So that's really -- those are difficulties weighing

8   and deliberating.  You see pretty consistently through

9   Mr. Dear's testing where people will say unable to educate,

10  right, unable to educate, unable to hear what's going on and

11  get it.  And again, that's the difficulty of being able to

12  problem solve.

13  Q.  Can you talk about how Mr. Dear's negative symptoms are

14  impacting his competency?

15  A.  Mr. Dear's negative symptoms impact his competency in two

16  ways.  They keep him isolated, but they also impair his

17  communication with others.  If you notice, Mr. Dear has a

18  history -- it's really interesting -- moving to a new facility

19  and within a relatively short time having difficulty with some

20  of the other inmates or, as you saw at BOP, actually having a

21  difficulty with one of the guards where he -- the guard -- it

22  was noted that the guard gave him too many directives, and

23  Mr. Dear responded in a very agitated way.

24         You know, these are socialization issues, not just

25  issues of paranoia.  These are socialization issues as well,

George W. Woods, Jr. - Direct

1    which is a kind of language issue -- I mean, kind of

2    socialization issues that you see in negative symptoms.

3    Q.  And just to be clear, Mr. Dear has never been diagnosed

4    with having a personality disorder.

5    A.  That is correct.

6    Q.  Now I want to turn to Dr. Sarrazin's treatment plan.

7    A.  Sure.

8    Q.  First of all, is that treatment plan in your opinion

9    substantially likely to render Mr. Dear competent?

10   A.  In my professional opinion, no.

11   Q.  And broadly speaking, why not?

12   A.  It appears to be a standard assessment and treatment plan

13   that doesn't take into consideration the unique factors that

14   Mr. Dear presents.  And without taking those into

15   consideration, it really in my opinion could be a very, very

16   complex and very difficult situation.

17   Q.  And I want to get into some of those specific things about

18   Mr. Dear that make it not substantially likely that the plan

19   will restore him to competency.  But before I get to some of

20   his specific issues, I want to talk with you about whether the

21   four medications that are listed in that treatment plan are

22   substantially likely to treat Mr. Dear's positive symptoms to

23   the point he could be rendered competent.

24   A.  Say that last part again?

25   Q.  What I want to talk to you about is whether those four

George W. Woods, Jr. - Direct

1    medications that are listed in the treatment plan --

2    A.   Yes.

3    Q.   -- are substantially likely to render Mr. Dear's positive

4    symptoms ameliorated to the point where he is competent to

5    proceed.

6    A.   Got it.

7    Q.   Again, you weren't here yesterday for Dr. Preston Baecht

8    and Dr. Sarrazin's testimony, but they testified that the

9    delusions that Mr. Dear is experiencing don't need to go away

10   completely for Mr. Dear to be restored.  Do you agree with

11   that?

12   A.   I would agree that his positive symptoms don't have to go

13   away completely.  Of course, that leaves his cognitive symptoms

14   and his negative symptoms, but I could see that.  I think

15   getting rid of his positive symptoms given how long they have

16   been there is a task.  So we are not talking -- we are talking

17   about to what degree they go away rather than whether they go

18   away or not.

19   Q.   And do you think that the treatment plan that's proposed by

20   Dr. Sarrazin does anything to address the negative symptoms

21   that Mr. Dear exhibits?

22   A.   No, it does not.

23   Q.   Will those four medications that are proposed treat those

24   negative symptoms?

25   A.   There really is no good treatment for negative symptoms

George W. Woods, Jr. - Direct

1  today.

2  Q.  And does the treatment plan take into account Mr. Dear's

3  cognitive symptoms?

4  A.  No, it does not.

5  Q.  Would those four medications treat Mr. Dear's cognitive

6  symptoms at all?

7  A.  Absolutely not.

8  Q.  Now, you mentioned the length of Mr. Dear's illness.

9  A.  Yes.

10  Q.  And you testified that it does appear to go back quite a

11  ways.

12  A.  Yes.

13  Q.  Can you date when that may have begun?

14  A.  The history that we have is decades.  It appears that,

15  according to the stories of his children, that he has been

16  increasingly entrenched in stories about the FBI, about

17  President Obama, et cetera, for decades.

18  Q.  Does the length of Mr. Dear's untreated psychosis factor

19  into your opinion about whether that plan that Dr. Sarrazin's

20  proposed will work?

21  A.  Absolutely.

22  Q.  In what way?

23  A.  Psychiatric disorders are like most medical disorders.  The

24  longer you leave them untreated, the more difficult they are to

25  treat and the less impact you have on that treatment -- on

George W. Woods, Jr. - Direct

1   their benefit.  So the literature is pretty clear and

2   particularly the work of Dr. Steven Strakowski at the

3   University of Texas -- he was at the University of Cincinnati

4   before that -- on the rigidity and entrenchment of long periods

5   of time without -- of psychosis without it being treated.  It's

6   a much more difficult avenue than someone that is young.  You

7   can treat them over a longer period of time.

8           THE COURT:  Counsel, excuse the interruption, but we

9   have arrived at our noon recess for today during which, Doctor,

10  you may stand down.

11          Counsel you may stay seated at your convenience.  We

12  are in recess until 1:00 o'clock p.m.

13      (Recess at 12:00 p.m. until 1:00 p.m.)

14          THE COURT:  Ms. Beck.

15          MS. BECK:  Thank you, Your Honor.

16          THE COURT:  You are welcome.

17  BY MS. BECK:

18  Q.  Dr. Woods, when we left off at the break, we were just

19  talking about how Mr. Dear's length of untreated psychosis

20  would make it substantially less likely that Dr. Sarrazin's

21  plan would work.  I wanted to talk with you about your review

22  of the case materials.

23          Now, in your review of the case materials, did you

24  ever see a time where Mr. Dear agreed to voluntarily take

25  psychotropic medication?

George W. Woods, Jr. - Direct

1   A.   I don't recall a period of voluntary, although there was a

2   seven-day period in which he was given medication.

3   Q.   That was against his --

4   A.   That's correct.

5   Q.   And additionally Mr. Dear has throughout his time at CMHIP,

6   the state hospital, throughout his time in federal custody he

7   has regularly refused medical treatment as well, right?

8   A.   That's correct.

9   Q.   Now, does Mr. Dear's refusal to cooperate with medical

10  treatment factor into your opinion about whether Dr. Sarrazin's

11  treatment plan is substantially likely to render Mr. Dear

12  competent?

13  A.   Absolutely.

14  Q.   In what way?

15  A.   The complexity of treating someone of Mr. Dear's age and

16  with the hypertension, but particularly because of his age is

17  complicated when they are unwilling to be treated.  And so the

18  protocol that -- Dr. Sarrazin?

19  Q.   That's right.

20  A.   -- that Dr. Sarrazin prescribed and more importantly the

21  follow-ups that Dr. Sarrazin prescribed in terms of his

22  template are the -- it's the protocol of someone that is 18 to

23  40, maybe 50, that is pretty cooperative.  Dr. Sarrazin notes

24  that if he doesn't cooperate, then eventually you may have to

25  give him injectable medication.

332

George W. Woods, Jr. - Direct

1          Well, we have someone that for six years has not

2    cooperated.  We have someone that saw a psychiatrist, according

3    to the psychiatrist, Dr. DeQuardo, 75 to a hundred times, had a

4    very good relationship with him.  He liked him, thought he was

5    a very good doctor, and still would not cooperate either with

6    medication or with medical care.  So when he went to the Bureau

7    of Prisons, he described it as the best place he had been so

8    far in terms of prisons, and yet we see him again not

9    cooperating.

10          So there is an assumption that Dr. Sarrazin and to

11   some degree Dr. Holland made about the population that they

12   have treated and the population that -- and how that population

13   responds to the medication.  Much of it is based on getting

14   that person cooperative, but for Mr. Dear that's been a

15   significant, significant undertaking and so far a failure.

16          So what if he is not cooperative?  What does

17   Dr. Sarrazin do then?  He introduces other medications that, in

18   fact, have their own difficulties.  He introduces -- and I am

19   sorry.  Am I answering -- have I gone too far?

20   Q.  Well, I was going to ask you a follow-up question, which is

21   that essentially it sounds like you -- your opinion would be

22   that Dr. Sarrazin's treatment plan assumes that Mr. Dear would

23   cooperate, but if not, it does have a contingency to use a

24   use-of-force team eventually, right?

25   A.  Yes.

333

George W. Woods, Jr. - Direct

1    *Q.* Now, have you ever seen someone be forcibly medicated

2    before?

3    *A.* Yes.

4    *Q.* Can you describe what that looks like?

5         *MS. RHYNE:* Objection, Your Honor, relevance, outside

6    the scope of the BOP environment.

7         *THE COURT:* Response?

8         *MS. BECK:* Your Honor, my question was whether

9    Dr. Woods had ever seen someone be forcibly medicated.  And

10   it's relevant in order for the Court to make a determination

11   about whether or not to order the treatment plan to go into

12   effect.  It's important for the Court to understand what that

13   process looks like.  We did hear testimony yesterday about what

14   Dr. Sarrazin's plan included, but it was really mechanical

15   rather than painting a picture about what that looks like.

16        *THE COURT:* Well, although a close call, you are again

17   in luck.  This is a hearing to the Court.  I will receive the

18   evidence and then weigh it accordingly.  The objection is

19   overruled.

20        Doctor, you may answer counsel's last question if

21   after all of this you recall it.

22        *THE WITNESS:* I do.

23        *THE COURT:* And two, you can answer it.

24        *THE WITNESS:* Thank you, Your Honor.  I appreciate

25   that.

334

George W. Woods, Jr. - Direct

1   A.  For someone that -- it's different with different people.

2   If someone was resistant -- some people will resist.  Often you

3   will see particular people that have cognitive impairments,

4   they are more agitated.  They will push against you.  They will

5   not want this to occur.  And then it becomes a show of force

6   that often can be emotionally disruptive.

7          The other part of it, too, is that you are introducing

8   another medication.  It's not just the physicality of it.  You

9   are actually introducing another medication into the picture.

10  And in my opinion, the other medications that have a very, very

11  good potential of being introduced into the medication regimen

12  have cognitive problems in and of themselves, what we call

13  drug-drug interactions that can be difficult.

14         So if you've got someone that is used to medication,

15  they may have had a bad day or they come in and they're pretty

16  psychotic, but you know them, they know you.  They refuse their

17  meds and you give them a medication because they have been on

18  meds for 10 years or 15 years, you can often find that that

19  person will be less resistant.  But for someone that has chosen

20  in my opinion from a delusional perspective not only to not

21  take medication, but not to do the assessments and the testing

22  that allows you to do that safely and effectively is really --

23  is really problematic.

24  BY MS. BECK:

25  Q.  So Dr. Woods, I want to talk with you specifically about

George W. Woods, Jr. - Direct

1    the opinion that you've rendered about whether Dr. Sarrazin's

2    treatment plan is medically appropriate or in his best medical

3    interest.

4    *A.*   Sure.

5    *Q.*   Why don't you think that Dr. Sarrazin's treatment plan is

6    medically appropriate for Mr. Dear?  What are some of the

7    factors that you're thinking about?

8    *A.*   The first factor is age.  Mr. Dear is turning the corner on

9    65.  I have to respectfully disagree with Dr. Holland this

10   morning.  Certainty from a physiological point of view, 65 is

11   an elderly person.  By the time you are 50, your body is

12   changing in ways that are directly related to health, but more

13   importantly for this directly related to medication.  Your

14   metabolism is slowing.  Your body makeup is changing so that

15   you are -- it's hard to maintain muscle.  You have more fat

16   than you did when you were younger.

17         So the question of obesity is not really the issue.

18   The question is fat content because these drugs, the

19   antipsychotic medications are what are called lipophilic,

20   L-I-P-O-P-H-I-L-I-C.  They are fat loving.  And these are

21   medications that get stored in the fat.  These are also

22   medications, and I am talking now only about the four

23   antipsychotics, that are protein bound.  They are bound to

24   proteins in the blood.  And they are very highly bound.

25         Abilify is 99 percent bound by protein in the blood.

George W. Woods, Jr. - Direct

1    So what that means is you give someone a shot of Abilify or you

2    give someone some olanzapine, and only 1 percent of that

3    medication is actually flowing in the body.  The rest of it is

4    bound to protein.  And giving other drugs can increase that

5    blood level.  Slowing down your metabolism can increase that

6    blood level.  You're not breaking it down as quickly.

7             Giving other drugs like, for example, Dr. Sarrazin is

8    talking about, and appropriately so, if Mr. Dear at 65 has a

9    35 percent greater chance of developing akathisia than someone

10   that is 40, a 35 percent increase than someone who is 40, if he

11   develops akathisia, which is not tardive dyskinesia.  So you

12   give the person Cogentin.  Cogentin is an anticholinergic.

13   There is an anticholinergic delirium.  The term is "Red as a

14   beet, mad at a hatter," or Mr. Dear is agitated and you give

15   him Lorazepam, a benzodiazepine, to, quote, calm him down.  You

16   are giving -- there is a very high potential given Mr. Dear's

17   history of recalcitrants to medications.  You have a very high

18   potential of creating what's called polypharmacy, multiple

19   drugs, not just the antipsychotics, but multiple drugs that he

20   will have to have as part of his body.

21             Now, if he were 40, I would feel totally different

22   about this, but at 65 with the potential of decreased

23   metabolism, giving you a potential increase in blood levels,

24   the idea of these antipsychotics lowering blood pressure --

25   it's not treating his blood pressure.  You don't want that

337

George W. Woods, Jr. - Direct

1    because the biggest cause of morbidity after 65 are falls.

2           So his age is important.  It's not just a factor that

3    goes along.  It impacts everything that happens in his

4    pharmacological landscape.  And I don't see that as being

5    thought of in a thoughtful way in Dr. Sarrazin's protocol,

6    particularly because Mr. Dear refuses medical care.  He refused

7    the EKG.  He refused the lab work.  He refuses all the things

8    that you need to ensure that you're staying on top of these

9    drugs.

10   Q.  Now, you reviewed the records, the medical records that are

11   in the record in this case, right?

12   A.  Yes.

13   Q.  So are you aware that Mr. Dear suffers from high blood

14   pressure?

15   A.  I am.

16   Q.  Do you believe that that is a risk factor or a red flag for

17   Mr. Dear?

18   A.  Absolutely.

19   Q.  Can you talk more about that?

20   A.  Sure.  I think we have all heard the adage about high blood

21   pressure being the silent killer.  It's cardiac and then there

22   is cardiovascular.  Mr. Dear has cardiovascular disease,

23   meaning he has blood vessel disease that renders him having

24   hypertension.  Hypertension is not a disease of the heart.

25   It's a disease of the vascular system.  You have an increased

George W. Woods, Jr. - Direct

1    tension in your peripheral vasculature that gets it too tight

2    and that's what causes pressure, but it's not just on the

3    heart.  High blood pressure is a disease of small blood

4    vessels, so hands, feet, eyes and brain.

5    Q.  Now, you were in the courtroom this morning when

6    Dr. Holland testified, right?

7    A.  Yes.

8    Q.  Does any of his testimony regarding Mr. Dear's medical

9    history change your opinion about whether Dr. Sarrazin's

10   proposed treatment plan is in Mr. Dear's best medical interest?

11   A.  I would have to respectfully say no.

12   Q.  Why is that?

13   A.  I thought that Dr. Holland did an excellent job of

14   describing the anatomy of the heart, yet the issue I had with

15   Dr. Holland is the same that I have with Dr. Sarrazin, and that

16   is you have to look at the person.  Mr. Dear is not -- you have

17   to look at statistical analysis.  When we look at the

18   psychiatric literature on restorability, the highest range of

19   non-restorable are people that are older with cognitive

20   impairments.  I am not talking about dementia.  Older with

21   cognitive impairments.

22        When we look at the issue of the highest range of

23   morbidity as well as mortality with these medications, it's

24   not -- he respectfully was incorrect.  It's not in the

25   eighties.  It's actually people that are like 68 to 72 with at

George W. Woods, Jr. - Direct

1    least one co-morbidity like diabetes or hypertension.  I mean,

2    there's a reason why they tell us to get our vaccination at 65.

3    It's not because it starts there.  It's because we are already

4    in it.

5              So the fact that his age isn't taken into

6    consideration to the degree that it should be in terms of his

7    metabolism, in terms of his brain structure, brain functioning,

8    makes it -- and the fact that he is so recalcitrant about

9    getting the kinds of testing that would be necessary to monitor

10   his health makes this particular approach of concern to me.

11   Q.  Dr. Woods, are you familiar with Mr. Dear's family history

12   of cardiac disease?

13   A.  I understand that his dad had cardiac disease.  I believe

14   that it -- I believe that it was in the records after he was at

15   Pueblo, but I am not exactly sure where he was.

16   Q.  Okay.  You talked a little bit about how Dr. Sarrazin's

17   treatment plan acknowledges that there are side effects to

18   taking the antipsychotic medications that he lays out before in

19   his plan.

20   A.  Sure.

21   Q.  What are some of those side effects?  You talked a little

22   about some of them, but would you describe for us what some of

23   the side effects are that are of concern to you?

24   A.  Well, the side effects, of course, are the akathisia, which

25   is much more common in the elderly.  It's not tardive

George W. Woods, Jr. - Direct

1    dyskanesia.  And akathisia is a shaking -- it's really a

2    disruption of the nervous system.

3         You also have the metabolic syndrome which Dr. Holland

4    acknowledged is a very serious impairment.  And we know that

5    it's because the antipsychotics that were mentioned except for

6    Haldol for some reason have what's called a glucogenic effect.

7    They increase glucose.  And it depends upon your body's ability

8    to handle that glucose as to whether you gain weight, as to

9    whether you develop a metabolic syndrome.

10        But then you also have really the overlooked symptom

11   and that's delirium, mild delirium, just a kind of confusion,

12   just kind of a waxing and waning of consciousness that's often

13   confused with the symptoms of the psychiatric disorder.

14        And unfortunately, two of the drugs that Dr. Sarrazin

15   is recommending to treat the psychosis are benzodiazepines and

16   anticholinergics, which have a very high potential for

17   delirium.  So delirium in someone that's 40 is much different

18   than someone that's 65 because balance is very different, being

19   able to stand and being able to get up.

20        And that's why when Dr. Holland said earlier that the

21   all cause mortality for antipsychotics is higher in the

22   elderly, that's accurate, but it's not all because of the drug.

23   It's because of falls.  It's because of delirium.  It's because

24   of the metabolic syndrome.  It's because of all these things

25   that may be secondary to the medication rather than a direct

341
George W. Woods, Jr. - Direct

1    effect of the medication.

2              The problem is if it's, you know, me, I'm going to go

3    to the doctor on a regular basis and make sure that I get my

4    lab works done, lab work done and follow this through.  That

5    has not been our experience in looking at Mr. Dear's medical

6    history.

7    Q.  So Dr. Woods, in conclusion, in your opinion does

8    Dr. Sarrazin's treatment plan adequately consider who Mr. Dear

9    is as he sits here today?

10   A.  No.

11   Q.  And why not?  What's missing?  What are the problems there

12   with that plan?

13   A.  Dr. Sarrazin does not give the changes, the potential

14   changes in metabolic function, in distribution, what we call

15   biodistribution, which is the fat distribution,

16   biodistribution, cognitive impairment.  He does not give those

17   the weight that one, in my opinion, should give to someone who

18   is 64, before this would get done would be 65 years of age.

19             And when you see the -- for example, when you see the

20   laboratory, lab work that Dr. Sarrazin is recommending, none of

21   it relates to drug metabolism.  So we don't know whether

22   Mr. Dear is a fast metabolizer or a slow metabolizer.  None of

23   it relates to true liver function as it relates to -- as it

24   speaks to drug metabolism.  None of it relates to just

25   Mr. Dear.  He has got hypertension.  It's my opinion that he

George W. Woods, Jr. - Cross

1   has cognitive impairments.  I don't see an MRI just to see.  I

2   don't see neuropsychological testing.  So it's a template, it's

3   a standard template that doesn't speak to the specific person

4   that Mr. Dear is.

5           MS. BECK:  May I have a moment?

6           THE COURT:  You may.  Thank you.

7           MS. BECK:  Nothing further.  Thank you.

8           THE COURT:  Very well.  Cross-examination for the

9   government?

10                          **CROSS-EXAMINATION**

11  BY MS. WHITE:

12  Q.  Good afternoon, Dr. Woods.

13  A.  I apologize, I didn't catch your name.

14  Q.  I am Maura White.

15  A.  Okay, Ms. White.  How are you?

16  Q.  I am good, thank you.

17          You have been hired by the defense in this case,

18  correct?

19  A.  That's correct.

20  Q.  What is your hourly rate?

21  A.  500 an hour.

22  Q.  And you were hired as a consultant for the defense team

23  very early on in this case back in 2019, correct?

24  A.  That's correct.

25  Q.  The federal defense team initially retained you to review

George W. Woods, Jr. - Cross

1   the competency work conducted by the State of Colorado,

2   correct?

3   *A.*   Yes.

4   *Q.*   The federal defense team also retained you for purposes of

5   Mr. Dear's *Sell* hearing, correct?

6   *A.*   Correct.

7   *Q.*   How much time did you spend reviewing the materials and

8   working on your May 2022 expert opinion?

9   *A.*   That's the most recent one.

10  *Q.*   Correct.

11  *A.*   I really don't know.   I would say 30 hours.

12  *Q.*   Have you ever met with Mr. Dear?

13  *A.*   No.

14  *Q.*   Why not?

15  *A.*   I wasn't able to meet with Mr. Dear.

16  *Q.*   Why not?

17  *A.*   The team made it clear that he would not meet with me.

18  *Q.*   According to your testimony, you have been retained as a

19  mental health expert in over 200 federal cases, approximately.

20  How many times have you been retained by the defense?

21  *A.*   The great majority of those, particularly capital cases,

22  have been by the defense.   I would say over 90 percent.

23  *Q.*   Have you ever been hired by the prosecution?

24  *A.*   Once in Seattle, Washington.

25  *Q.*   Have you been retained as a mental health expert in state

George W. Woods, Jr. - Cross

1    court cases?

2    A.  I have more rarely, but I have.

3    Q.  How many times approximately were you hired by the

4    prosecution?

5    A.  I don't think ever in a state court.

6    Q.  How many times have you been hired to provide an expert

7    opinion regarding the use of involuntary antipsychotic

8    medication to restore competency to a defendant?

9    A.  I would say five times perhaps.

10   Q.  Have you ever opined that the use of antipsychotic

11   medication was substantially likely to render someone

12   competent?

13   A.  Yes.

14   Q.  For which diagnosis?

15   A.  Schizophrenia.

16   Q.  And what was your opinion?

17   A.  That it would, in fact, be substantially helpful.

18   Q.  Helpful or substantially likely?

19   A.  I am sorry?

20   Q.  Helpful or substantially likely to render someone

21   competent?

22   A.  Likely is a tough one for me, but given the standard, I

23   would say substantially likely, but helpful is really

24   clinically the way I feel about it.

25   Q.  How many times have you been hired to provide an expert

George W. Woods, Jr. - Cross

1    opinion regarding the use of involuntary antipsychotic

2    medications to restore competency to a defendant who was

3    diagnosed with delusional disorder?

4    A.   Only once.

5    Q.   On that occasion did you testify for the defense?

6    A.   Yes.

7    Q.   Did you opine that the use of antipsychotic medication was

8    substantially likely to render that defendant competent?

9    A.   No.

10   Q.   Approximately how many patients have you personally treated

11   who have been diagnosed with delusional disorder?

12   A.   I would say 50.

13   Q.   What was the scope of your treatment for those patients?

14   A.   It depends upon the presenting symptoms.  There are some

15   that I would treat with antipsychotics.  There were others that

16   I treated with mood stabilizers.  If their primary presentation

17   was really more mood than psychotic, I would start out with

18   mood stabilizers, and then I might move to antipsychotics, but

19   it was always with either one type of psychotherapy or another.

20   Q.   With respect to those patients that you treated with

21   antipsychotic medication, what types of antipsychotic

22   medication did you prescribe?

23   A.   Again, it depends upon the other presenting symptoms.  I

24   would use Seroquel.  I have used Abilify in cooperative

25   patients.  We are talking about people who are all cooperative;

George W. Woods, Jr. - Cross

1   is that correct?

2   Q.  I am asking about all of your experience.

3   A.  Okay.  In 1983, 1984, I used Haldol, which I would never

4   use again, but in 1983, 1984, I used Haldol.  In the nineties,

5   I probably used Trilafon more frequently.  I think really those

6   are the ones that I would use.

7   Q.  For the patients that you treated with antipsychotic

8   medication, what was the duration of that treatment?

9   A.  We're talking about 50 different people, so there wasn't a

10  specific duration.  I mean, some I may have treated for --

11  excuse me, some I may have treated for months.  Others I -- I

12  have a patient now with delusional disorder I have treated for

13  28 years.

14  Q.  What were the outcomes of these patients overall?

15  A.  I would like to say they have all done well, but we know

16  better than that, don't we?  It depends upon where they were on

17  the spectrum.  I have had patients with delusional disorders

18  that have been salesmen and did very well.  I have had patients

19  with delusional disorders that have been soccer moms and had

20  really problems with their children and getting divorced.

21          I have had patients that are really closer to the

22  schizophrenia spectrum that, you know, about 38 percent of

23  patients that are diagnosed with delusional disorder in their

24  twenties are diagnosed with schizophrenia in their sixties and

25  seventies.  So I have had patients that as they get older have

George W. Woods, Jr. - Cross

1   not necessarily functioned as well, but because we often see

2   positive symptoms decrease with age, I was able to back off on

3   their medications.

4   Q.   Do you have any other experience working with patients with

5   delusional disorder in another capacity other than treating

6   them as you just described?

7   A.   In my own practice?

8   Q.   Yes, or over the course of your career.

9   A.   We have a small number of patients with delusional disorder

10   at Crestwood in the current -- in my current practice, but it's

11   very small.  I would say it's probably 20 of our 7,000 clients.

12   Q.   And what role do you play in their treatment, if any?

13   A.   I am a consultant to their doctor.

14   Q.   In your report you state that you agree that Mr. Dear's

15   diagnosis is delusional disorder; is that correct?

16   A.   Yes.

17   Q.   You also state that delusional disorder is a separate and

18   distinct disorder from schizophrenia, correct?

19   A.   Yes.

20   Q.   You list the Cleveland Clinic's web page about delusional

21   disorder as one of the resources that you relied on, correct?

22   A.   Yes.

23   Q.   In your opinion, does their website contain accurate

24   information?

25   A.   It depends upon the information.

George W. Woods, Jr. - Cross

1  Q.  Well, with respect to delusional disorder, do you believe

2  that it contains accurate information?

3  A.  I think that it has dated information.  It's close.  It's

4  about the best.  But the only difference that I would draw with

5  that clinical -- I think it's the Cleveland clinical article;

6  is that correct?

7  Q.  Yes.

8  A.  -- was the question of no negative symptoms.

9  Q.  So is it fair to say that you found the Cleveland Clinic to

10 be a reliable source generally speaking?

11 A.  Except for that, absolutely.

12 Q.  And the Cleveland Clinic's website is the only literature

13 that you specifically cited related to delusional disorder; is

14 that correct?

15 A.  I believe so.

16 Q.  And that was the date of May 10th, 2022 for the clinical

17 materials that you provided?

18 A.  Yes.  I don't remember the date of the article, but that's

19 correct.

20        MS. WHITE:  Your Honor, with the Court's permission,

21 may I hand the courtroom deputy once she gets back an exhibit

22 that I had marked as Government's Exhibit No. 9?

23        THE COURT:  You may.  To short-circuit this, you may

24 approach the witness to do that.

25        MS. WHITE:  Thank you, Your Honor.  And may the record

George W. Woods, Jr. - Cross

1    reflect that I am handing a copy to counsel?

2    *BY MS. WHITE:*

3    *Q.*  I will you give you an opportunity to review that,

4    Dr. Woods.  But just for the record, this is the Cleveland

5    Clinic's web page regarding delusional disorder from August 14

6    of 2022.

7    *A.*  I think it's June 1st of 2022 and it was reviewed May 22nd

8    of 2022.

9    *Q.*  The one I handed you was dated at the top, it says

10   August 14, 2022, the top left-hand corner?

11   *A.*  Okay.  That's not the date of the article.  Is that what

12   you mean?

13   *Q.*  I am handing you, just for the record, an updated printout

14   from the Cleveland Clinic.  This is not the article that you

15   sent.

16   *A.*  Oh, I see.  I am sorry.  What was your question again?  I

17   apologize.

18   *Q.*  No, I wanted to give you an opportunity to review it if you

19   would like.

20   *A.*  Yeah, I have reviewed it.

21        *MS. WHITE:*  I would ask to bring up Exhibit No. 9.

22   *BY MS. WHITE:*

23   *Q.*  I am going to direct you to Page 2 of the exhibit.  It's

24   the section that describes the difference between delusional

25   disorder and schizophrenia.

George W. Woods, Jr. - Cross

1    A.   Yes.

2    Q.   According to the Cleveland Clinic, schizophrenia includes

3    negative symptoms, correct?

4    A.   Yes.

5    Q.   On the next line of Government's Exhibit No. 9, the

6    Cleveland Clinic goes on to state that delusional disorder is

7    different from schizophrenia because there aren't any other

8    psychotic symptoms other than delusions, correct?

9    A.   Yes.

10   Q.   Meaning that according to the Cleveland Clinic, delusional

11   disorder does not include negative symptoms, correct?

12   A.   Well, I think actually the -- I think the delusional

13   disorder says that.  And, in fact, this is actually different

14   than the one that I sent out because the one I sent out, it

15   says right in there delusional disorder does not include

16   negative symptoms.

17   Q.   That's correct.  And I guess my point is I am showing you

18   that their updated version does not include that sentence.  And

19   it's now updated to say that delusional disorder is different

20   from schizophrenia because there aren't any other psychotic

21   symptoms other than delusions.  So is that --

22   A.   Well, that's correct.  However, if you look on page -- let

23   me see.  I just saw this.  On Page 68 at the bottom on the

24   right, it says -- Page 68, it says:  What are the possible

25   complications of delusional disorder?  If left untreated,

351

George W. Woods, Jr. - Cross

1   delusional disorder might lead to depression, social isolation,

2   which is a negative symptom, and legal issues.

3        And if you go back to the point that you were just

4   making on the first page, you will see that there are --

5   Page 2, I am sorry, the next page -- you will see the way that

6   they define negative symptoms is a decrease in emotion in a

7   person's facial expressions and motivation.  Well, that's not

8   all negative symptoms.  Those are specific types of negative

9   symptoms, what we call flat affect, but those aren't all really

10  negative symptoms.

11       So really when you look at delusional disorder and

12  negative symptoms, you are really looking at what we call late

13  onset delusional disorder, not the onset of, say, at 40.  And

14  the literature is pretty clear.  This particular article did

15  not, although I liked it because I thought it had a broader

16  understanding of what delusional disorder really was.

17  Q.  But just to be clear, they list negative symptoms only in

18  the schizophrenia context on that page, correct?

19  A.  That limited discussion of negative symptoms, that's

20  correct.

21  Q.  And according -- going just a little farther down on the

22  same page, the Cleveland Clinic also states that delusional

23  disorder most often occurs in middle to late life with the

24  average onset of being 40 years old; is that correct?

25  A.  Correct.

George W. Woods, Jr. - Cross

1   Q.  And you previously testified that Mr. Dear had late onset

2   delusional disorder?

3   A.  That's correct.

4   Q.  And is that -- although this is saying that it typically

5   happens at 40 years old.

6   A.  It didn't say it typically happens.  It says that's the

7   average, right?  When you look at the literature, delusional

8   disorder typically occurs later than schizophrenia, meaning 25

9   on up.  So someone that really picks up delusional disorder in

10  their forties and fifties is really looking at a later onset.

11        MS. WHITE:  You can take down Government's Exhibit 9.

12  BY MS. WHITE:

13  Q.  You reviewed Dr. Preston Baecht's report to the Court dated

14  November 17th of 2021, correct?

15  A.  I have.

16  Q.  You are aware she diagnosed Mr. Dear with delusional

17  disorder, correct?

18  A.  Yes.

19  Q.  You are aware that she personally met with Mr. Dear on

20  multiple occasions prior to making this diagnosis, correct?

21  A.  Yes.

22  Q.  In her report Dr. Preston Baecht states that Mr. Dear has

23  never displayed any signs of negative symptoms; is that

24  correct?

25  A.  That's what she says.

George W. Woods, Jr. - Cross

1   Q.  Are you aware that in the medical records from CMHIP

2   Mr. Dear played chess frequently with other inmates?

3   A.  Yes.  That doesn't imply no negative symptoms.

4   Q.  Are you aware that Dr. Sarrazin testified that he

5   attributed Mr. Dear's beliefs about the FBI as related to his

6   delusional disorder?

7   A.  I am sorry.  As it relates to?

8   Q.  As it relates to -- so he, Dr. Sarrazin, testified that he

9   attributed Mr. Dear's beliefs regarding the FBI as related to

10  his delusions.  Are you aware of that testimony?

11  A.  Yes.

12  Q.  Do you agree that Mr. Dear's delusions -- excuse me, his

13  beliefs about the FBI could be his delusions rather than his

14  cognitive symptoms or impairments?

15  A.  Well, they are his delusions, yes.  However, as I stated,

16  cognitive impairments are often the basis for positive symptoms

17  as well.

18  Q.  You state that -- I believe you testified that and you

19  wrote in your report that Mr. Dear's cardiovascular disease

20  predisposes him to even greater cognitive disease which

21  contributes to his potential increased cognitive deterioration.

22  What cardiovascular disease are you referring to?

23  A.  Hypertension.

24  Q.  What materials did you review when you identified

25  hypertension?

George W. Woods, Jr. - Cross

1   *A.*   The medical records through -- from his various stays at

2   Pueblo, at Parkland and in Springfield.

3   *Q.*   Did you consult with a cardiologist in reviewing these

4   records?

5   *A.*   No, I did not.

6   *Q.*   Did you consult with any other medical professional?

7   *A.*   About his high blood pressure numbers?

8   *Q.*   Yes.

9   *A.*   No.

10  *Q.*   With respect to Mr. Dear's age -- excuse me, his age and

11  vascular disease, you're not saying that everyone in their

12  sixties with cardiovascular disease and hypertension is going

13  to have vascular dementia; is that correct?

14  *A.*   No.

15  *Q.*   Are you simply saying that those are factors that may

16  increase the risk of that?

17  *A.*   Well, first of all, we really need to use the word

18  untreated when we talk about Mr. Dear's hypertension because

19  it's untreated and it's been untreated for decades.  And that

20  again puts it into a much different category when we are

21  looking at the potential of cognitive impairments.  That's

22  No. 1.

23          No. 2, and I am sure we will get into this, Mr. Dear's

24  screening, neuropsychological testing, shows brain impairment.

25  And he shouldn't have that level of brain impairment.  It could

George W. Woods, Jr. - Cross

1    come from some other reason, but certainly with a 25-year

2    history or longer of hypertension with numbers running into 180

3    on just chance takes, there is a good chance that the he -- there

4    is a better than good chance that he has vascular disease

5    impacting his brain.

6    Q.  Other than the assessment that you just mentioned, is there

7    any actual evidence that you have seen that suggests that he

8    has vascular dementia?

9    A.  You mean other than the MOCA with the frontal lobe,

10   parietal lobe and hippocampal impairments?

11   Q.  Yes.

12   A.  No.

13   Q.  So you relied on that MOCA assessment that Drs. Grimmett

14   and Gray gave to Mr. Dear back on January 20th of 2016,

15   correct?

16   A.  I did.

17   Q.  Your report says that you reviewed and I believe your

18   testimony as well the transcripts from the competency hearings

19   in the state case that were held on April 28th of 2016?

20   A.  Yes.

21   Q.  And May 10 of 2016, correct?

22   A.  Yes.

23   Q.  In that hearing Dr. Gray testified that on April 28th,

24   2016 -- excuse me, Dr. Gray testified on April 28, 2016 about

25   that MOCA assessment that he and Dr. Grimmett gave to Mr. Dear

George W. Woods, Jr. - Cross

1    on January 20th, 2016, correct?

2    A.  Yes.

3    Q.  Specifically, Dr. Gray testified that he attempted to

4    conduct the MOCA assessment, but Mr. Dear was not particularly

5    cooperative and that they did not obtain data that they could

6    use to obtain a meaningful score, correct?

7    A.  That's correct.  However, that doesn't mean that they

8    weren't able to obtain meaningful information.  There is a

9    difference between a score and information and that's exactly

10   the difference on that MOCA.  If you look -- if you also look

11   at their notes, they comment on when he refused and they wrote

12   on when he refused.

13          So is this a MOCA that I would score to determine

14   whether Mr. Dear was mild, moderately or severely impaired?

15   No.  Is this a MOCA that I could look at and from a

16   neurological point of view point out specific deficits in his

17   brain functioning?  Absolutely.  I don't know whether Dr. Gray

18   or Dr. Grimmett had the neurological experience to be able to

19   do that.

20   Q.  You would agree, though, that the person who administered

21   the MOCA, Dr. Gray and Dr. Grimmett, would be in a better

22   position to determine whether there was any meaningful data

23   obtained, correct?

24   A.  Of course not.  I don't know whether any one of them had

25   been trained in the MOCA.  At the time that they gave it in

George W. Woods, Jr. - Cross

1    2015, you did not have to be certified in order to give the

2    MOCA.  And I am not sure that they could pull -- I mean, his

3    answer is the appropriate answer for someone that gives a test

4    and looks at the score but doesn't understand the implications

5    of the tests themselves.

6    *Q.*  Dr. Gray also testified that they did not note any

7    significant issues that were apparent in terms of memory or

8    attention and some of the other cognitive functions, correct?

9    *A.*  That's correct.

10   *Q.*  Does Dr. Gray's testimony regarding Mr. Dear's MOCA

11   assessment and lack of apparent significant memory, attention

12   or cognitive issues change your opinion that Mr. Dear may

13   suffer from vascular dementia?

14   *A.*  Well, I didn't say that he was suffering from vascular

15   dementia.  I said there was potential leading to vascular

16   dementia.  I did not say he was suffering from vascular

17   dementia.

18        It's ironic because if you look at the test that

19   Mister -- if you look at the scales on the MOCA that Mr. Dear

20   refused to do, they were a test of memory and attention.  So

21   it's important to keep in mind and to really understand the

22   test sufficiently that you know what he did and what he did

23   not.  And in my conversations with Dr. Gray, he made it clear

24   that he was not a neuropsychologist, and therefore he was

25   giving the MOCA the way that many people give it, which is just

George W. Woods, Jr. - Cross

1    you get a score or to determine whether to go on to more

2    significant testing.  That's only one way which you can use

3    that test.

4    Q.  Wouldn't you agree that if a patient isn't giving his best

5    effort on this test such as Mr. Dear for not cooperating, the

6    test does not reflect the patient's true abilities?

7    A.  No.  And the reason why I would not is because what did he

8    not give his best effort on?  He did fine on the Serial 7s.  He

9    did fine on other tests.  He did fine on the animals.  He did

10   fine on the forward.  So the implication is that he only -- he

11   didn't -- if he didn't do his best effort and that there was a

12   whole literature on effort in testing, then No. 1, they didn't

13   give a test of effort.  They didn't give a Toms.  They didn't

14   give a -- any other Green word memory test to really look at

15   his effort.

16        And on there he did do satisfactorily on a number of

17   areas, orientation, digit span, half of digit span, on naming

18   of animals.  Even on the verbal fluency where he got 8 out of

19   11, it's not as though he didn't try.  So you can't really

20   blame it on effort when you see good effort in one area and

21   less effort in others.

22        MS. WHITE:  If I can have a moment, Your Honor.

23        Can you guys pull up your Exhibit 4?  Thank you.

24   BY MS. WHITE:

25   Q.  Doctor, I was bringing up Defense Exhibit No. 4.

1  *A.*  Yes.

2  *Q.*  With respect to the top task at the top of the page.

3  *A.*  Yes.

4  *Q.*  Visuospatial and executive.

5  *A.*  Yes.

6  *Q.*  The first portion on the left-hand side, the first box is

7  entirely blank.

8  *A.*  Correct.

9  *Q.*  What evidence do you have based on your review of this

10 document that Mr. Dear tried and failed to complete the tests

11 in the box on the left-hand side?

12 *A.*  The score on the right-hand side.  Dr. Grimmett actually

13 gave a score.  On the test that he refused, she gave no score.

14 So if you look on the right-hand side, there is a zero for 5.

15 The next is 3 for 3.  Would you please go down?  The next one

16 where he refused, no points.  If you look at the next one, he

17 got the first line, one point, 1 of 2.  The next one he

18 refused, no points.  Serial 7, 3 of 3.  Verbal fluency, 8 of

19 10.  I suppose you get them all, zero of one point.

20 Similarities, 2 of 2, base 0 of 5.  Orientation, 6 of 6.  So

21 where he refused, she said he refused.

22 *Q.*  Dr. Woods, doesn't that reflect an assumption on your part

23 with respect to what happened on each of these individual tests

24 in the MOCA assessment?

25 *A.*  No.

George W. Woods, Jr. - Cross

1    Q.  Why not?

2    A.  Because she put the score there.  She put a score there.

     And when he refused, she didn't put a score.

4    Q.  You have never done a MOCA assessment for Mr. Dear, have

5    you?

6    A.  No, I have not.

7    Q.  You mentioned in your direct examination regarding the

8    duration of untreated psychosis.  In your materials you list a

9    2014 article from the British Journal of Psychiatry regarding

10   the duration of untreated psychosis as a predictor of a

11   long-term outcome in schizophrenia, correct?

12   A.  Yes.

13   Q.  The authors in that study note that it is likely that in

14   the long-term other factors such as individual characteristics,

15   social support and treatment factors are more influential than

16   duration of untreated psychosis in determining outcomes,

17   correct?

18   A.  I think that's true, yes.

19   Q.  On Page 6 of your report, you state that psychotherapy is

20   the primary treatment for delusional disorder.

21   A.  Yes.

22   Q.  And again the only article that you cited in support of

23   delusional disorder was the Cleveland Clinic's web page; is

24   that correct?

25   A.  Correct.

361

George W. Woods, Jr. - Cross

1   *Q.*  Did you rely on anything else when you made that statement?

2   *A.*  Yes.  I relied upon the Kaplan and Sadock Comprehensive

3   Textbook of Psychiatry, 11th Edition, its chapter on delusional

4   disorders.  And I also relied upon the -- I think it's the 7th

5   Edition of the American Psychiatric Association Compendium on

6   Psychotic Disorders.

7   *Q.*  You did not list those.

8   *A.*  No, I did not.  You are right, there is a lot of literature

9   that I did not list.

10      *MS. WHITE:*  I am going to ask for Government's Exhibit

11  No. 9 again, Page 4, please.

12  *BY MS. WHITE:*

13  *Q.*  Again, this is the Cleveland Clinic's web page on

14  delusional disorder from August 14 of 2022.  I am going to

15  direct your attention to Page 4 of this document.  And there

16  the Cleveland Clinic states that the treatment for delusional

17  disorder most often includes psychotherapy and medication,

18  correct?

19  *A.*  Yes.

20      *THE COURT:*  Counsel, it appears that we are using for

21  substantive purposes an exhibit that has not yet been offered

22  or admitted.  Your response?

23      *MS. WHITE:*  Your Honor, I would seek to admit this

24  exhibit into evidence at this time.

25      *MS. BECK:*  No objection.

George W. Woods, Jr. - Cross

1    THE COURT:  Now, how closely or how strictly do you

2   want me to apply 803(18), because this is essentially a learned

3   treatise.  The reason I ask that is because it may be admitted,

4   but the document doesn't come in.  You simply read the relevant

5   portion of the document into the record.  My own inclination is

6   to recommend that all of you waive that and I simply receive

7   the document in toto.  Any objection by the government?

8    MS. WHITE:  Your Honor, if I may have a moment.  No

9   objection.

10    THE COURT:  Or by the defense?

11    MS. BECK:  No, Your Honor.

12    THE COURT:  Then the strictures of 803(18) are waived.

13   Government's Exhibit 9 for identification admitted in evidence

14   in toto.

15    MS. WHITE:  Thank you, Your Honor.  May I proceed?

16    THE COURT:  You may.  Thank you.

17    MS. WHITE:  Thank you.

18    THE WITNESS:  Did you want me to read the rest of the

19   sentence?

20   BY MS. WHITE:

21   Q.  I guess my question first to you is that the Cleveland

22   Clinic's web page now includes psychotherapy and medication.

23   The primary treatment -- no longer states that the primary

24   treatment is psychotherapy, is that correct, according to the

25   most updated article?

George W. Woods, Jr. - Cross

1   A.  Well, it includes them, but as you can see, the rest of

2   your sentence says, How is delusional disorder treated?

3   Treatment for delusional disorder most often includes

4   psychotherapy, talk therapy, and medication, but delusional

5   disorder is highly resistant to treatment with medication

6   alone.

7   Q.  But it no longer says -- my only question is it no longer

8   states that psychotherapy is the primary treatment, correct?

9   A.  Can we go one more page?

10  Q.  Yeah, sure.

11  A.  And I am certainly not saying that this is -- that this

12  sequence of this means that it's primary, but the next page

13  really talks about treatment.  And the first thing they list,

14  of course, are psychotherapy for delusional disorder, and they

15  list two different types of psychotherapy.  And then if you go

16  down one more step, they talk about medications and they talk

17  about the antipsychotics.

18  Q.  I understand that.  My only question is --

19  A.  I am sorry.

20  Q.  The only question I had was that it no longer states that

21  psychotherapy is the primary treatment for --

22  A.  Yes.  Did I say that in my report?

23  Q.  You did.  And that's what the other Cleveland Clinic

24  article said from May 14th of 2022.

25  A.  Okay.  Can you show that to me?  I'm sorry.

George W. Woods, Jr. - Cross

1          *THE COURT:*  We are experiencing temporary role

2    reversal.

3          *THE WITNESS:*  I apologize.

4          *THE COURT:*  Let's have the questions from the podium

5    and the answers from the witness.

6          *THE WITNESS:*  I am sorry, Your Honor.

7          *THE COURT:*  No apology necessary.

8    *BY MS. WHITE:*

9    *Q.*  Are you aware that Dr. Sarrazin testified that when

10   treating a patient who suffers from delusional disorder,

11   antipsychotic medications are the treatment of choice and that

12   psychotherapy is an adjunct treatment?

13   *A.*  I am not aware that Dr. Sarrazin testified that way.

14   *Q.*  Do you agree with that statement?

15   *A.*  No, I don't.

16   *Q.*  Why not?

17   *A.*  Because as we just noted, delusional disorder is highly

18   resistant to antipsychotic treatment.  And because of that

19   resistance, you often find it very, very difficult to put

20   together an effective treatment -- medication treatment plan.

21   *Q.*  So I am going to direct your attention again to

22   Government's Exhibit 9, Page 6 from the Cleveland Clinic's web

23   page.  And it is in the Outlook and Prognosis section.  And it

24   is the paragraph starting, "The prognosis of delusional

25   disorder."  They state that:  The prognosis of delusional

George W. Woods, Jr. - Cross

1  disorder is better if the person sticks to their treatment

2  plan.  Almost 50 percent of people have a full recovery.  More

3  than 20 percent of people report a decrease in symptoms, and

4  less than 20 percent of people report minimal to no change in

5  symptoms.

6         Do you see that?

7  A.  I do.

8  Q.  Do you agree with that statement?

9  A.  I would like to know what they mean by full recovery before

10  I could say whether I agree with it or not.  I don't know what

11  they mean by that.

12  Q.  Okay.  On page -- in your report and as you just testified,

13  you state that delusional disorder is known to be more

14  resistant to medication than other disorders.

15  A.  Yes.

16  Q.  Other than the Cleveland Clinic, are there other -- is

17  there other literature that you base that on?

18  A.  Yes.

19  Q.  What other literature?

20  A.  I think the most relevant would be Goodman and Gilman's

21  Pharmacological Basis of Therapeutics.

22  Q.  Did you list that as one of the articles you relied on?

23  A.  No.  You asked me what the bases, what my statement was

24  based on?

25  Q.  Yes.

366

George W. Woods, Jr. - Cross

1   *A.*  That would be the No. 1, which is really the top book

2   for -- there are other -- there is a Cambridge series on

3   delusional disorder that speaks to the pharmacological

4   treatment, as well as the psychotherapy.  What else?

5   *Q.*  Did you list any of those, cite any of those as things that

6   you relied on, Doctor?

7   *A.*  No.

8   *Q.*  You stated in your report that it's well established that

9   antipsychotic medication could have a sedative effect on

10  Mr. Dear, correct?

11  *A.*  Yes.

12  *Q.*  Do you agree that the sedative effect can be addressed by

13  changing the dose, the time, the administration, the type of

14  medication used or prescribing an additional medication?

15  *A.*  Well, let me start at the end.  I think the worst possible

16  thing you can do is to prescribe an additional medication

17  because that's the polypharmacy that we are trying to stay away

18  from.  It depends upon the medication.

19        You certainly can give people certain medications at

20  night so they will sleep and that will help in terms of

21  sedation, but it depends upon -- dose is actually not related

22  to sedation.  Sedation, when people get overdosed, that's not

23  being sedated.  And that may be a common mistake among people

24  that the fact someone is knocked out like this is somehow them

25  being sedated.  That's not sedation.  That's overdosing and

George W. Woods, Jr. - Cross

1    it's a much different phenomenon.  So you are saying time,

2    dose.  What were the others?

3    Q.  The type of medication.

4    A.  Sure.  There are some medications that are more sedating

5    than others for sure.

6    Q.  So it sounds like you agree with all besides prescribing an

7    additional medication; is that correct?

8    A.  I'm sorry?

9    Q.  You agreed with that list that all but prescribing an

10   additional medication; is that correct?

11   A.  That you can handle the sedation issue by switching things

12   up?

13   Q.  Yes.

14   A.  Yeah, I would agree with that.

15   Q.  On Page 7 of your report, you state that Mr. Dear's EKG

16   results and elevated glucose levels demonstrate that he has

17   already suffered from cardiac conduction and other

18   cardiovascular problems, correct?

19   A.  Yes.

20   Q.  In Footnote 2, you state that you are relying on the

21   summary of the medical records, including the EKG and blood

22   pressure readings contained in Dr. Morton's 2019 affidavit; is

23   that correct?

24   A.  That's correct.

25   Q.  And that affidavit includes his summary and interpretation

George W. Woods, Jr. - Cross

1  of the medical records, correct?

2  A.  That's correct.

3  Q.  But Dr. Morton is not a medical doctor, correct?

4  A.  No.

5  Q.  In your report you state that Mr. Dear's age and overall

6  health factors, and today you also testified to as well, are

7  not adequately addressed by Dr. Sarrazin's plan given that the

8  antipsychotic medications like those proposed may actually lead

9  to further cardiac conduction issues.

10 A.  Yes.

11 Q.  What do you base that statement on?

12 A.  The literature on people over 65 or older and their cardiac

13 status and the impact they have on drugs.  People that are 65

14 and older often get higher doses.  And if you remember

15 Dr. Holland's report as well as his testimony, higher doses

16 can, in fact, impact the conduction effect of these drugs.  So

17 when you have someone that is older metabolizing more slowly a

18 drug, that can increase their dose.  That's when you run into

19 these kinds of problems.

20 Q.  Have you consulted with anyone other than Dr. Morton about

21 Mr. Dear's cardiovascular health conditions in his records?

22 A.  No, but I've read it about it and I've read the literature

23 on it.

24 Q.  In Dr. Sarrazin's report, he states that the four -- he

25 states that paliperidone, aripiprazole and olanzapine are

George W. Woods, Jr. - Cross

1    approved treatment of bipolar disorder, schizoaffective

2    disorder and psychotic disorders such as it schizophrenia,

3    unspecified schizophrenia spectrum and other psychotic

4    disorder.  Do you agree with that.

5    *A.*  Yes.

6    *Q.*  The next sentence of that report Dr. Sarrazin states that

7    haloperidol is used in the treatment of psychotic disorders.

8    Do you agree with that?

9    *A.*  Yes.

10    *Q.*  Do you agree that competency does not require the complete

11    resolution of delusional beliefs?

12    *A.*  It depends upon what's left.  I mean, that's such a broad

13    statement, what delusional beliefs are left.  If you don't take

14    them all, if you don't take them all, what do you have left?

15    And that really is what you can use to determine whether

16    someone -- whether it impacts competency.

17    *Q.*  But I guess my question is do you agree that the delusions

18    do not have to resolve entirely, in other words, be completely

19    gone?

20    *A.*  That's a different question, and the answer is yes.

21    *Q.*  Okay.  In his report Dr. Sarrazin states that the

22    therapeutic benefits of treatment with antipsychotic

23    medications have a dramatic impact on the day-to-day lives of

24    hundreds of thousands of patients who suffer from psychotic

25    illnesses as well as their families.  Do you agree with that?

370

George W. Woods, Jr. - Cross

1   *A.*  I would respectfully -- I can't say, Ms. White, that I

2   disagree, but I think that Dr. Sarrazin describes a much more

3   complex, much more conflicted experience of people that take

4   antipsychotic medications.  Often -- when you look at the fact

5   that the non-compliance rate is 62 percent in the United States

6   alone of people that have taken antipsychotics and have stopped

7   taking antipsychotics, they are very powerful drugs that impact

8   people's lives significantly and at times successfully, I don't

9   deny that, but that's only part of the story.

10          *MS. WHITE:*  If I may have a moment, Your Honor.

11          *THE COURT:*  You may.  Thank you.

12  *BY MS. WHITE:*

13  *Q.*  I want to go back just briefly to something that you

14  mentioned on your direct examination and that was the

15  misidentification syndrome.

16  *A.*  Yes.

17  *Q.*  And I believe you testified that Mr. Dear had misidentified

18  guards and other people in the course of his incarceration,

19  correct?

20  *A.*  Yes.

21  *Q.*  And you attributed that to -- well, let me ask you this

22  question.  Why isn't Mr. Dear's misidentification or

23  identifying those people as incorrectly a sign of his

24  delusional disorder rather than his cognitive impairment?

25  *A.*  His cognitive symptoms are part of his delusional disorder.

George W. Woods, Jr. - Redirect

1   They are not separate.  And his cognitive symptoms are the

2   foundation for his other symptoms.  When we first started out

3   looking with antipsychotics, all we knew were positive

4   symptoms.  Now we know that there are other symptoms and we

5   certainly know that delusional disorder, just like

6   schizophrenia, is a brain-based disorder.  So it's really

7   the -- there are multiple misidentification syndromes, Capgras

8   is another one, that really speak to this cognitive mismatch

9   that ends up with delusional thinking.

10          MS. WHITE:  Your Honor, I have no further questions.

11          THE COURT:  Redirect examination, Ms. Beck.

12          MS. BECK:  Thank you, Your Honor.

13                          **REDIRECT EXAMINATION**

14   BY MS. BECK:

15   Q.  Dr. Woods, you were asked if you have met with Mr. Dear.

16   A.  Yes.

17   Q.  In your opinion, do you need to meet with Mr. Dear in order

18   to render an opinion about the likelihood that Dr. Sarrazin's

19   treatment plan would restore Mr. Dear to competency or whether

20   it's in his best medical interest?

21   A.  Ms. Beck, let me just say that I would always like to meet

22   with someone.  However, the quality of information that I have

23   over years, multiple examinee examiners, multiple records makes

24   me very confident in my findings.

25   Q.  Ms. White asked you about your treatment of patients with

372

George W. Woods, Jr. - Redirect

1   delusional disorder.

2   A.   Yes.

3   Q.   And whether you ever prescribed antipsychotic medications

4   to them.

5   A.   Yes.

6   Q.   When you prescribed antipsychotic medications to people who

7   had delusional disorder, you also combined it with

8   psychotherapy, right?

9   A.   Absolutely.

10  Q.   Ms. White asked you about whether you ever consulted with a

11  cardiologist or another doctor about Mr. Dear's blood pressure

12  numbers.

13  A.   Yes.

14  Q.   Did you need to consult with a cardiologist or a doctor

15  about Mr. Dear's blood pressure numbers to know whether numbers

16  like 210 over 112 was high?

17  A.   Well, unfortunately I have high blood pressure, so I am

18  pretty up-to-date on that literature.  And also, no, because

19  those are -- every five years or so they put out criteria for

20  mild, moderate and severe blood pressure.  And for someone to

21  have untreated numbers like that and still be walking around

22  and, as far as we know, to have had those numbers for years is

23  scary.

24  Q.   You were asked about what literature you reviewed to form

25  an opinion in this case, right?

George W. Woods, Jr. - Redirect

1   A.   Yes.

2   Q.   In addition to literature whether you cited it in your

3   opinion or not, did you also rely on your 40-plus years of

4   experience in neuropsychiatry?

5   A.   I did, but I -- you know, I have 15,000 articles running

6   the range from medicine, cardiology.  I am not a cardiologist.

7   I am not an infectious disease person, but I think it's

8   important that as a doctor you keep up to the degree that you

9   can.

10  Q.   You were asked about whether antipsychotic medication can

11  be successful and whether it can be good for many people, and

12  you said that was only part of the story, right?

13  A.   Yes.

14  Q.   What's the other part of the story?

15  A.   Just quickly, the other part of the story is that these are

16  extraordinarily powerful drugs, and if not monitored

17  appropriately, you see the kind of side effects, tardive

18  dyskinesia, metabolic syndrome.  And we also know when we look

19  at the literature, it's just like the flu or just like COVID.

20  If you are 65, you need to be monitored and you need some

21  treatment.  If you're 65 years old and someone is going to

22  start antipsychotic medication on you, you need to be

23  cooperative.  You need to go along.  You need to recognize that

24  there may be times when you get another drug like Cogentin that

25  will handle your shakes.  You need to make sure your blood

William Alexander Morton, Jr. - Direct

1   pressure doesn't drop so you don't fall.  And if you are not

2   cooperative in that process, it can be very, very serious and

3   very dangerous.

4          *MS. BECK:*  No further questions.  Thank you.

5          *THE COURT:*  And may Dr. Woods be excused and released

6   from subpoena?  Any objection by the defense?

7          *MS. BECK:*  No, Your Honor.  Thank you.

8          *THE COURT:*  Or the government?

9          *MS. WHITE:*  No, Your Honor.

10         *THE COURT:*  Dr. Woods, you are both excused and

11  released from subpoena with our thanks.

12         *THE WITNESS:*  Thank you, Your Honor.  I appreciate it.

13         *THE COURT:*  And when prepared the defense may call its

14  next witness.  Ms. Stricklin?

15         *MS. STRICKLIN:*  Thank you, Your Honor.  The defense

16  calls Dr. Morton.

17      (**William Alexander Morton, Jr.** was sworn.)

18         *THE WITNESS:*  Yes, sir, I do.

19         *THE COURT:*  Ms. Stricklin, you may inquire.

20         *MS. STRICKLIN:*  Thank you, Your Honor.

21                      **DIRECT EXAMINATION**

22  *BY MS. STRICKLIN:*

23  *Q.*  Good afternoon, Dr. Morton.

24  *A.*  Good afternoon.

25  *Q.*  Can you please state your name and spell your name for the

William Alexander Morton, Jr. - Direct

 1   Court's record.

 2   A.   It's William Alexander Morton, Jr., W-I-L-L-I-A-M,

 3   A-L-E-X-A-N-D-E-R, M-O-R-T-O-N, Jr.

 4   Q.   And do you go by doctor?

 5   A.   Yes.

 6   Q.   Now, Dr. Morton, are you retired?

 7   A.   I am retired almost.

 8   Q.   Since when?

 9   A.   I have been retiring slowly.  I retired from the medical

10   university where I worked in academia for 28 years in 2004 and

11   then I went into private practice.  And then about '18 and

12   '19 I started retiring and not taking any more private patients

13   or consultations.  And I said almost because I am here today,

14   and also I have one other case that I have been working on for

15   about 15 years.  And while I checked a year ago that they

16   didn't need me, there is a possibility that they will call me

17   at some time and I will go.

18   Q.   So Dr. Morton, because you are here today --

19   A.   Yes.

20   Q.   -- I won't phrase my question in the past tense, but what

21   do you do for a living?

22   A.   I am a psychiatric pharmacist.  I practice in the area of

23   psychiatric drug therapy, psychopharmacology.  I've practiced

24   for the most part in academic institutions since I received my

25   degree.  And basically I ensure hopefully that the drug therapy

376

William Alexander Morton, Jr. - Direct

1    that involves psychiatric medicine is appropriate, helps people

2    and doesn't hurt them.

3    Q.   Now, I think your answer gave us some clues, but what is

4    meant by the term psychopharmacology?

5    A.   Psychopharmacology, clinical psychopharmacology versus

6    being in the lab involves people that are taking either

7    prescribed or not prescribed medication that has psychiatric

8    effects on the brain and possibly parts of the body.  And it

9    involves looking at the mechanism of action, the appropriate

10   dose, complications in dosing the medicine, metabolism,

11   elimination, what is the accurate dose, what would be absorbed,

12   the pharmacokinetics, how fast it's broken down, looking at

13   that and trying to apply it to an individual patient that you

14   may not know anything about or you know a lot about, and also

15   trying to do it with the least amount of complications and side

16   effects.

17   Q.   And Dr. Morton, are you board certified?

18   A.   I am board certified.

19   Q.   In what?

20   A.   I am board certified in psychiatric pharmacy practice.

21   Q.   And is that a somewhat rare field to be board certified in?

22   A.   Somewhat.

23   Q.   Rare field to be board certified in?

24   A.   It's not a rare field.  There are 1350 people that are

25   board certified in that area in the world.  32 are in Colorado

William Alexander Morton, Jr. - Direct

1   and 52 are in North Carolina where I come from.

2   Q.  Can you describe what the day-to-day practice of a

3   psychiatric pharmacist looks like?

4   A.  Well, I think it would vary differently from each person

5   that would be in this state.  You heard Dr. Holland say he

6   makes rounds with doctor of pharmacy students or practitioners,

7   pharm Ds.  That would not be a psychiatric pharmacist.  That

8   would be one that would be specialized in probably cardiology

9   and internal medicine.  So everybody would be different.

10         And my practice when it was active at the university

11   every day was different.  There was a morning and afternoon,

12   and sometimes an afternoon.  And Monday and Tuesday and

13   Wednesday and Thursday and Friday were always different to some

14   degree.  They were involving an inpatient practice rounding on

15   inpatients with psychiatric disorders in the morning, taking

16   care of any issues that came up, looking up information.

17         And then in the afternoon, I might be in an outpatient

18   clinic or I might be doing a seminar for medical students or I

19   might be meeting with psychiatric pharmacy residents because

20   while I was -- I had appointments in the college of pharmacy at

21   Meadow University, as well as the department of psychiatry, and

22   basically it was to coordinate the education of psychiatric

23   medicines for our medical students, medical residents, first,

24   second, third and the fourth residents, medical fellows,

25   sometimes faculty if they asked.  They might ask me to do a

378

William Alexander Morton, Jr. - Direct

1  presentation on the new antipsychotics and I would say, okay,

2  how about Thursday?  And so I might meet with them.

3          The next day I might be supervising third-year

4  psychiatric fellows or residents in our psychopharmacology

5  clinic, which I started with another practitioner.  He had an

6  M.D. degree, but we started that together.  And I would be a

7  primary supervisor for anywhere from eight to 22 psychiatric

8  residents.

9          So they would see patients.  They would come and

10  present them to me and I would say, good job.  Fine.  When are

11  you going to bring them back?  Two weeks?  Great.  Or I would

12  say, whoa, we need to do this, this and this.  Do you agree

13  with that?  They might say yeah, I think -- that's what I was

14  going to ask you.  Let's go tell the patient what we are going

15  to do.  And I might step in there for one to three minutes and

16  say this is what we're going to do and Ms. Jones is going to

17  follow up with you.  And then I would step out.  And we might

18  see 30 to 40 patients in that afternoon.  That was on

19  Wednesdays.

20          Sometimes I would be consulting at an alcohol and drug

21  treatment facility on Tuesdays and Thursdays either meeting

22  with patients or reviewing those patients' charts for any side

23  effects, adverse drug reactions, any issues of people not

24  complying with what we were recommending.  I would give

25  educational talks.  When I talked on cocaine, probably if there

William Alexander Morton, Jr. - Direct

1    were 40 patients in that room, four of them would get up and

2    leave because I used the word cocaine more than once or twice

3    and it would actually start stimulating them to want to use it.

4          And I would go back to -- I knew that after a while.

5    I would go back to the nurse's station and I would talk with

6    the nurses and I would talk with the patients that, yes, it is

7    a problem, and that's something you will be facing when you get

8    out of here that you're going to have to change your

9    environment about where you can't hear that word really.

10   Q.  Dr. Morton, I think we will skip Fridays.  And can you

11   briefly tell us about your education?

12   A.  My education, I received my bachelor's in pharmacy from

13   University of North Carolina in Chapel Hill.  I received my

14   doctorate of pharmacy at University of Tennessee in Memphis,

15   and that was most of my education with the exception I

16   completed a clinical residency at the University of California

17   in San Francisco.

18   Q.  Now, Dr. Morton, let's discuss some of your credentials.

19   Are you published?

20   A.  I do have published data.

21   Q.  How many publications?

22   A.  A small number, 46 papers.

23   Q.  And do any of those publications specifically address the

24   use of antipsychotic medications?

25   A.  Two do.

380

William Alexander Morton, Jr. - Direct

1  Q.  Have you later investigated research studies?

2  A.  I have been involved with a number of clinical research

3  studies, most -- only once as the primary investigator that I

4  got money and I could control it and hire people to help me.

5  66 other studies where I was coinvestigator where I saw the

6  patient, did rating scales, evaluated the efficacy of that

7  drug, looked at side effects and made adjustments working with

8  a psychiatrist.

9  Q.  In addition to investigating research studies, have you

10  actually taught classes on assessing the efficacy of

11  medications?

12  A.  Yes.  I've taught many.

13  Q.  And assessing side effects?

14  A.  Yes.

15  Q.  Have you previously testified in court as an expert in

16  psychopharmacology?

17  A.  I have.

18  Q.  Have you previously consulted in criminal cases that are

19  set for *Sell* proceedings?

20  A.  Yes.

21  Q.  And with the exception of your work in this case,

22  Mr. Dear's case, have you testified in any *Sell* hearing?

23  A.  I have testified three other times.

24  Q.  Now, Dr. Morton, I am going to pull up on the screen

25  Defense Exhibit 2.  Is this a recent copy of your CV?

381

William Alexander Morton, Jr. - Direct

1    *A.*  Yes, it is.

2           *MS. STRICKLIN:*  And I would move for the admission of

3    Defense Exhibit 2.

4           *THE COURT:*  Response?

5           *MS. WHITE:*  No objection, Your Honor.

6           *THE COURT:*  Defendant's Exhibit 2 for identification

7    admitted in evidence.

8           *MS. STRICKLIN:*  Thank you.

9    *BY MS. STRICKLIN:*

10   *Q.*  Dr. Morton, let's turn to your work on this case.  How did

11   you become involved in Mr. Dear's case?

12   *A.*  In 2016 I got a call from Mrs. Nelson who was at the

13   Colorado defense, legal defense program, and she asked me if I

14   would be interested in testifying -- not testifying, but be

15   interested in consulting on a particular patient that she had

16   with delusional disorder and possibly testifying.

17   *Q.*  And do you recall what year that was?

18   *A.*  That was 2016.

19   *Q.*  Now, and you continued now working with us, Mr. Dear's

20   federal defense team, correct?

21   *A.*  Yes.  Mr. King gave you my information and you called me in

22   January.

23   *Q.*  That's correct.  Dr. Morton, your work in the state case,

24   did that involve preparing an expert report for Mr. Dear's

25   state defense team?

William Alexander Morton, Jr. - Direct

1   *A.*  Yes.  You asked me to do that.

2   *Q.*  Did it -- back in the state, I am talking about when you

worked with the state defense team.

3

4   *A.*  For the state they asked me to do that, yes.

5   *Q.*  Did your work for the state defense team also include

6   preparing an affidavit that was submitted to the Court?

7   *A.*  Yes.

8   *Q.*  And did your work include testifying in a prior *Sell*

9   hearing at the state level?

10  *A.*  It did.

11  *Q.*  Now, I want to summarize the materials with you that you've

12  reviewed.  I know they are many, so I will try to categorize

13  them.  Have you reviewed records from the jails and different

14  prisons that Mr. Dear has been confined in?

15  *A.*  Yes.

16  *Q.*  Have those records included mental health records?

17  *A.*  Yes.

18  *Q.*  Medical records?

19  *A.*  Medical records, yes.

20  *Q.*  Behavioral records?

21  *A.*  Yes.

22  *Q.*  Do those records include records from the Colorado Mental

23  Health Institute at Pueblo?

24  *A.*  Yes.

25  *Q.*  Do they also include medical records from Parkview Hospital

William Alexander Morton, Jr. - Direct

1    in Colorado Springs?

2    A.  Parkview, yes.

3    Q.  Do they also included albeit older but records from

4    Memorial Hospital in Colorado Springs?

5    A.  Yes.

6    Q.  Have you also reviewed investigative materials from

7    Mr. Dear's case like police reports?

8    A.  Yes.  I remember reviewing a very long report as well as

9    videotapes and audiotapes from a detective that was primarily

10   involved in this case in October of 2015.

11   Q.  Have you reviewed the state competency materials including

12   the 15 evaluations?

13   A.  Yes.

14   Q.  And the notes and worksheets that accompany those

15   evaluations?

16   A.  Well, I say yes to that.  I can't say that I saw 15.  It

17   seemed like that.  I read everything that I could and I read a

18   number of competency hearings.

19   Q.  Have you read the forensic psychology report prepared now

20   in the federal case by Dr. Preston Baecht?

21   A.  Yes.

22   Q.  And the Bureau of Prisons proposed treatment plan prepared

23   by Dr. Robert Sarrazin?

24   A.  Yes.  And I heard both of them testify here.

25   Q.  And you also reviewed transcripts from the state

384

William Alexander Morton, Jr. - Direct

1   proceedings?

2   A.  I am sorry, say --

3   Q.  Have you reviewed a transcript from the state proceedings,

4   the state *Sell* hearing?

5   A.  Yes.

6   Q.  And various academic articles?

7   A.  Yes.  When I was preparing for this, I reviewed numerous

8   articles, some of which I listed in my report.  Some I did not

9   list because I didn't totally rely on them, but I read whatever

10  I could get my hands on that appeared to be in my area of

11  psychopharmacology because it's a fascinating illness and I am

12  fascinated by it.

13  Q.  Did you rely on each of those materials in forming your

14  opinions?

15  A.  I did.

16  Q.  And in forming your opinions, did you also rely on your

17  experience as a board certified psychiatric pharmacist?

18  A.  Yes, both working at the medical university and other

19  facilities there, as well as private practice and consulting.

20  Yes, I relied on all that.  And it was probably a total of

21  about 15 to 16,000 patients that I had some level of contact

22  with to monitor and assess them.  So yes, I did rely on that

23  experience a lot.

24  Q.  And also your expertise in psychopharmacology?

25  A.  Yes.

385

William Alexander Morton, Jr. - Direct

1    Q.  I want to discuss with you your opinions regarding the

2    efficacy of antipsychotic medications.

3              THE COURT:  Right after the upcoming recess.

4              MS. STRICKLIN:  Of course.  Thank you, Your Honor.

5              THE COURT:  We are going to be in recess until

6    2:50 p.m.

7              And of course, Doctor, you may stand down.

8              Counsel, you may be seated at your convenience.

9              Madam clerk, show us out, please.

10        (Recess at 2:34 p.m. until 2:55 p.m.)

11             THE COURT:  Ms. Stricklin.

12             MS. STRICKLIN:  Thank you, Your Honor.

13   BY MS. STRICKLIN:

14   Q.  Dr. Morton, I think we left off with me stating that I

15   wanted to talk to you about your opinion regarding the efficacy

16   of antipsychotic medications.

17   A.  Okay.

18   Q.  As a psychiatric pharmacist, are you responsible for

19   understanding the efficacy of medications and the treatment of

20   mental health disorders?

21   A.  Yes, I am, and usually teaching about it in addition and

22   sometimes doing research to discover what that is, so I am

23   familiar with efficacy of medications.

24   Q.  Now, let's talk about the efficacy of antipsychotic

25   medication drugs generally.  What is your opinion as to the

William Alexander Morton, Jr. - Direct

1   efficacy of these medications generally?

2   *A.*   That they are effective for psychosis, but people expect

3   more from them than they can deliver.  And the side effects are

4   pretty significant.  And as Dr. Woods said, these are powerful

5   medicines.  You can't -- you have no idea unless you take one

6   how powerful they are.

7   *Q.*   What about specifically as to delusional disorder, what is

8   your opinion regarding the efficacy of these medications in the

9   treatment of delusional disorder?

10  *A.*   That in delusional disorder the use of almost all the

11  antipsychotics is unpredictable and unimpressive, unpredictable

12  in that you don't have a good idea of which one to choose and

13  unremarkable in that you seldom get a response that you would

14  like to see.  In fact, almost every article that's written

15  about antipsychotics and delusional disorder talks about how

16  long it's been known that they are ineffective.

17  *Q.*   Now, you listened to Dr. Preston Baecht discuss the 2007

18  Herbel and Stelmach study?

19  *A.*   Yes.

20  *Q.*   As well as the 2012 Cochrane study?

21  *A.*   Cochrane study, yes.

22  *Q.*   What are some specific issues that you've identified in

23  these studies?

24  *A.*   The commonality, the two things would be that they are

25  review studies, that they are not original studies conducted by

William Alexander Morton, Jr. - Direct

1    the practitioners, but people have collected data from records

2    from other treatments done by other people over a period of

3    time.  And they collect that data and they try to make sense of

4    it, but they have no control over it really except what they

5    publish, which may or may not be useful to the readers.  So

6    that's one commonality.  It's they are all reviewed

7    retrospective studies.

8            They are very small studies.  One study involves 22

9    patients and one study involves 15 patients.  And there is

10   reasons for that.  The reasons is that delusional disorder is a

11   rare disorder.  And in addition to that, people do not seek

12   treatment.  And when they do seek treatment, they usually don't

13   want treatment afterwards.  There is one exception with the

14   subtype of somatic disorder, which is almost always someone

15   that is delusional that there are parasites, bugs, something in

16   their skin, and they scratch, and they usually will see a

17   dermatologist.  Most dermatologists now know to treat them with

18   a particular antipsychotic.  One of the problems is that drug

19   that they use is one of the most potent antipsychotics and does

20   cause a lot of complications.

21   Q.  Do you take issue with the sample size in these studies?

22   A.  Yes.  The sample size is small.

23   Q.  And what does that mean?

24   A.  It means it's hard to generalize to someone else.

25   Q.  Do you think that the studies adequately take into account

388

William Alexander Morton, Jr. - Direct

1   age of the patient?

2   *A.*   They get what they get.   They don't have the ability to

3   control what the age is.   They look at the age, but no, the

4   emotionally younger people -- there are some older patients.

5   They address that.   They look at some of the issues there.   And

6   at least in one study Stelmach And Herbal, they noticed that it

7   wasn't so much age.   It was how long people had gone untreated.

8   That was the issue in that study, that they found people that

9   had that longer history of being untreated for the psychosis,

10   they did not respond as well.

11   *Q.*   Do you think the reliance on these two studies may be

12   misplaced?

13   *A.*   Yes and no; yes in that they are very small studies.   They

14   have some bias.   They address that potential bias, but there is

15   not much else out there and you have to rely on pretty thin

16   medical information.   So it's a start.   It's a start.   The most

17   exciting thing about the Cochrane study is the title because it

18   promises everything clear and concise.   And it's not so clear

19   and it's not so concise what you do with a delusional disorder

20   as far as treating them when they are refusing treatment.

21   *Q.*   Now, knowing what you know about the efficacy of these

22   medications, do you have -- in the treatment of delusional

23   disorder as well as the characteristics that you know about

24   Mr. Dear, do you have an opinion regarding whether these drugs

25   will effectively treat him, meaning Mr. Dear?

389
William Alexander Morton, Jr. - Direct

1   A.   I do.

2   Q.   And what is that opinion?

3   A.   My opinion is that they will not likely affect and

4   effectively treat his disorder.

5   Q.   And why is that?

6   A.   For a number of reasons.  One, I have not seen anywhere in

7   any record that he deviates from his delusion about the Federal

8   Government and the FBI and anyone else connected to them.  He

9   doesn't ever use maybe or might.  He is committed to that.  His

10   conviction that that is a conspiracy doesn't leave room for

11   anybody to work with.  That's one reason.

12        The length of time he has had this disorder, and I

13   know we use 30 years as kind of the mark, but also I have read

14   a little bit of his history about -- from his family, and they

15   don't want to talk about him too much.  They don't want to give

16   too much history, but he's been strange for a long time, not so

17   much that it brought attention to himself.

18        The third reason is that I guess his medical problems,

19   I think there are so many factors there that need to be taken

20   into consideration.  I think there are a lot of risk to give

21   him a medicine that I don't think is going to work, but that's

22   not what you asked me.  You asked me why I didn't think they

23   were -- why they were going to work.  I think -- I had some

24   other thoughts and they will come around any minute now.

25   Q.   Well, let's move on to the second part of the analysis, the

390

William Alexander Morton, Jr. - Direct

1   analysis of risk.  As a psychiatric pharmacist, are you aware

2   of the side effects that these antipsychotic medications can

3   have?

4   A.  I am very aware, yes.

5   Q.  And talk briefly about some of the long-lasting effects on

6   different systems of the body.

7   A.  The long-lasting effects are secondary from where they

8   work.  They work on the nervous system on dopamine receptors,

9   and they may actually change those receptors for a long period

10  of time.  So people can have the effects even after the drug

11  has been out of your body for weeks, sometimes months.  And you

12  can see that with some of the extrapyramidal side effects of

13  tardive dyskinesia, tardive dystonia, tardive meaning late and

14  lasting, that lasts for years.

15  Q.  What about some of the more common side effects?  What are

16  some of the more common side effects that are notable?

17  A.  The most common side effect is it leaves you with a sense

18  of feeling bad.  And people seem to think that that doesn't

19  occur hearing what was said yesterday, but almost everyone I

20  know does not like the way these medicines make them feel.  I

21  wrote it as enjoy.  Yeah, they don't enjoy it, but they just

22  don't like the way they feel.  And the phenomena of compliance

23  universally is people -- what I hear and what I see repeatedly

24  is people quit taking their medicine, and when they quit taking

25  it, they feel better.  Their muscle systems relax.  Their

William Alexander Morton, Jr. - Direct

1    clarity comes back.  Their energy comes back.  Their creative

2    thinking comes back.  They feel their old selfs .

3              Unfortunately, they have got an underlying psychiatric

4    disorder that one, two, five, 10 weeks later will flare up and

5    they will become psychotic again.  And they will not connect up

6    stopping their medicine with going back in the hospital.

7    Q.  Now, as to this long list of side effects that's been

8    discussed throughout this hearing, are there any that are

9    particularly concerning to you when we are discussing the

10   treatment of Mr. Dear?

11   A.  Yes.

12   Q.  And what are those?

13   A.  They are his cardiovascular side effects and his -- the

14   central nervous system effects on his thinking and response.

15   Q.  Let's take those in reverse --

16   A.  Psychiatric side effects.

17   Q.  Okay.  Let's take those in reverse order.

18   A.  Okay.

19   Q.  What are some of the psychological or psychiatric side

20   effects that are concerning to you and why?

21   A.  Not feeling your normal self, feeling like you have enough

22   energy to get up and go and do what you want to do and work

23   with the problems that are occurring in your life.  And you

24   want to stay in bed and lie down and be -- not totally

25   depressed, but just a little depressed.  You don't have the

William Alexander Morton, Jr. - Direct

1    zing and zest in life.  That's common in my practice, maybe not

2    other people's, but it's always there.

3    Q.  And as that side effect relates to Mr. Dear, why is that

4    concerning to you?

5    A.  Well, we already have a problem of getting him to interact

6    with his defense counsel, you and Ms. Beck.  He doesn't want to

7    solve this problem that he has.  And if you've got him cloudy,

8    tired, falling asleep while he is sitting there with you,

9    that's a double or triple type problem.  If you can't get him

10   to listen to you because he is cloudy -- I am not saying that's

11   what he would -- that would absolutely happen.  It just happens

12   in so many patients.

13   Q.  Now, moving on to the cardiac side effects.  Now, as a

14   psychiatric pharmacist, are you responsible for understanding a

15   patient's medical history?

16   A.  I am.

17   Q.  And are you responsible for identifying specific things in

18   that patient's medical history which are concerning in light of

19   potential side effects?

20   A.  Yes.

21   Q.  And is that the analysis that you engaged in when reviewing

22   Mr. Dear's medical history?

23   A.  The second time that is what I did.  I realized the first

24   time I tried to cover every side effect in court and in my

25   report and there is not enough time to cover that all, so I

William Alexander Morton, Jr. - Direct

1   picked the cardiovascular ones because they were the most

2   dramatic ones, and I couldn't believe what I was seeing.

3   Q.  Let's talk about some of the things that you saw.  Did you

4   review Mr. Dear's medical records for history of abnormal EKG

5   results?

6   A.  I did, especially when I became aware that he had some

7   abnormal EKG reports at Parkview.

8   Q.  And that was in early 2018, January and February?

9   A.  Yes.

10  Q.  Now, if we are defining abnormal as having a result of

11  higher than 450 milliseconds, what EKG results did you see in

12  the record?  And would it refresh your recollection to actually

13  see your report?

14  A.  Yes.  I saw two, but it would -- it would help.

15          MS. STRICKLIN:  Mr. Cohen, can we bring up D23, Page

16  4?  Let's move on to 5.  Seven, Page 7, sorry.

17  BY MS. STRICKLIN:

18  Q.  Okay.  At the bottom you see a chart that you put together

19  with various EKG results, correct?

20  A.  Yes.

21  Q.  Now, on this list what results did you identify as

22  potentially concerning?

23  A.  That he had several abnormal EKGs, as well as normal EKGs,

24  and he had PVCs, premature ventricular contractions.  And there

25  was a notice about he was at risk for atherosclerotic

394
William Alexander Morton, Jr. - Direct

1    cardiovascular disease.  That was in his notes there.  And if

2    we go to Page 8, we will see that 1/30/18 it talks about an

3    abnormal EKG and he had a myocardial infarction.  If you back

4    up, it says exactly where it occurred in the heart.

5    Q.  Now, I want to talk first about -- and we'll go back to

6    Page 7, please.  This first EKG result that you document having

7    occurred on January 21st, 2016.

8    A.  Yes.

9    Q.  Now, this result showed a prolonged QTC range of 478 -- an

10   interval, excuse me, of 478 milliseconds.

11   A.  Right.

12   Q.  You heard Dr. Holland testify this morning, and Dr. Holland

13   also identified this result as being abnormal; is that right?

14   A.  Yes.

15   Q.  Now, if we use the value as 450 milliseconds, there is an

16   additional EKG from January 30th of 2018 that you identified as

17   abnormal, correct?

18   A.  Right, or someone else identified it as abnormal.

19   Q.  That you flagged as abnormal.

20   A.  I said look at this.  That's all I did.  I didn't make that

21   diagnosis.  I said red flag here.

22   Q.  That's right.  And I think that's an important reminder.

23   When you looked through Mr. Dear's medical record, what was the

24   purpose of that?

25   A.  To see what kind of risk he would have with antipsychotic

395

1  medication.

2  *Q.* And was the purpose to flag particular things that could be

3  of concern?

4  *A.* Yes.

5  *Q.* Was the purpose to then go back and independently verify

6  the accuracy of the medical records?

7  *A.* Well, yes, yes. I wanted to make sure it was accurate,

8  yeah, but I am just reporting it to someone else so they can

9  get Dr. Holland or someone else to come in and say, hey, we

10 need to treat this. We need to do another EKG, which hasn't

11 happened for years.

12 *Q.* Now, you discussed the notation in your chart, and we'll

13 move on to Page 8, that there is a notation of this myocardial

14 infarction.

15 *A.* Right.

16 *Q.* Now, that originally appears in the Parkview medical

17 records; is that right?

18 *A.* Yes.

19 *Q.* And where else have you seen it?

20 *A.* Say that again?

21 *Q.* Where else have you seen it notated?

22 *A.* Yes.

23 *Q.* Where? What other records?

24 *A.* I've seen it in the medical records and I write about it

25 here. I've seen it in two other medical records of the

William Alexander Morton, Jr. - Direct

1   government facility that he has been transferred to.  It

2   says -- it talks about old MI, myocardial infarction.

3   Q.  And there are two records I think that you are referring

4   to.

5        MS. STRICKLIN:  Mr. Cohen, can you please bring up D2?

6   BY MS. STRICKLIN:

7   Q.  Now, Dr. Morton, is this one of the records that you are

8   referring to?

9   A.  Yes.

10  Q.  And does it right underneath health problems say an old

11  myocardial infarction?

12  A.  That's what it says current.  He has an old myocardial

13  infarction which -- yeah.

14  Q.  I think you said transfer paperwork.  Is this the transfer

15  paperwork that you saw that applied from when Mr. Dear was

16  transferred from the Federal Detention Center to the

17  Springfield Federal Medical Center?

18  A.  I think so.  There was another one also, two different

19  physicians.

20       MS. STRICKLIN:  Mr. Cohen, can you please bring up D3?

21  BY MS. STRICKLIN:

22  Q.  Is this the other record that you were referring to?

23  A.  Old myocardial infarction, yes.

24  Q.  And is this the record that appears from when Mr. Dear was

25  transferred out of the Federal Medical Center in Springfield?

William Alexander Morton, Jr. - Direct

1   *A.*   I think so.  I mean, you want people to know what's going

2   on with these patients as you transfer them around in

3   institutions.

4   *Q.*   Now, I want to talk to you for a minute about Dr. Holland's

5   testimony.  You heard Dr. Holland testify that it's his opinion

6   that Mr. Dear did not suffer a Type 1 myocardial infarction,

7   meaning a traditional heart attack.  Let's assume that

8   Dr. Holland is correct.

9   *A.*   Okay.

10  *Q.*   Does that substantially change your opinion as to his risk

11  for adverse cardiac side effects?

12  *A.*   No, it lessens it a little bit, but the big problem is the

13  prolongation of the QT interval.

14  *Q.*   Is one of the additional problems the lack of information

15  that we have?  Is an additional problem the lack of information

16  that we have on Mr. Dear --

17  *A.*   Yeah, yeah.

18  *Q.*   -- in terms of EKG results?

19  *A.*   Yeah.  We don't know.  We don't know what his heart is

20  like.  We know he is hypertensive.  We know that's been slowly

21  or quickly causing his body to wear down and wear out.  And

22  we've had two or three people talk about the potential side

23  effects.

24  *Q.*   Now, I want to move on to that history of untreated

25  hypertension that you mention.  What is a normal blood pressure

398

William Alexander Morton, Jr. - Direct

1    reading?

2    *A.*  Unless it's changed, it's 120 over 80.  That's kind of the

3    standard.

4    *Q.*  And when you reviewed Mr. Dear's medical records, did you

5    note several instances in which he had a blood pressure reading

6    that should be concerning?

7    *A.*  Yes.  There were many.  I guess I could have counted those

8    and they would have been in the teens or twenties or --

9    *Q.*  Would it help you to see your report where you documented

10   each of those?

11   *A.*  To count them?

12   *Q.*  Well, just to see what the results were, I suppose, and how

13   many.

14   *A.*  I guess.  It won't hurt.  They are outrageous.  Some of

15   the -- some of the elevations is scary.

16          *MS. STRICKLIN:*  Mr. Cohen, can you put up D23 and go

17   to Page 6, please?

18   *BY MS. STRICKLIN:*

19   *Q.*  Now, in this first list that you have compiled, what

20   readings would you indicate that are outrageous or concerning?

21          *THE COURT:*  Has this exhibit been admitted?

22          *MS. STRICKLIN:*  It has not.

23          *THE COURT:*  Well, let's not address it substantively

24   until it is.  If you need additional foundation, so be it.

25   *BY MS. STRICKLIN:*

399

William Alexander Morton, Jr. - Direct

1   Q.  Dr. Morton, are you looking at your report dated May 23rd,

2   2022?

3   A.  Yes.

4        THE COURT:  Well, let me understand the purpose.  If

5   the purpose is to refresh recollection under Rule 613, that's

6   one thing; but if you want the doctor to testify to substantive

7   provisions, that's another.

8   BY MS. STRICKLIN:

9   Q.  Dr. Morton, can you recall each of the actual results that

10   you identified as concerning, the actual numbers?

11   A.  No, I can't recall.

12   Q.  And would it help you to remember to look at your report?

13   A.  Yes.

14        MS. STRICKLIN:  Your Honor, I think we can just use it

15   to refresh his recollection.

16        THE COURT:  Very well.

17   BY MS. STRICKLIN:

18   Q.  So if you look at this page of your report, Dr. Morton,

19   does it refresh your recollection as to the blood pressure

20   results you identified as concerning?

21   A.  Yes.  He came into the emergency room with a blood pressure

22   of 208 over 127.  When he finally was admitted there, his blood

23   pressure was 210 over 112.  And those other one, two, three,

24   four, five, six, seven, eight, nine readings all are elevated

25   the systolic, the top number, and the diastolic are all

400

William Alexander Morton, Jr. - Direct

1    elevated outside of the normal range.

2    Q.  And did you also look at his blood pressure results from

3    the Parkview medical records?

4    A.  I think this is Parkview.  You mean when he actually got

5    into the hospital?

6    Q.  Yes.

7    A.  Yes, I looked at those also and they were elevated.  Not

8    every one was elevated, but almost always his blood pressure is

9    elevated.

10   Q.  And is the same true for the records that you reviewed from

11   the Bureau of Prisons?

12   A.  Yes, when he allows his blood pressure to be taken.

13   Q.  When a patient is being prescribed antipsychotic

14   medication, why as a psychiatric pharmacist are you concerned

15   about a history of untreated hypertension?

16   A.  Well, first of all, the first dose of an antipsychotic can

17   often cause rarely an increase in blood pressure, the first

18   dose.  The second, third, fourth and fifth dose usually causes

19   a decrease in blood pressure when one stands up.  That's called

20   orthostatic hypertension, O-R-T-H-O-S-T-A-T-I-C, orthostatic

21   hypertension, which is well-known with these medications.  It's

22   well-known in us.  If we get up too quickly, we can be dizzy

23   and we can pass out because we don't have the capacity to pump

24   blood to our head.  We've lost that capacity because of one of

25   the side effects of the antipsychotic drug.

William Alexander Morton, Jr. - Direct

1   Q.  In your review of the records, does Mr. Dear have a family

2   history of cardiovascular disease?

3   A.  He does.

4   Q.  Now, in your opinion, does the Bureau of Prisons treatment

5   plan adequately take into account Mr. Dear's cardiac history

6   when assessing risk?

7   A.  I was concerned about that treatment plan.  That treatment

8   plan met the minimum standards I would think one would have,

9   minimum standards for safety and for efficacy.  I did not see

10  anything in there that would help someone assess his response.

11  No one is rating him.  No one is responsible for doing any

12  rating scales.  That's one of the characteristics of -- that's

13  one of the problems with almost all the studies is that no one

14  does a rating scale with a definition of what their response

15  is.

16          There is a scale called a PANSS.  That's the Positive

17  And Negative Symptom Syndrome scale which is almost always used

18  in treating or evaluating antipsychotics and schizophrenia, but

19  I haven't seen anybody use it with Mr. Dear.

20  Q.  Do you think the plan adequately takes into account

21  Mr. Dear's history of untreated hypertension?

22  A.  I think that plan has a lot of little problems that are

23  going to eventually result in a serious big problem.  I think

24  it's a potential setup for him having problems because he's

25  going to be an experiment basically, an experiment of one, a

William Alexander Morton, Jr. - Direct

1    research study of one.  And I don't know who's going to be

2    responsible for that, making decisions, collecting the data,

3    making sure that when a thing is abnormal and someone flags it

4    that they take care of it and they resolve that.  I don't see

5    that happening in that plan.

6    Q.  Now, what other adverse side effects have you observed in

7    patients when taking antipsychotic medications that you're

8    concerned about as it relates to Mr. Dear's case?

9    A.  Let me just start at the top.  Confusion, delirium, blurred

10   version, dry mouth, twisting of the neck, twisting of the

11   muscles, problems swallowing, because maybe you have abnormal

12   movements.  That's very clear in my mind because I have had

13   some patients that choke because they can't swallow their food

14   properly, real clear in my mind.

15          So coming on down, cardiac, tachycardia, prolonged

16   side effects of the prolongation of the QT interval, possibly

17   arrhythmias because of that, rare, but possible, quite

18   possible, coming on down to the stomach, constipation, coming

19   on down, liver inflammation, hanging around metabolically

20   causing him to want to eat more sweets, causing his glucose

21   level to go up, causing him to gain weight for the combination

22   of that, causing him to increase various lipids in his blood,

23   the clog-up of his blood vessels, high cholesterol, feeling

24   restless, not being able to sit still.

25          I have testified in at least two patients that it

William Alexander Morton, Jr. - Direct

1    was -- the appeal was given because the jury didn't like him

2    jumping around because he was so restless and anxious, this

3    akathisia, they thought he was doing it on purpose.  And you

4    can't sit still.  It's restless.  You've got to move to try to

5    relieve it, so that, akathisia.  Possibly tardive dyskinesia,

6    which is abnormal movements of the tongue and face and eyes,

7    inability to control your temperature.  Sometimes that's called

8    neuroleptic malignant syndrome.  People become delirious.

9    Their blood pressure shoots up.  And almost always if they

10   don't get it treated with immediate effects, it will be fatal.

11          I have seen one of my patients that I was working with

12   come in with that and she died in the ICU because she got an

13   injection, which she will have that medicine in her body for

14   three to four weeks before it starts decreasing.  So it doesn't

15   occur in everyone for sure, for sure; but when it does occur,

16   it's bad.  Those would be some of the side effects.

17   Q.  Do you have an opinion about the BOP's proposal to treat

18   certain side effects with adjunct medications?

19   A.  More medications, and it makes sense in a healthy, a young,

20   healthy person.  If you get a dystonia, and I ask people about

21   that.  What did you think was happening?  Well, I thought I was

22   having a stroke.  I couldn't control my body.  My muscles were

23   drawing up.  I thought I was going crazy.

24          And then we gave you either intravenous Benadryl or

25   intravenous Cogentin and it resolved in minutes.  They don't

William Alexander Morton, Jr. - Direct

1    want to take that medicine anymore.  Well, you can make a deal.

2    You can say we will decrease the dose.  We'll put you on

3    Cogentin which will help with that.  It will also give you a

4    dry mouth and cause you to have difficulty urinating and maybe

5    constipation, but it will prevent that dystonia from occurring

6    hopefully.  We don't ever want you -- we don't want you to feel

7    bad.  That's what I would be saying to a patient.  And indeed

8    it works.

9         If it's akathisia, we might give them -- at the Bureau

10   of Prisons they are suggesting Ativan or Lorazepam, which is a

11   benzodiazepine, which if you take it within -- if you put it

12   under your tongue, maybe 30 to 60 minutes you'll get an effect.

13   If you use Valium, you will probably get an even faster effect,

14   maybe 20 minutes.  A one-time dose of that might help.  If not,

15   you might use what's called propranolol, a beta blocker.  That

16   helps the most if it returns, that restless-type feeling, but

17   acutely you would probably use one of those.  And I think

18   that's in the plans.

19        If it's from the intramuscular long-acting injection,

20   which is the medicine tied to a fatty acid that sits in the

21   muscle and slowly is released from the muscle or back here,

22   usually it's better to put it back here in someone's glute,

23   it's slowly released.  In that case you would have to probably

24   dose them for one or two months with that medicine or you would

25   be hesitant to take them off of that medicine.

William Alexander Morton, Jr. - Direct

1   Q.  And do you share Dr. Woods' concerns about polypharmacy in

2   Mr. Dear?

3   A.  I always have concerns with polypharmacy in any patient,

4   especially in Mr. Dear who we don't really know anything about

5   because we have not really assessed him lately.  We don't

6   know -- we know he and I are both getting older.  I don't mind

7   saying I'm getting older.  Everybody is squirming around when

8   they talk about older.  I'm getting older.  My metabolism is

9   slowing.  I will respond to medicines differently if I have to

10  take medicines.

11  Q.  And just to conclude, do you have an opinion as a board

12  certified psychiatric pharmacist in whether or not the Bureau

13  of Prisons' treatment plan is medically appropriate for

14  Mr. Dear?

15  A.  Well, I think it's not appropriate.  I think it's

16  appropriate -- it looks like it's used for whoever has a *Sell*

17  hearing.  It doesn't look like it's been tailored specifically

18  for him.  I've work in clinical research and I'm for holding

19  people accountable for doing the things that they need to do,

20  and they do usually if they are laid out what you have to do.

21  And I'm not sure what's going to happen there.

22        I know in the hospital a lot of adverse side effects

23  occur.  I know a lot of drug interactions occur.  I know a lot

24  of medication errors occur.  And I know you don't want me to

25  talk about them because they are horrible numbers of what

William Alexander Morton, Jr. - Cross

1   happens, but I feel a need to say that all these health

2   practitioners are well meaning, but they are overworked.  They

3   are distracted and they are interrupted and they make errors,

4   bad errors.  And so I don't want there to be two drugs or three

5   drugs or five drugs because no one's going to raise the red

6   flag probably when he starts having problems.

7   Q.  Do you have a similar opinion as to whether or not this

8   proposed treatment plan is in Mr. Dear's best medical interest?

9   A.  I don't think it's in his best medical interest.  I think

10   it will cause him problems and it will not deliver what we

11   would like for him to do, respond to.  Maybe there is a 6 to

12   10 percent chance he may respond.  That would be great if you

13   could get that kind of response.

14          MS. STRICKLIN:  Your Honor, I don't have any further

15   questions.  Thank you.

16          THE COURT:  Very well.  Cross-examination for the

17   government?

18          MS. WHITE:  Thank you, Your Honor.

19          THE WITNESS:  Hello.  You are Mrs. White, right?

20          MS. WHITE:  That's correct.

21                         **CROSS-EXAMINATION**

22   BY MS. WHITE:

23   Q.  Good afternoon, Dr. Morton.

24   A.  Good afternoon.

25   Q.  You do not have a medical degree, correct?

William Alexander Morton, Jr. - Cross

1   A.   I do not, no.

2   Q.   You are not a psychologist, correct?

3   A.   No.

4   Q.   You testified that you are a psychiatric pharmacist; is

5   that right?

6   A.   Pharmacist, yes.

7   Q.   What is that exactly?

8   A.   It's somewhat who has graduated from a college of pharmacy

9   either with a BS degree or a Doctor of Pharmacy degree and has

10  taken a board certification examination, has practiced in a

11  situation where there is psychiatric patients for a period of

12  time and meets criteria for the board certification and then

13  practices in the area, either a subspecialty of psychiatry or a

14  subcategory of mental health looking at the pharmacology of the

15  medicines that are used or not used.  What happens if you don't

16  treat?  What happens if you do treat?  Look at the benefits of

17  those medicines, make people aware of staying on top of the

18  benefits.  Are the benefits always outweighing the side

19  effects, the problems?  That's what we always want.  That's

20  what I want.

21       When I go in, I want to make sure that I am delivering

22  good care of someone liking what they are getting, appreciating

23  what they are getting and having tolerable side effects.  I

24  can't guarantee no side effects, but can you put up with it?

25  Will you put up with it?

408

William Alexander Morton, Jr. - Cross

1    *Q.*  How many years of schooling does a pharm D require?

2    *A.*  It varies.

3    *Q.*  How many years did you go to school for your degree?

4    *A.*  I went six, six, and seven for my residency.

5    *Q.*  According to your report, you specialize in substance abuse

6    disorder, affective disorder and anxiety disorders; is that

7    correct?

8    *A.*  That's what I have specialized in, yes.

9    *Q.*  You have been hired by the defense in this case, correct?

10    *A.*  Yes.

11    *Q.*  What's your hourly rate?

12    *A.*  $300 an hour.

13    *Q.*  In your report you indicate that you consulted with

14    Mr. Dear's federal defense team on several occasions since

15    January of 2022.  How many hours did you spend consulting with

16    them?

17    *A.*  Probably between 20 and 30 hours.

18    *Q.*  And I believe you testified you already -- previously today

19    that you were hired by the state defense team as well and you

20    testified in that *Sell* hearing, correct?

21    *A.*  Yes, before, yes.

22    *Q.*  Have you ever met with Mr. Dear?

23    *A.*  I have not.

24    *Q.*  Why not?

25    *A.*  When I originally was retained, I wanted to meet with him,

409

William Alexander Morton, Jr. - Cross

1    but Mrs. Nelson said I don't think that's good because he is

2    not seeing anybody.  He is not even seeing me.  I don't want

3    you to upset him.  At that point I think he was almost getting

4    a *Harper* hearing because they were thinking about self -- about

5    medicating him against his will briefly and then that changed

6    and that did not become an issue.

7    Q.  Since you have been hired by the federal defense team, you

8    have not met with him; is that correct?

9    A.  Yes.

10   Q.  Approximately how many times have you been hired to provide

11   an expert opinion in a criminal case?

12   A.  In a criminal case, I would say 91 times.

13   Q.  Of those 91 times, how many times were you hired by the

14   defense?

15   A.  I think hired by the defense, all those.  I am often

16   consulted by prosecution and defense, and then they may or may

17   not want me, but also the prosecution has their own clinicians

18   working in state facilities.  They don't need to look and call

19   me up, beg me to come.

20   Q.  So you have never been hired by the prosecution.  Is that

21   fair to say?

22   A.  I have never been hired.  I have testified for them.

23   Q.  Okay.  How many times have you been hired to provide an

24   expert opinion regarding the use of involuntary antipsychotic

25   medication?

William Alexander Morton, Jr. - Cross

1    *A.*  I think this would be the fourth time.

2    *Q.*  Have you ever opined that the involuntary use of

3    antipsychotic medication was substantially likely to render

4    someone competent?

5    *A.*  Yes.  I believe I opined that the drug would work, but I

6    would not start off at that dose.  I would not give him

7    25 milligrams of Haldol without having given him some oral

8    Haldol first, but yes, give him Haldol for his schizophrenia.

9    *Q.*  How many times have you been hired to provide an expert

10   opinion regarding the use of involuntary antipsychotic

11   medication to treat a defendant with delusional disorder?

12   *A.*  Only twice.

13   *Q.*  And of those occasions, did you always testify for the

14   defense?

15   *A.*  Yes, I did.

16   *Q.*  Did you opine that the use of antipsychotic medication was

17   substantially likely to render those defendants competent?

18   *A.*  The other defendant, I did not think it would render him

19   competent, and I don't think it will render Mr. Dear competent.

20   *Q.*  So just to be clear, the two patients you are referring to,

21   one of them is Mr. Dear; is that correct?

22   *A.*  Yes, yes.

23   *Q.*  How many times have you treated a patient on your own for

24   mental illness?

25   *A.*  On my own.

William Alexander Morton, Jr. - Cross

1  Q.  Yes.

2  A.  I have always treated patients in conjunction with a

3  practitioner of medicine who allows me to practice and write --

4  he writes prescriptions for the patient for me.  And I've had a

5  practice there at the VA Hospital for years, maybe 130 patients

6  for a while that I was their primary practitioner, and then at

7  the medical university probably 30 to 40 patients.  And then

8  for probably 10 years I was the only person that knew how to

9  give an injectable antipsychotic medicine, and that was Haldol

10 Decanoate or Prolixin Decanoate.  So usually I would teach

11 medical students and pharmacy students how to do that because

12 they need to know how to do that.

13 Q.  So just to be clear and make sure I am understanding you

14 correctly, you did that in conjunction with a psychiatrist; is

15 that correct?

16 A.  Yes, I did.

17 Q.  You're not able to prescribe medication.

18 A.  No.

19 Q.  You are not able to provide psychotherapy, correct?

20 A.  No.  I don't do either of those.

21 Q.  And so have you ever treated someone with a psychotic

22 disorder on your own without a psychiatrist?

23 A.  No.  I have referred them.

24 Q.  How many times have you -- excuse me.  So with respect to

25 those times that you discussed, your role as a consultant is to

412

William Alexander Morton, Jr. - Cross

1   advise about the potential risks of using certain medications

2   when treating patients.  Is that fair to say?

3   A.  That's fair to say, yes.

4   Q.  And how many times have you diagnosed someone with a

5   psychotic disorder?

6   A.  I think I have only diagnosed a patient one time, and I

7   didn't know the hearsay rule and it was a *Molina* decision.

8   They said I could not make a diagnosis because I repeated the

9   diagnosis of the clinician that was coming, but that clinician

10  hadn't been there yet.  And I didn't understand that I could

11  not say he has a diagnosis of so and so until he got there and

12  said he has the diagnosis of bipolar disorder, so that's the

13  only time I've done that.  But I talk about -- I talk about

14  diagnosing frequently because they all have components of

15  symptoms, and that's what I know a lot about is the symptoms.

16          But when you take one or two or five symptoms and then

17  you take a number of other issues together, that's when you

18  start getting a disorder that you make a diagnosis on, and I

19  don't do that.

20  Q.  And just to be clear, Dr. Morton, what you just testified

21  about, the *Molina* hearing, I believe, that was a case out of, I

22  believe, the Common Wealth of Virginia?

23  A.  Yes.

24  Q.  And that's where you testified in court about someone's

25  diagnosis, correct?

William Alexander Morton, Jr. - Cross

1    *A.*   Yes.

2    *Q.*   My question to you is whether you have ever treated

3    somebody and personally diagnosed them with an antipsychotic

4    disorder.  And I think you just testified no; is that correct?

5    *A.*   No, I have not done that.  I am not allowed to do that.

6    *Q.*   Are you familiar with the four antipsychotic medications in

7    Dr. Sarrazin's proposed treatment plan?

8    *A.*   I am.

9    *Q.*   In your role as a consultant, have you given advice about

10   prescribing any of those four medications to a patient?

11   *A.*   I haven't given any advice about paliperidone; the others,

12   yes.

13   *Q.*   Did you ever recommend that any of those would be

14   appropriate to treat a patient?

15   *A.*   Yes.

16   *Q.*   Which of those medications did you recommend?

17   *A.*   Abilify, Haldol, olanzapine.

18   *Q.*   And Abilify is also known as aripiprazole?

19   *A.*   Aripiprazole, yeah.

20   *Q.*   How frequently have you recommended those medications?

21   *A.*   I have often recommended them as a consideration, as an

22   option.  I don't remember saying this is the only thing that's

23   going to help them.  I might say you may want to consider

24   aripiprazole because they had a problem with haloperidol, so I

25   would go back with aripiprazole and that might be a

William Alexander Morton, Jr. - Cross

1    recommendation, but I cannot -- I don't have anything

2    documented that I recommended those medicines specifically for

3    any of the patients I've seen.

4    Q.  Okay.  But it sounds like if I am hearing you correctly,

5    that you have considered these medications and made

6    recommendations to a treating psychiatrist based on a patient's

7    overall medical history; is that correct?

8    A.  Yes, I have.

9    Q.  Do you agree that the four recommended antipsychotic

10   medications are generally considered safe?

11   A.  Generally they are considered safe, yes.

12   Q.  Do you agree that all four are frequently prescribed for

13   psychotic disorders?

14   A.  Yes, they are.

15   Q.  Do you agree that these medications have positive impacts

16   on most of the patients who take them?

17   A.  I believe all of antipsychotics have a positive effect, but

18   it's not as rosy as what Dr. Baecht and Dr. Sarrazin made them

19   out to be.  They do help people dramatically, but it's not

20   changing the world without complications.  And that's what I

21   heard yesterday, and I thought we live in two different worlds,

22   I guess.

23   Q.  Dr. Morton, do you agree that side effects are not

24   experienced at all by many patients?

25   A.  Relatively few, but yes, I do believe that happens.  I

William Alexander Morton, Jr. - Cross

1   don't get to see them.  I don't know.  They go --

2   Q.  Do you agree that many of those side effects can be

3   addressed by, for example, changing the dose of a medication?

4   A.  Yes, absolutely.  That's a frequent thing I would do with

5   antidepressants or antipsychotics.  I would say no, don't give

6   them 5 milligrams.  Give them 1 and a quarter milligrams, but 1

7   one and a quarter, they would respond, the whoever, the

8   practitioner would say, 1 and a quarter is not going to do

9   anything.

10          Well, they have been psychotic for three months.  Give

11  them that for the first day and then give them 2 and a half for

12  three days and then give them 5.  Why can't we just give them 5

13  right away?  Because they are going to have side effects.  So I

14  am using to titrating people very slowly and put up with, well,

15  that's not going to help them.  Well, you are just getting

16  started in helping them, but that helps decrease some of the

17  side effects.  Switching to PM, adjunct medications can help,

18  yeah, or switching totally to a different medicine.

19  Q.  So all three of those things can help with side effects?

20  A.  They can help the side effects, yeah.

21  Q.  Do you agree that many of the side effects -- excuse me.

22  Strike that.  You testified that you have worked with I think

23  you said between 1500 --

24  A.  16,000 patients.

25  Q.  16,000, excuse me, during the course of your career.

William Alexander Morton, Jr. - Cross

1   A.   Yeah.

2   Q.   How many of those patients were suffering from delusional

3   disorder?

4   A.   That I am aware of, probably two.

5   Q.   What was your role in working with those patients?

6   A.   It was to not ask them any questions.  We were told not to

7   ask them about who's pumping gas in their house.  That was the

8   word that came down from the doctor because it was totally

9   insane what they were worried about.  And it wasn't a good

10  idea, and I understand that now, to repeatedly ask someone

11  about their delusional disorder.

12  Q.   Just so I can be clear, are those two patients that you are

13  discussing Mr. Dear and the other person you previously

14  testified about with respect to the *Sell* hearing?

15  A.   Yes, yes.

16  Q.   And did you treat the other patient with antipsychotic

17  medication?

18  A.   No.  The psychiatrist was already treating them.

19  Q.   And how frequently did you -- it sounds like you did not

20  interact with that patient at all, correct?

21  A.   I met with him twice.

22  Q.   What was the nature of your meetings?

23  A.   I am sorry, what?

24  Q.   What was the nature of your meetings with the patient?

25  A.   Oh, in a group meeting.  I now remember that man had a

417
William Alexander Morton, Jr. - Cross

1   serious delusion about the internet and him being denied
2   $2.5 million, that a company was stealing from him.  And he
3   unloaded his gun on four people there and killed them.  And one
4   of the things in the studies that we look at is that I don't
5   think any of the patients I've seen come close to approaching
6   what Mr. Dear's behavior was.  It's often they carried a knife
7   into the courtroom.  They carried a knife on the plane.  They
8   didn't show up for probation.  It's -- so --
9   Q.  Let me ask you another question, Dr. Morton.  So with
10  respect to the one patient whose treatment you were involved
11  with who was diagnosed with delusional disorder, did the
12  treating psychiatrist make the assessment about the patient's
13  progress?
14  A.  Yes.
15  Q.  And you were relying on the results about that progress as
16  being reported to you; is that correct?
17  A.  Yes.
18  Q.  What results were reported to you in that case?
19  A.  That as long as you don't bring up the disorder, the
20  delusion, he is fine.  He gets along with his wife.  He gets
21  along with everyone, but don't bring up the internet.  And the
22  other man was don't bring up -- don't bring up the gas being
23  pumped into your house.
24  Q.  So Dr. Morton, you opined that the medication regimen and
25  plan outlined by Dr. Sarrazin is not substantially likely to

William Alexander Morton, Jr. - Cross

1  render Mr. Dear competent, correct?

2  A.  Correct.

3  Q.  But you are not a psychiatrist, right?

4  A.  No, just a psychopharmacologist.

5  Q.  You are not a psychologist.

6  A.  Not a psychologist.

7  Q.  And you are not qualified to render an opinion as to a

8  patient's competency, correct?

9  A.  That's correct.

10 Q.  What experience are you relying on to disagree with

11 Dr. Sarrazin's opinion?

12 A.  The world's literature is one.  My experience with a very

13 few patients, and that's about many more than a lot of

14 practitioners ever see or get a chance to treat.  It's a rare,

15 rare disorder, double rare disorder.  What's in the literature?

16 What's in the world literature?  No one talks about how well

17 people do with the exception of Herbel and Cochrane.  They talk

18 about them having a positive response.

19        When you look at it closer, there are very few of

20 those patients had a marked reduction in paranoid thinking.

21 They still had paranoid thinking when they were, quote,

22 restored, so hopefully they will come up with a follow-up

23 report about how the person's doing after they're treated, you

24 know, one, two, three years.  Did they maintain that or did

25 they relapse?  That data just is not in the literature.  We

William Alexander Morton, Jr. - Cross

 1   don't know.

 2   Q.  Dr. Morton, you cited a 1995 study conducted by Munro and

 3   Mok that looked at the treatment of delusional disorder and

 4   found that delusional disorder if well treated is a disorder

 5   with an optimistic outlook, correct?

 6   A.  They could have said that, yes.

 7   Q.  In fact, the authors found that with all treatments

 8   combined, 80.8 percent of patients showed total or partial

 9   recovery, correct?

10   A.  I don't know.  Can I look at that study, please?

11   Q.  Dr. Morton, this is an article that you relied on, correct?

12   A.  I read it, yes.  One of the aspects, and I don't know if it

13   was Munro's study or not, is that they had a large sample, but

14   only four of those people had delusional disorder of

15   persecutory delusions.  The other people had delusions, somatic

16   delusions of parasites.  And they get better.  They do.  They

17   get remarkably better.

18   Q.  So this is one of the ones that you reviewed.  And you're

19   saying that you don't remember.

20   A.  I don't remember, no.  If you give me that study, I will

21   potentially remember.

22        MS. WHITE:  I am happy with the Court's permission to

23   share one of our copies to refresh Dr. Morton's recollection,

24   if there is no objection by the defense.

25        THE COURT:  Madam clerk, your assistance, please.

420

William Alexander Morton, Jr. - Cross

1   *BY MS. WHITE:*

2   *Q.*   And I am directing you to the Page 19 in the left-hand

3   column, third paragraph down.

4   *A.*   Right.   They do report a response rate of 80 percent.

5        *MS. WHITE:*   I can take that back at this time, Judge.

6   That was my question with respect to that.

7   *A.*   They had 156 treated cases with somatic subtype disorder.

8   91 percent recovered.   They had 40 patients treated with other

9   causes of -- other subtypes of --

10  *BY MS. WHITE:*

11  *Q.*   But they report --

12  *A.*   7 percent responded there and recovered, 7 percent

13  responded.   5 percent partially responded.   That's the problem

14  with some of these studies is that they mix in these subgroups

15  and they pretend like it's one thing, that delusional disorder

16  is all the same.   But there is seven different subtypes and you

17  would expect seven different responses.

18  *Q.*   And I understand you dispute the reliability or portions of

19  that study, but you would agree it provides some evidence that

20  antipsychotics can effectively reduce delusions, correct?

21  *A.*   Yes, if you have the delusion of bugs and occasionally if

22  you have delusions of some other subtype.   What are the other

23  subtypes?   They may or may not have told us.

24  *Q.*   Doctor, you understand that there is a difference between

25  competency restoration and remission, correct?

William Alexander Morton, Jr. - Cross

1   A.   Yes.

2   Q.   And do you agree that a delusion need not completely

3   resolve in order to restore a patient to competency?

4   A.   That's what I've heard.

5          THE COURT:   Madam clerk, you may retrieve the exhibit.

6   I believe we are finished with it.   Thank you.

7          MS. WHITE:   Thank you, Your Honor.

8   A.   I know in the majority of patients, inpatients that we

9   treat with psychotic disorders -- treat for psychotic disorders

10   with antipsychotics, they often leave the hospital with partial

11   symptoms of either delusions or hallucinations.   And hopefully

12   they are less bothersome to them so they can go about their

13   lives and make it to their outpatient appointment.

14   BY MS. WHITE:

15   Q.   But for purposes of competency specifically, my question to

16   you is you understand that in order to restore a patient to

17   competency, the delusion does not need to resolve or go away

18   entirely.   Do you understand that?   Do you agree with that?

19   A.   That's what Herbel and Stelmach said because they had

20   patients that they said recovered, that were better, but they

21   still had significant paranoid symptoms.

22   Q.   And, in fact, they reported that 73.3 percent of patients

23   diagnosed with delusional disorder who were treated with

24   antipsychotics were restored to competency, correct?

25   A.   They did.

William Alexander Morton, Jr. - Cross

1  Q.  Of the patients that you have treated, and I think you said

2  it was between 15 and 16,000.

3  A.  Yes.

4  Q.  How many of them had preexisting cardiac conditions?

5  A.  I don't know.

6  Q.  Are flagging these types of concerns an important part of

7  your consulting role as a pharmacologist?

8  A.  Yes.

9  Q.  Where you see that a patient may have a cardiac condition,

10  do you recommend that the treating psychiatrist consult with a

11  cardiologist?

12  A.  I would if they are unstable, if they are not having -- if

13  they are having -- if they are stable and they are seeing their

14  internist or psychologist and they have no problems, and we

15  have recent EKG data and their blood pressure is stable, I

16  might not have anything to say about that.  Keep up your

17  appointments with your family doctor or cardiologist or I might

18  say before we start this medicine, you have to get another EKG.

19  Q.  And you ask them to do that because you're not a

20  cardiologist, correct?

21  A.  Who's not?

22  Q.  You're not.

23  A.  Yes.  That's clear.

24  Q.  You can only flag the concern.

25  A.  I can only flag my concern, yeah.

William Alexander Morton, Jr. - Cross

1  *Q.*  You agree that the cardiologist is the expert who is most

2  qualified to assess cardiac concerns that you flag regarding a

3  patient?

4  *A.*  Oh, absolutely.

5  *Q.*  Have you ever diagnosed a patient with hypertension

6  yourself?

7  *A.*  No, not -- no, I have not, no.

8  *Q.*  Why is that?

9  *A.*  Diagnosed a patient with hypertension?

10  *Q.*  Yes.

11  *A.*  I have taken people's blood pressure, but I didn't ever

12  find someone that said, hey, you've got hypertension.  I might

13  have said, you have an elevated blood pressure.  You might want

14  to see a family doctor about this.

15  *Q.*  And you would refer them to a doctor because that person

16  would be the correct --

17  *A.*  Person.

18  *Q.*  -- person to diagnose that person.

19  *A.*  Yes.

20  *Q.*  Have you diagnosed a person with cardiac damage based on

21  elevated levels of triponin?

22  *A.*  No.  I know what that is, triponin.  I know Dr. Stamey at

23  the hospital saw Mr. Dear.  He had problems.  He was scared

24  that he was having an MI.  And she had a triponin level drawn

25  there.  And that was never discussed or looked at with

William Alexander Morton, Jr. - Cross

1   Dr. Holland.  He never saw that level.  It was 0.67 which is 10

2   times larger than those four.  I don't know what that means,

3   but it would have been nice if he had provided him with that

4   level in the hospital that Dr. Stamey drew before he went to

5   Parkview.

6   Q.  Have you ever diagnosed a patient with a myocardial

7   infarction?

8   A.  No.

9   Q.  Why not?

10  A.  I just haven't.

11  Q.  Are you qualified to do that?

12  A.  No.

13  Q.  When you flagged cardiac concerns for one of your patients

14  who is considering an antipsychotic, how frequently do those

15  patients take antipsychotic medication after considering the

16  concerns?

17  A.  I don't have an accurate answer on that.  I don't know, but

18  how often do they even get an EKG from their cardiologist?  I

19  don't know that either.

20  Q.  In your report you discuss Mr. Dear's cardiovascular

21  conditions.  You have never physically examined Mr. Dear, have

22  you?

23  A.  No, I have not.

24  Q.  Does your opinion rely solely on your review of his medical

25  records?

425

William Alexander Morton, Jr. - Cross

1   *A.*  It relies on what I've heard, what I've read and what I

2   know about his medical records, and that someone needs to take

3   those medical records into consideration before they give him

4   an antipsychotic.  That's what I know.  And I'll say yes, I'll

5   wave a flag again.  Someone acknowledge that he's got these

6   problems and they'll check it.  They'll get him an EKG.  Seven

7   years is not asking too much.  That's not a rush, now, is it?

8   *Q.*  In your report you say that if treated with antipsychotics,

9   Mr. Dear risks recurrent hypertensive crisis and increased

10  blood pressure, correct?

11  *A.*  I think I did say that.

12  *Q.*  In your opinion, can a patient with a history of

13  hypertension ever be safely treated with antipsychotics?

14  *A.*  Oh, yes.

15  *Q.*  Does Dr. Holland's testimony that these four recommended

16  antipsychotic medications would be safe for Mr. Dear and also

17  not contraindicated in Mr. Dear give you any pause in your

18  opinion that you have issues with the treatment plan or the

19  medications?

20  *A.*  It doesn't.  No, it would not.

21  *Q.*  Why not?

22  *A.*  Because I heard a well-discussed treatise with Dr. Woods

23  about what he laid out about a man his age and the

24  complications that he expected, and I respected his opinion.

25  So that only bolsters my idea that the use of an antipsychotic

426
William Alexander Morton, Jr. - Cross

1    in Mr. Dear is not in his best interest.  If it worked, it

2    might be different.  If they worked.  I don't think they do.

3    Q.  In Dr. Sarrazin's report, he states that paliperidone,

4    aripiprazole and olanzapine are approved for the treatment of

5    bipolar disorder, schizoaffective disorder and psychotic

6    disorders such as schizophrenia, unspecified schizophrenia

7    spectrum and other psychotic disorders.  Do you agree with

8    that?

9    A.  Yes.

10   Q.  He also states that haloperidol is used in the treatment of

11   psychotic disorders.  Do you agree with that?

12   A.  Yes, I do.

13   Q.  Dr. Sarrazin states that the therapeutic benefits of

14   treatment with antipsychotic medications have a dramatic impact

15   on the day-to-day lives of hundreds of thousands of patients

16   who suffer from psychotic illnesses as well as their family.

17   Do you agree with that?

18   A.  I do.  I would probably change that wording if I was to say

19   it because that makes it sound all rosy and like everything

20   worked out fine and it doesn't.

21   Q.  You state in your report that akathisia, which is the

22   medical term for restlessness and agitation, is a common side

23   effect of an antipsychotic medication?

24   A.  Correct.

25   Q.  In his report Dr. Sarrazin addresses that potential side

427

William Alexander Morton, Jr. - Cross

1  effect by recommending medication to treat it; is that correct?

2  A.  That's correct.

3  Q.  Do you agree that medication is appropriate to address that

4  issue?

5  A.  In everyone but Mr. Dear.

6  Q.  Why?

7  A.  Because he's older.  He has a different body, a different

8  metabolism, a different way of excreting these drugs, a

9  different response.  He may be more sensitive to the

10  benzodiazepines, as well as the anticholinergic drugs.  I don't

11  know, but chances are he would be more sensitive than a younger

12  person.

13        MS. WHITE:  If I may have a moment, Your Honor?

14        THE COURT:  You may.  Thank you.

15  BY MS. WHITE:

16  Q.  Dr. Morton, you testified about the duration of untreated

17  psychosis in your testimony earlier.  In Herbel and Stelmach's

18  2007 article that you cite, the authors state:  The possible

19  confounding effect of a medication trial of inadequate duration

20  in two of the four patients coupled with the very small sample

21  size and uncertainty about the actual length of the DUP reduces

22  confidence that the poor outcomes in the last group were solely

23  attributable to the lengthy DUP.  Is that correct?

24  A.  I'll take that as a consideration, yeah.

25  Q.  The authors do not conclude that DUP is a useful predictor

428

William Alexander Morton, Jr. - Cross

1  of nonresponse to antipsychotic medications; is that correct?

2  A.  If you say so.  I don't have it in front of me.

3  Q.  Well, given the fact that two of the patients had an

4  inadequate treatment duration, is it possible that duration of

5  treatment rather than the DUP affected the outcome?

6  A.  I don't know.  I don't know.

7       MS. WHITE:  Nothing further, Your Honor.

8       THE COURT:  Redirect examination?

9       MS. STRICKLIN:  I have no questions, Your Honor.

10  Thank you.

11       THE COURT:  May this witness be excused and released

12  from subpoena?  Any objection by the defense?

13       MS. STRICKLIN:  No, Your Honor.  Thank you.

14       THE COURT:  Or the government?

15       MS. WHITE:  No, Your Honor.

16       THE COURT:  Sir, you are both excused and released

17  from subpoena with our thanks.

18       Now, it's my understanding that we are through for the

19  today.  We are not?

20       MS. BECK:  Your Honor, we have a third witness who is

21  prepared and is here.  We could get started on him today.  I

22  don't know how the Court wanted to proceed with the scheduling.

23       THE COURT:  Well, let's go as far as we can today.

24  We'll resume at 8:30.  I know that your final witness is due at

25  8:45; is that right?

429

Richard Peter Martinez - Direct

1          MS. BECK:  So our final witness, Your Honor, is our

2     third witness who is present in the courtroom today.  We could

3     get started today or he could be here at 8:45 tomorrow.

4          THE COURT:  Let's begin today if we can, please.

5          MS. BECK:  Sure.  Your Honor, the defense would next

6     call Dr. Richard Martinez.

7        (**Richard Peter Martinez** was sworn.)

8          THE WITNESS:  I do.

9                        **DIRECT EXAMINATION**

10    BY MS. BECK:

11    Q.  Good afternoon.  Can you please state your full name and

12    spell your last name for the court reporter?

13    A.  Richard Peter Martinez., R-I-C-H-A-R-D, Peter, P-E-T-E-R,

14    Martinez, M-A-R-T-I-N-E-Z.

15    Q.  Do you go by Doctor?

16    A.  If you would like.

17    Q.  Dr. Martinez, can you please tell us what you currently do

18    for a living?

19    A.  Yes.  I am a professor of psychiatry, forensic psychiatry,

20    at the University of Colorado Health Science Center in the

21    department of psychiatry.

22    Q.  And are you licensed to practice psychiatry here in

23    Colorado?

24    A.  Yes, I am.

25    Q.  Do you have any licenses in other states?

430
Richard Peter Martinez - Direct

1   A.   No.

2   Q.   Okay.  Are you certified, board certified?

3   A.   Board certified, yes, both in general psychiatry, as well

4   as forensic psychiatry, subspecialty.

5   Q.   Can you please describe for us your educational background?

6   A.   Should I back up and just -- I didn't know if you wanted to

7   know what I do besides being a professor at the department of

8   psychiatry.  Would you like more information about that?

9   Q.   I would love more information about that.

10  A.   Okay.  Let me get a little bit of water.  Anyway, I was

11  saying I was a professor in the department of psychiatry.  I am

12  the director of the forensic psychiatry services within that

13  department, and in that role as director of the forensic

14  services in the department of psychiatry at the university,

15  various activities which includes running training programs for

16  fellows in forensic psychiatry, residents in general

17  psychiatry, as well as oversee medical student education at

18  times.

19  Q.   Okay.  And how long have you been doing that?

20  A.   I have been in this role for about 16 years.

21  Q.   And prior to that, can you tell us a little bit about what

22  you did?

23  A.   Yes.  So you were asking about education.  So I grew up in

24  New Orleans and attended Tulane undergraduate and then went to

25  LSU Medical School.  From there I came to Colorado in the 1980s

Richard Peter Martinez - Direct

1    to do a residency in general psychiatry at the University of

2    Colorado when it used to be on 8th and Colorado before it moved

3    out to Anschutz.  And my -- after completing that general

4    psychiatry training, I have done a number of things before I

5    entered forensic psychiatry.

6            So initially I worked in the department and provided

7    student health services up at the University of Colorado -

8    Boulder and also worked in a general psychiatric clinic for a

9    period of time.  And then sort of in the early 1990s I went

10   back to school while working in the department and I worked on

11   a master's of humanities degree because I was increasingly

12   getting interested in the field of bioethics and in

13   professional ethics and ethical education within medicine and

14   within other professions.

15           That took me on a journey to Boston for two years

16   where I completed a fellowship in bioethics at Harvard Medical

17   School.  And then I spent a year at the Kennedy School in

18   Cambridge completing a second fellowship in professional

19   ethics.

20           That then brought me back to Colorado.  And for about

21   six years I helped in the development of the ethics and

22   humanities program at the Health Sciences Center, so I was

23   almost exclusively involved in education creating that ethics

24   humanities program, educational program, while I also did, if

25   you will, general psychiatry at a clinic at the Health Sciences

Richard Peter Martinez - Direct

1   Center.

2          And then to complete the story -- you know you are

3   getting old when you have a story like this.  So then at that

4   point I met a man named Robert Miller, who was a forensic

5   psychiatrist running the program that I am now running.  And he

6   in the late 1990s and around 2000, he began talking to me about

7   this field of forensic psychiatry and over a period of several

8   years convinced me to do a part-time fellowship under his

9   direction.  And then I completed this third fellowship in

10  forensic psychiatry in the early 2000s.  And so I have been

11  almost exclusively involved in that subspecialty field from an

12  educational perspective and a clinical perspective since about

13  2004.

14  Q.  And can you just briefly describe what forensic psychiatry

15  is?

16  A.  So forensic psychiatry is a field -- and Judge, I am

17  assuming you know, so I don't mean to look over as if you don't

18  know, but forensic psychiatry is a subspecialty within

19  psychiatry.  It's one of four or five subspecialties.  So just

20  as you get subspecialty training in child adolescent or in

21  addictions, you also have the subspecialty called forensic

22  psychiatry that is a board certified subspecialty.  And

23  specifically it's the relationship between mental health

24  issues, psychiatric issues and the law.

25          I often try to describe it as a four-legged stool, if

Richard Peter Martinez - Direct

1    you will, where the various areas of study and inquiry and

2    participation, one leg of that school is in the criminal law

3    and the ways in which criminal law overlaps with mental health

4    issues.  The second leg of the stool is in the civil area of

5    law, so involved in things like malpractice, standards of

6    practice, the kinds of civil litigation where mental health

7    issues and the law overlap in the civil area.

8          The third area is in correctional psychiatry, so many

9    people who train in forensics end up clinically working in

10   prisons and jails or in forensic facilities like the state

11   hospital down in Pueblo.

12         And then the fourth area is what I would call dealing

13   with administrative public policy and legislative issues, so

14   it's looking at ways in which public policy gets shaped,

15   especially through legislative action.  So part of what I have

16   done over the years has been involved with legislative

17   activities, advising, testifying, et cetera, when there are

18   laws facing the state legislature dealing with mental health

19   issues.

20   Q.  Thank you.  In addition to the work that you're doing with

21   your fellows and at Anschutz, are you currently serving on any

22   councils or any associations?

23   A.  Well, I am a member of -- sort of the parent subspecialty

24   organization for forensic psychiatry is the American Academy of

25   Psychiatry and Law, and I have been pretty involved with that

Richard Peter Martinez - Direct

1    organization over the years.  I have been a counselor on

2    essentially what is their board.  I have also been the

3    vice-president of the organization for a period of time.  I

4    have chaired a number of task forces with the American Academy

5    of Psychiatry and Law in various areas.

6           And then I am also involved with the American

7    Psychiatric Association.  I have been on the American

8    Psychiatric Association's ethics committee for many, many

9    years.  And I recently was appointed chair of a council of the

10   APA called the Council for Psychiatry and Law.  This is one of

11   the councils that essentially advises the American Psychiatric

12   Association board of trustees on issues that involve obviously

13   the field of psychiatry and the law that may be impacting

14   issues of delivery or other aspects of mental health issues

15   throughout the nation.

16   Q.  Have you been published in this field?

17   A.  Yes.  I mean, I am in an academic environment a professor.

18   In fact, Robert Miller, who was my mentor, I sit in his

19   professor chair called the Robert Miller chair of forensic

20   psychiatry in the department, so yes, I have published.  I have

21   obviously, I have taken my interest obviously in ethics and my

22   background in ethics, and I have applied that a great deal into

23   medicine and into forensic work in the last 16, 17 years.  So

24   my publications range from traditional ethical issues in

25   medicine like end-of-life care, issues about informed consent,

435

Richard Peter Martinez - Direct

1    issues about the patient/doctor relationship and the dynamics

2    of that relationship, issues dealing with boundaries in the

3    relationship and a whole assortment of ethical issues in

4    medicine.

5          And then in the last 16 years, I have been doing

6    obviously much more writing in the area of defining the

7    professional role of forensic psychiatry in the courtroom, in

8    society in general, and so a lot of ethics writing in that area

9    as well.

10   Q.  Can you tell the Court about your experience working in a

11   psychiatric ER?

12   A.  Yeah.  One of the jobs I had actually in transition around

13   the time I -- Dr. Miller convinced me to do another fellowship

14   program was I was the director of the psychiatric emergency

15   services at Denver Health here in Denver.  And Denver Health

16   has an incredible free-standing psychiatric emergency room

17   within their medical surgical department, really one of the

18   first developed in the region.  And so essentially it

19   operates -- I think it's up to 15 beds now.  When I was there,

20   we had 12 beds.

21         And essentially we work with the medical and surgical

22   side of the ER.  When psychiatric patients come in after they

23   have been medically cleared, they come on to our side on the

24   psychiatric emergency side, and we essentially evaluate, treat

25   people, and ultimately are very involved in the disposition of

Richard Peter Martinez - Direct

1  people there.  So I was the director of that for about four

2  years.

3  *Q.*  And can you tell the Court about your experience working

4  with and at the Colorado Mental Health Institute?

5  *A.*  Yes.  So since I've become a forensic psychiatrist in

6  practice since about 2005 or so, obviously we partner a great

7  deal with the Colorado Mental Health Institute in Pueblo,

8  running a training program.  In fact, some of my fellows are

9  here today.  In running that program, we partner with the state

10  hospital and with what they call court services, which is run

11  not out of the hospital, but out of the Office of Behavioral

12  Health for the State of Colorado.  And essentially court

13  services, if you will, is the system that distributes all

14  competency, insanity, mental condition, all state, district,

15  state-ordered mental health evaluations.

16        And through that court services who we partner with,

17  those cases are assigned to my fellow psychologists around the

18  state and employees of the state hospital.  So all the

19  competency evaluations, all these issues of restoration, issues

20  of criminal responsibility I have been very intimately involved

21  with.  As a consultant to the state hospital, I cochair what

22  you would call a quality assurance committee that meets

23  monthly.  And essentially what we do is look at quality issues

24  about the quality of competency assessment, competency

25  evaluation, sanity evaluation, et cetera.  So we supervise the

Richard Peter Martinez - Direct

1    whole pool of psychologists and psychiatrists that create those

2    products for the state of Colorado and I am -- I cochair that.

3    Q.  Can you describe your work in forensic consulting?

4    A.  Well, it's a mix.  I mean, one thing that I left out that I

5    think is very important and relevant to my being here today is

6    one of the areas I consult is the Department of Corrections at

7    the San Carlos Prison down in Pueblo.  The San Carlos Prison --

8    as you know, Department of Corrections has close to, I think,

9    16 or 18 prisons.  One of those prisons, San Carlos, is

10   strictly for mental health patients, and really I would say the

11   most serious of mental health patients are at San Carlos.

12          San Carlos is also the place where what we call the

13   *Harper* hearings that we have been talking about over the last

14   two days occur.  And the bed capacity at San Carlos is about

15   225.  I estimate at any one time up to 40 or 50 people are on

16   involuntary medications at San Carlos.  And I once a month

17   chair the *Harper* hearing, and I have been doing that for over

18   10 years, so essentially in that consulting role I am

19   essentially assisting the Department of Corrections in

20   determining who should be on involuntary medications within the

21   prison system under a *Harper* hearing and who should not.  So

22   that's I think an important part of my consultant role for the

23   purposes of testifying here, obviously, and the discussion

24   going on.  Other consulting --

25   Q.  Before you move on, I just want to make sure that you have

Richard Peter Martinez - Direct

1    an opportunity briefly to describe what a *Harper* hearing is.

2    A.   Well, I think it's been testified to --

3    Q.   It has.

4    A.   -- so I don't want to get it too repetitive, but *Harper*

5    hearings, as Your Honor knows, a Supreme Court decision that

6    essentially created a structure in which internally prisons

7    with post-adjudicated individuals who were sentenced to prison

8    where there could be a due process panel that reviews petitions

9    for involuntary medication and then that panel, according to

10   the Supreme Court, would be providing the proper due process to

11   then give, if you will, give permission to those petitions for

12   involuntary medication within the prison system.

13   Q.   Now moving on to your work in forensic consulting, can you

14   describe some of your work in that field?

15   A.   Well, you know, my -- just to describe kind of sort of like

16   Dr. Morton was saying, no day is exactly the same or no

17   afternoon or morning because of such a variety of things I am

18   engaged in, but obviously the core of what I do is an educator,

19   so I run a fellowship in education program.  So a good half of

20   my time is teaching, giving lectures, preparing lectures.  I

21   speak nationally when I go to the national meeting and that's

22   on different topics, so I would say I am heavily steeped in

23   educational projects and educational programs.

24        And then in the other time, you know, which maybe is

25   about 40 percent of my time, I do do forensic expert work,

439

Richard Peter Martinez - Direct

1   consulting, and that can be a range of criminal, civil

2   activity.  With my background in ethics, I do a lot of

3   consulting to medical boards and even the Bar sometimes in

4   terms of issues of professional misconduct with professionals

5   to medical boards dealing with different kind of complainants

6   asking me to evaluate or consult.  And then, of course, in the

7   civil area and in the criminal area, I still continue to do

8   criminal evaluations myself in addition to supervise my

9   trainees.

10          But I tend to, you know, I have kind of subspecialize

11  in a number of areas.  I have stuck with an interest in the

12  criminal justice system and in those kinds of evaluations

13  dealing with sanity, with competency, et cetera.  So I would

14  say that's a heavy load that I continue to work in, but also do

15  occasional civil work.  And a lot of the work is consulting,

16  not necessarily testifying.  I don't have a long, you know,

17  hundred testimonies a year type practice at all.  It's much

18  more consulting with people.

19  Q.  Have you consulted with both the defense and the

20  government?

21  A.  I have over the years, yes.

22  Q.  And have you also been retained to be a specific expert for

23  the Court?

24  A.  I have.  I mean, sometimes even at the state level you can

25  be obviously hired by one side or the other, but most of the

440

Richard Peter Martinez - Direct

1    competency and sanity work in Colorado really is, quote, court

2    ordered through that court service system through the Office of

3    Behavioral Health.  So I have been very involved in that over

4    the years.  I also have been asked here in the federal court to

5    be a court-appointed evaluator in some cases, a handful of

6    cases, not a lot.  And I also have also been an expert in a

7    couple of federal cases here.

8            And let's see, what else?  Subspecialty areas, I do a

9    lot of -- for good or bad, I have been identified as an expert

10   regionally and nationally as well as locally as -- I do a lot

11   work infanticide and neonaticide cases.  I get more than I care

12   to sometimes because they are very tragic cases, but I do feel

13   like I can be helpful in those cases because of my expertise,

14   so I do a lot of that, and then complicated and even high

15   profile cases sometimes.  I have worked with Dan King on a

16   number of, if you will, high profile shootings and murders in

17   the state of Colorado.  I will leave it at that.

18   Q.  Do you ever do what's considered a second look

19   consultation, a second opinion consultation?

20   A.  Yeah, sure.

21   Q.  Can you talk about your work doing that?

22   A.  Well, it's a mix.  I mean, I may get a call from a judge

23   occasionally that needs a second opinion on something.  There

24   is, you know, there is disagreements about either the quality

25   or the conclusion or the opinion, whether it be on a sanity

Richard Peter Martinez - Direct

1    case or a competency case.  And then, of course, I do consult

2    with the State Public Defender's Office.  Again when they have

3    complicated cases, sometimes I have been a consultant.  And

4    then, of course, occasionally private attorneys will call me

5    and say could you take a look at this.  I need some

6    consultation before I make decisions about whether I am going

7    to plead NGRI or I am not sure I have a client here who may

8    need a competency evaluation, so I do get called in sometimes

9    early in cases.

10          In terms of second opinions relevant again to me being

11   here today, I have had a handful of cases where individuals

12   have been found incompetent for a period of time, ultimately

13   treated at the state hospital, then found competent with the

14   diagnosis of delusional disorder.  And I have been asked to

15   come in and kind of reassess things because of, which maybe we

16   will talk, about how complicated this syndrome, this condition

17   is and frankly how difficult sometimes it is to label someone

18   competent or incompetent in that context sometimes, so I have

19   done some consulting in that area.

20   Q.  When you have consulted in that area specifically for

21   second-look opinions about whether someone who has delusional

22   disorder has been rendered competent and whether that's the

23   right call, what was your opinion in those cases?

24   A.  Well, the two cases I am doing right now, so I don't have

25   an opinion yet.  I mean, they are active and ongoing.  And I

1    can't say there is a trend.  I mean, you come in, you evaluate.

2    And you go back to the attorney and say, you know, I think the

3    state hospital got it right here.  Here is the reasons even

4    though I can understand your hesitancy or there have been

5    certainly cases that I have said, you know, it's up to you.  I

6    am more than willing to go testify and tell you where I think

7    it might not be as clear cut as it's been presented, and I am

8    willing to testify and say that in court and let the judge, of

9    course, reassess the issue of competency.  These are frankly

10   very complicated cases from a mental health perspective,

11   especially when we're dealing with delusions.

12   Q.  So based on your experience that you have just described, I

13   am assuming that you are familiar with the *Dusky* case?

14   A.  Yes.

15   Q.  And you are familiar with the *Sell* case?

16   A.  Yes.

17   Q.  And the criteria in each of those cases?

18   A.  Yes.

19   Q.  Have you in your experience working on the *Harper* hearings,

20   you have had to make the decision about whether to forcibly

21   medicate someone or recommend to forcibly medicate, right?

22   A.  Well, it's a panel.  The *Harper* decision led to prisons

23   around the country obviously to set up these *Harper* hearings.

24   That's a whole another historical discussion about the

25   demographic shift of mentally ill people into our prisons and

443

Richard Peter Martinez - Direct

1    jails, but yeah, there is a necessity to set these panels up.

2    So there are three people on the panel.  The psychiatrist is

3    the, if you will, the chair of the panel.  And then by mandate

4    there has to be a psychologist, and then there has to be a

5    third mental health professional on that panel.

6          So I don't make the decision solely.  There is a

7    discussion and process amongst three health professionals

8    examining the evidence, examining the presentation, and then

9    determining whether under the *Harper* criteria is it a problem

10   decision to go ahead and grant the petition to the physician

11   requesting those involuntary medications.

12   *Q.*  So you talked a little bit about how your forensic work has

13   intersected with people who have delusional disorder.

14   *A.*  Yes.

15   *Q.*  Is there anything else you want to say about your

16   experience dealing with people diagnosed with delusional

17   disorder in your forensic work that we haven't covered yet

18   generally?

19   *A.*  Do you have something specific in mind?

20   *Q.*  I don't.

21   *A.*  Let me give thought to that.  I mean, well, I think I have

22   covered the *Harper* hearings.  Well, I guess the other thing is

23   because I am involved in the supervising a fellowship program,

24   I literally supervise, you know, over a hundred cases a year

25   independent of my own direct expert work.  So I am literally

Richard Peter Martinez - Direct

1    looking at, you know, with my fellows, I literally look at over

2    a hundred competency evaluations a year and then another 25

3    sanity or mental condition evaluations.

4         That's a very exacting kind of supervision because

5    you're editing.  You are looking at the reasoning.  You are

6    looking at, frankly, the quality of the work.  And you are

7    training a new generation of young forensic psychiatrists to

8    want to do high standard work.  We run into delusional

9    disorders, obviously, during the evaluation process.  It's a

10   very, very low number that come across this kind of supervisory

11   activity, but it does come up.

12        And then in addition, we have a process in play that

13   if someone is deemed incompetent by one of our fellows, the

14   opinion is rendered, the Court adjudicates a finding of IPC or

15   incompetent to proceed, we often try to make sure that at the

16   three-month mark when there is a reevaluation, the fellows do

17   the reevaluation across the year of their fellowship.  So if

18   you are following me, we get to see a little continuity about

19   how treatment is going at the state hospital or in another

20   location.

21        So I do have impressions, if you will, about on a

22   clinical -- in a clinical sense about restoration treatment,

23   the process of restoration, who seems to get restored, who

24   doesn't, as well as there is a rich, rich literature on this

25   about restoration issues and about the demographics of people

Richard Peter Martinez - Direct

1    who are more likely to be restored versus less likely to be

2    restored.

3    Q.  Okay.  In your clinical practice, did you also come across

4    people who were dealing with delusional disorder?

5    A.  It's very rare.  I mean, when I ran the psych emergency

6    room, we would very rarely see someone who would fit that

7    diagnostic criteria.  In a psych emergency room, frankly, you

8    are going to see obviously people that are in crisis who are

9    acutely psychotic.  Often substances are going to be involved

10   or there may be chronically mentally ill people who have

11   stopped their medication and have gotten in crisis.  You are

12   really seeing people at a time of urgency or of crisis.

13          Normally people with delusional -- as we have talked

14   throughout in the last day and a half, I am sure everybody here

15   has learned a lot about delusional disorder -- but tends to be

16   under the radar.  People with this condition because of the

17   reasons discussed, people often are functional in many, many

18   ways outside of the, if you will, core delusion.  And also

19   intrinsic to the condition is a sort of lack of recognition

20   that there is a problem or issue, so folks are not going out of

21   their way to go see a mental health person.  So in answer to

22   your question, very, very few people I would say we have seen,

23   but they have come through the emergency room when I was

24   directing that.

25   Q.  And what about your experience in chairing the *Harper*

446
Richard Peter Martinez - Direct

1    hearings?  Did you come across people who had been diagnosed

2    with delusional disorder in that setting?

3    A.  Yes.  And I have monitored this informally, not in a formal

4    study, but again it fits with kind of some of the discussion

5    that's gone on here the last number days.  It's a low number.

6    It's a low percentage of people.  I have been in *Harper*

7    hearings, I am giving an estimate, of at least 10 years.  I

8    maybe see 40 cases a year, once a month, so I have seen close

9    to 400 individuals through the *Harper* hearings.  And I would

10   estimate that we're looking at somewhere around the 5 percent

11   area that, quote, officially come in and the treating physician

12   at the prison has diagnosed them as delusional disorder.

13        *MS. BECK:*  Mr. Cohen, will you please pull up Defense

14   Exhibit No. 1?

15   *BY MS. BECK:*

16   *Q.*  Dr. Martinez, can you look at your screen and tell me if

17   you recognize that document?

18   *A.*  Yes, I do.

19   *Q.*  What that?

20   *A.*  That's my CV.

21        *MS. BECK:*  Your Honor, at this time I would move for

22   the admission of Defense Exhibit 1.

23        *THE COURT:*  Response?

24        *MS. RHYNE:*  No objection.

25        *THE COURT:*  Defense Exhibit 1 for identification

Richard Peter Martinez - Direct

1    admitted in evidence.

2         *MS. BECK:*  Thank you, Your Honor.

3    *BY MS. BECK:*

4    *Q.*  Dr. Martinez, let's now turn to your work on Mr. Dear's

5    case.  Can you tell us how you first became involved on

6    Mr. Dear's state case?

7    *A.*  Yes.  So because I had worked previously with Dan King in

8    some death penalty work and some previous cases, he called me

9    when this incident happened in November of 2015 shortly after

10   literally within a week, and he asked if I would come in and

11   meet Mr. Dear at the jail.  And this seems to become more

12   frequent as part of my career path is getting requested to come

13   in early, frankly, to sort of observe, examine and, frankly,

14   consult with the defense team early on about helping them

15   understand what kind of potential mental health issues or

16   mental health problems a particular defendant is reflecting in

17   those early observations.

18   *Q.*  And I just want to stop you before we move forward.  Dan

19   King was one of the attorneys who represents Mr. Dear in his

20   state case, correct?

21   *A.*  Yes, I am sorry.  I am assuming that that's been fleshed

22   out here, but it hasn't.  Yeah.  And Dan King also was the head

23   of the -- I forgot what they called it, the death penalty

24   defense unit before Colorado abolished the death penalty

25   several years ago.

Richard Peter Martinez - Direct

1    *Q.*  So he asked you to come in and meet with Mr. Dear at the

2    jail.

3    *A.*  Yes.

4    *Q.*  And then how did you become involved in his federal case

5    here?  Why are you here today?

6    *A.*  Well, can I follow up?  So I did go meet Mr. Dear in

7    December literally maybe a week or a little more after the

8    shooting and spent some time with him and then consulted with

9    the defense team at that point.  And then I went back and saw

10   him a second time in February.  And then at that point I guess

11   the history is that the defense team obviously solicited the

12   state hospital to do a competency assessment, and the rest of

13   the story I think has been in the record.  He has been sitting

14   there.

15          So when he was -- so this case for me kind of went

16   away in terms of any activity on my part after the spring of

17   2016, I guess.  And then I got a call from -- I guess I had

18   read in the paper or heard somewhere that things had changed

19   and he was now in the federal system rather than the state

20   system.  And then I guess your office contacted me I want to

21   estimate maybe December last year.

22   *Q.*  And why did we contact you?  What have we asked you to do?

23   *A.*  Well, you first just talked a little bit about the history

24   of how I had been involved earlier with Mr. Dear.  And then

25   essentially you said that there -- as I recall, there may be

449

    1   ways in which I could continue to be a consultant to you in

    2   terms of -- and to the Federal Public Defender's Office because

    3   you didn't know -- I don't remember exactly, you weren't sure

    4   at that point whether he was going to be found competent or

    5   incompetent or maybe that was already after the point he had

    6   been found incompetent now that I think about it.

    7   Q.  Did we ask you to take a look at a proposed treatment plan

    8   from the Bureau of Prisons?

    9   A.  Later on, yes, that's correct.

   10   Q.  And you did that.

   11   A.  Yes.

   12        THE COURT:  Counsel, again I excuse the interruption,

   13   but I owe my court reporter an overdue recess and this is a

   14   good time for us to call it a day for day two.

   15        Doctor, it's my understanding you are available

   16   tomorrow at or about 8:45 a.m.?

   17        THE WITNESS:  Yes, Your Honor.  I can make that, yes.

   18        THE COURT:  Can you and will you return to continue

   19   your testimony?

   20        THE WITNESS:  Very much so.

   21        THE COURT:  Thank you.  You are excused until then and

   22   can stand down.

   23        THE WITNESS:  Thank you.

   24        THE COURT:  You are welcome.

   25        So my plan is that we'll reconvene tomorrow at

1   8:45 a.m. continuing the testimony of Dr. Martinez.  I don't

2   know whether the government will seek leave of the Court to

3   present any rebuttal evidence.

4           *MS. RHYNE:*  We don't expect to, Your Honor.

5           *THE COURT:*  So we are looking at 8:45 to roughly

6   9:45 a.m.  Ms. Beck has a professional engagement at

7   10:00 o'clock a.m.  I have moved my 11:00 o'clock hearing to

8   10:00 o'clock, so if all goes well, we will be able to resume

9   at or about 11:00 o'clock a.m.  In the afternoon to the extent

10  that is required, I have a hearing at 2:30 p.m., so we will

11  have from 1:00 until 2:30 p.m.

12          I don't know how long this will take, I am talking

13  about the testimony of Dr. Martinez, but I intend to argue this

14  and complete this hearing sometime tomorrow, and I ask counsel

15  that you be prepared accordingly.  For now I am planning oral

16  closing arguments, although I always retain and reserve the

17  discretion to require written closing arguments.  Counsel, if

18  you have conferred and have a preference, I am interested in

19  your position or recommendation, if any.

20          *MS. RHYNE:*  The government prefers oral argument, Your

21  Honor.

22          *THE COURT:*  So it's over.

23          The defense?

24          *MS. BECK:*  We don't object to that procedure, Your

25  Honor.

451

1          *THE COURT:*  Very well.  Thank you.

2          Very well.  Before I conclude, of course, it is

3    ordered that this hearing is continued until tomorrow at

4    8:45 a.m. mountain daylight time, at which time Mr. Dear shall

5    appear before the Court without further notice or order of the

6    Court provided further that to the extent necessary the United

7    States Marshal for the District of Colorado shall assist the

8    Court in securing the appearance of Mr. Dear tomorrow at

9    8:45 a.m.  Until then, we are in recess.

10          Madam clerk.

11      (Recess at 4:50 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    Item                                                    Page

3    WITNESSES

4       Matthew Richard Holland

5             Direct Examination By Ms. White          236

6             Cross-examination By Ms. Stricklin       274

7             Redirect Examination By Ms. White        286

8       George W. Woods, Jr.

9             Direct Examination By Ms. Beck           291

10            Cross-examination By Ms. White           342

11            Redirect Examination By Ms. Beck         371

12      William Alexander Morton, Jr.

13            Direct Examination By Ms. Stricklin      374

14            Cross-examination By Ms. White           406

15      Richard Peter Martinez

16            Direct Examination By Ms. Beck           429

17                            EXHIBITS

18   Exhibit       Offered  Received  Refused  Reserved  Withdrawn

19   Defense 1              447

20   Defense 2              381

21   Defense 3              299

22   Defense 4              312

23   Government's 7         243

24   Government's 9         362

25

1                           REPORTER'S CERTIFICATE

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.  Dated

4    at Denver, Colorado, this 25th day of November, 2022.

5

6

7                                S/Janet M. Coppock

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25