1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 19-CR-00506-PAB
3

UNITED STATES OF AMERICA,
4

     Plaintiff,
5

vs.
6

ROBERT LEWIS DEAR, JR.,
7

     Defendant.
8   _____

9                   REPORTER'S TRANSCRIPT
                    *Sell* Hearing, Volume 3
10  _____

11        Proceedings before the HONORABLE PHILIP A. BRIMMER,

12  Judge, United States District Court for the District of

13  Colorado, commencing at 8:45 a.m., on the 1st day of September,

14  2022, in Courtroom A1001, United States Courthouse, Denver,

15  Colorado.

16

17

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A257, Denver, Colorado, 80294, (303) 335-2106

Richard Peter Martinez - Direct

1              APPEARANCES

2         Pegeen Rhyne, U.S. Attorney's Office,

3    1801 California Street, Suite 1600, Denver, CO 80202;

4         Maura White, U.S. Department of Justice,

5    950 Pennsylvania Avenue, N.W., Washington, DC 20530, appearing

6    for the Plaintiff.

7         Natalie Stricklin and Jennifer Beck, Office of the

8    Federal Public Defender, 633 17th Street, Suite 1000, Denver,

9    CO 80202, appearing for the defendant.

10

11              PROCEEDINGS

12         THE COURT:  If our witness is available to resume his

13   testimony.

14         Doctor, good morning.  If you will come forward and

15   resume your seat in the witness stand.  Thank you.  And Doctor,

16   I simply remind and admonish you that of course you continue to

17   testify during this hearing under oath.  And do you understand

18   that?

19         THE WITNESS:  I do, yes.

20     (**Richard Peter Martinez** was previously sworn.)

21         THE COURT:  Ms. Beck.

22         MS. BECK:  Thank you, Your Honor.

23              **DIRECT EXAMINATION CONTINUED**

24   BY MS. BECK:

25   Q.  Good morning, Dr. Martinez.  How are you?

Richard Peter Martinez - Direct

1  A.  Good morning, Ms. Beck.  Hi.

2  Q.  So yesterday we kind of stopped at the point where you

3  became involved in the case.  You had testified, just to orient

4  us all, to the fact that you were engaged initially by the

5  state team in order to meet with Mr. Dear at the very beginning

6  of the case, right?

7  A.  Yes.

8  Q.  And then after you met with Mr. Dear a couple of times,

9  your work on the case stopped for a period of time, right?

10  A.  Yes.

11  Q.  And then we contacted you to review Dr. Sarrazin's

12  treatment plan.

13  A.  Yes.

14  Q.  Okay.  So I want to go back in time, then, to when you

15  initially met Mr. Dear.  Can you please tell us about what

16  those meetings with Mr. Dear were like and what your

17  impressions of Mr. Dear were back in 2015 and 2016.

18  A.  Yes.  So the first time I saw Mr. Dear, of course, was I

19  think within weeks of the incident, the shooting in Colorado

20  Springs.  When I first saw him, he did meet with me, I can't

21  remember now how long, but we were able to talk a little bit

22  about his background to some degree and get a little bit of

23  background information.  He was also, as I recall certainly

24  during those weeks, he was having some pretty significant

25  behavioral concerns.  I believe, as I recall, he was drinking

Richard Peter Martinez - Direct

1    perhaps his own urine.  He was pretty disorganized for a period

2    of time.

3          So there were extensive video recordings within the

4    jail that I reviewed at that time that frankly, if you will,

5    documented his level of disorganization and his level of, if

6    you will, erratic behavior at that time.  So I would say that

7    in the early phases of talking with him in December, he was --

8    not only was he obviously psychotic, but he was also -- there

9    was some question of whether he also may have had some

10   superimposed delirium at that point.  So that was the first

11   meeting.

12         And then a period of a couple of months or six to

13   eight weeks maybe or more went by.  Obviously, I met with the

14   defense team to discuss those observations.  And then I went

15   back in and saw him again in February of 2016.  And again, he

16   was -- he spent some time with me, I can't remember again total

17   minutes or whatever, but we were able to get a little more

18   background information, the fact that he had been married

19   several times, the fact that he had four sons, and just trying

20   to obtain some background historical information from him.

21         My purpose at that point was clearly to try to build

22   some rapport with Mr. Dear and see if ultimately I would be

23   able to get more information and further evaluate him.

24   Q.  Were you able to build that rapport or did his delusions

25   complicate matters for you?

Richard Peter Martinez - Direct

1   A.  No.  He ultimately pretty quickly into our relationship,

2   like with every other evaluator, he became opposed to talking

3   to me further and engaging me.

4   Q.  Okay.  During your meetings with him, whether it was the

5   first or the second meeting, did he go into his delusional

6   thought system with you?  Did he discuss those things with you?

7   A.  Yeah.  I mean, there was some discussion about the FBI,

8   about the FBI following him.  We did talk a little bit about

9   the incident in Colorado Springs and that the FBI had been

10  following him.  So some of the testimony you have already heard

11  in terms of background was certainly things that he, if you

12  will, the things he shared with me are consistent with what

13  you've heard in the court here in the last two and a half days

14  about the FBI, about Obama, about biblical quotes.  I am trying

15  to think what else.  Obviously, awareness that he had gone to a

16  Planned Parenthood for a very clear purpose according to him in

17  terms of saving babies.  I think we have heard that expression

18  over and over again.

19  Q.  Aside from meeting with him, you mentioned that there was

20  audio and video-recorded footage.  Did you review that footage?

21  A.  Yes, I did.

22  Q.  And in addition to that footage in preparation for your

23  testimony specifically today, did you review all of the

24  competency evaluations that were prepared by the doctors at the

25  Colorado Mental Institute at Pueblo?

Richard Peter Martinez - Direct

1    A.  Yes.  Obviously, those happened after my encounters with

2    him, but yes, I have reviewed those.

3    Q.  Additionally, in preparation for your testified today, did

4    you prepare Dr. Sarrazin's proposed treatment plan?

5    A.  I did review that, yes.

6    Q.  And did you also review Dr. Preston Baecht's competency

7    evaluations?

8    A.  Yes, I did.

9    Q.  Now, generally speaking, I want to talk to you about your

10   opinion in this case.  Do you have an opinion about whether

11   Dr. Sarrazin's treatment plan would be substantially likely to

12   render Mr. Dear competent to proceed?

13   A.  Yes, I do.

14   Q.  And, first of all, do you agree with the diagnosis of

15   delusional disorder for Mr. Dear based on your review of

16   materials and what you have heard in court over the course of

17   the last couple of days?

18   A.  Yes, I do.

19   Q.  Can you give us a bit of background on how delusional

20   disorder -- how we've got into this concept of delusional

21   disorder within the scheme of psychiatry?

22   A.  Okay.  So I think like anything else, it always helps to

23   start a little with history.  A gentleman named Kraepelin, who

24   was considered sort of the founder of modern psychiatry,

25   diagnostic psychiatry, really was the first to identify in the

460

Richard Peter Martinez - Direct

1    late 1800s three main categories of what we call today

2    psychotic illnesses.  And he was the first to really create a

3    taxonomy, if you will, of those three buckets or labels to put

4    on individuals that he observed.

5         And keep in mind, this was in the late 1800s.  There

6    were no psychopharmacologic interventions.  There weren't many

7    treatments.  So psychiatrists in that day had people in

8    institutions and they did a lot of just observing.  And they

9    also had the advantage of observing people longitudinally

10   because these people were institutionalized for years and

11   years.  So they were able to not only observe acute symptoms,

12   if you will, but they were also able to observe people

13   longitudinally over many, many years.  So they were able to, if

14   you will, create theories about the longitudinal or historical

15   aspect of some of these conditions.

16        And the three main buckets everybody here is probably

17   familiar with is now called bipolar illness or affective

18   disorders, was called manic depression.  The second category

19   was what Kraepelin labeled dementia praecox, which ultimately

20   another psychiatrist, Bleuler, relabeled as schizophrenia.  And

21   then the third were paranoid disorders.  So Kraepelin very

22   early on, if you will, watching sort of the natural progression

23   of these illnesses, he thought these were three distinct

24   illnesses in some way.

25        We move forward and that was kind of the accepted

Richard Peter Martinez - Direct

1    nosology or taxonomy at the time.  Of course, we didn't have

2    any of the treatments that ultimately came into play in the

3    1950s with the first use of an antipsychotic medication.

4            But in the mid 1900s going into the 1970s, the

5    diagnosis of schizophrenia became probably overutilized and a

6    lot of people got thrown into the bucket, so if you will,

7    American psychiatry at that point tended to, in terms of

8    psychotic disorders, and this is not absolute, but tended to

9    use two buckets.  Either you are schizophrenic or you had what

10   we now call a mood disorder, manic depression.

11           It's important because those two conditions are very

12   distinct in terms of natural history and the way symptoms are

13   manifest, and even our treatments are very different today.

14   Then in the 1970s individuals in psychiatry started paying

15   attention to this condition called -- what was called paranoid

16   disorder again.  And increasingly, American psychiatry began --

17   psychiatrists began to really begin to revisit Kraepelin's

18   original diagnostic labels and understanding.  And if you will,

19   there was a growing interest in delusional disorder indeed as a

20   separate entity from schizophrenia.  And so the DSM, the

21   Diagnostics Statistical Manual in its evolutions in the

22   eighties incorporated this third bucket, paranoid disorder, but

23   they called it delusional disorder, which is what we have

24   retained up until the recent revolution of the DSM with DSM-V

25   and now DSM-V TR.

Richard Peter Martinez - Direct

1    Q.   So on Tuesday you were here for Dr. Preston Baecht's

2    testimony, right?

3    A.   Yes.

4    Q.   There was a discussion with her about the distinction

5    between bizarre and non-bizarre delusions.  Do you recall that

6    part of her testimony?

7    A.   Yes.

8    Q.   What are your thoughts about the relevance of non-bizarre

9    versus bizarre delusions in Mr. Dear in terms of his diagnosis?

10   A.   Well, first historically again this distinction of

11   bizarre/non-bizarre for a while was held as one of the

12   differentiating factors between whether someone may be

13   schizophrenic versus whether one should be placed in the bucket

14   of delusional disorder.  And let me just -- can I just say

15   this?  Remember, these are not disease diagnoses.  These are

16   syndromal diagnoses.  We don't have the precision in psychiatry

17   to say schizophrenia is caused by this particular genetic

18   abnormality, et cetera, et cetera, et cetera, in the way that

19   we can make definitive diagnosis, obviously, with infectious

20   diseases, viral infections and others.

21   Q.   Before we move on, why is that distinction about it not

22   being a disease and it being more of a syndromal condition

23   important to you?

24   A.   Well, because it ultimately ties into this debate about

25   psychotropic medications and the use of psychotropic

463
Richard Peter Martinez - Direct

1   medications.  Sometimes there is, especially in the public and

2   even within the specialty of psychiatry, there is an

3   overplaying of the idea that these are precision interventions

4   with these psychotropics.  It's not.  It's a very crude

5   instrument, so to speak.  It's a very crude intervention.

6       It does not have the precision of an antibiotic where

7   you culture an infection and you identify the pathogen, and you

8   have science behind you that says this particular group of

9   antibiotics are going to be most effective with that particular

10  pathogen.  So it's really important to dispel this idea that

11  when we are talking about psychotropics, we are talking about a

12  crude instrument.  We are not talking about a precise

13  instrument in the way we are with other medical and surgical is

14  interventions in medicine.

15      So that's one of the reasons it's important, because

16  it has relevance to the discussion we're having here about the

17  issue of whether these psychotropics are going to be of benefit

18  or not.

19  Q.  Right.  And I interrupted you when I was asking you about

20  the non-bizarre versus bizarre delusions and how that helps us

21  understand generally delusional disorder versus schizophrenia

22  and where Mr. Dear may fall.

23  A.  Yeah.  So bizarre/non-bizarre for a while was held as a

24  distinction between, if you will, there was the notion that

25  people with delusional disorders had, quote, non-bizarre

Richard Peter Martinez - Direct

1    delusions and people with schizophrenia had, quote, bizarre

2    delusions.  The problem is what do you define as

3    bizarre/non-bizarre has broken down, especially in modern

4    society.  I mean, you just have to listen to the radio or the

5    debates going on in this country and the issue of what's a

6    bizarre belief system and what's a non-bizarre belief system

7    has eroded.

8          Now, there are extreme examples, no question.  I think

9    Dr. Preston Baecht gave a very good example about someone who

10   believes aliens have taken their organs out and removed their

11   organs and yet there is no scars or evidence.  We would all

12   agree that's a fairly bizarre extreme kind of delusion.  And

13   there is obviously plenty of evidence to show to that person

14   this couldn't have happened.  I mean, you have no scars, et

15   cetera.  So those are sometimes used as examples of very

16   extreme, quote, bizarre.

17         And as we have already talked in court here,

18   non-bizarre, quote, are things that theoretically could happen

19   in real life.  The FBI could be following you.  You get into

20   the religious realm, it really gets complicated, right?  If

21   people believe that God is directing them, who is to make the

22   judgment if that's bizarre or non-bizarre?  That's a tough

23   question.  So the distinction between bizarre and non-bizarre

24   has broken down.  So I don't think, if you will, the most

25   progressively thinking psychiatrist in making these diagnoses

Richard Peter Martinez - Direct

1    would no longer put a lot of weight on the bizarre versus

2    non-bizarre distinction.

3         In terms of Mr. Dear you asked, I think the vast

4    majority of his belief system as he has articulated it

5    certainly fits in what used to be called non-bizarre in the

6    sense he talks about the FBI is a very much central part of his

7    belief system of explaining his motives and his actions over

8    many, many years, including what happened in 2015.

9         And, you know, who's to say the issue of quoting a

10   biblical scripture, I mean, we have a lot of people in our

11   society who are literalists or fundamentalists in terms of how

12   they look at biblical scripture.  So how do we make a judgment

13   of bizarre/non-bizarre?  For some its faith.  So it gets very

14   complicated.  And Mr. Dear, though, I think one can confidently

15   say most of his, quote, delusional material or his belief

16   system fits more the historical description of non-bizarre, and

17   then we get into some discussion or debate are some of his

18   ideas bizarre.  You know, I personally in my own experience

19   don't get too lost in that distinction.

20   Q.  Okay.

21   A.  I can tell you people who are truly schizophrenic, and you

22   follow them over many, many years, they are a lot more

23   disorganized in their belief systems.  They are a lot more

24   rambling and jumping from one topic.  And frankly there is no

25   coherence many times in their belief systems.  It's truly a

Richard Peter Martinez - Direct

1   disorganized delusion, meaning that there is many parts and

2   pieces.  And, if you will, for the rational or logical mind who

3   is observing this, it's really hard to make sense of it;

4   whereas with Mr. Dear I think there are elements of his

5   delusional thought as he has expressed it over these years that

6   we can all make some sense of what he was -- what he at least

7   is claiming.

8   Q.  Okay.  Now I want to talk a bit about what's involved

9   generally in treating delusional disorder from a clinical

10  perspective.  So can you talk about that?

11  A.  Well, there has been a lot of discussion here and, frankly,

12  I think a bit of a polarization about whether it's all meds or

13  it's all psychotherapy.  And, you know, the reality is that

14  there is no treatment that doesn't involve understanding and

15  appreciating the centrality of the patient/doctor relationship

16  is the foundation upon which any treatment intervention has to

17  build.

18          I don't need to go into a long discussion about the

19  ethics of that relationship, but the issue of building trust,

20  of building an alliance with patients.  Patients have to

21  believe in you.  There are studies that show that depending on

22  the attitude or approach of a patient toward the treater, that

23  may impact outcome, obviously, not just in psychiatry, but in

24  medicine in general.

25          So the way I begin to think about treatment of

Richard Peter Martinez - Direct

1    delusional disorder is first to, if you will, cradle it in the

2    patient/doctor relationship as the beginning step, as

3    foundation.  Think of it as building a wall or structure or a

4    house.  The foundation bricks are important.  And those

5    foundational bricks start with the relationship.

6           Even some of us in this room may have had surgical

7    procedures.  I don't know about you, I have had a few, and I

8    want to trust the guy who is going to operate even if he only

9    comes and spends 20 minutes with me preoperatively and I am in

10   his office two months earlier.  I mean, that relationship is

11   important to building some confidence that what you're telling

12   me you're going to do to me is going to make a beneficial -- is

13   going to have a benefit for me.

14   Q.  Does that have a particular significance, the

15   doctor/patient trust building piece have a particular

16   importance in the context of somebody who has delusional

17   disorder?

18   A.  Well, absolutely.  So back to the polarization of whether

19   it's meds or therapy.  I mean, to me it's a combination of

20   both, and it's one of the reasons that involuntary treatment

21   raises in my mind some particular concerns in Mr. Dear's case

22   and in many of these kinds of cases.

23          But let me go back to the issue specifically.  I think

24   the literature and data and experience tells us that the most

25   effective -- first of all, delusional disorders as a group are

Richard Peter Martinez - Direct

1    not terribly amenable to treatment.  And we've discussed some

2    of the data that talks about those that have had symptoms for

3    many, many, many years who have never been treated or more

4    refractory.  They are less likely to respond to any treatment.

5            But in the cases where there has been interventions,

6    there is no question that psychotropics may make a difference,

7    but it's also shown that the way to treat delusional disorder

8    is not confrontational.  It's not going to the patient and

9    saying let me attack your delusions and belief system from the

10   get-go.  Let me tell you why you are not perceiving reality

11   correct.

12           It's joining with that patient and being curious and

13   interested in that belief system, hearing it out, forming an

14   alliance.  And this is not going to happen over two weeks or

15   three weeks.  This sometimes literally can take years working

16   with people with these kinds of symptoms.  So you build trust

17   and alliance.  You then may suggest that, you know, let me tell

18   you a little bit about the kinds of medications that might be

19   helpful with this, might help you function a little better or

20   more effectively.  So, if you will, it's an ongoing dialogue, a

21   conversation over many, many months, years even that some

22   people do, if you will.

23           The delusional thoughts and belief systems may quiet.

24   They may not go away or get eradicated completely, but they may

25   quiet.  It may allow a person to be more inter-relationally and

Richard Peter Martinez - Direct

1    socially engaged and ultimately help a person improve.

2           There is no question historically and clinically that

3    there is a subgroup of individuals who are just going to live

4    with their delusions the rest of their lives.  They are going

5    to learn to, you know, be a little more socially appropriate

6    and not try to force their beliefs on you, and they are going

7    to find ways to maintain their belief system, but they learn

8    enough about social cues not to create situations where they

9    come to the attention of medical people or, for that matter,

10   the criminal justice system.

11          And you have heard a lot of testimony about the

12   prevalence of delusional disorder.  These are guesses.  But,

13   you know, the position that -- the reason we don't see a lot of

14   people with this diagnosis is because they do stay below the

15   radar.  Not to stereotype, it's probably some of the homeless

16   people we see around in the community.  Certainly we see people

17   show up in medical clinics with delusional disorders where

18   their delusions are not causing criminal problems or even so

19   severe or behaviorally concerning that they end up at the

20   mental health system, but they certainly come in and maybe get

21   some medical treatment from the local family doc at Denver

22   Health in one of the outlying clinics.  We see these people in

23   these clinics, but they don't necessarily rise to the level

24   that they get referred for mental health treatment.

25   Q.  And you mentioned that if you're looking at treating

Richard Peter Martinez - Direct

1   someone with delusional disorder in a clinical setting, it's a

2   combination of psychotherapy and antipsychotic medication.

3   What is it about the antipsychotic medication that -- what is

4   the aim of the antipsychotic medication specifically?

5   A.  Well, again, I want to emphasize that psychotropic

6   medications is a crude instrument.  We don't have the precision

7   or understanding of it.  There is a whole dopamine excess

8   hypothesis about psychotic symptoms.  I think you have heard a

9   little about that here in testimony.

10      Current research certainly suggests the dopamine

11  excess hypothesis, if you will, has legitimacy.  So our best

12  estimate at this point is that these medications in certain

13  areas of the brain where, if you will, dopamine is implicated,

14  that these medications interfere with those receptors in some

15  way.  They bring some balance, and therefore there is some

16  amelioration of these psychotic symptoms.

17      But we really can't tell you -- localize this in the

18  sense that certain types of auditory hallucinations can be

19  localized here.  Delusional thinking can be localized here.  I

20  think anyone that studies neuropsychiatry and the brain/mind

21  realities as we are learning more about the connection between

22  brain and mind, this is never going to be localized.  It's a

23  complex circuitry we're dealing with.  The brain is a very

24  complex thing that is -- different parts of it are interacting,

25  circuitry, et cetera.  So back to the question of

471

Richard Peter Martinez - Direct

1   psychotropics.  So what psychotropics are doing at that level

2   is implicating the dopamine system is the understanding.

3        When you look symptomatically, what are you doing with

4   these medications?  So the first thing you're doing is are you

5   quieting, are you calming the agitated psychotic person?  These

6   medications are very effective in calming people.  I ran an ER

7   for four years.  I can't tell you how many times I had to

8   inject Haldol and inject antipsychotics in people to calm them

9   because they are so agitated, and we much rather have a calm

10  person who is not screaming, yelling, threatening to harm

11  people, so calming a person is the first step that the

12  psychotropics intervene on.

13       So the second level is -- so that would be like

14  behavioral control.  The second level is how in delusional

15  disorder, how preoccupied is the person with the delusions.  In

16  other words, how much are those belief systems just constantly

17  on their mind, constantly consuming their attention and their

18  consciousness.  And there is studies to show that that second

19  level, maybe psychotropics have some impact in decreasing the

20  individual's, if you will, preoccupation with the belief system

21  itself so they have less need to tell you all about it and to

22  force it upon you.

23       The third level is how does it impact the degree to

24  which the individual has a conviction about the belief system.

25  This is where we got in the discussion does it eradicate or

472

Richard Peter Martinez - Direct

1   does it soften the delusion.  Of course, we have been talking

2   about it in rather non-detailed ways.  You know, delusions

3   either go away or they are softened so that person can be made

4   competent.

5        I like to look at it more from the perspective of

6   since rationality is the core issue in determining competency,

7   how does it change the person's attachment to the belief system

8   even if their behavior has improved, even if their

9   preoccupation with it is less, but is it impacting the belief

10  system at a core.  And it seems from what I've read and

11  experienced that that part is not so impacted by psychotropic

12  medications.

13       So there are many people who on the surface can look

14  like they've made these dramatic changes because they are more

15  cooperative, they are calmer, they have less need to hammer you

16  with the belief system, but when you actually probe and begin

17  to talk to them, you actually see the belief system is still

18  there and it's still active and it's still impacting

19  rationality.

20       And then the fourth level, to finish this, is the

21  issue of how amenable is someone to begin considering

22  alternative views.  So as you have a dialogue with them and you

23  say, look, the FBI is not following you.  It has not been

24  following you.  How amenable -- how do these medications impact

25  the person's ability to begin to entertain alternative views of

Richard Peter Martinez - Direct

1    the universe and of themselves.  And that rarely happens in

2    delusional disorder.  It just -- you don't see it.

3            You don't see people going from 30 years of having a

4    belief system like this to suddenly one day after you give them

5    psychotropic medications saying you're right, that FBI was

6    never following me.  I mean, you just don't see that kind of

7    shift in change in people that have been tenaciously identified

8    with this belief system.  It's core to their identity.  It's

9    core to the way they perceive reality and the world about them,

10   and it just -- it just doesn't go away.

11   Q.  Now, I want to focus now on the testimony that we heard

12   from Dr. Preston Baecht and Dr. Sarrazin about their decision

13   to rely on a couple of articles in making a treatment decision

14   for Mr. Dear.  Do you recall that part of their testimony?

15   A.  Yes, sure.

16   Q.  So they were talking about the Herbel and Stelmach study

17   and the Cochrane study as being -- and I think it was

18   Dr. Sarrazin who said that's the highest quality evidence that

19   they have to decide what to do in Mr. Dear's case.  What are

20   your thoughts about that?

21   A.  Well, I mean, I'm all for case studies to help.  As I said,

22   psychotropics is a cruel -- I mean it's a crude instrument.

23   The fact is psychiatry doesn't have the precision

24   diagnostically or treatment-wise as some of my colleagues in

25   other subspecialties.  So I think anything that contributes to

Richard Peter Martinez - Direct

1    our understanding and helps guide our decision making is

2    helpful, so I welcome those articles into the literature.  So

3    that's No. 1.

4          You have already heard the criticisms of case studies

5    in terms of is that a high or low level of evidence in terms of

6    guiding clinical decision making.  It's a low level.  I won't

7    go into the details of that, but, I mean, I think that's been

8    well discussed here in the last two and a half days.

9    Q.  So just so I am clear on your opinion about their reliance

10   on that literature, you think it's important for them to

11   consider it, but that if you were making treatment decisions

12   about Mr. Dear, you wouldn't put a lot of weight in those

13   studies as guiding you?

14   A.  Well, if I were treating someone with a delusional disorder

15   on a voluntary basis and I could participate in an informed

16   consent process in which we discuss benefits and risk, and the

17   patient was fully informed of what those risks and benefits

18   might be and they make a competent, voluntary decision to

19   participate, that's one thing.  So certainly I would bring this

20   data to someone I am treating in a -- for a delusional disorder

21   outside of a criminal justice system, outside of a situation

22   like this.

23         In other words, if I thought that those articles at

24   least show that there is some potential benefit from a

25   psychotropic medication, I would share that with the patient.

Richard Peter Martinez - Direct

1    I would educate them about it, but I want them to participate

2    in a, quote, voluntary informed consent process.  But to do --

3    but to use that as evidence to justify the kind of intrusion

4    that goes on with involuntary treatment is what my concern is.

5    In other words, I think there has been an overvaluation of

6    those two articles and the results of those articles to give

7    justification for this involuntary treatment, and that's very

8    concerning to me.

9    Q.  There was some discussion with Dr. Sarrazin about how the

10   four medications in his treatment plan are all -- they are not

11   FDA approved and they are off label for treating delusional

12   disorder.  Is that something that you would also consider and

13   discuss with a patient in a clinical setting?

14   A.  Absolutely.  I mean, when we -- again, let's separate it

15   from the criminal justice system.  A patient who is at Denver

16   Health Hospital who is psychotic, whether it be a delusional

17   disorder or other reason, most of my colleagues are going to

18   have a serious discussion with that person and say, listen, I

19   am recommending something that's off label, meaning the FDA

20   hasn't fully tested it and approved it, but there is a lot of

21   evidence to suggest this may help you in your particular

22   situation.  And you have a dialogue and a discussion and you

23   engage in an informed consent process get to the decision of

24   whether you are going to try something off label.

25          I think you're obligated to inform patients when

1  something is off label versus not.  But I forget who testified,

2  but clearly whoever -- maybe Dr. Sarrazin said it.  There is no

3  question that using off label in psychiatry is very, very

4  common and it's acceptable practice, so I don't mean to imply

5  that it's not an acceptable practice.  It is.

6  Q.  To turn back to the literature discussion for a minute, is

7  there anything in that literature that Dr. Preston Baecht and

8  Dr. Sarrazin are relying on that helps you make a decision

9  about antipsychotics in Mr. Dear specifically?  Are those

10 studies something that really answer the question about how we

11 treat Mr. Dear?

12 A.  I don't think so.  I mean, I don't remember all the details

13 of the articles, but, you know, things that come to mind was

14 that, you know, I think in one study there were 22 individuals

15 diagnosed with delusional disorder, and the other maybe was I

16 think 15.  Maybe I am getting my numbers wrong, but the point

17 is it's a low volume or low number of people.  There wasn't

18 really good descriptions of individual patients.

19       I think someone talked a little bit about the mixed

20 subcategory of some were persecutory.  One was grandiose.  I

21 think we talked a little bit about there is one study that came

22 out in the nineties by Dr. Munro, who was really a delusion

23 expert.  He was one of the first people to write a paper in

24 favor of using a certain antipsychotic in the subcategory of

25 people with parasitosis.  I think that was discussed, which is

477
Richard Peter Martinez - Direct

1   the somatic subtype.

2          So the point is, no, there was nothing in there that

3   tells me in any -- with any kind of precision that given many

4   of the things that were talked about here about Mr. Dear's

5   questions about his health status, questions about his age,

6   there is -- none of that gets teased out of these articles.  In

7   fact, one of the articles made it clear -- but again I don't

8   put a lot of stock in that either necessarily -- but talking a

9   little bit about the issue of the length of time that has

10  transpired before first treatment with an antipsychotic

11  medication.  That group I think it was four and one was

12  restored.

13         I mean, you know, what does that tell you?  I just

14  don't think it tells you a lot except in that one little study.

15  But if you want to make an argument, you can say, well, there

16  is an example where length of time with the psychosis before

17  treatment, actually that study showed an unfavorable outcome.

18  Again, I think these two studies need to be put into

19  perspective.  They are helpful.  To me they would be more

20  helpful in thinking about how to engage in an informed consent

21  process with a voluntary patient, not an involuntary patient.

22  Q.  I want to move to the topic of Mr. Dear's competency.  We

23  talked about his mental illness, but let's talk about how his

24  competency is impacted by his delusional thinking and his

25  delusional disorder.  Obviously, you are familiar with the

Richard Peter Martinez - Direct

1  *Dusky* standard here and you have worked in the area of

2  competency for many years.  Can you start us off by talking

3  about what competency restoration looks like.

4  A.  Well, I thought you wanted me to talk about how the

5  delusions impact his competency first.  Did you want -- I

6  thought that's what you had asked.  Sorry.

7  Q.  I am happy to ask that question.  So in your opinion based

8  on your review of the information in this case, your meetings

9  with Mr. Dear, your reviews of the competency evaluations, you

10  know, how does Mr. Dear's delusional disorder impact

11  competency?

12  A.  Okay, because I think you have got to start there before

13  you start talking about restoration.

14  Q.  Okay.

15  A.  So clearly the *Dusky* standard is pretty familiar to

16  everyone here.  It's a two-prong standard.  One is about

17  working with one's attorney.  The other is about understanding

18  legal predicament and consequences, et cetera.

19       At the heart of the *Dusky* standard is what we call the

20  rationality standard.  And, in fact, *Dusky* mentions the term

21  rationality.  There has been a lot of court cases that have

22  really tried to handle what does that mean.  But at the end of

23  the day, in my view the *Dusky* standard is a rationality

24  standard.  It is ultimately a deep assessment of an

25  individual's ability to think rationally, to make decisions

Richard Peter Martinez - Direct

1   rationally.  And that obviously impacts both those prongs.

2         If you are believing that the FBI has been following

3   you, et cetera, and you have a way of explaining your action,

4   obviously that most of us consider to be misperception,

5   distortion, delusion, that's going to impact not only the way

6   you understand the Court proceedings, especially if your

7   attorneys start getting incorporated into this belief system,

8   the judge gets incorporated into the belief system, the

9   evaluators get incorporated into the belief system as a grand

10  conspiracy of some kind or certainly a grand attempt to

11  persecute and hurt you in some fashion.  That is obviously

12  going to impact both, quote, the rational understanding of the

13  proceedings and the potential -- and the way you make decisions

14  about participating in that, and it's obviously impacting the

15  way you're working with your attorneys in a very real way, as

16  many attorneys will attest to.

17        So in Mr. Dear's case, I think I have just summarized

18  where the obstacles are and they have been, and they have been

19  consistently articulated in that way in most of these

20  competency reports and competency evaluations, including

21  Dr. Preston Baecht.

22  Q.  Can you talk about the concept of decisional competency?

23  A.  Yeah.  So one of the things that's very important when

24  you're doing competency assessments is not just seeing whether

25  someone like a parrot can communicate back to you.  Yeah, I

Richard Peter Martinez - Direct

1   know what the judge does.  I know what each side of the court

2   is in terms of the prosecutor and the defense, what the jury

3   does.  I mean, it's not a question of just parroting knowledge,

4   factual knowledge.  It's about assessing how the person's able

5   to rationally manipulate and make decisions.

6          Now, Dr. Woods raised some very interesting questions

7   about the cognitive underpinnings to delusions and to

8   perceptual distortions.  That's real.  We see this all the

9   time.  I don't want to go down that path.  It will waste time,

10  but...  So it's about assessing how the person is able to

11  process and rationally manipulate the information put in front

12  of them.  And if at the core of this is a fundamental

13  irrational position upon one's self and the view of one's self

14  and of the world around them, that is a pretty huge obstacle in

15  terms of how do you overcome that obstacle to bring that person

16  to a place where some sense of rationality is restored

17  eventually.

18  Q.  Over the course of the last two days, there were some

19  examples that were thrown out by witnesses on both sides about

20  delusions.  So there was an example about the defendant

21  believing he was the king of England.  There was an example

22  about the defendant believing that someone was pumping gas into

23  their house.  There was a discussion about a defendant who

24  believed things about his contributions to the internet.

25         And the idea that you could just quiet those delusions

Richard Peter Martinez - Direct

1    in those people so that they no longer talked about how they

2    were the king of England or their gas wasn't being pumped into

3    their house or they didn't contribute to the internet, if you

4    just didn't talk about the internet, it would be fine.  Do you

5    think there is a distinction here between Mr. Dear's delusional

6    thinking about the FBI following him, about their conspiracy

7    against him, about how all of the court officers, the Court

8    evaluators are all mixed up in that?

9            MS. RHYNE:  Objection, compound.

10           THE COURT:  It's long enough, Ms. Beck, we might

11   assign it a Zip code.

12           MS. BECK:  I was just about to get to the core of the

13   question, if I may.

14           THE COURT:  Well, I am going to sustain the objection

15   and let you get right to the question you intend to ask.

16           MS. BECK:  Thank you.

17   BY MS. BECK:

18   Q.  Do you think that Mr. Dear's delusional thinking is the

19   sort of delusional thinking that can be quieted with

20   antipsychotic medication to the point that he is going to be

21   able to talk about his criminal case without a rational

22   discussion with his attorneys about the FBI, about the Court

23   process, et cetera?

24   A.  To me that's an excellent question at its core.  So how do

25   you assess -- it's not the content per se that I am concerned

Richard Peter Martinez - Direct

1    about.  It's more the qualities, the length of time of the

2    delusion, the degree to which this belief system has become

3    central to Mr. Dear's identity.  And I think we've heard

4    testimony that it certainly starts in 1993 with the Waco event

5    where he called into a radio station.

6         It actually, I think in some of my early notes and

7    others investigating, talking to his sons, maybe one of his

8    ex-wives, he had some odd thinking earlier.  He didn't come

9    into contact with the law necessarily, but it precedes 1993.

10   So we really are talking about an individual whose sense of

11   himself, his belief system about himself, his belief system

12   about the world he inhabits has been really ruling his behavior

13   for a long, long time culminating in this tragedy in 2015.  So,

14   if you will, the length of time of the delusion and the degree

15   to which it's been so integrated into the core of who he is is

16   important.

17        There is a big difference believing the FBI is

18   following you if it's because you got high on drugs the night

19   before or you took LSD.  It's a momentary transient moment of

20   delusion.  That's going to go away.  There is a big difference

21   if you are in a first period of what we call prodromal

22   schizophrenic psychotic break at the age of 22 and you start

23   believing and having paranoid thoughts over a six-month period.

24   To intervene with psychotropics in that individual very early

25   on, the evidence is it's going to have an impact and it's going

Richard Peter Martinez - Direct

1   to make a difference.

2           But for someone who has had 30 years of thinking about

3   the world in this way, believing this, I am very skeptical that

4   we are going to make that shift.  And back to my rationality

5   point, he may get quieter.  He may get more cooperative

6   possibly, I don't know, but at the end of the day, I am very

7   skeptical that you're going to impact the core belief system.

8   And this has in my view tremendous implications in terms of his

9   ability to work with his defense team because I think there is

10  enough data in this case to certainly suggest that justice

11  would require to take a look at that mental condition in terms

12  of his defense strategy, and Mr. Dear has been adamant that he

13  doesn't have a mental illness.

14          And I don't know how you are ever going to get over

15  that barrier medications or not.  I think he is going to remain

16  with or without medications in the belief that he doesn't have

17  a mental illness.  He may look more cooperative in terms of

18  behavior, but at the core of his thinking and rationality, it's

19  my view he is going to continue to say I don't have a mental

20  illness.  You guys are forcing this stuff on me.  I don't have

21  any choice at this point.  But at his belief system level he is

22  going to continue to say I don't have a mental illness.  So

23  when the defense team goes to talk to him about defense

24  strategies, even if he were declared competent at some point,

25  you are still going to run into that obstacle of resistance and

Richard Peter Martinez - Direct

1    reluctance and even disbelief that that's the proper way to go.

2            THE DEFENDANT:  You're right.

3            THE COURT:  Excuse me.  Marshals, please remove

4    Mr. Dear to the holding cell.  Mr. Dear, you may return on a

5    credible promise that you will remain silent and conduct

6    yourself properly.

7            THE DEFENDANT:  You're breaking the Constitution.  I'm

8    not allowed to get on the stand.  That's my right.

9            THE COURT:  That's your attorney's decision, Mr. Dear.

10           (Mr. Dear was removed from the courtroom.)

11           Excuse the interruption.  You may proceed.

12           MS. BECK:  Thank you, Your Honor.

13   BY MS. BECK:

14   Q.  Dr. Martinez, let's now talk about what competency

15   restoration looks like.

16   A.  Okay.

17   Q.  If you could explain briefly what competency restoration

18   looks like and --

19           MS. STRICKLIN:  Your Honor, can I just inquire to make

20   sure that as was the case yesterday, the sound is on in lockup?

21           THE COURT:  I believe that it is.

22           COURT DEPUTY CLERK:  It is, Your Honor.  We tested it

23   with the marshals.

24           THE COURT:  A good question with the right answer at

25   least for now.  And, of course, counsel, you will have the

485

Richard Peter Martinez - Direct

 1   opportunity to confer with Mr. Dear as soon as our next recess.

 2   And if he can communicate credibly to you who can communicate

 3   credibly to me that he will restrain himself in the minimum

 4   ways that I have required, then back in the courtroom he comes.

 5            MS. STRICKLIN:  I understand.  Thank you.

 6            THE COURT:  Thank you.

 7            Counsel.

 8            MS. BECK:  Thank you.

 9            COURT DEPUTY CLERK:  Your Honor, I do understand from

10   the Marshal Service that the volume is low today, so I am going

11   to get in touch with our IT department to work with that.  He

12   can remote in and work on that.

13            THE COURT:  Well, as we have heard about relativity

14   throughout these proceedings, what does low mean?

15            COURT DEPUTY CLERK:  They have the volume turned all

16   the way up.  There is a dial in the cell block.  And it's

17   turned to its maximum and still they can only barely hear the

18   Court and counsel.

19            THE COURT:  Then we need to be in recess until that's

20   rectified.  I am sorry.

21            COURT DEPUTY CLERK:  Okay.  In that case remembering

22   that defense co-counsel has another obligation, we should have

23   plenty of time to fix that before we resume again on the

24   record.

25            THE COURT:  Well, I want it fixed immediately.

Richard Peter Martinez - Direct

1          COURT DEPUTY CLERK:  Yes, Your Honor.  I am not sure

2    that in the next 15 minutes, which is about the time we have,

3    that's going to happen unfortunately.

4          THE COURT:  You are right.  I am looking at the clock.

5    It looks like we are going to be in recess of necessity until

6    roughly 11:00 a.m.

7          Doctor, how does that impact your professional

8    schedule?

9          THE WITNESS:  I made arrangements I could stay until

10   12:00 today.  I am hoping to finish between 11:00 and 12:00.

11         THE COURT:  That's a function of counsel's

12   examination, but they are hearing you.

13         Very well.  Of necessity we are in recess until

14   11:00 o'clock a.m. or as soon thereafter as counsel and the

15   Court can be available.  And until then, Doctor, you are

16   excused and may stand down.

17         THE WITNESS:  Thank you.

18         THE COURT:  Madam clerk.

19      (Recess at 9:35 a.m. until 11:02 a.m.)

20         THE COURT:  Very well.  Counsel for Mr. Dear, I see he

21   is in the courtroom lacking the approbation of the Court.  Thus

22   I inquire, do you have credible assurance that he will conduct

23   himself properly throughout the balance of this hearing?

24         MS. STRICKLIN:  Your Honor, I think the answer to that

25   question is a bit conditional.  For Mr. Dear's sake, I spoke to

Richard Peter Martinez - Direct

1    him in lockup during the Court's recess.  It appears that one

2    of his issues is that he doesn't believe that his thoughts are

3    going to be put on the record.  So to make a record, Mr. Dear's

4    issue is that he believes it violates his constitutional rights

5    not to be given the opportunity to testify at this hearing.  I

6    think now that the record clearly includes that information,

7    Mr. Dear will refrain from repeating that in court.

8         THE COURT:  Well, based on that representation, then

9    Mr. Dear may remain in the courtroom for now.  Thank you.

10        And Ms. Beck, you may resume your examination.

11        MS. BECK:  Thank you, Your Honor.

12        THE COURT:  You're welcome.

13   BY MS. BECK:

14   Q.  Dr. Martinez, when we last left off, I was starting to ask

15   you about what the process of competency restoration looks

16   like.  Can you tell us a bit about that?

17   A.  Well, in general terms competency restoration usually is

18   particularized to a particular individual who has been found

19   incompetent to proceed obviously.  So let me speak to the

20   differences obviously.  If someone is found incompetent based

21   on a developmental or intellectual disability, obviously the

22   interventions may be different than someone who is deemed

23   incompetent to proceed based on predominantly psychotic

24   symptoms and has a bona fide documented psychotic illness.

25        In general, since the majority of individuals who are

Richard Peter Martinez - Direct

1    found incompetent to proceed fit that latter category, usually

2    it's a combination of what we would call an educational

3    intervention, meaning familiarity, learning about the legal

4    system.  Both, for example, at the state hospital in Pueblo

5    there is an extensive educational program where individuals are

6    requested to participate, learn about the law, learn about

7    identifying the criminal procedure, et cetera, so there is an

8    educational component.

9          And then, of course, there is going to be a

10   psychiatric intervention and that will involve medications in

11   many of those cases obviously to treat whether it be certain

12   kinds -- specific psychotic symptoms whether it be

13   hallucinations or delusions or other symptoms of mental

14   illness.

15         And then thirdly there is a psychotherapeutic

16   component that usually also is attached to restoration, and

17   again that can be individualized to some degree.  So for

18   example, the state hospital in Pueblo, there is -- it's not

19   just there, but there is a sensitivity to the issue of how

20   trauma histories impact people, even people with psychotic

21   illnesses.  So, for example, they may be placed in a group or

22   even individual contact around issues of how developmental

23   and -- developmental issues of trauma may be impacting them in

24   some fashion, to give an example, or let's say someone has

25   depression accompanying their symptoms, that would be a

Richard Peter Martinez - Direct

1    targeted treatment in some fashion.  So in general, think of it

2    as a three-prong approach to restoration in general.

3    Q.  And you reviewed Dr. Sarrazin's proposed treatment plan in

4    this case.  And your opinion is that it will not

5    substantially -- it's not substantially likely that it would

6    restore Mr. Dear to competency, right?

7    A.  That's correct.

8    Q.  Now, you sat in throughout the hearing in this case for the

9    last couple of days and you listened to what Dr. Preston Baecht

10   and Dr. Sarrazin said about what the treatment process might

11   look like and what potential side effects might occur and how

12   those might manifest themselves in Mr. Dear or not.  What is

13   your overall impression about that testimony regarding how that

14   plan would be implemented and its effectiveness?

15   A.  That's a pretty broad question, but let me tackle it and

16   maybe you can guide me into some specifics.  But my overarching

17   view is that it is -- it's heavily focused, obviously, on

18   medication intervention, in other words, a psychopharmacologic

19   piece of restoration.  I have a lot of familiarity with these

20   systems, whether it be in the federal system or in forensic

21   systems like the Colorado Mental Health Institute.

22        Increasingly, the reliance on psychotropic medication

23   as the primary intervention has become part of the culture in

24   these institutions and in these places for restoration and

25   treatment.  So there's heavy, heavy emphasis on that particular

Richard Peter Martinez - Direct

1    intervention, so that's No. 1.  I call it an overreliance on

2    the medical model.  And I think I have already spoke because I

3    don't want to be repetitive about my concerns about

4    psychotropics being a blunt instrument and the idea that this

5    medical model, just as it has deficiencies in the general

6    treatment of mentally ill people, it has deficiency in the

7    world of restoration as well.  So that's No. 1 concern.

8    Q.  Do you have specific concerns about Mr. Dear and the

9    treatment plan?  Like are there specific things about Mr. Dear

10   that complicate the question of whether his delusional disorder

11   can be ameliorated with the four antipsychotic medications in

12   the plan?

13   A.  Well, I think I have already spoke to this a little bit,

14   but let me elaborate a little bit.  For a number of reasons in

15   Mr. Dear's particular situation and case, I have concerns about

16   whether the claim that these psychotropic medications are going

17   to, quote, restore him to competency and the claims being made

18   about their impact on his delusional disorder, his delusional

19   system, his belief system, I think have articulated a little

20   bit of that concern already.

21          And then the issue of evidence that while there are

22   some scattered reports that demonstrate that psychotropics may

23   restore some people with this diagnosis of delusional disorder,

24   there are problems with some of those studies.  They are very

25   limited it.  There is also studies preceding those studies, of

Richard Peter Martinez - Direct

1course, which helped feed the perception that delusional

2disorder is extremely difficult to treat prior to those studies

3which showed much lower rates of impact of psychotropics on

4delusional systems and on these kinds of belief systems.

5     And then there are particularities to Mr. Dear's --

6the nature of his delusions.  I think I already mentioned how

7long his belief system has been really dominating his world

8view, his view of himself, et cetera, and I have already given

9the example.  But to repeat, there is a big difference between

10giving these medications to a young 22-year-old who is first

11hearing voices and first having paranoid delusions who might

12have schizophrenia.

13     There is obviously a lot more evidence that that

14individual may be responsive to these medications in a positive

15way, but someone who has been with this delusional system, this

16belief system, this circumscribed psychotic process for at

17least 30 years is much less likely to respond to those

18medications in the ways that I described earlier in terms of

19describing the different areas of the delusional thinking that

20you're thinking about impacting in some way.  So that's a

21concern.

22     There is obviously concern, I mean, it's been

23discussed at length issues of and controversies about his

24health condition, about his age, about the issue of his heart

25condition, about, if you will, basically the side effect

492
Richard Peter Martinez - Direct

1    concerns that have been really I think discussed at length and

2    thoroughly in the courtroom in the last two and a half days.

3    That's a concern especially since one of the *Sell* criterias is

4    the issue of side effect impacts.

5              I don't know, have I answered the question?  I guess I

6    have.

7    *Q.*  I will ask another.

8    *A.*  Sure.

9    *Q.*  So do you think that the plan as proposed by Dr. Sarrazin

10   considers less harsh avenues of restoring Mr. Dear to

11   competency?

12   *A.*  Well, I think I spoke to that too, you know, before the

13   break that it's not just psychotropic medication.  I mean,

14   there is this relationship building component that I have

15   talked about a little bit.

16   *Q.*  And my question is specifically does Dr. Sarrazin's plan

17   provide those other alternatives?

18   *A.*  It doesn't really discuss those details.  I mean, it really

19   is focused on the medication intervention almost solely.  And,

20   you know -- well, I will leave it at that.

21   *Q.*  Do you have an opinion about whether it would be more

22   likely or less likely that Mr. Dear would be subjected to the

23   use-of-force team that Dr. Sarrazin discussed?

24        *MS. RHYNE:*  Objection.  Calls for speculation and

25   relevance.

Richard Peter Martinez - Direct

1          *MS. BECK:*  Your Honor, Dr. Martinez has significant

2     experience in dealing with -- I mean, he testified yesterday

3     about his experience in being present when someone forcibly

4     medicated a patient.  He testified about his experience in the

5     *Harper* hearing context.

6          *THE COURT:*  It's relevant.  The question really is, is

7     Mr. Dear likely to go gently into that good night.

8          *MS. BECK:*  Exactly.

9          *THE COURT:*  And that is a relevant question.  The

10    objection is overruled.  The colloquy may continue.

11         Doctor, you may answer counsel's last question if

12    after all of this you recall it and then can.

13    *A.*  I think it's an important question.  And it is -- we don't

14    know what's going to happen with Mr. Dear.  That is true.  I

15    can tell you that one way of conceptualizing, Mr. Dear has been

16    someone who has been very vociferous and clear that he does not

17    want these medications, that he does not have a mental illness.

18    He sees a lot of activity around him as part of the

19    conspiratorial process.

20         In my view, there is a chance -- I can't predict it

21    because we can't predict the future -- but there is a chance

22    that he might not go quietly into that good night.  He may

23    decide that protesting, refusing this medication.  He may

24    insist that you want to medicate me?  Okay, you're going to do

25    it the hard way.  And that is you are going to have to hold me

Richard Peter Martinez - Direct

1   down.  You are going to have to restrain me.  You are going to

2   have to use your force to get this medication into my body.

3   That is a real possibility.

4        I've seen it when I ran the emergency room.  We had to

5   do those -- we called them take-downs.  We didn't call them use

6   of force.  We have learned to be more delicate about the

7   language, but we used to call them take-downs because it

8   literally would involve surrounding the individual with six

9   strong people including security and literally premeditating

10  which limb each person was going to grab and how you are going

11  to get that person on a gurney and restrained in order to get

12  this medication.

13       Now, in due respect to Dr. Sarrazin, he made it sound

14  like, oh, it's just a matter of tying his little hands down and

15  we'll inject him.  It's just not that simple.  Once a person

16  especially with a psychotic disorder decides to protest and is

17  agitated, it takes a major use of force to inject people

18  involuntarily like this.  Now, it is true we don't know what's

19  going to happen.  He may have another kind of approach to it

20  and say, judge ordered it.  I am just going to go along and who

21  knows.

22       But the portrayal of the use of force in such a kind

23  way is really a distortion.  It's a very, very -- it can be a

24  very what I call a violent process.  And I can just share with

25  the Court when I was a resident, it was one of the hardest

Richard Peter Martinez - Direct

1    things to adjust to as a young resident because I came into

2    medicine to benefit, to do good, to relieve suffering, and the

3    first time I had to participate in a, quote, take-down in the

4    psych emergency room, it was really a discombobulating and

5    emotionally upsetting experience because it took me a while to

6    reconcile how am I doing this kind of thing to the person I am

7    supposed to be helping.

8           Now, I have come to reconciliation in that over time.

9    In situations where the judgment and the measurement that the

10   benefit outweighs the risk, that the benefit outweighs the

11   harm, it is a justified intervention in selected cases, but I

12   do want to clarify it can get violent.

13   *BY MS. BECK:*

14   *Q.*  And you just talked about how you have come to understand

15   that there can be a justification when the benefit outweighs

16   the harm.  Can you speak to whether you think there would be a

17   benefit in medicating Mr. Dear with these four medications in

18   Dr. Sarrazin's treatment plan?

19   *A.*  Well, this gets complicated because we are in the context

20   of involuntary treatment versus voluntary treatment obviously.

21   And if you look at the evolution of how we've come to

22   involuntary medication with mentally ill patients, it's been

23   through the Courts.

24          The initial justification for involuntary medications,

25   of course, at all state levels in part based on some Supreme

Richard Peter Martinez - Direct

1    Court decisions was a dangerousness standard which we all are

2    familiar with.  And those were in situations in which acute

3    dangerousness to the individual or to others are this thing we

4    have come to call grave disability which also has dangers to

5    the patient involved in grave disability has been the

6    justification.

7         And then at the federal level, of course, dealing with

8    prisons the *Harper* decision came along, which, of course, it

9    did two things.  It both changed some of the criteria.  The big

10   difference between civil commitment, involuntary commitment,

11   and the *Harper* is in civil involuntary medication,

12   incompetency, meaning the person is ruled to be or deemed to be

13   incompetent, is also a condition of that involuntary

14   medication.

15        You can have psychotic individuals, though, who can

16   still make medical decisions, and those individuals can refuse

17   medication in a psychiatric hospital when we're not under the

18   circumstances like this.  What the *Harper* hearing did is it

19   exempted competency to make medical decisions, so basically

20   it's totally a dangerousness standard and specifically it's

21   defined included danger to the integrity or the safety of the

22   institution has been the justification.

23        Now we have *Sell* come along that essentially enters

24   this world of competency restoration and the State's interest

25   obviously in proceeding with the prosecution.  So in one sense

Richard Peter Martinez - Direct

1  *Sell* has enlarged the use of involuntary medication, but in my

2  view *Sell* is there just as *Harper* is there to ultimately

3  protect the defendant.  In other words, there is a reason there

4  is Court oversight.  It's to protect still these fundamental

5  rights that's been a long tradition of not forcing involuntary

6  treatments or forcing medical interventions on people who don't

7  want them.  So one way of looking at *Sell* in my view is not

8  just as it gives a pathway to prosecute people.

9         I think the intention of it and the real reading of it

10 is it also set up criteria at a clear and convincing evidence

11 standard that basically said the Court is still going to be

12 paying real close attention to, if you will, the constitutional

13 rights of the person that the government or the State is

14 requesting involuntary treatment.

15 *Q.*  So Dr. Preston Baecht and Dr. Sarrazin both testified that

16 treating Mr. Dear with antipsychotic medication would improve

17 his quality of life and lessen his distress.  Do you agree with

18 that?

19 *A.*  I really don't.  And here is the reason.  Obviously, on the

20 dangerousness standard, to me that seems like a justified

21 intervention.  I mean, someone is either going to do harm to

22 themselves, maybe harm someone else.  Maybe they are not

23 drinking or eating.  They are going to starve themselves.  They

24 are going to create unnecessary medical risk to themselves.

25 That's a justification.

Richard Peter Martinez - Direct

1           There are people with the kinds of psychotic symptoms

2   that clearly are very distressing to them, someone who is

3   hearing a voice that's rattling off, kill yourself, kill

4   yourself, kill yourself or you're no good, you're no good.  In

5   other words, it's communicating messages that's agitating,

6   that's creating duress and discomfort is one kind of psychotic

7   symptom.

8           Some kinds of psychotic symptoms are either neutral or

9   even soothing for people.  There is no question about that.

10  There is some -- I continue to work and see people with

11  schizophrenia who even on medication continue to hear an

12  occasional voice, but that voice is saying something comforting

13  or soothing like, good work, good work, good work.  So in other

14  words, you have to assess the nature of the psychotic symptom

15  in terms of making this judgment about whether is this, quote,

16  going to relieve discomfort or suffering.

17          Now, in Mr. Dear's case it seems to me his delusions

18  are not agitating him in the way that I just described.  He

19  seems that he is okay with these delusions.  And, in fact, he

20  is fighting back and saying don't take them away from me.  He

21  is very resistant and reluctant to even let go of these in some

22  way.  He is not acting up on the unit.  He is not hitting

23  people or doing things to, if you will, that endanger him in

24  some fashion.

25          Sounds like he isolates a lot.  He goes into his room.

Richard Peter Martinez - Direct

 1   He occasionally has a little conversation with people here and

 2   there, at least in recent times.  I know there is a couple

 3   incidents at the state hospital, but my point is the nature of

 4   his psychotic symptoms don't seem to be troubling him, creating

 5   duress and discomfort in the way some other kinds of psychotic

 6   symptoms.  So the notion that I am relieving suffering or I am

 7   helping Mr. Dear is really one that -- it's ambiguous.

 8           The medical model, of course, says these are just bad

 9   symptoms they have, so let's take them away.  But there are a

10   lot of people who walk in the world with psychotic symptoms

11   that manage to function especially in the delusional area where

12   our judgment is outside people looking at them, of course, say

13   well, they could have a better life.  They could function

14   better, but that is a subjective judgment on our part.  And I

15   am not one that believes that, if you will, willfulness and the

16   concept of voluntary versus involuntary is an all or none.

17   It's on a continuum.

18   Q.  So when you are weighing an ambiguous benefit to Mr. Dear

19   with the risks of the side effects that we have been discussing

20   and the risk of what using force to forcibly medicate him might

21   look like, is it your opinion that on the whole, considering

22   everything, that you wouldn't recommend implementing

23   Dr. Sarrazin's treatment plan?

24   A.  I would not.

25           MS. BECK:  May I have a moment?

Richard Peter Martinez - Cross

1          *THE COURT:*  You may.  Thank you.

2          *MS. BECK:*  I don't have additional questions at this

3    time.  Thank you.

4          *THE COURT:*  Very well.

5          Cross-examination for the government?  Ms. Rhyne.

6          *MS. RHYNE:*  Thank you, Your Honor.

7          *THE COURT:*  You are welcome.

8                        **CROSS-EXAMINATION**

9    *BY MS. RHYNE:*

10   *Q.*  Good morning, Dr. Martinez.

11   *A.*  Hi, Ms. Rhyne.  Nice to meet you.

12   *Q.*  I know you said you didn't have a specific recollection of

13   how long you met with Mr. Dear in 2015, but what's your best

14   approximation?  Do you think it was less than an hour?

15   *A.*  It really is fuzzy, but I would estimate probably less than

16   an hour.

17   *Q.*  And what about the second meeting in 2016?

18   *A.*  In the second meeting, it was relatively, you know, even

19   less than that because it wasn't long before Mr. Dear

20   essentially said he did not want to continue to talk.

21   *Q.*  And you haven't met with him since 2016?

22   *A.*  I have not.

23   *Q.*  You agree that he has delusional disorder, correct?

24   *A.*  Yes.

25   *Q.*  You don't believe he has schizophrenia?

Richard Peter Martinez - Cross

1   A.   I do not.

2   Q.   Do you agree that negative symptoms are associated with

3   schizophrenia?

4   A.   In general, if you look at the DSM and how they talk about

5   negative and positive symptoms, if you will, the general

6   position is that negative symptoms you are going to see much

7   more in people that have schizophrenia.  But as I was talking

8   earlier, there is a whole history about how the delusional

9   disorder bucket became a, if you will, reintroduced bucket into

10  the DSM.

11  Q.   Understood.  And I am not looking for the history.  I am

12  looking for the current DSM diagnosis.  Do you agree with

13  Dr. Preston Baecht that if Mr. Dear presented with delusions

14  plus significant negative symptoms, he would receive a

15  diagnosis of schizophrenia under the current DSM?

16  A.   Well, if he had -- I think you used the word -- did you say

17  prominent or significant negative symptoms; was that correct?

18  Q.   Yes.

19  A.   Yeah, if it's significant, you have to consider the

20  alternative.  But you have to realize the DSM and descriptive

21  diagnosis, it's not a checklist that you say this check, this

22  check, this check, therefore I put him in that bucket versus

23  that bucket.  There is a lot of clinical discretion that goes

24  into this.  There is a lot of other, if you will, nuanced and

25  subtle aspects that ultimately go into making a descriptive

1    diagnosis, so I just want to dispel the idea that it's as

2    simplistic as that.

3    Q.   Sure.  Would you disagree with Dr. Preston Baecht when she

4    said she would have diagnosed him with schizophrenia if she had

5    observed significant negative symptoms?

6    A.   I think she reached the conclusion based on the DSM and

7    those kind of criteria that he fit the diagnosis of delusional

8    disorder, and I would agree with having made that choice.

9    Q.   You didn't hear my question.

10   A.   Oh.

11   Q.   Do you agree when she said she would have diagnosed him

12   with schizophrenia had she observed significant negative

13   symptoms in Mr. Dear in addition to his delusions?

14   A.   And I don't mean to be ornery.  It depends on what you mean

15   by significant.

16   Q.   What do you mean by significant?

17   A.   Well, I would think you want to see things like in the

18   classic presentation of schizophrenia, extremely flat affect,

19   not able to engage in any kind of conversation, a volition, a

20   person who won't get out of bed in the morning and won't even

21   drink their orange juice or take their food.  I mean, this is

22   the kind of people we see with significant negative symptoms.

23   They are not as simple as he isolates in his room or, if you

24   will, what I would call questionable whether you would even

25   call that a negative symptom.

Richard Peter Martinez - Cross

1      So to answer your question, if he were -- not

2    Mr. Dear, but if someone is showing those kind of significant

3    negative symptoms, you have to ask yourself the question about

4    schizophrenia versus delusional disorder.

5    Q.  And it's those types of significant negative symptoms that

6    aren't well treated by antipsychotics; is that right?

7    A.  That's correct.

8    Q.  Now, I am not sure I followed what role you play in

9    competency restoration cases.  Could you explain that to me?

10   A.  Well, I do the *Harper* hearings at the --

11   Q.  I am not focusing on your *Harper* experience, and we will

12   come to that, but your role specifically with competency

13   restoration.

14   A.  Well, that is part of my role because I have to then

15   monitor those people every six months in terms of they have to

16   be re-presented to the committee or to the panel.  And we have

17   to very diligently look at the treatment plan, what has

18   happened, what would have been the interventions if the

19   psychiatrist is coming back to the panel and saying I still

20   want to continue the involuntary medication, so there is a kind

21   of monitoring process about the restoration process in all

22   those people at the Department of Corrections.

23   Q.  So is that -- your *Harper* hearing experience, is that where

24   you have experience with the restoration process?

25   A.  No, I have extensive experience.  I do conditional and

Richard Peter Martinez - Cross

1    unconditional release risk assessments on NGRI acquittees,

2    which, of course, is a form of restoration, treatment with NGRI

3    acquitees.  I supervise.  Fellows and myself do second opinions

4    at times on people that the state hospital has deemed to have,

5    quote, undergone restoration treatment, and I am asked to

6    render a second opinion and assessment of whether that

7    restoration indeed has occurred and whether the person three

8    months later, six months later, a year later is truly now

9    competent.

10            So part of assessing competency, whether it be a

11   second opinion or following up on individuals that have been

12   adjudicated incompetent to proceed, part of what you are

13   evaluating is the question of the restoration.  And, in fact,

14   in the state of Colorado now, evaluators who are reevaluating

15   those that have been deemed incompetent to proceed actually

16   have to render opinion on the restoration question.  Has this

17   person been restored or not?  If they have not been restored,

18   what is your opinion about their restorability and what might

19   that take.  That's actually built into our statutes now in

20   Colorado, so all the fellows where I supervise these cases, we

21   have to discuss that dynamic, if you will.

22   Q.  Let me ask it this way.  Are you involved in the day-to-day

23   treatment of patients undergoing competency restoration?

24   A.  That's a better question.  No, I'm not.

25   Q.  And so you have a role on this *Harper* board, and we will

Richard Peter Martinez - Cross

1  come to that, right?

2  A.  Yes.

3  Q.  And you supervise fellows who have a role in competency

4  restoration opinions; is that right?

5  A.  Yes.

6  Q.  Okay.

7  A.  And I do some of my own evaluations in this area.

8  Q.  Okay.  When you supervise your fellows, do you meet with

9  the patients yourself or simply consult with them about their

10 opinions?

11 A.  It depends where we are in the year of training.  In the

12 first three to four months, I go to all evaluations with the

13 fellows.

14 Q.  How many of the competency restorations where you are

15 meeting with the patients have had a diagnosis of delusional

16 disorder?

17 A.  Now you're talking about combining experience with *Harper*,

18 with supervision, with my own individual?

19 Q.  Well, I appreciate that follow-up.  For the *Harper* board

20 are you meeting with patients or are you simply reviewing

21 evidence?

22 A.  We meet with patients when they show up at the review

23 board, which 75 percent of the time.

24 Q.  For a moment let's put that aside.  Focusing on your

25 non-*Harper* experience, how often is it delusional disorder?

506

Richard Peter Martinez - Cross

1    A.  Well, I would say it's extremely rare that in competency

2    assessments or in, if you will, reevaluations of competency

3    after a period of restoration.  It fits with some of the

4    statistics we have been throwing around here.  It's kind of

5    unusual.  We tend to see a lot more diagnosis of schizophrenia

6    or schizoaffective disorder.

7    Q.  I appreciate it's unusual.  I am really asking for your

8    best estimate as to the number of percentage.

9    A.  It's really hard to answer that.  I would say it's less

10   than 5 percent.

11   Q.  And what number would you assign to that?

12   A.  Well, you know, on any given year I am literally reviewing

13   over a hundred competency evaluations.

14   Q.  So five a year?

15   A.  Maybe five through the fellowship supervision.  I myself

16   because of occasionally getting called for second opinions

17   where there is a dispute about whether competency has been

18   restored, I have to say frankly this group of individuals with

19   delusional disorder seem to be a higher percentage of those

20   second opinion questions because of the complication of them.

21   Q.  Okay.  And of those second opinion questions, how many of

22   those people are being treated involuntarily?

23   A.  Well, I am trying to think whether to respond averaging out

24   over the last 10 years or the last five years or what period of

25   time?  I mean --

Richard Peter Martinez - Cross

1    Q.   10 years is great.

2    A.   Okay.  So in the last 10 years supervising -- well, let's

3    set the setting supervision of the fellows aside.  Let's talk

4    about my doing second opinions.  There are really -- you know,

5    I may get a handful a year of consulting about second opinions.

6    Some of those go to the point where I may go into the jail or

7    go and evaluate and then go back to the attorneys and say I

8    think they got it right.  I don't think we need to do more here

9    and it stops.

10          Some of those I may go and say, I see what the concern

11   is here.  Let's do a further examination of the individual.

12   And those, you know, on average maybe -- right now I am

13   involved in two cases that exactly raise this question about

14   how delusions are impacting competency in two defendants right

15   at the moment.

16   Q.   So my immediate question was how frequently are they being

17   involuntarily medicated.

18   A.   These are people who -- it's a mix.  Some may have started

19   with an involuntary petition, but it's very rare at the state

20   hospital.  It's usually on a dangerousness grounds.  They don't

21   really pursue *Sell* hearings at the state hospital very often.

22   Q.   Are you aware that Dr. DeQuardo pursued a *Sell* hearing with

23   Mr. Dear?

24   A.   I said it's rare.  Compared to the federal system, the

25   numbers we have been talking about here, it's very unusual.

Richard Peter Martinez - Cross

1   Q.   But you are aware that he did pursue that.

2   A.   Yeah.  So back to your question.  So my point is that I

3   don't think I have ever seen anyone in the state hospital

4   system, they were medicated because of a *Sell* hearing.  I have

5   seen people where they had the probate judge out of Pueblo

6   order involuntary meds based on dangerousness standards.  I

7   have seen a couple people like that.  But some of these second

8   opinions are people who ultimately took medications, frankly,

9   voluntarily and yet were still having symptoms.

10  Q.   Sure.  How many patients have you been involved with who

11  had delusional disorder who took antipsychotics?

12  A.   Again, that's -- I wish I could just simply answer that

13  question.  I am not trying to be difficult to the question.

14  It's so variable depending upon the setting in which I have

15  come into contact.  So the *Harper* hearing is a whole different

16  context for dealing with this question.  Working the emergency

17  room is a different kind of setting where I have come into this

18  situation.  So I can't put a number on it over 35 years of

19  practice.  I can tell you I saw delusional disorders as a

20  resident in the 1980s before any of these second generation

21  medications were even available, and I have seen them

22  throughout my career.

23  Q.   Doctor, this is not responsive to my question.  If you are

24  not able to put an estimate on the number, we will move on.

25  A.   Okay.  Thank you.

Richard Peter Martinez - Cross

1    *Q.* Now, let's actually talk about the *Harper* decisions. The

2    basis for the request for involuntary medication under *Harper*

3    is different than *Sell*; is that right?

4    *A.* Yes.

5    *Q.* And what standard does your committee use to decide whether

6    or not to uphold or deny requests to involuntarily medicate

7    someone under *Harper*?

8    *A.* Well, it follows the *Washington v. Harper* outline to some

9    degree. I mean, it's basically first you have to document they

10   have a mental illness or mental disease or defect or a mental

11   illness or what they might call a mental condition. So No. 1,

12   that's the first requirement.

13           And then secondly, it pretty much parallels what

14   occurs at the civil level. In other words, there is a danger

15   to self or others. And then that's evaluated or measured based

16   on a recent act, a recent verbal threat or -- well, those are

17   the main conditions in a sense, so there is a dangerousness

18   standard. And then there is a whole consideration of grave

19   disability. But it doesn't have to be a physical act toward a

20   deputy or someone. It can be also a verbal threat that

21   triggers *Harper* justification.

22   *Q.* And what evidence does your committee consider when

23   evaluating whether that standard has been met?

24   *A.* We -- the petitioning psychiatrist has to produce a very

25   lengthy report. It has to be a formal petition to the

Richard Peter Martinez - Cross

1    council -- I mean to the panel.  And in there is an extensive

2    historical documentation about the person's mental illness.

3    They essentially do a compilation of the entire historical

4    record.  When was the person first diagnosed?  What kind of

5    psychiatric history do they have before they came into the

6    Department of Corrections, the degree to which they have been

7    able to research and uncover that.

8            Then there is a whole discussion of their behavers

9    since they have been in the Department of Corrections,

10   incidences of disorganization, incidences of verbal threats,

11   those sorts of things, and then, of course, leading up to the

12   acute incident because in the vast majority of these, what

13   initially initiates the petition is what we call an emergency

14   medication.  In other words, there has been an incident that

15   the psychiatrist on an urgent emergent occasion has given a

16   medication to the individual, and the next step is to pursue

17   the petition for what we call involuntary medication.

18   Q.  And is the issue of whether or not the medications are,

19   quote, substantially likely to render a defendant competent at

20   issue in the *Harper* hearings?

21   A.  No, it's not.

22   Q.  Now, I think you testified yesterday that 5 percent of your

23   400 patients in the *Harper* proceedings have delusional

24   disorder; is that right?

25   A.  I would say that was a big guess, but yes.

Richard Peter Martinez - Cross

1   Q.  So my math says 20 patients.  Do you agree that that math

2   is correct?

3   A.  It may be a little higher, yeah.

4   Q.  And those patients, you're not directly involved with their

5   care, correct?

6   A.  No.  I don't prescribe for them or treat them, that's

7   correct.

8   Q.  Now, in the context of these *Harper* hearings, have you ever

9   agreed that a patient with delusional disorder should be

10  involuntarily medicated under the *Harper* standard?

11  A.  Yes.

12  Q.  Why?

13  A.  Because they've committed an act or a behavior of violence.

14  Q.  Why do you believe the medications are more effective in

15  that context?

16  A.  Well, because the medications, as I testified earlier, do

17  have impact on behavior, controlling behavior and agitation.

18  Q.  Okay.

19  A.  Well, the reason for approving is we are trying to get

20  agitation and, if you will, we are trying to get violence under

21  control.

22  Q.  And you believe that's effective even when it's

23  involuntarily administered.

24  A.  Absolutely.

25  Q.  But you appear to take exception to the involuntary use of

Richard Peter Martinez - Cross

1   administration -- the involuntary administration of

2   antipsychotics to render someone competent; is that right?

3   A.  As a generality or specifically in this case?

4   Q.  No, I am asking as a generality, I believe you testified

5   that you are very concerned about the involuntary use of

6   medications.

7   A.  In -- specifically in the nonviolent --

8   Q.  So the non-*Harper setting?*

9   A.  Yeah, the non-*Harper setting.*

10  Q.  Is that for all psychotic disorders or simply delusional

11  disorder?

12  A.  Well, in general if you can go the voluntarily route versus

13  the involuntary route, that's just better care.

14  Q.  Sure.

15  A.  In general.

16  Q.  Sure.

17  A.  So if you're asking me, certainly what's informing that

18  general concern is the issue of the effect of the psychotropic

19  medications specifically on the delusional system in delusional

20  disordered individuals.

21  Q.  I am not sure I understood your answer.  My question was do

22  you object to the involuntary use of these medications in a

23  non-*Harper* setting for all psychotic disorders or simply

24  delusional disorder?

25  A.  In general, I am more concerned about it in this particular

Richard Peter Martinez - Cross

1   diagnostic setting of a delusional disorder.

2   Q.  And when you say this particular diagnostic setting, do you

3   mean Mr. Dear in particular?

4   A.  No, in general people who are legitimately diagnosed with

5   delusional disorder.

6   Q.  So given that, would you ever opine in a *Sell* hearing that

7   antipsychotics were likely to render -- substantially likely to

8   render a patient with delusional disorder competent?

9   A.  It would again depend on very specifics to the individual,

10  as I have already testified.  I talked a little bit about the

11  nature of the delusion, the length of the delusion, the

12  severity of the delusion.  I mean, I certainly can imagine

13  situations where I may render an opinion that it's justified.

14  Q.  Justified or substantially likely to render someone

15  competent?

16  A.  I don't -- let me think about that before I answer because

17  it seems to me -- well, again I would have to address it to a

18  specific context and situation.

19  Q.  Okay.

20  A.  Because I don't want to be saying across the board everyone

21  with a delusional disorder should never have -- never meet the

22  *Sell* criteria.

23  Q.  And you're not saying that.

24  A.  And I don't think I am saying that.

25  Q.  Okay.  But you're not sure?

Richard Peter Martinez - Cross

1    A.  Well, it's hard to just say it theoretically without

2    thinking of specific context of a patient.

3    Q.  Okay.  Now, you said that the studies at Exhibits 5 and 6,

4    and these are the Herbel and Stelmach study and the *Sell*

5    effect, the Cochrane study, do you recall those?

6    A.  Yes.

7    Q.  You said that that provided helpful information that you

8    would use in consulting with a patient regarding the voluntary

9    use of these medications; is that right?

10   A.  Yes.

11   Q.  But you did not think it was appropriate to use these

12   studies in the context of involuntary medication; is that

13   right?

14   A.  I said I didn't think it's enough evidence to justify

15   involuntary treatment in a person with delusional disorder.

16   Q.  Does it provide appropriate evidence to be considered in

17   the context of using involuntary medication?

18   A.  I think any evidence is worthy of discussion, yes.

19   Q.  And the fact that these two studies actually focused on the

20   involuntary use of these antipsychotic medications gives them

21   more specific relevance to the involuntary use of medication,

22   correct?

23   A.  I think it's information we have to take into

24   consideration, yes.

25   Q.  But do you think that because it deals with that specific

Richard Peter Martinez - Cross

1    topic, it gives it more specific relevance?

2    *A.*  Well, I would have to go back and let me think about the

3    two studies in my mind.  I mean, in the Cochrane, and help me

4    if I am missing some of it in my memory, but it was

5    specifically looking at a population of individuals in the

6    federal prison system that through a *Sell* hearing involuntary

7    medication had been approved.  And then there was a breakdown

8    diagnostically to come to this subset of people with delusional

9    disorder.  Am I remembering that correctly I believe?

10   *Q.*  Yes.

11   *A.*  And then in the other -- those individuals, I believe that

12   was pre-*Sell*, and that was specifically looking at involuntary

13   treatment of a group of individuals again where they were able

14   to ultimately identify a small subset people with a delusional

15   disorder diagnosis.

16   *Q.*  That study actually focused entirely on people with

17   delusional disorder diagnosis.

18   *A.*  That's correct, okay.

19   *Q.*  Okay.

20   *A.*  So back to your question, if you would.  I am sorry.  I

21   just wanted to refresh my memory first.

22   *Q.*  Sure.  So given that both of those studies specifically

23   focused on the involuntary use of medications and the study of

24   their efficacy, doesn't that have specific relevance to the

25   question of involuntary medication and its efficacy?

Richard Peter Martinez - Cross

1    *A.*  Well, it does have relevance, but as we talked earlier and

2    has been testified to throughout the hearing is that there is a

3    lot of problems of whether or not we can attribute the

4    medication intervention alone as the reason for restoration to

5    competency or improvement in the symptoms.  There is so many

6    other variables that were not controlled for in those studies.

7    *Q.*  Okay.  Do you believe those two articles provide some

8    evidence that antipsychotic medications work to reduce

9    delusions even when they are administered involuntarily?

10   *A.*  I think they support what we know generally about

11   psychotropic medications, as I testified to earlier, that they

12   do have an impact on psychotic symptoms, including delusional

13   symptoms, but I think it's too broad to just talk about

14   delusional symptoms in the way that it's been discussed.  And I

15   tried to break down specific elements of the delusional

16   symptoms that you are trying to address with antipsychotics.

17   *Q.*  I do recall.

18   *A.*  Yeah.

19   *Q.*  How frequently do you prescribe antipsychotic medications?

20   *A.*  I really, since I left the emergency room, I don't

21   prescribe much in the way of antipsychotic medications.  I do

22   have a small, if you will, clinical practice that I do, but I

23   tend to be using more antidepressants.  I may occasionally use

24   an antipsychotic, but I am not treating a lot of, if you will,

25   very psychotic people at this point.

Richard Peter Martinez - Cross

1    Q.   And how long has that been the case?

2    A.   I left the emergency room maybe eight years ago or so.

3    Q.   Have you ever prescribed any of the four medications that

4    are listed in Dr. Sarrazin's treatment plan?

5    A.   I think all but the -- I don't think I have prescribed

6    Invega.  Certainly Abilify and I have prescribed Haldol a lot

7    in my past.  And I have also prescribed olanzapine.  I am just

8    remembering.  Let me reframe the answer to that because I

9    forgot.  For a while actually I did continue clinical work at a

10   dual diagnosis clinic called Independence House here in Capitol

11   Hill for many, many years until a year and a half, two years

12   ago.  And actually, now that I think about it, let me retract

13   what I said earlier.  I did prescribe a lot of antipsychotics

14   in that context up until a year and a half ago.

15        These were outpatients living in a residential

16   facility, actually came out of the Department of Corrections.

17   I am sorry I left that out of my earlier testimony, but so

18   these were dual diagnosis people.  We would see them weekly.

19   All of them were on antipsychotic medications.  So let me

20   retract what I said now that my memory comes back, and I

21   actually did do that for the eight years following leaving the

22   emergency room.

23   Q.   That's helpful.  Thank you.  Are the four medications

24   listed in the treatment plan commonly prescribed

25   antipsychotics?

518

Richard Peter Martinez - Cross

 1   A.  I think so, yes.

 2   Q.  Have you ever prescribed those medications to a patient

 3   with delusional disorder?

 4   A.  Well, yes, because now that I am thinking back to my days

 5   at Independence House, unfortunately, the contract got taken

 6   away.  The State denied this group the contract, so it's a loss

 7   to the city, by the way.  This was one of the few places they

 8   were doing great work with dual diagnosis men coming out of the

 9   Department of Corrections and helping stabilize them in

10   transition into the community.

11        To answer the question, though, we did see people with

12   delusional disorder there occasionally, in other words,

13   persistent delusions in the context of a dual diagnosis,

14   meaning they also had substance issues.  So yes, we were

15   prescribing.  It was a very, very low number, though.  I don't

16   want to give you the impression it was a large number of

17   people.  It was a low number of people.

18   Q.  Low number of people with delusional disorder?

19   A.  Yes.

20   Q.  And are these four medications generally well tolerated in

21   patients?

22   A.  Well, I think we have been through the whole --

23   Q.  I am asking you.

24   A.  Well, are they well tolerated, it depends on the individual

25   patient.  I think the patient who is experiencing a dystonic

1    reaction or is experiencing tardive dyskinesia would not say to

2    you these are well tolerated.

3    *Q.*   Understood.  So individual cases can have poor outcomes,

4    yes?

5    *A.*   Well, almost all cases of prescribing psychotropics,

6    especially antipsychotic medication, I will take issue with

7    Dr. Sarrazin's experience that I think Dr. Woods quoted a

8    figure of 60 percent of people with these disorders stop their

9    medication.  And the reason is even if they don't have the

10   overt side effects like tardive dyskinesia that develops down

11   the line or they don't have a dystonic reaction, most patients,

12   it's been my experience over 35 years, don't like the feelings

13   that the medications give them.

14        So even the people I've worked with who, if you will,

15   have come to accept they have a mental illness, who have come

16   to the point where they say, I think these medications are

17   benefiting me, the voices have gonna way, even those

18   individuals say, but my preference is I don't like the way it

19   makes me feel.  I don't like the way I am sleeping at night.  I

20   don't like the weight gain that has occurred from the

21   medication.

22        So I've rarely seen this rosy picture, and I don't

23   mean to pick on Dr. Sarrazin, but I just haven't seen that rosy

24   picture that these medications are perceived and reacted to in

25   such a favorable way even when they don't have the extreme side

Richard Peter Martinez - Cross

1  effects.

2  *Q.*  Do you agree that many of the side effects are effectively

3  managed through dosage change, change of time, the type of

4  medication?

5  *A.*  I think those are really appropriate strategies to try to

6  ameliorate side effects, yes.

7  *Q.*  And you agree that the Cochrane, the *Sell* effect, Cochrane

8  stated that most of those patients, 132 people well tolerated

9  those and had their side effects readily managed with those

10  treatments plus adjunct medications?

11  *A.*  Well, that's what Cochrane said.

12  *Q.*  You have reason to dispute that?

13  *A.*  I have been in those cultures.  Sometimes you're just not

14  asking the right questions of the patient.

15  *Q.*  Now, you've stated that delusional disorder should be

16  treated with both medication and psychotherapy, correct?

17  *A.*  Yes.

18  *Q.*  But you talked about how this hearing has had only pulled

19  out polar options, either all medicine or all psychotherapy.

20  Is that what you perceived?

21  *A.*  No.  I am just saying where the emphasis was.

22  *Q.*  So did you hear Dr. Preston Baecht say that psychotherapy

23  would be an appropriate adjunct treatment to the medications?

24  *A.*  I think I did hear her say that, and I also heard her

25  testify, if you will, her personal desire to help people, yeah.

Richard Peter Martinez - Cross

1   Q.  But she said that the delusions needed to be reduced first

2   before that psychotherapy could be effective.  Do you agree

3   with that?

4   A.  I don't think there is a singular formula.  I don't think

5   we are at the level of knowing that one size fits all.

6   Q.  Did you know from Mr. Dear's records that they attempted

7   psychotherapy for years and it was ineffective?

8   A.  They have tried to build an alliance with Mr. Dear off and

9   on over the years both at the federal hospital, as well as at

10  the state hospital.  I don't refute that they haven't made

11  those attempts.

12  Q.  And Dr. DeQuardo met with him regularly.

13  A.  And I know Dr. DeQuardo.  He is a great psychiatrist.

14  Q.  But he met with Dr. Dear regularly.

15  A.  Yeah.

16  Q.  So attempts have been made.

17  A.  Absolutely.

18  Q.  Now, focusing on the medications, you relied on an article

19  from 2016 called, A Systematic Review on the Pharmacological

20  Treatment of Delusional Disorder by Dr. Munoz-Negro and others,

21  correct?

22  A.  I don't have that list, but I will give you the benefit of

23  the doubt, yes.

24  Q.  I don't need you to give me the benefit of the doubt.

25  A.  If it's on my list, I certainly have come across it and

Richard Peter Martinez - Cross

1    read it at some point.

2    Q.  Okay.  And you relied on it because you put it on your

3    list, correct?

4    A.  Yes.

5    Q.  And in that article it states, quote, Drugs are the basis

6    of treatment for delusional disorder, namely antipsychotics,

7    correct?

8    A.  You would have to show it to me.  Since I am under oath, I

9    want to make sure that I am confirming something that I

10   actually see.  I don't have it in memory.

11          MS. RHYNE:  May I approach the courtroom deputy?

12          THE COURT:  You may.  Thank you.

13          MS. RHYNE:  For the record, I have actually handed

14   Dr. Martinez a number of articles, as I believe we will be

15   repeating this exercise.

16          THE COURT:  Thank you, madam clerk.

17   BY MS. RHYNE:

18   Q.  So I am looking at page --

19   A.  Which one?  I am sorry.

20   Q.  So the first one was a Systematic Review of the

21   Pharmacological Treatment of Delusional Disorder.

22          MS. BECK:  Your Honor, may I just have a moment to

23   grab my copies of those articles because the government hasn't

24   provided me with a copy?

25          THE COURT:  You may.  Grab quickly.

Richard Peter Martinez - Cross

 1              Ms. Beck, are you ready?

 2              *MS. BECK:*  Your Honor, I will make due.

 3              *THE COURT:*  You may proceed.

 4              *MS. RHYNE:*  Thank you.

 5   *BY MS. RHYNE:*

 6   *Q.*  On Page 684, the right-hand column near the top, the second

 7   sentence in the first full paragraph:  Drugs are the basis of

 8   treatment of delusional disorder, namely antipsychotics.  Do

 9   you see that?

10   *A.*  Yes.  Just give me a moment, sorry.  Yes, I see it.

11   *Q.*  And further down in the same column, about two-thirds of

12   the way down, it says -- excuse me.  Yes, the article notes

13   that psychiatrists are using second generation antipsychotics

14   as a first option treatment in spite of its off-label use in

15   delusional disorder, correct?

16   *A.*  I am sorry, where is that again?

17   *Q.*  Towards --

18   *A.*  On the first page?

19   *Q.*  First page.

20   *A.*  Yes.

21   *Q.*  Right side column, two-thirds of the way down, the last

22   sentence in the second full paragraph.

23   *A.*  Okay.  Yes.  And may I comment on these?

24   *Q.*  Sure.

25   *A.*  Because, first of all, the first quote, they are

Richard Peter Martinez - Cross

1   referencing at Reference 12 Dr. Munro.  And I think I testified

2   earlier, but Dr. Munro has been one of the biggest advocates

3   because of a study he did in the 1990s of treating people with

4   delusional disorder, specifically with the somatic type.  And

5   he treated -- he was one of the first people to start, if you

6   will, changing the thinking about the effectiveness of

7   psychotropic medication, quote, in delusional disorder, but he

8   was very much focusing on those with parasitosis, bug

9   infestation.  So I just want to clarify, that's where they are

10  quoting that from.

11  Q.  I see the footnote, but this article does not focus on

12  parasitosis, does it?

13  A.  No, but that particular quote where they say drugs are the

14  basis of the treatment is based on Munro's work, specifically

15  in the area of delusional disorder, subtype somatic type.

16  Q.  And you agree that the off-label use of these medications

17  for delusional disorder is an accepted and widely used

18  practice?

19  A.  Yes.

20       THE COURT:  Now, let's talk timing.  We have arrived

21  at the traditional noon hour.  Ordinarily I would recess until

22  1:00 o'clock p.m., but Doctor, I look to you.  What's your

23  availability this afternoon?

24       THE WITNESS:  Well, I will make myself available

25  because I would like to complete this, as you can understand.

Richard Peter Martinez - Cross

1  And I guess -- I don't want to put pressure on the government.

2  Are we going -- do you think we may be out of here by

3  2:00 o'clock?

4       MS. RHYNE:  I don't know.

5       THE WITNESS:  You can't commit.  Okay.

6       THE COURT:  The new target is 2:00 p.m.

7       THE WITNESS:  Yes, hopefully.

8       THE COURT:  As you have already experienced, by

9  definition, that's a moving target.

10      THE WITNESS:  Yeah, I see that, and that's been my

11  experience.

12      THE COURT:  We are going to be in recess as concerns

13  this hearing until 1:00 o'clock p.m.

14      And, of course, Doctor, you may stand down.

15      Counsel, you may be seated at your convenience.

16      Madam clerk.

17     (Recess at 12:00 p.m. until 1:03 p.m.)

18      THE COURT:  Ms. Rhyne, I suspect that you have

19  additional cross-examination.

20      MS. RHYNE:  I do.

21      THE COURT:  And you may.

22  BY MS. RHYNE:

23  Q.  Dr. Martinez, do you agree that delusions do not need to

24  resolve completely for a defendant to be restored to

25  competency?

Richard Peter Martinez - Cross

1    A.   Yes.

2    Q.   I believe you testified this morning that antipsychotics

3    can decrease someone's preoccupation with their delusional

4    belief system, yes?

5    A.   Yes.

6    Q.   But you believe that Mr. Dear is too attached to his

7    delusions to be restored to competency; is that right?

8    A.   It's one part of my concern, yes.

9    Q.   Did you hear Dr. Preston Baecht testify that the severity

10   of Mr. Dear's delusional disorder is typical among the patients

11   that she saw at the Bureau of Prisons?

12   A.   If she testified to that, yes.

13   Q.   You heard that.

14   A.   I heard that.

15   Q.   And she said that when she treated delusional disorder

16   patients with antipsychotics, she still had a 70 percent or

17   more success rate in restoring them to competency.  Did you

18   hear that?

19   A.   I don't recall it directly, but if she said that, she said

20   that.

21   Q.   How do you reconcile her success rate with your opinion

22   that someone like Mr. Dear is too attached to their delusions

23   to be restored?

24   A.   Well, I don't know what she sees.  You know, that is her

25   environment.  That's her claim she made in the court.  I'm not

Richard Peter Martinez - Cross

1   sure -- what is the question you're asking?  I can't make a

2   judgment about what Dr. Preston Baecht said in terms of her

3   shared observations.

4   Q.  Let me ask it this way.

5   A.  Yeah.

6   Q.  Do you doubt the accuracy of her opinions about those

7   defendants being restored to competency?

8   A.  Well, I think she made -- it sounds like she made a general

9   statement that she is in favor of medicating because she has

10  had experience or observational experience in her 20 years

11  there that these psychotropic medications have resulted in some

12  benefit to the patients she's worked with.  I don't refute

13  that.

14  Q.  I am asking you, do you doubt her assessment that her

15  patients have had a 70 percent or more restoration rate due to

16  antipsychotic medications when they have been diagnosed with

17  delusional disorder in a typical fashion to Mr. Dear's

18  presentation?

19  A.  Well, I can say that it's contrary to the literature and

20  the studies and the many case studies that have been gathered,

21  you know, over the years that a 70 percent rate that she made a

22  claim of is not supported in the literature in a consistent

23  fashion.

24  Q.  So do you doubt that she is credibly making that claim?

25  A.  Well, yeah, I would need to ask her more questions about,

Richard Peter Martinez - Cross

1   you know, how these individuals were diagnosed with delusional

2   disorder, how reliable those diagnoses were, I mean, there is a

3   lot of questions before I am going to make a judgment about her

4   70 percent figure.

5   Q.  Do you have the same concerns about the study results

6   produced in Exhibits 5 and 6, that you're not sure they did a

7   good job in assessing competency?

8   A.  It's not a judgment of whether they did a good job.  It's

9   just the limitations of research.  It has to do with the very

10  things we've talked about in the last two and a half days.

11  These are case studies.

12  Q.  I am not asking that.  For the people they assessed as

13  having been restored to competency, do you think they were

14  wrong as to those specific patients?

15  A.  I don't know if they were wrong or right.  I am just saying

16  there have been commentary about the flaws in doing case

17  studies in terms of lack of control about --

18  Q.  I am not asking about that.

19  A.  Well, it's --

20  Q.  It's a different question, Dr. Martinez.

21  A.  Well, then I am not understanding the question.

22  Q.  What I am hearing is that you're not prepared to take these

23  other psychiatrists at their word that they competently

24  reviewed the restoration of these patients; is that right?

25  A.  Well, now you are asking a different question.  I am not

529

Richard Peter Martinez - Cross

1    judging --

2    *Q.*   I am not.

3    *A.*   Oh, well, you want to try?

4    *Q.*   Yes.

5    *A.*   So look, the -- you are asking multiple questions.  I mean,

6    I am not making a judgment about these other clinicians and

7    their observations.  I am pointing out that there are variables

8    not controlled for that need to be taken into consideration.

9    And, for example, as you saw, there is a difference of opinion

10   of who would put a particular person in the bucket of

11   delusional disorder versus schizophrenia.  That's a legitimate

12   discussion that took place in this courtroom.

13   *Q.*   Okay.  We'll move on.

14   *A.*   Okay.

15   *Q.*   Now, do you agree that having an adequate medication trial

16   length is important to determining whether a drug has been

17   effective or not?

18   *A.*   In general, that is true about medications, and studies

19   support that notion.

20   *Q.*   And in particular, Exhibit 5, the Herbel and Stelmach study

21   noticed that 10 of those patients required a medication trial

22   of three to five months before being restored to competency,

23   correct?

24   *A.*   I think they did say that in their study.

25   *Q.*   And some of the old literature that you made reference to

Richard Peter Martinez - Cross

1    that had a poor result outcome, those had shorter medication

2    trials that were studied, correct?

3    A.  I can't make a generalization about all those articles.

4    Q.  And yet you made a generalization this morning about them.

5    A.  What did I say this morning?

6    Q.  That there was a poor prognosis in the old research.

7    A.  Yeah.  I mean, early on the perception was poor prognosis.

8    And there is a whole body -- some of the articles you just

9    handed to me, many of those studies have variable outcomes in

10   terms of whether we should be optimistic or pessimistic about

11   the responses.  But what they consistently show --

12   Q.  I am not asking about those articles yet.

13   A.  Okay.

14   Q.  So you don't recall whether the older articles had medical

15   trials that were shorter than three months.

16   A.  I can't say it across the board because I am not sure what

17   articles you are talking about, but in general the issue of

18   length of psychotropic medication is an important element in

19   the possibility of someone improving.

20   Q.  Okay.  Now I want to focus on the issue of medication

21   non-compliance.  Many of the articles that you list as having

22   relied upon cite patient non-compliance with prescribed

23   medication as one of the largest problems affecting the outcome

24   of studies to determine the efficacy of antipsychotics in

25   treating delusional disorder, correct?

Richard Peter Martinez - Cross

1   *A.*   Compliance is certainly a variable one should be concerned

2   about in terms of ultimately assessing the efficacy and the

3   benefit of those medications.

4   *Q.*   And you relied on Comparative Efficacy and Acceptability of

5   Existing Pharmacotherapies for Delusional Disorder by Mews and

6   Quante, correct?

7   *A.*   I am sorry, would you repeat that?  It was a lot.

8   *Q.*   The title of the study that you relied on is Comparative

9   Efficacy and Acceptability of Existing Pharmacotherapies for

10  Delusional Disorder, and the authors were Mews and Quante.  It

11  was published in 2013, correct?

12  *A.*   Yes, that was one of the articles.

13  *Q.*   And it says, quote:  Improving compliance may be the most

14  crucial factor in upgrading the overall prognosis of delusional

15  disorder.  Our findings support this as the patients who did

16  not improve also showed poor compliance, correct?

17  *A.*   Can you tell me exactly where you are reading from?

18  *Q.*   I am reading from Page 518, the right-hand column,

19  one-third of the way down.

20  *A.*   Read it again.  I am sorry.  Is that the Smith and Buckley

21  discussed these issues or the all patients who recovered fully

22  received different types of psychotherapy?  I am not sure where

23  you are.

24  *Q.*   I am on Page 518, right-hand column, the last sentence in

25  the first full paragraph.

Richard Peter Martinez - Cross

1    A.   Okay.

2    Q.   Improving compliance may be the most crucial factor in

3    upgrading the overall prognosis of delusional disorder.  Our

4    findings support this as the patients who did not improve also

5    showed poor compliance.

6    A.   Yes, that's a correct quote, yes.

7    Q.   And you agree that that's an issue.

8    A.   Compliance is an issue, yes.

9    Q.   And you relied on the 2006 article called Pharmacotherapy

10   of Delusional Disorders in the Context of Offending and the

11   Potential for Compulsory Treatment by Dr. Smith and Buckley,

12   correct?

13   A.   Yes.

14   Q.   And they stated:  Compliance is the main obstacle to

15   effective treatment of patients with delusional disorder,

16   correct?

17   A.   I hate to do this to you.  Can you tell me the page where

18   you are reading from?

19   Q.   Absolutely, Page 357.

20   A.   Okay.

21   Q.   Do you see that?

22   A.   And again direct me to where -- oh, yeah, there is a whole

23   section called improving treatment compliance.

24   Q.   And do you see the specific statement?

25   A.   Yes.  I agree with what you read, yes.

Richard Peter Martinez - Cross

1   Q.   And you agree that that is one of the main obstacles.

2   A.   Yes.

3   Q.   And many of the other articles that you cite cite this as a

4   primary obstacle in the treatment of delusional disorder,

5   correct?

6   A.   Well, and in terms of studying responses to the medication,

7   obviously, because if the medication is not getting into a

8   person, there is no way one can say much about whether it's

9   improving or not improving.

10  Q.   Right.  Let's look a moment at the 2006 article, Recent

11  Advances in the Treatment of Delusional Disorder by Manschreck

12  and Kahn.  On Page 118 they opined that the reason -- in the

13  cases they reviewed, clinicians possibly overlooked and did not

14  detect adherence problems, and in doing so, quote, reinforced

15  the perception that delusional disorder is difficult to treat,

16  correct?

17  A.   You correctly read that, yes.

18  Q.   And do you agree with that?

19  A.   Compliance is a problem.  I concede that and agree.

20  Q.   And do you believe that it reinforced a perception that

21  delusional disorder is difficult to treat?

22  A.   Well, we're quibbling over words.  I mean, the outcome of

23  these studies is what created doubt about the effectiveness of

24  these medications in the treatment of delusional disorder.  And

25  the issue of compliance has been noted in many of the studies

Richard Peter Martinez - Cross

1   as a problem in terms of ultimate outcome.

2   Q.  And it may result in poor outcomes because of the

3   non-compliance.

4   A.  It may lower the rates of what they measure as, quote,

5   improvement.

6   Q.  And that's not a fair assessment of the efficacy of the

7   drug because it wasn't taken consistently, right?

8   A.  That is correct, which is really one of the core problems

9   of the research at this point and where we are in understanding

10  delusional disorder.

11  Q.  And many of the articles that you cite list positive

12  outcomes in delusional disorder when treated with antipsychotic

13  medications, correct?

14  A.  All the studies show some improvement, and they vary in

15  terms of whether they are compilations of a lot of case

16  studies.  One of the articles just focuses, I think, on six

17  individuals that had delusional disorder.

18  Q.  Let me ask my next question.  The article that I think we

19  just looked at, 2006 article Recent Advances in the Treatment

20  of Delusional Disorder by Manschreck and Kahn, the author

21  stated, quote:  Delusional disorder should not be considered a

22  treatment resistant condition.  Medication can be effective if

23  the patient adheres to the treatment regimen, correct?

24  A.  Yes, they did say that.

25  Q.  And you relied on Aripiprazole for the Treatment of

Richard Peter Martinez - Cross

1   Delusional Disorders:  A Systematic Review, from 2020, correct?

2   A.  Yes.

3   Q.  And the authors stated:  Given its effectiveness, safety,

4   tolerability and the availability of long-acting injectable

5   formulation, Aripiprazole could be a viable treatment for

6   delusional disorder, correct?

7   A.  They do say that, yes.

8   Q.  And that's one of the medications on Dr. Sarrazin's list,

9   correct?

10  A.  Yes, it is, yes.

11  Q.  Your list included The Guideline for Determining

12  Restorability of Competency to Stand Trial and Recommendations

13  for Involuntary Treatment by Cochrane in 2021, correct?

14  A.  The guidelines article, yes.  Go ahead.

15  Q.  You relied on that?

16  A.  Yes.

17  Q.  And that article notes that:  Several observational studies

18  indicate that patients with delusional disorder respond

19  positively to antipsychotics and similarly to patients with

20  other psychotic disorders, correct?

21  A.  Again, can you tell me where you are reading from?

22  Q.  Page 1203.

23  A.  And whereabouts are you?

24  Q.  I am at the middle of the right-hand column.

25  A.  On Page 1203?

Richard Peter Martinez - Cross

1   *Q.*   Yes.

2   *A.*   Would you read that again?  Thank you.

3   *Q.*   Several observational studies indicate that these patients,

4   meaning delusional disorder patients, respond positively and

5   similarly to individuals with other psychotic illnesses.

6   *A.*   I am having trouble finding this, sorry.

7   *Q.*   Sure.  I will direct you.  It's the second full paragraph,

8   the paragraph that begins with the word "Unfortunately"?

9   *A.*   Oh, yeah.  Less is known about the effectiveness of

10  involuntary treatment -- okay, go ahead, yeah.

11  *Q.*   So I am looking at what I think now is the third sentence.

12  *A.*   There is little empirical data among patients with

13  delusional disorders.  And then, oh, however, several

14  observational studies indicate that these patients respond

15  positively.  Yeah, I see that.  Okay.  Thank you.

16  *Q.*   Okay.  And in the 2006 article called A Systematic Review

17  on the Pharmacological Treatment of Delusional Disorder.

18  Drs. Munoz-Negro and Cervilla stated, quote:  Antipsychotics

19  appear to be useful in the control of symptoms of delusional

20  disorder, correct?

21  *A.*   Yes.

22  *Q.*   And in Pharmacology of Delusional Disorder in the Context

23  of Offending and the Potential for Compulsory Treatment,

24  Dr. Smith and Buckley said that olanzapine is an appropriate

25  choice for the treatment of delusional disorder, correct?

Richard Peter Martinez - Cross

1    *A.*  Yes.

2    *Q.*  And they also said that aripiprazole was another

3  appropriate choice for treating delusional disorder, correct?

4    *A.*  Yes.

5    *Q.*  Now, you mentioned a couple of times your problem or

6  concerns about Exhibits 5 and 6, the Herbel and Stelmach study

7  and the Cochrane study, and your concern that it's not what we

8  call empirical data, right?  It's not a scientific study?

9    *A.*  No, it's a scientific study.  Yeah, it's --

10   *Q.*  Go ahead and describe your concern.

11   *A.*  Well, I think we talked about it earlier.  I mean, they are

12 both -- they are case studies.

13   *Q.*  And you -- let me ask it this way.  Do you prefer a study

14 that has a double blind or placebo tested control group?

15   *A.*  Well, that's kind of considered like the ideal research in

16 science and certainly in medical questions, but there is a lot

17 of problems of being able to achieve that level of research

18 when we are talking about the kinds of problems we are talking

19 about here, and I think you brought that out in testimony the

20 other day.

21   *Q.*  And do you agree that you can't do this type of study in

22 the context of involuntary medication?

23   *A.*  Yeah, there is limitations to the kind of research you can

24 do.

25   *Q.*  It would be both potentially impossible and unethical to

Richard Peter Martinez - Cross

1    even try.

2    A.  Agreed, which is more the reason the case studies have

3    value, so I am not saying they don't have value.  I hope that's

4    clear.

5    Q.  I agree.  It is clear.  Thank you.  And so along those

6    lines, are you saying that this is the -- based on the evidence

7    based principle of medicine the highest quality of evidence

8    available on this topic or are you familiar with a different

9    category of evidence that we haven't discussed?

10   A.  No.  I'm saying that we are very early in the research

11   endeavor of looking at delusional disorders.  We are very early

12   in collecting case studies.  We are very early in, if you will,

13   a group of researchers, whether it be in the Federal Bureau of

14   Prisons or whether it be private universities in Berlin or in

15   Canada, we are very early in terms of collecting data and

16   information about the kinds of questions we are dealing with

17   here right now from the question of do these medications

18   effectively resolve certain elements of the delusional disorder

19   or the delusional symptoms to the question of whether or not

20   there is enough data in the record to say absolutely we are

21   confident that at a 70 percent level we can restore people to

22   competency if you just give them medication, the issue of

23   whether it should be voluntary or involuntary, and are there

24   implications in one or the other in terms of outcomes

25   eventually.  Lots of these questions just haven't been solved

Richard Peter Martinez - Cross

1    yet is my testimony.

2    Q.  Now, if Mr. Dear were your patient, would you recommend

     that he take antipsychotic medications on a voluntary basis?

4    A.  You know, I have been giving a lot of thought to this and

5    making the distinction between clinical intervention if he were

6    my patient out of a criminal context versus within this

7    context.

8             The one thing we haven't talked enough about is the

9    issue of the use of antidepressants in individuals like

10   Mr. Dear and with delusional disorder.  There is a whole body

11   of research that supports a theory that some individuals

12   develop delusions because their premorbid state has to do with

13   depression or mood problems.  So there is actually in some of

14   the articles you have quoted here, there is actually discussion

15   about trying antidepressants in some of these people early on.

16   Q.  Did you -- I am sorry.  Did you hear Dr. Preston Baecht's

17   testimony yesterday or two days ago now that she did not

18   observe Mr. Dear to have a mood disorder?

19   A.  Well, that's a descriptive business.  I am looking at this

20   in a much more nuanced complicated way about how depression may

21   manifest in people.  And sometimes depression, low self-esteem,

22   if we would -- what we would call psychological elements of a

23   human being may manifest even in psychosis.  They may not look

24   like your stereotypic notion of what it means to be depressed.

25   You know, the person who is depressed can't get up in the

Richard Peter Martinez - Cross

1   morning, has lost appetite, may have suicide -- that's kind of

2   a classic notion of depression.

3        But let me, if I may, finish.  If you take psychotic

4   depression in the postpartum period, if you look at a woman who

5   is in a postpartum psychotic state, they, quote, don't look

6   depressed.  They look psychotic.  But the cause of the

7   psychosis has to do with the underlying postpartum depression.

8   It's the same thing with other kinds of psychosis.  And there

9   is a body of literature that supports the idea that some people

10  with delusional disorder may indeed -- depression may be a

11  component to it.  So therefore there is actually some

12  legitimate attempts to actually give antidepressants to people

13  like Mr. Dear to see what might happen, too, again on a

14  voluntarily basis.

15  Q.  Do you have any reason to believe that he would consent to

16  taking that kind of medication given his refusal of all others?

17  A.  Well, he said he would take lithium is my understanding

18  from the record and --

19  Q.  Because it is natural.  Is that your understanding?

20  A.  He said it's natural, it's a salt, but he was willing.  And

21  no one has offered it to him yet.

22  Q.  To your knowledge?

23  A.  To my knowledge, yeah.  Let me qualify that.

24  Q.  Now, you mentioned the long-treated illness as something

25  that's concerning to you.  Did you hear Dr. Preston Baecht

Richard Peter Martinez - Redirect

1   describe in her testimony that she had success in restoring

2   defendants who had lengthy duration of untreated psychosis,

3   including one of more than 40 years?

4   A.   I think I did hear her say that, yes.

5   Q.   And you agree that that is a possible outcome.  It's not --

6   the length of his delusions isn't a foregone conclusion that he

7   could not be restored.

8   A.   Correct.

9        MS. RHYNE:  May I have a moment, Your Honor?

10        THE COURT:  You may.  Thank you.

11        MS. RHYNE:  Nothing further.

12        Redirect examination, Ms. Beck?

13        MS. BECK:  Yes.  Thank you.

14                **REDIRECT EXAMINATION**

15   BY MS. BECK:

16   Q.   Dr. Martinez, if you could take a look at that 2001 article

17   by Cochrane -- or 2021 article that's titled Guidelines for

18   Determining Restorability?  Do you have that in front of you?

19   A.   Yes.

20   Q.   Would you please flip to Page 1203?

21   A.   Yes.

22   Q.   That was the page that Ms. Rhyne was discussing with you.

23   A.   Yes.

24   Q.   As a general question to start off, Ms. Rhyne asked you

25   about specific sentences that you -- I'm sorry.  Strike that.

Richard Peter Martinez - Redirect

1          Ms. Rhyne asked you about specific sentences in

2   articles that you relied on in forming your opinion, right?

3   *A.*   Yes.

4   *Q.*   Now, using this study as an example, if we start at the top

5   of the paragraph that says Unfortunately?

6   *A.*   Yes.

7   *Q.*   She asked you about a sentence midway through that said:

8   However, several observational studies indicate that these

9   patients respond positively and similarly to individuals with

10  other psychotic illnesses, right?

11  *A.*   Yes.

12  *Q.*   But what are the sentences before that say?

13  *A.*   Well, the sentence before that starts says:  Unfortunately,

14  less is known about the effectiveness of involuntary treatment

15  of defendants who suffer from other mental disorders such as

16  delusional disorder, schizoaffective disorder and unspecified

17  psychotic disorders.  For instance, the amenability of

18  delusional disorder to treatment has historically been a

19  subject of debate among experts.

20          And I might also add this article actually was

21  suggesting the kinds of questions you might want to ask in

22  evaluating someone about whether you think these medications

23  may or may not be helpful in delusional disorder.  So anyway,

24  they offered eight questions that you might ask, and those

25  questions are interesting to go through in line with Mr. Dear.

Richard Peter Martinez - Redirect

1   Q.  So as a whole, you know, what is your take-away from the

2   literature that you reviewed regarding the efficacy of

3   antipsychotic medication in restoring a defendant to

4   competency?

5   A.  Well, first of all, to put perspective on this series of

6   questions, the literature does not say that psychotropic

7   medications do not help people with psychotic symptoms clearly.

8   And specifically with delusional symptoms there is a body of

9   literature that supports the idea that there is some

10  improvement in some individuals.  We have already talked about

11  the problems of the studies, that they are not controlled.

12  Diagnosis is unclear in some of the studies.  I don't want to

13  go through the whole list again, but the point is of course

14  it's helpful in thinking about whether you are going to

15  medicate and give medication to someone with a delusional

16  disorder and those sorts of symptoms.  And the data for the

17  most part says it probably helps in some cases, helps

18  individuals.

19          How do we measure help?  What's improvement?  What's

20  moderate improvement?  What's mild improvement?  Those are all

21  untested and unresearched questions at this point.  Some of

22  these articles really were attempts to look at -- some of the

23  early studies in the nineties, I mentioned Munro, he used a

24  medication called pimozide, an antipsychotic in the nineties.

25  But his early work which actually began to change the tide in

Richard Peter Martinez - Redirect

1  terms of people thinking about this, he was mostly treating, as

2  I mentioned to Ms. Rhyne earlier, he was treating people with

3  the somatic delusional kind.  And they had some favorable

4  outcomes.

5          And then that caused the discussion about maybe we

6  should be looking at these psychotropics for delusional

7  disorder, but it was in a subgroup of people with somatic

8  disorders.  It didn't have persecutory type.  Furthermore, just

9  to show how the history of this works, pimozide was ultimately

10  determined to extend the QT interval and is now never used for

11  the treatment of delusional disorder because they weren't aware

12  of the kinds of risk that subsequently was learned, so it's not

13  a recommended treatment at this point.

14          So the point is the body of literature subsequently

15  has been dealing with lots of questions, obviously trying to

16  increase knowledge and understanding about how these

17  medications may or may not help people with delusional

18  disorder.  And I will repeat what I said earlier.  There is a

19  huge difference in using this level of scientific evidence to

20  work with a patient on a voluntary informed consent process

21  about experimenting with a treatment, because that's what

22  you're doing.  It's not uncommon with psychotropics to speak to

23  a patient and say this is off label.  We have got some good

24  results in some ways.  I want you to understand the risks, the

25  benefits, what are the potential side effects, but that is a

1      person giving a competent informed decision to participate.

2            This data is basically saying we're just not at the

3      level that we should be forcing this kind of medication on

4      people because we really -- we don't really have an

5      appreciation of how effective it is, how it might have an

6      impact on someone who has a 30-year delusion versus a one-year

7      delusion.  And we've talked about some of the specifics, but

8      that's the heart of what I'm concerned about.

9            I am not down on the literature or down on what it's

10     contributed.  It should inform clinical decisions to some

11     degree and it does to some degree.  You obviously could see in

12     the testimony from the physician from the Bureau of Prisons,

13     it's informing his decision.  But what I would say at the end

14     of the day is that whether you do -- if you do this voluntary

15     or involuntary, the physician still has a fundamental ethical

16     obligation, and that ethical obligation is to be making a

17     decision that uses this literature and this level of knowledge

18     in working with any patient.  A court order does not eliminate

19     an obligation to make sure that the patient is informed,

20     whether they are psychotic or not.

21   Q.  Thank you.

22            MS. BECK:  Nothing further.

23            THE COURT:  May this witness now be excused and

24     released from subpoena?  Any objection by the defense?

25            MS. BECK:  No, Your Honor.  Thank you.

1          *THE COURT:*  Or the government.

2          *MS. RHYNE:*  No, Your Honor.

3          *THE COURT:*  Doctor, you are both excused and released

4   from some with our thanks.

5          *THE WITNESS:*  Thank you very much.

6          *THE COURT:*  You are welcome.

7          Very well.  The defense may proceed.

8          *MS. BECK:*  Your Honor, the defense rests its case.

9          *THE COURT:*  Does the government seek leave to present

10  rebuttal evidence?

11         *MS. RHYNE:*  No, Your Honor.

12         *THE COURT:*  Then the evidence is complete.  I assume

13  you are prepared to commence closing argument?

14         *MS. RHYNE:*  Yes, Your Honor.

15         *THE COURT:*  May we limit that to 30 minutes total?

16         *MS. RHYNE:*  I believe so.  I am sorry, I need 30

17  minutes, Your Honor.  There is no way I can finish faster

18  without driving your court reporter insane.  I have a lot of

19  material to cover.

20         *THE COURT:*  I am sorry, I didn't hear you.

21         *MS. RHYNE:*  I apologize.  I need 30 minutes, so if you

22  are asking if we could jointly use 30 minutes --

23         *THE COURT:*  No, no, 30 minutes per side.

24         *MS. RHYNE:*  Then yes.

25         *THE COURT:*  I don't expect two lawyers to do anything

1    within 30 minutes.

2              MS. RHYNE:  Thank you.

3              MS. STRICKLIN:  Your Honor, I certainly haven't

4    practiced what I want to say, but I would find it unlikely to

5    think that I can get through all of this material in a closing

6    argument in 30 minutes.

7              THE COURT:  Well, what would be reasonable?

8              MS. STRICKLIN:  I am not sure.  And I can tell the

9    Court that I would do my absolute best to get through it as

10   efficiently as possible, but I am not sure.  There is a lot of

11   material here.

12             THE COURT:  Then we will fudge, 30 minutes plus or

13   minus.

14             MS. STRICKLIN:  I will do my best.

15             THE COURT:  The government may present its opening

16   closing argument.

17             MS. RHYNE:  Thank you, Your Honor.

18             THE COURT:  You are welcome.

19                        **CLOSING ARGUMENT**

20             MS. RHYNE:  Your Honor, before the Court gets to its

21   *Sell* inquiry, the 10th Circuit has held that it must first look

22   at the *Harper* inquiry and determine whether or not the

23   defendant could be medicated based on a dangerousness to

24   himself or others.  The government submits that it has no

25   evidence to indicate that Mr. Dear in a prison setting is a

548

1    danger to himself or others and asks the Court to make that

2    finding per the 10th Circuit's requirement.

3        Moving next to the *Sell* issue, before the Court can

4    order involuntary medication to render a mentally ill defendant

5    competent under *Sell*, the government must prove four factors by

6    clear and convincing evidence.

7        The first factor, the Court must find that important

8    government interests are at stake.  This one is, I think,

9    fairly easy, and I don't expect it to be rebutted, but it is

10   well established that the government's interest in bringing to

11   trial an individual accused of a serious crime is important.

12   There is no doubt that Mr. Dear is accused of serious crimes.

13       On November 27, 2015, he attacked a Planned Parenthood

14   clinic.  He brought with him multiple rifles, five handguns, a

15   shotgun and more than 500 rounds of ammunition.  During his

16   five-hour attack on that clinic and police officers, he killed

17   three people.  He intentionally shot and killed those people.

18   It was not an accident.  He injured five additional people.  He

19   terrorized the people hiding in place inside the clinic, as

20   well as the community at large.  The crimes are very serious.

21   He faces three life sentences as a result of the murders he

22   committed.

23       The 10th Circuit has noted that it is well settled

24   that the government's interest in bringing a criminal defendant

25   to trial is fundamental in nature.  For that reason the

1    government also has an interest ensuring the competency of a

2    defendant throughout his criminal proceedings because you

3    cannot try an incompetent defendant.

4         The government also has an interest in seeing that the

5    prosecution proceeds in the most timely fashion possible

6    because sending someone away for civil commitment and hoping

7    that they may be restored after years and then come back to

8    face their crimes may impact and prejudice the government's

9    ability to try that case as evidence may be lost, memories may

10   fade.

11        In some cases, special circumstances may lessen the

12   government's important interest.  The case law discusses cases

13   where the time it takes to resolve somebody's competency issues

14   is in parity with the criminal sentence they might receive.

15   That does not exist here.  Again, Mr. Dear faces three life

16   sentences.  There is no special circumstance that lessens the

17   government's important interest in this case.

18        Under the second *Sell* factor, the Court must conclude

19   that involuntary medication will significantly further the

20   government interests, which requires the Court to find both

21   that the use of these antipsychotic medications as set forth in

22   the treatment plan is substantially likely to render Mr. Dear

23   competent to stand trial and substantially unlikely to have

24   side effects that will interfere significantly with his ability

25   to assist counsel in conducting their trial defense.

1        Focusing on the first half of that, the *Sell* court did

2   not define what constituted substantially likely, but several

3   circuit courts have held that a 70 percent likelihood meets

4   that threshold.   Those circuit courts who have found that are

5   first the Second Circuit in *United States v. Gomes* at 387 F.3d

6   157, Page 161 through 162 in the year 2004; then followed by

7   the Eighth Circuit in *United States v. Nicklas*, N-I-C-K-L-A-S,

8   at 623 F.3d 1175, Page 1180 in the year 2010, and more recently

9   the Ninth Circuit in *United States v. Gillenwater* at 749 F.3d

10  1094, Page 1103 in the year 2014.

11       That last case is particularly relevant as it dealt

12  with a defendant with delusional disorder.   It discussed the

13  two articles at Exhibits 5 and 6 that were a focus of this

14  Court's hearing and upheld the Court's order to involuntarily

15  medicate that patient with delusional disorder with the

16  requested antipsychotic medications.

17       Now, the 10th Circuit has an unpublished decision in

18  seat en, *United States v. Seaton* at 773 F. Appx. 1013,

19  Page 1020 from 2019.   And in that case the 10th Circuit

20  affirmed an involuntary medication order where a BOP

21  psychologist and psychiatrist, coincidentally who happened to

22  be Dr. Preston Baecht and Sarrazin, testified that for a

23  defendant with schizophrenia, the comparative subset of their

24  patients at BOP with schizophrenia had a 75 percent or more

25  likelihood of being restored.   And the 10th Circuit found that

1    that met the threshold without determining what was the minimum

2    amount.   It said that was adequate and also because specific

3    factors about that defendant were discussed in rendering that

4    opinion.

5         Now, focusing on the evidence in this case, first and

6    importantly, Drs. Preston Baecht and Sarrazin testified they

7    considered Mr. Dear as an individual when they rendered their

8    opinions that the medications recommended were substantially

9    likely to restore him to competency.   They both said it

10   mattered that Mr. Dear did not have dementia or any other

11   cognitive impairment and that he didn't have a history of prior

12   treatment with antipsychotics for a significant duration or a

13   sufficient medical trial period and showed a poor outcome.

14   They said the lack of these two poor prognosis factors was

15   important in their belief that he would be successfully

16   restored.

17        They also testified that they considered him and his

18   intelligence.   They both commented based on their interactions

19   that he was a bright and intelligent man.   They also considered

20   the fact that he was able to live independently prior to his

21   arrest in 2015.   They cited those as positive prognostic

22   factors.

23        And Dr. Preston Baecht, who spent the most time with

24   Mr. Dear out of any of the witnesses who testified here -- only

25   three of those witnesses spent any time at all.   The most was

1    with Dr. Preston Baecht, then Dr. Sarrazin, and the two

2    meetings that you heard Dr. Martinez testify about.

3    Drs. Morton and Woods did not meet with Mr. Dear at all.  But

4    Dr. Preston Baecht testified that based on the time she spent

5    with him and her diagnosis of him, she observed his impairment

6    to be typical of the patients that she saw at the Bureau of

7    Prisons.  So any argument that his illness is particularly

8    severe is not supported by the person who has the most relevant

9    evidence on that point.

10         Drs. Preston Baecht and Sarrazin also testified that

11   they considered Mr. Dear's age and his duration of untreated

12   psychosis.  And I believe the estimates about that duration of

13   untreated psychosis was between 15 and 30 years, but it was

14   hard to say because there was no history of psychiatric or

15   psychological evaluation, that all you could do is base that

16   assessment on Mr. Dear's own referential statements to Waco.

17         They acknowledged that it would have been better had

18   Mr. Dear been treated earlier in his life and earlier in his

19   psychosis, but that based on their experience, that did not

20   change their opinion that he was likely to be restored or

21   substantially likely to be restored because they had observed

22   other patients with similar presentations be restored, but they

23   considered those factors unique to Mr. Dear.

24         Turning next to their experience and the literature

25   that they relied on, they both testified that based on their

553

1    own experience in restoring patients with delusional disorder

2    at the Bureau of Prisons and the most relevant literature,

3    which they testified to was Exhibits 5 and 6, the two studies

4    looking specifically at the treatment of patients on an

5    involuntary basis including patients with delusional disorder,

6    that there is a 70 to 80 percent likelihood that the

7    recommended antipsychotic medications will restore Mr. Dear to

8    competency.

9         Drs. Preston Baecht and Sarrazin testified that the

10   recommended medications are substantially likely to decrease

11   Mr. Dear's delusional beliefs to a degree where he will be able

12   to interact with his attorneys about his defense in a rational

13   and logical manner.  They both testified that in their own

14   experience, they have observed this in more than 70 -- at least

15   70 percent of patients with delusional disorder who were

16   treated with antipsychotic medications and have benefited by

17   this type of reduction in their delusions such that it rendered

18   them competent.  That's their personal experience.

19        They also again talked about Exhibits 5 and 6, the

20   Herbel and Stelmach study and the *Sell* effect study by

21   Cochrane, and they noted that those were the most relevant

22   studies to the issue before the Court because again they

23   focused specifically on the issue of the involuntary use of

24   antipsychotic medications to treat in the first instance

25   delusional disorder patients exclusively and in the second

554

1    instance 132 patients of whom 15 had delusional disorder.   And

2    both of those studies in the same context of that involuntary

3    treatment had high success rates.

4         In the first one, the Exhibit 5, the Herbel and

5    Stelmach study that had 22 delusional patients, 17 were

6    rendered competent, a 78 percent restoration success rate.   In

7    the second study, it had a smaller sample group, 15 delusional

8    disorder patients, 73.3 percent of whom were rendered

9    competent.   Again, both of those statistics show that the

10   minimum threshold of 70 percent has been met by the

11   government's evidence.

12        They also testified that the less positive outcomes in

13   earlier studies appear to have been caused at least in part by

14   inadequate medication trials.   The Herbel and Stelmach study

15   noted that 10 of those 17 patients with delusional disorder who

16   were restored required a medication trial of three to five

17   months before they were restored.   And earlier studies that

18   used shorter durations are then called into question because if

19   you didn't have an adequate medication trial, you didn't give

20   the medicine a chance to work, and the study didn't properly

21   conclude that it was ineffective as opposed to being improperly

22   administered.

23        Drs. Preston Baecht and Dr. Martinez both testified

24   that medication non-compliance has been one of the biggest

25   problems in treating -- first treating people with delusional

1    disorder and having an impact on the studies attempting to

2    determine the efficacy of medications to treat delusional

3    disorder.  Dr. Preston Baecht explained that patients with

4    delusional disorder don't believe they are ill, so it is very

5    difficult to convince them that they need to keep taking

6    medication and adhere to their treatment.

7         But where medication is administered on an involuntary

8    basis, the problem of medication non-compliance is virtually

9    eliminated.  It is logical that better compliance in medication

10   adherence would lead to better outcomes.  I submit to this

11   Court that this supports the higher success rates experienced

12   by Dr. Preston Baecht, Dr. Sarrazin and in these two studies

13   because they have eliminated one of the main problems in

14   treating patients with delusional disorder.  And Mr. Dear will

15   be in the same environment receiving these medications without

16   the option of non-compliance.

17        Now, the defense experts criticize the Herbel and

18   Stelmach study and the *Sell* effect because they are not double

19   blind or placebo controlled, although Dr. Martinez understood

20   that this was one of -- a limitation you couldn't resolve.  And

21   he didn't quite say this was the best available evidence for

22   the Court, but he did acknowledge that these studies had value

23   and should be considered.  Dr. Woods and Morton did not.  They

24   had disdain for these studies and said because they were

25   essentially not the highest level of evidence, they shouldn't

1  be considered.  But the Court should recognize that those types

2  of studies are impractical and would be unethical in the

3  context of involuntary medication.

4       And I would encourage the Court to follow the

5  evidence-based approach to medicine which requires the use of

6  the highest quality evidence available to guide treatment

7  recommendations.  And as Drs. Preston Baecht and Sarrazin

8  stated, the best evidence in this case in addition to their own

9  personal experience are those two studies which are most

10  directly relevant because they deal with involuntary

11  medication.

12       Now, the defense experts disagree that the medicines

13  recommended are substantially likely to render Mr. Dear

14  competent, but I would submit to the Court that based on the

15  quality of their experience, as well as the nature of their

16  testimony, Drs. Preston Baecht and Sarrazin are more credible

17  and more reliable to the Court in this inquiry.  I would like

18  to take a few minutes and look at Dr. Woods' testimony and some

19  of the things that he said that frankly I believe are not

20  credible.

21       First, Dr. Woods insists that Mr. Dear has cognitive

22  impairments.  And he says that's important because if Mr. Dear

23  has cognitive impairments, the medications won't address those

24  cognitive impairments and therefore can't restore his

25  competency.  But Dr. Woods relied entirely for that assessment

1   on this 2016 MOCA assessment located at Defense Exhibit 4, but

2   Dr. Woods did not administer that test.  It was done in 2016 by

3   Drs. Gray and Grimmett.

4          Dr. Woods concedes that Dr. Gray testified about that

5   assessment and stated that it did not provide them with data to

6   obtain a meaningful score, and Dr. Woods concedes that Dr. Gray

7   testified that he and Dr. Grimmett didn't note any significant

8   issues that were apparent in terms of Mr. Dear's memory or

9   attention and some other cognitive functions.

10         But Dr. Woods insists that he knows better, that he

11  doesn't trust Dr. Gray's assessment because he's not a

12  neurologist.  He potentially wasn't trained on this MOCA, maybe

13  didn't understand how to use the data he obtained, but those

14  were assumptions that he made.  Now, I think he did learn and

15  reported to the Court that Dr. Gray told him he was not a

16  neurologist, but he didn't tell the Court that he asked

17  Dr. Gray about whether or not he was trained on the MOCA or

18  whether or not he understood how to evaluate a MOCA.  Instead,

19  he wants the Court to believe that sitting years later and

20  looking just at those two pieces of paper, he has a better

21  understanding of what happened in that room and the level of

22  Mr. Dear's effort than Dr. Gray testified to, and that is

23  absurd.

24         He is asking the Court to believe that Dr. Gray's

25  notations on that form or Dr. Grimmett's notations, whichever

1    one it was, is so specific that because there was a zero

2    indicated on the first section of that assessment, that that

3    meant necessarily that Mr. Dear gave that section his best

4    effort and failed completely to do anything.  But that first

5    segment is a drawing exercise.  If Mr. Dear made any effort at

6    all, you would see some pen markings.  You would see some

7    effort to draw the cube, draw the clock or make connections

8    between those dots.  You see absolutely nothing.  And I think

9    the better read of that is that Mr. Dear did not try.

10           And importantly, while Dr. Woods insisted that he

11   understood completely the data on that two-page assessment, he

12   did not tell the Court that he inquired with either Dr. Gray or

13   Dr. Grimmett.  Instead, he just insisted that that two-page

14   assessment despite Mr. Dear's lack of cooperation meant that

15   Mr. Dear had cognitive impairment.  The government submits that

16   exhibit does not prove anything, and it certainly doesn't prove

17   that Mr. Dear has something as serious as cognitive impairment

18   for purposes of this hearing.

19           Second, Dr. Woods insists that delusional disorder

20   includes negative symptoms.  And the reason that's important to

21   him is because negative symptoms he has told the Court won't be

22   resolved by the antipsychotics, but nobody else really agrees

23   with that.  That's kind of a controversial assignment of

24   symptoms to delusional disorder.

25           You heard both Dr. Sarrazin and Dr. Preston Baecht say

1    no, negative symptoms are not indicative of delusional

2    disorder, but had he had those symptoms, it would have been

3    more indicative of schizophrenia.  But nobody who testified

4    believed that Mr. Dear had schizophrenia.  And Dr. Martinez

5    said, well, you might have some minor things and he might have

6    had isolation.  And Dr. Martinez said that probably isn't a

7    negative symptom.  We could argue about that, but he agreed

8    that this concept of whether or not antipsychotics would

9    address negative symptoms, that's addressed at very significant

10   negative symptoms which he agreed he didn't see present with

11   Mr. Dear.  And importantly, Dr. Preston Baecht, who spent the

12   most time with Mr. Dear, said she never observed him to have

13   negative symptoms.  Dr. Woods never met with Mr. Dear.

14          Now, Dr. Morton, he does not have sufficient personal

15   experience to opine on whether or not these medications are

16   substantially likely to render Mr. Dear competent.  He admitted

17   to the Court that he has only worked with two patients with

18   delusional disorder.  And he conceded that when he works with

19   those patients, he is actually working in conjunction with a

20   pharmacist and that it is the pharmacist -- excuse me,

21   psychiatrist who is evaluating the treatment progress of the

22   patient.  So any progress that is made or not made is

23   determined by the psychiatrist and reported to Dr. Morton and

24   not done himself on a firsthand basis in the same way that

25   Drs. Preston Baecht and Dr. Sarrazin are able to testify about.

1    And so again, with just the two patients and that one level of

2    provider removed, he doesn't have the hands-on personal

3    experience to support his opinion from any personal experience.

4           Now, he also said he relied on the literature, but he

5    misstated the findings of the Herbel and Stelmach study

6    regarding the significance of the DUP.  And Dr. Martinez

7    misstated this as well.  I think it's something that when you

8    are not in favor of these medications, maybe you read for a

9    specific outcome.  But if the court looks at Exhibit 5, it very

10   specifically says that despite the fact that one of the four

11   patients who had DUPs of between 13 and 24 patients, only one

12   was restored.  And so the tendency is to jump to that

13   conclusion that, aha, 25 percent restoration rate is bad.  They

14   are saying this is a poor indication -- indication of poor

15   outcome.

16          But the study very specifically goes on to correct

17   that misperception and says that two of those four patients

18   didn't get an adequate trial medication period, and therefore

19   there isn't sufficient data to render any conclusion about the

20   length of DUP.  And when Mr. Morton was asked about a study

21   that he listed on his own list of items that he relied upon for

22   this hearing, he could not remember important details about

23   that study.  So I would submit to the Court that his memory

24   about the literature that he supposedly relied upon in

25   rendering his opinion was not sufficient to be helpful to this

1    Court.

2           Now, Dr. Martinez also doesn't agree that the

3    medications are substantially likely to render Mr. Dear

4    competent, but Dr. Martinez is also not willing to accept the

5    outcome of other clinicians as stated by those clinicians.

6    Before he would accept Dr. Preston Baecht's outcome, he would

7    want to quiz her on what she observed to determine whether her

8    conclusions are accurate.  And so that level of skepticism I

9    don't think is helpful in the context of this hearing either.

10          On the second prong of that factor, the Court must

11   find that the recommended antipsychotic medications are

12   substantially unlikely to result in side effects that will

13   interfere significantly with Mr. Dear's ability to assist his

14   counsel in conducting a trial defense.  Dr. Sarrazin testified

15   that the vast majority of side effects typically resolve on

16   their own or can be adequately addressed by changing the dose,

17   changing the time at which the medication is administered,

18   changing the type of medication, or by adding a secondary

19   medication to address the side effect.  The studies at

20   Exhibits 5 and 6 both noted that the medications were well

21   tolerated and that the side effects were readily and easily

22   managed.

23          Drs. Woods and Morton, despite being very concerned

24   about side effects, both agreed that many of the side effects

25   could be addressed by changing the dose, changing the time of

1    administration, changing the type of medication.  And Dr.

2    Morton agreed that the proposed secondary medications could

3    treat the restlessness as a side effect.

4        Dr. Sarrazin did acknowledge that the medications have

5    a few more potentially serious side effects, but he noted for

6    the Court that those side effects were extremely rare.  All of

7    the experts who testified in front of this Court agreed that

8    these medications are frequently prescribed for psychotic

9    disorders in spite of those risks which should provide the

10   Court with context and reassurance that the risk is extremely

11   low and deemed acceptable to the medical community prescribing

12   these medicines.

13       Both Drs. Preston Baecht and Sarrazin also testified

14   that the recommended medications are going to help Mr. Dear

15   communicate with his counsel because his delusions will lessen

16   in intensity and he will be able to interact in a more logical

17   and rational manner.  They have also both testified that they

18   have never observed side effects from antipsychotic medications

19   to interfere with a defendant's ability to work with his

20   counsel after they have attempted the remedial measures

21   described.

22       The third factor, the Court must find that any

23   alternative less intrusive treatments are unlikely to achieve

24   substantially the same results.  Notably, not a single witness

25   has identified any other less intrusive option that was likely

563

1    to restore Mr. Dear.  Dr. Martinez talked about

2    antidepressants, but Mr. Dear has refused all medications other

3    than lithium because it's natural or I believe marijuana as

4    well.  There is no indication that he would accept an

5    antidepressant, and that would have to be done on an

6    involuntary basis as well.  It would not be less intrusive.

7            Dr. Preston Baecht testified that she was not aware of

8    any other treatment, and Dr. Preston Baecht explained that

9    psychotherapy alone was not likely to work.  She explained that

10   attempts to restore him through psychotherapy and educational

11   classes were made and failed at CMHIP.

12           The case law sometimes discusses an alternative of the

13   court ordering a defendant to take antipsychotic medication

14   under fear of being found in contempt as a lesser intrusive

15   means of ordering involuntary medication.  But in this instance

16   Mr. Dear's very established entrenched opposition to these

17   medications show that that is not a viable option, particularly

18   when we consider the lack of respect that he has shown for the

19   Court's authority.  As such, we ask the Court not to find that

20   that is a less intrusive means that is likely to have

21   substantially the same result.

22           Under the fourth *Sell* factor, the Court must determine

23   that the administration of drugs is medically appropriate,

24   meaning that it's in the patient's best medical interest in

25   light of his medical condition.  Dr. Preston Baecht testified

1    that Dear suffered as a result of his delusions because she

2    explained it is distressing to always believe that the FBI is

3    out to get you and to believe, for example, that people are

4    poisoning your food and that lessening his delusions would

5    relieve him of this distress.

6         Both Drs. Preston Baecht and Sarrazin testified that

7    the antipsychotic medications including the ones recommended

8    are the primary treatment for delusional disorder, and that the

9    quality of Mr. Dear's life would improve as a result of the

10   medications because his delusions would lessen.  Dr. Sarrazin

11   also testified that the recommended medications were in

12   Mr. Dear's best medical interest despite his hypertension

13   because, first, there were no drug-drug interactions between

14   the four recommended medications and any likely hypertensive

15   medication that Mr. Dear might take in the future.

16        Dr. Sarrazin also observed that the involuntary use of

17   these antipsychotics could actually improve Mr. Dear's health

18   and improve his hypertension because by lessening his

19   delusions, he might become more open to treating his healthcare

20   issues, including specifically his hypertension, which I

21   believe there has been significant study on and testimony about

22   untreated hypertension is very dangerous and potentially

23   lethal.  And potentially these antipsychotics would lessen his

24   delusions to the point where he would accept medication for his

25   hypertension.  It could be lifesaving.

1            And this particular effect was noted in Exhibit 6, the

2    *Sell* effect study, which showed that several patients had

3    improved health after being involuntarily medicated because

4    they accepted health treatment they had previously refused.

5            Now, Dr. Holland, the only cardiologist to testify,

6    said Mr. Dear did not have a prior heart attack and that he did

7    not have cardiac or cardiovascular disease.  Dr. Holland

8    explained in detail that the four recommended medications were

9    safe for Mr. Dear despite his hypertension.  In fact, he said

10   Mr. Dear was not the type of patient he would normally be

11   brought in to consult about because his medical history was

12   common and there was no drug-drug interaction to examine

13   because Mr. Dear was not currently on any hypertensives.

14           Dr. Holland also states that Mr. Dear's Stage 3 kidney

15   disease did not make the four recommended medications unsafe

16   because only paliperidone had any kidney clearance issues, and

17   that could be addressed by reducing the dose.  None of the

18   other three medications presented any issues for kidneys.

19   Drs. Holland and Sarrazin both testified that they did not see

20   any other medical condition in Mr. Dear's records that would

21   cause these medicines to be unsafe.

22           Now, Dr. Morton flagged a number of cardiac issues.

23   And he testified that it was an important part of his role as a

24   pharmacologist to flag issues that he saw so that those medical

25   issues could be addressed by a doctor, a medical doctor.  He

1   agreed that he is not qualified to evaluate the issues that he

2   flags.  He agreed that a cardiologist was the expert best

3   qualified to address the cardiac concerns that he flagged.

4          But after Dr. Holland testified at length about the

5   safety of these medications for Mr. Dear, Dr. Morton rejected

6   his opinion, this opinion of this very experienced

7   cardiologist, and instead endorsed the opinion -- the cardiac

8   and cardiovascular opinions offered by Dr. Woods, who is a

9   psychiatrist.  Taking the opinion of a psychiatrist over a

10  cardiologist about cardiac issues is simply not good medicine.

11  Instead, it calls into question Dr. Morton's ability to

12  objectively evaluate the evidence and tends to show his bias in

13  favor of an opinion that aligned with his own original

14  opinions.

15         Dr. Woods also discounted Dr. Holland's testimony

16  about the cardiac issues and about these medicines being safe,

17  and he based his opinion primarily on the fact that Mr. Dear is

18  almost 65 years old and talked at length about the importance

19  of age.  But the record shows that Dr. Holland knew exactly how

20  old Mr. Dear was when he reviewed his medical records and

21  assessed the risk these medications might present to him in

22  light of his medical history.

23         Yes, there was back and forth about whether 64 or 65

24  should be considered elderly, and he made the joke that because

25  he was roughly the same age, he refused to accept that; but

1  that does not undermine the quality of his medical opinion

2  fully understanding that Mr. Dear is 64 years old.  And as a

3  cardiologist, Dr. Holland is clearly far more qualified to

4  opine about the cardiac and cardiovascular risks presented by

5  the proposed medication, and he very clearly told this Court

6  they were safe for Mr. Dear to take.

7       The proposed medications are in Mr. Dear's best

8  medical interest because they are substantially likely to

9  reduce his delusions which will improve the quality of his

10  life.  Mr. Dear's medical history do not cause these medicines

11  to be unsafe.  And, in fact, Mr. Dear's hypertension could

12  improve as a result of the involuntary medication because he

13  may become more willing to treat that hypertension.  And again,

14  that could become lifesaving for him.

15       The government asks the Court to find that the

16  government has met its burden of proving by clear and

17  convincing evidence each of the four *Sell* factors required

18  before the Court orders involuntary administration of the four

19  medications recommended in the treatment plan.

20       Thank you.

21       *THE COURT:*  Counsel, thank you.

22       Argument in response for the defense, Ms. Stricklin.

23       *MS. STRICKLIN:*  Thank you, Your Honor.

24       *THE COURT:*  You're welcome.

25                    **CLOSING ARGUMENT**

1        MS. STRICKLIN:  Your Honor, I will start by

2   acknowledging that I do agree with the government that the

3   standard here is clear and convincing evidence, and that comes

4   from the *United States v. Bradley* case, which is a 10th Circuit

5   case from 2005.

6        Now, moving specifically to the *Sell* criteria, as I

7   think that the government also correctly articulated the *Sell*

8   case here as well, I will start with the first criteria which

9   is the Court must find that important government interests are

10   at stake.  *Sell* states that the government's interest in

11   bringing to trial an individual accused of a serious crime is

12   important.  And, of course, that's the starting point here.

13        And I want it to be clear that I am not to be

14   interpreted as being insensitive to the seriousness of what

15   occurred here, but the Court is also instructed to consider

16   specific facts of the individual case in evaluating the

17   government's interest in prosecution, and special circumstances

18   may lessen the importance of that interest.

19        Mr. Dear's case is unique in its chronology.  This

20   event happened on November 27th of 2015.  This case was and

21   continues to be prosecuted by the State of Colorado.  The

22   Federal Government decided to concurrently prosecute Mr. Dear

23   in December of 2019.  The U.S. Attorney's Office could have

24   involved itself from the beginning, but it chose not to until

25   after nearly -- just over four years after the event occurred.

1    Sell also discusses the government's substantial

2    interest in a timely prosecution and specifically recognizes

3    that it, quote, may be difficult or impossible to try a

4    defendant who regains competence after years of commitment

5    during which memories may fade and evidence may be lost.  That

6    is certainly an issue here.  We are nearly seven years after

7    this event.  That creates clear and obvious issues with the

8    idea of using involuntary medication to promote the

9    government's interest in a timely prosecution.  I suggest that

10   the government's interest has waned over time due to its own

11   actions or inaction.

12       The government correctly noted, and I note as well,

13   that *Sell* also discusses the potential of future confinement

14   and that that may undermine the government's interest.  I

15   submit that all roads lead to confinement here either through

16   conviction, an NGRI acquittal or a civil commitment.  And

17   significantly of importance here is that if Mr. Dear is not

18   voluntarily medicated or restored to competence, he can be

19   civilly committed in the federal system.  He can be returned to

20   the state system in their prosecution or the state could pursue

21   a civil commitment of their own, but it is definitively not the

22   case that if Mr. Dear were not ordered to be forcibly

23   medicated, he would just walk out the door.

24       Moving on to the second *Sell* factor -- and I will note

25   that the evidentiary hearing that we have had over the last

1    three days addressed the second, third and fourth *Sell* factors.

2    I will also note before I begin that the Court has as exhibits

3    the defense experts' CVs.  I will pick my top five credentials

4    for Dr. Woods and Dr. Martinez.

5              Dr. Woods is a physician specializing in

6    neuropsychiatry with more than 40 years in clinical practice.

7    He is currently the senior clinical consultant at Crosswood

8    Behavioral Health Clinic.  He is certified by the American

9    Board of Psychiatry and Neurology.  He is the president of the

10   International Academy of Law and Mental health.  It's his

11   second term.  He is a life fellow of the American Psychiatric

12   Association and continues his education through psychiatric

13   study through Harvard University.

14             Dr. Martinez is the director of forensic psychiatry at

15   the University of Colorado.  He is a distinguished life fellow

16   of the American Psychiatric Association.  He is a recent

17   president of the American Academy of Psychiatry and Law.  He is

18   a reviewer for the American Journal of Psychiatry, and he sits

19   on the faculty of professional and problem-based ethics

20   program.

21             Moving on now to the second factor, that the Court

22   must find that the administration of drugs is substantially

23   likely to render Mr. Dear competent to stand trial.  The

24   government referenced a couple of different cases, and that is

25   because the 10th Circuit doesn't seem to have a case that draws

1    a bright line as what percentage applies.  The *Bradley* case

2    discusses the finding of more than 80 percent was sufficient.

3    In *Seaton*, the testimony was that there was a finding of 75 to

4    90 percent likelihood that Mr. Seaton would be restored.  We

5    don't have a specific number for the Court to apply here.

6         I begin by asking the Court as a starting point to

7    look at what the experts with the obvious exception of

8    Dr. Holland agree on.  And first, the experts who can diagnose

9    the mental health disorder all agree that Mr. Dear's

10   appropriate diagnosis is delusional disorder.  This is

11   consistent with all five state hospital evaluators who

12   diagnosed Mr. Dear.

13        The question has arisen of what delusional disorder

14   means.  Dr. Preston Baecht specifically testified that

15   delusional disorder is a type of psychotic disorder.  It is

16   characterized by delusions; that is, fixed beliefs.  They could

17   be either bizarre or non-bizarre in nature, and that is the

18   predominant symptom.  Other psychotic symptoms such as

19   hallucinations, disorganized speech, negative symptoms,

20   catatonic behavior are not prominent.

21        Dr. Woods provided this Court a similar definition

22   despite the government's attempts to state to the contrary that

23   delusional disorder is a psychotic disorder with prominent

24   features of delusions.  Both Dr. Preston Baecht and Dr. Woods

25   agreed that psychotic disorders occur on a spectrum.

1           Why that matters here is for two reasons.  The first

2   is that there are basic principles about delusional disorder

3   which all the experts agree on, but what we see is a divergence

4   in opinion on whether the medication is substantially likely to

5   render Mr. Dear and how that delusional disorder affects him to

6   competency.

7           All of the experts agree that delusional disorder is

8   rare.  The percentages almost always consistently came out as

9   about 5 to 6 percent of patients over a lengthy career, and

10  that because there is less information regarding the

11  efficacy -- and because of that, there is less information

12  regarding the efficacy of antipsychotic treatment.  And all of

13  the experts agree that historically the literature has painted

14  a very poor response to treatment.

15          Delusional disorder is harder to treat with

16  antipsychotic medications as compared to other mental health

17  disorders.  All of the experts agree that it is likely that a

18  partial response is the best case treatment outcome and that

19  the medications will not eradicate the delusional thinking

20  although they may quiet it.  The experts clearly diverge on

21  whether or not taking those principles into account Mr. Dear

22  will be substantially likely to be restored to competency.

23          Starting with the government, the government experts

24  rely on what I will categorize as, No. 1, a series of factors;

25  No. 2, the two studies which were admitted into evidence, and

1    No. 3, their anecdotal experience.  I'd argue that the

2    government's reliance on those things results here in a very

3    generalized and overly optimistic opinion.

4         Dr. Preston Baecht articulated the factors that she

5    relied on as, one, whether there is a prior history of

6    treatment response or nonresponse.  This factor doesn't apply

7    to Mr. Dear.  No. 2, that a poor treatment response would be

8    anticipated if someone had a co-occurring intellectual

9    disability or a neurocognitive disorder.  Here she explained

10   that she didn't observe any evidence when she met with Mr. Dear

11   on two occasions for about 30 to 45 minutes in short weekly

12   interactions at his cell door.

13        The third factor was a history of long

14   hospitalization.  This factor came out to be a bit confusing

15   because Mr. Dear has been hospitalized here for nearly seven

16   years, but Dr. Preston Baecht testified that that's not really

17   what the factor is describing, but rather an accumulated

18   lengthy hospitalization history over time.  She did, however,

19   confirm that early intervention was a predictor of success.  We

20   are well past that here.

21        The fourth factor is age.  Dr. Preston Baecht

22   testified that with the exception of one study in which the

23   result seemed to be unexplained, the majority of the research

24   supported that someone older was less likely to get a positive

25   response.  Mr. Dear's age is a factor that cuts against

1    restoration.

2           The fifth factor which was addressed by the government

3    in their argument is this duration of untreated psychosis.

4    Here Dr. Preston Baecht testified that this could be a

5    predictor in that the longer the duration of untreated

6    psychosis is, the less likely of a positive response, but that

7    there wasn't enough information in the study with two of the

8    four patients having to be excluded for the study to actually

9    conclude that.  If that is the case, Mr. Dear's likelihood of

10   restoration is significantly decreased.  Interestingly, in that

11   study the reports are that the restoration for schizophrenia

12   patients with a long DUP was dismal at 11 percent.

13          The sixth factor that Dr. Preston Baecht talked about

14   was premorbid functioning.  And I found this interesting

15   because Dr. Preston Baecht seemed to define a good premorbid

16   functioning in that Mr. Dear never functioned so poorly that he

17   was involuntarily hospitalized.  That was the totality of the

18   information that she had.  I have a hard time accepting that

19   the lack of a prior hospitalization equates to good premorbid

20   functioning.

21          The seventh factor was that higher functioning

22   patients have positive responses.  Dr. Preston Baecht testified

23   that she thinks Dear is, quote a bright man, but provided no

24   real evidentiary support for that.  It also seemed to conflate

25   intelligence with brain functioning.  I submit that for

1    Mr. Dear these factors produces a mixed bag and clearly not
2    clear and convincing evidence.
3         The government's experts similarly relied on the
4    literature, and there has been an abundance of conversation and
5    questioning throughout the three days as to the literature.
6    But what Dr. Sarrazin did say was that the highest quality of
7    evidence in this case was the literature.  The issues with the
8    studies have not been contested as many of them were produced
9    by the authors of the studies themselves.  I would argue that
10   Dr. Sarrazin's reliance on these studies as, quote, the highest
11   quality of evidence certainly tells the Court something about
12   the quality of evidence here.
13        The government's reliance on the studies is
14   illustrative of the generalized opinion, and it doesn't
15   adequately take into account the realities of Mr. Dear.  We
16   simply have little to no information about the patient
17   population in these studies to determine if Mr. Dear is a
18   similar patient and to determine whether or not how Mr. Dear
19   experiences his disorder looks like the patient population in
20   these studies.
21        I also submit that the anecdotal evidence provided by
22   the government similarly paints so general a picture that it's
23   not all that useful to the Court.  Dr. Preston did testify that
24   70 to 77 percent of her patients with delusional disorder, of
25   course an extremely small sample size, were restored.  And she

576

1    did say that one was ill for over 40 years.  Dr. Sarrazin,

2    again using a similar small sample size, gives a slightly

3    better percentage of 75 to 80 percent.

4          The government points out that Dr. Preston Baecht said

5    the severity was similar to Mr. Dear, but severity tells us

6    very little about the specifics of the patient population she

7    refers to.  What was the subtype of the disorder?  What was the

8    age of the patient?  Were the patients previously hospitalized

9    with a successful response?  Was there an early intervention?

10   What was the duration of untreated psychosis?  What was the

11   premorbid functioning?  We have no answers about that patient

12   population to give us any information about the factors that

13   she said she would rely on.

14         This is the presentation of an overly optimistic

15   picture with little to no evidentiary support.  Relying on

16   statistics without context and touting statistics without

17   specifics is not enough to convince this Court that there is a

18   substantial likelihood that Mr. Dear will be restored to

19   competency and certainly not by a clear and convincing

20   standard.

21         The experts also do not engage in any meaningful

22   analysis of what competency looks like in this case

23   specifically.  They say Mr. Dear's delusions will be quieted

24   and he may be able to work with his lawyers.  Dr. Sarrazin

25   gives an example of the king of England.  Dr. Preston says

1    these patients can recognize that other people won't believe

2    what they're saying.  It's unlikely to be successful in their

3    case and they are willing to consider other avenues of defense.

4    But as Dr. Martinez explained, that's just simply not the

5    reality of the case here.  And I submit it is a very

6    superficial analysis of the complexity of competency that

7    applies to this case.

8         By contrast, the defense experts relied on a similar

9    although reduced set of factors.  They relied on an analysis of

10   all of Mr. Dear's symptomatology and a much more thorough

11   analysis of the complexity of competency present here.

12   Dr. Morton applied the factors by emphasizing the strength of

13   Mr. Dear's conviction and his beliefs, that it is absolutely a

14   fixed delusion in the decades long of untreated psychosis.

15        Dr. Woods also focused on the length of time Mr. Dear

16   has exhibited positive symptoms and that it may very well date

17   back even further than 1993.  He testified that like other

18   medical disorders, the longer they go untreated, the more

19   difficult they are to treat.  Dr. Martinez also emphasized the

20   length of the delusional history present.

21        Dr. Woods testified that psychotic disorders can have

22   positive, negative and cognitive symptoms.  The government

23   challenged him on whether the presence of negative symptoms

24   changes the diagnosis.  But as even their own expert concedes,

25   delusional disorder does not exclude the presence of negative

1   symptoms.  It simply requires that they aren't the dominant

2   syndrome.  This, of course, is true of Mr. Dear.  But as

3   Dr. Woods testified, Mr. Dear's symptomatology does include the

4   presence of negative symptoms.  Nonetheless, the government

5   challenged him.

6         Negative symptoms manifest themselves in impaired

7   motivation, problems with initiation and problems with context

8   and acting appropriately in context is what Dr. Woods

9   testified.  He described Mr. Dear as withdrawn.  The government

10   refutes that with testimony from Dr. Preston Baecht saying that

11   Mr. Dear came to the door and talked to her, but he never

12   initiated contact.  It was provoked socialization, as testified

13   to by Dr. Woods.  Mr. Dear never left his cell to talk to her.

14   And when given the opportunity to move to an open unit, he

15   declined.  He similarly never participated in restoration

16   groups.

17         Dr. Woods also talked about cognitive symptoms which

18   stem from issues with brain functioning and that these are not

19   just dementia or an intellectual disability, but an impairment

20   in functioning.  Dr. Woods, who has a specialty in

21   neuropsychiatry, identified the possibility of impaired brain

22   functioning through the MOCA which was administered in 2016.

23   Dr. Woods described the extent of these impairments would need

24   to be further evaluated as this was a screening instrument.  Of

25   course, we don't have the required further evaluation here.  So

1    Dr. Woods looked for other specific instances in the materials

2    which would support there were cognitive symptoms present.

3           Dr. Woods found examples of misidentification.  He

4    found examples with Mr. Dear's inability to weigh and

5    deliberate.  He saw this and multiple times the records note,

6    quote, inability to educate.  We heard Dr. Sarrazin describe it

7    in at least one time where he noted that in his record.  These

8    symptoms, negative and cognitive, are not treated with

9    medication.

10          But what the defense experts did that was lacking in

11   the government's presentation was to directly apply Mr. Dear's

12   symptomatology in a real world competency analysis.  Dr. Woods

13   described that Mr. Dear's perception of events is distorted and

14   cognitive symptoms would factor into a competency analysis.

15          Dr. Martinez specifically discussed how Mr. Dear's

16   delusions are part of his core identity, their duration of

17   30-plus years and their depth.  No amount or type of

18   antipsychotic disorder will reduce his delusions to a degree

19   that he will be restored to competency.  Dr. Martinez

20   emphasized the centrality of those delusions to his belief

21   system and the nature and substance of them.  Even if these

22   delusions are quieted, those delusions are still central as to

23   how Mr. Dear will view his defense team, this Court and the

24   world.

25          Dr. Martinez stated he was very skeptical that we are

1    going to make the shift to competency.  And Dr. Martinez

2    discussed that there is enough data to suggest that justice

3    would require us to look at mental condition as a defense

4    strategy and that the resistance, reluctance and disbelief that

5    Mr. Dear would express is relevant to competency.

6          The second part of the second factor is that at the

7    same time the Court must find that the administration of drugs

8    is substantially unlikely to have side effects which would

9    interfere significantly with the defendant's ability to assist

10   counsel in conducting a trial defense thereby rendering the

11   trial unfair.  I don't think that the Court gets to this piece

12   of the analysis because the government cannot establish by

13   clear and convincing evidence that the medications are

14   substantially likely to restore Mr. Dear to competency, but

15   because the *Sell* case does say, quote, at the same time, I will

16   briefly address it.

17         There are side effects to antipsychotics which can

18   affect competency.  Dr. Preston Baecht acknowledged that

19   sedation and being restless could impact a competency

20   evaluation, but that if it was observed she would report it to

21   Dr. Sarrazin and he would address it through a dose adjustment,

22   timing adjustment or adjunct medication.  This brings us to our

23   first introduction to the idea of polypharmacy and how that

24   applies to a nearly 65-year-old man and the risk associated to

25   that man, Mr. Dear, of engaging in polypharmacy to treat side

1   effects.  I will discuss this in greater detail when addressing

2   the third factor, and I will assume that the Court can apply

3   that argument to this factor as well.

4           The third factor is that the Court must conclude that

5   involuntary medication is necessary to further those interests.

6   This is a factor in which I will concede.  I don't think that

7   there is another alternative here.

8           Moving on to the fourth factor which is that the Court

9   must conclude that the administration of drugs is medically

10  appropriate, meaning that it is in the patient's best medical

11  interest in light of his medical condition.  Again, the

12  government's presentation of evidence to this factor is

13  generalized and overly optimistic.  The medications which are

14  proposed here are four antipsychotic medications, three of

15  which can be administered in oral or long-acting intramuscular

16  injectables.  I assert that we start here with the idea that

17  these medications would have to be administered through

18  long-action injectables.

19          What is particularly relevant when discussing side

20  effects, the relevance of this is that all the experts agree

21  that once you inject the medicine, you cannot get it out until

22  it is fully metabolized, and in these medicines it can take

23  weeks.  Dr. Sarrazin said it would be four weeks before the

24  next dose would be administered.

25          The other issue that this brings up is the idea that

1    if Mr. Dear persists in his refusals, a use-of-force team could

2    have to be used.  A use-of-force team that has to come in to

3    inject Mr. Dear subjects him to what Dr. Martinez said is,

4    quote, a violent process.  That undoubtedly would have side

5    effects of its own, likely raise blood pressure, a risk of

6    cardiac event, a risk of injury.  Dr. Martinez opined that

7    Mr. Dear, quote, might not go quietly into the good night.

8    Once a person decides to resist, it can take a major use of

9    force to inject that medication.

10          The side effects of these medications, some are

11   common, some are less common, but they demonstrate that these

12   are powerful drugs regardless of the frequency with which they

13   may be prescribed.  Dr. Sarrazin confirmed each and every one

14   of the side effects that I questioned him on in my

15   cross-examination.  He described that there are metabolic

16   effects which are common, weight gain, glucose, hyperlipidemia.

17   These effects of course are relevant here as weight gain can

18   have negative effects on organ function, particularly the

19   heart, and hyperlipidemia which Mr. Dear has a history of and

20   has refused to take medication for in the form of a statin to

21   control his high cholesterol.

22          There are extrapyramidal side effects, dystonia, which

23   was described as painful; tardive dyskinesia, which although

24   happens over the course of time can be permanent; prolactin

25   elevation, which can lead to osteoporosis and other

1   neurological disturbances; the very common side effect of

2   sedation; anticholinergic effects, dry mouth, constipation,

3   urinary retention, blurred vision and an increase of heart

4   rate; orthostatic hypertension, which is an instant drop in

5   blood pressure.  The relevance of this, of course, is that it

6   presents a significant fall risk.

7           This is a contributor to why these medications present

8   a 1.5 fold increase in all caused mortality and one example of

9   why this is particularly concerning to a man of Mr. Dear's

10  health and age.  A classic example is if Mr. Dear were to fall

11  and hit his head, we would be relying on prison staff to notice

12  and react timely.  Certainly there is a body of anecdotal

13  stories that we are all well aware of of people doing things in

14  their jail cells and it going unnoticed by staff.

15          One of the more serious side effects, although less

16  common, is the Neuroleptic Malignant Syndrome.  This can lead

17  to death.  QTC prolongation is another side effect of these

18  medications.  This hearing focused a lot on QTC prolongation,

19  but the reality is it does pose an increased risk in serious

20  cardiac death and a serious cardiac event.  This was confirmed

21  by Dr. Holland.

22          And it's particularly relevant here because although

23  Dr. Holland didn't think it concerning, there is at least one

24  abnormal QTC result.  There is also a history of abnormalities

25  that had to be treated during a hospitalization.  Although we

584

1   certainly don't know, but it raises the question of if Mr. Dear

2   had been taking these medications in 2018, would he experience

3   those metabolic abnormalities, what would the result have been.

4           I have a different take on Dr. Morton's testimony.  I

5   think Dr. Morton did his job.  As a psychiatric pharmacist, he

6   was tasked with reviewing the medical record and identifying a

7   risk.  He identified a risk that the government then hired

8   someone to take a second look at.  It was a risk that although

9   Dr. Holland downplays, it was a risk that Dr. Sarrazin never

10  considered.

11          I think we can accept that QTC prolongation is not a

12  risk factor for a lot of patients, younger patients, patients

13  with no cardiac history, but I urge the Court not to so

14  significantly downplay that risk as Dr. Holland ended up doing.

15  There was a reason that Dr. Holland included the

16  recommendations that he did for baseline testing and

17  monitoring.  Also although Dr. Holland as the practitioner

18  described the risk as low, Dr. Holland is not the patient who

19  must assume the risk.

20          Mr. Dear has Stage 3 chronic kidney disease which very

21  well could be organ damage from long-standing untreated

22  hypertension.  If that were to progress to the point where

23  dialysis is required, it places him at significant risk.  I

24  also think that in Dr. Morton's testimony, he did a good job of

25  painting a picture from the head to the toe of how these side

585

1    effects can very realistically show themselves.

2          I think that this factor also brings up the concept of

3    polypharmacy.  I would describe that polypharmacy here results

4    in a slippery slope of medications.  Dr. Sarrazin described,

5    which was supported by nearly all the experts, that the

6    treatment of side effects, many of them the common side

7    effects, requires treatment with adjunct medications, but in

8    his testimony he significantly underscored any of the risks

9    involved with those adjunct medications.

10         The reality here is that if we are forcing

11   antipsychotic medication on Mr. Dear, we are not only forcing

12   him to assume the risk of side effects which can be quite

13   serious, but we are also very likely forcing upon him a

14   continuum of adjunct medications which pose additional risk.

15   Again, these risks may not apply to all patients, but

16   Dr. Sarrazin didn't testify to an analysis of any of the

17   polypharmacy implications here.

18         He would treat side effects with benzodiazepine.

19   Dr. Woods testified that treatment of side effects with

20   anticholinergic medications carry a very high potential for

21   delirium.  His quote was red as a beet, mad as a hatter.  And

22   that delirium presents itself much differently in someone who

23   is 65 because of their age, their ability to metabolize, the

24   risk of an imbalance in blood pressure and the risk of fall.

25   Dr. Morton in his expertise as a psychiatric pharmacist agreed

1    that polypharmacy was a concern here.

2          The government talked about Mr. Dear's best medical

3    interest being in that antipsychotic medications would

4    alleviate distress or increase his quality of life as if

5    somehow those terms equate to best medical interest.

6    Dr. Preston Baecht testified he is in distress by those

7    beliefs.  He often shares them.  And to think that somebody is

8    trying to harm you, I think it would upset most people, so I

9    believe he is in distress.  She provided no evidence to support

10   her conclusion.

11         She testified that Mr. Dear couldn't go into an open

12   unit, not because of fear or distress, but because they thought

13   he would encourage other patients not to follow through with

14   their treatment plans.  This was contrasted by Dr. Martinez.

15   Dr. Martinez testified that Mr. Dear's psychotic symptoms are

16   not the kind that is causing him suffering, duress or

17   discomfort.

18         Another relevant issue to consider in assessing best

19   medical interest derives from the testimony of Dr. Sarrazin

20   that on February 23rd of 2022 he talked to Mr. Dear about

21   taking hypertensive medications.  This followed a time in which

22   Mr. Dear did cooperate with a blood pressure test that revealed

23   a result of 212 over 112.  I imagine that result was quite

24   concerning to the professionals at Springfield.  Dr. Sarrazin

25   described this as concerning to the extent that he conducted an

587

1    evaluation to assess whether Mr. Dear's refusal to take

2    antihypertensive medications, quote, reached the level of an

3    emergency under *Harper*, end quote.

4        After evaluating Mr. Dear, the professionals concluded

5    that Mr. Dear's refusal although, quote, unreasonable, end

6    quote, was not related to his delusional symptomatology.  This

7    is important because it is highly suggestive that Mr. Dear will

8    not suddenly just agree to take adjunct medications or

9    antihypertensive or other medications that may be recommended

10   to him simply because he was forced to take an antipsychotic.

11       Therefore, this quality of life argument that

12   Dr. Preston Baecht testified to won't turn out as she predicts.

13   And it further indicates that the Court is going to have to

14   force these type of medications upon Mr. Dear.  This idea

15   ignores the premise of *Sell* itself.  A *Sell* hearing is a last

16   resort to be used in rare and limited circumstances, and that

17   comes from the *Osborn* case in the 10th Circuit in 2019.

18       Here, we are proposing invading someone's body and

19   depriving them of a vital constitutional liberty.  That is

20   expressed in both *Sell* and *Harper*.  That is the premise from

21   which we need to start.  *Sell* presumes that because of mental

22   illness, Mr. Dear doesn't want to be medicated with

23   antipsychotic drugs. That's likely true.  He doesn't think he

24   is mentally ill, so he doesn't want to take an antipsychotic,

25   but this case, like many others, goes well beyond that premise.

1          It exposes the idea that the Court is taking away

2    Mr. Dear's medical agency, whether rudimental illness or not.

3    I am not sure *Sell* allows that.  That would require further

4    briefing.  But stripping Mr. Dear of all medical agency is

5    violative of his constitutional liberty interest.  In providing

6    someone with no medical agency is not in their best medical

7    interest.  People get to choose to reject medical

8    interventions.  Like Mr. Dear expressed, we are all going to

9    die.  He just exercised the choice when it comes to particular

10   medications to let God, quote, handle it.  That's not

11   delusional.

12          Mr. Dear has clearly exercised his medical agency in

13   his refusal to take medications like antihypertensives or

14   statins.  He is likely to similarly exercise medical agency in

15   his refusal not to participate and follow up in baseline

16   testing that would be required here.  I submit that the Court

17   should not strip him of all medical agency.

18          Over the last three days the defense experts testified

19   that the plan was not substantially likely to render Mr. Dear

20   to competency nor is it medically appropriate or in his best

21   medical interest.  I am not asking the Court to take my word

22   for it that there isn't clear and convincing evidence here.  I

23   am asking the Court to rely on very experienced experts who,

24   unlike the government, engaged in a truly individualized

25   analysis for Mr. Dear.

589

1          Thank you, Your Honor.

2          *THE COURT:*  Counsel, thank you.

3          Brief rebuttal by the government, Ms. Rhyne.

4                    **REBUTTAL ARGUMENT**

5          *MS. RHYNE:*  First, Your Honor, I disagree that the

6     government didn't provide individualized analysis.  As

7     Dr. Martinez stated, these medicines, he called them crude.

8     This is not the genetic targeting of a cancer.  We don't have

9     that amount of evolution such that we can take Mr. Dear's DNA

10    and give you scientific proof that these will work on him, but

11    we have taken the prognosis factors that exist.  And the

12    doctors have looked at Mr. Dear's factors.  They have analyzed

13    him as an individual.  They have analyzed the probability of

14    success of these medications on this treatment -- excuse me, on

15    this disorder.

16         And they have opined based on not just the

17    literature -- and Ms. Stricklin misunderstood when Dr. Sarrazin

18    and Dr. Preston Baecht said that these two articles were the

19    highest quality of available evidence.  They were referring to

20    the group of literature available.  Their own personal

21    experience isn't just anecdotal experience that she dismisses

22    and sets aside.  That is an additional body of evidence from

23    their personal experience to draw upon that shows this Court

24    that these medicines work, and they work for people with

25    delusional disorder and who have similar facets and factors

1    that Mr. Dear have.  But again, they very specifically did look

2    at the information available that was specific to Mr. Dear.

3         Second, Ms. Stricklin indicated that the best the

4    government offered the Court was that we could only expect a

5    partial recovery of Mr. Dear, and that is not what the evidence

6    suggests.  In fact, Exhibit 6 indicated that of the

7    defendant's -- excuse me, 5, of the defendants who were

8    restored, the 17 defendants who were restored, just several of

9    them only had partial improvement, but the government focused

10   on that because what we are aiming for is competency.  That's

11   what the Court has to decide and that doesn't require complete

12   recovery.  So again, she must have misunderstood that

13   testimony.

14        I think also it is not the case that the defense

15   presented a more individualized assessment of Mr. Dear, but

16   instead presented a strong bias against the medications and

17   certainly the medications on an involuntary basis.

18   Dr. Martinez strongly expressed his doubt that these

19   medications should ever be given on an involuntary basis

20   outside of the context of a *Harper* analysis where someone was

21   found to be a danger to themself or others.  That is a strong

22   bias that he has and it came through in his testimony.  He is

23   entitled to that bias, but it colors his opinions.

24        I want to take a moment and step back about the

25   government's first interest in timely prosecution.  Your Honor,

1    I submit that it is unfair to say that the government hasn't

2    done enough to timely prosecute this case.  Certainly it was

3    first charged by the State and four years later charged by the

4    Federal Government.  We are not here to litigate that.  But

5    from the moment this has been in federal courts, the government

6    has done its best to move this case forward efficiently and

7    timely.  The defense has asked for continuance after

8    continuance, and to use that as an argument against the

9    government's interest in prosecuting this case is unfair.

10            Now, this issue about negative symptoms, it isn't just

11   that Dr. Woods testified that there were a couple of

12   non-predominant things going on for Mr. Dear.  He said they

13   were these significant negative symptoms, that they were

14   significant enough that they would render him incompetent or

15   keep him incompetent even if these antipsychotic medications

16   resolved or reduced his delusions.  That is not consistent with

17   what Dr. Preston Baecht said and what Dr. Sarrazin said and

18   what the Cleveland Clinic's website said.  He doesn't have

19   significant negative symptoms.  That's what Dr. Preston Baecht

20   told you.  And if he did, she would have diagnosed him with

21   schizophrenia.

22            Of all of the experts, Drs. Preston Baecht and

23   Sarrazin have the most concrete applicable experience to tell

24   this Court whether these medications are substantially likely

25   to render Mr. Dear competent in the context of involuntary

1    medication.  It's their bread and butter.  They have been doing

2    this specific task for 20 years.  None of the other experts had

3    that experience.  While Dr. Martinez had some experience in the

4    restoration process, he admitted he does not work on

5    restoration cases on the day-to-day treatment of those

6    patients.  Instead, he gives opinions at various intervals and

7    on occasion meets with these defendants as a supervisor to

8    other people who are working with them.  He doesn't have the

9    same quality of experience to draw on that Dr. Sarrazin and

10   Dr. Preston Baecht do.

11        As far as the medical interest, the defense argues

12   that again the government has only presented generalized

13   evidence.  We hired a cardiologist who spent 30 hours studying

14   Mr. Dear's personal medical history.  That isn't generalized

15   evidence.  That is patient specific targeted medicine.  And

16   after that complete and thorough review, he told the Court

17   there were not concerns about Mr. Dear's medical history and

18   particularly any cardiac or cardiovascular concerns or concerns

19   about the kidney disease.  That's not generalized; again, very

20   very individual to Mr. Dear.

21        Ms. Stricklin also asked the Court to sort of opine

22   and imagine about the worst case scenarios including she tells

23   the Court that long-acting injectables will have to be used,

24   but Dr. Sarrazin told you that those would only be used after

25   his tolerance was tested with either the oral medications or

1    the short-acting injectables.  So it isn't the case we are

2    going to find out he has a poor reaction after he has been

3    given a long-acting injectable in the first instance.  That

4    simply isn't going to happen and it's something that

5    Dr. Sarrazin carefully accounted for in his treatment plan.

6         Now, Dr. Martinez did testify that he didn't believe

7    that Mr. Dear suffered as a result of his symptoms, but he also

8    told this Court that he hasn't met with Mr. Dear since 2016,

9    whereas Dr. Preston Baecht has met with him regularly between

10   May and November of 2021 when she was treating him.  Clearly

11   her knowledge of what he is going through is deeper based on

12   her personal interaction.  And I submit that her opinion has

13   more credibility because it has the substance to back it up.

14        And finally, the government continues to assert that

15   part of his best medical interest is not focusing on these very

16   extremely low probability side effects that might be serious,

17   admittedly serious, but so low probability that they should not

18   disturb the Court's analysis of these medicines.  Instead, it's

19   a much higher probability that while Mr. Dear does have medical

20   agency, it is clear that his untreated hypertension will cause

21   him medical issues and may well eventually cause him

22   life-threatening disease.

23        That is something that everyone agrees about.  It's

24   not a low probability.  It is a high probability, almost a

25   certainty.  And these antipsychotic medications may well help

1    him search out that treatment.  And while Ms. Stricklin says

2    that that's not likely because Dr. Sarrazin agreed that his

3    delusions weren't the root of his refusal to deny

4    antihypertensive medication, at least on that one meeting, he

5    also testified that despite that he still believed that these

6    medicines would encourage him to take a different approach to

7    his health because that's something that had been observed.  It

8    wasn't tied to his decision making being caused by his

9    delusions.  So her own opinion in drawing out that that

10   conclusion doesn't bear out because that is not what the

11   experts said.

12          We would ask that the Court find that the government

13   did meet its burden of proving the *Sell* factors by clear and

14   convincing evidence and order that Mr. Dear be involuntarily

15   medicated with the proposed antipsychotic medications with the

16   treatment plan.

17          *THE COURT:*  Counsel, thank you.

18          The issue is raised by and inherent to these

19   proceedings are now joined.  They are cognizable.  I take the

20   matter under advisement.  I will issue my written order as soon

21   as practicable.

22          To those involved in my 2:30 p.m. docket, we will

23   convene on the record at approximately 3:10 p.m., so please

24   plan accordingly.  Presuming there to be no additional business

25   before the Court in this matter, counsel, thank you.  Please

1    close the record.  The Court is in recess.

2         (Recess at 2:53 p.m.)

3                              INDEX

4    Item                                              Page

5    WITNESSES

6       Richard Peter Martinez

7            Direct Examination Continued By Ms. Beck    455

8            Cross-examination By Ms. Rhyne              500

9            Redirect Examination By Ms. Beck           541

10   CLOSING ARGUMENT

11      By Ms. Rhyne                                    547

12      By Ms. Stricklin                                568

13      Rebuttal Argument By Ms. Rhyne                  589

14                     REPORTER'S CERTIFICATE

15       I certify that the foregoing is a correct transcript from

16   the record of proceedings in the above-entitled matter.  Dated

17   at Denver, Colorado, this 27th day of November, 2022.

18

19                              S/Janet M. Coppock

20

21

22

23

24

25